IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, 501 Third Street, N.W. Washington, DC  20001,  ) ) ) ) ) | |
| Plaintiff,  ) | Civil Action No. _____ |
| ) | |
| v.  ) | Expedited Hearing |
| ) | Requested |
| PENSION BENEFIT GUARANTY CORPORATION, 1200 K Street, N.W. Washington, DC  20005,  ) ) ) ) ) | |
| Defendant.  ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION
OF ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO**

Plaintiff Association of Flight Attendants-CWA, AFL-CIO ("AFA"), hereby submits its memorandum in support of its motion for a preliminary injunction. AFA, which represents the over 15,000 Flight Attendants employed by United Airlines ("United," the "Debtors," or the "Company"), brings this action to enjoin the Pension Benefit Guaranty Corporation ("PBGC," the "Agency," or the "Corporation") from instituting proceedings to involuntarily terminate the defined benefit pension plan of United Airlines Flight Attendants ("Flight Attendant Plan" or "Plan") in violation of Sections 4041 and 4042 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 et seq., 29 U.S.C. §§ 1341 & 1342.

This action arises out of an unlawful, <u>ultra vires</u> agreement (the "Agreement" or "Settlement") between PBGC and United to terminate the Flight Attendant Plan.    PBGC is the federal government agency that administers the termination insurance program for defined benefit pension plans under Title IV of ERISA. United has managed its assets and operated its businesses under Chapter 11 protection since December 2002.    In approving the Agreement, the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") expressly held that challenges to the PBGC's treatment of the Flight Attendant Plan were not affected by the Bankruptcy Court's ruling and should be brought as independent claims against PBGC under Section 4003 of ERISA.

The Agreement at issue here provides that United will pay PBGC $1.5 billion in securities and, in exchange, the PBGC will terminate United's defined benefit plans, including the Flight Attendant Plan.    The Agreement also settles the claims against the Debtors asserted by PBGC, as a creditor; ends negotiations between United and AFA over the Company's proposed termination of the Flight Attendant Plan; and denies AFA judicial scrutiny of United's purported need to terminate the Flight Attendant Plan.

By agreeing to terminate the Plan, PBGC reverses its long-standing and steadfast position that United could achieve a successful reorganization without taking this step.    Undoubtedly, the benefits of its $1.5 billion bargain with United convinced PBGC to terminate the Flight Attendant Plan when for many months it had

considered that action to be unnecessary and avoidable. As reflected in pleadings to the Bankruptcy Court, testimony from the PBGC's financial advisor, and statements from its Executive Director, PBGC unequivocally endorsed and actively supported AFA's effort to prevent United from terminating the Plan. In fact, the Agency concedes that the only difference in the circumstances that existed before and after April 22, the date it signed the Agreement, was the Agreement itself; that <u>but</u> <u>for</u> a $1.5 billion payment it would not have altered its stance that the Flight Attendant Plan should be maintained. As we show below, the most notable trade dictated by the Agreement, however, is that in exchange for United's largesse, PBGC will repudiate the processes and protections of ERISA.

ERISA provides two basic methods for terminating a plan. The first, under Section 4041, is initiated by the employer and cannot be processed by PBGC if termination would violate a term of a collective bargaining agreement. The second procedure, which is initiated by PBGC under Section 4042, is referred to as an involuntary termination and can proceed despite the provisions of a collective bargaining agreement; however, PBGC is still required to determine that termination is warranted based upon the standards set forth in Section 4042(a). Once the PBGC makes such a determination, it can accomplish the actual termination, with the consent of the employer, or absent such agreement, by commencing judicial proceedings to obtain a court order.

As demonstrated below, PBGC is pursuing a third and unlawful course to terminate the Flight Attendant Plan that violates two fundamental provisions of ERISA. First, in violation of Section 4041 which governs employer-initiated terminations, PBGC is undertaking the involuntary termination of the Flight Attendant Plan, when the termination was, in fact initiated by United and not PBGC. Since termination of the Flight Attendant Plan was initiated by United, PBGC cannot, under Section 4041, terminate the Plan, since Section 4041's contract bar prohibits it from doing so. By ignoring the fact that United has initiated the termination, PBGC, unless enjoined, will unlawfully pursue an involuntary termination of the Flight Attendant Plan, circumventing ERISA's contract bar in the process.

Second, even assuming that this termination can be construed as one that has been initiated by PBGC, the Corporation is proceeding without having made the requisite determination under Section 4042. Instead of complying with the clear dictates of ERISA, PBGC is adhering to the terms of the Agreement which compel it to involuntarily terminate the Flight Attendant Plan. Unless enjoined, PBGC will violate ERISA by terminating a pension plan based upon a private agreement with an employer entered into before it has independently concluded that termination is necessary.

As we demonstrate below, AFA has satisfied each of the prongs of the test for injunctive relief. First, there is a substantial likelihood of success on the merits because PBGC has plainly violated Sections 4041 and 4042 of ERISA. Second, Flight

-4-

Attendants will be irreparably harmed if an injunction does not issue because they will make decisions, with irreversible effects, regarding whether to continue their employment with United on the basis of benefits that would be available to them upon termination. Third, far from injuring PBGC, an injunction will ensure that the Agency merely follows the explicit mandates of ERISA for achieving plan termination. Finally, an inunction serves the public interest because the issues regarding the security of private pension benefits raised by this case have tremendous public import. It is a critical element of sound public policy that PBGC follow the mandates of ERISA in making its decision to terminate a pension plan.

## STATUTORY FRAMEWORK

Under Title IV of ERISA, termination of a defined benefit plan by PBGC may be initiated by either the employer-sponsor (in this case, United) or PBGC itself.

## I. Employer-Initiated Termination.

Under Section 4041, which governs voluntary or employer-initiated termination, PBGC cannot proceed with a plan termination unless the employer meets certain statutory requirements. First, PBGC is prohibited from "proceed[ing] with a termination of a plan ... if the termination would violate the terms and conditions of [the] existing collective bargaining agreement." 29 U.S.C. § 1341(a)(3). This is what is commonly referred to as the "contract bar." Absent a settlement between the employer and the union, the contract bar remains in force, suspending termination proceedings

processes until the term of the collective bargaining agreement creating the bar is removed either by a final court order not subject to appeal or by a final order that is not appealed. 29 C.F.R. § 4041.7(e).

To remove the provision in a collective bargaining agreement that establishes a pension plan, a Chapter 11 debtor, like United, must satisfy the requirements of Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113. This provision of the Code, governing modification of a collective bargaining agreement, expressly forbids a debtor-in-possession from unilaterally modifying a collective bargaining agreement without complying with Section 1113's substantive and procedural requirements. See 11 U.S.C. § 1113(f); see also Adventure Res., Inc. v. Holland, 137 F.3d 786, 796 (4th Cir. 1998); In re Alabama Symphony Ass'n, 211 B.R. 65, 70-71 (N.D. Ala. 1996).[1]

If the contract bar is removed, termination proceeds under Section 4041 either as a standard termination or a distress

_____

[1] The procedural and substantive requirements of Section 1113 are set forth in Section 1113(b) and (c). Section 1113(b) requires the debtor to propose only modifications that are necessary for a successful reorganization and fair and equitable to all the parties and to negotiate in good faith with its unions over its proposed modifications. See 11 U.S.C. § 1113(b). Should negotiations fail, 1113(c) provides unions with judicial review of the negotiations and the necessity and fairness of the proposed contract modifications. See 11 U.S.C. § 1113(c). Under Section 1113(c), the bankruptcy court is precluded from authorizing rejection of a collective bargaining agreement unless it finds that: (1) the debtor has negotiated in good faith with its unions over necessary and equitable modifications; (2) the unions did not have good cause to refuse to accept the debtor's proposed modifications; and (3) "the balance of the equities clearly favors rejection." 11 U.S.C. § 1113(c)(1)-(3).

termination. Under a standard termination, the employer is solvent and the plan has sufficient assets to meet all "benefit liabilities" and plan assets are distributed to the beneficiaries. 29 U.S.C. § 1341(b).

Under a distress termination, the employer is a Chapter 11 debtor and plan funding may be insufficient to cover all benefit liabilities. PBGC may proceed with a distress termination only if it determines that the statutory requirements for a distress termination have been met. 29 U.S.C. § 1341(c)(2)(B). Most significantly, for PBGC to proceed with a distress termination, Section 4041(c)(2)(B)(ii)(IV) requires a finding by the bankruptcy court that "unless [the employer's] plan is terminated [it] will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process." 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).[2] Only after PBGC "determines that the requirements for a distress termination ... are met" can the Corporation implement plan termination. 29 U.S.C. § 1341(c)(A)-(B).

## II. PBGC-Initiated Termination.

Under Section 4042 of ERISA, PBGC may institute termination proceedings on its own initiative, in what is commonly referred to as an involuntary termination. To proceed with an involuntary termination, PBGC must first make an independent cause determination that the plan should be terminated. See 29 U.S.C. §

---

[2] Sections 4041(b) and 4041(c) "constitute the sole avenues for voluntary termination." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 446 (1999).

1442(a).  Under Section 4042(a), PBGC may "institute proceedings ... to terminate a plan" only where it determines:

> (1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under Section 4971(a) of Title 26;

> (2) the plan will be unable to pay benefits when due;

> (3) the reportable event described in section 1343(c)(7) of this title has occurred; or

> (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342(a)(1)-(4).  Further, Section 4042 requires that PBGC institute termination proceedings where it "determines that the plan does not have assets available to pay benefits which are currently due under the terms of the plan."  29 U.S.C. § 1342(a). In any event, PBGC may proceed with an involuntary termination only after it has made one of the five cause determinations under 4042(a).  Because an involuntary termination is initiated by PBGC, independent of the employer, the requirements of Section 4041, including removal of the contract bar and satisfaction of the distress termination criteria, do not apply.  As noted above, however, PBGC is prohibited from processing an employer-initiated termination under Section 4042, unless the employer has satisfied the requirements of Section 4041 -- namely removing the contract bar and meeting the distress termination criteria.

## STATEMENT OF FACTS

On November 25, 2004, the Debtors moved the Bankruptcy Court for authority to reject their collective bargaining agreements, pursuant to Section 1113(c) of the Bankruptcy Code, 11 U.S.C. § 1113(c). Specifically, United sought authority "to eliminate any provisions in [its] CBAs that would prohibit a distress termination of the Company's [four] pension plans" -- the Pilot Plan, the Flight Attendant Plan, the Union Ground Plan, and the Management, Administrative and Public Contact Employee ("MAPC") Plan. Babcock Decl., Exh. A at 73. Section 34(1) of AFA's collective bargaining agreement with United expressly bars "[t]he Company" from "reduc[ing]" "benefits provided in the Retirement Plans ... without the prior agreement of the Union." Davidowitch Decl., Exh. A. United proposed replacing the Flight Attendant Plan with a 3% defined contribution plan. In addition to seeking the removal of the contract bar to plan termination, the Debtors demanded $725 million in average annual concessions from its unions, including $135 million from AFA through 2010 -- the term of United's restructuring business plan. See id. ¶ 3.

On December 16, the Air Line Pilots Association ("ALPA") reached a settlement with United over the Section 1113 modifications to its collective bargaining agreement. As part of that settlement, ALPA agreed to waive the contract bar in its collective bargaining agreement, not to oppose United's distress termination of the Pilot Plan, and to establish that the

termination date of the Pilot Plan would not be earlier than April 2005.

On December 29, PBGC issued a Notice of Determination that the Pilot Plan should be terminated involuntarily and PBGC should be appointed as the plan's statutory trustee, pursuant to ERISA Section 4042. On December 30, PBGC filed a complaint with the Bankruptcy Court, seeking an order terminating the pilots' plan, appointing PBGC as the statutory trustee of the plan, and establishing the plan's termination date as December 30.

In contrast to the Pilot Plan, prior to the Agency's eventual settlement with United, PBGC vigorously opposed termination of the Flight Attendant Plan. On January 4, 2005, PBGC filed an Objection to the Debtors' Section 1113(c) Motion, specifically disputing United's contention that it had to terminate all of its plans in order to reorganize successfully. PBGC asserted that "it [was] clear that United can reorganize in Chapter 11 and maintain one or more of its Pension Plans." Babcock Decl., Exh. B at 11. Specifically, PBGC found that the Flight Attendant Plan is "affordable in a variety of scenarios." Id. at 20-27. According to PBGC's expert, Michael Kramer, "the Company has sufficient liquidity and free cash flow to support at least one of the Pension Plans currently in place, namely the F[light] A[ttendant] plan ..." Id., Exh C ¶ 8.

On January 8, 2005, AFA and United reached a tentative agreement regarding wage and other concessions, providing the Company with $130 million in additional annual savings between 2005

and 2010 ("2005-2010 Agreement").  <u>See</u> Davidowitch Decl. ¶ 4.  In a side letter to the 2005-2010 Agreement, AFA and United agreed to "continue to meet and confer regarding the Defined Benefit Plan." <u>Id.</u>, Exh. B.  The 2005-2010 Agreement was subsequently ratified by Flight Attendants and approved by the Bankruptcy Court on January 31.  <u>See</u> <u>id.</u> ¶ 5.

Even before the 2005-2010 Agreement was ratified and approved, AFA initiated discussions with PBGC, seeking to enlist the Agency in its effort to find alternative funding for the Flight Attendant Plan and avoid termination.  At a January 27, 2005 meeting with AFA, PBGC indicated that it was ready and willing to explore a wide range of options to the distress termination proposed by United. <u>See</u> <u>id.</u> ¶ 6.

On March 10, as PBGC was continuing to support AFA in its effort to avoid termination of the Flight Attendant Plan, the Corporation issued a Notice of Determination that the Ground Plan should be terminated.  On March 11, the day after issuing its Notice of Determination, as it had with the Pilot Plan, PBGC filed a complaint (in this case, in the Eastern District of Virginia) seeking an order terminating the Ground Plan.

During February and March of 2005, as AFA developed its proposal for alternative plan funding, it consulted regularly with PBGC, which continued to be receptive to AFA's ideas for avoiding a distress termination of the Flight Attendant Plan.  <u>See</u> <u>id.</u> ¶¶ 6-9.

In a March 30 letter to Bradley Belt, the Executive Director of PBGC, AFA described its proposal to keep the Flight Attendant Plan intact. <u>See id.</u> ¶ 10, Exh. C. Earlier the same day, AFA had sent to PBGC a formal term sheet for its proposal. <u>See id.</u> ¶ 10, Exh. D. In his April 4 reply, Belt characterized AFA's proposal as "constructive" and reiterated the Agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11." <u>Id.</u>, Exh. E. Mr. Belt added that: "Based upon available information, we continue to believe that the interests of the participants and the pension insurance program would best be served by the continuance of the AFA Plan." <u>Id.</u> In closing, he encouraged further work between the Agency and AFA to resolve the pension funding issue. <u>See id.</u>

On April 11, pursuant to a scheduling order entered by the Bankruptcy Court on January 31, United re-filed its Section 1113(c) motion, seeking authority to reject its collective bargaining agreements' contractual bar to a distress termination and the unions, including AFA, re-filed their objections to the motion. Also, as provided by the scheduling order, United sought judicial determination that it had satisfied the requirements for a distress termination under Section 4041(c). If United were unable to reach agreements with its unions, a pre-trial hearing would occur on May 10, with an evidentiary hearing to follow the next day.

On April 14, PBGC filed an emergency motion to postpone consideration of United's motion for distress terminations of its defined benefit plans, calling United's motion "premature" and

arguing that the Company had failed to show that the plans were not salvageable.  <u>See</u> Babcock Decl., Exh. D.  PBGC explained that, until United "provide[s] an updated business plan ... and file[s] its plan of reorganization ... PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy."  <u>Id.</u> at 5-6.

Also on April 14, United issued notices of intent to terminate the Flight Attendant Plan and the MAPC Plan, pursuant to Section 4041(c), notifying plan participants that June 30, 2005 was the termination date for both plans.

Then, on April 22, United announced that it had reached an agreement with PBGC, which would result in the termination of all four defined benefit plans.  Pursuant to the Agreement, United is to provide three tranches of securities with a total value of $1.5 billion, ($500 million of which is contingent on United achieving certain financial targets), to PBGC in exchange for PBGC terminating the four pension plans and settling certain other claims.  <u>See id.</u> Exh. E at 1-8.

By the terms of the Agreement, PBGC agrees that "[a]s soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement ... PBGC staff will initiate termination under [Section 4042,] 29 U.S.C. § 1342 of the Flight Attendant ... Plan[]."  <u>Id.</u> ¶ 4(a).  Finally, while the Agreement ostensibly purports to require PBGC only to initiate the involuntary termination process, plan termination is an express, material condition of the agreement.  <u>Id.</u> ¶ 16(a).

On April 27, the Debtors filed a motion with the Bankruptcy Court, seeking an order approving the Agreement.

On May 11, after a hearing on the Debtors' motion, the Bankruptcy Court entered an order approving the Agreement.  Upon the Agreement's approval, negotiations under Section 1113 of the Bankruptcy Code ended, judicial scrutiny of these negotiations was avoided, and the need for a distress termination hearing required by Section 4041 was eliminated.

On May 19, USAToday reported that, according to a PBGC spokesperson, the Agency "still believes it would be best for the flight attendants and the government if United kept the [P]lan." Id., Exh. F.

Significantly, at the hearing on the Debtors' motion, the Bankruptcy Court recognized that:

> the important thing is that if [PBGC] were to act in an inappropriate way, if it were to take action that's not authorized by the statute in seeking involuntary termination of a pension plan, the [A]gency would be subject to a lawsuit under Section 1303 [29 U.S.C. § 1303] to have its decision reviewed by a court.

Id., Exh. G at 187:21-188:2.  The Bankruptcy Court's written order underscored this concern, providing that "[a]ggrieved parties have their rights under Section 4003(f) of ERISA, 29 U.S.C. § 1303(f), to bring actions against PBGC to challenge the propriety of its actions under ERISA." Id., Exh. H at 2.

Section 4003 specifically provides jurisdiction and venue in this Court, 29 U.S.C. § 1303(f)(3), and Section 4070 allows a

collective bargaining representative to sue for injunctive relief to prevent prospective violations. 29 U.S.C. § 1370.

As a result of the Bankruptcy Court's approval of the Agreement terminating the Flight Attendant Plan, many Flight Attendants will make decisions, with irreversible consequences, regarding whether to continue their employment with United on the basis of the benefits available to them upon termination of the Flight Attendant Plan and replacement with a defined contribution plan. See Davidowitch Decl. ¶ 13. As Flight Attendants are well aware, Plan termination and replacement with a defined contribution plan will result, on average, in a 50% decrease in retirement benefits. See id. ¶ 12. Since November, when the Company proposed Plan termination, approximately 100 Flight Attendants have informed AFA that they intend to resign or retire from United if the Plan is terminated. See id. Many more Flight Attendants, undoubtedly, will leave United if the Flight Attendant Plan is terminated based on the substantial diminution of their overall compensation. See id. ¶ 13.

Many of the consequences of retiring or resigning cannot be reversed. First, Flight Attendants who voluntarily retire or resign and then seek reinstatement will have forfeited their seniority, when and if United rehires them. Further, retirement or resignation, especially when not anticipated, often involves significant lifestyle changes, including relocation, sometimes to pursue other work opportunities. See id. ¶ 14.

## ARGUMENT

**THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION ARE MET.**

A court considering a plaintiff's request for a preliminary injunction must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction. Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998)(citation omitted). Notably, "[t]hese factors interrelate on a sliding scale and must be balanced against each other"; therefore, "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. (citation omitted).

An injunction stopping PBGC from initiating the involuntary termination process should issue here. First, AFA has a substantial likelihood of succeeding on the merits because the settlement agreement violates ERISA in two ways: (1) PBGC is impermissibly undertaking the involuntary termination of the Flight Attendant Plan at the behest of United, in violation of Section 4041; and (2) PBGC effectively has terminated the Flight Attendant Plan by settlement without first having made a cause determination, in violation of Section 4042.

Second, AFA will suffer irreparable injury if an injunction does not issue because its Flight Attendants will make decisions regarding whether to continue their employment with United on the

-16-

basis of the benefits available to them upon termination and replacement of the Plan, as opposed to the benefits available under their current Plan.  It will not be possible to reverse the effects of these decisions after a judgment on the merits.

Finally, it will not injure PBGC to ensure that it follows the explicit mandates of ERISA in achieving plan termination.  To the contrary, those provisions were enacted by Congress to further the public interest.

**I.  AFA WILL SUCCEED ON THE MERITS BECAUSE THE SETTLEMENT INDEPENDENTLY VIOLATES BOTH SECTIONS 4041 AND 4042 OF ERISA.**

The Supreme Court has emphatically stated that, although PBGC has considerable leeway in determining whether to terminate or restore a pension plan under ERISA, it still must comply with the unambiguous terms of the statute in making its determinations:

> [t]he statute does not direct the PBGC to make ... decisions that further the 'public interest' generally, but rather empowers the agency to [make determinations that] further the interests that Title IV of ERISA is designed to protect. Given this specific and unambiguous statutory mandate, we do not think that the PBGC did or could focus "inordinately" on ERISA in making its restoration decision.

PBGC v. LTV Corp., 496 U.S. 633, 646 (1990).  As a creature of statute, PBGC was without authority to enter into a private agreement that supersedes the termination provisions of Title IV. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125-26 (2000)("although agencies are generally entitled to deference in the interpretation of statutes that they administer, a reviewing 'court as well as the agency, must give effect to the unambiguously expressed intent of Congress'"), quoting, Chevron U.S.A. Inc. v.

<u>Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984); <u>MCI Telecommunications Corp. v. AT & T</u>, 512 U.S. 218, 229 (1994)("an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear")(citations omitted); <u>Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.</u>, 29 F.3d 655, 670 (D.C. Cir. 1994), <u>cert. denied</u>, 514 U.S. 1032 (1995)("it is beyond cavil that 'an agency's power is no greater than that delegated to it by Congress'")(citation omitted); <u>United States v. Amdahl Corp.</u>, 786 F.2d 387, 392-93 (Fed. Cir. 1986)("[a]dministrative actions taken in violation of statutory authorization or requirement are of no effect")(citation omitted).

**A.    PBGC Has Exceeded Its Statutory Authority Under Section 4041 of ERISA by Agreeing to Process the Company-Initiated Termination of the Flight Attendant Plan When United Has Not Satisfied the Requirements of Section 4041.**

PBGC has exceeded its statutory authority under Section 4041 by agreeing -- at United's behest -- to initiate an involuntary termination of the Flight Attendant Plan without requiring United to first satisfy the requirements of Section 4041. As we show below, it is the employer, United, that, in fact, initiated the termination of the Plan, the Corporation's invocation of Section 4042 notwithstanding. Therefore, PBGC is prohibited from proceeding with termination, unless the United has satisfied the requirements of Section 4041 -- including removing the contract bar and meeting the distress termination criteria. <u>See</u> 29 U.S.C. §§ 1341(a)(3)&(c)(3). It is undisputed, however, that United has not satisfied either of those statutory requirements with regard to the

Flight Attendant Plan. Accordingly, Section 4041 plainly forbids PBGC from proceeding with termination of the Plan.

> **1. There can be no doubt that the termination of the Flight Attendant Plan was initiated by United and United alone.**

To begin with, the terms of the Agreement leave no doubt that it is United, and not PBGC, that initiated termination of the Flight Attendant Plan. The consideration exchanged between the parties, specifically the $1.5 billion in securities, requires PBGC to "initiate termination [of the Flight Attendant Plan] under [Section 4042,] 29 U.S.C. § 1342." Babcock Decl., Exh. E ¶ 4(a). If PBGC were to contend that this was not the effect of the settlement and it was merely doing what it otherwise can do under ERISA, the Agreement would be mere surplusage.

The purpose of the Agreement is clearly to effectuate the termination of United's defined benefit plans, initiated by the Company back in November 2004, without subjecting United to the requirements of Section 4041. That this is the purpose of the Agreement is evidenced by a stipulation between United and PBGC, approved by the Bankruptcy Court on May 2, which provides that "[i]n the event that the Court [did] not approve the [Agreement] United reserve[d] all rights to move, on an emergency basis, for an expedited discovery and hearing schedule on its Voluntary Distress Termination Motion." Id., Exh. I at 2. As the stipulation demonstrates, United and PBGC understood full well that, but for the Agreement, United is subject to the requirements of Section 4041. The Agreement, thus, enables United to bypass the

requirements of Section 4041 by inducing PBGC to terminate the
Flight Attendant Plan under Section 4042.

Further, there is absolutely no indication that PBGC intended
to initiate termination under Section 4042 prior to the Agreement.
Instead, Michael Kramer, PBGC's own expert, testified on May 5,
almost two weeks <u>after</u> the Agreement was announced, that he
continues to "stand by [his December 28, 2004] declaration," <u>id.</u>,
Exh. J at 31:23, where he asserted that "the Company has sufficient
liquidity and free cash flow to support at least one of the Pension
Plans currently in place, namely the F[light] A[ttendant] plan..."
<u>Id.</u>, Exh. C ¶ 8.  According to Kramer, the only thing that has
changed "that leads the PBGC to conclude that the AFA pension plan
should be terminated" is that PBGC and United have reached "a
negotiated settlement." <u>Id.</u>, Exh. J at 116:23-117:9.  Nowhere has
PBGC ever claimed that it was anything other than the $1.5 billion
in consideration provided by United that caused the Corporation to
invoke Section 4042 vis-a-vis the Flight Attendant Plan.

To the contrary, prior to receiving $1.5 billion from United,
PBGC steadfastly opposed termination of the Flight Attendant Plan.
In its January 4, 2005 opposition to United's 1113(c) Motion, PBGC
stated that the Flight Attendant Plan was "affordable" and could be
"retained in a successful reorganization." <u>Id.</u>, Exh. B at 20.
This paralleled the conclusion of PBGC's own expert that "the
Company has sufficient liquidity and free cash flow to support at
least one of the Pension Plans currently in place, namely the
F[light] A[ttendant] plan." <u>Id.</u>, Exh. C ¶ 8.  Throughout February

-20-

and March, AFA consulted regularly with PBGC, which encouraged its efforts to identify alternative sources of savings so that termination of the Flight Attendant Plan could be avoided.  <u>See</u> Davidowitch Decl. ¶¶ 6-9.

Indeed, PBGC was highly receptive to AFA's proposal for saving the Flight Attendant Plan, which identified sufficient alternative funding to avoid Plan termination.  <u>See id.</u> ¶¶ 9-10, Exh. C.  In an April 4 letter, PBGC Executive Director Belt called AFA's proposal "constructive" and reiterated the Agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11."  <u>Id.</u>, Exh. E.

On April 14, PBGC filed an emergency motion to postpone consideration of the Company's motion for distress termination of its defined benefit plans, calling United's motion "premature" and arguing that United had failed to show that the plans could not be salvaged.  <u>See</u> Babcock Decl., Exh. D at 1-7.  As to United's defined benefits plans generally, PBGC explained that, until United "provide[s] an updated business plan ... and file[s] its plan of reorganization ... PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy."  <u>Id.</u> at 5-6.

Thus, the only intervening event between April 14, when PBGC stated that any termination of United's defined benefit plans would be "premature," and April 22, when PBGC agreed to "initiate termination [of the Flight Attendant Plan] under [Section 4042,] 29 U.S.C. § 1342," <u>id.</u>, Exh. E ¶ 4(a), was the $1.5 billion the

Company offered PBGC in exchange for the Corporation initiating an involuntary termination under Section 4042, thereby removing the contract bar and exempting United from compliance with the requirements for a distress termination.

As the record makes crystal clear, termination of the Flight Attendant Plan was initiated by United. Simply put, but for the actions of United, PBGC would not have begun the termination process.

> **2. Because United, and not PBGC, initiated termination of the Flight Attendant Plan, but has neither obtained a court order removing the contract bar in AFA's collective bargaining agreement nor satisfied the requirements for a distress termination, PBGC is prohibited, by Section 4041 from processing termination of the Plan.**

PBGC is prohibited from proceeding with an employer-initiated termination of a plan, unless the contract bar is removed, pursuant to Section 4041(a)(3), and the employer satisfies the requirements of a distress termination, pursuant to Sections 4041(b)-(c).

As PBGC itself has acknowledged, Section 4041 "prohibit[s]" the agency "from proceeding with a company-initiated termination ... if the termination would violate the terms and conditions of a collective bargaining agreement." Id., Exh. K at 14.

As United itself has recognized, there are only two ways to remove the contract bar, "either [by] obtain[ing] the consent of the ... union(s) ... or [by] secur[ing] an order authorizing the rejection of the CBA pursuant to Section 1113 of the Bankruptcy Code." Id., Exh. A at 40. United has done neither. It is undisputed that United has not obtained court authorization to

remove the contract bar. Indeed, according to United one of the principal purposes of the Agreement was to avoid "the risks associated with litigating a sharply contested ERISA Section 4041 sponsor-initiated distress termination ... together with the Section 1113(c) trial." Id., Exh. L at 18.

Nor has United obtained the consent of AFA to remove the contract bar. Again, as United recognizes, absent a court order, it "must ... obtain the consent of the ... union" to remove the contract bar. Id., Exh. A at 40. Further, the pertinent regulations make clear that only "the parties" -- i.e. the union and the employer -- can "enter into a settlement that" removes the contract bar. 29 C.F.R. § 4041.7(e)(1). This is what happened when ALPA, as part of its concessionary agreement with the Company, reached a settlement with United removing the contract bar in the Pilots' collective bargaining agreement. Here, however, in a patently ultra vires action that cannot be allowed to stand, PBGC has supplanted AFA, reaching a settlement with United, to which AFA is no way a party, that removes the contract bar in the Flight Attendants' collective bargaining agreement and dispenses with a distress termination hearing. Indeed, United has plainly stated, the purpose of the Agreement was to avoid the need to satisfy those requirements. See Babcock Decl., Exh. L at 18.

In conclusion, as we demonstrate above, the termination of the Flight Attendant Plan now being processed by PBGC was initiated by United, PBGC's invocation of Section 4042 notwithstanding. Since it was company-initiated, termination of the Flight Attendant Plan

is prohibited, under Section 4041, unless and until United removes the contract bar, pursuant to Section 4041(a)(3), and satisfies the requirements for a distress termination, pursuant to Section 4041(c). As it is undisputed that United has not met either of these conditions for an employer-initiated termination of the Flight Attendant Plan, PBGC is clearly exceeding its statutory authority as long as it continues to process the termination of the Plan.

**B.    The Settlement Violates ERISA Section 4042 Because United Obtained PBGC's Agreement to Involuntarily Terminate the Flight Attendant Plan Prior to PBGC Making the Independent Cause Determination Required by Section 4042(a).**

ERISA unambiguously and without exception requires PBGC to make an independent cause determination under Section 4042(a) prior to commencing the involuntary termination process. Accordingly, PBGC must make this cause determination before entering into a settlement with a plan administrator, and any settlement that involuntarily terminates a plan before PBGC has made this determination is illegal. See, Allied Pilots Ass'n v. PBGC, 334 F.3d 93, 97 (D.C. Cir. 2003). As demonstrated below, that is precisely what happened here: in exchange for $1.5 billion, PBGC entered into an agreement to involuntary terminate the Flight Attendant Plan before making an independent cause determination -- in clear violation of ERISA § 4042.

**1.    PBGC may not involuntarily terminate a plan pursuant to the terms of a private settlement agreement.**

The plain language of Section 4042(a) requires PBGC to make a cause determination at the outset of the involuntary termination process.[3/]  Courts have repeatedly held that this language makes a cause determination an initial, necessary prerequisite for all involuntary plan terminations.  See, e.g., Allied Pilots Ass'n, 334 F.3d at 97; PBGC v. Heppenstall Co., 633 F.2d 293, 296-97 (3d Cir. 1980); Air Line Pilots Ass'n Int'l v. PBGC, 193 F.Supp. 2d 209, 219 (D.D.C. 2002); Addison v. United Airlines, Inc., No. 85 C 6177, 86 C 2830, 1988 WL 9100 at *3 (N.D.Ill. Feb. 2, 1988).  As a result, PBGC may not involuntarily terminate plans "based on factors other than the ERISA criteria" and it certainly cannot "terminat[e] a plan based on the terms of a non-statutory, private law agreement." Allied Pilots Ass'n, 334 F.3d at 96.

_____

[3/]    Section 4042 reads, in pertinent part:

(a) Authority to institute proceedings to terminate a plan

The corporation [PBGC] may institute proceedings under this section to terminate a plan whenever it determines that--
(1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under section 4971(a) of Title 26,
(2) the plan will be unable to pay benefits when due,
(3) the reportable event described in section 1343(c)(7) of this title has occurred, or
(4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

The holding in <u>Allied Pilots</u> is particularly instructive here. In <u>Allied Pilots</u>, PBGC made a cause determination under Section 4042(a)(4) during the Trans World Airlines ("TWA") bankruptcy that its long-run liability was going to increase unreasonably if TWA's defined benefit pilots' plan was not terminated.   <u>See Air Line Pilots Ass'n Int'l v. PBGC</u>, 193 F.Supp. 2d at 219, <u>aff'd Allied Pilots Ass'n v. PBGC</u>, 334 F.3d at 97.  PBGC thereafter entered into a settlement agreement with the plan administrator and the unions that provided for future involuntary termination on the occasion of certain "Significant Events."  334 F.3d at 95.  When a "Significant Event" occurred eight years later, the pilots' union brought suit, arguing that the settlement agreement (to which it was a signatory), violated ERISA.  <u>Id.</u>

The district court held, however, that PBGC is free to enter settlement agreements covering involuntary plan terminations -- including agreeing to involuntary plan terminations that take place after a future defining event -- <u>provided  it first makes an original, independent cause determination under Section 4042(a)</u>. <u>See Air Line Pilots Ass'n Int'l</u>, 193 F.Supp. 2d at 219.   The District of Columbia Circuit affirmed on appeal, holding:

> ERISA, which authorizes the PBGC to terminate a plan 'whenever it determines that' one of four criteria is met, 29 U.S.C. § 1342(a), imposes no procedural strictures on the PBGC other than requiring it to 'issu[e] a notice ... to a plan administrator [that the PBGC] has determined that the plan should be terminated' <u>before seeking</u> either district court enforcement or voluntary settlement, <u>id.</u> § 1342(c).

<u>Allied Pilots Ass'n</u>, 334 F.3d at 97 (emphasis added).

The exact opposite sequence of events occurred here. PBGC entered into a settlement to terminate the Flight Attendant Plan before it has made a cause determination under ERISA § 4042(a).

### 2. The Settlement requires that the PBGC involuntarily terminate the Flight Attendant Plan.

Plan termination is a material condition under the unambiguous terms of the agreement between PBGC and United. See Babcock Decl., Exh. E ¶ 16(a). Paragraph 16 of the Agreement pins the "effectiveness" of the Settlement on the occurrence of certain "conditions subsequent", including "[t]ermination of all of the Pension Plans pursuant to Title IV of ERISA." Id. PBGC, therefore, forfeits any claim to the $1.5 billion that United paid in consideration for the Settlement if the Flight Attendant Plan is not terminated. See id. Making plan termination a condition of the Agreement, thus, has the same legal effect as terminating the Plan by settlement. See, e.g., Peabody Holding Co. v. Costain Group PLC, 813 F.Supp. 1402, 1416 (E.D. Mo. 1993)("[a] condition subsequent is a contingency stipulated in a contract which contemplates an 'ipso facto cancellation [of the contract] on the happening or occurrence of a stipulated event or condition.'"), quoting, 17A C.J.S. Contracts § 339, at 323 (1963).[4/]

_____

[4/]    Any argument that, by labeling plan termination a "condition subsequent" rather than a "condition precedent," the Agreement itself does not require termination of the Flight Attendant Plan, is incorrect. Under black letter contract law, there is no distinction between a condition subsequent and a condition precedent when it comes to contract performance. See Restatement (Second) of Contracts § 224 (1981)(defining a "condition" as an event "which must occur, unless its non-occurrence is excused, before performance on a contract becomes
(continued...)

-27-

The Agreement also provides, in material part, that:

As soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement ... PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant and MA&PC Plans. If and when PBGC issues Notices of Determination that the Flight Attendant and MA&PC Plans should terminate, then PBGC and United shall execute termination and trusteeship agreements with respect to such Plans.

Babcock Decl., Exh. E ¶ 4(a)(emphasis added). The other terms of the Agreement, the statutory framework of ERISA, and the post-Agreement statements of the parties all reveal that the single conditional phrase of "If and when" has no practical effect, and involuntary termination is the only outcome for which the parties bargained.

Assuming PBGC were not to find cause to terminate under Section 4042, the only other process by which the termination condition of the Agreement could be satisfied is if United were to initiate a distress termination under Section 4041. United would first have to remove the contract bar through Section 1113 negotiations or litigation. If it succeeds, PBGC could then concur with United's view that termination of the Plan satisfied the distress termination standard. AFA, however, could still oppose United's position in a hearing before the Bankruptcy Court. This scenario largely replicates the position United was in prior to its Agreement with the PBGC and the position it would be in if the

---

[4]/(...continued)
due" and making no distinction between a condition precedent and condition subsequent). Indeed, the revised Restatement abandoned the "condition precedent" and "condition subsequent" terminology because there is no real distinction between them. See Restatement (Second) of Contracts § 224 (1981), Comment e.

Agreement had not been approved by the Bankruptcy Court. Clearly, United did not pay the PBGC $1.5 billion just so that it could maintain the status quo that existed before the Agreement was signed. What United bargained for, and what PBGC agreed to provide, was termination, which the PBGC could only guarantee by instituting proceedings under Section 4042.

The fact that the parties understood that an involuntary termination was the practical and exclusive outcome is reflected in United's own description of the Agreement. On April 29, United made a presentation to the Official Committee of Unsecured Creditors regarding the settlement with PBGC. See Babcock Decl. ¶ 14. United stated that the Agreement would provide it with "certainty and closure" regarding pension obligations. Id., Exh. M at 9. Indeed, based upon the deal it had struck with the PBGC, termination was not only assured, but the time it would take to achieve it was also understood. As United stated in a slide captioned "Termination Timing", "10-14 Days after May 10 hearing, PBGC issues notice of determination that AFA and MA&PC plans should terminate." Id. at 8. Clearly, the certainty, closure and immediacy afforded by the Agreement and touted by United was predicated upon PBGC involuntarily terminating the Flight Attendant Plan.

> **3.    Under the Agreement, PBGC will terminate the Flight Attendant Plan prior to making the requisite determination in violation of Section 4042 of ERISA.**

PBGC has exceeded its statutory authority and violated Section 4042 by deciding to involuntarily terminate the Flight Attendant

Plan without having made an independent cause determination that the Plan should be terminated, pursuant to Section 4042(a).  As we demonstrate above, PBGC is required by the Agreement to involuntarily terminate the Flight Attendant Plan.

At the same time, it is undisputed that PBGC had not, at the time of the Agreement, made an independent cause determination regarding the Flight Attendant Plan before deciding to involuntarily terminate a plan, as required by Section 4042.  By entering into the Agreement to terminate the Flight Attendant Plan without having made the statutorily required cause determination that the Plan should be terminated, PBGC clearly violated this provision of ERISA.  See Allied Pilots Ass'n, 334 F.3d at 97; Air Line Pilots Ass'n, Int'l, 193 F. Supp. 2d at 219.

## II.  AFA AND THE PLAN PARTICIPANTS WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF AN INJUNCTION.

The termination of the Flight Attendant Plan as required under the Terms of the Agreement will lead to irreparable injury.  Such injury will result because Flight Attendants will make decisions regarding whether to continue their employment with United on the basis of the benefits available to them upon termination and replacement of the Plan, as opposed to the benefits available under their current Plan.  See Davidowitch Decl. ¶ 13.  After the time it will require to get a judgment on the merits of this action, it will not be possible to reverse the effects of these decisions. Id.

Absent an injunction, many Flight Attendants will make decisions regarding whether or not to retire or resign based upon the Plan termination resulting from PBGC's Agreement.  See id.

-30-

Since November 2005, approximately one hundred Flight Attendants have already informed AFA that they intend to retire or resign from United if the Flight Attendant Plan is terminated. <u>See</u> <u>id.</u> ¶ 12. Given that, on average, Plan termination will result in a 50% decrease in their retirement benefits, many more Flight Attendants undoubtedly, will find it in their best interests to resign or retire from United if the Plan is terminated. <u>See</u> <u>id.</u> ¶¶ 12-13.

Having made the choice to retire or resign, however, these Flight Attendants could not simply return to their former status upon a judgment on the merits. First, they will have forfeited their United seniority through voluntary resignation or retirement. <u>See</u> <u>id.</u> ¶ 14. Reversal of those decisions and restoration of seniority status, even if permitted, would prejudice the interests of other Flight Attendants who will have moved up in seniority rank in the interim to positions at domiciles different from those where they are currently based. <u>See</u> <u>id.</u> "It is clear that in a meritorious labor controversy the courts often grant preliminary injunctive relief in order to avoid the potential later problems of 'unscrambling eggs'." <u>IAM v. Trans World Airlines, Inc.</u>, 601 F. Supp. 1363, 1372 (W.D. Mo. 1985); <u>see also</u> <u>Local 553 v. Eastern Air Lines, Inc.</u>, 695 F.2d 668, 678 (2d Cir. 1982) (irreparable injury due to "ripple effect" of employer action throughout seniority system"); <u>Tech., Office, & Professional Workers Union v. Budd Co.</u>, 345 F. Supp. 42, 45 (E.D. Pa. 1972) (irreparable injury due to "domino effect" of employer action throughout seniority system).

Second, the decision to retire or resign involves many significant life choices that cannot easily be reversed. Those leaving a position often choose to move from their current home. This is especially true of those retiring if their anticipated retirement income is insufficient to support continuation in their current residence. Others may need to relocate to pursue other work opportunities. Obviously, if a person sells their home, that is not a transaction which can be undone. See Davidowitch Decl. ¶ 14. Such "tremendous disruption in their personal lives and the personal lives of their families" is "the type of harm which is irreparable." Tech., Office, & Professional Workers Union v. Budd Co., 345 F. Supp. at 46. Thus, Flight Attendants will suffer irreparable injury because they will make life-altering decisions on the basis of the plan termination, which cannot be undone upon a judgment on the merits.

### III. REQUIRING PBGC TO FOLLOW THE REQUIREMENTS OF ERISA IN TERMINATING THE FLIGHT ATTENDANT PLAN WILL NOT SUBSTANTIALLY INJURE PBGC AND SERVES THE PUBLIC INTEREST.

Merely requiring PBGC to follow the express requirements of ERISA and thereby fulfill its statutory duty in no way harms PBGC. The resolution of this case will also have a substantial impact on the public interest. For this reason also, entry of an injunction is warranted. The issues regarding the security of private pension benefits raised by the Agreement have tremendous public import. The Agreement between United and PBGC effectuates the largest pension plan default in United States history. There are very real concerns that United's unprecedented move to cast off an estimated

$9.5 billion in pension liabilities through the Agreement with PBGC will have ripple effects throughout the airline industry and beyond. As set forth in the Memorandum of Amici Curiae Members of Congress in Opposition to Approval of Debtors' Agreement with PBGC, "if one company enters bankruptcy and manages to shed all of its pension liabilities onto the PBGC, its competitors will be under intense pressure to follow suit, leading to further plan terminations and the further deterioration of the defined benefit pension system." <u>See</u> Babcock Decl. ¶ 15, Exh. N, at 5. To forestall such further deterioration, a bill was introduced in Congress to impose a six-month moratorium on pension plan transfers to PBGC in the wake of the Court's decision. H.R. 2327, 109th Cong. (May 12, 2005). The bill currently has 53 co-sponsors in the United States House of Representatives. The moratorium would allow Congress time to work on legislation to address the security of private pension plans. <u>See</u> Press Release from Congressman George Miller, dated May 13, 2005, ("Moratorium Intended to Give Congress Time to Sort Out Pension Mess"). <u>See</u> <u>id.</u>, ¶ 16, Exh. O. An injunction would also serve the public interest in forestalling a run on the Nation's pension insurance system that would jeopardize the retirement security of vast numbers of working Americans.

Respectfully submitted,

Robert S. Clayman
D.C. Bar No. 419631
Jonathan P. Rolfe
D.C. Bar No. 474296
Carmen R. Parcelli
D.C. Bar. No. 484459
Matthew E. Babcock
D.C. Bar No. 488107

GUERRIERI, EDMOND, CLAYMAN
& BARTOS P.C.
1625 Massachusetts Avenue, N.W.
Suite 700
Washington, DC 20036
(202) 624-7400

Dated: May 20, 2005            Counsel for Association of Flight
                               Attendants-Communications Workers of
                               America, AFL-CIO