**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **UAL CORPORATION, et al.,** | ) | **Case No. 02-B-48191** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | **Honorable Eugene R. Wedoff** |

---

**MEMORANDUM IN SUPPORT OF THE DEBTORS' MOTION**
**TO REJECT THEIR COLLECTIVE BARGAINING AGREEMENTS**
**PURSUANT TO 11 U.S.C. § 1113(c)**

---

James H.M. Sprayregen, P.C.
Alexander Dimitrief, P.C.

KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200
*Counsel for the Debtors*
*and Debtors-in-Possession*

Dated:  December 14, 2004

institute "replacement plans" to provide retirement benefits for active employees on a going-forward basis.

### a.    "Distress" Terminations.

An employer may terminate an underfunded pension plan through a process known as a "distress termination."[103]  An employer in Chapter 11 typically seeks to satisfy the "reorganization distress test," which requires proving that "unless the plan is terminated, [the sponsor] will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the Chapter 11 reorganization process."[104]  The PBGC cannot process an employer-initiated distress termination, however, if the termination is prohibited by a CBA.[105]  Accordingly, a debtor seeking to terminate a plan required by a CBA must either obtain the consent of the participants' union(s) to the distress termination or secure an order authorizing the rejection of the CBA pursuant to Section 1113 of the Bankruptcy Code.[106]  *It is this impediment to a potential ERISA distress termination (and, insofar as pension plans, this impediment alone) that United seeks to address as part of the present Section 1113 process.*

---

[103]   29 U.S.C. § 1341(c).  A "standard termination" may be pursued by an employer unilaterally (unless prohibited by collective bargaining agreements), but only if the pension plan has assets sufficient to purchase annuities or provide lump-sum payments in full and complete satisfaction of all liabilities.  29 U.S.C. § 1341(b).

[104]   29 U.S.C. § 1341(c)(2).

[105]   29 U.S.C. § 1341(a)(3).

[106]   29 C.F.R. § 4041.7(b).  By contrast, the PBGC may "involuntarily" terminate a pension plan on the PBGC's own initiative even if doing so would contradict the terms of a CBA.  The PBGC may "involuntarily" terminate a pension plan if the PBGC determines that:  (1) the plan has not met the minimum funding standards; (2) "the plan will be unable to pay benefits when due;" or (3) "the possible long-run loss [to the PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated."  29 U.S.C. § 1342(a)(3).

approximately 450 employees who work under a collective bargaining agreement at United's subsidiary, Mileage Plus, Inc. ("MPI").

B.     **The Company's Proposals**.

United presented its Section 1113(c) term sheets to each of its unions more than six weeks ago. These detailed proposals implicate complex provisions within each of the eleven CBAs that apply to the Company's unions. Accompanying this memorandum are seven Appendices – Appendix A details United's proposal for uniform benefits for all employee groups and Appendices B-G explain, on a CBA-by-CBA basis, the rationale for each and every change United requests. In addition, United will update its term sheets at the beginning of any hearings that prove necessary to reflect interim developments at the bargaining tables.

1.     **Contractual Flexibility to Terminate and Replace the Defined Benefit Plans in Compliance with ERISA**.

United proposes to eliminate any provisions in the CBAs that would prohibit a distress termination of the Company's pension plans. Subject to continued post-1113 negotiations with its unions and the PBGC (and, of course, compliance with ERISA), this would afford United the contractual flexibility to terminate its pension plans and "replace" them (for current and future employees) with defined contribution plans. It bears emphasis that securing this contractual flexibility would not diminish the Company's ongoing commitment to working with its unions, the PBGC and other stakeholders to exhaust all potential alternatives to terminating and replacing the Company's pension plans. But at this juncture, the Company requires the contractual flexibility to exercise what will remain an unwanted option of last resort.

Should it prove necessary to terminate and replace United's pension plans, the Company proposes to make two types of payments to new defined contribution plans. First, the Company will contribute a percentage of each employee's income to his union's plan each year.