IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UAL CORPORATION, et al., | ) | Case No. 02-B-48191 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Eugene R. Wedoff |
| | ) | |
| | ) | Related Docket Nos: 8814 |
| | ) | Hearing Date: January 10, 2005 |
| | ) | Objection Deadline: January 4, 2005 |

PENSION BENEFIT GUARANTY CORPORATION'S OBJECTION TO
DEBTORS' MOTION FOR AUTHORITY TO REJECT THEIR
COLLECTIVE BARGAINING AGREEMENT PURSUANT TO SECTION 1113(c)

Dated: January 4, 2005

LOCAL COUNSEL:

Christopher T. Sheean, Esq.
(ARDC# 6210018)
Kelley Drye & Warren LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 857-7087 (telephone)
(312) 857-7095 (facsimile)
csheean@kelleydrye.com

TERRENCE M. DENEEN
Acting General Counsel
JEFFREY B. COHEN
Deputy General Counsel
JOHN A. MENKE
Senior Counsel
CHARLES L. FINKE
Assistant General Counsel
KAREN L. MORRIS
Assistant General Counsel
STEPHANIE THOMAS
SHANNON L. NOVEY
ANDREA M. WONG
JACQUELYN M. GRAY
Attorneys
PENSION BENEFIT GUARANTY
CORPORATION
Office of the General Counsel
1200 K Street, NW, Suite 340
Washington, D.C.  20005-4026
(202) 326-4020, ext. 3848 (telephone)
(202) 326-4112 (facsimile)
Novey.Shannon@pbgc.gov and
efile@pbgc.gov

debtor. However, § 1113 contains two additional requirements that may be relevant – that the Court consider what is fair and equitable to all parties, and that the balance of the equities favors rejection of the collective bargaining agreement. The ERISA distress test contains no similar provisions. Moreover, as discussed *infra,* the judicial gloss on the meaning of the necessity provisions of § 1113 appears to differ, and in some courts differ dramatically. Thus, as explained *infra*, even if the Court were to rule in favor of the Debtors' motion here, such a ruling should not serve as the Court's finding that the Debtors meet the Title IV tests for termination of all the Pension Plans.

## IV.  Argument

As shown by expert financial and actuarial testimony and supporting documentary evidence based upon United's own current financial plan, it is clear that United can reorganize in Chapter 11 and maintain *one or more* of its Pension Plans. That same evidence also suggests that United may not be able to reorganize and keep *all* of the Pension Plans. In the context of a distress termination motion, or motions, later in the bankruptcy, this means that the Court must enter orders on a plan-by-plan basis approving or denying distress terminations based upon findings of affordability for each plan. The Title IV affordability standards are explained in the second part of the Argument.

It is less clear how the Court should proceed in the context of the current § 1113 motion, which allegedly seeks only the flexibility to later terminate the Pension Plans in distress terminations. As discussed below, depending on the legal standard the Court uses in determining whether the modifications the Debtors seek are necessary to permit the reorganization of the Debtors, PBGC's view on whether the Debtors are entitled to the modification differs. However,

should the Court adopt the standard that might allow it to remove the contractual requirement to maintain a defined benefit plan, that standard is completely different than the distress termination standards in § 1341, and this Court's order would have no relevance to the showing necessary by United in any subsequent § 1341 motions for termination of a pension plan.

**A.    The Statutory Criteria for the § 1113 Modifications**

Of the nine requirements in § 1113 that United must satisfy for the rejection of a collective bargaining agreement, three appear most relevant here: whether the modifications requested by United are necessary to permit the reorganization of the debtor; whether United is treating all affected parties fairly and equitably; and whether the balance of the equities favors rejection of the collective bargaining agreements. Each will be discussed in turn, and then considered together.

**1.    Rejection of the Provisions for Maintaining Defined Benefit Plans Must Be Necessary to the Reorganization.**

In order to reject its collective bargaining agreements, United must show that its proposal "provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor . . . ."[24] This Court has recognized that the Seventh Circuit has yet to address a split in other circuit courts over whether necessary modifications to permit reorganization are "those that are essential to prevent liquidation or those that also will enable reorganization to occur."[25]

---

[24] 11 U.S.C. § 1113(b)(1)(A).

[25] *In re Garofalo's Finer Foods Inc.*, 117 B.R. at 371. Compare *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074 (3d Cir. 1986) with *Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82 (2d Cir. 1987). *See also In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887 (10th Cir. 1990) (adopting the Second Circuit standard).

12

###### a.    The *Wheeling-Pittsburgh* standard

In *Wheeling-Pittsburgh*, the Third Circuit determined that the language of § 1113(b)(1)(A) required the debtor to propose only those modifications needed to avoid liquidation. A debtor could reject or modify a collective bargaining agreement only if it would be forced to liquidate absent such rejection or modification.[26] Under this 'but for' standard, it seems clear that here United has not established that the modification is necessary to avoid liquidation. First, United is only seeking with this motion the flexibility to terminate its Pension Plans.[27] United has not yet made a motion to terminate any of the plans under 29 U.S.C. § 1341. Simply having the flexibility to terminate the plans if at some point it becomes necessary does not meet the strict test of a debtor being forced to liquidate if the agreement is not modified. Morever, where the evidence at hearing will clearly show one or more of the Pension Plans to be affordable for a reorganized United, the *Wheeling-Pittsburgh* standard clearly is not satisfied.

###### b.    The *Carey Transportation* Standard

The Second Circuit, in *Carey Transportation, Inc.,* rejected the Third Circuit's view of § 1113(b)(1)(A), and held that "necessary to permit the reorganization of the debtor" did not require the modifications proposed by the debtor to be the most minimal modifications needed to avoid liquidation. Rather, the Second Circuit found that "the necessary requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains

---

[26]  *Wheeling-Pittsburgh,* 791 F.2d at 1088-1089.

[27]  Debtors' Memo at 40.

necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."[28]

Debtors' Memo suggests that the Court should adopt a relaxed version of the *Carey Transportation* standard, and this Court has indicated in a slightly different context that it leans toward the *Carey Transportation* approach.[29]  Should this Court agree that the pension maintenance provisions in the CBAs can be removed based upon a generalized showing of "a greater probability of successful reorganization than if the contract were allowed to stay in force,"[30] then this Court's ruling in the § 1113 context should have no bearing on any subsequent motion or motions for distress terminations under 29 U.S.C. § 1341.  That is because, as discussed *infra* at II. B., the distress test is applied on a plan-by-plan basis, and is at least as strict as the liquidation standard in *Wheeling-Pittsburgh*.  Furthermore, the distress termination test under 29 U.S.C. § 1341 contains neither an analysis of whether it is fair and equitable to other parties, nor a balancing of the equities consideration – both of which are required under § 1113.

### 2.    Fair and Equitable Treatment of Affected Parties Does Not Require Rejection of the Pension Provisions in the CBAs

Another requirement often addressed by courts under § 1113(b) is the requirement that all constituencies be treated fairly and equitably in light of the debtor's proposed modifications. Courts have looked to identify whether non-union employees and management have been asked to take reductions in their wage and benefits along with those governed by the collective

---

[28]  *Carey Transportation, Inc.,* 816 F.2d at 90.

[29]  Debtors' Memo at pp. 82-85; 6/2/04 Hr'g Tr. at 14-15

[30]  *Carey Transportation, Inc.,* 816 F.2d at 90.

bargaining agreements, even if not identical in amount or scope.[31]  The court must identify

whether or not the proposal "serves the purpose of spreading the burdens of saving the company

to every constituency while ensuring that all sacrifice to a similar degree."[32]

   If the Court adopts the *Wheeling-Pittsburgh* standard for necessity, United cannot justify

an all or nothing approach to the termination of its Pension Plans based upon this fairness

requirement.  It does not require that each creditor, including each of the unions, be treated

exactly alike.[33]  United has acknowledged as much in its own filing by requesting varying labor

cost savings from each of its unions, ranging from $200,000 to $191 million,[34] and by providing

the unions with a menu of options from which to obtain the savings requested by United.[35]  This

menu of options by its very terms will treat each union differently as each will be able to pick and

choose whether to take, for example, a larger wage cut in order to keep certain work rules or vice

versa.  Similarly, United can terminate some but not all of its Pension Plans without running

afoul of the requirement that the creditors be treated fairly and equitably.

---

[31]  *See id.* at 90-91; *Wheeling-Pittsburgh Steel Corp.*, 791 F.2d 1074; *In re Indiana Grocery Co., Inc.,* 136 B.R. 182.

[32]  *In re Garofalo's Finer Foods Inc.*, 117 B.R. at 370.

[33]  As is evident by the Letter of Agreement with the Air Line Pilots Association, United has a variety of ways to provide benefits to its employees.

[34]  Debtors' Memo at 79 exhibit 33.

[35]  Debtors' Memo at 82.

3.    **A Balancing the Equities Does Not Further the Need for Rejection of the Pension Plan Requirements in the CBAs**

The final element of the § 1113 process by which United offers further justification for removing provisions for defined benefit plans from the CBAs is the balancing of the equities that must be made under § 1113(c).  The standard for determining the balancing of the equities is taken from the Supreme Court's decision in *Bildisco*, as it is generally recognized that the § 1113(c) requirement was merely a codification of the decision.[36]  In *Bildisco*, the Court stated that when a bankruptcy court is balancing the equities, it "must focus on the ultimate goal of Chapter 11 when considering these equities."[37]  The court must weigh:  the interests of the debtor, creditors, and employees, considering the likelihood and consequences of liquidation for the debtor absent rejection of the collective bargaining agreement; the reduced value of creditors claims if the collective bargaining agreement were affirmed in its current form; the impact on rejection of the collective bargaining agreement on the employees; and the degree and quality of hardship each constituency may face if the collective bargaining agreement is rejected.[38]

The removal of the contractual obligation to continue the Pension Plans is not made more necessary here by a balancing of the equities.  Keeping one or more of is Pension Plans, as is

---

[36]  *Carey Transportation Inc.*, 816 F.2d at 92-93 (2d Cir. 1987); *In re Century Brass Products, Inc.*, 795 F.2d 265, 273 (2d Cir. 1986); *In re Electrical Contracting Servs. Co.*, 305 B.R. 22, 30 (Bankr. D. Colo. 2003); *In re Horsehead Industries Inc.*, 300 B.R. 573, 585 (Bankr. S.D.N.Y. 2003); *In re Garofalo's Finer Foods, Inc.*, 117 B.R. at 369; *In re Express Freight*, 119 B.R. 1006 (Bankr. E.D. Wisc. 1990); *In re Indiana Grocery*, 136 B.R. at 196; *In re Cook United Inc.*, 50 B.R. 561, 564 (Bankr. N.D. Ohio 1985).

[37]  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)

[38]  *Id*.  *See also Carey Transportation*, 816 F.2d at 92-93 (gleaning six factors from *Bildisco* and its progeny).

discussed *infra* in the affordability analysis, will not force United into a liquidation.  United can keep one or more of the Pension Plans and still meet or exceed the necessary targets set by Debtors to obtain exit financing.  Creditors claims would not be reduced if the Pension Plans were not to terminate.  In fact, if United is able to keep some of the Pension Plans intact, one of its largest current unsecured creditors (PBGC) would have much smaller claims against the estate.  And if some of the plans are retained, employees would be in a similar, if not a better, position than if all the Pension Plans were terminated.

**B.      *Under the ERISA Distress Termination Provisions, One or More Pension Plans are Clearly Affordable By a Reorganized United***

If the Court finds that United, under the less strict § 1113 necessity test – as influenced by the fair and equitable prong and the balancing of the equities prong – has met its burden of proof for eliminating the contractual obligations to continue its pension plans, United has still not met the distress criteria for terminating its Pension Plans.  United is seeking through its § 1113(c) motion to lay the foundation for the termination of its Pension Plans, without acknowledging that the test to apply in § 1341 proceedings is a drastically different one than what United sets out as the § 1113 test for this Court when deciding whether to permit rejection of a CBA.[39]

The Court should not be fooled by the United's attempt to confuse the issues.  The statutory language is clear.  Bankruptcy Code § 1113 applies only to the "rejection of collective bargaining agreements," while ERISA § 1341 establishes the "exclusive means" of voluntary pension plan termination.  These two statutory provisions are intentionally different, as they apply to different inquiries and further different congressional objectives.

---

[39]  Debtors' Memo at pp. 82-85

17

Under § 1341, United must show on a plan-by-plan basis that each one of its Pension Plans meets the distress criteria.[40]  Congress dramatically changed ERISA in 1986 enacting detailed restrictions on plan termination where there previously had been none.  Where termination of one or *all* of a company's pension plans previously had been permitted at the whim of the company, whether or not it was in bankruptcy, the 1986 amendments to ERISA restricted plan termination in many ways.  In the Single-Employer Pension Plan Amendments Act of 1986,[41] Congress established the first "distress" termination provisions, which required that the bankruptcy court "approv[e]" the termination of *a pension plan* maintained by a Chapter 11 debtor.[42]  This singular language was retained through the 1987 amendments, which sought to further significantly restrict when a pension plan could terminate in bankruptcy.  As a result of the 1987 amendment, the law now provides that "*A* single-employer *plan* may terminate under a distress termination"[43] only if among other things, "the bankruptcy court determines that, unless *the plan* is terminated,"[44] the debtor cannot reorganize.  By the clear mandate of the statute,

---

[40]  *Cf. In re Kaiser Aluminum Corporation*, Order (A) Determining that the Financial Requirements for a Distress Termination of the Debtors' Defined Benefit Pension Plans Under ERISA Section 4041(c)(2)(B) are Satisfied; (B) Approving a Distress Termination of Certain Pension Plans; (C) Authorizing Implementation of Replacement Plans; and (D) For Certain Related Relief, Case # 02-10429, Docket # 3657 (Bankr. D. Del., February 5, 2004) (appeal to district court dismissed upon settlement between PBGC and Kaiser in which Kaiser agreed to maintain 4 of the seven plans at issue).

[41]  Pub. L. No. 99-272, 100 Stat. 237.

[42]  29 U.S.C. § 1341 (c)(2)(B)(ii)(III) (1986) (emphasis added).

[43]  29 U.S.C. § 1341(c)(1) (2000 & Supp I 2001) (emphasis added).

[44]  29 U.S.C. § 1341(c)(2)(B)(ii)(IV) (emphasis added).

United must factually show that it can not afford each plan based on a plan-by-plan analysis.

Nowhere in its 155 page memorandum has United even attempted to perform such an analysis.

Furthermore, as this Court has expressly held, the test for a distress application under § 1341 "is whether *but for* distress termination, the Debtor will not be able to pay its debts when due and not continue in business."[45]  It is not just that the particular plan of reorganization proposed by a debtor shows that the plans need to be terminated, but whether the debtor can obtain confirmation of *any* plan of reorganization without termination of its pension plans.[46] This requires the bankruptcy court to look not only the debtor's plan of reorganization, if one has been proposed, but to look at "existential financial reality and try to judge whether the plan [of reorganization] provisions are necessary or whether they are merely desired by the entities that would benefit from the termination."[47]

Despite United's assertion that it is seeking only to remove the contractual obligation to continue the Pension Plans, it goes on to argue that due to the credit metrics necessary to obtain exit financing, "the importance of terminating and replacing the Company's pension plans . . . cannot be overstated."[48]  The Debtors' Memo argues at length that alternatives different from termination and replacement of all of the Pension Plans will not provide enough savings to the

---

[45] *In re Resol Manufacturing Co., Inc.*, 110 B.R. 858, 862 (Bankr. N.D. Ill. 1990). (emphasis added).

[46] *In re US Airways Group, Inc.,* 296 B.R. 734, 743 (Bankr. E.D. Va. 2003).

[47] *In re Philip Services Corp.,* 310 B.R. 802, 808 (Bankr. S.D. Tex. 2004); *see also* 133 Cong. Rec. H11970 (Dec. 21, 1987) (a debtor's pension plan may be terminated "only if it otherwise would force the sponsor into liquidation").

[48] Debtors' Memo at 90.

19

company to secure exit financing.[49]  Through these arguments United is requesting the Court to

find that the Pension Plans should be terminated, without addressing (let alone satisfying) the

requirements of 29 U.S.C. § 1341(c)'s distress test, in which each Pension Plan must be

examined individually to determine whether the reorganized United can afford each in its own

right, and not merely lumped together as a whole package.

The likely evidence and testimony at the § 1113 hearing will establish that one or more

plans can be retained in a successful reorganization by United.  Even more clearly, United is not

able to establish that each of its Pension Plans, considered alone, is unaffordable and a complete

barrier to reorganization.  PBGC financial and actuarial expert testimony shows one or more of

the Pension Plans to be affordable in a variety of scenarios.  And, several of these scenarios

substantially satisfy the metrics believed by United to be necessary for exit financing and

reorganization.

## 1.    United's Credit Metrics Do Not Require the Termination of All Pension Plans

United has produced an expert declaration stating that it must substantially meet several

ratios and credit metrics in order to obtain exit financing and have sufficient cash to operate post-

Chapter 11.  The Debtors Memo argues in particular that two metrics, the free cash flow and the

fixed charge coverage ratio, are most crucial and can be met only if all of the Pension Plans are

terminated.[50]  However, if United were to analyze these metrics when looking at the Pension

---

[49] Debtors' Memo at 112 *et. seq*.

[50] Debtors' Memo at 88-91.

Plans in a plan-by-plan analysis, the company would reach a drastically different result. PBGC asked its outside financial advisor, Greenhill & Co., to do just that analysis.

Greenhill partner Michael Kramer reports in his Declaration that he analyzed six scenarios involving the termination of some but not all of the Pension Plans, assuming a freeze the accrual of benefits for the remaining plans, and offering the same 4% defined contribution replacement plan as described in United's financial plan. One of the scenarios – keeping a frozen Flight Attendants Plan while terminating the other three Pension Plans – would not even require United to seek minimum funding waivers from the IRS. The other scenarios assume that United both freezes the ongoing Pension Plans, applies for, and receives, three consecutive funding waivers in order to free up cash for its needs upon exit and in the years immediately after exit from Chapter 11.

Most scenarios meet the requirements of United's own credit metrics – the metrics that United says are necessary for it to obtain exit financing. Kramer is of the opinion that United could obtain exit financing under several of these scenarios. The alternative looked at by Greenhill that generally presents the most difficulty in meeting the metrics is an alternative in which all Pension Plans are retained except the Pilots Plan. The alternative that generally most easily satisfied the metrics was retaining only the Flight Attendants Plan, with minimum funding waivers. This memorandum therefore focuses on the application of the metrics to these two scenarios, recognizing that the other four scenarios fall generally between these two.[51]

---

[51] Greenhill decl. ¶ 10. The other four scenarios are: (a) retain all but the Ground Employment Plan (with waivers); (b) retain the Pilots and Flight Attendants Plans (with waivers); (c) retain the Management, Administrative and Public Contract Plan and Flight Attendants Plan (with waivers); and (d) retain only the Flight Attendants Plan *without* waivers.

Several metrics that United claims to be important to obtaining exit financing are not impacted greatly by the retention of the Pension Plans: liquidity as compared to other carriers, fixed charge coverage ratio, adjusted funds flow to total debt, and the return on invested capital as compared to the weighted average cost of capital. Kramer also believes that exit financing will be available without passing the targets United as set out.[52] Credit metrics that are more significantly impacted by the retention of the Pension Plans are the previous fixed charge coverage ratio and the free cash flow.[53]

### a. Liquidity Level as a Percentage of Revenue

For example, United implies that it must terminate all of its Pension Plans to achieve a liquidity level as a percentage of revenue to gain a sufficient credit rating for exit financiers. However, when comparing the termination and replacement of all Pension Plans to the scenarios looked at by Greenhill, the ratio remains approximately the same. By terminating and replacing all the Pension Plans, United would obtain a liquidity to revenue ratio of 12.9%, by terminating the Pilot Plan only the ratio remains 12.9%, and by retaining the Flight Attendant Plan with waivers the ratio improves to 13%. Only in the scenario where the Flight Attendants plan is retained without waivers does the ratio drop, and then insignificantly to 12.4%. Moreover, competitors Northwest and American recently refinanced with liquidity levels of 8.53% and 8.13% respectively.[54]

---

[52] Greenhill decl. ¶¶ 12, 13.

[53] Greenhill decl. ¶ 14.

[54] Greenhill decl. ¶ 16 exhibits 1, 2 & 3.

### b. Targeted Fixed Charge Coverage Ratio

If United were to keep the Flight Attendants Plan, the MA&PC Plan and the Ground Employee Plan, it would only miss, by an extremely small margin, its targeted fixed charge coverage ratio in 2006 and 2007. Even under its current plan to terminate all Pension Plans, United misses the ratio in 2006. If retaining the Flight Attendants Plan only, with or without waivers, United will similarly miss its target for the fixed charge coverage ratio only in 2006, and by about the same amount that United predicts will be missed under the its current business plan with all Pension Plans terminated. The same is true for the scenario in which both the Flight Attendants Plan and the Management, Administrative and Public Contact Plan is retained.[55]

### c. Adjusted Funds Flow to Total Debt Ratio

Another credit metric that United claims is relevant in the long term is the adjusted funds flow to total debt ratio. A company that wants to achieve a BB credit rating (United's stated long term goal) would look for a ratio of approximately 20%. United asserted termination of all the Pension Plans would allow it to achieve a ratio of 22% to 25% by 2010. But Greenhill shows that United would be able to exceed 25% by the year 2010 *in all six scenarios*.[56] In addition, the distress test does not require a reorganized debtor to be able to achieve a BB credit rating.

### d. Return on Invested Capital

United claims it needs a return on invested capital that is greater than its weighted cost of capital (targeted at 8-9%). Under its own business plan, assuming United obtains $725 million in labor savings and the termination and replacement of all its Pension Plans, this return will be

---

[55]  Greenhill decl. ¶ 19 exhibit 4.

[56]  Greenhill decl. ¶ 20 exhibit 5.

achieved in 2008, when its return on invested capital will be 8.7%.  If only the Pilot Plan is

terminated, United can obtain an 8.8% return on invested capital in year 2008, and if only the

Flight Attendant Plan is retained with waivers, United can obtain an 8.7% return on invested

capital in year 2008.  Indeed, all the scenarios fare nearly as well, or better, than the business plan

with all Pension Plans terminated.[57]

### e.  Previous Fixed Charge Coverage Ratio

The Previous fixed charge coverage ratio targeted by United is 1.3x.  Assuming all

Pension Plans are terminated and the $725 million in labor savings are achieved, United will be

able to exceed this ratio every year exiting bankruptcy.  However, if only the Pilot Plan is

terminated, United will miss its target only in 2008.  If United retains only the Flight Attendant

Plan with waivers, it will exceed the target in every year after exiting bankruptcy, as it will in the

three other scenarios in which it retains one or two Pension Plans.[58]

### f.  Free Cash Flow

United and Greenhill believe that Free Cash Flow is an important consideration for

lenders.  United believes it needs to have at least break even cash flow in 2005, have $300

million in 2006, and $500 million in 2007.  In retaining the Flight Attendants Plan with waivers,

United surpasses these targets every year.  In retaining it without waivers, it misses the target in

only 2005 and 2006, and by less than $15 million dollars.  According to Greenhill, this would not

deter lenders, as United will have $3 billion cash on hand.  Retaining the Flight Attendant Plan

and the MA&PC Plan would put United less than $72 million off of its targeted free cash flow in

---

[57]  Greenhill decl. exhibit 6.

[58]  Greenhill decl. exhibit 7.

only three years, two of which will have  free cash flow in excess $400 million, and in the other

year, the free cash flow will be $246 million.  If United were to only keep the Flight Attendant

Plan, it would exceed all of its targeted cash flows for every year after exiting from bankruptcy.[59]

United asserts that it could not meet the necessary credit metrics in order to obtain exit

financing.  As is evidenced by the discussion above and more generally in the Declaration of

Michael Kramer, this assertion is simply not true if United were to look at the credit metrics

when analyzing the Pension Plans on a plan-by-plan basis.  Quite simply, some of the Pension

Plans are affordable for a reorganized United, and therefore do not meet the requirements for

distress termination.

### 2.     Additional Cost Savings Suggested by United Makes the Pension Plans More Affordable

If United obtains the additional $150 million in non-labor savings as it has agreed to

pursue in the Letter of Agreement with the Airline Pilots Association, and if United were to take

into consideration the current lower fuel price trend, its ability to retain its Pension Plans

increases.[60]  Looking just at the free cash flow metric, for example, United would no longer be

missing any of its targets if it were to retain the Flight Attendant Plan and the MA&PC Plan.  If

United retained the Flight Attendant, MA&PC Plan and the Ground Plan, it would only miss its

targets in 2008, a year in which United would still have over $400 million in free cash flow.[61]

---

[59]  Greenhill decl. exhibit 8.

[60]  Greenhill decl. ¶ 25.

[61]  Greenhill decl. exhibit 9.

### 3.    Even Building in Pessimistic Projections for the Future Does Not Support Termination of All the Pension Plans

Even if one assumes that United is unable to meet its business plan forecasts and fuel prices remain high, United would still have significant unrestricted cash balances when retaining at least two of its plans.  For example, if United retains the Flight Attendant Plan and the MA&PC Plan, its unrestricted cash balances will remain greater than $500 million in every year after exiting bankruptcy.[62]

### 4.    Minimum Funding Waivers Are Appropriately Factored into the Affordability Analysis

United addresses the issue of obtaining IRS minimum funding waivers in a cursory manner.  First, United states that the waivers will only make matters worse in the long run because total cash outlays for the Plans will slightly increase.[63]  United fails to acknowledge, however, that waivers will defer significant cash payments until a time when United's own business plan states that it could afford to make the payments.[64]

Second, United makes an interesting argument that it would not be able to obtain the waivers on any grounds, because it is not suffering a temporary substantial business hardship as required by the Code.[65]  Its own business plan belies this claim, as it shows the company

---

[62]  Greenhill decl. exhibit. 11.

[63]  Debtors Memo at 113.

[64]  Greenhill decl. ¶ 9.  Snyder declaration p. 17 exhibit 4.

[65]  26 U.S.C. § 412(d)(1).  The test for the determination of a business hardship includes, but is not limited to the consideration of whether the employer is operating at an economic loss, whether there is substantial unemployment in the industry in which the employer is operating, whether the sales and profits of the industry in which the employer operates are depressed or declining, and finally whether it is reasonable to expect the plan will be continued only if the

constantly improving its position after a few lean years upon exit.  It says United will have free

cash flow of over $420 million starting in year 2006 increasing up to over $750 million by the

year 2007.[66]  If United  thinks that it is enduring a permanent hardship that can not be

surmounted, the feasibility of any plan of reorganization would be called into question.

Third, United argues that minimum funding waivers would not be forthcoming as PBGC

would require a security interest in some portion of the Debtors' property, and this collateral will

be already pledged.  PBGC has not determined what type of security it might seek in the event of

United waiver applications, and would not make the argument it has here if it believed resolution

of this issue was not likely.  United has not approached PBGC about any possible alternatives to

a first security interest in post-petition assets.  Furthermore, the IRC mandates only that the

Secretary of Treasury *may* require security for granting a waiver request, not that he shall require

security.[67]

Thus, United's situation, as evidenced by its current business plan, is a near text-book

case for short term hardship justifying minimum funding waivers to spread out the large costs do

in the near term.  It is therefore appropriate to consider waivers in an affordability analysis of the

Pension Plans.

---

waiver is granted.  26 U.S.C. § 412(d)(2)

[66]  Snyder declaration p. 17 exhibit 4.

[67] 26 U.S.C. § 412(f)(3)(A)(i).  Obviously PBGC does not grant waivers, and does not
know if waivers will be granted as contemplated in the scenarios.  However, it is another instance
where United simply is not stating the law correctly, nor exploring all options available to it prior
to the drastic measure of the termination of its pension plan.

## Conclusion

If this Court follows the strict *Wheeling-Pittsburgh* standard, the court should not allow the elimination of the CBA requirement for the maintenance of the Pension Plans. If the Court follows a lenient application of the *Carey Transportation* standard, the court should limit itself to finding whether it is necessary under § 1113 to remove the contractual obligation to maintain the Pension Plans. Any Order granting the rejection of the CBAs under § 1113 should expressly note that actual plan termination requires compliance with the requirements of 29 U.S.C. § 1341. A distress termination will therefore require a separate evidentiary hearing in which United must demonstrate, on a plan-by-plan basis, that the Reorganized United cannot afford to maintain any of its four existing Pension Plans.

Dated: January 4, 2005                    Respectfully submitted,

                                          TERRENCE M. DENEEN
                                          Acting General Counsel
                                          JEFFREY B. COHEN
                                          Deputy General Counsel
                                          JOHN A. MENKE
                                          Senior Counsel
                                          CHARLES L. FINKE
                                          Assistant General Counsel
                                          KAREN L. MORRIS
                                          Assistant General Counsel
                                          STEPHANIE THOMAS
                                          SHANNON L. NOVEY
                                          ANDREA M. WONG
                                          JACQUELYN M. GRAY
                                          Attorneys

28

PENSION BENEFIT GUARANTY
CORPORATION
Office of the General Counsel
1200 K Street, NW, Suite 340
Washington, D.C.  20005-4026
(202) 326-4020, ext. 3848 (telephone)
(202) 326-4112 (facsimile)
Novey.Shannon@pbgc.gov and
efile@pbgc.gov

LOCAL COUNSEL:                          /s/ Christopher T. Sheean
                                        Christopher T. Sheean, Esq.
                                        (ARDC# 6210018)
                                        Kelley Drye & Warren LLP
                                        333 West Wacker Drive
                                        Chicago, Illinois 60606
                                        (312) 857-7087 (telephone)
                                        (312) 857-7095 (facsimile)
                                        csheean@kelleydrye.com
                                        Attorneys for Pension Benefit Guaranty Corporation

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4, 2005, a copy of the attached Pension Benefit Guaranty

Corporation's Objection to Debtors' Motion for Authority to Reject Their Collective Bargaining

Agreement Pursuant to Section 1113(c) was served, via e-mail, on the 2002 service list, except

for (i) those parties that constitute the Core List, which parties were also served via facsimile; (ii)

those parties with no e-mail address, which parties were served via facsimile; and (iii) those

parties with no e-mail address or facsimile number, which parties were served via First Class,

U.S. Mail, postage prepaid.

/s/ Christopher T. Sheean

Christopher T. Sheean
Attorney

## SERVICE LIST

**Core Service List (Via Facsimile):**

| | |
|---|---|
| **Debtors:** | **Counsel to Debtors and Debtors in Possession** |
| United Air Lines, Inc. | Kirkland & Ellis, LLP |
| WHQLD | Attn: James H.M. Sprayregen, P.C. |
| Attn: John Lakosil | Mark Kieselstein |
| 1200 East Algonquin Road | David R. Seligman |
| Elk Grove Village, Illinois 60007 | Steven Kotarba |
| Facsimile: (847) 700 - 4683 | 200 East Randolph Street |
| | Chicago, Illinois 60601 |
| | Facsimile (312) 861-2200 |
| | |
| **United States Trustee:** | **Counsel to the Debtors' debtor in possession lender (Bank One)** |
| Office of the United States Trustee | |
| Attn: Stephen Wolfe | Latham & Watkins |
| 227 West Monroe Street, Suite 3350 | Attn: David Heller |
| Chicago, Illinois 60606 | Timothy Barnes |
| Facsimile: (312) 886-5794 | 233 South Wacker Drive, Suite 5800 |
| | Chicago, Illinois 60606 |
| | Facsimile: (312) 993-9767 |
| | |
| **Counsel to the Debtors' debtor in possession lender (CIT Group)** | **Counsel to the Debtors' debtor in possession lender (Citibank and JP Morgan)** |
| Schulte, Roth & Zabel | Morgan, Lewis & Bokius, LLP |
| Attn: Robert J. Mrofka | Attn: Richard S. Toder |
| 1919 Third Avenue | Jay Teitlbaum |
| New York, New York 10022 | 101 Park Avenue |
| Facsimile: (212) 593-5955 | New York, New York 10178 |
| | Facsimile: (212) 309-6001 |
| | |
| **Counsel to the Debtors' debtor in possession lender (Citibank and JP Morgan)** | **Debtors' Private Copy Service** |
| Kaye Scholer, LLP | Merrill Corporation |
| Attn: Michael B. Solow | Attn: Patrick Finnerty |
| 3 First National Plaza | 250 South Wacker, 4th Floor |
| Suite 4100 | Chicago, Illinois 60606 |
| 70 West Madison Street | Facsimile: (312) 930-5986 |
| Chicago, Illinois 60602 | |
| Facsimile: (312) 583-2360 | |

**Official Notice and Claims Agent:**
Poorman-Douglas Corporation
Attn: Rhonda G. McNally
10300 SW Allen Boulevard
Beaverton, Oregon 97005
Facsimile: (503) 350-5230

**Counsel to Committee:**
Sonnenschein, Nath & Rosenthal
Attn: Fruman Jacobsen
Robert E. Richards
8000 Sears Tower
Chicago, Illinois 60606
Facsimile: (312) 876-7934

**Counsel to Committee:**
Sonnenschein, Nath & Rosenthal
Attn: Carole Neville
1221 Avenue of the Americas
24th Floor
New York, New York 10020
Facsimile: (212) 768-6800

**2002 List (Via E-mail or as indicated on the Certificate of Service):**

Attached please find the most recent 2002 list printed from UAL Corporation's Restructuring Information website found at: http://www.pd-ual.com/Downloads/2002List12-11-03.xls