IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE:<br><br>UAL CORPORATION., et al.,<br><br><br>Debtors | Chapter 11<br><br>Case No. 02-48191<br>(Jointly Administered)<br><br>Honorable Eugene R. Wedoff<br><br>Related Docket # 10808<br>Hearing Date: April 22, 2005<br>Hearing Time: 9:30 a.m. |

**MEMORANDUM IN SUPPORT OF PBGC'S EMERGENCY MOTION
TO POSTPONE CONSIDERATION OF DEBTORS' MOTION
FOR VOLUNTARY DISTRESS TERMINATION OF THEIR PENSION PLANS**

The Debtors' motion is premature. Before a distress termination may be approved, this Court must determine that, unless the plan is terminated, each Debtor (collectively "United") will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside of bankruptcy.[1] Obviously, this Court cannot make that determination until United is much closer to emerging from bankruptcy, when this Court can formulate findings regarding United's financial landscape at that relevant time. Currently, United's "business plan" is still a work in progress; the distress hearing must wait until it is a "done deal."

United has asked to extend the deadline for providing an updated business plan and for filing a plan of reorganization until July, 2005, and expects to emerge from bankruptcy no earlier than September, 2005, and probably later. At the time this Court set the schedule for this proceeding, United was required to file its final business plan on March 31, 2005, with an expected date of bankruptcy emergence of June, 2005. The current schedule was entirely

---

[1] *See* 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

appropriate under those circumstances. But those circumstances have markedly changed, and the date for the distress hearing needs to be changed accordingly. PBGC requests that the distress termination hearing be postponed until after United has completed its final business plan, after it has filed a proposed plan of reorganization, and no earlier than two months before it intends to confirm its plan of reorganization. It is possible that after PBGC has reviewed the final business plan, we may not oppose the distress terminations, saving the parties and the Court from expending substantial resources and time in litigating the matter.

## BACKGROUND

PBGC is the United States government agency that administers the statutory pension plan termination insurance program pursuant to Title IV of ERISA.[2] When a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes trustee of the plan and pays plan participants their pension benefits up to the statutory limits.[3] UAL sponsors four defined benefit pension plans covered by Title IV (collectively, the "Pension Plans" or "Plans").[4]

On November 5, 2004, pursuant to 11 U.S.C. § 1113(c), the Debtors moved to reject their collective bargaining agreements (collectively, "CBAs"), including the provisions requiring them to maintain the Pension Plans. United reached consensual agreements with four of its six unions

---

[2] *See* 29 U.S.C. §§ 1301-1461 (2000 & Supp II 2002).

[3] *See* 29 U.S.C. §§ 1321, 1322, and 1361.

[4] The Pension Plans are (1) the United Airlines Ground Employees' Retirement Plan ("Ground Plan"); (2) the United Airlines Management, Administrative and Public Contact Defined Benefit Pension Plan; (3) the United Airlines Flight Attendant Defined Benefit Pension Plan; and (4) the United Airlines Pilot Defined Benefit Pension Plan ("Pilot Plan").

2

– Air Lines Pilots Association ("ALPA"), Professional Airline Flight Control Association ("PAFCA"), Transport Workers Union of America ("TWU") and the Association of Flight Attendants ("AFA") – for interim wage and related relief, deferring until April 11, 2005, pension issues and long-term labor cost savings. The Court imposed similar interim relief with respect to the Aircraft Mechanics Fraternal Association ("AMFA") and International Association of Machinists and Aerospace Workers ("IAM").

On December 29, 2004, and March 10, 2005, PBGC issued Notices of Determination that the Pilot and Ground Plans should be terminated, respectively, and PBGC should be appointed as the Plans' statutory trustee.[5] PBGC filed Complaints in the United States District Courts for the Northern District of Illinois and Eastern District of Virginia, seeking orders terminating the Pilot and Ground Plans, appointing PBGC as the statutory trustee of the Plans, and establishing the Plans' termination dates as December 30, 2004 and March 11, 2005, respectively.[6]

On April 8, 2005, the Debtors moved to extend their exclusive period to file their plan of reorganization from April 30, 2005 to July 1, 2005, and to extend the date to seek acceptance of such plan to September 1, 2005. They also moved for an order authorizing payment of certain fees in connection with the Eleventh Amendment to the Club DIP Facility, which, among other things, extends the deadline for United to provide an updated business plan to the DIP Lenders from March 31, 2005, to July 31, 2005. Those motions are pending.

On April 11, 2005, United refiled its Section 1113 motion to reject the CBAs for AFA,

---

[5] See 29 U.S.C. § 1342(c).

[6] See 29 U.S.C. §§ 1342 and 1348(a).

AMFA, and IAM.[7] Notwithstanding PBGC's pending termination cases, United also moved for approval of the distress terminations of the Pension Plans. The hearing for the Section 1113 and distress termination motion is set for May 11, 2004.

ERISA provides the exclusive means for terminating covered single-employer pension plans.[8] One means is a distress termination, under which the employer must show that the pension plan meets the statutory distress criteria.[9] One such criterion requires a bankruptcy court to find that, unless the plan is terminated, the debtor will be unable to pay all of its debts under a plan of reorganization and will be unable to continue in business outside of bankruptcy.[10] ERISA clearly places the burden of proof on the employer. "The basic policy of the legislation is to limit the ability of plan sponsors to shift liability for guaranteed benefits onto other PBGC premium payers and to avoid responsibility for the payment of certain nonguaranteed benefits, to cases of severe business hardship."[11]

---

[7] The Court approved agreements between United and ALPA, PAFCA, and TWU on all labor issues, including ALPA's agreement not to oppose termination of the United Airlines Pilot Defined Benefit Pension Plan.

[8] *See* 20 U.S.C. § 1342(a); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999); *PBGC v. Mize Co.*, 987 F.2d 1059, 1061 (4th Cir. 1993); *Phillips v. Bebber*, 914 F.2d 31, 34 (4th Cir. 1990).

[9] *See* 29 U.S.C. § 1341(c)(1) and (c)(2)(B)(ii)(IV).

[10] *See* 29 U.S.C. § 1341(c)(2)(B)(ii)(IV). *See In re Resol Mfg. Co., Inc.*, 110 B.R. 858, 862 (Bankr. N.D. Ill. 1990) ("appropriate standard of review for the distress termination of a pension plan, pursuant to Section 1341(c)(2)(B)(ii), is whether but for distress termination, the Debtor will not be able to pay its debts when due and not continue in business").

[11] H.R.Rep. No. 300, 99th Cong., 1st Sess. 278, 279 (1985), *reprinted in* 1986 U.S.C.C.A.N. 929-930.

4

## ARGUMENT

In order for United to shift its unfunded pension promises onto PBGC, it must prove to this Court that *but for* the termination of the pension plan in issue, it will be forced to liquidate.[12] This test requires United to demonstrate that under a plan of reorganization, it is unable to maintain the pension plan, after exhausting options short of termination, such as obtaining minimum funding waivers or implementing other non-pension cost saving initiatives.[13] In the instant case, United's last business plan is over six months old, it has not submitted a proposed plan of reorganization, and it has no imminent plans to emerge from bankruptcy.

The parties agreed to the schedule for this distress termination proceeding in December, 2004. At that time, the parties contemplated that United would have provided an updated business plan according to its schedule and filed its plan of reorganization prior to seeking the distress termination of their Plans. Those circumstances have changed. The timing for the distress hearing must also change. Otherwise it will be impossible for this Court to follow the law and determine whether United can afford to maintain any of the Pension Plans after it emerges from bankruptcy on the basis of a plan of reorganization and the financial outlook of United. For instance, vital decisions regarding fleet planning, negotiations with the public debt group, and contracting with United's regional partners remain to be resolved. Until the Debtors

---

[12] 29 U.S.C. § 1341(b)(2)(B)(ii)(IV) requires that "the bankruptcy court (or such other appropriate court) determine[] that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approve[] the termination."

[13] *See In re US Airways Group, Inc.*, 296 B.R. 734, 743-44 (Bankr. E.D. VA. 2003) ("the test is whether the debtor can obtain confirmation of *any* plan of reorganization without termination of the retirement plan"); *In re Resol Mfg. Co.*, 110 B.R. at 862.

can provide final answers to these critical issues and their impact on United's financial projections, PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy, and it will be impossible for this Court to decide what the restructured United can or cannot afford.

The Debtors must demonstrate that they cannot afford to maintain the pension plans against realistic and relevant financial projections, not against moving targets. Based on United's last business plan, PBGC currently believes that United can afford to maintain at least one or more of its Pension Plans. It is certainly possible that United's financial picture may get grimmer, in which case PBGC could very well conclude that it would not oppose the distress motion. Alternatively, this Court might find that the Pension Plans should be terminated on the basis of the current information. If United's financial picture then improves, however, the agency may be forced to consider restoring one or more Pension Plans under 29 U.S.C. § 1347.[14] In either event, the expenditure of time and resources in what will likely be a long and

---

[14] 29 U.S.C. § 1347 provides,

> Whenever [PBGC] determines that a plan which is to be terminated under § 4041 or § 4042, or which is in the process of being terminated under § 4041 or § 4042, should not be terminated under § 4041 or § 4042 as a result of such circumstances as [PBGC] determines to be relevant, [PBGC] is authorized to cease any activities undertaken to terminate the plan, and to take whatever action is necessary and within its power to restore the plan to its status prior to the determination that the plan was to be terminated under § 4041 or § 4042. In the case of a plan which has been terminated under § 4041 or § 4042 [PBGC] is authorized in any such case in which [PBGC] determines such action to be appropriate and consistent with its duties under this title, to take such action as may be necessary to restore the plan to its pretermination status, including, but not limited to, the transfer to the employer or a plan administrator of control of part or all of the remaining assets and liabilities of the plan.

6

contentious distress hearing would be unnecessary. Similarly, PBGC has pending in federal court the PBGC-initiated terminations proceedings for two of the Pension Plans – the Pilot and Ground Plans. Should these pension plans terminate in those termination proceedings, the distress termination proceedings would become significantly less complicated.

The importance of this issue — and the magnitude of approximately $9 billion of liability that United seeks to shift onto PBGC and the affect on the pensions of some 121,557 participants — requires that this case be decided on a fully-developed record. PBGC requests that the distress termination hearing be postponed until after United has filed its final business plan, after it has filed a proposed plan of reorganization, and when it is sufficiently close to emergence from bankruptcy, at which time litigation over its Pension Plans makes sense.

## CONCLUSION

PBGC respectfully requests that the Court postpone the distress termination hearing until after United has completed its final business plan, after it has filed a proposed plan of reorganization, and no earlier than two months before it plans to emerge from bankruptcy.

Dated: April 14, 2005

Respectfully submitted,
JEFFREY B. COHEN
Chief Counsel
CHARLES L. FINKE
NANCY HEERMANS
Associate Chief Counsels
JOHN A. MENKE
PAULA CONNELLY
Assistant Chief Counsels
STEPHANIE THOMAS
SHANNON L. NOVEY
ANDREA M. WONG
Attorneys
PENSION BENEFIT GUARANTY CORPORATION
Office of the Chief Counsel
1200 K Street, NW, Suite 340
Washington, D.C. 20005-4026
(202) 326-4020, ext. 3848 (telephone)
(202) 326-4112 (facsimile)
Novey.Shannon@pbgc.gov and efile@pbgc.gov

LOCAL COUNSEL:

/s/ Christopher T. Sheean
Christopher T. Sheean, Esq.
(ARDC# 6210018)
Kelley Drye & Warren LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 857-7087 (telephone)
(312) 857-7095 (facsimile)
csheean@kelleydrye.com
Attorneys for Pension Benefit Guaranty Corporation