IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re ) <br> ) <br> UAL CORPORATION, et al. ) <br> ) <br> Debtors. ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Chapter 11 <br><br> Case No. 02-B-48191 <br> (Jointly Administered) <br><br> Hon. Eugene R. Wedoff <br><br> Pre-trial Hearing Date: May 9, 2005 <br> Pre-trial Hearing Time: 1:30 p.m. <br><br> Hearing Date: May 10, 2005 <br> Hearing Time: 10:30 a.m. |

**MOTION OF MEMBERS OF U.S. CONGRESS FOR EXTENSION OF TIME TO FILE AMICUS BRIEF IN RESPONSE TO EMERGENCY MOTION TO APPROVE DEBTOR'S AGREEMENT WITH PBGC**

Amici Members of the U.S. Congress, Representatives Jan Schakowsky and George Miller, respectfully request an extension of time to file an amicus brief in response to the above-styled Debtor's emergency motion to approve its agreement with the Pension Benefit Guaranty Corporation (PBGC).

This extension of time is necessary and for good cause for the following reasons:

(1) Amici Members of Congress were not apprised of basic details of the agreement in question until early Friday, May 6, 2005.

(2) Accordingly, once Amici identified their interest in the case, Amici acted to draft a memorandum for the Court.

(3) Upon learning of a Friday, May 6, 2005, filing deadline for objections to the agreement,

1

Amici, through their staff, attempted to contact the clerk of this Court to determine how a timely filing of either the brief itself or this motion for extension of time might be achieved. Contact was not successful the day of May 6, 2005.

(4) Logistically, in any event, due to the short period of time, pressing schedules of Members, and coordinating approval among Members for this brief, in-person filing of signed original papers would have been impossible on Friday, May 6, 2005.

For the foregoing reasons, Amici Members of Congress respectfully request an extension of time until the Court's receipt of this Motion on May 9, 2005, accompanied by the short and narrowly-focused Amici brief itself.

Because of the shortness of time, consent of the parties to the above-styled matter for either the extension of time or the filing of the amicus brief has not been obtained.

Respectfully submitted,

JAN SCHAKOWSKY
Member of Congress
1027 Longworth House Office Building
Washington, DC 20515
Tel. 202-225-2111
Fax 202-226-6890
On behalf of herself and
GEORGE MILLER
Member of Congress

Dated May 9, 2005

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re ) | |
| ) | |
| UAL CORPORATION, et al. ) | Chapter 11 |
| ) | |
| Debtors. ) | Case No. 02-B-48191 |
| ) | (Jointly Administered) |
| ) | |
| ) | Hon. Eugene R. Wedoff |
| ) | |
| ) | Pre-trial Hearing Date: May 9, 2005 |
| ) | Pre-trial Hearing Time: 1:30 p.m. |
| ) | |
| ) | Hearing Date: May 10, 2005 |
| ) | Hearing Time: 10:30 a.m. |

**MEMORANDUM OF AMICI CURIAE MEMBERS OF CONGRESS IN OPPOSITION TO APPROVAL OF DEBTOR'S AGREEMENT WITH PBGC**

**INTEREST OF THE AMICI CURIAE**

Members of Congress Jan Schakowsky and George Miller submit this memorandum as amici curiae for the purpose of bringing to the Court's attention their views on whether the April 2005 Agreement between the Pension Benefit Guaranty Corporation (PBGC) and debtor United Airlines ("the Agreement") comports with the congressional intent of statutes governing bankruptcy, collective bargaining rights, and pension plan terminations. This Agreement, whereby all of United's pension plans would be terminated, has been brought to the Court for its approval. Amici's interest is in preserving Congress's intent to strike a fair and equitable balance between the collective bargaining rights of workers and the needs of business in bankruptcy organization. Additionally, our interest is in the broader public policy goal of maintaining the defined benefit plan system and stemming a wider crisis in the airline industry's

1

and the country's retirement system. We respectfully request the Court to consider these views and critically examine whether in fact there is a need to terminate all of United's plans, allowing the Company to break its promises to its employees.

## INTRODUCTION

United Airlines has sought to terminate all four of its pension plans. The PBGC has, until this Agreement, opposed such terminations. As recently as April 14, 2005, the PBGC requested the Court to postpone consideration of United's motion for distress terminations of its pension plans, as in its view the Company had failed to demonstrate that the plans could not be saved. Consequently, the PBGC sought discovery of documents relevant to the affordability of at least one plan. In short order, however, the PBGC has reversed course based on the deal struck with United. Under the deal, the PBGC will terminate all of United's qualified defined benefit plans in exchange for $1 billion in securities from United. The terminations enable the PBGC to limit its losses and immediately maximize its asset collection, yet pay retiree benefits over a delayed period of time. However, the losses to employees, estimated by the PBGC at over $3 billion, are immediate and unrecoverable.

To the extent that the terminations are conditioned upon United's payment of $1 billion in securities to the PBGC, these terminations are not involuntary. The deal itself appears to be, at least on United's behalf, an end-run around the Company's obligation to engage in good-faith bargaining with its unions over the fate of the plans. Under the Bankruptcy Code, 11 U.S.C. 1113(f), a debtor may not unilaterally alter or void a collective bargaining agreement unless it first complies with the provisions of that section. Namely, the debtor must negotiate in good faith with its employees' representatives, presenting proposals for modifications to employee benefits plans which are *necessary* for the debtor's successful reorganization in bankruptcy.

2

As termination of all plans seemed far from necessary in the PBGC's view just days before the deal was struck, we remain and urge the Court to remain skeptical that termination of all plans is in fact necessary. If termination of any particular plan sustained by collective bargaining agreement is not necessary, then the Company's bargaining obligations under Section 1113 have not been exhausted. The Company must continue to negotiate in good faith with its unions over the fate of the plans in question. Unfortunately, however, the practical effect of the deal with the PBGC is to render meaningless any further bargaining to save the plans. The Company, whose apparent goal is to shed all of its defined benefit plans, has no further incentive to strike a deal with a union to save a pension plan. With the PBGC agreement, the Company need only pay $1 billion in securities to the federal agency to purchase PBGC terminations of its plans.

## ARGUMENT

1. **The PBGC-United Agreement Undermines Congressional Intent Behind the Collective Bargaining Obligations of Section 1113.**

This Agreement flies in the face of what Congress intended by both Section 1113 and ERISA's plan termination insurance program. Congress enacted Section 1113 in reaction to the U.S. Supreme Court's decision in <u>NLRB v. Bildisco & Bildisco, Debtor-in-Possession</u>, 465 U.S. 513 (1984), which held that a debtor did not commit an unfair labor practice by unilaterally rejecting a collective bargaining agreement in bankruptcy. That same year, Congress passed the Bankruptcy Amendments – particularly Section 1113 – to overturn <u>Bildisco</u>, prohibiting unilateral rejection of collective bargaining agreements by a debtor unless and until a bankruptcy court has determined that the debtor has met the collective bargaining requirements laid out by Section 1113. The congressional outcry against <u>Bildisco</u>'s subversion of collective bargaining

3

rights of employees to the reorganization prerogatives of a debtor-employer was swift. The Bankruptcy Amendments passed the House by a vote of 394-0 and passed the Senate by an unrecorded voice vote – and were signed into law by President Reagan less than 5 months following the Supreme Court's Bildisco decision. 130 Cong. Rec. H7499 and S8887 (daily ed. June 29, 1984); 157 Pub. L. No. 98-353. Apparently thus far unable to achieve what it wants with the unions with which it is obligated to bargain, the Company has turned to the PBGC, offered a payment in securities worth $1 billion, and won what has been characterized as PBGC-initiated plan terminations, presumably to avoid any further need for negotiations with the unions. With this deal, if approved, termination of the plans becomes a fait accompli, and collective bargaining to determine the fate of the plans becomes futile. This is not what Congress intended with Section 1113.

2. **The PBGC-United Agreement Undermines Congressional Intent Behind the Purposes of the Plan Termination Insurance Program in ERISA.**

This Agreement also does not square with Congress's intent behind the plan termination insurance program of the PBGC. Laid out explicitly in the Employee Retirement Income Security Act (ERISA), the purposes of the PBGC are three-fold:

> (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,
> (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and
> (3) to maintain premiums established by the corporation . . . at the lowest level consistent with carrying out its obligations under this subchapter.

29 U.S.C. 1302(a). First and foremost among these purposes is the continuation and maintenance of pension plans. Yet the effect of this Agreement is the termination of plans, apparently without regard to whether those plans need to be terminated for successful bankruptcy

4

reorganization but with great regard to whether the Agreement "is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy." See "PBGC Reaches Pension Settlement with United Airlines," PBGC Press Release, April 22, 2005. Whether those plans could survive bankruptcy appears to still be in question, considering the PBGC's very recent contention that at least one plan may remain viable. If a plan is salvageable and the PBGC is terminating the plan – with all of the cuts to participants' benefits that accompany plan termination – it does not appear conceivable that the PBGC is in fact complying with its statutory obligation to encourage "the continuation and maintenance of voluntary private pension plans for the benefit of their participants." Additionally, if one company enters bankruptcy and manages to shed all of its pension liabilities onto the PBGC, its competitors will be under intense pressure to follow suit, leading to further plan terminations and the further deterioration of the defined benefit pension system.

## CONCLUSION

Amici respectfully request that, when considering the propriety of the PBGC-United Agreement, the Court take into account Congress's intent behind the framework for protecting collective bargaining rights in bankruptcy and for encouraging the continuation and maintenance of the defined benefit pension system. Based on our understanding of that Agreement, gathered in the limited time available to consider it, we believe the Agreement undermines the collective bargaining process envisioned by Section 1113 and, particularly if one or more of the plans is in fact salvageable, undermines the key purpose behind the plan termination insurance program of ERISA.

5

/s/ Jan Schakowsky
JAN SCHAKOWSKY
Member of U.S. Congress
1027 Longworth House Office Building
Washington, DC 20515
Tel. 202-225-2111
Fax 202-226-6890
On behalf of herself and
GEORGE MILLER
Member of U.S. Congress

Dated May 9, 2005

## CERTIFICATE OF SERVICE

I, Guerino J. Calemine, III, hereby certify that, on this 9th day of May 2005, true copies of the foregoing Motion of Members of U.S. Congress for Extension of Time to File Amicus Brief in Response to Emergency Motion to Approve Debtor's Agreement with PBGC and Memorandum of Amici Curiae in Opposition to Approval of Debtor's Agreement with PBGC were served via overnight delivery or facsimile to the Core Group Service List and via electronic mail to the 2002 List provided at http://www.pd-ual.com/ .

_____
Guerino J. Calemine, III