```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


                                      )
ASSOCIATION OF FLIGHT                 )
ATTENDANTS-CWA, AFL-CIO,              )
501 Third Street, N.W.                )
Washington, DC  20001,                )
                                      )
         Plaintiff,                   )   Civil Action No. _____
                                      )
    v.                                )   Expedited Hearing
                                      )   Requested
PENSION BENEFIT GUARANTY              )
CORPORATION,                          )
1200 K Street, N.W.                   )
Washington, DC  20005,                )
                                      )
                                      )
         Defendant.                   )
                                      )
```

## DECLARATION OF GREGORY DAVIDOWITCH

Gregory Davidowitch hereby declares, in accordance with 28 U.S.C. § 1746, as follows:

1. Since July 1, 2002, I have served as the President of the Master Executive Council ("MEC") for the Association of Flight Attendants-Communications Workers of America, AFL-CIO ("AFA"), at United Airlines ("United" or the "Company"). The MEC is composed of the presidents of 17 Local Executive Councils ("LEC") at United. AFA establishes an LEC at each domicile where Flight Attendants are based. I am the highest elected AFA official, representing exclusively United Flight Attendants. The matters set forth herein are based upon my personal knowledge.

2.   As MEC President, I communicate regularly with United's executives, including officers of the Company and senior management, regarding issues of importance to Flight Attendants.

3.   In November 2004, United proposed to all of its unions modifications to their collective bargaining agreements that would permit termination of the Company's four defined benefit plans. Section 34(1) of AFA's collective bargaining agreement with United expressly bars "[t]he Company" from "reduc[ing]" "benefits provided in the Retirement Plans ... without the prior agreement of the Union."  (Attached hereto as Exhibit A is a true and correct copy of Section 34 of the United 2003-2009 Flight Attendant Agreement.) United proposed replacing the Flight Attendants' defined benefit pension plan ("Flight Attendant Plan") with a 3% defined contribution plan.  United also demanded $725 million in average annual concessions from its unions, including $135 million from AFA through 2010 -- the term of United's restructuring business plan.

4.   Just as the scheduled hearing on United's Section 1113(c) Motion was set to begin, the parties reached agreement on the $130 million in annual savings ("2005-2010 Agreement").  A side letter to the 2005-2010 Agreement provided that "United and AFA-CWA will continue to meet and confer regarding the Defined Benefit Plan." (Attached hereto as Exhibit B is a true and correct copy of the Letter of Agreement between United Airlines, Inc. and The Flight Attendants in the Service of United Airlines, Inc.)  That letter further provided that, if the parties were unable to reach

agreement on the pension issue by April 11, United would re-file its Section 1113(c) Motion with respect to the pension issue.

5.   On January 31, Flight Attendants ratified the 2005-2010 Agreement by a margin of 56% to 44%.  Over 70% of eligible Flight Attendants participated in the ratification vote, the highest turnout for any vote conducted by the Union in the course of United's bankruptcy.

6.   In late January, while the 2005-2010 Agreement was still out for a ratification vote, AFA turned its efforts toward addressing the open pension funding issues.  On January 27, 2005, AFA met with PBGC and learned that the agency was willing to explore a wide range of options to termination of the Flight Attendant Plan.

7.   During February 2005, the actuarial firm of Feinstein, Glaser & Olney, previously retained by AFA, continued to provide professional analysis of alternatives to plan termination, and the impact of those alternatives on the retirement benefits of Flight Attendants.  AFA also continued to request from the Company the information necessary for the Union's actuaries and other professionals to evaluate alternatives to termination.  In the same time period, AFA also researched various pension funding solutions, including the solution adopted by General Motors Corporation in 2003, in which the company issued debt and placed the proceeds into its plans.

8.   AFA and the Company met to discuss pension issues on March 3, 2005.  The PBGC participated in the meeting by telephone.

At the meeting, AFA outlined the ideas that would later form its proposal to United, including the contribution of common stock received by AFA in bankruptcy, issuance to AFA of a note like that United issued to ALPA, and a possible contribution from PBGC to assist in meeting the minimum funding requirements for the Plan.

9.  In order to further develop its alternative funding proposal, AFA retained corporate counsel Gregg S. Lerner of Freidman Kaplan Seiler & Adelman LLP in early March.  On March 15, Mr. Lerner, other representatives of AFA, and I met with the PBGC to discuss further the outlines of AFA's proposal.  The PBGC representatives were receptive to AFA's proposal, despite the fact that it contemplated PBGC undertaking unprecedented obligations in order to preserve a pension plan.

10.  On March 30, 2005, AFA's corporate counsel sent a letter to Bradley D. Belt, PBGC's Executive Director.  (Attached hereto as Exhibit C is a true and correct copy of the letter dated March 30, 2005 from Lerner to Belt).  Earlier on the same date, AFA had sent to PBGC a formal term sheet for its pension proposal.  (Attached hereto as Exhibit D is a true and correct copy of the term sheet.)  The term sheet presented five potential sources of funding that would permit the Plan to remain intact:

   (1)  an estimated $150-$250 million in UAL common stock to be received in bankruptcy representing both (i) the value of AFA's unsecured claims arising from prior wage reductions and (ii) the value of PBGC's claim were the Flight Attendant Plan terminated;

   (2)  $165 million in payments that United had proposed to make to a defined contribution plan in lieu of payments to the Flight Attendant Plan;

  (3) a note of like tenor to the note received by ALPA from United in conjunction with termination of the pilots' plan;

  (4) application to the IRS for minimum funding waivers; and

  (5) if necessary, a contribution from PBGC in an amount sufficient when combined with the other funding sources in 1-4 to fund United's minimum funding contributions through December 31, 2010.

  11. Executive Director Belt responded to AFA's letter on April 4, 2005.  (Attached hereto as Exhibit E is a true and correct copy of the letter dated April 4, 2005 from Belt to Lerner).  Mr. Belt characterized the proposal as "constructive" and reiterated the position taken by the agency before this Court "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11."  Mr. Belt added that: "Based upon available information, we continue to believe that the interests of participants and the pension insurance program would best be served by the continuance of the AFA plan."  In closing, he encouraged further work between the agency and AFA to resolve the pension funding issue.

  12. As MEC President, I communicate regularly with Flight Attendants about the impact of United's reorganization on their jobs and lives.  Two concessionary agreements with United have resulted in a 19% wage cut for Flight Attendants, as well as a substantial increase in what Flight Attendants pay for healthcare.  Based on my numerous communications with Flight Attendants, I know that, of all the hardships imposed on them during this restructuring, Flight Attendants, as a group, are most concerned

about losing their pension benefits. Through various media, including direct mail and the AFA-United MEC Web site, AFA has educated Flight Attendants about the impact of United's proposal to terminate the Flight Attendant Plan. Specifically, AFA has explained to Flight Attendants that, on average, replacement of the Flight Attendant Plan with the defined contribution plan proposed by the Company will result in a 50% decrease in retirement benefits. Needless to say, the reaction of Flight Attendants to this information has been uniformly negative. Since November 2004, I would estimate that approximately 100 Flight Attendants have told me that if United terminated the Flight Attendant Plan they would retire or resign from United.

13. As a result of the Bankruptcy Court's approval of the Agreement terminating the Flight Attendant Plan, many Flight Attendants will make decisions, with irreversible consequences, regarding whether to continue their employment with United on the basis of the benefits available to them upon termination of the Flight Attendant Plan and replacement with a defined contribution plan. Many Flight Attendants, including the approximately 100 I have spoken to since November, will undoubtedly resign or retire from United if the Flight Attendant Plan is terminated based on the substantial diminution of their overall compensation.

14. Many of the consequences of retiring or resigning cannot be reversed. First, Flight Attendants who voluntarily retire or resign and then seek reinstatement will have forfeited their seniority, when and if United rehires them. Restoration of

seniority status, even if permitted, would prejudice the interests of other Flight Attendants who will have moved up in seniority rank in the interim. Further, retirement or resignation, especially when not anticipated, often involves significant lifestyle changes, including relocation, sometimes to pursue other work opportunities. This is particularly true of those retiring if their anticipated retirement income is insufficient to support continuation in their current residence. Others may need to relocate to pursue other work opportunities. Obviously, if a person sells their home, that is not a transaction which can be undone.