**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **ASSOCIATION OF FLIGHT** | ) | |
| **ATTENDANTS – CWA, AFL-CIO,** | ) | |
| | ) | **Civil Action No.:  1:05CV01036** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PENSION BENEFIT GUARANTY** | ) | **Judge Ellen Segal Huvelle** |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ———————————————— | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO THE ASSOCIATION OF FLIGHT ATTENDANTS'**
**MOTION FOR PRELIMINARY INJUNCTION**

Dated:  May 27, 2005
        Washington, DC

JEFFREY B. COHEN (DC Bar # 347880)
Chief Counsel
CHARLES L. FINKE
Associate Chief Counsel
PAULA J. CONNELLY (DC Bar # 389055)
Assistant Chief Counsel
ANDREA M. WONG (DC Bar # 449128)
SHANNON L. NOVEY (DC Bar # 476277)
JOEL RUDERMAN (DC Bar # MD13125)
Attorneys
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 326-4020, ext. 3448
Facsimile:  (202) 326-4112
Emails: wong.andrea@pbgc.gov and
         efile@pbgc.gov

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Statutory and Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Distress Termination under 29 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     PBGC-Initiated Termination under 29 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    PBGC's Administrative Process for Informal Adjudication . . . . . . . . . . . . . . . . . . . . 4

        Procedural and Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT - AFA HAS WHOLLY FAILED TO ESTABLISH ANY OF THE FOUR
PREREQUISITES NECESSARY FOR A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . 10

I.      AFA IS NOT ENTITLED TO AN INJUNCTION BECAUSE IT CANNOT
        SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS . . . . . . . . . . . . . . . . . . . . . 12

        A.      The Agreement is Consistent with ERISA, and PBGC is Acting
                Completely within its Statutory Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.      Because PBGC Has Not Taken Final Action, An Injunction
                May Not Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.     AFA CANNOT SHOW IRREPARABLE HARM WILL RESULT IF A
        PRELIMINARY INJUNCTION IS DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    OTHER INTERESTED PARTIES STAND TO BE HARMED IF THE COURT
        GRANTS AFA'S MOTION FOR PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . 20

IV.     PUBLIC INTEREST FAVORS DENIAL OF AFA'S MOTION FOR
        PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES CITED</u>

<u>Page(s)</u>

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Adair v. England*,
    217 F. Supp. 2d 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

* *Allied Pilots Ass'n v. PBGC* ,
    334 F.3d 93 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*American Bankers Ass'n v. Nat'l Credit Union Admin.*,
    38 F. Supp. 2d 114 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Boivin v. US Airways, Inc.*,
    297 F. Supp. 2d 110 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

* *Citizens Alert Regarding the Env't v. EPA*,
    355 F. Supp. 2d 366 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Citizens Alert Regarding the Env't v. EPA*,
    259 F. Supp. 2d 9 (D.D.C. 2003)
    *aff'd*, 2004 WL 1336644 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*CityFed Financial Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Clifton Power Corp. v. FERC*,
    294 F.3d 108, 110 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Common Sense Salmon Recovery v. Evans*,
    329 F. Supp. 2d 96 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hercules, Inc. v. EPA*,
    598 F.2d 91 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hughes Aircraft Co. v. Jacobson,*
  525 U.S. 432 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kahane v. Secretary of State,*
  700 F. Supp. 1162 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 21

*LaRouche's Comm. for a New Bretton Woods v. FEC,*
  2004 WL 1701046 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nat'l Conf. on Ministry to the Armed Forces v. James,*
  278 F. Supp. 2d 37 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Nat'l Nutritional Foods Ass'n v. FDA,*
  491 F.2d 1141 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pan American World Airways, Inc. Co-op Retirement Income Plan, In re,*
  777 F. Supp. 1179 (S.D.N.Y. 1991),
  *aff'd mem.,* 970 F.2d 896 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Patriot Inc. v. Dep't of Hous. & Urban Dev.,*
  963 F. Supp. 1 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21

*PBGC v. Kaiser Aluminum,*
  2005 WL 735551 (D. Del. March 30, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*PBGC v. Republic Technologies Int'l,*
  386 F.3d 659 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pension Comm. for Farmstead Foods Pension Plan for*
  *Albert Lea Hourly Employees v. PBGC,*
  991 F.2d 1415 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*San Luis Obispo Mothers for Peace v. NRC,*
  751 F.2d 1287 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Serono Laboratories, Inc. v. Shalala,*
  158 F.3d 1313 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*US Airways Group, Inc., In re,*
  296 B.R. 734 (Bankr. E.D. Va. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

-iii-

*Wisconsin Gas Co. v. FERC*,
  758 F. 2d 669 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Yakus v. United States*,
  321 U.S. 414 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**\* Authorities chiefly relied upon are marked with an asterisk.**

## UNITED STATES CODE CITED

**Page(s)**

5 U.S.C.
  Section 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11 U.S.C.
  Section 1113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20
  Section 1113(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  Section 1113(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 7
  Section 1113(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26 U.S.C.
  Section 9041 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 U.S.C.
  Sections 1301-1461 (2000 & Supp. II 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  Section 1301(a)(14)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  Section 1303(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16, 18
  Section 1321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  Section 1322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  Section 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 12, 13
  Section 1341(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  Section 1341(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12
  Section 1341(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  Section 1341(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  Section 1341(c)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  Section 1341(c)(2)(B)(ii)(IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3
  Section 1341(c)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  Section 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
  Section 1342(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
  Section 1342(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 76, 15
  Section 1348(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  Section 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  Section 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
  Section 1370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## <u>OTHER AUTHORITIES CITED</u>

<u>Page(s)</u>

29 C.F.R.

    Section 4041.7(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Section 4041.7(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Section 4041.7(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Section 4041.7(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Section 4041.7(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Section 4041.44(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Section 4041.44(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Section 4041.41(c)(2)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

On May 20, 2005, the Association of Flight Attendants-CWA, AFL-CIO ("AFA") filed and served a Complaint and Motion for Preliminary Injunction ("Motion") on the Pension Benefit Guaranty Corporation ("PBGC"). AFA seeks to enjoin PBGC from terminating the United Airlines Flight Attendant Defined Benefit Pension Plan ("FA Plan"), a defined benefit pension plan sponsored by United Airlines, Inc. ("United"). PBGC files this opposition to the Motion because AFA has wholly failed to satisfy the requirements for such relief.

AFA is unhappy about a settlement agreement between PBGC and United resolving most of the issues between them arising out of United's Chapter 11 bankruptcy case, including issues involving the FA Plan. Having failed to block bankruptcy court approval of the agreement, AFA attempts an end run of the Chapter 11 proceeding by bringing this suit, the sole purpose of which is to stop PBGC from performing its statutory duties with regard to the FA Plan. The legal theories underlying AFA's suit lack any merit, and the relief sought could wreak havoc on the nation's pension termination insurance program administered by PBGC. A preliminary injunction is completely inappropriate in this case.

## Statutory and Regulatory Background

PBGC is the United States government agency that administers the pension plan termination insurance program pursuant to Title IV of ERISA.[1] When a pension plan covered by Title IV terminates without sufficient assets to pay all promised benefits, PBGC typically becomes trustee of the plan and pays participants their pension benefits up to statutory limits.[2]

---

[1] 29 U.S.C. §§ 1301-1461 (2000 & Supp. II 2002).

[2] 29 U.S.C. §§ 1321, 1322, 1361.

Title IV provides the exclusive means for terminating a pension plan.[3]  Plan termination of an underfunded plan may be initiated either (1) by the employer in a "distress" termination pursuant to 29 U.S.C. § 1341, or (2) by a PBGC-initiated termination pursuant to 29 U.S.C. § 1342.

## I.    Distress Termination under 29 U.S.C. § 1341

A distress termination requires that the employer provide participants and PBGC notice of its intent to terminate the pension plan, and that the employer meet one of four statutory tests for distress.[4]  The tests generally require that the plan sponsor be in financial distress and essentially be unable to afford the pension plan and continue in business.  Pursuant to PBGC regulation, the notice to PBGC is filed on PBGC Form 600, Distress Termination, Notice of Intent to Terminate.[5]

Here, United invoked the "reorganization in bankruptcy" distress test, which requires the employer to be in Chapter 11 bankruptcy proceedings and to move for bankruptcy court approval of the distress termination.[6]  The statute requires the bankruptcy court to find that unless the pension plan is terminated, the employer, United, and each debtor member of its controlled group will be unable to pay all of their debts under a plan of reorganization, and will be unable to continue in business outside of bankruptcy.[7]  PBGC will be bound by a final and non-appealable

---

[3]  29 U.S.C. § 1341(a); *see Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999).

[4]  *See* 29 U.S.C. § 1341(c)(1).

[5]  PBGC reviews the Form 600 to ensure compliance with ERISA's requirements.  *See* 29 C.F.R. § 4041.44(a), (b).  PBGC also determines whether the plan is sufficient for guaranteed benefits.  *See* 29 U.S.C. § 1341(c)(3)(A); 29 C.F.R. § 4041.47.

[6]  29 U.S.C. § 1341(c)(2)(B)(ii).

[7]  29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

order of the court.[8]  In addition, non-debtor controlled group members must establish to PBGC

that they too cannot afford to maintain the plan and stay in business.[9]

ERISA prohibits PBGC from processing a distress termination if it would violate an

existing collective bargaining agreement.[10]  Under the bankruptcy code, a debtor may amend or

reject its collective bargaining agreement pursuant to 11 U.S.C. § 1113 to allow the distress

termination.[11]  During this time, the distress termination process is suspended.[12]  If the proposed

distress termination violates a collective bargaining agreement, PBGC will suspend the

processing of the distress termination proceeding, and all actions taken to effect it will be null

and void.[13]  If the proposed distress termination does not violate the collective bargaining

agreement, PBGC will reactivate the distress termination proceeding.[14]  Significantly, nothing in

ERISA prevents PBGC from itself initiating termination of a pension plan under 29 U.S.C.

§ 1342, notwithstanding the existence of a distress termination filing or a "contract bar."[15]

---

[8]  29 U.S.C. § 1341(c)(2)(B)(ii)(IV); 29 C.F.R. § 4041.41(c)(2)(iv).

[9]  29 U.S.C. § 1341(c)(2)(B).

[10]  29 U.S.C. § 1341(a)(3).

[11]  A debtor may reject or modify a collective bargaining agreement if the debtor complies with the requirements in 11 U.S.C. § 1113.  The debtor must first negotiate in good faith with its employees to reach consensual modifications to the collective bargaining agreement.  *See* 11 U.S.C. § 1113(b).  If such negotiations fail, the debtor may apply to the bankruptcy court to reject the collective bargaining agreement over the employees' objections.  11 U.S.C. § 1113(c), (d).

[12]  29 C.F.R. § 4041.7(a), (c)(1).

[13]  29 C.F.R. § 4041.7(d)(1).

[14]  29 C.F.R. § 4041.7(d)(2).

[15]  29 U.S.C. § 1341(a)(3) provides:  "[PBGC] shall not proceed with a [distress] termination of a plan under this section if the termination would violate the terms and conditions of an existing collective bargaining agreement.  Nothing in the preceding sentence shall be

## II.   PBGC-Initiated Termination under 29 U.S.C. § 1342

PBGC may institute proceedings to terminate a pension plan whenever it determines that one or more of four statutory criteria contained in § 1342 are met.  That section provides that PBGC "may institute proceedings . . . to terminate a plan" whenever it determines that:

> (1) the plan has not met the minimum funding standard required under section 412 of Title 26 . . .;
> (2) the plan will be unable to pay benefits when due;
> (3) the reportable event described in section 1343(c)(7) of this title has occurred; or
> (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.[16]

After making the necessary finding, PBGC may effect plan termination and its appointment as statutory trustee either by seeking an order of a federal district court, or by entering into an agreement with the plan administrator.[17]  Importantly, the statutory criteria to terminate under §§ 1341 and 1342 are not the same.[18]

## III.   PBGC's Administrative Process for Informal Adjudication

PBGC follows an established administrative process to determine whether a pension plan should terminate under 29 U.S.C. § 1342.[19]  The Trusteeship Working Group ("TWG") – an interdisciplinary body comprised of members from PBGC's financial, actuarial, policy, and legal

---

construed as limiting the authority of [PBGC] to institute proceedings to involuntarily terminate a plan under [29 U.S.C. § 1342]."  *See also* 29 C.F.R. § 4041.7(f).

[16]  Section 1342(a) also mandates that PBGC initiate termination of plan when it does not have assets to pay benefits currently due participants.

[17]  29 U.S.C. § 1342(c).

[18]  *Compare In re Pan American World Airways, Inc. Co-op Retirement Income Plan*, 777 F. Supp. 1179, 1183 (S.D.N.Y. 1991), *aff'd mem.*, 970 F.2d 896 (2d Cir. 1992) *with In re US Airways Group, Inc.*, 296 B.R. 734, 743 (Bankr. E.D. Va. 2003).

[19]  *See* Bacon Decl., Exh. D.

offices – reviews a written recommendation by PBGC staff that one or more of the statutory criteria under 29 U.S.C. § 1342(a) have been met, and that the pension plan should be terminated. The TWG considers the recommendation from staff, and then makes its own recommendation, with supporting documents, to the "approving official."[20]

In cases involving claims of more than $100,000,000, the approving official is the agency's Executive Director.[21] The Executive Director reviews the TWG recommendation and determines whether to terminate the plan and have PBGC appointed trustee, and proposes an appropriate plan termination date.[22] The Executive Director's decision is documented in a Notice of Determination ("NOD") and a Termination and Trusteeship Decision Record ("TDR").[23] PBGC sends the NOD to the plan administrator.[24] PBGC typically effects the termination, trusteeship, and establishment of the plan termination date by agreement with the plan administrator. Where PBGC and the plan administrator cannot agree, ERISA authorizes PBGC to apply to the appropriate United States district court for a decree adjudicating that the plan is terminated, and appointing PBGC trustee.[25]

---

[20] Bacon Decl., Exh. D at § 3(d)(3). *See id.* at §§ 2(b), (j), and 3. The TWG reviews actuarial, financial and other information regarding the pension plan's funding status and the financial condition of the employer and relevant members of its corporate group. *See id.* at § 3(a)-(e); *see also* 29 U.S.C. § 1301(a)(14)(A).

[21] *See* Bacon Decl., Exh. D at § 2(b)(4).

[22] *See id.* at § 3(d)(5).

[23] *See id.* at §§ 2(f), (h), 3(d)(5). The administrative process is the same for a distress termination except the PBGC staff, TWG, and approving official must determine that the employer satisfies one of the four distress tests contained in 29 U.S.C. § 1341(c).

[24] 29 U.S.C. § 1342(c).

[25] *Id.*

**Procedural and Factual Background**

Although the instant lawsuit has just been filed, a significant factual and procedural history is necessary to place this suit in context. United sponsors four underfunded defined benefit pension plans (the "Pension Plans"), including the FA Plan,[26] that are covered by Title IV of ERISA. Collectively, the Pension Plans are underfunded by almost $10 billion.[27] The FA Plan provides pension benefits to current and former United flight attendants and their beneficiaries.

On December 9, 2002, United and other members of its corporate group filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Illinois. The cases are being jointly administered. Since July 2004, United has failed to make the minimum funding contributions for the Pension Plans required by ERISA and the IRC. Moreover, since the fourth quarter of 2004, United has consistently maintained that it can no longer afford the Pension Plans, *i.e.*, that all four must eventually be terminated so that it can reorganize in bankruptcy.

On November 5, 2004, pursuant to 11 U.S.C. § 1113(c), the Debtors moved to reject their collective bargaining agreements (collectively, "CBAs"), including provisions whose removal was necessary to allow for the distress termination of the Pension Plans.[28] On December 29,

---

[26]   United's other underfunded pension plans are: the United Airlines Pilot Defined Benefit Pension Plan ("Pilot Plan"), the United Airlines Ground Employees Retirement Plan ("Ground Plan"); and the United Airlines Management, Administrative and Public Contact Defined Benefit Pension Plan ("MAPC Plan"). United sponsors a fifth plan, the United Air Lines, Inc. Employees' Variable Benefit Retirement Income Plan ("Variable Plan"), a small overfunded plan not at issue.

[27]   *See* Bacon Decl., Exh. A.

[28]   *See* Novey Decl. at ¶ 4.

2004, and March 10, 2005, proceeding under 29 U.S.C. § 1342, PBGC issued Notices of

Determination that the Pilot and Ground Plans, respectively, should be terminated, and PBGC

should be appointed as their statutory trustee.[29]  PBGC filed Complaints in the United States

District Courts for the Northern District of Illinois and Eastern District of Virginia, seeking

orders terminating the Pilot and Ground Plans, appointing PBGC as the statutory trustee, and

establishing the Plans' termination dates as December 30, 2004 and March 11, 2005,

respectively.[30]  On May 23, 2005, United and PBGC signed a Termination and Trusteeship

Agreement regarding the Ground Plan, whereby PBGC became statutory trustee of the Plan, with

a plan termination date of March 11, 2005.  United and PBGC have therefore filed a joint motion

to dismiss the § 1342 proceedings in the Eastern District of Virginia.

On January 31, 2005, the bankruptcy court approved modifications to the CBAs,

providing either permanent or interim labor savings.  The court also approved an agreement

between the Air Line Pilots Association ("ALPA") and United to modify the pilot CBA,

including removal of the provision requiring United to maintain the Pilot Plan.  CBA provisions

regarding the other Pension Plans and long-term cost savings were deferred until May 2005,

while United continued to negotiate with its unions and PBGC.[31]

Because United and some of its unions could not agree on long-term savings or pension

issues, on April 12, 2005, United renewed its motion under § 1113(c) to reject its CBAs.[32]

Notwithstanding the then-pending PBGC-initiated termination cases with respect to the Pilot and

---

[29]  *See* Bacon Decl. at ¶ 4; *see also* 29 U.S.C. § 1342(c).

[30]  29 U.S.C. §§ 1342 and 1348(a).

[31]  *See* Novey Decl. at ¶ 5.

[32]  *See* Novey Decl. at ¶ 6.

Ground Plans, United moved for approval of the distress terminations of all four Pension Plans ("Distress Termination Motion").[33]  United issued to affected parties Notices of Intent to Terminate both the MAPC and FA Plans, each with a proposed termination date of June 30, 2005.[34]

On April 22, 2005, PBGC and United executed a settlement agreement resolving many complex and difficult pension issues in United's bankruptcy case (the "Agreement").  Under the Agreement, PBGC compromised significant secured, priority, and joint and several claims that otherwise could have real, immediate and large cash costs to United, in exchange for a package of securities and equity in the reorganized United.  For example, PBGC agreed to:

> (1) settle claims for unpaid minimum funding contributions to the Pension Plans, including administrative priority claims estimated by the Plans' independent fiduciary at $993 million;

> (2) give up its joint and several claims of approximately $10 billion for plan underfunding against all 27 debtors, and assert only a single claim in that amount against the estate;

> (3) release its right to a government set-off against the $365 million in tax refunds that United received early in its bankruptcy (the bulk of which PBGC believed it would have been entitled to);

> (4) release its perfected liens against the assets of three non-debtor controlled group members, whose value may exceed $100 million; and

> (5) release its administrative claim relating to insurance premiums of approximately $8 million.

The Agreement also would bring closure to many of the pension issues facing United.  For example:

---

[33]  *See* Novey Decl. at ¶7.

[34]  *See* Bacon Decl., Exh. B.  On April 29, 2005, United also filed with PBGC Forms 600 for the MAPC and FA Plans.  Bacon Decl., Exh. C.

(1) PBGC agreed to initiate the § 1342 process for termination of the FA Plan and the MAPC Plan, which, if completed, would avoid protracted litigation over distress terminations;

(2) the Agreement creates an expedited mechanism for PBGC's review and approval of United's replacement plans under PBGC's "follow-on plan" policy, and PBGC's waiver of its right to restore the Pension Plans; and

(3) PBGC agreed to dismiss its appeal of the bankruptcy court's approval of United's agreement with ALPA regarding pension and other matters.

Clearly, the potential termination of the FA Plan is only a small component of the Agreement. Although the parties can terminate the Agreement if any of the Pension Plans is not terminated during the Chapter 11 process, the Agreement does *not* mandate the termination of the FA Plan, but only the "initiation" of termination proceedings by PBGC staff.

A number of parties, including AFA, filed objections and presented oral argument against the Agreement; the Official Committee of Unsecured Creditors supported the Agreement.[35]  On May 11, 2005, the bankruptcy court entered an order approving the Agreement.[36]  In rendering its opinion, the court specifically recognized that the Agreement did not require the termination of the Pension Plans, and did not violate law by requiring PBGC to exercise its administrative process.[37]  The bankruptcy court also discussed the rights of employees and unions to judicial recourse under 29 U.S.C. § 1303(f) in the event the "aggrieved persons" were to have a claim that PBGC's subsequent actions violated ERISA.[38]  AFA appealed the bankruptcy court's

---

[35]  *See* Novey Decl., Exhs. C and D.

[36]  *See* Novey Decl., Exh. E.

[37]  Novey Decl., Exh. D at 189.

[38]  *See* Novey Decl., Exh. D at 186-87.

approval of the Agreement and moved for a stay of the Agreement pending the appeal.[39]  The bankruptcy court denied AFA's stay motion at a hearing on May 26, 2005, and invited the AFA to take the issue to the district court.

The distress termination proceedings regarding the Pension Plans have been suspended – the bankruptcy court approved a stipulation between United and PBGC to hold in abeyance the Distress Termination Motion, and PBGC is holding in abeyance its processing of United's distress filing.[40]  The proceedings could be resuscitated if one or more of the Pension Plans do not terminate under § 1342.

Since the bankruptcy court's approval of the Agreement, PBGC staff has studied the case for termination of the FA Plan, but has not completed any written recommendation concerning potential termination.  The TWG – the agency's internal deliberative body that considers such recommendations – has not met with regard to the FA Plan.[41]  The Agreement provides that if and when PBGC determines that the FA Plan should be terminated under § 1342, and issues a NOD, United will sign an agreement to effect the termination and PBGC's trusteeship.

## ARGUMENT

## AFA HAS WHOLLY FAILED TO ESTABLISH ANY OF THE FOUR PREREQUISITES NECESSARY FOR A PRELIMINARY INJUNCTION.

The Supreme Court has long recognized that a preliminary injunction is a drastic and extraordinary form of relief that should not be granted absent a clear and convincing showing by

---

[39]  *See* Novey Decl., Exhs. F and G.

[40]  *See* Novey Decl., Exh. B; Bacon Decl. at ¶ 6.

[41]  *See* Bacon Decl. at ¶ 16.

the moving party.[42]  Before granting such extraordinary relief, this Court must find that AFA has

shown that:  (1) there is a substantial likelihood that it will succeed on the merits of its claims;

(2) it will suffer irreparable injury if the injunction is not granted; (3) an injunction will not

substantially injure other interested parties; and (4) the issuance of the injunction is in the public

interest.[43]

     AFA falls far short of showing *any* likelihood of success on the merits, let alone  a

substantial likelihood.[44]  And even if AFA could make that showing, it still would not be entitled

to a preliminary injunction solely on that basis, but must also show irreparable injury.[45]  In order

for an injury to be irreparable, it must be both certain and great, and all existing legal remedies

must be inadequate.[46]  A mere speculative injury is insufficient.  Rather, the moving party "must

show that 'the injury complained of [is] of such *imminence* that there is a 'clear and present' need

for equitable relief to prevent irreparable harm."[47]  Finally, before granting a preliminary

---

[42] *See Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997); *Yakus v. United States*, 321 U.S. 414 (1944); *accord Cobell v. Norton,* 391 F.3d 251, 258 (D.C. Cir. 2004).

[43]*Cobell,* 391 F.3d at 258;  *Serono Laboratories, Inc. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

[44]*Nat'l Conf. on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 45 (D.D.C. 2003)("[A]bsent a 'substantial indication' of the likely success on the merits, 'there would be no justification for the court's intrusion in the ordinary process of administration and judicial review.'") (*quoting Adair v. England*, 217 F. Supp. 2d 1, 4 (D.D.C. 2002)); *Kahane v. Secretary of State*, 700 F. Supp. 1162, 1165 (D.D.C. 1988).

[45] *CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995); *American Bankers Assoc. v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 141 (D.D.C. 1999); *Kahane*, 700 F. Supp. at 1165..

[46]*Wisconsin Gas Co. v. FERC*, 758 F. 2d 669, 674 (D.C. Cir. 1985); *Kahane*, 700 F. Supp. at 1165.

[47] *Wisconsin Gas Co.*, 758 F.2d at 674 (*citation omitted*)); *Nat'l Conference*, 278 F. Supp. 2d at 39.

injunction, a court must examine the public consequences in granting such extraordinary relief.[48]

In doing so, a court should give deference to the public's interest in complying with federal law.[49]

## I.    AFA IS NOT ENTITLED TO AN INJUNCTION BECAUSE IT CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.

In its Motion, AFA seeks an order enjoining PBGC from "initiating the involuntary

termination procedure with respect to the [FA Plan] pursuant to the [Agreement] so long as that

agreement remains in effect."[50]  In its Complaint, it seeks similar relief.  AFA cannot succeed on

the merits in this case because this action seeks too much, too soon.

### A.    The Agreement is Consistent with ERISA, and PBGC is Acting Completely within its Statutory Authority

Contrary to AFA's assertions, there is no violation of ERISA embodied in the Agreement.

First, no distress termination proceedings under 29 U.S.C. § 1341 are ongoing, at United's behest

or otherwise.  Because ERISA prohibits PBGC from processing an employer-initiated

termination if the termination would violate the terms of an existing collective bargaining

agreement, United's distress filings with PBGC are being held in abeyance by the agency.  In

addition, a hearing on United's motion for distress terminations has been postponed indefinitely

by the bankruptcy court.  Accordingly, to the extent AFA is seeking to enjoin § 1341

proceedings, there simply are no such proceedings for the Court to enjoin.[51]

---

[48]  *Kahane*, 700 F. Supp. at 1165.

[49]  *Patriot Inc. v. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997); *see also Kahane,* 700 F. Supp. at 1168.

[50]  Proposed Order submitted with AFA's Motion.

[51]  AFA's assertion that PBGC's entry into the Agreement is an *ultra vires* action that impermissibly "removes the contract bar" of § 1341(AFA brief at 23) is specious.  PBGC has no need to remove the contract bar; § 1341(a)(3) explicitly provides that the contract bar against employer-initiated terminations does *not* limit PBGC's authority to institute termination

-12-

Second, no termination under 29 U.S.C. § 1342 – much less a termination without statutory grounds – is mandated by the terms of the Agreement. Instead, the Agreement only requires PBGC staff to "initiate termination," and specifically provides that "[i]f and when" PBGC determines that the FA Plan should be terminated, PBGC and United will sign a trusteeship agreement terminating the Plan.[52] As the bankruptcy court recognized in approving the Agreement:

> This settlement does not itself terminate the plan, any plan. This settlement provides that the PBGC will go through its administrative procedures to come to a conclusion as to whether the plans in question here ought to be involuntarily terminated.[53]

PBGC has well-established procedures for reaching an agency determination on whether grounds exist for involuntarily terminating a pension plan.[54] The agency is in the early stages of that process with respect to the FA Plan.[55] Accordingly, AFA's second ground for an injunction – that PBGC has agreed to terminate the FA Plan without grounds – is specious.

---

proceedings under § 1342. And it is neither improper nor uncommon for PBGC to institute § 1342 proceedings after a company begins § 1341 proceedings. *See Pension Comm. for Farmstead Foods Pension Plan for Albert Lea Hourly Employees v. PBGC*, 991 F.2d 1415, 1418, 1421 (8th Cir. 1993).

[52] Novey Decl., Exh. E at Exh. 1.

[53] Novey Decl., Exh. D at 188. *See also id.* at 62 (argument of PBGC counsel) ("[W]e have made clear that all the agreement requires us to do is have PBGC staff initiate the internal process for a PBGC-initiated termination. Believe me, Your Honor, that group is not a rubber stamp, and PBGC does not terminate plans in the absence of statutory grounds.").

[54] *See* p. 4, *supra* and Bacon Decl., Exh. D and ¶ 8 .

[55] *See* Bacon Decl. at ¶ 16.

-13-

The D.C. Circuit recently made it clear in *Allied Pilots Ass'n v. PBGC* that PBGC can enter into a settlement agreement that contemplates the future termination of a pension plan.[56] Recognizing PBGC's broad settlement authority contained in 29 U.S.C. § 1367,[57] the D.C. Circuit upheld a settlement agreement under which PBGC was required to terminate the pension plans if certain defined "significant events" occurred. Similarly, here the bankruptcy court correctly concluded that "this settlement does not violate the law," as, under its terms, PBGC "is [agreeing] to exercise its statutory obligation to determine whether a pension plan ought to be involuntarily terminated."[58]

AFA suggested during the May 24 telephone conference with the Court that PBGC's financial recovery under the Agreement has necessarily compromised PBGC's ability to apply the statutory termination criteria, apparently because the agency is predisposed to a result by the lure of the deal. But AFA offers no evidence of this other than the recovery itself. And, as described above, the Agreement contains a host of advantages and disadvantages to all parties. Courts must presume regularity on the part of agency officials in the decision-making process, "absent the most powerful preliminary showing to the contrary."[59] Moreover, courts must presume that "when administrative officials purport to decide weighty issues within their domain,

---

[56]  334 F.3d 93 (D.C. Cir. 2003).

[57]  Section 1367 authorizes PBGC "to make arrangements with any contributing sponsors and members of their controlled groups who are or may become liable under [Title IV of ERISA] for payment of their liability . . . ."

[58]  Novey Decl., Exh. D at 189.

[59]  *Nat'l Nutritional Foods Ass'n v. FDA*, 491 F.2d 1141, 1146 (2d Cir. 1974).

they have conscientiously considered the issues."[60]  Additionally, Congress expressly stated that

avoiding unreasonable losses to its insurance fund is a justification for PBGC to initiate a

termination.[61]  Thus, Congress expected PBGC to act in the interests of the pension insurance

system and its stakeholders in weighing plan terminations.[62]  Accordingly, the Agreement and

PBGC's obligations under it are completely consistent with ERISA, and AFA cannot succeed on

its allegations to the contrary.

AFA also focuses in great detail on PBGC's initial opposition to United's motion to

allow for the distress termination of the FA Plan, and the parties' efforts to avoid that result –

suggesting the agency's recovery under the Agreement must be the sole factor motivating any

future termination proceedings.[63]  Of course, the changes in the economy, the airline industry,

and the company's financial and operational circumstances will play a role in any termination

analysis, and if PBGC ultimately determines that the statutory termination criteria are met, its

grounds will be documented in an administrative record and subject to challenge.  But it is

---

[60] *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978) (citations omitted).  AFA also asserted during that conference call that PBGC's decision-making process will be tainted because its Executive Director, the ultimate decisionmaker on plan termination, was the agency's signatory to the Agreement.  This naked allegation similarly does not constitute evidence of irregularity.

[61] 29 U.S.C. § 1342(a)(4), (c)

[62] *See PBGC v. Republic Technologies Int'l*, 386 F.3d 659, 668 (6th Cir. 2004)  ("ERISA provides for involuntary termination proceedings precisely so that PBGC can protect its own financial interests and 'avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.'").

[63] Plaintiff's Memorandum at 10-13; Babcock Decl.

premature to address the merits of any PBGC analysis when AFA is trying to prohibit the agency from performing that very analysis.[64]

In any event, termination of the FA Plan through the PBGC-initiated termination process under § 1342 is not necessary for the Agreement to be effectuated. As PBGC stated to the bankruptcy court: "we left open the possibility that if the agency could not find that there [were] statutory grounds to terminate two plans that have not yet been the subject of PBGC-initiated termination [including the FA Plan], . . . we would have to have the distress termination hearing [under section 1341] go forward at a later date."[65]

Finally, AFA's action is a collateral attack on the bankruptcy court's approval of the Agreement, and is unsustainable on that basis. AFA objected to the Agreement in the bankruptcy court, and did not prevail. The bankruptcy court approved the Agreement, and AFA has appealed that decision to the federal district court for the Northern District of Illinois. The bankruptcy court expressly acknowledged that the Agreement did not terminate the Plans or require their termination, and relied on the availability of a challenge under 29 U.S.C. § 1303(f) to a termination decision actually made by PBGC. The appeal of that order is the appropriate

---

[64] A myriad of factors played a role in PBGC's decisions in this regard. This includes the prospect for success in any contested distress termination proceeding. Even assuming that PBGC's expert would still opine in May that United might be able to afford to maintain the FA Plan outside bankruptcy, (at his May 5, 2005 deposition he expressed no opinion about that), it is reasonably possible that the bankruptcy court would have ruled in United's favor. This possibility was exacerbated by a recent district court decision, *see PBGC v. Kaiser Aluminum*, 2005 WL 735551 (D. Del. March 30, 2005) (appeal filed 3d Cir. May 25, 2005), where the district court affirmed the bankruptcy court's erroneous application of the distress test, finding that it was proper to aggregate the pension plans in ruling on the distress termination motion. While PBGC has appealed and believes it will ultimately prevail there, factors like these led PBGC to concluded that its settlement was likely superior to the results the agency would have received by litigating all its issues before the bankruptcy court.

[65] Novey Decl., Exh. D at 62.

-16-

venue to challenge the Agreement, and the Court should reject AFA's attempt to use this suit as a

vehicle to obtain a second bite at the apple simultaneously.

### B.    Because PBGC Has Not Taken Final Action, An Injunction May Not Issue.

AFA cannot succeed on the merits for a more fundamental reason:  PBGC has not taken

final agency action to terminate the FA Plan; therefore, there is nothing for the Court to review.

Accordingly, AFA's action is premature, and should not even be considered at this juncture.

As described above, PBGC has a well-established, multi-step process for reaching a

determination whether there are statutory grounds to terminate a pension plan.  PBGC currently

is in the early stages of that process with respect to the FA Plan.  Staff has not yet made a

recommendation to the TWG, and no meeting of that group has been held or even scheduled.  If

those steps are completed and the TWG recommends termination, the Executive Director will

consider and reach a determination on that recommendation.  Clearly, there is no final agency

action on this matter, and thus nothing for the Court to review or enjoin.

This is a jurisdictional question, as well as a matter of comity between the judiciary and

executive branches.  As the D.C. Circuit has held, "this court is ordinarily without jurisdiction to

review an agency action that is not final."[66]  As this Court similarly found in *Citizens Alert*

*Regarding the Env't v. EPA*, where an agency's review is "ongoing," "there [is] nothing for this

Court to enjoin."[67]  The D.C. Circuit affirmed that holding, finding that until the agency

---

[66]  *Clifton Power Corp. v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002); *accord Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("[w]ith a few exceptions, if there is no final agency action, there is no basis for review of the government's decision or policy"); *Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 102 (D.D.C. 2004).

[67]  355 F. Supp. 2d 366, 368 (D.D.C. 2005) (Huvelle, J.), describing earlier holding at 259 F. Supp. 2d 9, 20 (D.D.C. 2003) (Huvelle, J.).

completed its review and reached a decision, "there has been no final agency action within the meaning of 5 U.S.C. § 704 [the APA], and the matter is not ripe for judicial review."[68]  And the D.C. Circuit has made it equally clear that a statutory provision granting review of agency "action," like 29 U.S.C. § 1303, allows review only of "final agency action," as the APA does.[69]

Here, PBGC has not taken final agency action with respect to the FA Plan.  That will occur only if its Executive Director signs a notice of determination evidencing the agency's conclusion that statutory grounds for plan termination exist and that the Plan should therefore be terminated.  In these circumstances, the Court should respect the autonomy of the agency and allow its process to continue.[70]  As the Supreme Court made clear long ago in *Abbott Laboratories v. Gardner*, a court should not interfere until the "administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."[71]  That simply has not occurred here.

---

[68]  2004 WL 1336644 (D.C. Cir. June 15, 2004).

[69]  *See LaRouche's Comm. for a New Bretton Woods v. FEC*, 2004 WL 1701046 (D.C. Cir. 2004).  The *LaRouche* case involved 26 U.S.C. § 9041, which provides for review of "any agency action by the Commission made under the provisions of this chapter."  Similarly, 29 U.S.C. § 1303(f)(1) authorizes challenge by a list of persons and entities who are "adversely affected by any action of the [PBGC] with respect to a plan . . . ."
   The other jurisdictional provision that AFA cites in its complaint, 29 U.S.C. § 1370, authorizes challenge by a list of persons and entities who are "adversely affected by an act or practice of any party (*other than [PBGC]*)."  Therefore, AFA cannot rely on § 1370 for its position that its request for an injunction is appropriate under ERISA, for the simple reason that one cannot bring an action *against PBGC* under § 1370.  And 29 U.S.C. § 1303(f)(4) provides that section 1303(f) "shall be the exclusive means for bringing actions against [PBGC] under [Title IV of ERISA] . . . ."

[70]  *San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1329 (D.C. Cir. 1984).

[71]  387 U.S. 136, 148-49 (1967).

## II.    AFA CANNOT SHOW IRREPARABLE HARM WILL RESULT IF A PRELIMINARY INJUNCTION IS DENIED

AFA cannot demonstrate that irreparable harm will result if this Court denies its Motion. AFA seeks to prevent PBGC from exercising its statutory authority to initiate termination procedures under § 1342.  According to AFA, if PBGC is not enjoined from terminating the FA Plan, certain flight attendants may resign from their employment upon the FA Plan's termination.  This contention is speculation, and cannot be the basis for a preliminary injunction.[72]

Moreover, this is not the kind of harm that courts find to be irreparable.  Nothing in that passage of time between today and the possible termination date of the FA Plan constitutes irreparable harm.  A decision whether to leave work because there may be a change in benefits due to a plan termination is a personal one faced by participants in many plans that PBGC takes over.  While unfortunate, this type of harm is not what courts consider irreparable.  Participants and their union here must wait and challenge any termination decision after it takes place – after final agency action – as contemplated by the statute.  AFA will have sufficient opportunity at that point to address any perceived impropriety in the termination process.  If PBGC determines that the FA Plan should be terminated and AFA is successful in challenging that determination, flight attendants will have adequate legal remedies.  No irreparable harm occurs to them prior to final agency action.

In similar circumstances of participants suing PBGC over alleged losses to their pensions resulting from the termination of their airline employer's pension plan, this Court found that the plaintiffs injuries were not irreparable, and denied a preliminary injunction:

---

[72] *Wisconsin Gas Co.*, 758 F.2d at 674; *Nat'l Conference*, 278 F. Supp. 2d at 39.

As the D.C. Circuit has explained, "[t]he key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." . . . . The Court does not doubt that the reduction of plaintiffs' benefits has caused them financial hardship, particularly in light of the fact that the plaintiffs are all retirees. But the injuries documented on this record – the forced sale of a house, a boat or stock, or losses due to market declines and U.S. Airways' stoppage of paying health insurance premiums – do not rise to the level of "irreparable" harm necessary to warrant the extraordinary remedy of a preliminary injunction.[73]

Finally, one must look at the alternatives to a PBGC-initiated termination. If PBGC determines there are not grounds under § 1342 (or if it were enjoined from invoking the statutory process), it does not mean the FA Plan will not terminate – it just means that United would have to resuscitate the § 1113 and distress termination process. AFA and participants are on notice of that, and of United's proposed Plan termination date of June 30, 2005. AFA has not set forth any reason why participants will be harmed by a termination that at best would precede the distress termination date by a week or two.

## III.   OTHER INTERESTED PARTIES STAND TO BE HARMED IF THE COURT GRANTS AFA'S MOTION FOR PRELIMINARY INJUNCTION

Enjoining PBGC from initiating the § 1342 termination process "so long as that agreement remains in effect," as AFA requests, could hamstring the agency for months – an obvious injury to PBGC, an interested party. In addition to the harm that will be suffered by PBGC, United, its creditors, and its other employees will suffer significant harm if the Court grants AFA's Motion for Preliminary Injunction. Prior to emerging from bankruptcy, United must obtain confirmation of a plan of reorganization that is agreed to by a majority of its

---

[73] *Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 118-19 (D.D.C. 2003) (citations and footnotes omitted).

creditors in accordance with the Bankruptcy Code. As building blocks to obtain confirmation, United must enter into agreements with certain significant creditors to obtain support for a plan of reorganization. PBGC is one of United's most significant creditors. United and PBGC entered into the Agreement, thereby resolving many difficult and complex pension issues, including PBGC's claims in United's bankruptcy case, and the bankruptcy court approved the Agreement. Therefore, an injunction here poses harm to United and its creditors.

## IV. PUBLIC INTEREST FAVORS DENIAL OF AFA'S MOTION FOR PRELIMINARY INJUNCTION

The public interest favors denial of AFA's Motion. AFA seeks to enjoin PBGC from initiating a termination of the Plan under 29 U.S.C. § 1342. Yet, Congress specifically authorized PBGC to institute proceedings to terminate a pension plan when it determines that certain statutory conditions have been met. If PBGC were enjoined from initiating a termination in this case, it would be precluded from making such a determination and thereby from performing the very acts that Congress has mandated. The public interest is served when public servants are allowed to do the job Congress has mandated that they do. The public's interest in having governmental agencies comply with the laws that created them is great.[74]

An injunction would directly affect PBGC's mission. Congress mandated that PBGC balance multiple and often competing objectives – specifically, to encourage the continuation and maintenance of voluntary pension plans for the benefit of their participants, to ensure that it can make timely and uninterrupted payments to participants in trusteed plans, and to keep premiums

---

[74] *See Patriot, Inc.*, 963 F. Supp. at 6 ("[P]ublic interest is best served by having federal agencies comply with the requirements of federal law"); *see also Kahane,* 700 F. Supp. at 1168 ("the balance is further tipped toward the defendant due to the strong policy interest in compliance with congressional intent").

as low as possible.[75]  PBGC thus has a responsibility to balance the interests of multiple

constituencies: the flight attendants and other employees of United; the flight attendants and

other employees of Braniff, Eastern, Pan Am, and TWA who are currently being paid their

pension benefits by the PBGC; the flight attendants and employees of other airlines that still

maintain pension plans for their workers; the 44 million Americans covered by PBGC's

insurance programs; and potentially the U.S. taxpayers.[76]  Therefore, the public interest strongly

favors denial of AFA's Motion.

## <u>Conclusion</u>

For the foregoing  reasons, AFA has wholly failed to show its entitlement to a preliminary

injunction.  The Court should enter an Order denying AFA's Motion.

Dated:  May 27, 2005
        Washington, DC

Respectfully submitted,

/s/ Andrea M. Wong
JEFFREY B. COHEN (DC Bar # 347880)
Chief Counsel
CHARLES L. FINKE
Associate Chief Counsel
PAULA J. CONNELLY (DC Bar # 389055)
Assistant Chief Counsel
ANDREA M. WONG (DC Bar # 449128)
SHANNON L. NOVEY (DC Bar # 476277)
JOEL RUDERMAN (DC Bar # MD13125)
Attorneys
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 326-4020, ext. 3448
Facsimile:  (202) 326-4112
Emails: wong.andrea@pbgc.gov and efile@pbgc.gov

---

[75]  29 U.S.C. § 1302(a).

[76]  *See* Novey Decl., Exh. D at 181-183 (Wedoff, J.) (recognizing the public policy in "protecting the solvency of the pension benefit guarantee system").