## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS – CWA, AFL - CIO, 501 Third Street, N.W. Washington, D.C.  20001 | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. <u>1:05CV01036</u> |
| PENSION BENEFIT GUARANTY CORPORATION, 1200 K Street, N.W. Washington, D.C.  20005 | ) ) ) ) ) | |
| Defendant. | ) ) | |

### DECLARATION OF ROBERT BACON

I, Robert Bacon, submit this Affidavit in support of PBGC's Opposition to Motion for a Preliminary Injunction of Association of Flight Attendants – CWA, AFL - CIO, and declare as follows:

1. I am Acting Deputy Director of the Division of Insurance Supervision and Compliance ("DISC") at the Pension Benefit Guaranty Corporation ("PBGC").  I am also a member of the Trusteeship Working Group ("TWG"), although I am recused from voting in cases in which I am a signatory to the staff recommendation memorandum.  My duties include analyzing the financial condition of United Air Lines, Inc. and members of its corporate group, and the risks posed by the company's financial condition and pending bankruptcy to its defined benefit pension plans and the pension termination insurance program administered by PBGC.

2.  United sponsors four underfunded defined benefit pension plans covered by Title IV of ERISA:  (a) the United Airlines Flight Attendant Defined Benefit Pension Plan ("FA Plan"); (b) the United Airlines Pilot Defined Benefit Pension Plan ("Pilot Plan"), (c) the United Airlines Ground Employees Retirement Plan ("Ground Plan"); and (d) the United Airlines Management, Administrative and Public Contact Defined Benefit Pension Plan ("MAPC Plan").

3.  Collectively, United's pension plans are underfunded by almost $10 billion.  Attached hereto as Exhibit A is a true and correct copy of the United Air Lines, Inc Pension Information Profile prepared by DISC.

4.  On December 29, 2004, and March 10, 2005, proceeding under 29 U.S.C. § 1342, PBGC issued Notices of Determination that the Pilot and Ground Plans, respectively, should be terminated, and PBGC should be appointed as their statutory trustee.  PBGC filed Complaints in the United States District Courts for the Northern District of Illinois and Eastern District of Virginia, seeking orders terminating the Pilot and Ground Plans, appointing PBGC as the statutory trustee, and establishing the Plans' termination dates as December 30, 2004 and March 11, 2005, respectively.  On May 23, 2005, United and PBGC signed a Termination and Trusteeship Agreement regarding the Ground Plan, whereby PBGC became statutory trustee of the Plan, with a plan termination date of March 11, 2005.  United and PBGC have therefore filed a Joint Motion to dismiss the § 1342 proceedings in the Eastern District of Virginia.

5.  United issued to affected parties Notices of Intent to Terminate both the MAPC and FA Plans in distress terminations under 29 U.S.C. § 1341, each with a proposed termination date of June 30, 2005.  Attached hereto as Exhibit B is a true and correct copy of the Notice of Intent to Terminate the United Air Lines, Inc. Flight Attendant Defined Benefit Pension Plan dated April 12, 2005.

6. On April 29, 2005, United also filed with PBGC Forms 600 for the MAPC and FA Plans. PBGC is holding in abeyance its processing of United's distress filing. Attached hereto as Exhibit C is a true and correct copy of the PBGC Form 600 for the FA Plan, Distress Termination Notice of Intent to Terminate, filed with PBGC.

7. On April 22, 2005, PBGC and United executed a settlement agreement resolving many complex and difficult pension issues in United's bankruptcy case ("Agreement"). Under the Agreement, PBGC compromised significant secured, priority, and joint and several claims that otherwise could have real, immediate and large cash costs to United, in exchange for a package of securities and equity in the reorganized United. Under the Agreement, PBGC agreed to:

(1) settle claims for unpaid minimum funding contributions to the Pension Plans, including administrative priority claims estimated by the Plans' independent fiduciary at $993 million;

(2) give up its joint and several claims of approximately $10 billion for plan underfunding against all 27 debtors, and assert only a single claim in that amount against the estate;

(3) release its right to a government set-off against the $365 million in tax refunds that United received early in its bankruptcy (the bulk of which PBGC believed it would have been entitled to);

(4) release its perfected liens against the assets of three non-debtor controlled group members, whose value may exceed $100 million; and

(5) release its administrative claim relating to insurance premiums of approximately $8 million.

The Agreement also would bring closure to many of the pension issues facing United:

(1) PBGC agreed to initiate the § 1342 process for termination of the FA Plan and the MAPC Plan, which, if completed, would avoid protracted litigation over distress terminations;

(2) the Agreement creates an expedited mechanism for PBGC's review and approval of United's replacement plans under PBGC's "follow-on plan" policy, and PBGC's waiver of its right to restore the Pension Plans; and

(3) PBGC agreed to dismiss its appeal of the bankruptcy court's approval of United's agreement with ALPA regarding pension and other matters.

The potential termination of the FA Plan is only a small component of the Agreement.

8.     Pursuant to an internal directive, PBGC follows an established administrative process to determine whether a pension plan should terminate under 29 U.S.C. § 1342. Attached hereto as Exhibit D is a true and correct copy of the PBGC Directive TR-00-2 (issued May 8, 2001).

9. The Trusteeship Working Group ("TWG") – an interdisciplinary body comprised of members from PBGC's financial, actuarial, policy, and legal offices – reviews a written recommendation by PBGC staff that one or more of the statutory criteria under 29 U.S.C. § 1342(a) have been met, and that the pension plan should be terminated.

10. The TWG considers the recommendation from staff, and then makes its own recommendation, with supporting documents, to the "approving official."

11. In cases involving claims of more than $100,000,000, the approving official is the agency's Executive Director.

12. The Executive Director reviews the TWG recommendation and determines whether to terminate the plan and have PBGC appointed trustee and proposes an appropriate plan termination date.

13. The Executive Director's decision is documented in a Notice of Determination ("NOD") and a Termination and Trusteeship Decision Record ("TDR").

14. PBGC sends the NOD to the plan administrator.

15. PBGC typically effects the termination, trusteeship, and establishment of the plan termination date by agreement with the plan administrator. Where PBGC and the plan

administrator cannot agree, ERISA, 29 U.S.C. § 1342(c), authorizes PBGC to apply to the appropriate United States district court for a decree adjudicating that the plan is terminated, and PBGC appointed trustee.

16. Since the bankruptcy court's approval of the Agreement, PBGC staff has studied the case for termination of the FA Plan, but has not completed any written recommendation concerning potential termination. The TWG – the agency's internal deliberative body that considers such recommendations – has not met with regard to the FA Plan.

17. The Agreement provides that if and when PBGC determines that the FA Plan should be terminated under § 1342, and issues an NOD, United will sign an agreement to effect the termination and PBGC's trusteeship.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of May, 2005.

Robert Bacon

# EXHIBIT A

# United Air Lines, Inc.

## Pension Information Profile

|  | Total of Underfunded Plans |  | Financial Analyst: | Andreas Wilkinson |
|---|---|---|---|---|
|  |  |  | Actuary: | Ruth Williams |
|  |  |  | Consultant: | Milliman, Inc. |
|  |  |  |  | Bolton Partners |

**Part I -- Actuarial Assumptions**

| Valuation Date | 31-Jan-05 |
|---|---|
| PBGC Immediate Interest Factor | 4.10% |
| Calculation Date | 22-Feb-05 |

**Part II -- Underfunding Details**

| Assets | $6,928.0 |
|---|---|
| Total Vested Benefits | $13,587.4 |
| UVL | $6,659.4 |
| Total Benefit Liabilities | $16,914.4 |
| UBL | $9,986.4 |
| Funded UBL Ratio [Assets / Total Benefit Liabilities] | 41% |
| Form 4010 Filed | YES |

**Part III -- Funding Information**

| Annual Expected Benefit Payments (2003) | $665.6 |
|---|---|
| PY 2004 Minimum Contribution | $803.5 |
| PY 2004 Minimum (if no credit balance/(funding deficiency)* | $717.2 |
| PY 2004 Max. Deductible Contribution* | $2,450.0 |
| Actual 2003 Contribution | $133.4 |

**Part IV -- Number of Participants at January 1, 2004**

| Retired | 35,159 |
|---|---|
| Terminated Vested | 21,787 |
| Active** | 64,595 |
| Total | 121,541 |

**Part V -- Sources, Methods & Comments**

Data source: partial 2003 AVR, 2004 TP numbers and census information, 2003 Form 5500 prepared by Towers Perrin.
* 2003 for the Pilots Plan; assets as of 12/31/04
**Active participant count for the Flight Attendant Plan includes 5,374 participants on voluntary leave status on August 31, 2003.
Assets provided by Northern Trust as of December 31, 2004 and were assumed to earn 25.02% per year.
Benefit Liabilities are estimated using PBGC assumptions.
Analysis completed by Bolton for DISC.
Reviewed by: Ruth Williams

# EXHIBIT B

**APRIL 12, 2005**

## NOTICE OF INTENT TO TERMINATE THE UNITED AIR LINES, INC.
## FLIGHT ATTENDANT DEFINED BENEFIT PENSION PLAN

United Air Lines, Inc. intends to terminate the United Airlines Flight Attendant Defined Benefit Pension Plan in a distress termination. The law requires that we provide you with written notice of the proposed termination. If the proposed termination does not occur, United Air Lines, Inc. will notify you in writing.

**NAME OF CONTRIBUTING SPONSOR:**   United Air Lines, Inc.

**EIN/PN:** 36-2675206

**PROPOSED TERMINATION DATE:** June 30, 2005

We will notify you if the proposed termination date is changed to a later date.

**CONTACT PERSON:** If you have any questions concerning the plan's termination, please contact:

> In writing:
> United Airlines – WHQIN - PT
> P.O. Box 66100
> Chicago, IL 60666

> By phone:
> Call 1-866-317-3405 to speak with a customer service representative. If you need additional assistance, ask to speak with their supervisors, Todd Hall, Martie DeWitt or Dale Dutt.

**CESSATION OF ACCRUALS:** Benefit accruals will cease as of June 30, 2005.

**OBTAINING A SUMMARY PLAN DESCRIPTION:** If you wish to obtain a copy of the summary plan description for your plan, you may find the most current version on SkyNet (http://united.intranet.ual.com). If you do not have access to a computer, you may request a paper copy by writing to:

> United Airlines - Pension Programs Dept. - SPD
> P.O. Box 66100
> Chicago, IL 60666

**PLAN FUNDING LEVEL:** The plan does not have sufficient funds to pay all promised benefits. The Pension Benefit Guaranty Corporation (PBGC), a federal government agency, will assure that you receive pension benefits that are guaranteed by law.

**BENEFITS GUARANTEED BY PBGC:** The PBGC pays most people all pension benefits, but some people may lose certain benefits that are not guaranteed.

- The maximum guaranteed benefit that the PBGC can pay is set by law each year. For pension plans ending in 2005, for example, the maximum guaranteed amount is $3,801.14 per month ($45,613.68 per year) for a worker who retires at age 65.

    - The maximum benefit will be reduced for an individual who begins receiving payments before age 65.
    - The maximum benefit also will be reduced if a pension includes benefits for a survivor or other beneficiary.

- The PBGC does not guarantee benefits that are not vested (fewer than 5 years of service) when the plan terminates. [Usually because the individual has not worked enough years for the company.]

- Benefit increases and new benefits that have been in place for less than a year are not guaranteed. Those that have been in place for less than 5 years are only partly guaranteed.

- Early retirement payments that are greater than payments at normal retirement age may not be guaranteed.

- Benefits other than pension benefits, such as health insurance, life insurance, death benefits, vacation pay, or severance pay are not guaranteed.

- The PBGC generally does not pay lump sums exceeding $5,000.

- The PBGC may recoup any pension payments that exceed the PBGC's guarantee.

## Questions and Answers

**1. Which employees participate in the Flight Attendant Plan, and who is affected?**

Participants in the Flight Attendant Defined Benefit Pension Plan (Flight Attendant Plan), include retired flight attendants and international flight attendants, active flight attendants and international flight attendants represented by the Association of Flight Attendants, terminated vested flight attendants and international flight attendants and their beneficiaries.

**2. What is the immediate impact on affected groups as a result of the company's announcement?**

If the Bankruptcy Court approves the termination effective June 30, 2005, as the company has proposed, the administration of the Plan will be transferred to the PBGC and all service and benefit accruals will cease as of June 30, 2005. The actual transfer will not happen immediately upon the court's ruling. For many retirees, monthly payments will be unchanged. Any adjustments to the monthly payments from the Plan will be made in accordance with the PBGC's plan termination rules. Retirees will be notified of any changes.

**3. How will the company's action affect employees in this Plan who have already announced that they will be retiring?**

Retirements will continue to be processed. If the Bankruptcy Court approves the termination effective June 30, 2005, as the company has proposed, the administration of the Plan will be transferred to the PBGC, and benefits will be adjusted in accordance with the PBGC's plan termination rules. The actual transfer will not occur immediately upon the court's ruling.

**4. How does the company's decision affect retired employees?**

If the Bankruptcy Court approves the termination effective June 30, 2005, as the company has proposed, the administration of the Plan will be transferred to the PBGC and all benefit payments will be reviewed and may be adjusted in accordance with the PBGC's plan termination rules. The actual transfer will not occur immediately upon the court's ruling. For many retirees, monthly payments will be unchanged. Any adjustments to the monthly payments from the Plan will be made in accordance with the PBGC's plan termination rules. Retirees will be notified of any changes. Retirees who have retiree medical premiums deducted from their pension payments will be sent new procedures for paying their premiums before the actual transfer to the PBGC occurs.

**5. When will I get additional information?**

Upon taking over the plan, the PBGC will send specific information and instructions to Plan participants. United will work with the PBGC to make this process as seamless as possible.

**6. As a Plan participant is there anything I should be doing as a result of the company's actions?**

No. Upon taking over the Plan, the PBGC will send specific information and instructions to Plan participants.

*For information about the termination process and the PBGC's management of terminated Pension Plans, please visit http://pbgc.gov and SkyNet (http://united.intranet.ual.com). You can also call our representatives at 1-866-317-3405.*

# EXHIBIT C

# ◤UNITED

A STAR ALLIANCE MEMBER ✧ ™

April 29, 2005

*VIA FEDERAL EXPRESS*

Processing and Technical Assistance Branch
Pension Benefit Guaranty Corporation
1200 K Street, N.W.  Suite 930
Washington, D.C 20005-4026

Re:    Form 600 for the United Air Lines, Inc.
       Management, Administrative and Public Contact
       Defined Benefit Pension Plan, and
       Flight Attendant Defined Benefit Pension Plan.

Gentlemen:

Enclosed for filing is a Form 600 for each of the above named retirement plans.  I have enclosed one copy of the attachments to the Form 600s because the attachments are identical for each Form 600.  The other attachments required to be attached to the Form 600 have previously been provided to the PBGC and are, therefore, not attached to these Form 600s. If you need additional information or have any questions concerning the enclosed, please do not hesitate to contact the undersigned.

Sincerely,

Marian M. Durkin
Vice President
Deputy General Counsel

Enclosures

cc:   Jeff Cohen



**Distress Termination**
**Notice of Intent to Terminate**

**PBGC Form 600**
Approved OMB 1212-0036
Expires 09/30/2007

| PART I    IDENTIFYING INFORMATION | |
|---|---|
| **1a** Plan Name<br><br>United Airlines Flight Attendant Defined Benefit Pension Plan | **1b** Plan effective date (mo., day, yr.)<br>1/01/1941<br>**1c** Last day of plan year<br>12/31 |
| **2a** Contributing Sponsor's name and address<br>(Address should include room or suite no.)<br><br>United Air Lines, Inc.<br>WHQTE - Pension Programs<br>P.O. Box 66100<br>Chicago, IL 60666 | Sponsor's telephone number<br>(847) 700-4000<br>**2b** 9-digit employer identification number (EIN)<br>36-2675206<br>3-digit plan number (PN)<br>006 |
| **2c** If you used a different EIN or PN for this contributing sponsor/plan in previous filings with the PBGC, also show the number(s) previously reported. | **2d** Contributing sponsor's tax year end (mo., day, yr.)   12/31/2005<br>**2e** 6-digit business code<br>481000 |
| **3a** Plan Administrator's name and address (if same as 2a, enter "same")<br>(Address should include room or suite no.)<br><br>Same | Plan Administrator's telephone number<br><br>E-mail address (optional) |
| **3b** Name and address of person to be contacted for more information (if same as 3a, enter "same").  (Address should include room or suite no.)<br><br>Debra Reskey<br>same | Telephone number<br>(847) 700-3878<br>E-mail address (optional)<br>Debra.Reskey@united.com |

| PART II    GENERAL PLAN INFORMATION | | | |
|---|---|---|---|
| **4** Proposed termination date | (mo., day, yr.) | | 6/30/2005 |
| **5** Estimated number of plan participants as of the proposed termination date | | | |
| **a** Active participants: | | | |
| (i)   Fully vested | (i) | | 18,232 |
| (ii)  Partially vested | (ii) | | 0 |
| (iii) Nonvested | (iii) | | 0 |
| (iv)  Total active participants [add a(i) through (iii)] | (iv) | | 18,232 |
| **b** Retirees or beneficiaries receiving benefits | 5b | | 5,199 |
| **c** Separated vested participants entitled to benefits | 5c | | 4,971 |
| **d** Total [add a(iv) through c] | 5d | | 28,402 |

| **6** Changes in contributing sponsor associated with plan termination (check all that apply): | | |
|---|---|---|
| **a** No change | 6a | |
| **b** Reorganization as part of bankruptcy or similar proceeding | 6b | X |
| **c** Merger of existing subsidiaries or divisions not involving bankruptcy | 6c | |
| **d** Sale or closing of subsidiaries or divisions not involving bankruptcy | 6d | |
| **e** Acquisition by another business | 6e | |
| **f** Acquisition of another business | 6f | |
| **g** Liquidation | 6g | |

**Distress Termination • Notice of Intent to Terminate**                    PBGC Form 600 • Page 2

| 7 | Intention concerning expected pension coverage for currently employed participants covered under the terminated plan (check all that apply): | | |
|---|---|---|---|
| a | No new plan | 7a | |
| b | New or existing defined benefit plan | 7b | |
| c | New or existing profit-sharing plan | 7c | X |
| d | New or existing 401(k) plan | 7d | |
| e | Other new or existing plan. Specify: | 7e | |

| 8a | Is there more than one contributing sponsor? | ☐ Yes  ☒ No |
|---|---|---|
| b | If "Yes," is this a multiple-employer plan? | ☐ Yes  ☐ No |
| 9a | Is the contributing sponsor(s) a member of a controlled group? | ☒ Yes  ☐ No |
| b | If you checked "Yes" in 8a or 9a, attach a statement identifying each contributing sponsor and each member of the contributing sponsor's controlled group as of the proposed termination date and the distress test each entity expects to meet. | |
| 10a | Has there been a change in the composition of a contributing sponsor's controlled group within the 5-year period prior to the proposed termination date? | ☒ Yes  ☐ No |
| | | 10b  If "Yes," attach a statement that describes the transaction(s). |
| 11a | Has the contributing sponsor(s) filed, or had filed against it, a petition seeking reorganization in bankruptcy under Chapter 11, liquidation in bankruptcy under Chapter 7, or reorganization or liquidation in a similar proceeding under the laws of a state or a political subdivision of a state? | ☒ Yes  ☐ No |
| b | If you checked "Yes" in 11a, are the proceedings still ongoing? | ☒ Yes  ☐ No |
| c | If "Yes," attach a copy of the petition showing the court docket number. If "No," attach a copy of the order dismissing or otherwise resolving the proceedings. | For reorganization under Chapter 11 or similar state proceeding, complete item 11d. |
| d | Has the bankruptcy court been requested to approve the termination of the plan? | ☒ Yes  ☐ No |
| e | If "Yes": | |
| | (i) Enter the date of request to the court | (mo., day, yr.)      4/11/2005 |
| | (ii) Enter the date documents were submitted to PBGC | (mo., day, yr.)      4/11/2005 |
| 12a | Are all eligible participants/beneficiaries, who are entitled to and have applied for benefits, receiving such monthly benefits from the plan? | ☒ Yes  ☐ No |
| 12b | If "No," attach a statement as to the reason for non-payment, including the number of participants/beneficiaries and total monthly benefits not being paid. | |
| 13a | Are the plan assets expected to be sufficient to continue to pay all benefits when due during the next 180 days? | ☒ Yes  ☐ No |
| | | 13b  If "No," attach an explanation. |
| 14a | Are any participants/beneficiaries receiving benefits in excess of estimated Title IV benefits? | ☒ Yes  ☐ No |
| 14b | If "Yes," are they scheduled to be reduced to the estimated Title IV level as of the proposed termination date? | ☐ Yes  ☒ No |
| 15 | Attach copies of the following documents: | |
| a | All plan documents, including all amendments within the last five years; | |
| b | Trust documents and/or insurance contracts; | |
| c | Most recent financial statement of plan assets; | |
| d | Collective bargaining agreements relating to the plan; | |
| e | IRS determination letter(s); | |
| f | Most recent plan actuarial report; and | |
| g | Form 5500, Schedules B and SSA (last three years). | |

| 16 | Location of plan records (Address should include room or suite no.) | Type of Record |
|---|---|---|
| | United Air Lines, Inc.<br>WHQTE - Pension Programs<br>P.O. Box 66100<br>Chicago, IL  60666 | Electronic, Paper<br>Telephone number<br>(847) 700-3878 |

**PART III.  PLAN ADMINISTRATOR CERTIFICATION**

I, the Plan Administrator, certify that, to the best of my knowledge and belief: (1) I am implementing the termination of the plan in accordance with all applicable laws and regulations; and (2) the information contained in this filing and made available to the Enrolled Actuary is true, correct, and complete. In making this certification, I recognize that knowingly and willfully making false, fictitious, or fraudulent statements to the PBGC is punishable under 18 U.S.C. 1001.

| _(signature)_ | 4/28/05 | United Air Lines, Inc. |
|---|---|---|
| Plan Administrator's signature | Date | Name and title of Plan Administrator |

**Attachment**

**Item 15 – Attach copies of the following documents:**

    a) All plan documents, including all amendments within the last five years;
    b) Trust documents and/or insurance contracts;
    c) Most recent financial statement of plan assets;
    d) Collective bargaining agreements relating to the plan;
    e) IRS determination letter(s);
    f) Most recent plan actuarial report; and
    g) Form 5500, Schedules B and SSA (last three years).

United provided copies of the above stated documents to the PBGC within the past few months with the exception of the following, which are enclosed:

    1.    Most recent IRS Determination Letter for both the United Airlines Management, Administrative and Public Contact Defined Benefit Pension Plan and the United Airlines Flight Attendant Defined Benefit Pension Plan.

    2.    Actuarial Valuation Reports for both the United Airlines Management, Administrative and Public Contact Defined Benefit Pension Plan and the United Airlines Flight Attendant Defined Benefit Pension Plan for the 2004 Plan Year.

**United Air Lines, Inc.**
**EIN 36-2675206**

**Identifying Information for Controlled Group Members - Expected as of Proposed Termination Date**

| | |
|---|---|
| Company Name: | United Air Lines, Inc. |
| EIN: | 36-2675206 |
| Mailing Address: | P.O. Box 66100 |
| City | Chicago |
| State | Illinois |
| Zip Code | 60666 |
| Telephone Number: | (847) 700-4000 |
| Distress Test: | Reorganization Test |

## SUBSIDIARIES OF UNITED AIR LINES, INC.

**COVIA, LLC**
1200 E. Algonquin Road
Elk Grove Township, IL 60007
Federal I.D. No. 36-2675206 (same as United Air Lines, Inc.)

**KION de MEXICO, S.A. de C.V.**
c/o Sanchez-DeVanny, Eseverri y Ramirez Villegas, S.C.
World Trade Center
10th Floor
Montecito No. 38
03810 Mexico, D.F.
Place of Incorporation: Mexico
Mexico Tax I.D. No. UAI-770831-AYI

**KION LEASING, INC.**
1501 Mittel Blvd.
Wood Dale, IL 60191
State of Incorporation: Delaware
Federal I.D. No. 36-2946443

**MILEAGE PLUS, INC.**
1600 Golf Road
Suite 520
Rolling Meadows, IL 60008
State of Incorporation: Delaware
Federal I.D. No. 36-3189467

**MILEAGE PLUS, INC.** became a subsidiary of United Air Lines, Inc. on 3/29/02.

**PREMIER MEETING AND TRAVEL SERVICES, INC.**
CHIPG
1200 East Algonquin Road
Elk Grove Township, IL 60007
State of Incorporation: Delaware
Federal I.D. No. 36-4207846

**UNITED AIR LINES VENTURES, INC.**
1200 East Algonquin Road
Elk Grove Township, IL 60007
State of Incorporation: Delaware
Federal I.D. No. 36-4517729

**UNITED AVIATION FUELS CORPORATION**
WHQFJ
1200 E. Algonquin Road
Elk Grove Township, IL 60007
State of Incorporation: Delaware
Federal I.D. No. 36-3235783

## SUBSIDIARIES OF UNITED AIR LINES, INC. - continued

**UAL LOYALTY SERVICES, LLC.**
8550 W. Bryn Mawr
6th Floor
Chicago, IL 60631
State of Incorporation:  Delaware
Federal I.D. No. 36-4401481

UAL LOYALTY SERVICES, LLC became a subsidiary of United Air Lines, Inc. on 3/29/02

**UNITED COGEN, INC.**
UA Maintenance Operations Center
San Francisco International Airport
San Francisco, CA 94128
State of Incorporation: Delaware
Federal I.D. No. 36-3333841

**UNITED GHS INC.**
1200 E. Algonquin Road
Elk Grove Township, IL 60007
State of Incorporation: Delaware
Federal I.D. No. 36-3555070

**UNITED VACATIONS, INC.**
1200 E. Algonquin Road
Elk Grove Township, IL 60007
State of Incorporation: Delaware
Federal I.D. No. 36-3324931

**UNITED WORLDWIDE CORPORATION**
Sinforoso M. Tolentino
c/o Carl Smith
134 West Soledad Avenue
Bank of Hawaii Bldg.
Suite 401
P.O. Box BF
Agana, Guam 96932-5027
Place of Incorporation: Guam
Guam Tax I.D. 66-0454431

**Customer:** This service area is provided for your internal use and convenience. Service must be marked on airbill.

FedEx Service:  

Extremely

# FedEx Envelope

FedEx | Ship Manager | Label 7929 0964 5493

Page 1 of 1                S

Insert
airbill
here
▼

From:   Origin ID:   (847) 700-5331
Marian Durkin
UNITED AIRLINES
1200 E. Algonquin Road

Elk Grove Village, IL 60007

**FedEx**
Express
**E**

Ship Date: 28APR05
Actual Wgt: 1 LB
System#: 8388813/INET2000
Account#: S *********

REF:


Delivery Address Bar Code

SHIP TO:   (202) 326-4070       BILL SENDER

**Jeff Cohen**
**Pension Benefit Guaranty Corp.**
**1200 K Street, N.W.**

**Washington, DC 200054026**



**PRIORITY OVERNIGHT**                        **FRI**
Deliver By:
29APR05

TRK#  **7929 0964 5493**   FORM
0201

IAD       A1

**20005**   -DC-US

## NJ JPNA



# EXHIBIT D

**Transmitted by:  PBGC NOTICE NO.  01-04**                                    **Part:  TR**

---

**Date:  May 8, 2001**                                                          **Section:  00-2**

---

**SUBJECT:        TERMINATION AND TRUSTEESHIP OF SINGLE-EMPLOYER**
**                          PENSION PLANS**

1.     **OVERVIEW**

This directive sets forth the administrative process of the Pension Benefit Guaranty
Corporation (PBGC) for determining whether a covered pension plan should be
terminated and trusteed in either a "distress" termination or a PBGC-initiated termination.
This directive does not apply to "standard" terminations of fully funded pension plans.
*See* Sections 4041 and 4042 of the Employee Retirement Income Security Act of 1974
(ERISA), *as amended.*

A pension plan that is covered by Title IV of ERISA may terminate under either section
4041 or section 4042 of ERISA, depending on whether the termination is initiated by the
plan administrator or by PBGC.  The administrator of a pension plan may initiate a
"distress" termination by following the procedures under section 4041 of ERISA.  PBGC
determines whether the contributing sponsor and each member of the contributing
sponsor's controlled group meet one or more of the statutory distress criteria.

PBGC may itself seek plan termination under section 4042 of ERISA whenever one of
the criteria in that section is met (*i.e.*, a "discretionary termination").  In addition, under
section 4042 PBGC must seek plan termination as soon as practicable when ". . . the plan
does not have assets available to pay benefits which are currently due under the terms of
the plan" (*i.e.*, a "mandatory termination").  PBGC can initiate termination of a plan if the
requirements of section 4042 are satisfied, even if a distress termination application is
pending.

**Part Two** of this directive sets forth definitions; **Part Three** sets forth general procedures
for processing both distress and PBGC-initiated termination cases; **Part Four** sets forth
procedures for processing distress termination cases; **Part Five** sets forth procedures for
processing PBGC-initiated termination cases; **Part Six** sets forth procedures for effecting
trusteeship by agreement, and **Part Seven** sets forth procedures for effecting trusteeship
by court action.

1

**Transmitted by: PBGC NOTICE NO. 01-04**                      **Part: TR**

---

**Date: May 8, 2001**                                          **Section: 00-2**

---

2.    **DEFINITIONS**

    In this directive, the following definitions apply:

    a.    <u>Aggregate amount of PBGC's claims</u> means PBGC staff's best estimate of the total principal amount of PBGC's claims for unfunded benefit liabilities with respect to the relevant plans.

    b.    <u>Approving Official</u> means the official with authority to approve a recommendation regarding termination and/or trusteeship of a pension plan.  The Approving Official is:

        (1)    The Chairperson of the Trusteeship Working Group (TWG), for Exempt cases in which the aggregate amount of PBGC's claims is less than $5 million.

        (2)    The Deputy Executive Director and Chief Operating Officer (Chief Operating Officer), for Exempt cases in which the aggregate amount of PBGC's claims is $5 million or more, and for cases in which the aggregate amount of PBGC's claims is $25 million or less and the relevant plans have fewer than 5,000 participants.

        (3)    The Chief Negotiator/Director, Corporate Finance and Negotiations Department (Chief Negotiator), for cases in which the aggregate amount of PBGC's claims is more than $25 million, and less than or equal to $100 million, or the relevant plans have 5,000 or more participants.

        (4)    The Executive Director, or his designee, for cases in which the aggregate amount of PBGC's claims is more than $100 million, or for any case in which there is a novel or significant policy issue.

    c.    <u>Executive Summary</u> means a summary memorandum prepared by OGC to accompany the partially executed Trusteeship Decision Record (TDR) when it is routed through the TWG Chairperson (and, if applicable, through any other concurring OED officials) to the Approving Official.  OGC will prepare an

<div align="center">2</div>

Executive Summary regarding each Non-Exempt distress and PBGC-initiated termination case.  No Executive Summary is required for Exempt cases.

d.    Exempt case means a case that may be reviewed by the TWG Chairperson alone, without requiring a meeting of the full TWG.  The criteria for an Exempt case are set forth in 3.b. below.

e.    Non-Exempt case means a case that must be reviewed by the full TWG.  If a case does not meet the criteria for a Exempt case, it is a Non-Exempt case.

f.    Notice of Determination (NOD) means the determination issued by PBGC under section 4042(a) that a plan should or must be terminated.

g.    Relevant plans means each plan sponsored by a person or any member of such person's controlled group.

h.    Termination and Trusteeship Decision Record (TDR) is the form used to document the approval of PBGC's determinations:

    (1)    as to whether the distress termination criteria under section 4041 have been met;

    (2)    to seek termination of a plan under section 4042;

    (3)    to seek the appointment of PBGC as trustee; and, usually,

    (4)    as to the recommended plan termination date.

i.    Trusteeship Agreement (TA) is the written agreement between PBGC and the plan administrator terminating a plan, appointing PBGC trustee of the plan, and establishing the plan termination date.

j.    Trusteeship Working Group (TWG) is composed of a Chairperson, who is a voting representative from the Office of the Deputy Executive Director and Chief Operating Officer; voting representatives from the Office of the General Counsel

3

**Transmitted by: PBGC NOTICE NO. 01-04**                              **Part: TR**

**Date:  May 8, 2001**                                                **Section: 00-2**

(OGC), the Insurance Operations Department (IOD), the Corporate Policy and Research Department (CPRD), and the Corporate Finance and Negotiations Department (CFND); and nonvoting representatives from the Financial Operations Department (FOD) and the Communications and Public Affairs Department (CPAD).  The Director, IOD; the General Counsel; the Director, CPRD; the Director, CFND; the Director, FOD; and the Director, CPAD will designate representatives from their respective departments to serve on the TWG.

The TWG or the TWG Chairperson (for Exempt cases) is responsible for reviewing all recommendations:

(1)     regarding whether a contributing sponsor and each member of the sponsor's controlled group meet the distress termination criteria;

(2)     that PBGC initiate termination proceedings, whether discretionary or mandatory;

(3)     regarding the appropriate plan termination dates in distress or PBGC-initiated terminations; and

(4)     that PBGC assume trusteeship of a pension plan, whether on a permanent basis under section 4042(c) or an interim basis under section 4042(b).

3.    **PROCEDURES FOR PROCESSING DISTRESS AND PBGC-INITIATED TERMINATIONS**

a.    Cases are assigned to the Pre-Termination Division (PPD) within IOD or CFND based upon the amount of the liability and the number of plan participants.

(1)     Unless otherwise agreed upon by the Chief Operating Officer and the Chief Negotiator, PPD/IOD is responsible for cases in which the aggregate amount of PBGC's claims totals $25 million or less <u>and</u> there are fewer than 5,000 participants in the relevant plans, and CFND is responsible for all other cases.

4

**Transmitted by: PBGC NOTICE NO. 01-04**                          **Part: TR**

**Date:  May 8, 2001**                                            **Section:  00-2**

    (2)     PPD/IOD or CFND should notify the Director, CPAD prior to the first TWG meeting of all cases in which the aggregate amount of PBGC_s claims is $25 million or more, or there are 5,000 or more participants in the relevant plans.

  b.    The department assigned to the case will, with the assistance of OGC, present termination recommendations to the TWG Chairperson.  Each termination recommendation is reviewed by the full TWG, unless a case is Exempt from full TWG review.  A case is Exempt if:

    (1)     the aggregate amount of PBGC's claims totals $25 million or less;

    (2)     there are fewer than 5,000 participants in the relevant plans;

    (3)     no novel or significant policy issue is involved; and

    (4)     one or more of the following criteria is also met:

        (a)     the plan is recommended for mandatory termination under section 4042(a);

        (b)     the plan is recommended for discretionary termination under section 4042(a)(2) and within the next six months, the plan will not have assets available to pay benefits when due;

        (c)     the plan is recommended for discretionary termination under section 4042(a)(1) or 4042(a)(2), there is no ongoing plan sponsor, and the combined projected annual gross revenues of all known controlled group members are less than 50% of the projected annual minimum funding requirements with respect to the plan; or

        (d)     the plan is recommended for distress termination on the grounds that the plan sponsor and each controlled group member, if any,

meet the liquidation test under section 4041(c)(2)(B)(i), the reorganization test under 4041(c)(2)(B)(ii), or are, as of the proposed termination date, not engaged in any business or commercial activity, have no assets or only nominal assets, and have no employees.

The full TWG will, however, review a case that otherwise meets the criteria for an Exempt case upon request of OGC, PPD/IOD, CFND, CPRD, or the TWG Chairperson.

c.     Processing Termination Recommendations for Exempt Cases

(1)     Termination recommendations for Exempt cases should include a memorandum supporting the recommendation, a TDR with concurring signatures, appropriate background documentation, and in the case of a PBGC-initiated termination, an NOD to be signed by the Approving Official.

(2)     Concurring signatures required for Exempt cases are:

(a)     IOD - The Auditor/Financial Analyst; the Division Manager and the Director, IOD (or his designee); and

(b)     OGC - The Assistant General Counsel.

(3)     If, after review, the TWG Chairperson requires that substantive changes be made to the recommendation or that additional information be provided before approving or concurring in the termination, PPD/IOD or CFND will revise the TDR, re-circulate it for concurrences, and resubmit it to the TWG Chairperson for approval or concurrence.

(4)     If the aggregate amount of PBGC's claims is less than $5 million, the TWG Chairperson will approve the recommendation by signing the TDR and NOD.  If the aggregate amount of PBGC's

6

Transmitted by: PBGC NOTICE NO. 01-04                          Part: TR

Date:  May 8, 2001                                             Section: 00-2

claims is $5 million or more but less than or equal to $25 million, the TWG Chairperson will concur in the recommendation, then forward it to the Chief Operating Officer for approval.

d.    Processing Termination Recommendations for Non-Exempt Cases

(1)    Termination recommendations for Non-Exempt cases should include the memorandum supporting the recommendation, a draft TDR, and appropriate background documents.  The TWG Chairperson will schedule a meeting of the TWG.

(2)    During the meeting, PPD/IOD or CFND will present a termination recommendation concerning the plan to the TWG.  The TWG will consider the recommendation, which generally will address (i) whether the plan should terminate and, if so, on what grounds; (ii) a proposed termination date; and (iii) whether PBGC should become trustee of the plan.  The TWG will then either concur in the staff recommendation or make its own recommendation.  In PBGC-initiated termination cases, the TWG will also address whether one or more of the requirements of section 4042(c) are satisfied.  The TWG may render a recommendation on any matter by consensus or by majority vote.  The TWG Chairperson will keep minutes of TWG meetings.

(3)    After the TWG meeting, PPD/IOD or CFND, with OGC's advice and assistance, will prepare the TWG's termination recommendation to the Approving Official.  This will include (i) an Executive Summary prepared by OGC; (ii) the final TDR with the concurrences as set forth in (4) below; (iii) for a PBGC-initiated termination case, an NOD to be signed by the Approving Official; (iv) minutes of the TWG meeting (draft minutes may be used if the minutes have not been finalized); and (v) the recommendation package considered by the TWG.

(4)    Concurring signatures required for Non-Exempt cases are:

7

Transmitted by: **PBGC NOTICE NO. 01-04**                          **Part: TR**

Date:  **May 8, 2001**                                                        **Section:  00-2**

(a)    IOD or CFND (whichever department was assigned to the case) - (1) The Auditor/Financial Analyst; (2) the PPD Manager or CFND supervisor; and (3) the Director, IOD (or his designee) or the Deputy Director, CFND;

(b)    OGC  - (1) The Assistant General Counsel; (2) the Deputy General Counsel; and (3) the General Counsel in all distress termination recommendations under criterion 3 (business hardship test) (section  4041(c)(2)(B)(iii)(I)), or criterion 4 (burdensome pension costs test) (section 4041(c)(2)(B)(iii)(II)).

(c)    OED - The TWG Chairperson.

(d)    OED - The Chief Operating Officer.  The Chief Operating Officer will generally be the Approving Official in PPD/IOD cases, but will concur (rather than approve) in PPD/IOD cases where there is a novel or significant policy issue;

(e)    The Chief Negotiator.  The Chief Negotiator will generally be the Approving Official in CFND cases, but will concur (rather than approve) in CFND cases where there is a novel or significant policy issue or the aggregate amount of PBGC's claims exceeds $100 million.

Once all required concurrences are obtained, the case will be forwarded to the Approving Official.

(5)    If the Approving Official agrees with the final termination recommendation, he or she will sign the TDR, and sign the NOD in PBGC-initiated termination cases.

(6)    If the TWG does not concur with a staff recommendation regarding termination or trusteeship, the assigned staff may request the Director, IOD (or his designee) and the Deputy Director, CFND to review the case.

8

If the Director, IOD (or his designee) and the Deputy Director, CFND concurs with the staff recommendation, they will forward the case to the Executive Director through the Chief Operating Officer and the Chief Negotiator for review and determination.

e.    The TWG Chairperson will maintain records of all termination decisions and will distribute copies of the decisions to IOD and OGC. For cases approved for trusteeship, the TWG Chairperson will also route a copy of the signed TDR to the Director, CPAD and the Chief, Investment Accounting Branch, COD/FOD.

## 4.    <u>ADDITIONAL PROCEDURES APPLICABLE TO DISTRESS TERMINATIONS</u>

a.    Termination Recommendations under Section 4042 Where Distress Terminations Have Been Filed

If an incomplete distress termination filing has been made, the assigned PBGC Department will generally write the filer and give the filer an opportunity to complete the filing.  However, nothing will preclude the PBGC Department from recommending that PBGC itself immediately initiate termination proceedings under section 4042 where circumstances warrant.  Generally, if a complete distress filing has been made, the TWG will consider the filing before considering a recommendation that PBGC initiate termination proceedings.

b.    Issuance of Determinations Regarding Distress Terminations

(1)    Cases Meeting the Distress Criteria

After a distress termination has been approved, the PPD/IOD Auditor/Financial Analyst or the CFND Financial Analyst will issue a section 4041(c)(2) determination letter stating that PBGC has determined that the contributing sponsor and each member of the sponsor's controlled group has met at least one of the applicable criteria for termination, and a section 4041(c)(3) determination letter stating whether the plan is sufficient for guaranteed benefits. These two determinations may be issued in the same letter. If PBGC is unable to determine that the plan is

9

sufficient for guaranteed benefits, the section 4041(c)(3) determination normally will be issued before, or concurrently with, the mailing of a Trusteeship Agreement to the plan administrator.  If the plan has sufficient assets to provide guaranteed benefits and PBGC trusteeship is not recommended, the section 4041(c)(3) determination letter will state that PBGC has determined that the plan is sufficient for guaranteed benefits and instruct the plan administrator to distribute plan assets in accordance with section 4041(b).

Determination letters will be issued to the plan administrator or the plan administrator's duly authorized representative, if one has been designated.  Section 4041(c)(2) determinations that grant a request for a distress termination will state that they are final.

(2)    Cases Not Meeting the Distress Criteria

If the request for a distress termination is disapproved, the PPD/IOD Auditor/Financial Analyst or the CFND Financial Analyst will issue a section 4041(c)(2) determination letter stating that PBGC has determined that the applicable requirements for termination have not been met. Section 4041(c)(2) determinations that deny a request for a distress termination normally will state that they are initial determinations subject to reconsideration by the Executive Director (or his designee).

c.    Modification of a Section 4041(c)(2) Determination Letter

If a section 4041(c)(2) determination letter has been issued, but a plan has not yet been terminated, and assigned staff concludes that the determination letter should be modified, the PBGC Department that made the initial termination recommendation will prepare a memorandum recommending modification of the determination letter.  The memorandum, along with a modified section 4041(c)(2) determination letter, will be routed to the Approving Official in the same manner and with the same concurrences as for the termination recommendation.

10

Transmitted by:  PBGC NOTICE NO.  01-04                    Part:  TR

Date:  May 8, 2001                                        Section:  00-2

5.    **ADDITIONAL PROCEDURES APPLICABLE TO PBGC-INITIATED TERMINATIONS**

    a.    Non-Exempt Terminations - Special Circumstances Cases

        Notwithstanding anything in this directive, when time is of the essence and facts and circumstances make it impractical to convene a meeting of the TWG with regard to a Non-Exempt case, the Chief Operating Officer (for PPD/IOD cases) or the Chief Negotiator (for CFND cases) may propose that a plan should be terminated under section 4042 by forwarding his or her recommendation to the Executive Director or the Executive Director's designee, who may approve the recommendation.

    b.    Issuance of Notices of Determination

        The Approving Official will return the signed TDR and NOD to the TWG Chairperson for retention and issuance, respectively.  The NOD will be issued to the plan administrator.  The NOD will state that PBGC has completed its decision-making process and that its determination is effective on the date of the NOD's issuance.  The TWG Chairperson will route copies of the TDR and NOD to OGC, and to the recommending PBGC Department.  The TWG Chairperson also will route a copy of the signed TDR to the Chief, Investment Accounting Branch, COD/FOD.  IOD will continue the termination and trusteeship process after receipt of a copy of the signed NOD and the TDR, whether the case was initially assigned to PPD/IOD or to CFND.

    c.    Modification or Withdrawal of Notices of Determination

        (1)    If an NOD has been issued, but a plan has not yet been terminated, and assigned staff concludes that the NOD should be modified, the PBGC Department that made the initial termination recommendation will prepare a memorandum recommending modification of the NOD.  The memorandum, along with a modified NOD, will be routed to the Approving Official in the same manner and with the same concurrences as

**Transmitted by:  PBGC NOTICE NO.  01-04**                                **Part:  TR**

**Date:   May 8, 2001**                                                    **Section:  00-2**

<div style="margin-left:2em">

for the termination recommendation.

(2)    If an NOD has been issued, but a plan has not yet been terminated, and assigned staff concludes that PBGC should not terminate the plan, the PBGC Department that made the initial termination recommendation will prepare a memorandum recommending withdrawal of the NOD.  The memorandum, along with a proposed Notice of Withdrawal of Termination Decision, will be routed to the Approving Official in the same manner and with the same concurrences as for the termination recommendation.

</div>

The Approving Official approves the recommendation by signing and issuing the modified NOD or Notice of Withdrawal.  The TWG Chairperson will route a copy of the executed NOD or Notice of Withdrawal to OGC; to the Chief, Investment Accounting Branch, COD/FOD; and to IOD or CFND, as appropriate.

**6.    TRUSTEESHIP BY AGREEMENT**

The PPD/IOD Auditor/Financial Analyst will prepare the Trusteeship Agreement for all IOD cases, unless informed by OGC that court action will be necessary.  OGC will prepare the Trusteeship Agreement for CFND cases.

Three copies of the unsigned Trusteeship Agreement normally will be sent by the TWG office to the plan administrator or the plan administrator's duly authorized representative with instructions that the three original copies of the agreement are to be signed and returned to the TWG office.  Upon receipt of the agreements signed by the plan administrator, the TWG office will forward them to the IOD/Trusteeship Processing Division (TPD) Auditor.

If the trusteeship agreement has been modified by the plan administrator, the TPD Auditor will request that OGC review the modification(s) and will not execute the modified agreement until and unless OGC concurrence is obtained.  If appropriate, the TPD Auditor will sign the agreements on behalf of PBGC, and will then return an original to the plan administrator, forward an original to OGC and retain an original in the case file.  The TPD Auditor will route a copy of the agreement to the Chief, Investment

**Transmitted by:  PBGC NOTICE NO.  01-04**                    **Part:  TR**

**Date:  May 8, 2001**                                        **Section:  00-2**

Accounting Branch, COD/FOD and to the Treasury Division.

A case must be referred to OGC if it appears that trusteeship cannot be effected by agreement.  *See* Part 7.

7.     **TRUSTEESHIP BY COURT ACTION**

If PBGC trusteeship is to be effected by court order, OGC will apply to the appropriate United States District Court for a decree adjudicating the plan terminated and appointing PBGC trustee.  Upon obtaining a court order, OGC will route a copy of the order to the TWG office; to the Manager of the assigned TPD; to the Chief, Investment Accounting Branch, COD/FOD; and to the Treasury Division.