## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASSOCIATION OF FLIGHT** )<br>**ATTENDANTS – CWA, AFL - CIO,** )<br>**501 Third Street, N.W.** )<br>**Washington, D.C. 20001** )<br>　　　　　　　　　　　　　　 )<br>　　　**Plaintiff,** )<br>　　　　　　　　　　　　　　 )<br>　　　**v.** )<br>　　　　　　　　　　　　　　 )<br>**PENSION BENEFIT GUARANTY** )<br>**CORPORATION,** )<br>**1200 K Street, N.W.** )<br>**Washington, D.C. 20005** )<br>　　　　　　　　　　　　　　 )<br>　　　**Defendant.** )<br>　　　　　　　　　　　　　　 ) | **Civil Action No. 1:05CV01036** |

### DECLARATION OF SHANNON L. NOVEY

I, Shannon L. Novey, submit this Declaration in support of PBGC's Opposition to Motion for a Preliminary Injunction of Association of Flight Attendants – CWA, AFL - CIO, and declare as follows:

1. I am an attorney in the Office of Chief Counsel of the Pension Benefit Guaranty Corporation. My duties include representing the agency in both United's bankruptcy proceeding and this action.

2. On December 9, 2002, United and other members of its corporate group (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Illinois. The cases are being jointly administered.

3. Since the fourth quarter of 2004, United has consistently maintained that it can no longer afford its four underfunded Pension Plans – the FA Plan, Pilot Plan, Ground Plan, and

MAPC Plan (collectively "Pension Plans") – *i.e.*, that all four must eventually be terminated so that United can reorganize in bankruptcy. Attached hereto as Exhibit A is a true and correct copy of the Debtors' November, 2004 Report on Status of Reorganization.

4. On November 5, 2004, pursuant to 11 U.S.C. § 1113(c), the Debtors moved to reject their collective bargaining agreements (collectively, "CBAs"), including provisions whose removal was necessary to allow for termination of the Pension Plans.

5. On January 31, 2005, the bankruptcy court approved modifications to the CBAs, providing either permanent or interim labor savings. The court also approved an agreement between the Air Line Pilots Association and United to modify the pilot CBA, including removal of the provision requiring United to maintain the Pilot Plan. CBA provisions regarding the other Pension Plans and long-term cost savings were deferred until May, 2005, while UAL continued to negotiate with its unions and PBGC.

6. Because United and some of its unions could not agree on long-term savings or pension issues, on April 12, 2005, United renewed motions under section 1113(c) to reject its CBAs ("1113 Motion").

7. Notwithstanding the then-pending PBGC-initiated termination cases with respect to the Pilot and Ground Plans, United moved for approval of the distress terminations of all four Pension Plans ("Distress Termination Motion").

8. The bankruptcy court approved a stipulation between United and PBGC to hold in abeyance the Distress Termination Motion. Attached hereto as Exhibit B is a true and correct copy of the Stipulation and Agreed Order Between the Debtors and the Pension Benefit Guaranty

Corporation Regarding Debtors' Motion for Voluntary Distress Termination of Their Defined Benefit Pension Plans Pursuant to 29 U.S.C. § 1341(c).

9.  A number of parties, including AFA, filed objections and presented oral argument against the April 22, 2005 settlement agreement between PBGC and United (the "Agreement"); the Official Committee of Unsecured Creditors supported the Agreement.  Attached hereto as Exhibits C and D are true and correct copies of the Objection of the Association of Flight Attendants-CWA, AFL-CIO, to Debtors' Emergency Motion to Approve Agreement with PBGC and the Transcript of Proceedings Before the Honorable Eugene R. Wedoff on May 10, 2005, respectively.

16.  On May 11, 2005, the bankruptcy court entered an Order approving the Agreement. Attached hereto as Exhibit E is a true and correct copy of the Order Approving Debtors' Emergency Motion to Approve Agreement with PBGC.

17.  AFA appealed the bankruptcy court's approval of the Agreement and moved for a stay of the Agreement pending the appeal.  The bankruptcy court denied AFA's stay motion at a hearing on May 26, 2005, and invited the AFA to take the issue to the district court.  Attached hereto as Exhibits F and G are true and correct copies of the Notice of Appeal of Association of Flight Attendants-CWA, AFL-CIO, from the Order Approving Debtors' Emergency Motion to Approve Agreement with PBGC and Emergency Motion for a Stay Pending Appeal of the Association of Flight Attendants-CWA, AFL-CIO, from the Order Approving Debtors' Emergency Motion to Approve Agreement with PBGC, respectively.

3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of May, 2005.

_____
Shannon L. Novey

# EXHIBIT
# A

### THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **UAL CORPORATION, et al.,** | ) | **Case No. 02-B-48191** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | **Honorable Eugene R. Wedoff** |
| | ) | |
| | ) | |
| | ) | |

### NOTICE OF FILING

TO:    SEE ATTACHED SERVICE LIST

**PLEASE TAKE NOTICE** that on the 18th day of November, 2004, the Debtors caused to be filed with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division at 219 S. Dearborn St., Chicago, Illinois 60604, **Debtors' November, 2004 Report On Status Of Reorganization,** a copy of which is attached hereto.

        PLEASE TAKE FURTHER NOTICE that you may obtain further information concerning these Chapter 11 cases:

- At the website of the United States Bankruptcy Court, Northern District of Illinois at www.ilnb.uscourts.gov (home page); or

- At the Debtors' private web site at www.pd-ual.com.

Dated: Chicago, Illinois
       November 18, 2004

                                        Respectfully submitted,

                                        _____
                                        James H.M. Sprayregen, P.C. (ARDC No. 6190206)
                                        Marc Kieselstein, Esq. (ARDC No. 6199255)
                                        David R. Seligman, Esq. (ARDC No. 6238064)
                                        Kirkland & Ellis LLP
                                        200 East Randolph Drive
                                        Chicago, IL 60601
                                        (312) 861-2000 (telephone)
                                        (312) 861-2200 (facsimile)

                                        Counsel for the Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UAL CORPORATION et al., | ) | Case No. 02-B-48191 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Eugene R. Wedoff |

## DEBTORS' NOVEMBER, 2004 REPORT ON STATUS OF REORGANIZATION

United is now stepping into a critical stage of its reorganization -- finalization of its business plan and immediate execution of cost-savings and business efficiency initiatives. As this stage begins in the face of harsh industry conditions, United has accelerated its timetable for implementing all cost savings so as to ensure cash balances are at sustainable levels in the first quarter of 2005. To devote all of its energies to addressing these challenging tasks without distraction, United has filed a motion requesting a sixty-day extension of its exclusivity period to January 31, 2005, when United hopes to be nearing completion of the Section 1113 and related processes. United's focus can then turn to the next – and final – stage of its exit strategy, beginning with obtaining exit financing and negotiating and filing a plan of reorganization.

The challenging industry conditions that United and the other airlines are experiencing, caused by record-high fuel prices, air fares at 12-year lows, and a highly competitive revenue environment, require immediate and substantial cost-savings initiatives. JPMorgan Chase recently estimated U.S. airlines' losses in 2004 at $4.5 billion.[1] These challenges are immense, and analysts' forecasts do not show the environment improving in the near future.

- Collectively, the major carriers reported a disappointing $1.1 billion net loss ($1.0 billion pretax loss) for the September quarter. This ranks as the third worst on record (2001 and 2002 losses were greater) and represented only the 6th time since 1970 that the industry posted a net loss in the seasonally strong September quarter. Merrill Lynch Global Securities Research & Economics Group, "Airline Industry Update - Sector Picks for Uncertain Times," November 2, 2004

---

[1] "Businesses feel pinch of fuel costs/ Customers will pay more as higher prices cut into company profits," Houston Chronicle, September 29, 2004.

- While load factors were generally healthy for carriers, excess capacity and low cost carrier growth continued to pummel yields, which combined with an average crude price of over $43/bbl, produced dismal results for most. Further, as we look to this quarter, we expect to see more of the same as fuel prices remain high and yields continue to weaken on a y/y basis. – Bear Stearns Equity Research, "US Airlines: Post Earnings/Investor Days Wrap Up," November 8, 2004

- We see the industry burning through nearly $2 billion of cash during the seasonally slow fall and winter quarters and another $3 billion in the March quarter. These estimates imply that the industry will be consuming 25% of its $20 billion total cash position over the next six months. – Goldman Sachs Global Investment Research, "US Transportation: Airlines - Not yet bad enough to be good," October 13, 2004

- The U.S. airline industry October mainline unit revenue (RASM) decreased 2.9% to 8.33 cents on a 6.4% decline in yield and a 2.8pt increase in the load factor. (RPMs and ASMs grew by 8.7% and 4.8% y/y, respectively). The October y/y mainline RASM growth was basically flat with September's 3% y/y decline, when the yield fell 7.8% and the load factor expanded 3.7 points to 74.6%. – Bear Stearns Equity Research, "US Airlines: RASM Growth Loses Steam," November 17, 2004

Indicative of the particularly difficult industry environment, United reported an operating loss of $80 million in its third quarter 2004 earnings report, typically its strongest quarter. That compares with a $19 million operating profit in the same period last year. Mainline unit costs increased by 1% in the third quarter (excluding fuel, however unit costs dropped by 7%). Fuel expenses were $291 million higher than in the third quarter of 2003, and average fuel prices for the quarter (including taxes) were up 44% year-over-year. United also reported a net loss of $274 million, including $97 million in reorganization expenses. United ended the third quarter with an unrestricted cash balance of $1.5 billion and an additional restricted cash balance of $857 million. In its September monthly operating report filed on October 28, United reported a $118 million operating loss for the month.

Moreover, while United met the requirements of its debtor-in-possession financing in September, United also stated that there was a strong possibility that it will not be able to comply with its DIP financing's EBITDAR covenants during the fourth quarter of 2004. As a result, United worked extensively with its Club DIP lenders to reach an agreement to amend the Club

2

DIP Facility to waive United's compliance with its EBITDAR covenants for October, November, and December 2004, and to increase its minimum cash covenant instead. United's motion for authority to pay fees in connection with this amendment is set for the November 19 omnibus hearing.

Given the overall industry environment, all carriers -- not just United -- are taking immediate steps to cut costs: American Airlines will be furloughing 1,100 mechanics and pilots; Northwest pilots are taking a 15% pay cut; and Delta is laying off 6,900, cutting salaries by 10%, and its pilots endorsed a five-year contract that will decrease their wages and benefits by $1 billion annually. FLYi, Inc., parent of Independence Air (formerly a United Express partner, Atlantic Coast Airways) recently stated that it may seek bankruptcy protection if it cannot address its liquidity issues in the near future. Just last week, US Airways filed a motion to reject its collective bargaining agreements, terminate its pension plans, and modify its retiree medical benefits, expressing its need to implement savings in the mid-January 2005 timeframe to avoid liquidation.

As stated in United's status reports over the last several months, United has been engaged in a broad range of in-depth communications and coordination with its key stakeholders -- including the Creditors' Committee and its unions -- as United has formulated its business plan to identify cost cuts not unlike some of those announced by other carriers. (In its motion to extend exclusivity, United provided a detailed update of its efforts to include its key stakeholders in this process and so will not repeat them here). The most important development was that, by the end of October 2004, United and the Creditors' Committee's Working Group[2] substantially

---

[2] To facilitate the exchange of information, the Working Group formed five sub-committees, comprised of both principals and "business" professionals of both the Creditors' Committee and United, to focus on some of the most important elements of United's ongoing restructuring: Exit Financing, United Express, Aircraft Maintenance,

3

completed their efforts to review, revise, and stress test the business plan (follow-up coordination is continuing), which calls for significant, enterprise-wide cost savings. Subsequently, United presented its plan to UAL's Board of Directors and then to the entire Creditors' Committee on October 28 and November 9, respectively. Starting on November 1, Bridge Associates, LLC commenced its review of United's business plan. Approximately seven Bridge representatives have been reviewing and analyzing company data, and meeting with United and other key stakeholders (including the IAM, AFA and the Creditors' Committee) to assist in its endeavor. Bridge will deliver a preliminary draft of its report on November 22.

## I.    UNITED'S IMPLEMENTATION OF COST-SAVING AND BUSINESS EFFICIENCY INITIATIVES

United's business plan addresses the harsh business realities in the airline industry by delivering a cost structure that future revenues can support through significant restructuring initiatives, including additional cost-cutting and efficiency improvements. United's business plan calls for approximately $2 billion in additional annual cost-savings. United already has started executing on its business plan to implement these cost saving initiatives so that it can obtain financing for its business plan to fund its exit from bankruptcy. (As previously stated, the Club DIP Lenders have shown their confidence in United's ability to execute its business plan by agreeing to waive United's compliance with its EBITDAR covenants for the fourth quarter of 2004).

### A.    Business Improvement Initiatives

For example, United has been working to streamline its airport and maintenance operations, which among other things already has resulted in United's lost baggage rate being the

United's Network/Business Model, and Other Cost/Revenue Improvements. Two additional Working Group teams continue to evaluate United's pension plans and aircraft financing costs, respectively.

4

lowest in its history. Given the record high cost of fuel, United has been implementing a range of initiatives to maximize its fuel consumption efficiency. United already is in the process of implementing a call center excellence initiative through call center efficiency improvements.

United is also taking steps to ensure that it is paying market rates to its United Express carriers while still providing safe, and reliable customer care. To that end, United recently submitted a request for proposal to a number of regional airlines to operate up to 70 regional jets in the United Express network on routes currently operated by Air Wisconsin. This process also will provide United with an opportunity to fine-tune the mix of smaller and larger regional jet aircraft in the United Express fleet.

United continues to examine its business for opportunities to rationalize and optimize its asset portfolio and corporate structure. These efforts recently resulted in the sale of United's remaining interest in Orbitz (all of the proceeds of which will be kept entirely by United pursuant to a proposed amendment to its Club DIP Facility), the consummation of certain Heathrow slot transactions, and a pending motion seeking authority for an inter-company equity contribution, which will result in significant corporate and tax savings to the estates. Moreover, United has requested court approval to retain two real estate brokers to evaluate, market and sell surplus real estate to provide United with additional cash.

At the same time, United is well underway in its preference avoidance process, having settled approximately 392 potential preference avoidance actions, which will bring substantial value to the estate in the form of cash or other concessions. United also has started commencing preference avoidance adversary proceedings, and will continue to do so to the extent that United is unable to resolve outstanding preference claims.

K&E 31484-159:9980790.13

United's efforts continue on the revenue side as well. United recently announced that it has entered into a significant revenue contract to provide comprehensive flight training for Eclipse Aviation Corporation starting in mid-2005. Moreover, United negotiated three new corporate volume sales contracts worth approximately $130 million over five years.

**B.    Section 1110 Process**

A significant portion of the non-labor savings built into United's revised business plan must be obtained through further negotiations with United's aircraft financiers. As this Court is aware, United already has significantly reduced the cost of operating its fleet by upwards of $500 million per year (without regard to ongoing monthly savings derived from the various Interim Adequate Protection Stipulations with the Public Debt Group).

The Court will also recall that United previously had reached an agreement-in-principle with the Public Debt Group on a comprehensive restructuring of the 175 aircraft in that component of United's fleet (including certain rejected and abandoned aircraft). Unfortunately, negative industry developments, coupled with the ATSB denial, rendered that restructuring insufficient to meet United's needs going forward. Accordingly, as part of its business plan development process, United carefully has developed a new set of transaction-by-transaction proposals with respect to the Public Debt Group and anticipates presenting those proposals within the next fifteen days. United also is arranging a business plan presentation to holders and their advisors in the Public Debt Group, subject to appropriate confidentiality and trading restrictions, so that the revised proposals can be seen in the appropriate context. It is hoped that the business plan presentation to the Public Debt Group will occur during the week of November 22, 2004.

In constructing its revised proposals, United has solicited substantial feedback from the Creditors' Committee and its advisors to ensure that any future agreements will provide for

6

global resolution and be supported by all major stakeholders. Given the extraordinary powers conferred on aircraft financiers by virtue of Section 1110(c) of the Bankruptcy Code, United is well aware that these negotiations will not be a simple matter. Nonetheless, United believes that all parties will continue to work constructively and in good faith to ensure the continuing integrity of United's fleet and its operations.

In addition to the Public Debt Group, United is in the process of revisiting its restructurings with all components of its fleet, including the auction pool, manufacturer financed deals, offshore leveraged leases and other specific restructurings. Although each transaction has its own idiosyncratic fact pattern, United intends to seek the greatest level of savings achievable with a particular deal, given the time constraints of the market for used aircraft.

### C.    Savings From Wages and Benefits

At the October 15 omnibus hearing, United advised the Court that the harsh financial environment across the industry made termination and replacement of the pension plans likely. This has been confirmed in the business plan, which contemplates approximately $725 million in labor savings above and beyond termination and replacement of the pension plans.

To that end, United officially commenced Section 1113 discussions with its labor unions on November 4, 2004 and distributed term sheets to them, accompanied by United's business model. The term sheets contain specific proposals for consideration by each union, including suggested modifications to wages, benefits, and work rules that would provide each group's allocation of the approximately $725 million in labor cost reductions that United needs to start implementing in January 2005, plus a proposal to eliminate any CBA requirement to maintain defined benefit plans. United also provided additional alternative cost savings options for the unions to consider, and underscored its willingness to consider all workable options and alternatives proposed by the unions that will still provide the long-lasting savings United needs

7

to exit Chapter 11 successfully. United also announced that salaried and management employees will participate in the labor cost savings, and that United's executive council voluntarily has agreed to a salary reduction, effective January 1, 2005.

As in the prior Section 1113 negotiations, United stressed to each union that it is available to meet and negotiate with them around the clock to find a viable resolution that will allow United to emerge as a financially stable and competitive business. All of the unions have received the proposals (together with United's valuations of the proposals). Moreover, United has participated in separate follow-up informational and question and answer sessions with all of the unions except the AFA, which is refraining from any negotiations until its Master Executive Council and Board meetings are concluded on November 19. Now that the informational sessions have concluded, United hopes that the parties can move towards serious negotiations in the coming days and weeks ahead.

United has stated all along that it hopes to reach a consensual resolution with its unions and avoid Section 1113 litigation. However, if a consensual resolution cannot be reached, United needs a ruling from the Court by mid-January 2005 so that it can implement necessary cost-savings to keep cash balances at sustainable levels. To that end, United filed a Section 1113 scheduling motion to allow the parties the maximum time for negotiations, which hopefully will maximize the chances of consensual resolutions.

## II.    OPERATIONAL UPDATE

Despite the harsh financial realities facing the industry, as well as the potential distractions of its complex restructuring, United continues to deliver outstanding operational performance. In the third quarter 2004, 70% of United flights departed exactly on time, 2% better than the goal set by United for its new employee incentive program. Customer satisfaction ratings surpassed this internal goal by 1%. On November 4, United released its October 2004

8

traffic results, reporting its highest-ever October load factor of 77.8%. October is the seventh consecutive month that the airline has broken a monthly load-factor record. United also placed first among the seven major U.S. carriers in on-time arrival :14 performance, according to the September Air Travel Consumer Report released November 4 by the U.S. Department of Transportation (DOT). United's employees achieved an 87.9% on-time arrival :14 mark, despite a record load factor for September of 77.5%. United Express delivered significant operational improvement in September 2004 as well posting its best on-time performance since October 2003. United also posted the lowest mishandled baggage rate of all seven major carriers; it was also the lowest rate United has ever reported to the DOT.

United's customers remain pleased with the company's performance as the company exceeded its corporate goal for Definite Intent to Repurchase (DIR) for October by 1.1%.[3]

United continued to optimize its mainline schedule. On October 31, United launched daily nonstop service between Chicago O'Hare and Shanghai and between Chicago O'Hare and Buenos Aires (with connecting service to Montevideo, Uruguay). On November 12, United announced that it will expand service between California and Japan. Specifically, United will move up by more than two months the launch of daily, nonstop service between San Francisco International Airport and Nagoya, and double the service between Los Angeles International Airport and Tokyo.

Finally, on October 29, United launched p.s. (SM), the company's new premium service that offers customers more space and comfort when traveling between New York (JFK) and California (Los Angeles International Airport and San Francisco International Airport).

---

[3] A metric derived from interviews with passengers conducted by Marketrak.

9

## Conclusion

United must implement additional cost-savings initiatives on an urgent timetable due to harsh industry conditions. United's path over the next 60 days is clear, difficult and necessary. During this time period United must substantially complete the Section 1113 process and finalize its business plan. Maintaining exclusivity during this time period will enable United to devote the attention required for achieving substantial necessary savings and ensuring sustainable levels of cash in the first quarter of 2005. Continued serious engagement by all stakeholders in this phase will be required to enable United to advance toward the completion of its restructuring and its emergence from Chapter 11 as a competitive and sustainable airline.

United will continue to work together with its key stakeholders, including the Creditors' Committee, unions, the PBGC, Club DIP Lenders, and others over the next sixty days, while also continuing to keep the Court and its key stakeholders advised of all restructuring developments.

Dated: November ____, 2004         UAL CORPORATION, et al.
Chicago, Illinois

KIRKLAND & ELLIS LLP
James H.M. Sprayregen, P.C. (ARDC No. 6190206)
Marc Kieselstein (ARDC No. 6199255)
David R. Seligman (ARDC No. 6238064)
200 East Randolph Drive
Chicago Illinois 60601
(312) 861-2000 (telephone)
(312) 861-2200 (facsimile)

Counsel for the Debtors and Debtors in Possession

10

## CERTIFICATE OF SERVICE

I, David L.Andrews, a non-attorney, certify that on the 18th day of November, 2004, I caused to be served, by e-mail (to parties who have provided an e-mail address), facsimile (to parties who have not provided an e-mail address) and by overnight delivery (to all parties who have not provided an e-mail address or a facsimile number), a true and correct copy of the foregoing **Debtors' November, 2004 Report On Status Of Reorganization,** on the parties on the attached service list.

Dated: November 18, 2004

_David L. Andrews_
_____
David L.Andrews

Subscribed and sworn to before me
this 18th day of November, 2004.

"OFFICIAL S.......
Scott F. Walker
Notary Public, State of Illinois
My Commission Expires Jan. 24, 2008

# EXHIBIT
# B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UAL CORPORATION, et al., | ) | Case No. 02-B-48191 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Honorable Eugene R. Wedoff |

STIPULATION AND AGREED ORDER BETWEEN THE DEBTORS AND THE
PENSION BENEFIT GUARANTY CORPORATION REGARDING DEBTORS'
MOTION FOR VOLUNTARY DISTRESS TERMINATION OF THEIR DEFINED
BENEFIT PENSION PLANS PURSUANT TO 29 U.S.C. § 1341(C)

On April 11, 2005 the debtors and debtors-in-possession ("Debtors" or "United")

renewed their Motion to Reject Their Collective Bargaining Agreements Pursuant to 11 U.S.C. §

1113(c) and filed their Motion for the Voluntary Distress Termination of Their Defined Benefit

Pension Plans Pursuant to 29 U.S.C. § 1341(c) ("Voluntary Distress Termination Motion").

Pursuant to the Agreed Scheduling Order on Debtors' Motions Under Section 1113(c) of the

Bankruptcy Code and for Distress Termination Of All Defined Benefit Pension Plans Pursuant

To 29 U.S.C. § 1341 ("Agreed Scheduling Order") entered on January 21, 2005, the hearing on

United's motions under Section 1113(c) and for voluntary distress termination is scheduled to

begin on May 11, 2005. The dates for opposition briefs to United's motions, responses to

discovery requests, expert reports, and other pre-hearing proceedings are all set by the Agreed

Scheduled Order. The Agreed Scheduling Order applies to United, the Pension Benefit Guaranty

Corporation ("PBGC"), and certain of United's unions.

On April 22, 2005, United and the PBGC reached a settlement agreement (the

"United/PBGC Agreement"). United filed a motion to approve the United/PBGC Agreement on

April 26, 2005, and is requested, at the behest of the Official Committee of Unsecured Creditors,

that the motion be heard on May 10, 2005. On April 22, United and the PBGC agreed that staying further discovery and proceedings between the two parties on the Voluntary Distress Termination Motion would best serve the interests of the Estate and the PBGC by sparing both parties the unnecessary expense of proceedings that both sides now hope will be unnecessary.

Therefore, United and the PBGC agree and stipulate:

1.  The Agreed Scheduling Order shall not apply to the PBGC.

2.  The hearing on United's Voluntary Distress Termination Motion shall be held in abeyance and not proceed on May 11.

3.  In the event that the Court does not approve the United/PBGC Agreement, United reserves all rights to move, on an emergency basis, for an expedited discovery and hearing schedule on its Voluntary Distress Termination Motion, and the PBGC reserves all rights to oppose such a motion.

4.  Subject to the Court's ruling on United's motion to approve the PBGC/United Settlement, this agreed order and stipulation shall have no effect on United's Motion to Reject its Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113(c), which shall proceed under the terms of the Agreed Scheduling Order.

SO ORDERED this ___ day of May, 2005

Honorable Eugene R. Wedoff
United States Bankruptcy Judge
5/2/05

2

Dated: May 2, 2005

UAL Corporation, et al.

By: _____
James H.M. Sprayregen, P.C. (ARDC 6190206)
Alexander Dimitrief, P.C. (ARDC 6190494)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

Counsel for the Debtors and Debtors-in-Possession

Dated: _____

By: _____
Jeffrey B. Cohen
John A. Menke
Shannon L. Novey
PENSION BENEFIT GUARANTY CORP.
Office of Chief Counsel
1200 K Street, NW, Suite 340
Washington, D.C. 2005-4026
Telephone:    (202) 326-4020 ext. 3848
Facsimile:    (202) 326-4112

LOCAL COUNSEL

Christopher T. Sheean (ARDC 6210018)
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, Illinois 60606
Telephone:    (312) 857-7087
Facsimile:    (312) 857-7095

Attorneys for Pension Benefit Guaranty
Corporation

3

# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) |
| UAL CORPORATION, et al. | ) Chapter 11 |
| | ) |
| Debtors. | ) Case No. 02-B-48191 |
| | ) (Jointly Administered) |
| | ) |
| | ) Hon. Eugene R. Wedoff |
| | ) |
| | ) Pre-trial Hearing Date:   May 9, 2005 |
| | ) Pre-trial Hearing Time:   1:30 p.m. |
| | ) |
| | ) Hearing Date:   May 10, 2005 |
| | ) Hearing Time:   10:30 a.m. |
| | ) |

## OBJECTION OF ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, TO DEBTORS' EMERGENCY MOTION TO APPROVE AGREEMENT WITH PBGC
### [Docket No. 11024]

The Association of Flight Attendants-CWA, AFL-CIO ("AFA"), hereby submits its Objection to Debtors' Emergency Motion to Approve Agreement with the Pension Benefit Guaranty Corporation ("PBGC"). United seeks Bankruptcy Court approval of an agreement (the "Agreement") which provides, in pertinent part, that United will pay PBGC $1.0 billion in securities in exchange for PBGC involuntarily terminating the defined benefit plan covering Flight Attendants (the "Flight Attendant Plan" or "Plan").

## INTRODUCTION

United's motion should be denied on four different and independent grounds. First, the Agreement excludes AFA from settlement of litigation to which it is a party. As the Seventh Circuit has held, such an Agreement violates Bankruptcy Code Section 363, 11 U.S.C. § 363. Indeed, it is a fundamental legal principle that two parties may not impair the legal rights of a third party in the manner contemplated by the Agreement that United asks the Court to bless.

Second, the Agreement unilaterally cancels a provision of the Flight Attendants' collective bargaining agreement in violation of Section 1113(f), 11 U.S.C. § 1113(f), and the Railway Labor Act ("RLA"), 45 U.S.C. § 151, et seq. Those legal provisions plainly prohibit

United from unilaterally altering the terms of its agreement with AFA, unless and until statutory procedures are exhausted.  In this way, United's action resembles its recent attempt to unilaterally alter an agreement with the Air Line Pilots Association by claiming that certain provisions of that agreement were "mere surplusage."  In that instance, the Court rejected United's attempt to alter unilaterally its contractual obligations, and for the same reasons Debtors' current effort with respect to AFA' s agreement should be rejected as well.  United's action also echoes its recent attempt to use Section 1113(e) to nullify AFA's contractual right to notice termination of its most recent Section 1113 agreement in the event that United failed to live up to its commits thereunder.  The Court rejected that effort too.

Third, the Agreement voids United's obligations and AFA's rights under Section 1113. Through Section 1113, Congress requires a debtor to negotiate in good faith with its unions over contract modifications, and should negotiations fail, provides unions with judicial review of the negotiations and the necessity and fairness of the proposed contract modifications.  United's motion seeks to bring the Section 1113 process to a premature end.  This Court previously rejected United's attempt to "tilt the playing field" in Section 1113 negotiations regarding pensions through agreement with only one of its unions.  United's current attempt to abandon the Section 1113 playing field entirely constitutes an even more egregious violation of the Bankruptcy Code processes and AFA's rights thereunder.  Under no circumstances would such a violation be permissible.  But here, when United seeks a pension plan termination that will result in an average 50% reduction in the retirement income of current Flight Attendants, the Company's attempt to circumvent the multiple layers of legal protection afforded to pension benefits is unconscionable.

Lastly, the Agreement violates ERISA by basing a so-called "involuntary" termination upon criteria not set forth in or permitted under the statute.  Simply stated, ERISA does not allow PBGC to trade its regulatory authority for monetary compensation as a bankruptcy creditor.  In fact, United itself has raised the same objection in another stage of these proceedings, asserting

- 2 -

that PBGC cannot permit its pecuniary interests to dictate the exercise of its regulatory powers. The Company was right then -- it and PBGC are wrong now.

## FACTUAL BACKGROUND

On January 8, 2005, AFA and United reached a tentative agreement, providing the Company with $130 million in additional annual savings between 2005 and 2010 ("2005-2010 Agreement"). In a side letter to the 2005-2010 Agreement, AFA and United agreed to "continue to meet and confer regarding the Defined Benefit Plan." Davidowitch Decl. (dated Apr. 15, 2005), Exh. 3. That letter further provided that, if the parties were unable to reach agreement on the pension issue by April 11, United would re-file its Section 1113(c) motion with respect to the pension issue. See Davidowitch Decl. (dated Apr. 29, 2005) ¶ 5.

On January 31, Flight Attendants ratified the 2005-2010 Agreement by a margin of 56% to 44%. Over 70% of eligible Flight Attendants participated in the ratification vote, the highest turnout for any vote conducted by the Union in the course of United's bankruptcy. The same day, immediately after the ratification vote was announced, the Court approved the 2005-2010 Agreement. See id.

In late January, even before the 2005-2010 Agreement was ratified, AFA initiated discussions with PBGC, seeking to enlist the agency in its effort to find alternative funding for the Flight Attendant Plan and avoid termination. PBGC has consistently maintained that the Flight Attendant Plan was "affordable" and could be "retained in a successful reorganization." PBGC's Obj. Debtors' 1113(c) Mot. (filed Jan. 4, 2005) at 20. According to PBGC's expert, Michael Kramer, "[u]nder the Gershwin 5.0F projections, the Company has sufficient liquidity and free cash flow to support at least one of the Pension Plans currently in place, namely the F[light] A[ttendant] plan, even without application for any waivers." Kramer Decl. & Expert Report (dated Dec. 28, 2004) ¶ 8. At a January 27, 2005 meeting with AFA, PBGC indicated that it was willing to explore a wide range of options to plan termination. See Davidowitch Decl. (dated Apr. 29, 2005) ¶ 7.

- 3 -

At the same time, AFA attempted, largely in vain, to engage the Company in negotiations over alternatives to plan termination. As the Company itself recognized, the purpose of the three-month hiatus from litigation was to negotiate over "termination alternatives." Davidowitch Decl. (dated Apr. 15, 2005), Exh. 9. Indeed, the Company told AFA that it "remain[ed] willing to consider any termination alternatives." Id. Despite its professed openness to consider termination alternatives, the Company demonstrated very little real willingness to engage in meaningful negotiations with the AFA about saving the Flight Attendant Plan. See AFA's Supp. Obj. (filed Apr. 29, 2005) at 11-14.

PBGC, on the other hand, throughout this period, encouraged AFA's efforts to find alternative funding. During February and March, AFA regularly consulted with PBGC, as the Union developed a proposal that identified sufficient alternative funding to save the Flight Attendant Plan. See id.

AFA outlined its proposal in a March 30 letter to Bradley Belt, the Executive Director of PBGC. See Davidowitch Decl. (dated Apr. 29, 2005) ¶ 16, Exh. 4. In his April 4 reply, Belt characterized AFA's proposal as "constructive" and reiterated the agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11." Id. ¶ 17, Exh. 6. Mr. Belt added that: "Based upon available information, we continue to believe that the interests of participants and the pension insurance program would best be served by the continuance of the AFA plan." Id. In closing, he encouraged further work between the agency and AFA to resolve the pension funding issue. See id.

On April 11, United re-filed its Section 1113 motion, seeking authority to reject the collective bargaining agreements' contractual bar to a distress termination.

On April 14, PBGC filed an emergency motion to postpone consideration of United's motion for distress terminations of its defined benefit plans, calling United's motion "premature" and arguing that the Company had failed to show that the plans were not salvageable. PBGC's Mem. Supp. Emergency Mot. (filed Apr. 14, 2005) at 1-7. PBGC explained that, until United

- 4 -

"provide[s] an updated business plan . . . and file[s] its plan of reorganization . . . PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy." Id. at 5-6. On April 15, PBGC served written discovery on United, requesting "[a]ll documents relating to the affordability of the Flight Attendant Plan." PBGC's 2d Req. Docs. No. 13.

Then, on April 22, United announced that it had reached an agreement with PBGC, which would result in the termination of all four defined benefit plans. Pursuant to the Agreement, United is to provide three tranches of securities with a total value of $1.5 billion, ($500 million of which is contingent on certain conditions subsequent), to PBGC in exchange for PBGC terminating the four pension plans and settling certain other claims. See Debtors' Emergency Mot. Approve Agreem't PBGC (filed Apr. 26, 2005) ("Debtors' Mot."), Exh. A. By the terms of the Agreement, PBGC agrees that "[a]s soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement . . . PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant and MA&PC Plans." Id. at 2. The Agreement also provides that "United shall not establish any new ERISA-qualified defined benefit plans for a period of ten (10) years after the Exit Date." Id. at 4.

The immediate consequence of the Agreement being approved by the Court is that it would do away with the "need" for further Section 1113 negotiations and the hearing under Section 1113 and ERISA Section 4041. See Debtors' Mot. at 14-15. As the Company says in its Motion, "[i]f United did not enter into the Agreement, it would have to run the risks associated with litigating a sharply contested ERISA Section 4041 sponsor-initiated distress termination of all four Pension Plans, together with the Section 1113(c) trial." Id. at 18.

Further, the public statements of the Company and PBGC heralding the Agreement leave no doubt that both parties entered into the Agreement fully intending and expecting that, pending Court approval, the Agreement would result in termination. In PBGC's April 22 press release, Executive Director Belt hailed the "'reaching [of] a settlement,'" "[u]nder the terms [of which]

- 5 -

. . .," according to the press release, "the PBGC would terminate and become trustee of the company's four pension plans."  Exh. 1 (PBGC Reaches Pension Settlement with United Airlines).  Likewise, the Company announced on April 22 that "the company and the [PBGC] have reached an agreement for the agency to terminate all of United's defined benefit pension plans."  Exh. 2 (UAL Responds to PBGC Announcement of Agreement on Termination of United's Pension Plans).

## ARGUMENT

### I.    THE BANKRUPTCY CODE BARS THE AGREEMENT BECAUSE AFA IS NOT A PARTY TO THE SETTLEMENT.

The Debtors bring their motion under Section 363(b), claiming that, pursuant to Federal Rule of Bankruptcy Procedure 9019, the use of the estate assets to achieve a settlement resolving the dispute over the Flight Attendant Plan, is justified.  According to the Debtors, "various courts have endorsed the use of Bankruptcy Rule 9019 to resolve disputes."  Debtors' Mot. at 13

The key issue, however, is what dispute this agreement is settling and who are the parties to that dispute.  United provides the answer: The litigation is over the "contested ERISA Section 4041 sponsor-initiated distress termination of all four Pension Plans, together with the Section 1113(c) trial . . . over termination of the Plans", and the parties to the litigation are "PBGC, AFA, AMFA, IAM, and the retired pilots."  Debtors' Mot. at 18.  Although AFA is a recognized party to the litigation United describes, it is not a party to the agreement that ends that litigation.  In  a case involving approval of a litigation settlement under Section 363, the Seventh Circuit made clear that "two parties cannot agree to extinguish the claim of a third party not in privity with either of them."  Fogel v. Zell, 221 F.3d 955, 964 (7th Cir. 2000).

What is forbidden by Fogel is exactly what is happening here.  AFA is not a party to the Agreement, nor is it in privity with either the Company or PBGC.  Nonetheless, the Agreement is depriving AFA of its rights as a litigant to contest plan termination in the Section 1113 and ERISA Section 4041 proceedings.  Although Flight Attendants' rights are extinguished by the Agreement, AFA was completely excluded from the process of reaching the settlement, indeed,

- 6 -

was never informed a settlement was being negotiated, and was in no way a party to the "compromise."

The Company disingenuously urges the Court, in determining whether the Agreement is in the best interests of the estate, to weigh the costs of potential litigation against the benefits to the estate of the settlement. See Debtors' Mot. at 14. This simply ignores the fact that the litigant in this case, AFA, has not agreed to the terms of the settlement. Indeed, the case relied on by the Debtors is readily distinguishable on those grounds. In In re Miller, 148 B.R. 510 (Bankr. N.D. Ill. 1992), all of the potential litigants were parties to the approved settlement.

Further, where, as here, the settlement excludes a party whose rights are extinguished by the agreement, whether litigation is avoided is irrelevant as a matter of law. In Fogel, the court noted that "[J]udges naturally prefer to settle complex litigation . . . especially when it is litigation in a bankruptcy proceeding -- the expenses of administering the bankruptcy often consume most or even all of the bankrupts assets." 221 F.2d at 960. However, the preference for settlement notwithstanding, the Fogel court rejected the settlement because it excluded a party whose rights were extinguished by the agreement.[1]

## II.    THE AGREEMENT VIOLATES SECTION 1113.

United not only fails to satisfy the most basic requirement of Section 363 and Bankruptcy Rule 9019, but its reliance upon these provisions is precluded by Section 1113. By entering into the Agreement, United intends to cancel the provision of AFA's collective bargaining agreement that establishes the Flight Attendant Pension Plan, an action that can only be taken once a debtor has complied with the requirements of Section 1113. United knows this all too well, as it has on two different occasions invoked the processes set forth in this provision in order to modify the labor agreements of six different unions. It also understands that Congress enacted Section 1113

---

[1]    The Debtors cite Fogel v. Zell for the proposition that compromises are favored to reduce administrative costs, but neglect to point out that in that case the Seventh Circuit reversed the lower court's decision, finding that the district court had abused its discretion in approving a settlement that extinguished the rights of a party that was not party to the settlement. See Debtors' Mot. at 13.

- 7 -

in order to establish a standard of review for collective bargaining agreements that would supplant the standard applied to all other executory contracts under Section 365. See Debtors' Mem. Supp. Mot. Reject CBAs Pursuant to Section 1113(c) (filed Mar. 17, 2003) at 58-59; Debtors' 1113(c) Mem. (filed Dec. 14, 2004) at 79-84. Clearly, United cannot plead ignorance of the law, and so its decision to proceed with this Motion can only be seen as a deliberate attempt to evade both the purpose and requirements of Section 1113.

Fundamentally, Section 1113 prohibits a debtor from unilaterally changing a collective bargaining agreement and imposes upon the debtor both procedural and substantive obligations that must be satisfied before it can modify a labor agreement. By entering into the Agreement, United seeks to evade this prohibition and to void these obligations.

1.    **By Entering into the PBGC Agreement United Has Violated Section 1113(f).**

The Agreement contravenes Section 1113(f), which expressly forbids a debtor-in-possession from unilaterally modifying a collective bargaining agreement without complying with Section 1113's substantive and procedural requirements. See id. See Adventure Res., Inc. v. Holland, 137 F.3d 786, 796 (4th Cir. 1998) (Section 1113 "plainly imposes a legal duty on the debtor to honor the terms of a collective bargaining agreement, at least until that agreement is properly rejected"); In re Alabama Symphony Ass'n, 211 B.R. 65, 70-71 (N.D. Ala. 1996) ("If a debtor is free to breach the CBA without impairing its ability to reject the contract later, then § 1113 provides no incentive to abide by the terms of the CBA in the interim."); see also In re Elec. Contracting Servs. Co., 305 B.R. 22, 29-30 (Bankr. D. Colo. 2003).

Indeed, in its 1113(c) memorandum, the Company acknowledged that, absent the consent of the union, "a debtor seeking to terminate a plan required by a CBA must . . . secure an order authorizing the rejection of the CBA pursuant to Section 1113 of the Bankruptcy Code." Debtors' 1113(c) Mem. at 40. It is not disputed that the Agreement will have the effect of canceling the provision of the AFA contract that establishes the Flight Attendant Plan. Yet, in presenting the Agreement to the Court in a Section 363 motion, the Company is failing to do

- 8 -

precisely what it has acknowledged it must: "secure an order authorizing the rejection of the CBA pursuant to Section 1113." Id.

### 2. By Entering into the PBGC Agreement, United Has Completely Abnegated Its Section 1113 Obligations.

Section 1113 has two essential purposes: (1) to ensure that a debtor negotiates in good faith with its unions over proposed modifications to its collective bargaining agreements; and (2) to provide unions with judicial review of those negotiations and the necessity and fairness of the proposed modifications before the debtor is authorized to reject a collective bargaining agreement.[2/]   See 11 U.S.C. § 1113(b)-(d).   In its 1113(c) memorandum, the Company recognizes that Section 1113 is the exclusive means under the Bankruptcy Code to modify a collective bargaining agreement, as well as the centrality to the Section 1113 scheme of the court's review of the purported necessity of proposed modification, noting that "Section 1113 protects [the debtor's] . . . unions . . . against changes to CBAs except those that a bankruptcy court independently confirms are 'necessary' for a reorganization to succeed." Debtors' 1113(c) Mem. at 150.

With regard to the first purpose of Section 1113 -- good faith negotiations -- United is compelled in this case to engage in such bargaining not only by the law, but by Court order and contract as well.  A side letter to the 2005-2010 Agreement expressly provides that "United and AFA-CWA will continue to meet and confer regarding the Defined Benefit Plan."  Davidowitch Decl. (dated Apr. 15, 2005), Exh. 3.  On January 31, the Court entered an order approving the 2005-2010 Agreement, including the requirement that the Company continue to negotiate with AFA to find an alternative to termination.

With this Agreement, however, the Company jettisons the Section 1113 negotiations altogether.  In making termination of the Flight Attendant Plan a fait accompli, the Agreement renders further negotiations to avoid termination a futile and pointless exercise.

---

[2/]     The Court said essentially this at the June 2004 hearing on the Debtors' Section 1114 motion.  See 6/2/04 Hrg. Tr. at 13-14.

The Company's professed willingness to continue negotiating with AFA is a transparent pretense. Having come to an agreement with PBGC to terminate the Flight Attendant Plan, United has absolutely no incentive to reach an agreement with AFA providing otherwise. Under such circumstances, even if United continues to sit down at the bargaining table, there can be no "honest purpose to arrive at an agreement as the result of the bargaining process," as Section 1113 requires. In re Walway Co., 69 B.R. 967, 973 (Bankr. E.D. Mich 1987); see also In re Blue Diamond Coal Co., 131 B.R. 633, 646 (Bankr. E.D. Tenn 1991); In re Lady H Coal Co., 193 B.R. 233, 242 (Bankr. S.D. W. Va. 1996).

The second principal purpose of Section 1113 - judicial review of United's compliance with its Section 1113 obligations -- is also nullified by the Agreement. Under Section 1113, the court must scrutinize United's conduct during negotiations to determine if it has satisfied each of the requirements set forth in this provision. Here, as agreed to by United and ordered by the Court, judicial review would entail a seven-day hearing. Now, according to the Company, there is to be no hearing and no adjudication of its compliance with Section 1113. United will merely have to pass the business judgment test, a standard that Congress replaced when it enacted Section 1113 to provide greater protection to collective bargaining agreements than to other executory contracts. See In re Century Brass Prods., Inc., 795 F.2d 265, 271-73 (2d Cir. 1986).

## III.  BECAUSE THE AGREEMENT CONSTITUTES UNLAWFUL SELF-HELP UNDER THE RAILWAY LABOR ACT FLIGHT ATTENDANTS ARE ENTITLED TO STRIKE IF THEIR DEFINED BENEFIT PLAN IS TERMINATED.

Like Section 1113(f), the RLA prohibits unilateral modification of a collective bargaining agreement.[3/] See 45 U.S.C. § 152, Seventh. Under the RLA, a contract's amendable

_____

[3/]      The RLA distinguishes between "minor" and "major" disputes. A minor dispute arises "'out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" Consol. Ry. Corp. v. Railway Labor Executives Ass'n, 491 U.S. 299, 303 (1989) (quoting 45 U.S.C. § 153 First (I)); see also Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246 (1994) ("minor disputes . . . are those that are grounded in the [collective-bargaining agreement]"). Minor disputes are subject to arbitration before the board of adjustment, which is authorized to make a "final and binding" decision on the matter. See 45 U.S.C. §§ 153 First (I) and (continued...)

- 10 -

date establishes when negotiations begin between the union and the carrier over modifications to the collective bargaining agreement. An employer must bargain in good faith over proposed contractual changes under the procedures set forth in the RLA. See 45 U.S.C. § 156.

Under the RLA, an employer that unilaterally modifies a collective bargaining agreement has created a "major dispute" over which employees may strike. Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378-80 (1969); Pan Am. World Airways v. IBT, 894 F.2d 36 (2d Cir. 1990). "If the [carrier] is free [to] . . . resort to self-help, the union cannot be expected to hold back its own economic weapons." Detroit & Toledo Shore Line v. UTU, 396 U.S. 142, 155 (1969).

Here, as discussed above, the Agreement unilaterally modifies the Flight Attendants' collective bargaining agreement by terminating those provisions establishing the Flight Attendant Plan. Not only does the Agreement terminate Flight Attendants' contractual rights in the present, it also denies them those rights for ten years, barring the establishment of a defined benefit plan until 2015. See Debtors' Mot., Exh. A at 4. Clearly, United intends to unilaterally modify the Flight Attendants' agreement before it has even begun, much less completed, the bargaining process required by the RLA. By this conduct, United would create a major dispute which would trigger AFA's concomitant right to initiate a strike against the airline.

―――――――――――――――

³/(...continued)

(m); Consol. Rail, 491 U.S. at 303-304. By contrast, a major dispute, which is what United has created here, arises "during the process of negotiation and formation of an RLA collective-bargaining agreement." Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, 861 F.2d 1546, 1554 (11th Cir. 1988); see also Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 723 (1945). To resolve major disputes, the RLA mandates that parties undergo a "virtually interminable" process of bargaining and mediation. Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 118 (1991); see also Consol. Rail, 491 U.S. at 302. Major disputes are "subject to mediation by the [National Mediation Board,] voluntary arbitration, conciliation attempts by the President." Air Line Pilots Ass'n, Int'l v. Texas Int'l Airlines, Inc., 567 F. Supp. 66, 71 (S.D. Tex 1983). Until they have exhausted the required procedures, the parties must maintain the status quo. Consol. Rail, 491 U.S. 302-03. Only at the conclusion of "this protracted process[, where no] agreement has been reached, [may] the parties . . . resort to the use of economic force." Id. at 303. The Company may unilaterally modify the collective bargaining agreement, and the union may respond with its own economic weapons including a strike.

- 11 -

IV.    **PBGC HAS EXCEEDED ITS STATUTORY AUTHORITY IN AGREEING TO AN INVOLUNTARY TERMINATION OF THE FLIGHT ATTENDANT PLAN.**

Pursuant to 29 U.S.C. § 1342(a), PBGC may institute proceedings to terminate a defined benefit plan only after making one of the following independent determinations:

> (1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under Section 4971(a) of Title 26;
>
> (2) the plan will be unable to pay benefits when due;
>
> (3) the reportable event described in section 1343(c)(7) of this title has occurred; or
>
> (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably in the plan is not terminated.

29 U.S.C. § 1342(a)(1)-(4).  Only after having made one of these determinations can PBGC proceed with termination either by obtaining the agreement of the plan administrator to terminate the plan or by obtaining a court decree adjudicating that the plan must be terminated.  See 29 U.S.C. § 1342(c).

As the Company itself has recognized, PBGC must base its determination to involuntarily terminate a defined benefit plan on one of the four factors enumerated in Section 1342(a).  See Debtors' Mot. at 9.  Indeed, in Allied Pilots Ass'n v. Pension Benefit Guar. Corp, a case upon which the Company relies for its contention that the Agreement comports with ERISA, the court of appeals approved of the finding in Air Line Pilots Ass'n v. Pension Benefit Guar. Corp. (also relied upon by the Company) that "the PBGC may not terminate plans based on factors other than the ERISA criteria."  334 F.3d 93, 97 (D.C. Cir. 2003).  In fact, United itself has recognized that the criteria PBGC may rely upon are strictly limited to those stated in Section 1342.  In the pre-trial statement relating to the litigation over the Pilots' pension plan, United stated categorically that basing a decision to involuntarily terminate a pension plan upon PBGC's own "pecuniary interest as a creditor" is not "proper grounds for termination under 29 U.S.C. § 1342."  Pretrial Statement in PBGC v. UAL (filed Mar. 19, 2005) at 5-6.

- 12 -

One only has to consider PBGC's position before the $1.0 billion inducement from United and after to grasp that the agency plainly based its decision to terminate the Flight Attendant Plan on its own pecuniary interest. Until PBGC and United announced the Agreement to terminate the defined benefit pension plans, PBGC had consistently stated that termination of the Flight Attendant Plan was not necessary for United to reorganize successfully.

In its January 4, 2005 opposition to United's Section 1113(c) motion, PBGC stated that the Flight Attendant Plan was "affordable" and could be "retained in a successful reorganization." PBGC's Obj. Debtors' 1113(c) Mot. at 20.

In an April 4 letter, Bradley Belt, the Executive Director of PBGC, characterized AFA's proposal, which identified sufficient alternative funding to save the Flight Attendant Plan, as "constructive" and reiterated the agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11." Davidowitch Decl. (dated Apr. 29, 2005), Exh. 6.

On April 14, PBGC filed an emergency motion to postpone consideration of the Company's motion for distress terminations of its defined benefit plans, calling United's motion "premature" and arguing that United had failed to show that the plans could not be salvaged. PBGC's Mem. Supp. Emergency Mot. at 1-7. PBGC explained that, until United "provide[s] an updated business plan . . . and file[s] its plan of reorganization . . . PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy." Id. at 5-6 (emphasis added). As recently as April 15, PBGC served discovery on the Company, requesting "[a]ll documents relating to the affordability of the Flight Attendant Plan." PBGC 2d Req. Docs. No. 13.

Then, on April 22, United announced that it had reached its Agreement with PBGC, whereby the Company paid PBGC securities valued at $1.0 billion in exchange for PBGC terminating United's four defined benefit plans.

- 13 -

The only intervening event between April 14, when PBGC stated that any termination of United's defined benefit plans would be premature and April 22, when PBGC agreed to terminate the plans, and, therefore, the only conceivable explanation for PBGC's about face was the Company's $1.0 billion inducement. PBGC has completely abdicated its public trust, exalting its own pecuniary interest as a creditor over the public's interest in preserving defined benefit plans whenever possible.

Again, the Company has recognized that it is improper under ERISA Section 4042 for PBGC to base its decision to terminate on its pecuniary interest as a creditor. See Pretrial Statement in PBGC v. UAL (filed Mar. 19, 2005) at 5-6. PBGC has also recognized that its role as regulator should not be conflated with its role as creditor. In opposing referral of its action to terminate the Pilots' Plan to this Court, PBGC stated that "referral to the bankruptcy court ignores the fact that this action involves PBGC as regulator and United as plan administrator, not in their debtor-creditor relationship." PBGC's Mot. Reconsid. (filed Feb. 11, 2005) at 7.

Apparently, however, PBGC is no longer concerned with maintaining any kind of boundary between its creditor role and its regulator role. Nowhere are the merger of those identities and the decision to subordinate the public interest to PBGC's pecuniary interest as a creditor more apparent than in PBGC's April 22 press release, announcing the Agreement with United. There, PBGC acknowledges that it is taking the regulatory action of termination based on a determination that "the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy." Exh. 1.

The fact that PBGC's determination to terminate the Flight Attendant Plan is a condition subsequent of the Agreement leaves no doubt that this termination is in fact voluntary. Two willing parties entered into "arm's length" negotiations and they freely decided to reach an agreement with each other. See Agreement at 2. By the terms of the Agreement, PBGC's notice of determination and initiation of termination is contingent on the $1.0 billion payout from United. Thus, the Company's claim that this involuntary termination was "PBGC-initiated" is

ludicrous. How could this involuntary termination be PBGC-initiated, if PBGC is waiting to get paid by United before it initiates termination proceedings?

Indeed, PBGC has plainly failed to comply with the involuntary termination process mandated by ERISA, which requires that the "PBGC initiate[] the termination process by 'issuing a notice . . . to a plan administrator [of PBGC's] determin[ation] that the plan should be terminated.'" Allied Pilots Ass'n v. Pension Benefit Guar. Corp., 334 F.3d at 95 (quoting 29 U.S.C. § 1342(c)). After the notice of determination has issued, PBGC may negotiate with the plan administrator, either obtaining an agreement to terminate the plan or some other settlement that avoids adjudication. Otherwise, PBGC applies for a decree adjudicating the plan terminated. Here, PBGC has done the reverse of what ERISA mandates. It negotiated the Agreement to terminate the defined benefit plans with United first and promises to issue a notice of determination that the Flight Attendant and MA&PC Plans should be terminated as a condition of that Agreement.

The Company's reliance on the authority cited in its Motion for the proposition that the "PBGC has the statutory power to terminate pension plans whenever [the] PBGC believes the ERISA criteria are met (including, among other scenarios, as part of a settlement agreement with the plan sponsor)," Debtors' Mot. at 20, is entirely misplaced. In all three cases cited by the Debtor for this proposition, PBGC first issued a notice of determination that the plan should be terminated. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 641 (1990); Allied Pilots Ass'n v. Pension Benefit Guar. Corp., 334 F.3d 96; Air Line Pilots Ass'n, Int'l v. Pension Benefit Guar. Corp., 193 F.Supp. 2d 209, 212-13 (D.D.C. 2002). At that point, in Allied Pilots Ass'n and Air Line Pilots Ass'n, PBGC gave the administrator the option of agreeing or opposing the termination. Indeed, in both cases, the plan administrator, upon being notified by PBGC of its determination to involuntarily terminate the employees' pension plans, began negotiations with the unions and PBGC, which ultimately culminated in an agreement that resulted in the

- 15 -

plans surviving for another eight years.  See Allied Pilots Ass'n, 334 F.3d at 96; Air Line Pilots Ass'n, 193 F.Supp.2d at 213.

The Company's claim that Section 1113 has no bearing upon an involuntary termination may be true when it is actually initiated by PBGC.  That is not the case here.  As shown above, PBGC and United made a deal to swap involuntary terminations for $1.0 billion in securities.  As a co-sponsor of the agreement and its consequences, United cannot now try to place all the "credit" on PBGC's shoulders.  By making this trade, United has sought to avoid the responsibilities it alone has under Section 1113 and ERISA Section 4041.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the Debtors' Emergency Motion to Approve Agreement with PBGC should be denied.

Respectfully submitted,

Robert S. Clayman (admitted pro hac vice)
Carmen R. Parcelli (admitted pro hac vice)
Matthew E. Babcock (admitted pro hac vice)
GUERRIERI, EDMOND, CLAYMAN &
BARTOS, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036-2243
Telephone: (202) 624-7400

Counsel for Association of Flight
Attendants-CWA, AFL-CIO

Dated: May 6, 2005.

- 16 -

# EXHIBIT 1



Home > News > News Releases > 2005 >





**FOR IMMEDIATE RELEASE**
**April 22, 2005**
**PBGC Public Affairs, 202-326-4040**

### PBGC Reaches Pension Settlement with United Airlines

WASHINGTON—The Pension Benefit Guaranty Corporation (PBGC) announced today that it has reached a settlement with United Airlines over the termination of the company's pension plans.

"We believe that this agreement, under the circumstances, is in the best interests of the pension insurance program and its stakeholders," said PBGC Executive Director Bradley D. Belt. "The PBGC has an obligation to reduce its losses for the protection of workers and retirees, other companies that pay insurance premiums, and taxpayers. By reaching a settlement now, we further that goal."

Under the terms of the agreement, which must still be approved by the bankruptcy court overseeing UAL's restructuring, the PBGC would terminate and become trustee of the company's four pension plans and the agency's claims against the company would be settled. The PBGC and its financial advisers believe the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy.

Collectively, United's pension plans are underfunded by $9.8 billion on a termination basis, $6.6 billion of which is guaranteed, according to the PBGC. The four plans are: the UA Pilot Defined Benefit Plan, which covers 14,100 participants and has $2.8 billion in assets to pay $5.7 billion in promised benefits; the United Airlines Ground Employees Retirement Plan, which covers 36,100 participants and has $1.3 billion in assets to pay $4.0 billion in promised benefits; the UA Flight Attendant Defined Benefit Pension Plan, which covers 28,600 participants and has $1.4 billion in assets to pay $3.3 billion in promised benefits; and the Management, Administrative and Public Contact Defined Benefit Pension Plan, which covers 42,700 participants and has $1.5 billion in assets to pay $3.8 billion in promised benefits.

As of September 30, 2004, the PBGC's own balance sheet showed a $23.3 billion deficit, with $39 billion in assets to pay $62.3 billion in guaranteed pension benefits to more than 1 million workers and retirees. By law, the PBGC is required to keep premiums as low as possible and has no call on the U.S. Treasury beyond a $100 million line of credit.

"This again highlights the need for the comprehensive pension reform. Unless and until Congress fixes the rules that allow pension plans to become so underfunded, the insurance program and plan participants are at risk of suffering large financial losses," Belt said.

The PBGC is a federal corporation created under the Employee Retirement Income Security Act of 1974. It currently guarantees payment of basic pension benefits for about 44 million American workers and retirees participating in over 31,000 private-sector defined benefit pension plans.

- ### -

PBGC No. 05-36

Send comments about this Web site to *webmaster@pbgc.gov*
Last Edited: 04/22/05

# EXHIBIT 2

united.com - Press release detail

**UNITED**

Contact United | Site search—

| Planning travel | Travel support | Mileage Plus | About United |

Home > About United > Company information > Press room > Press releases
> Press release detail

# UAL Responds to PBGC Announcement of Agreement on Termination of United's Pension Plans

Quick links:

Shop for flights

Special deals

Vacation packages

Mileage summary

Customer support

**Ted** flyted.com

April 22, 2005

**Chicago, April 22, 2005** – UAL Corporation, the parent company of United Airlines, issued the following statement in response to today's announcement by the Pension Benefit Guaranty Corporation (PBGC) that the company and the agency have reached an agreement for the agency to terminate all of United's defined benefit pension plans:

"This agreement with the PBGC – if approved by the U.S. Bankruptcy Court – resolves one of the major issues standing between United and its successful exit from bankruptcy. It will allow the company to move forward as a sustainable, competitive enterprise for the long term – ultimately United's most important goal.

"While the company's first choice was to resolve pension issues consensually with all of its unions, unfortunately no viable solutions were offered or found over the past many months. In the event that United and its unions are able to find a viable alternative to termination and replacement of their defined benefit pension plans prior to this agreement taking effect, the agreement would allow United to pursue that alternative.

"If approved, the agreement will streamline the trial that is scheduled to begin on May 11, allowing the trial to focus solely on issues related to 1113(c). In addition, this agreement will keep United on track to exit bankruptcy.

"United's employees have been doing extraordinary work throughout the restructuring, and today's step will allow the company to move ahead efficiently though this next, most challenging part of the process and toward a far more competitive future.

"United plans to submit this agreement to the Bankruptcy Court as quickly as possible for approval prior to the May 11 trial date."

**About United**

United Airlines (OTCBB: UALAQ.OB) is the world's second largest airline and operates more than 3,400 flights a day on United, United Express and Ted to more than 200 U.S. domestic and international destinations from its hubs in Los Angeles, San Francisco, Denver, Chicago and Washington, D.C. With key

global air rights in the Asia-Pacific region, Europe and Latin America, United is the largest international carrier based in the United States.* United is also a founding member of Star Alliance, which provides connections for our customers to nearly 800 destinations in 139 countries worldwide. United's 60,000 employees reside in every U.S. state and in many countries around the world. News releases and other information about United can be found at the company's Web site at united.com.

* Measured by revenue passenger miles as reported to the U.S. Department of Transportation for 12 months ending September 2004, the most recent comparison data available.

### #

Privacy | Terms and conditions | Compatible browsers © 2005 United Air Lines, Inc.                    STAR ALLIANCE

## CERTIFICATE OF SERVICE

I, Carmen R. Parcelli, hereby certify that, on this 6th day of May 2005, true copies of the foregoing **Objection of Association of Flight Attendants-CWA, AFL-CIO, to Debtors' Emergency Motion to Approve Agreement with PBGC** were served via overnight delivery on the attached Core Group Service List and via electronic mail or facsimile on the Updated 2002 Service List. Pursuant to Section C.3.i(1) of the Second Amended Notice, Case Management and Administrative Procedures in this proceeding, service lists have been filed with the Court. In accordance with Rules 9014 and 7004, a true copy of the foregoing Objection was served by first-class mail on Frederic Brace, an Officer of United.

Carmen R. Parcelli

# EXHIBIT D

Page 1

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
 4   In re:                    )
                               ) No. 02 B 48191
 5   UAL CORPORATION, et al.,  )
                               ) Chicago, Illinois
 6                             ) May 10, 2005
                      Debtors.  ) 10:30 a.m.
 7
 8         TRANSCRIPT OF PROCEEDINGS BEFORE THE
                HONORABLE EUGENE R. WEDOFF
 9
10   APPEARANCES:
11   MR. JAMES SPRAYREGEN
     MR. TODD GALE
12   MR. ALEX DIMITRIEF
     on behalf of the debtors;
13
     MR. FRANK CITERA
14   on behalf of the city of Chicago;
15   MR. JEFFREY COHEN
     on behalf of the PBGC;
16
     MR. FRUMAN JACOBSON
17   on behalf of the creditors committee;
18   MR. BRUCE SIMON,
     on behalf of the Air Line Pilots Association;
19
     MR. ROBERT CLAYMAN
20   on behalf of the Association of Flight Attendants;
21   MR. LEE SEHAM
     on behalf of the Aircraft Mechanics Fraternal
22   Association;
23   MR. JACK CARRIGLIO
     MR. FRANK CUMMINGS
24   on behalf of the Retired Pilots;
25   MR. PAT HERRINGTON
     on behalf of IFS;
```

Page 2

1   MR. BILL SMITH
    on behalf of the Bank of New York;
2
    MS. SHARON LEVINE
3   on behalf of the International Association of
    Machinists and Aerospace Workers.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        THE CLERK: UAL Corporation, 02 B 48191.
2        MR. SPRAYREGEN: Good morning, Judge
3   Wedoff. James Sprayregen from Kirkland & Ellis on
4   behalf of the debtors. Your Honor, you had --
5   someone had contacted our office about the Chicago
6   municipal bond omnibus. I don't know if you wanted
7   to -- no omnibus, but some questions on that. Did
8   you want to handle that at a different time?
9        THE COURT: No. That should take very
10  little time, and we can take care of that at the
11  beginning of today's hearing. But before we do,
12  there are a couple of things I wanted to say. The
13  first is that I can easily understand the great
14  interest that employees of United have in today's
15  proceeding. And I want to let you know that I wanted
16  to make it possible for everyone to hear what was
17  going on in today's proceedings. We made
18  arrangements to get the largest courtroom available,
19  that is this courtroom. The single largest courtroom
20  in the building was not available because it's used
21  for immigration and naturalization matters, and that
22  was previously reserved for that purpose. I am very
23  grateful to the staff of the district court for
24  making facilities available to let as many people be
25  present in this courtroom and to allow the people who

Page 4

1   would not fit in this courtroom to be able to hear
2   today's proceedings.
3        It's also very important, obviously,
4   that the attorneys who are representing all of the
5   parties, including the employees, be able to move
6   through the courtroom and consult with one another.
7   So to the extent that anyone had to leave this
8   courtroom to make room for those attorneys, I'm sorry
9   that that was required. But I think you can
10  understand why it was necessary. And, again, I'm
11  happy, as I understand it, that everyone who wishes
12  to hear these proceedings will be able to hear them.
13       We're going to take up arguments on
14  the debtors' motion to enter into a settlement with
15  the Pension Benefit Guaranty Corporation in just a
16  second. But as Mr. Sprayregen said, there is a
17  matter that involves the city of Chicago and the
18  enforcement of certain payment obligations regarding
19  bonds issued by the city that needs to be addressed
20  first.
21       MR. GALE: Good morning, Your Honor. Todd
22  Gale for the debtors.
23       MR. CITERA: Good morning, Your Honor.
24  Frank Citera here on behalf of the city of Chicago.
25       THE COURT: My question is really going to

Page 5

1   Mr. Citera. In reviewing the briefs that the parties
2   had submitted on United's pending motion for judgment
3   on the pleadings, it became very apparent that a
4   major argument made by the city was that judgment on
5   the pleadings was inappropriate because the city
6   wanted to introduce evidence on the relationship
7   between the airport use agreement and the special
8   facilities agreement. Now, if the city still wants
9   to present evidence on that point, I would like to
10  know what the evidence is that you want to present
11  and schedule a hearing to let you present it.
12       MR. CITERA: Well, Your Honor, I think that
13  more appropriately what -- as we've pointed out in
14  our motion, and I believe correctly pointed out in
15  our motion, 12(c) is an inappropriate vehicle to deal
16  with this particular issue, particularly based on the
17  pleadings as presented to the court, and including,
18  and most specifically, the complaint of United, which
19  is barren of essentially any facts.
20       While it's true that the city has
21  pointed out in its motion that it would like to
22  introduce evidence, I mean, that evidence has to be
23  framed, in our view, more appropriately by whatever
24  issues United raises. I mean, if United wishes to
25  file a Rule 56 motion and comply with the obligations

Electronically signed by Jackleen DeFini (201-184-194-7430)    b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 6

1  to set forth what they believe are the undisputed
2  facts, then certainly the city has an opportunity to
3  respond to those facts and introduce contrary
4  evidence. But they have the burden of both moving
5  forward and the burden of proof.
6      THE COURT: Mr. Citera, I don't see it that
7  way. They have very clearly set forth their position
8  that the agreements themselves provide all the basis
9  that United needs for the court to make a
10 determination that these are separate and distinct
11 provisions, and that the presence of Section 27.08
12 serves only as an unenforceable obstacle to
13 assumption of the airport use agreement. And the
14 authorities that have been cited direct the court to
15 look at what might be the relationship between the
16 two agreements economically.
17     MR. CITERA: Sure.
18     THE COURT: Now, the city has said the
19 contracts themselves provide all that the court needs
20 to make that determination. The city has argued that
21 that's not correct, that there is other evidence that
22 the court ought to consider. And what I'm suggesting
23 to you is that I would be very happy to give the city
24 the opportunity to present additional evidence if it
25 wishes to do so. The city may take the position that

Page 7

1  the contracts do provide the only evidence that the
2  court needs to establish that its position is
3  correct. And if that's the case, I'll be happy to
4  take the matter under advisement on that basis. But
5  I don't want to render a decision based on an
6  assumption on my part that the contracts themselves
7  are the only relevant evidence if the city does have
8  evidence that it would like to present.
9      MR. CITERA: Well, I think as to the issue
10 raised by United, which would, in effect, eviscerate
11 Section 27.08, then I think the court does need to
12 consider evidence as to the effect that that would
13 have both on the city of Chicago. Moreover, I think
14 United has a burden to show that enforcing 27.08
15 would somehow impede their reorganization. And we
16 don't believe they can make that showing, certainly
17 not at this juncture in the case.
18     So I think the short answer to your
19 question, Your Honor, because I know Your Honor
20 obviously has other things to take up this morning,
21 is that, yes, we would like to have that opportunity.
22     THE COURT: Okay. Well, what we're going
23 to do then is schedule an opportunity for you to
24 present that evidence. And since I will be giving
25 you that opportunity --

Page 8

1      Mr. Gale, is my assumption correct
2  that United would have no evidence that it would wish
3  to present at such a hearing?
4      MR. GALE: Not only does United not intend
5  to present any evidence, Your Honor, it's our
6  position, as stated in our briefs, that the city
7  cannot present any evidence because their 30(b)(6)
8  witness on this particular topic made clear that
9  there is no evidence to present. This is spelled out
10 in our brief that was filed on September 8th,
11 United's supplemental brief relating to its motion
12 for judgment on the pleading. We set out on pages 3
13 and 4 the testimony from Mr. Walter Norm. That's
14 probably more of an answer than you wanted. But from
15 our perspective, there is no evidence to present
16 here, and the city has admitted as much in the
17 discovery that they've given us.
18     THE COURT: All right. What I'm going to
19 do is to continue this particular matter for one
20 week. And then if you would, Mr. Citera, come back
21 on Tuesday of next week at 10:00 o'clock in my
22 ordinary courtroom and just tell me what evidence you
23 want to present. And depending on extent of that
24 evidence, we'll find the time to hear it.
25     MR. CITERA: Okay. I will be out of town,

Page 9

1  but I'm sure someone from my office will be able to
2  do that.
3      THE COURT: Okay. So this matter will be
4  continued to Tuesday of next week, the 17th, I
5  believe.
6      THE CLERK: Yes.
7      MR. GALE: I believe that's correct, yes,
8  sir.
9      THE CLERK: 10:00 o'clock.
10     THE COURT: 10:00 o'clock.
11     MR. GALE: One other thing, Your Honor. In
12 the list of pleadings that we've provided, there was
13 one pleading that was left off that goes to this
14 particular topic, and I wanted to flag it for the
15 court, if I could. It was docket number 160. United
16 Airline Incorporated's reply to the city of Chicago's
17 objection and to the response of the trustees to
18 United Airline Incorporated motion for judgment on
19 the pleading.
20     THE COURT: Okay. Fine. We'll be careful
21 to take that into consideration as well then. Thank
22 you, both.
23     MR. CITERA: Thank you.
24     MR. GALE: Thank you, sir.
25     THE COURT: All right. Before we engage in

3 (Pages 6 to 9)

Page 10

1   any argument, Ms. Williams reminds me that I do have
2   a number of motions that are more or less routine. I
3   want to make sure that I have orders granting the
4   motions for leave to file briefs in excess of 15
5   pages and the motion for leave to file a certain
6   report under seal. If there are any other motions of
7   that sort that need to be addressed, if you'd take
8   them up with Ms. Williams, those are motions which in
9   the absence of objection I would grant.
10         MR. SPRAYREGEN: Your Honor, there was one
11  other motion that came in yesterday from two
12  congressman to file a late brief. I don't know if
13  the court has seen that.
14         THE COURT: I have not. But, obviously,
15  without objection that would be granted as well.
16         MR. SPRAYREGEN: Thank you.
17         Your Honor, we ended yesterday's
18  pre-trial with a request from the court that the
19  various objectors and proponents get together and
20  agree on an argument schedule, in the absence of
21  which you said you would set one. Thankfully we
22  don't need to ask you to do that because we have
23  agreed, assuming it works for the court. We're not
24  on exactly the same time frame I thought we would be
25  on. But our thought at least was for UAL to take 50

Page 11

1   minutes right now, and that could be shorter
2   dependent on the extent of the court's questioning;
3   the PBGC, 25 minutes; the creditors committee, five
4   minutes; ALPA, two minutes. They're not proponents,
5   but they're not objectors. And we thought by then we
6   would be at a time for a lunch break. And then I'll
7   get to in a minute, one party has since settled, the
8   APG group, and I'll describe what that means. So we
9   have seven objectors left. The IAM asked for 20
10  minutes; AMFA 15; AFA 15 to 20; URPA, 15; indenture
11  trustees, ten minutes; IFS, five minutes; IFPTE said
12  they didn't need any time, they would rest on their
13  pleadings, although I assume they reserve their
14  rights. And then we thought 20 minutes for UAL
15  rebuttal. Assuming we were back at 2:00, according
16  to that schedule we would be done with argument at
17  3:45.
18         THE COURT: That's fine. That will work.
19         MR. SPRAYREGEN: Okay, Your Honor.
20         Your Honor, in a lot of ways much of
21  this case has been about avoiding coming to you to
22  ask for the relief we're asking for, not just today
23  but starting with the trial tomorrow. And the
24  debtors are quite conscious of the difficult issue
25  we're asking the court to address and the difficult

Page 12

1   issues they impose on the lives and lifestyles of our
2   current employees and our retirees.
3         We remain committed as we move forward
4   here even in this contested proceeding, and even as
5   we go into tomorrow's trial, to do everything we can
6   to continue to reach consensus with those unions with
7   whom we have thus far, unfortunately, been unable to
8   do so.
9         Nevertheless, in the absence of
10  consensual agreement, it is the debtors' obligation
11  to take into account the multiplicity of competing
12  interests to maximize the value of the debtors'
13  estate, to honor past historic promises to the
14  greatest extent possible while at the same time have
15  a reorganization and a restructuring of this
16  enterprise that results in a viable and sustainable
17  business going forward that will be around for the
18  benefit of all of its stakeholders.
19         I would note that, quite importantly,
20  Your Honor, notwithstanding today's proceedings and
21  contentious nature of them and some of the heated
22  rhetoric, the company continues to run a great
23  operation and deliver great value to its customers.
24  Its operating matrix have basically never been
25  better. And we do thank all of the employees of this

Page 13

1   airline for their continued efforts in that regard
2   because without those great operations, we would have
3   less here to fight about.
4         The first thing I thought I would do,
5   Your Honor, would be to just make sure the court
6   understands and the parties understand the various
7   modifications we've reached, which are not that many.
8   And there has been a couple even since the pleadings
9   were filed yesterday.
10         THE COURT: All right. One thing that I
11  was going to ask is just to get an overview of the
12  agreement so that everybody is on the same page. If
13  we went through the agreement as it was attached to
14  your motion, perhaps you could point out where
15  provisions have changed. And then if there is
16  something that I had a question about, perhaps I
17  could raise it just to get an understanding of what
18  the terms of the agreement really are.
19         MR. SPRAYREGEN: I'm happy to do that.
20         THE COURT: So the first page has a number
21  of whereas clauses which I'm confident haven't
22  changed. And then the first paragraph has to do with
23  pursuing alternatives. And that I don't think is a
24  substantive issue. Then there is consideration to
25  the PBGC in paragraph 2. There have been some

Page 14

1  changes with respect to that; is that correct?
2      MR. SPRAYREGEN: Minor changes. The only
3  real change I think on that -- and if I miss any,
4  I'll come back because I have a list that's not
5  necessarily keyed to the agreement.
6      THE COURT: Okay. Well, do your best
7  because I think it will be much easier for me to
8  follow if you present the changes in the order that
9  they are in the agreement.
10      MR. SPRAYREGEN: I will try, Your Honor.
11  We actually thought it wouldn't be helpful to all of
12  the parties to get a new red-lined agreement at the
13  last minute before the hearing, so we kept them
14  separate. But I will try to do that.
15      What's changed in the consideration is
16  none of the consideration but the -- in (a)(2) on
17  page 2, the contingent senior subordinated notes are
18  now going to be pari passu with the ALPA notes.
19      THE COURT: Okay.
20      MR. SPRAYREGEN: With the next paragraph,
21  the indenture, we have agreed with the creditors
22  committee and the APG group that we would both
23  consult and give notice in advance as we negotiate
24  the indenture with the final documents, which we
25  would really anticipate being much closer to the time

Page 15

1  of plan of reorganization so we can make sure the
2  final docs fit in with all of the other final docs.
3      THE COURT: Okay. You didn't make any
4  changes to paragraph 3, the safety valve?
5      MR. SPRAYREGEN: No changes to that, Your
6  Honor.
7      THE COURT: All right. I had a question
8  about that. Is this intended simply to emphasize the
9  power that's accorded later in the agreement to the
10  parties to change any of the terms of the agreement
11  by their consent and in writing, or is this intended
12  to create a situation where if either of the parties
13  feels that there is a need for changing the terms of
14  the agreement, and it would be United, obviously,
15  felt that there was a need to change the terms of the
16  securities that were being issued in order to allow
17  exit financing, that that matter could be raised
18  before the court?
19      MR. SPRAYREGEN: It's the latter. Except
20  if we agree, we would, obviously, come back to the
21  court for whatever is necessary to come back to the
22  court. But this is supposed to be very protective of
23  United and, to the extent something happens that we
24  didn't anticipate, to give us some flexibility.
25      THE COURT: The ambiguity was in the phrase

Page 16

1  "in the parties' judgment." That could be read to
2  indicate that both the parties would have had to
3  agree that there was an obstacle to exit financing
4  imposed by the form of the securities set forth in
5  the agreement. And I wanted to get clarification, I
6  would want this from PBGC, too, that this would allow
7  for changes if in United's determination, the
8  debtors' determination, the form of the securities
9  created an obstacle.
10      MR. SPRAYREGEN: Well, it's all qualified
11  at the end that in all events --
12      THE COURT: Oh, yeah, the economic value
13  has to remain the same, that's very clear. But the
14  point I want to make is, or get clarification on, was
15  that if United determined that the current form of
16  the securities created an obstacle, United could
17  propose, and the court would consider, whether
18  alternative securities that would be more favorable
19  provided the same economic value to PBGC.
20      MR. SPRAYREGEN: I'll have to confirm that
21  with the PBGC and maybe come back to that because
22  I'm -- okay.
23      THE COURT: Okay. Fine. Any changes in
24  number 4?
25      MR. SPRAYREGEN: Yes. In C we have

Page 17

1  agreed -- I'm not sure where the words are, but we
2  have agreed we will not execute any trusteeship
3  agreement in favor of the PBGC until the litigation
4  that is pending concerning the termination of the
5  ALPA plan is concluded with the result being
6  termination.
7      THE COURT: Okay.
8      MR. SPRAYREGEN: So we put that at the end
9  rather than where we had it happening, right away. I
10  think that's the only change there.
11      THE COURT: Okay. Paragraph 5 on
12  termination date.
13      MR. SPRAYREGEN: No changes there.
14      THE COURT: Okay. Paragraph 6 on
15  restoration rights.
16      MR. SPRAYREGEN: Yes. That is bound up
17  with a process that we came up with the PBGC to
18  approve also replacement plans and a dispute
19  resolution mechanism in the event we were unable to
20  agree. We have agreed with ALPA that United and PBGC
21  agree that United remains required under the
22  agreement between ALPA and United to provide the
23  pilots with the C plan established under the ALPA
24  agreement irrespective of the PBGC agreement. And
25  United intends to implement the PBGC agreement in a

1  manner consistent with the ALPA agreement, including
2  United's obligations under the ALPA agreement to
3  provide the C plan contribution under paragraph 5
4  thereof. I think when you hear from the PBGC, they
5  will confirm that and also have their own
6  reservation.
7      THE COURT: All right. In the event that
8  United proposes a defined contribution plan in the
9  future that is not approved by PBGC, paragraph 6(a)
10 provides that that dispute would be resolved by the
11 Chicago federal court as requested by the PBGC,
12 United not to challenge such selection. I don't
13 understand what that means.
14     MR. SPRAYREGEN: That means that PBGC has
15 taken the position consistently that the appropriate
16 court for these matters to be heard in is a district
17 court, not the bankruptcy court. We have disagreed
18 with that. And this permits us to continue to have
19 discussion, if we ever end up coming to court, about
20 the appropriate court to hear it. But in the absence
21 of agreement on the appropriate court, the agreement
22 gives them the right to select which court actually
23 hears that point.
24     THE COURT: Okay. That's fine. Obviously
25 I suppose if the district court determined that

1  because the matter was a bankruptcy-related matter
2  and was, therefore, subject to the automatic
3  reference that's contained in the district court
4  rules, this agreement couldn't stop the district
5  court from making that determination.
6      What I wanted to get clear is that the
7  parties couldn't stipulate to some jurisdiction that
8  wouldn't otherwise exist or change the jurisdiction
9  of rules that are in place. And as long as that --
10 what you've explained I think is completely clear,
11 and I would have no problem with that.
12     MR. SPRAYREGEN: We wouldn't presume to do
13 that. And if the PBGC disagrees, I'm sure you'll
14 hear. But I don't think they do.
15     THE COURT: All right. Any other changes
16 in 6?
17     MR. SPRAYREGEN: Yes. In 6(c) we have
18 reduced the ten-year period to five years. And we
19 have carved out even from that five-year period the
20 obligation under the ALPA plan, which is called an
21 IRC Section 514 excess plan arrangement negotiation.
22 Under a provision of that agreement we're supposed to
23 have, that would not be limited even by the five-year
24 prohibition.
25     THE COURT: Okay.

1      MR. SPRAYREGEN: I do note I did miss one
2  as I'm cross-checking as we go through here. If we
3  went back to the notes -- I'm sorry. I didn't miss
4  it.
5      THE COURT: Then we're on paragraph 7 of
6  the agreement, page 5.
7      MR. SPRAYREGEN: Okay. I don't think there
8  is any changes there.
9      THE COURT: The unfunded liability claim,
10 this is something that I think was made clear in the
11 briefing, but just to emphasize, although the amount
12 of this claim is going to be determined under PBGC
13 regulations, no party other than the debtor would be
14 foreclosed from objecting to the amount of the claim
15 as asserted by the PBGC.
16     MR. SPRAYREGEN: A little nuance, that's
17 basically correct. It's the debtor has agreed with
18 the PBGC calculating it in that method. And it is
19 correct that it's not an allowed claim. And,
20 obviously, the rest of the process takes over after
21 that.
22     THE COURT: Okay. Then let's continue.
23 Taking into account, among other things, the effect
24 of this agreement including, without limitation, the
25 joint and several nature of PBGC's claims. How would

1  the joint and several nature of PBGC's claims affect
2  the amount of the claim calculated under PBGC's
3  regulations?
4      MR. SPRAYREGEN: Good question. The
5  difficulty here, Your Honor, and this is -- in some
6  ways we left it for another day to determine that.
7  But because of the control group liability statute
8  and PBGC having a claim against every entity in the
9  full amount, and because they are giving that up as
10 part of this agreement and only having one overall
11 claim, they may have an argument that they deserve a
12 larger claim against one entity because they gave up
13 the claim against all of the other entities. It may
14 or may not have that argument, but it's --
15     THE COURT: Okay.
16     MR. SPRAYREGEN: -- preserved if they want
17 to make it.
18     THE COURT: I just wanted to understand
19 what that was talking about.
20     MR. SPRAYREGEN: Okay.
21     THE COURT: Obviously I understand what the
22 value provided to PBGC under the agreement is. PBGC
23 is not going to be able to assert a claim for which
24 it's already been paid under the securities that this
25 agreement calls to be issued, but then PBGC's waiver

Page 22

1 of certain of its claims under this agreement. PBGC,
2 for example, waives minimum funding contribution
3 claims under this agreement. How would the waiver of
4 one claim affect the amount of another claim?
5        MR. SPRAYREGEN: I think -- again, I don't
6 know whether it would or not. But when we get to the
7 claims allowance process, it could be that they take
8 the position that that's a -- that waiver, they
9 deserve some plus credit for --
10        THE COURT: All right. Fine. I understand
11 what you're talking about.
12        All right. No changes then that
13 you've made to 7(a); is that right?
14        MR. SPRAYREGEN: Correct.
15        THE COURT: All right. Any change in 7(b)?
16        MR. SPRAYREGEN: No, except there is some
17 language that we have agreed with actually various
18 parties on the methodology and mechanism of objecting
19 to the claim. If you want me to do that now, I can.
20        THE COURT: Yes.
21        MR. SPRAYREGEN: Okay. If the court
22 recalls, one of --
23        THE COURT: If there is someone with a cell
24 phone in the courtroom, and if anyone else has a cell
25 phone here, would you please turn it off.

Page 23

1        MR. SPRAYREGEN: It might have been for me.
2 I'm not sure.
3        We have what we refer to as the
4 April 30, '03, reservation which we've gone through
5 in here which was carried over into the ALPA deal
6 which has carried over into this deal, as proposed to
7 the court at least. If the court recalls, at the
8 time the ALPA deal being approved, Mr. Spiotto
9 clarified or embellished or -- there is a transcript
10 where he stated what he believed the reservation
11 meant. The court agreed. And that was part of what
12 happened with the ALPA agreement.
13        This time we actually have some words,
14 and then creditors committee added some. So if I
15 could read those. And these would ultimately be in
16 what would be an attachment to the proposed order
17 with actually all of these changes. So nothing
18 contained in the order shall be deemed to limit,
19 interfere with, or waive the right of the aircraft
20 trustees or any other parties on -- or aircraft
21 trustees or any holders for whom they act, or any
22 other parties in interest or creditors, to object to
23 the size or allowance of the UBL claims of the PBGC
24 or to object to the terms of any plan of
25 reorganization in this case based upon the

Page 24

1 feasibility of the plan, the creditworthiness of the
2 debtor, best interest test, unfair discrimination
3 among creditors, inappropriate impact on other
4 creditors, or any other ground available under
5 applicable law, and all such rights are preserved,
6 period.
7        THE COURT: Okay. The one suggestion I
8 would make is that the agreement itself doesn't
9 define UBL. As I saw it, UBL came up as a term in
10 the briefing. The agreement just refers to unfunded
11 liability claims which looks to me like ULC. So it
12 would be a good idea to make those consistent.
13        MR. SPRAYREGEN: I think we can just say
14 the claim of the PBGC really encompasses any claims
15 they have. Mr. Jacobson notes that there is some
16 additional handwriting I missed here. The
17 reservation also goes to objecting to the method of
18 calculation, including without limitation the formula
19 or PBGC regulations as the method, as the appropriate
20 method of calculation.
21        THE COURT: Yes.
22        MR. SPRAYREGEN: Okay.
23        THE COURT: Anything else in paragraph 7,
24 Mr. Sprayregen?
25        MR. SPRAYREGEN: Not that I see, no.

Page 25

1        THE COURT: Okay. Let me just raise,
2 because I think this may be one of the first times it
3 comes up, a form of language that the agreement uses
4 is in 7(b). "PBGC shall be deemed to have settled
5 and released any claims against United." That form
6 of language comes up in several places in the
7 agreement. Is there any difference between being
8 deemed to have settled and released and actually
9 settling and releasing?
10        MR. SPRAYREGEN: Not quite, but there is a
11 temporal element, and that's because this agreement
12 is subject to a number of conditions subsequent.
13        THE COURT: Yes.
14        MR. SPRAYREGEN: So when this agreement, if
15 the court were to approve it, there is a number of
16 things that need to happen before they've actually
17 released and waived. Once all of those things
18 happen, there is no more action we need from the
19 PBGC. At that moment in time they are deemed to have
20 done these things.
21        THE COURT: Okay. So the idea is that
22 these waivers and settlements will be retroactive to
23 the date of the entry of this settlement upon the
24 conditions subsequent having been satisfied; is that
25 the idea?

Electronically signed by Jackleen DeFini (201-184-194-7430)    b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 26

1    MR. SPRAYREGEN: Candidly, I don't think we
2  focused on retroactivity because I don't think it
3  matters. But I think that doesn't make a difference
4  whether it's retroactive or that moment in time
5  because they go away.
6    THE COURT: Okay.
7      Number 8, any changes?
8    MR. SPRAYREGEN: No.
9    THE COURT: 9?
10    MR. SPRAYREGEN: Yes. Your Honor, this is
11  changed in a couple of ways. The simplest, we have
12  agreed to actually say that nothing in this agreement
13  or any termination agreement with the PBGC will
14  affect the contractual termination provisions in the
15  DOL and FSA, or IFS, termination agreement -- I'm
16  sorry, agreements. And United will comply with both
17  of those agreements, the DOL and the FSA agreement,
18  before terminating the IFS. So before, they were
19  being terminated in advance, and there was a period
20  of notice that was necessary. We're just going to
21  comply with whatever the terms of those agreements
22  are.
23    THE COURT: Fine.
24    MR. SPRAYREGEN: And that resolves not all
25  but most of the IFS objection. You'll still hear

Page 27

1  something.
2    THE COURT: 10.
3    MR. SPRAYREGEN: We also --
4    THE COURT: You're still on 9?
5    MR. SPRAYREGEN: Well, I'm not sure if it
6  fits there or not. But we did get a request from the
7  Department of Justice to confirm that no governmental
8  unit other than the PBGC is bound by this agreement.
9  This is our agreement with the PBGC. And that will
10  be in the proposed order.
11    THE COURT: Okay.
12    MR. SPRAYREGEN: Okay. I go to 12.
13    THE COURT: All right. Let me see if I
14  have anything before then. In 12(a) I did have a
15  question. There is a requirement that PBGC
16  affirmatively support United's structuring activities
17  and positions in the Chapter 11 cases and the POR,
18  which is plan of reorganization, quote, "in
19  connection with the implementation of this agreement
20  and related initiatives." Is the intent of this that
21  PBGC's obligations are limited to supporting the plan
22  and United's reorganization insofar as that the
23  agreement here bears on those activities?
24    MR. SPRAYREGEN: Your Honor, we received a
25  lot of questions from a lot of parties on that

Page 28

1  provision. And literally to avoid debate and
2  objections, we've actually substantially modified and
3  narrowed that provision.
4    THE COURT: Fine. Why don't you tell me
5  what it reads now.
6    MR. SPRAYREGEN: Really all it provides now
7  is that the PBGC will support the granting of this
8  motion and the actions necessary to put the agreement
9  into effect.
10    THE COURT: Fine.
11    MR. SPRAYREGEN: No broader than that.
12    THE COURT: Okay. Do you have anything
13  else on 12?
14    MR. SPRAYREGEN: No.
15    THE COURT: Okay. I take it there is some
16  substantial changes to 13?
17    MR. SPRAYREGEN: Yes. The changes to 13
18  are as follows: There is two. One is by agreement
19  with the committee, and this was part of the
20  agreement with the committee to make several changes
21  that ultimately resulted in their filing a support of
22  the granting of the motion requesting approval of
23  this agreement. And I'll just read it. "United's
24  direction of PBGC's assignment of 45 percent of its"
25  -- it says "ULB claim," but I think we just changed

Page 29

1  it to "claims shall be consistent with the best
2  interests of general unsecured creditors; shall be
3  subject to at least ten business days prior notice to
4  the committee; shall have been made after
5  consultation with the committee; and shall be subject
6  to bankruptcy court approval after notice to the 2002
7  list and hearing under the best interests of
8  creditors test in a de novo review. Failing United's
9  direction otherwise consistent with the foregoing,
10  United shall direct distribution to the unsecured
11  creditor body."
12      And then we also have agreed to an
13  additional paragraph with the APG group along with
14  that previous reservation I gave in this paragraph,
15  assuming it's acceptable, resolves their objection to
16  the approval of today's agreement. And that is,
17  "United's direction of PBGC's assignment of
18  45 percent of its unfunded benefit liability claim,"
19  again we can just say, "claims shall be consistent
20  with applicable law including the provisions of the
21  Bankruptcy Code and shall be subject to ten business
22  days notice, prior notice to the aircraft trustees."
23  That's the same time as for the committee. "United
24  shall consult with the aircraft trustees as the
25  documents reflecting and evidencing the securities

Page 30

1  are negotiated with the PBGC." That's actually a
2  separate provision which I mentioned before with the
3  indentures, and we have the same arrangement with the
4  creditors committee. But those are the two changes
5  to the 45 percent issue.
6        THE COURT: All right.
7        MR. SPRAYREGEN: I think that gets us to
8  16.
9        THE COURT: Yeah, I have no questions
10  before 16.
11        MR. SPRAYREGEN: Okay. We've added a
12  lead-in to 16 that United will not waive any
13  condition subsequent in paragraph 16 of this
14  agreement without consulting with the committee and
15  providing five business days advance notice of the
16  waiver to the 2002 list.
17        THE COURT: Okay.
18        Subparagraph (d) in paragraph 16
19  appears to me to have a grammatical mistake, unless
20  I'm misreading it. I think what it says is a
21  condition subsequent that United has determined in
22  its discretion that the rights of the parties has
23  been resolved to its satisfaction? I don't know what
24  this means.
25        MR. SPRAYREGEN: Your Honor, the rights of

Page 31

1  the parties is referring to this stipulation that was
2  entered early on in the case that I was going to
3  address. We summarized it as -- we called it the
4  "setoff stipulation," although that's not really what
5  it is. And so the rights -- there is a dispute about
6  what the rights of the parties are under that
7  document. And part of the conditions subsequent is
8  it needs to be resolved in our favor.
9        THE COURT: Okay. What needs to be
10  resolved? What's the subject of "has been resolved
11  to its satisfaction"?
12        MR. SPRAYREGEN: The effect of the
13  stipulation and agreed order. Maybe it's not written
14  as well as it could be. But the intent is, in
15  essence, that that stipulation needs to either go
16  away or be dealt with in a fashion satisfactory to
17  United.
18        THE COURT: Okay. I think what you mean is
19  that the rights of the parties under that stipulation
20  be determined in such a way as satisfactory to
21  United; is that right?
22        MR. SPRAYREGEN: Yes, although we would
23  hope to settle it as distinct from asking the court
24  to determine it.
25        THE COURT: Well, the determination could

Page 32

1  be by agreement or a court ruling, but --
2        MR. SPRAYREGEN: That's fine.
3        THE COURT: But the singular verb and the
4  plural subject caused me some confusion. In any
5  event, I think you've clarified what that is intended
6  to do.
7        Anything in 17?
8        MR. SPRAYREGEN: No.
9        THE COURT: 18?
10        MR. SPRAYREGEN: No.
11        THE COURT: Now, on 18, prior to the
12  occurrence of certain of the conditions precedent,
13  action is going to be taken under this agreement,
14  right?
15        MR. SPRAYREGEN: Yes. Conditions
16  subsequent, not --
17        THE COURT: Yes. Prior to the conditions
18  subsequent being satisfied, action will be taken by
19  each party. Now, paragraph 18(c) says that if the
20  conditions subsequent don't occur, the agreement will
21  be terminated and it will become null and void in its
22  entirety and the parties shall thereafter be governed
23  by the status quo ante without regard to this
24  agreement. Does that mean that the actions taken
25  pursuant to the agreement will become null and void?

Page 33

1        MR. SPRAYREGEN: Your Honor, there was some
2  discussion of what might need to be unwound. And,
3  you know, on this one, if the court will need more
4  clarification, we may need to talk with the PBGC.
5  But our thought with the PBGC was to leave it as is.
6  We don't anticipate that provision coming into
7  effect, and if it does, to deal with it if and when
8  it does.
9        THE COURT: You would prefer to leave a
10  deliberate ambiguity here?
11        MR. SPRAYREGEN: I'm not necessarily
12  agreeing there is ambiguity the way it is. I have my
13  view of it not being ambiguous. But I think you've
14  indicated your view.
15        THE COURT: Well, let's be frank here. The
16  concern I have is that there might be a termination
17  of a pension plan that takes place prior to the
18  satisfaction of a condition subsequent. And then the
19  question is does that termination become ineffective
20  as a result of the nullification of the agreement.
21  And I would hope that that circumstance never arises,
22  but I think it would be better to have any ambiguity
23  in that connection removed.
24        MR. SPRAYREGEN: If I could hold on one
25  second. We did solve for some those issues. If I

1  could refer you, with Mr. Seligman's help, to
2  paragraph 12(b). And if could I explain that
3  provision, unless it doesn't need it?
4      THE COURT: If that answers the question I
5  just posed to you, I don't see how. But if you coul
6  explain that, I would appreciate it.
7      MR. SPRAYREGEN: What it does is we did --
8  the precise question -- we didn't solve for
9  everything. But the precise question you asked we
10 believe we solved for. If the plans are terminated,
11 the anticipation is, and the condition subsequent
12 fails so the agreement does not become fully
13 effective, the anticipation is the plans are not
14 resurrected, but various claims and liens and claims
15 like that that the PBGC has against us in the
16 bankruptcy case are resurrected. That's why you have
17 7(b)(1), 811, 13, and 14 to be deemed null and void
18 because those are mostly the things that the PBGC --
19 the affirmative claims that they're giving up.
20     THE COURT: All right. That's the answer
21 to my question. And what I will appreciate with
22 respect to all of the questions I've been asking you
23 about what I perceive as potential ambiguities in the
24 agreement, if the PBGC disagrees with any of the
25 answers that you've given, I will certainly hope to

1  hear from them in their remarks. Okay.
2      MR. SPRAYREGEN: I only have a couple of --
3  I don't have anything else in the agreement, if the
4  court has any questions there.
5      THE COURT: No, I don't have any other
6  questions. So why don't you add whatever you need to
7  add, Mr. Sprayregen, and then you can go ahead with
8  your argument.
9      MR. SPRAYREGEN: In Exhibit A under the
10 senior subordinated note, there is a reference to the
11 interest rate and a reference to the pilot notes
12 contained in there. United and the PBGC confirm with
13 respect to that provision that the United/PBGC
14 agreement in no way affects United's obligations to
15 ALPA under the ALPA agreement for United to provide
16 the interest rate for the ALPA notes as set forth in
17 that ALPA agreement.
18     THE COURT: Okay.
19     MR. SPRAYREGEN: And the only other thing,
20 I believe, is that with respect to really all of the
21 foregoing, both PBGC and United represent that
22 nothing prevents United and PBGC, that is all of
23 these clarifications, from complying with the
24 PBGC/UAL agreement, nothing is intended to affect the
25 PBGC's regulatory rights, and United reserves its

1  rights with respect to the ranking issue in the same
2  way that ALPA reserved its rights earlier on as I
3  mentioned with respect to a potential ranking of
4  securities issue. Those would be all of the changes.
5      THE COURT: Okay.
6      MR. SPRAYREGEN: Your Honor at the
7  conclusion of yesterday's very short hearing,
8  identified four major issues that you would like me
9  to address. At least I summarized them as whether
10 the settlement violates the CBAs and, if so, would
11 United have to reject the CBAs under 1113 and,
12 otherwise, would a lack of rejection give rise to a
13 breach that results in damages and/or a right to
14 strike.
15     The second question is whether United
16 is receiving adequate consideration for this deal. I
17 will note that the major objection to that, the APG
18 group, has been resolved, and I will address that.
19     Third, whether the agreement will
20 impede exit financing.
21     And, fourth, whether the 45 percent
22 assignment provision constitutes property of the
23 estate and needs to be distributed under a plan of
24 reorganization.
25     Without any intent to be glib at all,

1  the answers are no, yes, no, and maybe. But I
2  obviously can get into detail on that. The first
3  thing I would like to address is whether the
4  agreement violates the CBAs. And I think the simple
5  way to start off is it does not. The debtor believes
6  that this disagreement is not only consistent with
7  its CBAs, it's consistent with the Bankruptcy Code,
8  with ERISA. And when I say the Bankruptcy Code, I
9  mean all provisions, but especially including 1113(f)
10 consistent with the RLA and consistent with all other
11 applicable law.
12     And, in fact, we are not asking this
13 court to approve an agreement that is not consistent
14 with all applicable law. To the extent the court
15 were to determine that we were not complying with
16 applicable law and asking for this agreement to be
17 approved, we're not asking the court to approve it.
18 We do believe, though, that we do comply with all
19 applicable law and the agreement ought to be
20 approved.
21     It's difficult to really get into this
22 issue without stepping back a ways as to how we got
23 to today. And that really -- we can all pick a time
24 when it started. But maybe for me more than anything
25 it started December 5, '02, four days before this

Page 38

1  bankruptcy case was filed, with the first ATSB denial
2  of United's request for a loan guarantee, which
3  contained a lengthy recitation of the issues at least
4  the ATSB thought United needed to address in order to
5  properly restructure to merit either access to the
6  capital markets or perhaps an ATSB guarantee. That
7  was December 5, '02.
8        December 9, the bankruptcy was filed.
9  And, unfortunately, an 1113 process was commenced
10  virtually immediately thereafter, first an E process.
11  Ultimately the good news culminating on April 30,
12  '03, less than six months into the case, with the
13  agreed April 30, '03, deal with all of our unions
14  with respect to consensual changes to our collective
15  bargaining agreements.
16        As the court I'm sure recalls, in the
17  summer of '03 we went through the 1114 process and,
18  meanwhile, all that time working on our amended ATSB
19  application to go back to the ATSB during that time
20  frame. There was during that time frame also a
21  negotiated settlement with the APG. And there was
22  activity lobbied jointly by the company and its
23  unions and Congress to amend the pension laws to try
24  to address some of our pension issues.
25        Unfortunately, in June of '04, almost

Page 39

1  a year ago now, we received the final ATSB denial.
2  Up to that point in time the company had done
3  everything it could to restructure its operations
4  without touching its pension plans. There was some
5  modifications at the time of the April 30, '03,
6  agreement, and I don't want to minimize them, but
7  without the issue of termination arising.
8        I don't think it's a secret to anybody
9  in this room that that issue had been an elephant in
10  the room in the case all the way up until that time.
11  But once the final ATSB denial occurred, it obviously
12  immediately came to the floor with the activities
13  before this court, which really commenced when the
14  company, even though it had made its pension funding
15  under the first day order where we were permitted but
16  not directed to do so of about $150 million during
17  the time of the case up until then, ceased making
18  those payments due to a number of factors, including
19  fuel and the ATSB denial and the revenue environment,
20  and also, thankfully, for all the people in this room
21  were able to access another $500 million in DIP
22  financing to bolster the company's liquidity.
23        At that time the parties, the company,
24  the creditors committee, and all of its unions,
25  really engaged in a tremendous amount of steady

Page 40

1  deliberation, due diligence, interaction, taking into
2  account the effect of there was not going to be a
3  government loan guarantee. The exit process from
4  this bankruptcy was going to be through accessing the
5  capital markets, and how could we access the capital
6  markets with this pension issue now fully to the
7  floor.
8        If the court recalls, around that time
9  we informed the APG group that we wouldn't be able to
10  go forward with the deal that we had negotiated in
11  principle. And late in the fall we announced a
12  second 1113 process. As the result of all of those
13  deliberations, our work with the creditors committee
14  working group that was reported on to the court
15  during the various status reports, there was the
16  bridge report, a tremendous amount of activity for
17  not just the debtors, but all parties to try to get
18  an understanding of what the solution would be and,
19  frankly, was there a solution that existed without
20  what we're asking to be done today, without
21  terminating the pension plans.
22        We were, quite candid, even starting
23  back in June of '04 that we had reached a preliminary
24  determination then, obviously since finalized, that
25  we, notwithstanding not desiring to terminate pension

Page 41

1  plans, had been unable to come up with an alternative
2  that would permit the company to successfully
3  reorganize and exit without that occurring. But on
4  any number of occasions in this court publicly to all
5  of the constituents in this room, we noted that our
6  minds were wide open to any better alternatives that
7  would not result in termination.
8        And, in fact, paragraph 1 of this
9  agreement, as the court noted, to this day continues
10  that offer to -- if anyone has an idea of a way to
11  get this done without the debtors' needing to take
12  the action we're taking who are open to discuss it,
13  and we have had a number of those discussions.
14  Unfortunately, the solutions that have come up have
15  not at least put us in a position where we think as a
16  responsible debtor-in-possession we could do anything
17  other than that which we're doing today.
18        As the court knows, there has been
19  substantial disagreement on that point. We ended up
20  with our 1113 process in the latter portion of last
21  year and the trial set in January. And even up until
22  then there had been a tremendous amount of work done,
23  about seven months work since the ATSB denial, but
24  even then, at the request of numerous parties that
25  perhaps more time would permit ideas to germinate and

Page 42

1 a different solution to be found, asked for a 90-day
2 delay in the January trials to what is supposed to
3 start tomorrow. We agreed to that because of the
4 company's commitment to do what it can to reach
5 consensus on this difficult issue and in the hopes
6 that we would find an alternative working
7 consensually with our various stakeholders.
8        We believe we did that. I think you
9 might hear from some other parties they have a
10 different view. But we believe we've done that over
11 the last 90 days. And, again, unfortunately, we're
12 still in a position where we don't see an alternative
13 to what we're proposing today and tomorrow.
14       Your Honor, I go through all of that
15 because it's quite important to the context of why
16 we're here today. Ever since really the final ATSB
17 denial, the company has worked with a variety of its
18 constituencies who have at varying times agreed with
19 our process and direction or disagreed. And we
20 obviously, where we stand today, were able to get a
21 consensual agreement without ALPA that the court
22 approved after a little delay, and then have
23 proceeded forward. And we're pleased to actually get
24 the creditors committee's support for this agreement
25 today.

Page 43

1        Unfortunately we still have three of
2 our major unions with whom we still don't have
3 agreement, the AFA, the IAM, and AMFA. As I noted at
4 the beginning, we're committed to continuing to try
5 to get agreement, whatever the court does today. We
6 would hope to approve the agreement, but that doesn't
7 detract a wit from our desire to still attempt to
8 arrange a consensual arrangement taken into account
9 our hopeful granting of today's motion.
10       At the same time we were negotiating
11 with our various unions, the company believed it was
12 its obligation to deal with its other important
13 stakeholders, it's APG group, its creditors
14 committee, and, in particular, the PBGC. At least
15 their allegation was they were the largest creditor
16 in our case.
17       THE COURT: Mr. Sprayregen, I imagine a
18 number of the people who are listening to your
19 argument don't know what "APG" is.
20       MR. SPRAYREGEN: I apologize.
21       THE COURT: So you might want to explain
22 that.
23       MR. SPRAYREGEN: That's the aircraft
24 provider group or the institutions that are lessors
25 and financiers of many of our aircraft.

Page 44

1        Your Honor, our view, as I noted,
2 would have been to reach consensual agreement with
3 all of our unions and not have -- not be proceeding
4 in the manner we're proceeding with today's
5 settlement motion. That was first choice. However,
6 we're at second choice. We're not at third or fourth
7 choice. We can't over-estimate the importance of
8 this agreement to the reorganization process. And
9 I'll get into the benefits in a little bit after I
10 address its compliance with CBA's and other
11 applicable law.
12       But this deal, if approved by the
13 court, solves any number of issues, but also has the
14 very salutary effect of, in our view, obviating the
15 need for a very divisive, acrimonious trial on this
16 issue and 1113(c) trial on the pension issues. And
17 we'll get into how that can be and how that can
18 comply with the CBAs. But I don't think we should
19 pause on that point for a moment, because if this
20 deal is approved, the necessity, in particular for
21 AFA where we have agreement on everything but
22 pension, of rejecting their contract to otherwise get
23 the relief we believe we need, that is termination of
24 pension, actually goes away and the contract does not
25 need to be rejected. We think that's a good

Page 45

1 development for the estate, for the debtors, and for
2 AFA members themselves. And, as I said, we hope,
3 that the court approves the deal, to still talk to
4 all of the various parties with whom we don't have
5 agreements.
6        So let me turn to the issue of
7 compliance with all applicable law. As I noted, we
8 believe we are in this agreement. If the court
9 approves it, they will be fully in compliance with
10 our CBAs. And, in particular, we're really talking
11 about the AFA CBA, the IAM CBA. AMFA did not object
12 on that ground, but similar language. So we think
13 that we're complying with that also, but complying
14 with the CBA, ERISA, 1113(f), and all other
15 provisions of the Bankruptcy Code and the RLA.
16       We don't believe there is any basis
17 for damages. It obviously follows. If there is not
18 a violation, there wouldn't be damages. We also
19 don't believe there would be any basis for any
20 strike. Again, if we're complying with the contract,
21 there is not a basis for that.
22       Okay. So how do we get there? Title
23 IV of ERISA provides the exclusive means for
24 termination of pension plans. 1341(a)(3), I'll refer
25 to it as "41," I think that's the easy shorthand,

Page 46

1  provides that the PBGC may not process a
2  sponsor-initiated termination that would violate the
3  terms and conditions of an existing collective
4  bargaining agreement. That's the termination trial
5  that we've now put off. And that's why in that
6  context we also have a tandem 1113 motion because the
7  statute right on its face says you need to comply
8  with collective bargaining agreements to do that. So
9  we filed an 1113 motion with respect to AFA for
10  pension. And IAM and AMFA is obviously broader than
11  pension, but pension and the other issues.
12          The other means for termination under
13  ERISA is 4042. I'll just refer to it as "42," or
14  1342 if you're using 29 U.S.C. In that alternative
15  the PBGC may initiate a termination proceeding with
16  or without litigation. And our view, and I think
17  you'll hear the same from the PBGC, is under 42 the
18  PBGC was vested with a right to terminate pension
19  plans if it determines certain tests are met under
20  that. The standard for review of that determination
21  is a deferential, arbitrary, and capricious standard
22  in the context where the debtor also consents. And
23  I'm going to get to that in a minute also.
24          Now, under the U.S. Supreme Court's
25  LTV decision, it says right in there very clearly

Page 47

1  that the PBGC may terminate a pension plan under 42,
2  notwithstanding any alleged limitation that may exist
3  and the plan sponsors CBA with its unions. There is
4  no suggestion in that U.S. Supreme Court case that
5  after such 42 action that may not be consistent with
6  the collective bargaining agreement that would then
7  mean the plan sponsor is in breach of its collective
8  bargaining agreement. And, moreover, when unions and
9  the debtors bargained for their rights under CBAs,
10  and in particular the retirement plans, we are
11  talking about ERISA-qualified plans, and at that
12  moment in time when those were agreed to, Section 42,
13  Section 41 exist and any agreements under the CBA
14  come with the statutory scheme of ERISA. This isn't
15  something being imposed later. This is something
16  that existed at the point in time that the contracts
17  were entered into and agreements were made.
18          Now, I mentioned that the PBGC can
19  commence litigation under 42. But once they issue a
20  notice of termination, again, 42, the statute very
21  clearly says that the sponsor or the plan
22  administrator may agree that a pension plan should be
23  terminated and PBGC appointed as trustee. The debtor
24  has the right do that in the ERISA statute.
25          Now, the Jones & Laughlin case, we

Page 48

1  cite that in our brief, a very important -- it's
2  another LTV case, but it's referenced as Jones &
3  Laughlin out of the Second Circuit. In that
4  situation the PBGC initiated a 42 proceeding. Within
5  days, the debtor consented actually with no
6  bankruptcy court to the termination. The unions
7  challenged the debtor's ability to consent, and the
8  Second Circuit held that under 42 it was clear that
9  the debtor had the right to consent to termination
10  even without the need for judicial decree and that
11  the unions had no statutory or Fifth Amendment due
12  process rights to contest the termination done in
13  that manner. And I'll let the PBGC address their
14  regulatory authority. But I think that's -- their
15  regulatory authority is, in essence, what explains
16  that.
17          THE COURT: Mr. Sprayregen, you've only got
18  a couple of minutes left of the 50 minutes that you
19  had allotted to yourself. Now, plainly the
20  discussion that I had with you regarding the changes
21  to the agreement and questions I asked regarding
22  provisions of the agreement took up some time you'll
23  might have intended to use for argument, so I'll give
24  you until 12:30. But I would really ask you to be
25  finished at that point.

Page 49

1          MR. SPRAYREGEN: Okay. I was hoping that
2  wasn't counting against me, but I'm glad you
3  clarified that.
4          In any event, Your Honor, with that
5  background, we can turn to whether this violates the
6  CBAs. We lay out the language of the CBAs in our
7  briefs. And the language provides -- well, let me
8  step back. One thing I wasn't clear whether you
9  raised yesterday or not was entering into the
10  settlement agreement, potential breach of the CBAs.
11  We assumed, but I want to make clear, that the court
12  means if the court were to approve it. We're
13  standing here today having the signed document, but,
14  obviously, subject to bankruptcy court approval. If
15  the court approves, it's effective. If it doesn't,
16  it's a nullity. So I just wanted to make sure we're
17  clear on that.
18          Our position, Your Honor, is the CBAs
19  don't require that United maintain pension plans in
20  the face of a 4042 termination by the PBGC. The CBAs
21  are subject to ERISA, and they must be interpreted
22  and yield to and be discussed consistently with
23  ERISA. And if ERISA under 4042 permits the action to
24  be taken, our view is that can't be a violation of
25  the CBAs. And there is actually an interesting

Electronically signed by Jackleen DeFini (201-184-194-7430)

Page 50

1   Seventh Circuit case approaching that entitled ALPA
2   v. UAL where Judge Posner uses an example if the CBA
3   provided for payment to be made partially in cocaine,
4   just because it's in the CBA doesn't make that
5   effective. External law would prevent that from
6   being effective.
7           Same thing, for example, if our CBA
8   and the pilots purported to require us to permit
9   pilots to retire at 65, the FAA law requires 60. We
10  can't change that by our CBA. By the same token,
11  ERISA, 41, 42 exists as it is and it qualifies the
12  CBA.
13          Now, I think where the nub of the
14  dispute comes in is that there doesn't seem to be a
15  dispute by the unions that the PBGC can without
16  agreement with the debtor, this agreement we're
17  seeking to have approved, act under 42. But the
18  allegation seems to be that because there is an
19  agreement here for the debtor to resolve a variety of
20  issues with the PBGC and part of that agreement has
21  the PBGC agreeing they are going to go through the
22  process, their termination process, their normal
23  process, they haven't agreed to terminate, they're
24  going to go through their process, that somehow that
25  changes that which are the PBGC's rights under 42 in

Page 51

1   the absence of any agreement with us.
2           Now, I don't want to be disingenuous
3   with the court for a moment because we obviously
4   believe the result of them going through that process
5   would be termination. Obviously we have our own
6   motion to terminate. And we would expect that to be
7   the case. But they have been very clear to us, in
8   fact, have told us to make sure that we inform you
9   that if they go through that process and didn't
10  terminate, we could be back here on an 1113(c) trial
11  to go --
12          THE COURT: You've been very clear on that
13  in your briefs.
14          MR. SPRAYREGEN: Okay. Thank you.
15          Your Honor, our point on this is the
16  bankruptcy process, ERISA interpreted consistently
17  with the CBAs, must permit this type of an agreement
18  to occur. Otherwise, we've constructed a process
19  where the CBAs, interpreted according to AFA's
20  argument into 1113 and 1113(f), are really a recipe
21  for paralysis of the case and to allow that party
22  that is the most recalcitrant to prevent agreement
23  from occurring with anyone else.
24          The idea that the PBGC has the
25  prerogative to do a 42 termination and the debtor has

Page 52

1   nothing to do with it, but somehow because we settled
2   with the PBGC all of a sudden the PBGC can't take
3   that action, and because the debtor has the right
4   under 442 to consent, right in the statute, that we
5   are not consenting and it's all part of the global
6   deal, this should be good news, Your Honor. This is
7   a good thing for the estate. This shouldn't be
8   something that is interpreted under 1113 or the CBAs
9   to be prohibited unless that party with the most
10  extreme demands signs on. I don't believe that's the
11  structure of 1113, what 1113 contemplated, what the
12  Bankruptcy Code contemplated, and surely not what
13  ERISA contemplated.
14          Your Honor, if you ultimately agree
15  with that position, the rest of the analysis on
16  various violation of law is easy. There is no
17  1113(f) violation. If there is no 1113(f) violation,
18  there's no NLRA violation. There is no breach, there
19  is no right to strike. The agreement is approved.
20  They go through their termination process.
21  Presumably they terminate and we move on with an AFA
22  agreement extant. We'll have to see what happens
23  with the other two.
24          THE COURT: Okay. The hypothetical that I
25  think the unions are posing is one in which the

Page 53

1   PBGC's determination to seek an involuntary
2   termination is not well-founded, that the interests
3   of both the company and the PBGC in its many
4   capacities would not be served by terminating the
5   plan. But management would prefer to have the plan
6   terminated for other reasons, and the union is
7   completely cut out of the process. In that
8   hypothetical, which I'm not saying exists here, but
9   if there were an improper determination by PBGC and a
10  putatively bad faith agreement with that
11  determination by management, it is nevertheless your
12  position that the unions have no recourse?
13          MR. SPRAYREGEN: Well, the management
14  doesn't have input on that PBGC decision.
15          THE COURT: No. But management has, as
16  you've just explained, the unfettered discretion to
17  agree with the PBGC's determination.
18          MR. SPRAYREGEN: Your Honor, I think there
19  is plenty of remedies under the Bankruptcy Code to
20  address alleged misconduct by management. And we've
21  seen some of those attempted remedies through the
22  course of this case, none of which have borne
23  fruition, thankfully. But the hypothetical you posed
24  I do not believe is an impediment to this deal. If
25  those eventualities came to pass, we're not saying

Page 54

1  nothing can be done about those things. We don't
2  believe that's obviously a proper hypothetical. But
3  if it came to pass, there is people who can take
4  action with respect to the PBGC action, and there is
5  action that can be taken with respect to us.
6       THE COURT: All right. The action that
7  would be taken against the PBGC would be some sort of
8  an administrative challenge, an attempt to get
9  judicial review of the PBGC's determination?
10       MR. SPRAYREGEN: The Jones & Laughlin case
11  is exactly that. That's what happened. Now, the
12  court held against the unions, but they got their day
13  in court and went through the entire process all the
14  way to the Second Circuit and had their position
15  aired voluminously.
16       THE COURT: But with the result that they
17  lacked standing to challenged the PBGC's action.
18       MR. SPRAYREGEN: Yes.
19       THE COURT: All right. That gets back to
20  what I was talking about. The position you're taking
21  here is that the employees, the beneficiaries of the
22  pension plan, would have no opportunity, given the
23  Jones & Laughlin decision, to challenge the PBGC's
24  determination that there should be an involuntary
25  termination.

Page 55

1       MR. SPRAYREGEN: That's correct, Your
2  Honor.
3       THE COURT: So that the only recourse they
4  have is to challenge management's decision to agree
5  with the PBGC's determination. And they can do that
6  in this context by arguing that the settlement is not
7  a good one.
8       MR. SPRAYREGEN: Well, yes, although we are
9  asking for authority as part of this settlement to go
10  and do exactly what the court has posited.
11       THE COURT: I understand that.
12       MR. SPRAYREGEN: Right.
13       THE COURT: So your position would be that
14  there is no lack of due process, no fundamental
15  unfairness because if there were in the circumstances
16  of this case an unfairness, an impropriety of some
17  sort in an agreement that called for the debtor to
18  consent to a determination by the PBGC that there
19  should be involuntary termination, that unfairness
20  could be challenged here.
21       MR. SPRAYREGEN: I think that's correct,
22  but I think it needs to be challenged today.
23       THE COURT: I understand that.
24       MR. SPRAYREGEN: And I would say, Your
25  Honor, the point is, just to make sure I don't leave

Page 56

1  it as a pure hypothetical, this is the point about
2  paralysis of the bankruptcy process. The Bankruptcy
3  Code is constructed with a series of checks and
4  balances. The PBGC is not all powerful, ERISA is not
5  all powerful. What we're doing is we're weaving
6  together the tapestry of these various statues in the
7  way the Bankruptcy Code works. And there is plenty
8  of opportunity for input and ideas from, say, the AFA
9  to come and make a deal with us. We have,
10  unfortunately, even a year into talking about this
11  issue, from July of '04, are still at the point where
12  there is no basis to have a discission with the AFA
13  other than on the basis of complete preservation of
14  the pension plan. So there is an opportunity to make
15  a deal. Unfortunately, we have not been able to
16  engage in that negotiation. And my point is, that
17  being the case, the debtors' job is not to sit there
18  like a potted plant and get nothing done. The
19  debtors' job is to see if we can make arrangements,
20  legal, with other stakeholders that work and we'll
21  move this case towards fruition, and at the end of
22  the day probably encourage, hopefully encourage in a
23  responsible fashion, other parties like the AFA, IAM,
24  AMFA to come to an agreement for the benefit of
25  themselves and all the other parties.

Page 57

1       I know I only have a moment left. I
2  guess what I would say, Your Honor, with respect to
3  the other issues, I think the 45 percent issue is, my
4  view, at least dealt with by the structure we came up
5  with because we can't do anything without coming back
6  to this court on notice and opportunity for a
7  hearing. So whatever the court wants to do. If you
8  think, if we come in with a motion, it needs to be
9  done under the plan, we can deal with it at that
10  point in time. There is no reason to deal with it
11  now.
12       With respect to the exit financing and
13  the benefits, as I noted, the major objector there I
14  think has withdrawn their objection based on the
15  reservation. And the benefits are legion and laid
16  out in the document. Todd Snyder's report I think is
17  very clear on that, that there are just tremendous
18  monetary enclosure and ability to exit benefits of
19  this agreement to the debtors really and to all
20  parties in creating not just a solution to this
21  issue, some broader issues, but create a momentum to
22  put the debtor in a position to exit bankruptcy
23  hopefully yet this year, hopefully in the fall.
24       So, Your Honor, with that, obviously I
25  reserve time for rebuttal. But we obviously are

Electronically signed by Jackleen DeFini (201-184-194-7430)

Page 58

1 asking for the motion to be granted.
2     THE COURT: Okay. Thank you.
3         I'll give the PBGC the option to
4 either make its argument now or after lunch,
5 whichever you prefer.
6     MR. COHEN: Why don't we go forward now,
7 Your Honor.
8     THE COURT: Fine. Go ahead.
9     MR. COHEN: Good afternoon. Jeffrey Cohen
10 on behalf of the PBGC. Your Honor, let me address
11 the question you just asked while its fresh in my
12 mind and then get back to where I was going to start,
13 which is the question you asked about what recourse
14 the unions might have in light of the Jones &
15 Laughlin case.
16         And the answer is, as set forth in
17 that decision by the Circuit Court, they would have a
18 right under Section 4003 of ERISA to sue the PBGC as
19 an aggrieved person sort of apart from the
20 Section 4042 proceedings, which was the context in
21 which that case arose. And there is also a sentence
22 in that decision which I would characterize as dicta
23 that the participants can also sue the PBGC for
24 fiduciary breach. I would point out that because the
25 agency takes the action to terminate the plan in its

Page 59

1 corporate guarantor capacity, not as a fiduciary,
2 that wouldn't be a successful action.
3 But nevertheless, the --
4     THE COURT: It only assumes fiduciary
5 duties after the termination takes place.
6     MR. COHEN: That would be the theory, I
7 suppose, Your Honor. But I guess our response would
8 be we didn't take that action as a fiduciary.
9     THE COURT: Okay. But the point you're
10 making is that there is a provision for some kind of
11 judicial review of administration -- of the PBGC's
12 decision, although not in the involuntary termination
13 proceedings itself.
14     MR. COHEN: Yes, Your Honor, they would
15 have recourse to get judicial review, but not in the
16 Section 4042 proceeding.
17     THE COURT: Okay.
18     MR. COHEN: Your Honor, obviously this
19 agreement reflects a compromise that was achieved
20 through difficult, hard-fought negotiations over
21 complex issues. And as I believe would be the case,
22 the hallmark of any good compromise is that no
23 parties are especially happy about each and every
24 provision, as a whole, which we think particularly as
25 modified as you heard from Mr. Sprayregen.

Page 60

1     In view of all of that, the PBGC has
2 concluded that the agreement was in the best interest
3 of all of the PBGC's stakeholders. And that includes
4 not only participants in this plan, but the
5 participants in all the covered plans and the defined
6 benefit universe, and the premium payers, which are
7 other employers that sponsor to find benefit plans,
8 and ultimately the taxpayer because, as I'm sure Your
9 Honor is aware, PBGC is a self-financing agency. So
10 we are not -- we get no funds from the treasury. But we
11 are having a rough time at the moment in terms of our
12 deficit. And so while we hope that doesn't become
13 the case like the banking agencies 15 or so years
14 ago, there is a danger of a taxpayer bailout. I
15 don't want to say that, you know, the sky is falling.
16 But ultimately this could be a taxpayer issue. So
17 while we're being criticized for our parochial
18 pecuniary interest, our point is that it is the
19 entire insurance program that PBGC has a duty to act
20 on behalf of. And it's the system, it's not PBGC's
21 pocketbook.
22     In that regard, PBGC does not
23 cavalierly terminate pension plans. We do so only as
24 a matter of last resort. And to say somehow in this
25 proceeding that terminating individual plans is

Page 61

1 contrary to our mission seriously misconstrues the
2 PBGC's statutory missions. There are three. They
3 are sometimes in conflict, and none of them are
4 designated by the statute as a principal or primary
5 purpose. And those purposes are to encourage the
6 continuation and maintenance of defined benefit
7 plans, to assure the uninterrupted payment of
8 benefits, and to keep premiums as low as possible
9 consistent with those other duties.
10     Clearly, and the cases are legion,
11 PBGC has the power to terminate individual pension
12 plans to protect the insurance fund. There are many
13 cases where the court has made -- such as RTI and
14 PanAm, where the court has made clear that it's
15 participants in all covered plans, not the
16 participants in a particular plan, in weighing PBGC's
17 action. Obviously termination of one's pension plan
18 is not in these participants' interest. We
19 acknowledge that, and that's why we don't do it
20 lightly.
21     We also have the authority to enter
22 into arrangements under Section 4067 of ERISA to
23 resolve employer liability and the D.C. Circuit's
24 case from a couple of years ago, Allied Pilots, make
25 that abundantly clear. There was a simultaneous

16 (Pages 58 to 61)

Page 62

1  resolution of plan termination and employer
2  liability.
3       As Mr. Sprayregen pointed out, we have
4  made clear that all the agreement requires us to do
5  is have PBGC staff initiate the internal process for
6  a PBGC initiated termination. Believe me, Your
7  Honor, that group is not a rubber stamp, and PBGC
8  does not terminate plans in the absence of statutory
9  grounds. And that's why we left open the possibility
10 that if the agency could not find that there was
11 statutory grounds to terminate two plans that have
12 not yet been the subject of PBG-initiated
13 termination, we had to leave open the possibility
14 that we would have to have the distress termination
15 hearing go forward at a later date.
16      Additionally, we at PBGC also explored
17 alternatives with the various stakeholders and unions
18 for alternatives to termination. I certainly do not
19 want to get into the back and forth of those
20 negotiations. But suffice it to say that no
21 resolution was achievable there. And, in particular,
22 there were substantial legal and policy issues that
23 arose in the course of some rather creative
24 discussions. And while we were happy to enter into
25 those discussions in good faith and encourage them,

Page 63

1  we constantly noted that there were these legal
2  policy issues. And, as I said, nothing came from
3  those discussions.
4       In terms of -- in that regard, Your
5  Honor, I'm certain that there are going to be unkind
6  things said about PBGC by the objectors. And I would
7  actually like to reserve a small amount of rebuttal
8  time as well, if that is agreeable.
9       THE COURT: Well, twenty minutes of
10 rebuttal time has been reserved without dividing it
11 between the debtors and the PBGC. So you can talk to
12 Mr. Sprayregen about how you'd like to divide that
13 time.
14      MR. COHEN: Thank you, Your Honor. I'd
15 like to address --
16      THE COURT: And I will note you had
17 reserved 20 minutes for this argument. If you finish
18 it in less than 20 minutes, I'll be happy to add that
19 to the rebuttal time.
20      MR. COHEN: I'll do my best, Your Honor.
21      In response to your question of what
22 was the consideration to United, or, as we look at
23 it, what does PBGC give up, I think it's very
24 important to note at the outset that PBGC is a unique
25 creditor. While mean of its claims are unsecured,

Page 64

1  they're not the same as most of the creditors. In
2  particular, there is the joint and several, there is
3  the lienablity for missed contributions, as well as
4  the claims of priority status of different pieces of
5  claims.
6       Minimum funding contributions, which
7  are presently being litigated by the independent
8  fiduciary services, would become PBGC's claims under
9  Section 1362(c)(1) of 29 U.S.C. upon termination.
10 Obviously this court has already decided that the
11 priority piece of those contributions is limited to
12 post-petition services rendered. IFS has appealed.
13 And even the amount of what was subject to the
14 priority is in dispute. Gershwin V has committed
15 approximately 230 million for that amount. IFS says
16 it's somewhat higher. And the high end of the range,
17 were they to prevail on appeal, is closer to a
18 billion. In addition --
19      THE COURT: Okay. The debtors have argued
20 that, in fact, it's zero.
21      MR. COHEN: That's correct, Your Honor,
22 they certainly have. And that's part of the
23 discovery that is going on, that's right. So the
24 range is zero to 993 million dollars. And the
25 appellate litigation has already begun. So PBGC

Page 65

1  would become the owner of that claim. We're giving
2  that up. And we're giving up, you know, further
3  litigation over that. That claim also is a joint and
4  several claim. And so like the unfunded benefit
5  liability claim, PBGC would have that claim against
6  all members of the control group whether in
7  bankruptcy or not.
8       Therefore, while we have, as an
9  example, the United Loyalty Services being a
10 recipient at this time of the proceeds of the Orbit
11 sale, which is in excess of $240 million, in addition
12 to that, and this is hard to quantify because we
13 haven't done due diligence at this juncture with
14 respect to each and every estate, but our claim,
15 let's call it $10 billion for ease of reference, it's
16 9.8, the estimate, we would have a 10 billion-dollar
17 claim against each and every estate. And with many
18 of the estates, it's our belief that our claim would
19 dwarf the creditor pool. And if there is any value
20 in any particular estate, in the absence of
21 substantive consolidation, PBGC would be entitled to
22 assert its 10 billion-dollar claim against each and
23 every estate. Obviously we could never collect more
24 than $10 billion. But like a joint tortfeasor, a
25 judgment against joint tortfeasors, PBGC would have

Page 66

1    the right to elect which obligors it may pursue but
2    never to collect more than $10 billion.
3           The point is that we have that claim
4    against each and every estate, and that makes us very
5    uniquely situated compared to other creditors. We're
6    giving that up by agreeing to a single claim against
7    the operating entity. And, as noted, that is all the
8    debtor has agreed that's to be calculated in
9    accordance with the PBGC regulations. Other
10   creditors are expressly permitted to challenge the
11   calculation and to litigate that. But we're giving
12   up our joint and several claim, and that shouldn't be
13   understated as to how significant that is in terms of
14   our potential recoveries.
15          Similarly, we're giving up the lien
16   that we have perfected against the nondebtor entities
17   for missed minimum funding contributions.
18          THE COURT: You list a book value for those
19   assets in your brief, and obviously, you have not
20   had an opportunity to find out what the actual market
21   value of the assets --
22          MR. COHEN: Well, Your Honor, our
23   understanding -- and, you know, we haven't engaged in
24   formal discovery. But our understanding is that
25   there was some proceeds that were attributable --

Page 67

1    there was some cash assets that belonged to one
2    entity that's not in bankruptcy that was commingled
3    with the cash management system that was approved by
4    this court early in the case, and so there is an
5    intercompany claim issue. But whether it was an
6    appropriate upstreaming, you know, it would probably
7    be fair ground for litigation. And that's where the
8    book value comes from. There is a claim by the one
9    sub against the larger operation. So there is
10   certainly risks and costs of litigation for both
11   sides in pursuing that.
12          And also difficult to quantify, Your
13   Honor, but I think significant in terms of your
14   question about how does this deal affect exit
15   financing, if we are able to reach agreement or have
16   the dispute resolution mechanism work regarding the
17   replacement plans, PBGC will be giving up its claim,
18   its possible claim for future restoration of the
19   plans. And not only is that unprecedented, but it's
20   very significant in this case because it lifts a
21   cloud, an overhang, if you will, that the potential
22   exit lenders have focused on, that the creditors
23   committee has focused on throughout this case. And
24   we think that helps clear a path to the exit door.
25   And, again, while it can't be quantified, I think it

Page 68

1    shouldn't be understated in terms of its significance
2    in the dynamics of the reorganization.
3           And since I pointed out that it's
4    unprecedented, I would also would point out since the
5    retired pilots challenge our authority to do that --
6    well, we have broad authority to restore a plan
7    that's been terminated. We do so only after
8    consideration of its appropriateness under Title IV
9    of ERISA. And if we've agreed to this, one can read
10   into that that we have determined that it would not
11   be appropriate and consistent with our duties under
12   Title 4. And, again, that relates to taking the
13   action in the interest of all of the stakeholders of
14   PBGC and the protection of the insurance fund.
15          Also in terms of consideration, we
16   would be giving up the appeal of the ALPA agreement
17   and also a claim for administrative priority for
18   about $8 million in post-petition premium penalty and
19   interest. We're also giving up any right to the
20   setoff that was -- from the income tax refund that
21   Mr. Sprayregen referenced in the stipulation with the
22   justice department.
23          THE COURT: The value of that being
24   somewhat questionable now because it's not clear what
25   other governmental agencies might have a setoff right

Page 69

1    that could be asserted against those funds.
2           MR. COHEN: Well, that is certainly a fair
3    point, Your Honor. And we make -- I make no attempt
4    to quantify that. But it's a right we're giving up.
5           THE COURT: Okay.
6           MR. COHEN: And then, finally, we've
7    provided for an expedited process to investigate
8    whether there has been any breach of fiduciary duty.
9    And so that a claim that after a certain time, if we
10   haven't raised, we would be barred from pursuing in
11   the future.
12          So in terms of consideration to United
13   in exchange for the PBGC securities and the treatment
14   of its unfunded benefit liability claim, we've given
15   up things of tangible value, eliminated need for
16   litigation with risk and delays, and through waiver
17   of the future restoration have given United certainty
18   that we think will enhance their ability to get exit
19   financing. In view of that, we think clearly they
20   can meet the test that it's beneficial to the estate.
21          If I could move on to or just
22   elaborate perhaps a little bit on the discussion that
23   Mr. Sprayregen had issued regarding PBGC's ability to
24   terminate a plan under Section 4042 of ERISA
25   notwithstanding the collective bargaining agreement

18 (Pages 66 to 69)

Page 70

1  requiring its maintenance. Obviously Congress knew
2  how to put the contract bar in where it thought it
3  was necessary, i.e., in the employer-initiated
4  terminations. And there is no such bar in
5  Section 4042 which involves PBGC terminations.
6          And, obviously, the unions should not
7  be able to assert a contract bar against what is the
8  agency's most important police and regulatory power,
9  which is to have the ability to initiate termination
10  to prevent further losses to the system based on
11  particular pension plans. And I would refer the
12  court to the recent decision of the Sixth Circuit in
13  Republic Technologies as an excellent example of the
14  agency's ability to act to save the system from
15  losses where the union contract required maintenance
16  of the plan.
17          I really don't have much more to add
18  to Mr. Sprayregen's discussion of Jones & Laughlin in
19  the Second Circuit, nor to the analysis under labor
20  law and the Bankruptcy Code. But I would point out
21  that the consent, the ability to consent to a
22  PBGC-initiated termination is clearly provided for in
23  ERISA. And although it speaks of the plan
24  administrator being the necessary party to that
25  agreement, it's clear under both Department of Labor

Page 71

1  opinion letters and the Supreme Court opinion in the
2  Spink case, which I believe is cited in the debtors'
3  reply, and I think in ours as well, that it's not a
4  fiduciary function, it's a settlor function. And so
5  they would not be subject to -- should not be subject
6  to suits for breach of fiduciary duty in so agreeing.
7          Your Honor, I don't know how much time
8  I have left.
9          THE COURT: Well, about two-and-a-half
10  minutes.
11          MR. COHEN: Three-and-a-half minutes?
12          THE COURT: Two-and-a-half.
13          MR. COHEN: Two-and-a-half. Well, I will
14  just be really quick then in terms of the allegations
15  that we have an inflated claim. It's not inflated
16  when it's done in accordance with our regulations
17  which were done pursuant to an express delegation by
18  Congress that we were to adopt assumptions in
19  defining the present value of the stream of benefit
20  liabilities. Of course all the parties that object
21  cited the string cite of cases that have gone against
22  us. But I think they all failed to point out that
23  the most recent case in U.S. Airways, Judge Mitchell
24  in the Eastern District of Virginia agreed with
25  PBGC's position.

Page 72

1          THE COURT: Well, given that this
2  settlement doesn't fix the claim, I don't know if
3  that's a major concern. Anyone who disagrees with
4  you, and you've already made this clear, would be
5  free to object to the claim and it would ultimately
6  have to be determined in the claim objection process.
7          MR. COHEN: Precisely right, Your Honor. I
8  do have to speak to the ALPA modifications, as Mr.
9  Sprayregen indicated I would. Basically our position
10  is the ALPA agreement says what it says and the PBGC
11  agreement says what it says. Neither one trumps the
12  other. United obviously believes it can comply with
13  both. But PBGC has reserved its regulatory rights
14  with regard to the replacement plan. We have built
15  into the PBGC agreement a consent provision. And if
16  consent is withheld and United believes it was
17  unreasonably withheld, we've built a dispute
18  resolution mechanism that will be binding, one shot,
19  no appeals. And so just to be clear, absolutely
20  clear, that the language that ALPA agreed to with
21  United in no way should be taken as an indication
22  that PBGC is now consenting, because we're not, to
23  any replacement plan. We're reserving our rights.
24  And hopefully that's not too controversial.
25          And with that, unless the court has

Page 73

1  any questions, I reserve whatever time I have left.
2          THE COURT: I think that's 30 seconds, Mr.
3  Cohen.
4          MR. COHEN: Thank you.
5          THE COURT: But you'll add that to the 20
6  minutes that's reserved for rebuttal.
7          What I think we ought to do is hear
8  the other arguments in favor of the proposed
9  settlement before we break for lunch.
10          So, creditors committee, Mr. Jacobson,
11  or whoever is going to make that argument.
12          MR. JACOBSON: Your Honor, Fruman Jacobson
13  on behalf of the creditors committee. We can
14  probably cede the vast majority of our five minutes
15  to other worthy speakers today. As we filed in our
16  pleading, Your Honor, after arm's-length negotiations
17  with the company, we agreed, based upon the
18  modifications that you heard read into the record
19  today and will be included in the order, to support
20  the goal and the actuality of the company's agreement
21  with the PBGC to resolve its differences with the
22  PBGC.
23          THE COURT: Okay. I suppose it goes
24  without saying that you've made the determination
25  then that on balance this agreement is in the best

Page 74

1  interest of the estate?
2      MR. JACOBSON: Yes, that is correct, Your
3  Honor.
4      THE COURT: Okay. Thank you.
5      And then we wanted to hear from ALPA.
6      MR. SIMON: Yes, although not in support of
7  the agreement, we do have comments to make. Good
8  afternoon, Your Honor. Bruce Simon, Cohen Weiss &
9  Simon, counsel for the Air Line Pilots Association.
10 I have a couple of brief comments.
11     First, with the agreement of United,
12 they have corrected what was, we believe, an
13 editorial error in omitting the words "resulting from
14 plan termination" from one the bullet points on
15 page 7 of the reply brief and in the order. I
16 believe Mr. Sprayregen confirmed that, and I just
17 wanted to confirm it for the record.
18     Second, to correct the references in
19 United's reply brief which indicate on a couple of
20 pages that ALPA either supports or endorses the
21 agreement. Those words have significance in ALPA's
22 institutional and governance framework. What we have
23 done is not to endorse and not to support, but we
24 have determined not to file objections based upon the
25 understandings that were reached, one of which I will

Page 75

1  address in view of the PBGC's most recent comments.
2  And as a member of the official committee of
3  unsecured creditors, we see no need to go beyond the
4  committee's approval.
5      Now, with reference to -- well, one
6  other preliminary point. We would point out that in
7  the pending litigation under 4042 are the question of
8  the standard that has to be met will be addressed
9  along with the issue of -- and it's being addressed
10 along with the issue of the termination date. We
11 would not want our silence to assertions made as to a
12 deferential standard to indicate assent to that here.
13 That issue is being litigated and will be litigated
14 in the separate 4042 pending proceeding.
15     Finally, I would agree with one part
16 of Mr. Cohen's comment, which is that the ALPA/United
17 agreement will speak for itself, as will the PBGC
18 agreement. But I will simply point out that and
19 await PBGC's clarification.
20     The bullet points, perhaps most easily
21 referenced on page 7 of United's reply brief but also
22 in their proposed order, has as its first, United has
23 also obtained the support. I've addressed the
24 support issue with the following agreed-to
25 modifications: Interest rate, United and PBGC will

Page 76

1  confirm on the record that the agreement in no way
2  affects United's obligation to ALPA under the ALPA
3  agreement to provide the interest prayed for the ALPA
4  notes as set forth in the ALPA agreement. We did
5  hear United confirm that in court. We've not yet
6  heard the PBGC to confirm it in court. And in the
7  absence of PBGC's confirmation on the record, we
8  would believe that the agreement we reached with
9  United has not been fulfilled.
10     Similarly, bullet point two says,
11 "United and PBGC will confirm on the record that
12 United is required to provide the pilots with the C
13 plan established under the ALPA agreement
14 irrespective of the PBGC agreement." We would expect
15 the PBGC to confirm on the record that commitment.
16 It is clear that the PBGC has reserved, as obviously
17 they would have to in any event, its regulatory
18 powers, whatever they may be. But the agreement we
19 have reached, based upon which we have not filed
20 objections to the agreement, provide for PBGC
21 confirmations on the record that we have yet to hear
22 and we would expect to hear if our agreement with
23 United is to be fulfilled.
24     THE COURT: Okay. I would suggest that you
25 talk to Mr. Cohen about that over the lunch break.

Page 77

1  Anything else?
2      MR. SIMON: No, sir. Thank you.
3      THE COURT: All right. We'll resume then
4  at five minutes after 2:00.
5      (Proceedings recessed until 2:00 p.m.)
6      MR. COHEN: Good afternoon, Your Honor.
7  Jeff Cohen for the PBCG, and I'm requesting to use
8  the rest of my 30 seconds.
9      I have worked it out with Mr.
10 Sprayregen and Mr. Simon, and PBGC is hereby
11 confirming the matters in the bullet points under B
12 on page seven of the debtors' omnibus reply regarding
13 interest rates and replacement plans, and that
14 nothing in the foregoing in any way prevents PBCG and
15 United from complying with the PBCG agreements.
16     Moreover, nothing affects PBGC's
17 regulatory right. PBGC's position is that under the
18 language, that nothing affects PBGC's regulatory
19 rights. PBGC is neither consenting to nor it's not
20 consenting to the Pilot C plan at this time, and that
21 each of the ALPA, UAL and the PBGC/UAL agreements and
22 today's clarification speak for themselves.
23     And, Judge, in case -- I would like to
24 clarify that if it was not clear from my earlier
25 statement that ALPA supports the position of the

1    creditors committee.
2         THE COURT:  Thank you.
3         According to the schedule that
4    Mr. Sprayregen outlined at the outset of our
5    proceedings today, it would be the IAM that would go
6    next.
7         MR. CLAYMAN:  Your honor, by agreement, I
8    think the AFA is going to --
9         THE COURT:  That's fine, Mr. Clayman.
10        MR. CLAYMAN:  Robert Clayman for the
11   Association of Flight Attendants.
12        Your Honor, also by agreement, United
13   has agreed to extend my time another five minutes to
14   25 minutes if need be.  I will try to stick to the 20
15   minutes, but I think I may need a little more time.
16        THE COURT:  That's fine.
17        MR. CLAYMAN:  Your Honor, I appreciate that
18   Mr. Sprayregen took the time to explain how we got
19   here.  I would suggest, however, that the Association
20   of Flight Attendants perspective on how we got here
21   is somewhat, if not drastically, different than the
22   company's.
23        This Section 1113 process, which is,
24   in fact, scheduled to begin the hearing tomorrow, was
25   well under way as provided by law, by judicial

1    decree, the scheduling order, and by our contract,
2    which required United to meet and confer with us
3    about the pension termination issue --
4         The question that really needs to be
5    asked is what happened.  Well, I think
6    Mr. Sprayregen, in so many words, said it, which is
7    that United simply grew tired of the 1113 process.
8    That I think one only need to refer to a draft press
9    release of April 30th to understand exactly what
10   happened with regard to United.
11        And what it says there, and it's
12   quoting Mr. Brace in his deposition, he agreed that
13   this was still an accurate statement, it says:  Our
14   first choice was always to resolve pension issues
15   consensually with all of the unions.
16        Unfortunately, despite exploring
17   numerous alternatives over the past many months, no
18   viable, alternative solutions were offered for a
19   fact.
20        So United, on its own, and without any
21   allegiance to the law, decided that there was a
22   second choice, and it decided to go down a path that
23   is not plotted by the Bankruptcy Code or any other
24   statute.
25        And what it went on to say in this

1    indicates quite clearly exactly what United did.  It
2    states that United was, however, able to reach an
3    agreement with the PBGC on these difficult matters.
4    Now, the law does not provide for that, and I'll get
5    into that later in my argument.
6         The second question that has to be
7    asked is, what happened to the PBGC?  The PBGC was
8    intent upon saving at least one of United's pension
9    plans.  It was stated repeatedly in its pleadings
10   with the Court and as recently as a month ago in
11   Bradley Beltz' letters to the Association of Flight
12   Attendants.  Mr. Beltz is a signatory to this
13   agreement now.  But in his letter to the flight
14   attendants, he stated that he continued to believe
15   that the interest of the participants and the pension
16   insurance program would best be served by the
17   continuance of the AFA plan.
18        What happened to this belief, to this
19   commitment to salvage at least one of United's
20   defined benefit plans?  One need only look to the
21   deposition of PBGC's financial advisor and expert.
22   Mr. Michael Kramer of Greenhill provided an expert
23   report in December of last year in support of the
24   PBGC's position against termination, and in that
25   report, he stated that if the AFA plan were not

1    terminated, United could still satisfy the credit
2    metrics it believed necessary to obtain exit
3    financing.
4         The question is posed to Mr. Kramer in
5    his deposition on May 5th.  He's asked what changed
6    between December of '04, when you signed your
7    affidavit, your declaration, and now that leaves the
8    PBGC to conclude that the AFA pension plan should be
9    terminated?  His response?  I think what has changed
10   in terms of the overall situation is there's a
11   negotiated settlement that has been reached between
12   the PBGC and the company with respect to all the
13   issues between the two, that the PBGC is comfortable,
14   and which it believes is acceptable to enter into.
15        Now, the upshot of all this, of
16   course, is that an agreement was reached, and at that
17   moment, for all intents and purposes, United stopped
18   the Section 1113 process and the PBGC reversed its
19   position that it had been taking throughout this
20   case, and the two parties entered into an agreement.
21        And this is no different than any
22   other agreement.  As with any other agreement, its
23   purpose is to secure certain benefits that a party
24   may not otherwise receive while minimizing certain
25   costs it risks suffering.  That's exactly what United

1  did when it entered into this agreement.
2         Now, there's been some mention made of
3  what the impact of this agreement is, and I think
4  that the best source of what, in fact, is intended by
5  this agreement and the intended consequence of this
6  agreement will be is presented by United to the
7  creditors committee in a presentation that was given
8  on April 29th .
9         There, they have, as one of its many
10  slides, or several slides, in a Power Point
11  presentation, a slide that states, "overview of
12  settlement agreement." And it says, under the terms
13  of the settlement, the PBGC agreed to terminate and
14  take over all of United's defined benefit pension
15  plans and waive restoration rights. That is what
16  they agreed to. That is the benefit of United's
17  bargain.
18         Now, as with any agreement, United had
19  to waive the cost and benefit of this agreement, and
20  it did. Slide five of that same presentation is
21  titled, "cost/benefit analysis." And under the
22  benefits, under the benefits, there is listed the
23  following: Closure and certainty regarding pension
24  obligations. Again, there should be no doubt what
25  this bargain is about or what its intended

1  consequences are.
2         Now, finally, if there should be any
3  remaining doubt as to what United assumed would
4  happen here, one need only turn to slide eight of the
5  same presentation in which -- the caption of which is
6  "termination finance." And it says that within 10 to
7  14 days after May 10th's hearing, PBGC issues
8  notice of determination that AFA and MAPC plans
9  should terminate. Ten to 14 days, Your Honor.
10  There's no mystery here as to what's going to happen.
11         If Mr. Beltz is a signatory to this
12  agreement, this is a fait accompli, and the deal is
13  done, and our plan will be terminated if this
14  agreement is approved. There should be no doubt
15  about that. And at a minimum, at a minimum, this
16  agreement starts that process, and but for this
17  agreement, that process would not have been
18  undertaken by the PBGC. That is an irrefutable fact.
19         A billion and a half dollars buys you
20  something, and in this case, it bought the PBGC'S
21  agreement to initiate a process.
22         Now, what is the primary, though,
23  unstated benefit that United achieves by this
24  agreement? It enables it to do what the law
25  prohibits.

1         This agreement cannot be reconciled
2  with the plain language of Section 1113(f), with the
3  mandatory processes of Section 1113, or the Railway
4  Labor Act, or the fundamental principle that two
5  parties cannot extinguish the rights of the third
6  party who's not consenting to that agreement.
7         One has to struggle to understand how
8  United attempts to reconcile those legal requirements
9  with its conduct, and it engages with -- I would say
10  what it engages in can be described as slight of hand
11  advocacy.
12         What I mean by that is that they, in
13  essence, say now you see a fact, now you don't; now
14  you see a legal obligation, and now you don't. And
15  it's entirely dependent, Your Honor -- as to what is
16  appearing or disappearing is entirely dependent upon
17  the audience to whom it is appealing, what argument
18  it is responding to.
19         So, for example, with the aircraft
20  lessors, there, it touts the very significant
21  benefits that it will receive by entering into this
22  agreement. And it states on page 30 of its brief,
23  these benefits will render 1113(c) and 4441 distress
24  termination trial unnecessary. A trial on 1113(c)
25  and distress termination would be highly complex and

1  occur against the backdrop of an intense, emotionally
2  charged atmosphere. Although United believes it
3  would prevail, it would likely face the prospect of
4  continuing appeals and, hence, uncertainty in its
5  plans and exit process. And as I quoted earlier,
6  what they get from this is certainty and closure.
7  That's what they tout when they're trying to appeal
8  to the aircraft lessors.
9         But when it must address the impact of
10  the agreement upon employees, all of a sudden, the
11  agreement and its intended consequences disappear,
12  and all that is left standing is the PBGC. All one
13  needs to do is look at page 19 of their brief, and it
14  says 1113(f) and the the Railway Labor Act are not
15  implicated, whereas here, United is not acting
16  unilaterally to terminate its pension plans, rather,
17  it is PBGC that would be initiating and United that
18  would be consenting to the 4042 termination process
19  which can proceed, notwithstanding any allegedly
20  contrary provision in a CBA.
21         That, Your Honor, is a feat, a magical
22  feat that the law does not permit. There is a
23  continuum of conduct here, Your Honor, that they
24  cannot simply eliminate. This process began with
25  their agreement, and it will end with termination.

Page 86

1   And the terminations process is inextricably linked
2   to this agreement.
3         So I cannot understand, other than
4   through a slight of hand, that they can now, all of a
5   sudden, claim that there's no impact on 1113(f).
6         So where are we? What has to be done
7   is that there are, from this agreement clear,
8   intended consequences, and they have to be applied to
9   the law.
10        In the first law, the easiest of many
11  easy tasks here, is to apply the consequences to
12  Section 1113(f).
13        Now, it's interesting that
14  Mr. Sprayregen or no one else thought it appropriate
15  to read any portion of Section 1113, but 1113(f) is a
16  single sentence, and all that it says is that no
17  provision of this title shall be construed to permit
18  a trustee to unilaterally terminate or alter any
19  provision of a CBA prior to compliance with the
20  provision of this section. It's absolute. There
21  are, though, exceptions. It says no provision.
22        And where are they today? They're
23  here before you, Your Honor, invoking Section 363.
24  Not 1113. 363. They want you to use 363 to trump
25  1113(f). That is a provision of this title, and that

Page 87

1   is something that 113(f)does not permit. You cannot
2   use another title -- provision of this title to be
3   construed to permit a trustee to unilaterally
4   terminate a provision.
5         THE COURT: But the pretty obvious question
6   is, is what United is seeking to do now a unilateral
7   termination, or is this not a termination by the
8   PBGC.
9         MR. CLAYMAN: Your Honor, it's a difference
10  without a distinction or a distinction without a
11  difference. Let's be real about this, Your Honor.
12  The fact of the matter is, they entered into an
13  agreement for one purpose only, one primary purpose:
14  To achieve the termination of pension plans that it
15  was concerned about it could not accomplish through
16  the mandated process of 1113. There is no doubt that
17  this is the beginning of a process that will not have
18  begun but for this agreement. That's the end of the
19  inquiry.
20        The fact that they found a third party
21  to interfere with those rights is inconsequential.
22  The fact is that when you talk about permitting a
23  trustee to unilaterally terminate, what they're
24  talking about, what they're talking about is the
25  interplay, the relationship between labor and

Page 88

1   management. This statute doesn't contemplate that
2   they can go out and find a third party to basically
3   eviscerate the statute.
4         The fact is, it will be United that
5   terminates our contract ultimately because it has
6   begun the process. And but for this agreement, that
7   process would not have been undertaken. It is the
8   intended -- clearly the intended consequence of this
9   agreement. And the fact that they found a willing
10  participant to undermine and basically ignore the
11  dictates of 1113, they should not be rewarded for
12  that conduct. The law doesn't permit it. Now, there
13  should be no doubt, again, that consequence of
14  invoking 363 is to basically supplant the entire
15  purpose of 1113(f). That is what will happen.
16        Now, again, what the company tries to
17  do is to conceal the agreement -- to conceal the
18  effect of the agreement from consideration. It says
19  if the PBGC determines that it is appropriate to
20  terminate a pension plan in accordance with ERISA,
21  4042, United CBA obligations cannot override ERISA.
22        Thus, because the agreement merely
23  contemplates, merely contemplates that PBGC and
24  United take actions, ERISA explicitly permits that if
25  ERISA -- explicitly permits -- the agreement

Page 89

1   necessarily does not violate United CBA. That is one
2   of the most tortured interpretations of the law that
3   I've ever read.
4         Why? Because on page three of their
5   brief, they say exactly the opposite, that the PBGC
6   is required to initiate termination. That's what
7   this is about. There is no doubt that PBGC is
8   required to initiate termination. And there should
9   be little doubt that the expectation that the
10  intended consequence of all that is termination of
11  our plan.
12        Now, United continues along this road
13  when it tries to escape the requirements of the 1113
14  negotiations, as well as the Railway Labor Act. Both
15  those statutes provide for a method, a method for a
16  debtor to modify a collective bargaining agreement,
17  and United has violated both.
18        Now, let me refer, again, to their
19  brief. And this is quite amazing, but what they say
20  is that United acknowledges that the effect of this
21  agreement is that we'll render both the 1113 and
22  pension termination trial unnecessary. But then it
23  says that that is no more than the natural
24  consequence, the natural consequence of the
25  interaction between ERISA, its PBGC initiated

23 (Pages 86 to 89)

Page 90

1    termination scheme, the Bankruptcy Code, and the RLA.
2        What United may term as a natural
3    consequence, Your Honor, is, in fact, a legal
4    travesty.
5        In order for United's construction of
6    law to work, key provisions of the Bankruptcy Code
7    and the Railway Labor Act would have to disappear.
8        Section 1113 establishes a process for
9    reaching a consensual agreement between a union and a
10   company to modify its collective bargaining
11   agreement, and failing a consensual agreement, it
12   provides for an adjudicatory process that requires
13   judicial review and a judicial order.
14       By this agreement, there is no doubt,
15   I mean, no one can dispute that the company has shut
16   down the bargaining process and our efforts to
17   preserve the Flight Attendants pension plan. And
18   it's clear that it's attempting to avoid entirely
19   judicial review mandated by Section 1113.
20       One need only look at a couple of
21   places in their brief, and the extent to which they
22   are circumventing these requirements becomes readily
23   apparent.
24       Footnote three, they talk about the
25   argument that some unions make that they have not

Page 91

1    engaged -- that United has not engaged in good faith
2    negotiations. United, however, does not think the
3    Court needs to decide that issue anymore, as 1113
4    requires, but it should be the arbiter of its own
5    behavior in these negotiations. United just simply
6    says that it's bargaining in good faith and the
7    union's claims are false, and that's it. That's the
8    end of the inquiry. Let's move on. Let's get the
9    agreement approved under 363, and we don't have to be
10   bothered with that finding of fact.
11       Then you go to the issue later on in
12   their brief, and they claim necessary. They talk
13   about what's necessary. And, again, it makes its own
14   finding of fact, page 42. It says, termination or
15   replacement of all four pension plans is necessary
16   for United's emergence from Chapter 11. And then it
17   adopts another standard, its own, completely
18   different than that provided for in 1113. And what
19   is that standard? In any event, it says,
20   affordability is not a relevant inquiry for approval
21   of the agreement.
22       Your Honor, Congress did not intend
23   for this to happen. The whole purpose of 1113 is to
24   avoid this kind of denial of our right to bargain and
25   to avoid a unilateral change of our collective

Page 92

1    bargaining agreement. There's no doubt, there's no
2    doubt that the precipitating factor here is United's
3    conduct. The fact that they are one of two parties
4    to an agreement does not change the fact that they
5    have the obligation. It is their obligation under
6    the code to comply with 1113.
7        Now, what about the Railway Labor Act?
8    Again, there's a mandatory process for negotiations.
9    This process that they're now engaged in would
10   unilaterally terminate a provision of our contract
11   that provides for a pension plan.
12       Now, if you do not comply with those
13   processes, then the parties are engaged to respond in
14   kind, and a unilateral change not in compliance with
15   mandatory negotiations process of the RLA is a major
16   dispute and entitles the union to engage in a strike
17   against the carrier.
18       Now, the whole part of this, Your
19   Honor, is that for the agreement to become effective,
20   United must be permitted to run around or to do and
21   end run around all these procedural hurdles, the
22   Railway Labor Act and in Section 1113.
23       Now, what's curious about this
24   agreement, and it gives you a sense of the extent to
25   which it is improper and unlawful, is that it not

Page 93

1    only secures for United a pension termination, but
2    United cedes our bargaining power to another party.
3    For five years, AFA is now barred from bargaining
4    with United over a defined benefit plan.
5        So regardless, if United, God willing,
6    should emerge from bankruptcy and realize profits
7    that it never could have imagined and was in a
8    position to provide us with a defined benefit plan,
9    even assuming that they were able to terminate this,
10   it doesn't matter. Our bargaining rights are gone,
11   much in the same way as that provision of our
12   contract is gone if they are allowed to -- if this
13   agreement is approved.
14       Now, just briefly on Section 363, I
15   think that what we said in our brief is quite simple.
16   We are a party to the litigation, as the company has
17   identified it. We are not a party to the agreement.
18   Seventh Circuit says that can't happen, and
19   accordingly, even under the rubric of 363, the motion
20   should be denied.
21       But what is particularly offensive
22   here, Your Honor --
23       THE COURT: Just so you know, you have
24   about five minutes -- four minutes left.
25       MR. CLAYMAN: Thank you very much.

24 (Pages 90 to 93)

Page 94

1    What is particularly offensive here is
2 that they even entered into negotiations with other
3 parties to that litigation and reached resolution.
4 They have done it with ALPA. They have reached
5 separate agreements and modifications to the
6 settlement agreement with another party who's a party
7 to litigation, and they've been kind enough to
8 provide that the agreements specifically preserve
9 substantive third-party rights in the plan
10 confirmation process for all other creditors.
11    But when it comes to a legally
12 mandated right that we have that this agreement would
13 extinguish, there's no protection whatsoever. That's
14 just not the way the law should be allowed to work.
15    Now, I think there's one last
16 consideration. We believe, very wholeheartedly, that
17 the law here is compelling, that the law, wherever
18 you look, whether it be 1113(f) or the processes
19 under 1113 or the Railway Labor Act or even 363, the
20 result is obvious. They should not -- this agreement
21 should not be approved.
22    However, there's one other factor, and
23 that even though the law may be as compelling as it
24 is, the equities have to be considered. And they are
25 ever present here, Your Honor. And without equity,

Page 95

1 Your Honor, there is no justice. And what we are
2 dealing with is a quality of life for 15,524 flight
3 attendants in terms of their retirement.
4    And I believe, Your Honor, that when
5 you take into account the equity and you take into
6 account the overwhelming law that is on our side,
7 there is only one result here, Your Honor, and that
8 is that this motion be denied. Thank you.
9    THE COURT: Thank you, Mr. Clayman.
10    Ms. Levine, you're going to speak now?
11    (Brief interruption.)
12    MS. LEVINE: Your Honor, if I might before
13 I start my comments, I appreciate the importance of
14 this issue to all the IAM represented employees and
15 retirees who are with us in court today. I would ask
16 though that as a courtesy to me and to this court and
17 the other parties, you will respect the process and
18 save your comments for later or outside. Thank you.
19    Your Honor, we've heard some comments
20 here about whether and to what extent this agreement
21 will affect this company's ability to reorganize and
22 various constituencies and creditors' rights.
23    Make no mistake. I stand before you
24 representing one third of United's workforce. Those
25 are individuals. Men, women and their families. I

Page 96

1 represent 37 retirees. And the decision that Your
2 Honor makes today is not just going to upset their
3 portfolio or impact their ability to collect on a
4 claim, it is going to change their type of lifestyle,
5 and in many instances, their very quality of life.
6 And we appreciate the seriousness which the Court has
7 taken in these proceedings.
8    Your Honor asked us to consider four
9 issues when we spoke today. I'd like to start, if I
10 could, with the issue that Your Honor raised
11 yesterday first with regard to whether or not this
12 agreement violates the collective bargaining
13 agreement, and I would emphatically state, Your
14 Honor, it does.
15    The question seems to turn on whether
16 or not this is actually United or the PBGC initiating
17 the termination. And I would respectfully submit
18 that this agreement, which is the result of
19 negotiations by United with the PBGC and a motion
20 brought by United before this Court seeking approval
21 of an agreement, which provides on page one,
22 paragraph one, that prior to the approval date, the
23 parties may continue to explore alternatives to
24 termination, the approval date being, as indicated on
25 page two, paragraph four, the date that this Court

Page 97

1 enters an approval order, means, by the plain meaning
2 of that clause, Your Honor, that after the approval
3 date, they can't.
4    So this is United saying to all of its
5 constituencies, we are moving forward with a
6 settlement motion so that we can terminate these
7 pension plans, period. This is not simply an
8 acquiescence or a reaction to action by the PBGC.
9    I would respectfully submit, Your
10 Honor, that in the USAirways case, we recently saw a
11 situation where the carrier moved forward under
12 1113(c) procedures, and the PBGC requested the
13 opportunity to wait until later in the process to
14 make a determination as to whether or not it was
15 going to pose termination and distress termination of
16 the plans. In that case, the PBGC, after an
17 appropriate analysis with their financial advisor of
18 the viability of the pension plans and the carrier's
19 financial wherewithal made a decision not to oppose,
20 period. No other settlement agreement, no other
21 contract negotiations, no other inducements to
22 purchase that position.
23    I would respectfully submit, Your
24 Honor, that what we have here is not simply a
25 reaction to a PBGC action, but an active

Page 98

1  participation, an act by the carrier to terminate the
2  pensions in violation of CBA. We heard counsel for
3  the PBGC tell Your Honor on no less than three
4  occasions, in their view this is not a fiduciary act
5  by the PBGC because they're expecting reaction.
6         Your Honor, I would respectfully
7  submit that whether or not this is a fiduciary act by
8  the PBGC is a question for another day, but what that
9  concern evidences is that this is a two-party
10 negotiation based on a lot of different input and not
11 just the viability of the plans.
12        I would also note, Your Honor, that
13 both the carrier and the PBGC have spent a
14 substantial amount of time explaining to this Court
15 how much time they spent negotiating with every
16 constituency in the case. But they also spent a
17 substantial amount of time telling Your Honor that
18 they've been negotiating this agreement since
19 February.
20        During that same period of time, Your
21 Honor, we've been trying to negotiate, both with the
22 company and with the PBGC, with lukewarm response.
23 Nobody called me or anybody at the IAM to say, we've
24 got a backroom negotiation going on to terminate your
25 pensions, why don't you come to table? They kept us,

Page 99

1  Judge, at the kids' table.
2         Turning to the adequacy of the
3  consideration, Your Honor, page four, paragraph 6A.
4  Any defined contribution plan proposed to be provided
5  by United shall be subject to PBGC consent, which is
6  not to be unreasonably withheld. The clause goes on
7  to say that United, and not any other party, can
8  challenge whether or not the consent is reasonable.
9         Your Honor, we are not a party to this
10 two-party transaction, yet we are the ones that are
11 apparently giving up the consideration. If the PBGC,
12 after we successfully negotiate something with
13 United, decides to unreasonably withhold their
14 consent, we can't come to this Court and challenge
15 that, and nobody can appeal it, if you read that
16 clause, okay?
17        United comes to this Court, who shall
18 have the right -- or whatever the appropriate Court
19 is -- to have a right to request judicial
20 determination, and nobody has the right to seek
21 appeal or reconsideration. I would respectfully
22 submit that somebody who is not a party to this
23 agreement can't be bound by their right to either
24 come before an appropriate court, wherever they would
25 have standing or appeal.

Page 100

1         Your Honor, page four, paragraph 6C,
2  United shall not establish any new ERISA qualified
3  defined benefit plan. Mr. Clayman touched on this
4  briefly as well. We appreciate the fact that ALPA,
5  who apparently is invited to the grown-up table, got
6  the ability to negotiate down from ten years to five
7  years. But I would respectfully submit that not only
8  does this cut us out of the present 1113(c) process
9  even if Your Honor terminates with regard to what we
10 can negotiate from today forward, but it cuts us out
11 for multiple collective bargaining agreement cycles
12 on a go-forward basis.
13        At a minimum, if Your Honor were to
14 find that somehow or another this is an appropriate
15 provision for this agreement, and I would submit it
16 is not because it is taking consideration from no
17 party to this agreement, it's consideration for
18 United and consideration for the PBGC, it's
19 consideration from the beneficiaries, who are not
20 parties to this agreement.
21        But if Your Honor finds it to be an
22 appropriate provision, I would respectfully submit
23 that it certainly can't extend longer than the
24 amenable term of any modified collective bargaining
25 agreement consented to during this -- ratified,

Page 101

1  rather -- during this Section 1113(c) process.
2         Your Honor, I would further --
3         THE COURT: Run that by me again.
4         MS. LEVINE: Sorry, Your Honor.
5         THE COURT: The period during which United
6  cannot enter into a defined benefit plan should not
7  extend beyond what?
8         MS. LEVINE: The amenable period of any
9  modified collective bargaining agreement.
10        In other words, we shouldn't both be
11 barred from negotiating now under 1113(c) and
12 negotiating -- bringing this up during subsequent
13 collective bargaining agreement negotiations.
14        The point is particularly disturbing,
15 Your Honor, because this ten-year term --
16        THE COURT: It's five years now.
17        MS. LEVINE: Well, regardless, the
18 five-year term, but the original ten-year term, which
19 was the intent of the PBGC and United, and this goes
20 to the underlying issue of whether this is a proper,
21 good-faith, best-interest approval and negotiation,
22 exceeds even the debtors' business plan. Plus it
23 exceeds the requested modifications under the
24 collective bargaining agreement.
25        So they're tying up people who weren't

Page 102

1  invited into the room to negotiate the settlement
2  through the present process, through the future
3  process, and then through the future process beyond
4  that.
5       THE COURT: I guess there is an ambiguity
6  here that I didn't focus on.
7       United shall not establish any ERISA
8  qualified benefit plan for this period, five years
9  now I guess is the period.
10      I would expect that establishing would
11 be the date that it would go into effect, not the
12 date that it would be negotiated. But perhaps that
13 can be clarified with the parties.
14      So that I would think that if United
15 entered into an agreement with IAM, for example, even
16 though the agreement was entered into during this
17 five-year period, if it didn't call for the plan to
18 go into effect until five years after, that it would
19 be in compliance with this agreement. That's the
20 ambiguity that probably should be resolved. It may
21 address the question that you were talking about in
22 terms of the impact of agreements having automatic
23 renewable terms.
24      MS. LEVINE: Your Honor, I understand your
25 point. I would respectfully submit that it doesn't

Page 103

1  solve the problem. In other words, there are a lot
2  of contract parties here who are taking haircuts to
3  help this company reorganize. When this company
4  comes out of bankruptcy, when their contract expires,
5  or as market conditions change, they're going to have
6  an ability to renegotiate their deals.
7       Under this provision, whether it's
8  established and goes into effect at a future date or
9  whether it's whether or not we can even negotiate for
10 it, we're not going to be able to get that right for
11 a longer period of time. Initially, even the
12 debtors' business plan would have required --
13      THE COURT: Doesn't the debtor have a
14 five-year business plan?
15      MS. LEVINE: Your Honor, I'm missing a
16 point. The problem that we have is that we feel that
17 this is an unfair agreement --
18      THE COURT: Oh, I understand that.
19      MS. LEVINE: -- negotiated in the back
20 room. And the fact that it came out of that back
21 room with a ten-year term, and fortunately ALPA has
22 already resolved their 1113(c) issue and was able to
23 bring this issue to light is fortuitous, but it
24 doesn't indicate that this is an agreement that was
25 negotiated in good faith and in the best interest of

Page 104

1  the parties. It just indicates they got caught,
2  okay?
3       With regard to the five-year period, I
4  would respectfully submit that unlike other parties
5  who were going to be able to immediately start
6  renegotiating with the debtor once the debtor becomes
7  solvent again, if, in fact, this is a successful
8  reorganization, this five-year term, unless it is
9  coterminous with current collective bargaining
10 agreements, impairs our rights to negotiate for
11 better benefits, even when our current contracts
12 would expire.
13      THE COURT: That, I understood. The only
14 question I had was as to your statement that this
15 five-year period exceeded the debtors' business plan.
16 And I thought that the debtor had a five-year
17 business plan that was supposed to be effectuated
18 through the plan of reorganization. If I'm mistaken
19 about that, I apologize.
20      MS. LEVINE: I'll move that. That was
21 really -- I was talking about the fact that it was
22 actually double the debtors' business plan when they
23 came out with ten years. The five-year fix, thanks
24 to ALPA, was directed at a different issue.
25      Your Honor, turning to -- focusing

Page 105

1  still on the fact that the consideration seems to be
2  coming from us and not the parties to the agreement,
3  page five, 7(b), page five, 7(d), and right in
4  conjunction with page seven, 16(1) and (2). First
5  two clarifications, but then an observation.
6       The PBGC settles for itself and on
7  behalf of the pension plan certain claims in 7(b). I
8  just need to confirm that to the extent other parties
9  would have standing to bring those claims for
10 themselves derivably, to the extent somebody who's
11 not a party to this transaction, the PBGC can't be
12 releasing those claims.
13      THE COURT: That is absolutely my
14 understanding, and if that's not the understanding of
15 the parties to this agreement, I would certainly
16 expect them to say so in their rebuttal.
17      MS. LEVINE: In addition, Your Honor, with
18 regard to 7(d), the same instance with regard to the
19 standing of the people to assert claims or causes of
20 action, but also, if you read the releases that are
21 being given, any and all claims relating in any way
22 to United's pension plan, as well as any and all
23 claims against any other entity, based on control
24 group liability or any other theory relating in any
25 way to United's pension plan, obligations, or

Electronically signed by Jackleen DeFini (201-184-194-7430)

Page 106

1 liabilities.
2        Although the PBGC in its brief focused
3 on affiliate companies, as Your Honor is well aware,
4 entity is defined under the Bankruptcy Code, Section
5 15, to include persons. If you read this release
6 language in a vacuum, as may happen after this -- if
7 this agreement is approved, what's being released
8 here are claims against officers and directors, as
9 well as pension plan trustees.
10        So I want to make sure that not
11 only -- so these third-party releases hopefully are
12 only flowing to the PBGC and not to other third
13 parties. But I would note that even if that is the
14 case, Your Honor, page seven, 16(c), the debtor talks
15 about certain conditions subsequent, okay? And prior
16 to the date on which a hearing to confirm a plan of
17 reorganization is first set --
18        THE COURT: What are you looking at right
19 now?
20        MS. LEVINE: We're looking at page seven,
21 paragraph 16, Your Honor.
22        THE COURT: Yes.
23        MS. LEVINE: Even subject to the
24 limitations that the creditors committee had been
25 able to negotiate, the effectiveness of the agreement

Page 107

1 shall be subject to the occurrence of the following
2 conditions, subsequent prior to the date on which a
3 hearing to confirm the POR, the plan of
4 reorganization, is first scheduled to occur, United
5 having determined in it's sole and absolute
6 discretion any and all claims arising from or related
7 to any minimum funding obligations, etcetera,
8 including fiduciary duty claims, have been released,
9 and any and all claims, with certain exceptions,
10 relating in any way to United's pension plans, as
11 well as any claims against any other entities based
12 upon control group liability or other theory relating
13 in any way to United's pension plan obligations or
14 liabilities need to be released.
15        So what it says is, after everybody
16 votes on the plan, and I'll get to the 45 percent
17 claim in a second, United has the right to say the
18 IAM or other parties in interest haven't released
19 their claims against the officers and directors,
20 which Your Honor's familiar with the 105 application
21 earlier in this case, or there haven't been releases
22 against all of the pension plan trustees, and,
23 therefore, were pulling the plug on this agreement.
24        Because if you take a look at 16(c),
25 it doesn't limit itself to claims by or on behalf of

Page 108

1 the PBGC.
2        Your Honor, I turn now to page seven,
3 paragraph 13, release or assignment of the 45 percent
4 claim.
5        The debtors and the creditors
6 committees and the PBGC seem to imply that it is
7 acceptable to solve the problem of the consideration
8 being given for this claim by coming back to this
9 Court. In my view, Your Honor, that's not really
10 where the problem lies. Where the problem lies is
11 that the parties to this agreement have admitted that
12 the value, the economic value, of the agreement is
13 55 percent of the claim. The additional 45 percent
14 is nothing more than a voting block because there is
15 nothing in this agreement that stops United from
16 extinguishing the additional 45 percent of the PBGC
17 claim post vote, pre-confirmation hearing.
18        So I respectfully submit that
19 regardless of what the good intentions of the parties
20 may have been, it appears that in exchange for
21 getting consideration under this agreement, they're
22 buying a vote, and not only a yes vote for the
23 economic value of the claims that they're getting
24 under the agreement, but an inflated yes vote to a
25 management or debtor plan of reorganization.

Page 109

1        THE COURT: Well, I don't think that's true
2 if, as I mentioned several times in colloquy, the
3 claim of the PBGC is subject to objection. If you
4 think the claim they assert is inflated, and not only
5 of their calculations, but also in light of the
6 consideration of this they're already getting under
7 the plan, then you would be perfectly free to object
8 to that claim, and if your objection were successful,
9 it would be disallowed.
10        MS. LEVINE: I'm making a distinction, Your
11 Honor, and maybe I'm incorrect in how the agreement
12 reads. But my understanding is that well before the
13 claims objection process is complete, the PBGC is
14 going to vote its claim. And it may be an estimation
15 process, but it's going to vote a claim that's
16 45 percent higher than what it will ultimately be
17 entitled to collect on.
18        THE COURT: I very much doubt that the PBGC
19 would be allowed to vote the entire amount of a claim
20 that was reasonably subject to objection.
21        MS. LEVINE: Thank you, Your Honor.
22        With regard to exit financing, I'd
23 like to address two issues with regard to exit
24 financing. First, I think anytime you have a sub
25 rosa plan, it limits the flexibility that you have

28 (Pages 106 to 109)

Page 110

1   with exit financing. The debtors seem to be very
2   excited about this particular agreement because they
3   find it to be acceptable to their current and
4   existing lenders. The problem is, we don't know
5   because there is no business plan completed yet, and
6   there is no plan of reorganization on file yet,
7   whether or not the debtors' current intent to use
8   their existing lenders or some group of their
9   existing lenders as their exit lenders will
10  ultimately be the basis for a successful plan of
11  reorganization in this case.
12          What we have here is a piecemeal
13  getting out of the capital structure, and a piecemeal
14  locking up of certain votes in favor of a plan of
15  reorganization. What we also have actually even
16  worse than a sub rosa plan if you look at the Braniff
17  case or you look at some of the other cases where you
18  try and distribute proceeds of the sale, for example,
19  through a sale order, because we don't have a
20  business plan and we don't have is a distribution
21  plan, and we don't have even the terms of a plan of
22  reorganization, albeit not supported by the full type
23  of disclosure statement that you would normally like
24  to see. We have a sub rosa plan, Your Honor, even
25  without the plan. So I respectfully submit that that

Page 111

1   definitely would have an impact on exit financing.
2          Secondly, we're dealing with a
3   situation very important to the debtors' workforce.
4   This debtor has repeatedly come before this Court and
5   said to this Court that labor peace is of paramount
6   importance in order to keep a stable customer base,
7   to keep a stable product, and to maintain credibility
8   in the capital market.
9          Coming before this Court on this kind
10  of an agreement in this kind of a process jeopardizes
11  labor peace and is ripe for a situation where there
12  is unrest.
13          And I would respectfully submit, Your
14  Honor, that while we have had very, very contentious
15  labor negotiations and trials that Your Honor may
16  have read about in USAir, in the USAir prior case,
17  we've had very, very contested labor negotiations in
18  Aloha and in Hawaiian. In fact, it was recently in
19  Aloha. Three modified proposals were rejected before
20  one of the IAM representative groups actually
21  ratified a proposal. In none of those cases, Judge,
22  not one, did the IAM ever appear in court to oppose
23  exclusivity, to oppose debtor-in-possession
24  financing, to seek the appointment of a trustee, to
25  support an examiner, to oppose in an unprecedented

Page 112

1   act the consensual agreement with another labor
2   union, or oppose a settlement agreement designed to
3   further reorganization.
4          Nor have we repeatedly appeared before
5   Your Honor begging this Court's assistance to have
6   this process opened and made to appear fair. Even if
7   these parties are really acting in everybody's best
8   interest, Your Honor, the process they are choosing
9   and repeatedly choosing in these springing of
10  agreements, announcements in open court, lack of
11  inclusiveness, and now attempting to circumvent the
12  1113(c) process with a settlement motion, necessarily
13  exacerbates and makes tense a situation where you
14  already have a distrustful and disenfranchised
15  workforce.
16          It's not only illegal, Your Honor, it
17  just belies common sense. And I would respectfully
18  submit that to the extent that Your Honor's being
19  told that this is in the best interest of the
20  debtors' estate in order to move forward towards a
21  successful reorganization, I don't think that Your
22  Honor has been given any evidence that this would in
23  any way facilitate either settlement or rebuilding
24  bridges with this company's workforce.
25          Denial of due process, denial of

Page 113

1   access to the court in a situation where a consensual
2   agreement may not be possible can't possibly help
3   bring closure or healing in a difficult process.
4          Thank you.
5          THE COURT: Thank you, Ms. Levine.
6          AMFA will have the next opportunity to
7   argue.
8          MR. SEHAM: Lee Seham on behalf of the
9   Aircraft Mechanics Fraternal Association. We
10  consulted with United counsel. They have no
11  objection if we took another five minutes. I tried
12  to raise that issue this morning, but I couldn't push
13  my chair far back enough to stand up.
14          THE COURT: I'm scheduled to be in another
15  conference at 4:00 o'clock.
16          MR. SEHAM: I'll talk really fast.
17          THE COURT: No, you speak as long as you
18  want, and I guess the other folks will have to wait,
19  but go ahead.
20          MR. SEHAM: Again, if it please the Court,
21  my name is Lee Seham. I'm here on behalf of the
22  Aircraft Mechanics Fraternal Association.
23          While we agree with the comments
24  heretofore made by the IAM and AFA, we're here to
25  address a much narrower issue. Namely, that the

29 (Pages 110 to 113)

Page 114

1 settlement agreement and imposition of a retroactive
2 termination date of March 11th, 2005, on the ground
3 plan is improper, and one of two results must flow
4 from the improper imposition of a retroactive
5 termination date.
6        Either one, the date must be rejected
7 as a violation of the debtors' obligations under
8 Section 1113 to bargain in good faith concerning the
9 termination of a contractually mandated benefit, and
10 a date of March 17th, which would be appropriate,
11 given the PBGC's notice, should be established. Or,
12 two, AMFA and the members it represents must be given
13 full credit for its AAS, its average annual savings
14 obligations, for a value of the benefit it has lost
15 as a result of the retroactive termination of the
16 ground plan.
17        And to go into the background facts,
18 PBGC and United's treatment of the ground plan
19 vis-a-vis the termination date sticks out like a sore
20 thumb.
21        If you look at the flight attendant
22 plan and the MAGC plan, under paragraph 5(a)(1), they
23 will terminate five days after the PBGC's notice of
24 determination that the plan should terminate. And
25 then under 4(c), the notices of determination will

Page 115

1 not issue until after the bankruptcy court enters an
2 order approving the settlement five days after.
3        So the earliest that the flight
4 attendant and MAPC plans would terminate is mid May,
5 2005. The pilot plan gets much more complex, there
6 are cross-references to two different sections and a
7 letter of agreement. Suffice it to say -- and that's
8 addressed in our papers -- but suffice it to say, as
9 I stand here today, that United has made a commitment
10 to defend its obligations under its LOA with ALPA.
11 That's intwined in the settlement agreement with the
12 PBGC, and that, to boil it down to its essential and
13 stay within my minutes, provides that it should not
14 be terminated any sooner than any other plan. So
15 again, we're looking at mid May.
16        THE COURT: But at the same time, the PBGC
17 is free, under this agreement, to assert its position
18 that its allegedly retroactive date for termination
19 of the agreement affecting the pilots is enforceable.
20        MR. SEHAM: That is correct. But what's
21 telling is that its defending of its LOA with the
22 pilot group, what United has recognized is that this
23 is a mandatory subject of bargaining, that it's going
24 to defend that termination date in sharp contrast
25 with what they've established was a ground plan,

Page 116

1 which is that they're going to cooperate or agree on
2 a retroactive termination date with the PBGC in order
3 to strip of the ground plan beneficiaries of their
4 causes of action. And I'll go into that a little
5 further.
6        Again, only with respect to the ground
7 plan had UAL negotiated with PBGC to set a hard date
8 of March 11th for the termination of the plan. And
9 United agreed to this termination date in the
10 settlement of April 22nd, '05, despite its denial
11 of the PBGC allegation that the plan's termination
12 date should be March 11, 2005, and that's in Exhibit
13 C of our papers at paragraph 17.
14        The effect and indisputable intent of
15 the settlement agreement and imposing the
16 March 11th termination date is to prevent the
17 future accrual of benefits mandated under the plan,
18 under the AMFA/UAL collective bargaining agreement.
19 The collective bargaining agreement under letter of
20 agreement 021M expressly provides, quote, the company
21 agrees that the benefits provided in the plan will
22 not be reduced without the prior agreement of the
23 union, thus, the UAL/PBGC agreement to the
24 March 11th termination date dramatically decreases
25 PBGC liability.

Page 117

1        Indeed, the PBGC has stated that by
2 terminating the ground plan on March 11th instead
3 of March 14th or later, we're talking only three
4 days here, that the PBGC has avoided additional
5 liability of $139 million with respect to the
6 mechanics' portion of the ground plan standing alone.
7        Now, this is not, as we see in the LTV
8 case, which is the only case that the company is
9 citing on its behalf, this is not a straight-out,
10 involuntary termination where the PBGC has demanded
11 involuntary termination of the plan, volunteer is
12 simply acquiesced.
13        Instead, United has bargained with the
14 PBGC and traded a collectively bargaining right, which
15 was going to accrue on March 14th for an additional
16 20 percent of benefit and has bargained that right
17 away for cash and other considerations contained in
18 the settlement agreement.
19        Now, United has recognized that
20 pension plan termination dates are a mandatory
21 subject of bargaining under 1113, and United
22 negotiated, as referenced previously, a termination
23 date with ALFA and made a contractual commitment to
24 defend that termination date.
25        THE COURT: Mr. Seham, just so that I'm

Electronically signed by Jackleen DeFini (201-184-194-7430)    b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 118

1  clear on this, PBGC had sought termination of the
2  ground plan prior to reaching the agreement with
3  United as of that March 11 day?
4        MR. SEHAM: Right, and I'll come to that
5  presently, that their notice was inadequate.
6        THE COURT: That may be, but the point I'm
7  trying to get across is, United did not negotiate a
8  March 11 date as part of this agreement, and I think
9  that might be the impression that your argument is
10  creating, that this was a date that United negotiated
11  with the PBGC. The PBGC, prior to the agreement with
12  United, had chosen that date as its desired date for
13  involuntary termination.
14        MR. SEHAM: But by agreeing to it, that
15  March 11 date is subject to challenge by AMFA. They
16  are, in fact have been admitted as an intervening
17  party in the Eastern District of Virginia. So we are
18  free, in fact, the case law supports our position,
19  that that March 11th date is not defensible.
20        And I'll flip the page and cite the
21  case law and the facts that are, in fact, very
22  similar to our own, which state that the date of
23  termination set by the PBGC is not acceptable, and
24  should not --
25        THE COURT: Okay. Will this agreement, in

Page 119

1  your opinion, stop AMFA from litigating that matter?
2        MR. SEHAM: Yes, it will. Because United
3  and PBGC have taken the position that by agreeing to
4  the date under 1148, and Section 1148(a)(3), that
5  the termination date is then the date that hasn't
6  been agreed to and is not subject to challenge.
7        In the absence of an agreement, the
8  termination date is subject to 1348(a)(4) and becomes
9  a decision of the Court, and the Court owes no
10  deference to the PBGC.
11        So actually, yes, we have been
12  stripped of a cause of action against the PBGC. The
13  PBGC knows it's vulnerable, it knows it's vulnerable
14  to the extent of no less than $138 million. And by
15  virtue of this agreement that March 11th is the
16  kosher date, is the acceptable date, they seek to
17  strip standing of a -- for AMFA to press a cause of
18  action that we firmly believe we would prevail -- on
19  which we would prevail.
20        THE COURT: Why are you prohibited from
21  getting judicial review under Section 1309?
22        MR. SEHAM: Pardon?
23        THE COURT: 1309(f) of the ERISA.
24        MR. SEHAM: Why are we unable to pursue a --
25        THE COURT: Why are you unable to pursue a

Page 120

1  claim against the PBGC for an improper termination
2  date under Section 1309?
3        MR. SEHAM: Well, perhaps we are, but what
4  has been accomplished, or what the parties are
5  seeking to accomplish is to shift the termination
6  date -- the Court's jurisdiction with respect to the
7  termination date from 1348(a)(3) to 1348(a)(4) --
8  excuse me. In reverse. From 1348 (a)(4) to
9  1348(a)(3).
10        Under (a)(3), the parties get to set
11  the termination date, and the union has no standing
12  to object. Under (a)(4), if United had not agreed,
13  then without United's agreement, then the Court has
14  discretion. And the case law shows, PanAmerican
15  World Airways at 777 F.Supp. 1179 that almost
16  identical circumstances --
17        THE COURT: Let me have that citation
18  again.
19        MR. SEHAM: PanAmerican World Airways, 777
20  F.Supp. 1179, cite 1185, Southern District of New
21  York, 1991. That's a case where there had not been
22  an agreement, and the PBGC published notice in eight
23  different major newspapers. And the Court held in
24  that case that even given publication in eight major
25  newspapers, that the termination date did not -- that

Page 121

1  the judge would set the termination date seven days
2  later, seven days after the publication.
3        In our case, they published in seven
4  major newspapers. They contacted one LEC, one local
5  executive counsel, for AMFA out of eight possible
6  locals, and --
7        THE COURT: I have to apologize to you. I
8  said 1309. I meant 1303. I'm not as familiar with
9  ERISA as I should be. So it's 1303(f) that I was
10  talking about, that I believe -- again I'm certainly
11  not any expert in ERISA -- but it appeared to me that
12  1303(f) would provide any agreed party, including a
13  plan participant, with the right to challenge action
14  under PBGC. And if the PBGC set an inappropriate
15  termination, it appeared to me that that section
16  would allow you to challenge it.
17        MR. SEHAM: I would love to believe that's
18  the case. And, in fact, in reading PBGC's and United
19  papers, we began to perhaps take some part, because
20  United, at page 43 of its omnibus submission, said,
21  quote, if AMFA believes this is a valid issue,
22  there's nothing in the agreement that prohibits AMFA
23  from asserting whatever rights it has.
24        And the PBGC at page 12 of its
25  submission says, quote, the only claims that are

31 (Pages 118 to 121)

Page 122

1  being settled by the UAL/PBGC agreement are those
2  belonging to PBGC. It does not purport to extinguish
3  or otherwise settle a claim of any other party.
4        This is proven to be a bunch of
5  malarky, because we called last night, and we said,
6  well, then you wouldn't mind entering into a
7  stipulation whereby you concede that AMFA has full
8  standing to challenge the termination date in the
9  Eastern District of Virginia proceeding. And the
10  response was, United can't agree to that, and PBGC
11  can't agree to that because, yes, we believe one of
12  the effects of this settlement agreement is to take
13  away from the Court in the Eastern District of
14  Virginia the right to set its own termination date,
15  because we have agreed.
16        United, by agreeing to this
17  March 11th --
18        THE COURT: We're talking about two
19  different things now. A court proceeding is required
20  to have an involuntary termination go into effect
21  over the objection of the plan sponsor. And I take
22  it that's what's going on in the Eastern District of
23  Virginia right now; is that it?
24        MR. SEHAM: Right.
25        THE COURT: If the plan sponsor agrees with

Page 123

1  the PBGC's determination that there should be an
2  involuntary termination, there's no court proceeding.
3        1303(f), which I just referred to, is
4  not a court proceeding required to affect an
5  involuntary termination. It's a proceeding brought
6  by an agreed party, including a plan beneficiary,
7  challenging action taken by the PBGC. And my thought
8  was that even though the proceeding in Virginia might
9  be rendered moot by this agreement, that would not
10  prevent AMFA or any other agreed person from
11  challenging the PBGC's announced termination date.
12        So, for example, if the PBGC had put
13  in its termination notice, unopposed by United, that
14  the termination date was December of last year, it's
15  fairly apparent under any reading of any authority
16  that that would be an improper termination date, and
17  one would assume that an agreed person like AMFA
18  would be able to challenge it.
19        MR. SEHAM: That may be so, and I don't
20  want to say it isn't so, because I would like to
21  preserve that right. But the fact of the matter is,
22  the reason why the Eastern District of Virginia
23  proceeding might be terminated and why the
24  termination date might be set and become indisputable
25  under Section 1348 is by virtue of an agreement

Page 124

1  that's being submitted for this Court's approval
2  which trades our members, 138 --
3        THE COURT: It's going to be very important
4  for you to get the answer to the question that I just
5  asked, because if you retain the right to challenge
6  the agency action under Section 1303(f), I don't
7  believe that you really have been deprived of an
8  important right in the matter that you're arguing
9  about.
10        MR. SEHAM: We have been deprived of a
11  statutory -- a right under statutory provision for
12  the court to hear equitable arguments on what the
13  termination should be, and given the precedent that
14  exists, a virtual certainty of having the termination
15  date set at March 17th in accordance with the PanAm
16  case.
17        They have taken -- by these two
18  parties agreeing to terminate the plan and to
19  terminate it on date specific, they have taken it out
20  of the PanAm statutory analysis that would virtually
21  guarantee another $130 million per the benefits, and
22  that's what --
23        THE COURT: I don't understand why that
24  would be the case.
25        Your argument is that a proper

Page 125

1  interpretation of the law would not allow the PBGC's
2  termination date to stand, correct?
3        MR. SEHAM: Correct.
4        THE COURT: There would have to be
5  something like five or seven days after the original
6  announcement of its intent to seek involuntary
7  termination before there can be an effective
8  termination date. That's your position?
9        MR. SEHAM: Correct.
10        THE COURT: If that position is correct as
11  a matter of law, and if Section 1303 allows you to
12  seek a court determination of the correctness of your
13  legal position, I don't believe you've been harmed.
14        MR. SEHAM: I respectfully beg to differ,
15  because it would be taken out of the analysis of
16  1348, under which the Court would have exclusive
17  jurisdiction of the termination date issue. And
18  consistent with past precedent under that statutory
19  provision, we would prevail, and we would get those
20  additional benefits.
21        I understand there may be another
22  avenue, but we have a virtually certain win for those
23  20 percent of benefits, and that almost certain win
24  has been prevented by this agreement between the
25  parties.

32 (Pages 122 to 125)

b0ffd064-65c8-4693-bfe6-5e64e9115794

ge

.

ght.

**Page 126**

1  THE COURT: I think you're talking about a
2  legal position though, not a factual one, a legal
3  position as to what an appropriate termination date
4  is. If that's the case, it's a question of law.
5  Then it would seem to me that that question ought to
6  be decided the same way, whether it's decided in the
7  midst of an involuntary termination proceeding or
8  whether it's decided in a proceeding brought under
9  Section 1303.
10  MR. SEHAM: But unfortunately, the courts
11  draw a different -- they draw a distinction -- or the
12  statute draws a distinction between (a)(3) and
13  (a)(4).
14  THE COURT: I'll have to take a look at
15  that.
16  MR. SEHAM: Our position is, we -- in the
17  absence of this agreement, which trades consideration
18  between the parties on the issue that was the
19  subject, the mandatory subject of bargaining, in the
20  absence of this agreement, AMFA's mechanics would
21  have accrued another $138 million worth of benefits.
22  And that this agreement, we believe that pursuant to
23  1113, that part of the agreement, 1113 -- excuse me,
24  the termination date, should be excised from this
25  agreement. Or if the agreement is going to be

**Page 127**

1  approved, it should be recognized by this Court, as a
2  matter of equity, that another $138 million of value
3  has been taken out of our collective bargaining
4  agreement, and United Airlines should be obligated to
5  recognize the value of that in terms of the
6  calculation of the AAS --
7  THE COURT: Well, let me just make another
8  observation. I don't see anything in this agreement
9  that purports to limit the ability of any union to
10  assert a claim based on the termination of its
11  pension plans.
12  So that if you're correct, Mr. Seham,
13  that that amount of damage has been suffered by the
14  union, you're free to assert that as a claim in the
15  bankruptcy with whatever priority it would be
16  entitled to.
17  MR. SEHAM: What we sought to obtain last
18  night, Your Honor, is a stipulation from PBGC and
19  United to the effect there's nothing in this
20  agreement which would have the effect of depriving us
21  a standing in the Eastern District of Virginia
22  proceeding, and United and PBGC would not agree to
23  that.
24  THE COURT: That's a different point than
25  we've already discussed. The point that I just made

**Page 128**

1  is different. It's not a question of where you can
2  litigate the appropriate termination. The question
3  is whether you can assert a claim arising from
4  termination of the pension plan in this bankruptcy
5  case.
6  You were saying that United ought to
7  have to recognize if this termination date is honored
8  that there has been a loss of value to the members of
9  AMFA, and what I'm suggesting is that if there was a
10  claim incurred by the members of AMFA as a result of
11  this agreement being entered into, nothing in the
12  agreement prevents them from asserting that claim.
13  MR. SEHAM: I understand. I think that the
14  parties will confirm, PBGC and United will confirm
15  that part of the effect of this agreement is to take
16  away AMFA's standing and the Court's ability to set a
17  date, and that the effect of this agreement is that
18  the Court should now defer to that March 11th
19  termination date, whereas in the absence of this
20  agreement, another date might have been set at the
21  discretion of the Court.
22  And I would just also want to point
23  out, the only case that the company keeps coming back
24  to in support of its position on this issue is a
25  Second Circuit decision in LTV.

**Page 129**

1  THE COURT: Jones and Laughlin.
2  MR. SEHAM: Jones and Laughlin. And again,
3  I want to emphasize, that was a decision in which on
4  the same day that the PBGC came with a consent order,
5  the debtor-in-possession agreed. The sponsor agreed.
6  This is a situation where there was seven weeks of
7  negotiation, seven weeks of litigation, seven weeks
8  of the development of a complex plan involving an
9  exchange of hundreds of millions of consideration,
10  and this situation is not governed by the Second
11  Circuit decision in LTV.
12  Thanks.
13  THE COURT: Thank you. retired Pilots are
14  next.
15  MR. CARRIGLIO: Thank you, Your Honor, Jack
16  Carriglio for the Retired Pilots. Your Honor, by
17  agreement, and we'll stay under our allotted time, I
18  would split my argument with my co-counsel, Frank
19  Cummings, if that pleases the Court.
20  THE COURT: Fine.
21  MR. CARRIGLIO: Your Honor, this agreement
22  is not in the best interest of the estate. I take
23  issue with the very first sentence of United's reply
24  brief, which says, the global settlement between
25  United and PBGC is a landmark achievement in United's

Page 130

1 restructuring.
2       They're hurting their retirees.
3 They're hurting their employees. It's not an
4 achievement. It's something they should be ashamed
5 of. We've shown you the severe impact on the retired
6 pilots. 30 percent, 40 percent, 50 percent
7 reductions in their pensions, and these are retirees
8 who can't make those dollars back.
9       The unions, in their briefs, have told
10 you the impact on their groups, which is substantial.
11 It's not in their best interest either, and we are
12 all part of this bankruptcy estate.
13       United's response to all of this,
14 Mr. Sprayregen alluded to it at the beginning, is
15 that, well, they tried, but it just hasn't worked out
16 for the pension plans.
17       The pension plans don't fit the
18 metrics, I've heard that word a lot in this
19 courtroom, the formula for profitability, the metrics
20 of United's business plan. And that's a business
21 plan that assumes that United is unable to maintain
22 pensions and obtain exit financing.
23       Unable means that you tried and
24 failed. And God knows that everyone in Chicago knows
25 what unable means. We have the Chicago Cubs. They

Page 131

1 try, they fail, and so far, they've been unable.
2 United hasn't tried. They have not tried to get exit
3 financing for a business plan that includes its
4 pension plans. Our expert, and you received our
5 expert reports, an investment banker, says United's
6 metrics are to too severe. There are other airlines
7 with less severe metrics that are getting financing.
8       And we have, Retired Pilots, we have
9 provided United with a radically less expensive
10 alternative to the pension plan as an alternative to
11 pension plan termination, which is the only thing
12 they ever wanted to do. And they haven't done
13 anything with our alternate plan, other than reject
14 it.
15       Your Honor, when you're thinking about
16 the best interest of the estate, I ask that you
17 please consider what the United PBGC agreement may do
18 to the business of United. I've sat here and I've
19 heard the word "strike." I've heard it from the
20 unions, I've heard it from United, that that is a
21 prospect if this agreement goes through.
22       Also, it's obvious that this will have
23 a grave impact on employee morale at a time when
24 United's main rival, American Airlines, is quoted as
25 saying that they see their pension plan as a key to

Page 132

1 employee morale, and they're maintaining it. There's
2 no metric to measure those items, and none of those
3 things, strikes, job actions, bad employee morale,
4 none of those things is in the best interest of the
5 estate, and all of those things are caused by this
6 proposed agreement, and we ask the Court not to
7 approve it.
8       THE COURT: Thank you, Mr. Carriglio.
9       MR. CUMMINGS: Your Honor, Frank Cummings,
10 also co-counsel for URPBPA. This agreement is
11 unlawful. It is an unlawful bargain between two
12 parties preaching in their statutory duties in three
13 ways, at least. I'll confine my remarks to those
14 three. The 45 percent waiver, the joint and several
15 waiver, and the 4047 restoration waiver.
16       First as to the 45 percent waiver.
17 They have -- United -- PBGC has a claim for unfunded
18 vested liability under ERISA. That is a statutory
19 claim. It's not a discretionary claim. It's in the
20 statute. You can measure it precisely in accordance
21 with the statute. You can argue about whether it was
22 in accordance with the statute. But the statute
23 tells you how to measure it, and it says it is PBGC's
24 claim. But, the statute also provides that after
25 they collect whatever they collect, a portion of it

Page 133

1 belongs to us.
2       If you take a look at 4022 of ERISA,
3 which is 1322(c), Title 29 of US Code, you will see
4 something called a recovery ratio. And the recovery
5 ratios say that if you get a recovery for these
6 liabilities, you share it with the pension
7 participants in a precise way. There's a formula,
8 there's a fashion. You divide this by that, you
9 multiply -- actually, my eyes cross when I look at
10 that formula, but I'm confident it's there, and I'm
11 confident the judge knows how to apply it.
12       When you waive a claim, you are
13 waiving our rights to more benefits. This isn't just
14 between PBGC and its fist. It isn't between PBGC and
15 its solvency. That's a claim, and a part of it
16 belongs to us, and they bargained it away unlawfully.
17       Let me go on to joint and several. I
18 had explained to you this morning that the joint and
19 several claim was abandoned in favor of a single
20 debtor claim and that that had marvelous benefits for
21 United because there was a lot of cash left over in
22 one of the affiliates. There was some more cash left
23 over in the other affiliate, and it was explained to
24 you by our adversaries that if you impose that claim,
25 you get more cash.

34 (Pages 130 to 133)

Page 134

1    And what do you do with that cash?
2    You apply 4022(c), and a portion of it belongs to us,
3    and they gave it away. It's our money.
4    Next you come to the restoration,
5    which stands on a slightly different footing.
6    The PBGC has the right --
7    THE COURT: By the same thinking, would the
8    securities that are going to be issued under this
9    plan not fall to your benefit?
10    MR. CUMMINGS: No, because we don't have a
11    claim to anything but the recovery under 4063. To
12    the extent that those securities are deemed
13    satisfaction of 4063 --
14    THE COURT: Why couldn't they be?
15    MR. CUMMINGS: They reduce to some
16    extent --
17    THE COURT: Don't you argue that they are?
18    MR. CUMMINGS: We're going to argue --
19    THE COURT: So the point is, it's an
20    overall settlement package, and PBGC is making a
21    determination that the consideration that it's
22    getting under this settlement package is at least as
23    much as it would get if it contested with United all
24    the various aspects that are currently in
25    controversy.

Page 135

1    And to the extent that some portion of
2    that recovery is properly attributable to sums that
3    would otherwise be subject to this recovery, you're
4    free to argue that that ought to be distributed to
5    your client.
6    MR. CUMMINGS: Your Honor, I don't think
7    that they have suggested the securities that are
8    going to be issued under that provision of the
9    settlement agreement are going to be equal to their
10    claim. They still have their unfunded vested
11    liability claim, and this is applied to it, but they
12    still have their claim. Their claim is larger, and
13    this is an application to that --
14    THE COURT: The point that I was trying to
15    make is that this is an acknowledgment that was made
16    earlier. The allowed amount of PBGC's unfunded
17    liability claim is to be reduced by any amounts
18    attributable to that claim from the consideration
19    that's being provided pursuant to the settlement
20    agreement.
21    So to the extent that you can show
22    that sums paid under the plan pursuant to the
23    settlement agreement are properly attributable to the
24    unfunded liability, you have the right to seek this
25    recovery.

Page 136

1    MR. CUMMINGS: Yes, but not on a joint and
2    several basis, not as to the other 45 percent.
3    THE COURT: But you see, it's a package.
4    You can't split out these individual components. The
5    PBGC is getting a package of rights, including a
6    substantial amount of securities to be issued under
7    the plan and an unsecured claim reduced by this
8    45 percent. And the question is whether that package
9    deprives your client of any rights.
10    MR. CUMMINGS: It does.
11    THE COURT: My expectation is that as long
12    as you can assert your recovery rights against the
13    package, you have not been deprived of any right,
14    other than to say that the PBGC has failed in its
15    fiduciary duty by accepting less than it ought to
16    have accepted from United for its total package of
17    rights.
18    MR. CUMMINGS: Your Honor, I think, with
19    all due respect, you are confusing our claim with
20    their claim. We get a percentage of what they have a
21    right and duty to claim. They have a right and duty
22    to claim the whole enchilada, the whole thing,
23    including joint and several, including the
24    100 percent --
25    THE COURT: And they have a right to settle

Page 137

1    that claim, don't they?
2    MR. CUMMINGS: No.
3    THE COURT: They don't have a right to
4    settle?
5    MR. CUMMINGS: They have a right first to
6    make it. They haven't made it. They have given it
7    away before making it. They have a lot of debtors in
8    the --
9    THE COURT: You're essentially making the
10    opposite of the argument that was made by some of the
11    parties in their brief, that the debtor has given too
12    much to the PBGC. What you're arguing, in effect, is
13    that the PBGC has given too much to the debtor.
14    MR. CUMMINGS: Yes, yes. Correct. They
15    have given it, and what they have given away isn't
16    their money, although it has some of their money in
17    it, but because of the recovery ratio, and I urge you
18    to read that section on the recovery ratio --
19    THE COURT: Okay, let me just say --
20    MR. CUMMINGS: Because of that, they're
21    giving our money away.
22    THE COURT: This is not a determination for
23    me to make. If the PBGC has acted in derogation of
24    its duty to your client, I think, again, the proper
25    remedy would be for your client to seek recovery from

35 (Pages 134 to 137)

Page 138

1 the PBGC or an injunction against the PBGC pursuant
2 to Section 1303.
3        What I'm supposed to do is to make a
4 determination whether, A, this is an agreement that
5 the debtor has entered into without violating the
6 Bankruptcy Code, number one; and number two, whether
7 the overall settlement is in the best interest of the
8 debtors' estate, not whether a PBGC has done its
9 duty. That would be for another forum to determine.
10       MR. CUMMINGS: I think the agreement is
11 unlawful, Your Honor, and I think you cannot approve
12 or certainly ought not to approve an unlawful
13 agreement.
14       As far as 1303 is concerned, 1303
15 gives us a right to sue PBGC. What I'm complaining
16 about, however, is that PBGC has abandoned a right to
17 make a claim against United recovering on which we
18 will share in. And I can sue them to my heart's
19 content, and I have no right to recover against them
20 under 1303 or anything else, except as against what
21 they recover from PBGC, and they have sold that.
22 They have given it away in a bargain, and they have
23 bargained away our rights.
24       If I haven't made that clear, I don't
25 know how I can make it any clearer.

Page 139

1        Thank you.
2        THE COURT: We were going to hear from IFS.
3        MR. HERRINGTON: Good morning, Your Honor.
4 Pat Herrington on the phone.
5        THE COURT: Yes.
6        MR. HERRINGTON: I will cede back my time
7 to the Court, as the issue was addressed in the
8 redraft of the agreement.
9        THE COURT: Thank you very much.
10       IFPTE.
11       MR. SMITH: Your Honor, I think IFPTE will
12 speak, with your permission. I'm here on behalf of
13 the indenture trustee.
14       THE COURT: That's fine. Thank you very
15 much.
16       MR. SMITH: Bill Smith. I'm here on behalf
17 of the Bank of New York, and joining me in the
18 objection are HSBC and United States Bank, and I want
19 to try to convince you to do a trick you just told
20 Mr. Cohen you can't do, and that is parse a piece of
21 this agreement out while preserving the balance,
22 because elements of it, in fact, are not, I believe,
23 a complete package deal.
24       Each of the three trustees that stand
25 before Your Honor is a member of the creditors

Page 140

1 committee, each of the three trustees represent
2 purely unsecured creditors who make no claims of
3 security or any other priority.
4        I wish to focus your attention on the
5 third issue you raised yesterday, which is only the
6 45 percent and United's right to direct the
7 assignment of the 45 percent of the unfunded benefit
8 liability claim.
9        In its response papers, United raised
10 the point that this is, and I quote, an important
11 asset to be strategically utilized, by United, to
12 insist in the reorganization process.
13       As you can tell in the amendments to
14 this agreement which have been proposed to you today
15 by the creditors committee by United and by others,
16 people have struggled with this concept on how to
17 implement this in a fashion that's fair and that's
18 consistent with Bankruptcy Code. And we suggest to
19 you that while the struggle has been in good faith,
20 we also suggest to you the struggle has been
21 insufficient.
22       United has suggested in its papers
23 that the assignability and designation of that right
24 is a routine practice and is not prohibited by
25 bankruptcy rule 3001(e), but we suggest to you that

Page 141

1 neither bankruptcy rule 3001(e) nor --
2        THE COURT: Mr. Smith, in light of the
3 shortness of time, I want to make a suggestion. The
4 most recent revision of this part of the settlement
5 agreement provides that United may not make any
6 distribution of this 45 percent of the allowed PBGC
7 claim until it's given notice, and any party who
8 objects to the proposed distribution would have an
9 opportunity to come into court and make any objection
10 based on applicable law to the proposed distribution.
11       So whatever argument you would like to
12 make now, it appears to me, you can make then. And
13 if whatever distribution United proposes is
14 agreeable, acceptable to your client, we will have
15 saved a great deal of time. And if it's not, for
16 whatever reason, including the reasons that you'd
17 like to argue to me right now, I can hear them then,
18 just as well as I can hear them now.
19       MR. SMITH: Your Honor, that's quite
20 correct. And let me simply suffice it to say that
21 what has been created here is something that does not
22 exist under Bankruptcy Code. You have been asked in
23 a process that has been engaged in only 18 days to
24 try to think of all the protections you need to deal
25 with a process, which is considerably more elaborate,

36 (Pages 138 to 141)

Page 142

1   one that's been created functionally as a
2   fact-derivative call option, which Congress didn't
3   contemplate. And while we may think about it later,
4   I hope and I believe that the parties have tried to
5   give you the best effort to preserve the rights to
6   look at this later. I'm simply not sure that you've
7   been able to do that.
8          So with that comment, let me be quiet.
9          THE COURT: Thank you, Mr. Smith.
10         MR. SPRAYREGEN: Your Honor, I will try not
11  to be repetitive and just address the points I think
12  need addressing. I would ask if you think I'm
13  addressing points that don't need to be addressed,
14  I'm happy to be told to move on.
15         Ms. Levine actually drew a laugh from
16  the courtroom in the comment that her group, and by
17  implication, the other labor groups, have not been
18  invited to the adult table. Your Honor, we actually
19  don't take that as that funny.
20         We have invited all of our labor
21  groups to the adult table, nonstop, for virtually a
22  year now, to try to reach agreement. The problem is,
23  the adult table entails very difficult, painful,
24  compromise in giving up of things in order to get to
25  consensus. Unfortunately, we don't have that with

Page 143

1   the groups that are objecting at the present time.
2   We remain open to that. We would like to sit down at
3   the adult table with all of those groups and reach
4   consensus. It can't be done when the premise is no
5   change to the present situation. There is no such
6   thing as no change to the present situation in this
7   case.
8          The situation will change one way or
9   the other, whether everybody in this room likes it or
10  not. That's, unfortunately, a function of the world
11  we're living in right now. The question is, can we
12  get there in a way that's in the best interest of the
13  enterprise. I would suggest getting there
14  consensually would be the best way to get there.
15         Unfortunately, because we haven't been
16  able to get there, at least with those groups, and we
17  haven't given it up in any way, shape, or form, but
18  we have continued to try to get there with other
19  groups. We have succeeded in making an arrangement
20  with one of our major labor constituents, in fact,
21  someone who at the adult table took tremendous pain,
22  and that's ALPA, who agreed to what they agreed to in
23  the ALPA agreement. And whatever that is, I don't
24  need to get into characterizing it, we all know it
25  was extraordinarily painful for that constituency.

Page 144

1          The same thing here with the PBGC.
2   You heard from Mr. Cohen that the actions that they
3   are engaging in are unprecedented. Well, we are in
4   an unprecedented time for dealing with the problems
5   of not only this Chapter 11 debtor, but this entire
6   industry. And these types of times demand these
7   types of creative, albeit very difficult and very
8   painful, solutions.
9          The recurring theme here seems to be
10  that because we have not made deals with these
11  groups, we're not permitted to move forward with the
12  rest of the groups. As I talked about earlier, that
13  is a recipe for paralysis of this case. Every time
14  we move for extension of the exclusivity period in
15  this case, we're taking a task for our dilatoriness
16  in not proceeding forward by the very same groups
17  that are actually complaining we shouldn't be moving
18  forward today.
19         Your Honor, we just don't believe it's
20  the law, as we took you through earlier, that these
21  groups, because we haven't agreed with them, can
22  prevent the agreements that we are suggesting, to the
23  extent we otherwise prove up all the appropriate
24  bankruptcy requisites under 363 and the like, which
25  we think we are doing.

Page 145

1          Simply put, AMFA, IAM, AFA, contracted
2   for an ERISA government plan. That means the
3   termination of an ERISA government plan in compliance
4   with ERISA cannot violate the CBAs. And the unions
5   don't even argue that the PBGC can't involuntarily
6   terminate these plans. It's only the fact of the
7   settlement agreement with us that somehow makes it
8   that PBGC can't take these actions.
9          I'll emphasize again, Your Honor, we
10  believe we are complying with all applicable law, the
11  CBA, the RLA, ERISA, the Bankruptcy Code, 1113(f),
12  fiduciary duty, and we ask the Court don't approve
13  this agreement if the Court is not able to conclude
14  that we are.
15         We do not wish to be put in any
16  position where there is any argument from any of the
17  unions that we are in breach of any of these
18  collective bargaining agreements and the threats that
19  have followed, not only to us, but unfortunately in
20  the courtroom today as to the negative consequences
21  that flow from that.
22         As we noted, to the extent this Court
23  finds that we are complying with the applicable law,
24  there is no right to strike or breach or damages.
25         I think the Court has probably

Electronically signed by Jackleen DeFini (201-184-194-7430)                b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 146

1 adequately become aware of 4003. I apologize earlier
2 on for not recognizing that, but I think with Mr.
3 Cohen's comments and the colloquy, I don't need to
4 address that other than to say, I think it's clear
5 there are additional recourse rights.
6       THE COURT: I've been citing to 29 USC, so
7 I've been saying 1303, but it's 4003 if you're
8 dealing with the ERISA section.
9       MR. SPRAYREGEN: I apologize, yes.
10       Earlier on, I did neglect to cite the
11 Allied Pilots case, but Mr. Cohen did talk about
12 that, and I think that case is very clear for the
13 proposition that the PBGC can enter into settlement
14 agreements with debtors or other parties taking into
15 account items like this.
16       I'm not sure whether there's still an
17 issue with respect to the benefit of this agreement
18 to the debtors. There's one point the Court focused
19 on, which I want to correct factually. You noted
20 because we allowed other governmental entities to
21 assert claims, that that waiver of the $350 million
22 setoff wasn't as big as it was. There already has
23 been a governmental claim bar date. The claims
24 against the estate are about 60 million. There is a
25 possibility of some others, the IRS, etcetera. But

Page 147

1 because of that low level and major claims being from
2 the PBGC and them already agreeing to that, no
3 setoff, we actually believe that's very, very
4 beneficial.
5       Now, with respect to that issue, the
6 minimum funding issue, the minimum funding issue, the
7 orbits issue, the liens issue, the substantive
8 consolidation issue, etcetera, we haven't said we get
9 100 percent benefit and trumped all of that as
10 benefit of the settlement, because we've taken the
11 position in this Court and with many parties that we
12 will win these issues, and if forced to litigate all
13 those issues, we have a belief that we will. It
14 would not be credible for us, or for me, to advise my
15 client that it's a 100 percent chance that we'll win
16 those issues. With this settlement, it is. Those
17 issues are resolved. They are resolved in our favor.
18 There's $230 million in the business plan, cash, that
19 was supposed to be spent at closing that now will not
20 be and now is available for other --
21       THE COURT: I believe at this point, Mr.
22 Sprayregen, that there is no longer any objector who
23 is pressing the question of whether the estate is not
24 getting adequate consideration for what it's giving
25 up in this settlement. No one that argued today has

Page 148

1 made that point.
2       In fact, as I noted in Mr. Cummings
3 last argument, he's made the opposite point. He
4 believes that the PBGC is giving up too much.
5       MR. SPRAYREGEN: I'll move on, and I'll
6 only note that Mr. Clayman, in the citations to his
7 Exhibits 1113 and Mr. Snyder's affidavit, are really
8 the summary of the benefits. So there's a lot in
9 evidence as to those benefits.
10       Your Honor, let me focus for a moment
11 on this unilateral act argument, and it really goes
12 back to what I argued earlier today. The idea that
13 this is a unilateral act of debtor, this settlement,
14 presupposes that somehow the debtor has this right
15 under 42 to act. There's potentially two different
16 kinds of unilateral here. Unilateral without the
17 union's agreement or truly unilateral where the
18 debtor is doing it all on its own.
19       We don't have either of those in this
20 circumstance. The PBGC, through our agreement with
21 them, albeit, is taking the action that they're
22 statutorily entitled to do, and I keep saying, if
23 they can do that statutory action without us, it is
24 beyond my ken as to how they can no longer do it,
25 because they have an agreement with us. But none of

Page 149

1 that converts it into a unilateral act that would
2 fall within the scope of 1113(f).
3       Mr. Clayman cites all sorts of things,
4 that we're just living in a different world, that he
5 thought there's reasons why this agreement should not
6 be approved, like we thought it would get us
7 certainty and closure. That's a good thing, not a
8 bad thing.
9       I will say that the various
10 interpretations that the AFA has made through Mr.
11 Clayman's arguments from the podium today are mostly
12 what was in the briefs. But in essence, our view is
13 that the much overexpansive view of the reach of
14 Section 1113 and the ability of the company to do
15 things with other stakeholders when it is unable to
16 reach agreement with union stakeholders through an
17 1113 process.
18       Your Honor, Ms. Levine raised --
19 lastly, with respect to Mr. Clayman's comments, I
20 thought it was telling, his last couple of comments,
21 where he noted what he did not believe Congress
22 intended and the law should not be a certain way, and
23 then referred to equities. I think, unfortunately
24 what Mr. Clayman is really saying is that the law is
25 this way. He would prefer it to be a different way.

38 (Pages 146 to 149)

Page 150

1  And the law -- and we are not proceeding on any sharp
2  or cute or disingenuous interpretation of the law
3  here. This is the way 1342 works. Bankruptcy
4  encourages consensus, ERISA encourages consensus.
5  It's a good thing that we're able to move this case
6  along in this way, hopefully again with more
7  consensus from the rest of the unions.
8        Ms. Levine raised a few points I think
9  I can clear up. First of all, we do have a business
10 plan. It goes from 2005 to 2010. Her union has it.
11 She's on the creditors committee. They have it.
12 They've reviewed it with us. They continue to review
13 it with us. Is it possible that could change at some
14 point as things develop? Sure. That may be what was
15 being referred to. I'm not sure.
16       THE COURT: I think the main point in that
17 connection, whether it's a five- or ten-year period
18 is a small point that I think we cleared up during
19 the colloquy, but the main point was to say that
20 United, by agreeing with the PBGC not to propose a
21 defined benefit plan affecting the union for a
22 five-year period, was tying its hands, giving away
23 rights the union might otherwise have to negotiate
24 such an agreement impermissibly.
25       MR. SPRAYREGEN: Yes, I understand that. I

Page 151

1  was about to address that. I don't mean, yes, it's
2  impermissible. I think the answer is -- actually,
3  Ms. Levine I think proposed a solution from the
4  podium, which is acceptable to us, which I think
5  would be acceptable to PBGC. We'll hear from them.
6  The change was intended. Whether that's a problem or
7  not, we did not think it is, but instead of fighting
8  the point, we agreed on the five years with ALPA
9  because that gets them past their date, getting it
10 past the amendable firm of any modified CBA is okay
11 with us if that's a -- we don't think that's truly an
12 issue, but it's not something that we care to fight
13 about.
14       THE COURT: What is the reason for not
15 putting any defined benefit plan into effect during
16 the five years after this agreement?
17       MR. SPRAYREGEN: Your Honor, if you recall,
18 one of the major benefits we're getting from this
19 agreement is the waiver of restoration rights. If
20 the Court recalls, the only real case where that's
21 happened is LTV. What happened there, defined
22 benefit plans were restored. I can't get into
23 various people's minds as to exactly the reasons for
24 things, but as Mr. Cohen noted, that was an
25 extraordinary give, to give up the restoration

Page 152

1  rights, knowing, you know, what's going to happen
2  going forward, at least for some period of time,
3  might be relevant.
4        I can't speak to that exactly, but I
5  think that that's a, for us, given there hasn't been
6  a defined benefit plan to my knowledge, established
7  on a major corporation in America in quite some time.
8  We don't actually think that's a practical point. So
9  we thought that that was not something that was
10 terribly injurious to anybody, but we understand the
11 point on bargaining, and that's why we're willing to
12 adjust it the way we did.
13       There's many allegations from the
14 three unions that we have refused to negotiate --
15       THE COURT: Before you get off the question
16 of whether there are elements here that affect the
17 rights of third parties, Ms. Levine's next point was
18 that if there's a defined contribution plan that's
19 going to be subject to PBGC's approval, and if that
20 approval is withheld, there would be an opportunity
21 to have the reasonableness of its disapproval tested
22 in court. We talked about that during your opening
23 remarks about whether that court would be district
24 court or bankruptcy court.
25       But the question that Ms. Levine

Page 153

1  raised was whether it's appropriate to deny the other
2  party to the agreement generating the defined
3  contribution plan, the opportunity to participate in
4  that court proceeding.
5        MR. SPRAYREGEN: We didn't deny it. This
6  is an agreement between PBGC and United. How anybody
7  could argue that we denied or even addressed anybody
8  else's rights to do anything, come to court, not go
9  to court, is beyond me on that. We haven't said what
10 they can do. I have no idea whether they have
11 standing to do it or not, but we didn't purport to
12 say that they couldn't.
13       MS. LEVINE: Your Honor, maybe if I ask the
14 question, it will solve the problem, because maybe
15 we're not in disagreement. When you said United and
16 no other party, you meant party to this agreement
17 meaning just United and not the PBGC?
18       THE COURT: It says to the extent that the
19 parties dispute the reasonableness of PBGC's
20 withholding of its consent, United, and not any other
21 party, shall have the right to request judicial
22 determination.
23       MR. SPRAYREGEN: Let me take a moment with
24 Mr. Cohen.
25       (Brief pause.)

Page 154

1    MR. SPRAYREGEN: Your Honor, we're not
2 purporting to bar any other party. We're not
3 conceding anything either. Whether they have they
4 rights we don't know.
5    THE COURT: Let me just go through this
6 with Mr. Sprayregen, if you don't mind, Ms. Levine.
7    In the period after confirmation of a
8 plan, if this agreement goes into effect and the plan
9 contemplated by the agreement is confirmed, United
10 would be negotiating with its unions on replacement
11 of the defined benefit plan, defined contribution
12 plan.
13    As I read this agreement, those
14 replacement plans can only go into effect if the PBGC
15 approves them. United will be prohibited from
16 putting such a replacement plan into effect, absent
17 the PBGC's consent, right?
18    MR. SPRAYREGEN: No, not correct.
19    The construct, Your Honor, is we hope
20 to get consensus and work with the PBGC and the
21 unions on replacement plans. I will note that
22 unfortunately for the unions with whom we don't have
23 consensus yet, we haven't been able to even engage in
24 any replacements plans. But we would ultimately hope
25 to get consensus with whomever we can on that issue.

Page 155

1    To the extent the PBGC does not
2 consent, if we believe they are unreasonably
3 withholding their consent, we can go to court. If we
4 prevail, we can move forward. If we lose, we'd have
5 two choices: One, we cannot move forward and go back
6 to the bargaining table; or two, we can more forward,
7 in which case, PBGC does not waive its restoration
8 rights.
9    So one way or the other, at the end of
10 the day, we can move forward, like most of this
11 agreement. And like the points I'm making with
12 respect to our dealing with the rest of the unions,
13 none of these things are without consequences or a
14 free lunch. If we decide to move forward after
15 having gone through all of those hoops and losing,
16 there are consequences, maybe even consequences to
17 exit financing. But there is a construct here that
18 does not tie our hands.
19    THE COURT: That is an important limitation
20 on what appears to be the thrust of this agreement.
21 When the agreement says any defined contribution plan
22 proposed to be provided by United to its employees
23 following termination of the pension plan shall be
24 somebody to PBGC's consent, I think a reasonable
25 interpretation would have been that the agreement

Page 156

1 can't go into effect absent PBGC's consent.
2    And what you're saying is it that's
3 not what's intended by the parties, but what's
4 intended by the parties is that PBGC's consent is a
5 condition for the effectiveness of its agreement not
6 to seek restoration of the pension plan.
7    MR. SPRAYREGEN: Not to seek, but to waive
8 the right to have her seek.
9    THE COURT: That is what the parties
10 intend. I think that makes a difference, Ms. Levine,
11 because I think that leaves open the possibility of
12 United and the union agreeing to a defined
13 contribution plan even in the absence of PBGC
14 approval and even if a court finds that that approval
15 was not unreasonably withheld.
16    The other point that Ms. Levine made
17 that I think I really need to have addressed is the
18 question of whether there is any release being given
19 by PBGC pursuant to this agreement that would affect
20 an otherwise existing right of the beneficiary to
21 assert a claim against either the debtor or any
22 fiduciary under the defined benefit plan.
23    MR. SPRAYREGEN: Your Honor, we're not
24 purporting to give any non-debtor releases in sort of
25 the bankruptcy sense of the word through this

Page 157

1 agreement.
2    THE COURT: See, the problem is, very
3 frequently, trustees are found to have the authority
4 to waive claims of beneficiaries of the trust that
5 they administer. We've had similar situations that
6 have come up in the context of who has authority to
7 assert a claim on behalf of owners of aircraft who
8 have similar relationships with trustees. And it's
9 been the debtors' position, which I think has largely
10 been accepted, that it's the trustees who have the
11 ability to assert that claim, and, therefore the
12 trustees would have the ability, one would assume, to
13 compromise those claims or to waive them.
14    The question here is whether the
15 release that's being given by PBGC in its capacity --
16 in a capacity as trustee, would have the effect of
17 waiving claims that beneficiaries might otherwise
18 have.
19    MR. SPRAYREGEN: I have a note here that
20 says, "let me address this," from Mr. Cohen.
21    THE COURT: Those were the questions that
22 were raised by Ms. Levine that I wanted to get an
23 answer to. If you have other comments that you'd
24 like to make with respect to her argument, I'll be
25 happy to hear them.

40 (Pages 154 to 157)

Page 158

1    MR. SPRAYREGEN: Your Honor, the voting on
2 the 45 percent, I think the Court noted that's really
3 an issue for another day, we can deal with that. The
4 only thing I'll note, it's not just an allowance
5 issue, you can separate voting from allowance. And
6 the law is, if the claim's objected to, it's prima
7 facia not deem allowed, and somebody would have to
8 file a motion with you to allow it temporarily for
9 purposes of voting in some amount you would need to
10 establish.
11    THE COURT: I do not see -- at this point
12 the 45 percent provision is not an obstacle to
13 approval of the settlement.
14    MR. SPRAYREGEN: Your Honor, I think I'm
15 not going to get into the points about what's
16 happened or hasn't happened in all the other
17 bankruptcy cases. I don't see that's a relevant
18 argument that has anything to do with what we're
19 doing before you today. I literally don't know what
20 those arguments were.
21    AMFA, I think, Your Honor, the point
22 there, the court made it. I don't think I need to
23 belabor that. This is really an argument for them to
24 make in the Virginia court or against the PBGC or
25 somewhere else.

Page 159

1    THE COURT: Well, I believe the thrust of
2 your argument is that the Virginia proceeding would
3 become moot if United consents to the request of the
4 PBGC for involuntary termination. There would be no
5 matter to litigate that point in Virginia; is that
6 right?
7    MR. SPRAYREGEN: You're starting to test my
8 ERISA knowledge, but my understanding is we have a
9 right to do that.
10    THE COURT: That's the Jones and Laughlin
11 decision. There's no judicial proceeding when
12 there's consent by the plan sponsor to a PBGC
13 determination that there should be involuntary
14 termination.
15    MR. SPRAYREGEN: That's my understanding,
16 but I'm not going to purport to answer that question
17 for AMFA if they intervene, what effect would that
18 have, I have no idea.
19    THE COURT: Let me just say that in
20 overruling AMFA's objection on that point, I would do
21 it based on my understanding that Section 1303 of
22 Title 29 allows AMFA to challenge the appropriateness
23 of PBGC's termination date. It may be that Mr. Cohen
24 can confirm or deny my understanding on that point.
25    If not, if this would take away all

Page 160

1 opportunity for that to be challenged, I would want
2 to revisit the point. But on the assumption that
3 there still is an appropriate mechanism for judicial
4 determination of the appropriateness of the
5 determination date, under whatever view of the law
6 turns out to be correct, I don't think that's an
7 objection that would stand in the way of approval of
8 the settlement.
9    MR. SPRAYREGEN: Okay. Well ask for
10 Mr. Cohen to clarify that.
11    Your Honor, with respect to the
12 Retired Pilots argument, actually, I think part of
13 the argument was we were getting too good of a deal,
14 and I wish that were so. I think it's a fair deal,
15 but I just don't think that argument is well taken in
16 the tests for approving a deal like this.
17    And the argument of Mr. Carriglio
18 about what various alternatives were, there's no
19 evidence. I'm simply unable to respond to those
20 arguments from the podium when there were no exhibits
21 offered, there's really nothing to able to respond to
22 the allegations of whatever these alternatives are,
23 so I'm going to have to move on that.
24    I will say I did not think it was
25 helpful to suggest that the Court can't approve this

Page 161

1 agreement because of the strike threat. I just don't
2 think that's helpful in the deliberate understanding
3 of what ought to be done here, especially given our
4 position of no violation of law.
5    Finally, I'll wrap up, the there's the
6 citations to the Fogel v Zell, Seventh Circuit case
7 of both the IAM and AFA. That case is a mass tort
8 case dealing with a blown proof of claim bar date and
9 future claims. It just really doesn't seem to have
10 anything to do with the situation we have here.
11    THE COURT: The underlying proposition that
12 two parties can't agree between themselves to
13 eliminate the rights of a third party is one that I
14 think has considerable validity, and that's why I
15 wanted to explore with you those individual issues
16 that Ms. Levine raised where this agreement could be
17 seen as doing that. But I don't think we need to go
18 into the details of the case. I don't think it was
19 cited for its precise holding, but rather to that
20 general proposition.
21    MR. SPRAYREGEN: Well, we don't disagree
22 with the general proposition. We just took it the
23 way the settlement is structured. It does not follow
24 the general proposition.
25    The last detailed point, Your Honor,

41 (Pages 158 to 161)

Page 162

1   was just with respect to the citations to
2   Mr. Kramer's expert report. There's a pending motion
3   that is supposed to be heard in the pretrial that in
4   the deposition, which is evidence also because it was
5   part of Mr. Clayman's exhibits, that deposition 27
6   through 28, and 145 through 146, Mr. Kramer states
7   that at this point in time, he actually has no
8   opinion; that is, the opinion that was December '04
9   is no longer his opinion. He doesn't have an opinion
10  at the present time. He just hasn't been asked to
11  produce or update any expert report. So I just
12  wanted to bring that to the Court's attention.
13          And maybe more even importantly on a
14  substantive basis, even that report, even in December
15  '04, presumed that the AFA plan, even if it didn't
16  need to be terminated, was going frozen going forward
17  with a (d)(c) plan going forward from there, which is
18  quite different than I think was the way it was
19  characterized.
20          Your Honor, I think really that's the
21  detailed response. With respect to Mr. Smith's
22  argument, I obviously would say we think we solved
23  the types of objections to that issue, and, as the
24  Court indicated, by bringing that issue for another
25  day.

Page 163

1           And with all of this, and we
2   understand, Your Honor, and we know the difficulty of
3   what we're moving forward on here, but unfortunately,
4   it's even more difficult not to move forward. This
5   case has now been in bankruptcy for two and a half
6   years. As I've said many times before you here
7   today, we fervently desire to hopefully reach
8   agreements with the balance of arguments, whatever
9   the Court does. Hopefully it's in the context of an
10  approved PBGC deal, which is just a myriad of
11  benefit. And it is time to move this case forward
12  and get ready to turn to solving our issues with the
13  aircraft financiers and then move onto the exit
14  process and construction of a plan with a creditors
15  committee and other stakeholders and finalize the
16  exit financing and move to exit.
17          A denial of the approval of this is we
18  go forward with all of the trials. We'll obviously
19  have to deal with that if that's the case. But we
20  would suggest that the benefits of this agreement far
21  outweigh the burdens by leaps and bounds. It's way
22  above the lowest level of reasonableness. And most
23  importantly, and very importantly, because the
24  previous point is irrelevant, unless we're complying
25  with all the applicable law. We believe we are. And

Page 164

1   to be clear, as I said, if we're not and the Court
2   believes we're not, then you shouldn't approve the
3   agreement. We think you should. We think it does
4   comply, and we think it's very good for the estate
5   and all of it's stakeholders, notwithstanding the
6   very tough medicine.
7           THE COURT: Mr. Cohen.
8           MR. COHEN: Thank you, Your Honor. A
9   couple of points. I'll be happy to take up first the
10  question about the releases with regard to fiduciary
11  breaches that you've inquired that Ms. Levine raised.
12          PBGC's view is certainly that we're
13  not releasing anybody's claims but our own going
14  forward. However, it has been our position in other
15  cases, and there's some case that support it, that
16  while a participant might have standing under ERISA
17  to sue for a breach of fiduciary duty post
18  termination any recovery since it's on behalf of the
19  plan under Title One of ERISA, not an individual
20  recovery, it's a participant, would have to go to
21  PBGC as trustee so that it could then be taken into
22  account with all the allocation of other assets
23  which, in turn affects the point Mr. Cummings was
24  making, that PBGC has to share its recovery with
25  participants.

Page 165

1           THE COURT: But that's a point that's
2   independent of any release that's given in this
3   agreement.
4           MR. COHEN: Absolutely, Your Honor. But I
5   just wanted to go on record with our view that they
6   have a cause of action, but it not might be --
7           THE COURT: They may disagree with your
8   interpretation on that particular point.
9           MR. COHEN: Precisely.
10          THE COURT: The important issue here is
11  that the PBGC is not purporting through this
12  agreement to waive any claim that an individual might
13  otherwise have.
14          MR. COHEN: That's correct.
15          Mr. Cummings urged you to read Section
16  1322(c) since you're in 29 USC. If you do that, I
17  urge you to bring a bottle of aspirin along with you
18  when you read it. It does have a formula. That
19  section does require PBGC to share its recoveries
20  with people who have lost benefits. That is --
21          THE COURT: I don't think we have to spend
22  a long time on this, Mr. Cohen, because I think the
23  point that I was trying to make to Mr. Cummings,
24  unless you tell me I'm mistaken about this, would
25  continue to be accurate.

Page 166

1     To the extent that that settlement, if
2  approved, reflects PBGC's settlement and therefore
3  recovery on the claims that are covered by that
4  section, this section would apply.
5     MR. COHEN: Absolutely, Your Honor. We
6  would value the recovery, taking into account the
7  advice of our experts on how to value securities, and
8  it would no doubt be shared, based on our evaluation.
9     THE COURT: And if a participant disagreed
10  with your evaluation, they would be able to get some
11  kind of judicial review under 1303, I assume, but
12  that's another question I want to get your views on.
13     MR. COHEN: Yes, they would, Your Honor,
14  except that it's a very high standard they'd have to
15  meet. Under 1322(c), I forget the precise language,
16  but it's a high burden. There's a lot of deference
17  given to our valuation.
18     But before we leave 1322(c) and move
19  on to the 1303 question you want to ask, that section
20  also has an applicability to part of the colloquy you
21  had with counsel for AMFA in which you suggested that
22  the unions might have claims for benefits that they
23  lost and for non-guaranteed benefits.
24     The courts have universally held that
25  because of the presence of 1322(c), the PBGC, since

Page 167

1  the amendments in the late '80s, has a claim for the
2  entire amount of the unfunded benefit liabilities,
3  including the non-guaranteed amounts. Only PBGC has
4  a claim after the those amendments for -- and I
5  address your attention to United Steelworkers versus
6  United Engineering, which is cited in the debtors'
7  reply brief for a different point. But that's the
8  leading appellate authority on that point. So we
9  would take the position that the claim's only ours.
10     1303 and also on the AMFA claims, to
11  be honest and candid, as always, whether they would
12  have a claim under 1303, I think they could assert a
13  claim under 1303 regarding the termination date, but
14  it's never been done before. Those actions -- that
15  issue has only been litigated, that I'm aware of, in
16  the context of an involuntary termination action.
17  But I think they could probably survive a motion to
18  dismiss. Whether they have a meritorious claim --
19     THE COURT: That's another story. As I
20  said, if it's a legal question -- again to get back
21  to my hypothetical, if you issue a notice that said
22  the termination date is three months before the
23  notice was issued, I personally doubt very much that
24  any court would sustain your position, given what
25  little I know about ERISA.

Page 168

1     And I would expect that 1303(f) would
2  provide a mechanism for a court to say that the PBGC
3  acted improperly in setting that kind of termination
4  date.
5     Now, if you have a reason to disagree
6  with that understanding, Mr. Cohen, I would very much
7  appreciate your telling me that now.
8     MR. COHEN: I don't have a reason to
9  disagree, but I'm not aware of any cases where that
10  has actually happened. They should have a right to
11  sue under that.
12     I'd also note with regard to the AMFA
13  and their ability to challenge the date, I understand
14  that you get it, that it's not a retroactive date.
15  It was contemporaneous --
16     THE COURT: I understand there's a
17  significant difference of the reading of the law
18  through PBGC and AMFA, and you have a cited authority
19  for the proposition that constructive notice applies,
20  and that as long as the date is not to prior the date
21  the issuance takes place, there's an appropriate date
22  set.
23     But if there is a disagreement as to
24  whether that's a proper reading of the law, I think
25  it's important that there be some mechanism for that

Page 169

1  disagreement to be determined.
2     And if this settlement had the impact
3  of eliminating AMFA's opportunity to litigate that
4  question, it would raise a difficulty in my mind.
5     MR. CLAYMAN: And I'd also note, Your
6  Honor, that while we're certainly going to argue that
7  the Jones and Laughlin decision is the end of the
8  matter, that's from the Second Circuit, that's not a
9  court of controlling jurisdiction in the Fourth
10  Circuit where the matter is pending, they may be able
11  to convince the judge that that's not applicable or
12  it's not right; so I think they'll also have the
13  opportunity, even though we're going to take the
14  position that there's nothing to be heard from of the
15  unions after this agreement. They might convince
16  Judge Hilton.
17     MR. SEHAM: May I make a comment?
18     THE COURT: Go ahead, Mr. Sehman.
19     MR. SEHAM: Again, our question -- our
20  point was that AMFA had a substantial cause of action
21  that had, in effect, been undermined as part of the
22  consideration in the settlement agreement. And the
23  question that we put to the PBGC is, is the PBGC
24  willing to stipulate that United's agreement and the
25  March 11th termination date for the ground plan was

43 (Pages 166 to 169)

Page 170

1  not part of the consideration received by PBGC.
2      THE COURT: He doesn't have to stipulate to
3  that. Again, the substantive question that you
4  raised, the one that concerned me, was whether the
5  agreement eliminated AMFA's right to litigate the
6  appropriateness of the termination date. I think
7  it's been established that your right to litigate
8  that question has not been eliminated, that you have
9  the right under Section 1303 to challenge PBGC's
10 termination date.
11     To the extent that that's an open
12 question, I think Mr. Cohen's comments from the
13 podium today would help any court to resolve it.
14     MR. SEHAM: One last sentence, if I might.
15 It remains our position that United plays in the role
16 on our statutory right to challenge under 1348 in
17 exchange for consideration received from the PBGC,
18 and the PBGC received a $130 million benefit.
19     MR. COHEN: Well, Your Honor, really --
20     THE COURT: That doesn't need to be argued
21 anymore, because to the extent that remains a
22 litigated matter, you haven't received anything. If
23 the right to litigate the matter had been taken away,
24 think that point would have a great deal more for us.
25     MR. COHEN: This is not the forum for that.

Page 171

1  I would like to just address the five-year
2  prohibition from the PBGC's perspective, and it's
3  noteworthy that everybody was talking about -- well,
4  except Mr. Cummings, that perhaps we got paid too
5  much. We are, even with the face value, even if you
6  look at the face value of the securities we're
7  getting -- we're still going to being taking the
8  largest loss in the agency's over 30-year history
9  from the United plans put together. It's about
10 $5 billion if you take the face value. It's the
11 amount of guaranteed benefits that PBGC will be
12 eating.
13     And it's appropriate, and I realize
14 that other constituencies are taking haircuts, too,
15 but in that vein, the five-year prohibition from
16 PBGC's perspective is that when companies haven't
17 funded their pension plans and have left us with this
18 kind of liability, that there shouldn't be an
19 immediate second hit. And so, you know, there's no
20 magic to the five years, but it has been done before
21 where there's a prohibition on the establishment of
22 the new defined benefit plan.
23     THE COURT: I guess the point here is that
24 you're doing something fairly extraordinary in
25 limiting your ability to restore the defined benefit

Page 172

1  pension plans. And one of the elements for not
2  requiring restoration, for continuing to pay out the
3  insured pension benefits that is the agency's
4  responsibility, is that they're not what you would
5  perceive to be an add-on plan. And another defined
6  benefit plan supplementing the insurance payments
7  that you're making would be perceived by the agency
8  as likely to be such an add-on plan.
9      MR. CLAYMAN: Wrap around, yes, Your Honor.
10 You're absolutely right. It could start to look like
11 the kind of abuse that we saw in the LTV case, for
12 instance, but it's also -- which I think is the point
13 you're making, but also from our perspective, United
14 obviously likes the certainty that they wouldn't have
15 what they call the volatility associated with having
16 defined benefit plans, but from our regulatory
17 viewpoint, it's that we shouldn't be subject to an
18 immediate second hit after we've already taken a
19 large loss from the same plan sponsor.
20     So that's the government's view on
21 that.
22     Thank you, Your Honor.
23     THE COURT: Thank you. I believe that
24 concludes the argument; is that correct?
25     MR. SPRAYREGEN: Yes, Your Honor.

Page 173

1      THE COURT: What I would like to do is take
2  a brief recess. I want to go down and meet with the
3  people briefly that I was supposed to meet with at
4  4:00 o'clock, and I'll get back up here as soon as I
5  can.
6      (Brief recess.)
7      (Change of court reporters.)
8      THE COURT: In our pre-trial conference
9  yesterday, I identified four questions that I thought
10 needed to be addressed in passing on the question of
11 whether the proposed agreement between the debtors
12 and the PBGC should be approved. Those questions
13 basically broke down into two categories. One
14 category is whether this agreement satisfied the
15 obligations of any proposed settlement under the
16 Bankruptcy Code. That is to say, did it comply with
17 the law, did it provide adequate consideration to the
18 debtor, was it a benefit to the debtors' estate.
19 Those are questions that we would look at in any
20 bankruptcy settlement.
21     The other question was whether this
22 settlement was consistent with collective bargaining
23 agreements and the rights of the union members under
24 Section 1113 of the Bankruptcy Code and the RLA. The
25 general settlement requirements, as I think was

44 (Pages 170 to 173)

Page 174

1  reflected in the colloquy that took place today, have
2  been satisfied by the agreement. We can go through
3  the specific questions that I raised yesterday and
4  that have been addressed in the argument today. But,
5  again, I don't think there is a great deal of doubt
6  about those points.
7              Is there adequate consideration for
8  the rights that United is giving up? Now, what
9  United is giving up is $1.5 billion face amount in
10 securities and the nonobjection by United to a claim
11 to be calculated by the PBGC under its usual
12 procedures. That's the primary consideration that
13 United is offering.
14             In exchange, the PBGC is giving up
15 claims that it would have to minimum funding
16 contributions that accrued since the time this case
17 was filed; it's giving up its right to seek payment
18 from each of the debtors jointly and severally; it's
19 giving up its right to assert a setoff against sums
20 owing from the United States Government; it is giving
21 United a procedure that can assure that there will
22 not be restoration of pension plans by PBGC after the
23 effective date of a plan of reorganization; and it is
24 surrendering distribution rights of 45 percent of
25 whatever claim is ultimately allowed on account of

Page 175

1  underfunded pension contributions.
2              The discussions that have taken place
3  in court today have reflected the belief of the
4  creditors committee and the nonassertion by any other
5  party to the contrary that these tradeoffs are on
6  balance beneficial to the estate, that is to say that
7  what the estate is getting in terms of a surrender of
8  claims in terms of certainty for its future outweigh
9  or at least sufficiently balance what the company is
10 giving up.
11             As it turns out, the bankruptcy court
12 is directed in making this kind of determination to
13 use a very deferential standard. The court, as the
14 Seventh Circuit's stated in In re American Reserve
15 Corporation, is supposed to compare the settlement
16 terms with the probable cost and benefits of
17 litigation, and only to deny approval of the
18 settlement if the settlement is below the range of
19 likely litigation outcomes. The Seventh Circuit's
20 decision In re American Reserve Corporation, 841 F.2d
21 159, 161, 1987. And that's a decision that I also
22 discussed in a decision that I wrote in 1999, In re
23 Telesphere Communications, Inc., 229 B.R. 173, 181.
24 So, again, given the tenor of all of the discussions
25 today, it's quite clear that what the debtor is

Page 176

1  giving up is well within that range of potential
2  litigation outcomes.
3              The minimum funding contribution
4  liability that the debtors face right now
5  approximates a billion dollars if the position of the
6  PBGC were to ultimately prevail in a litigated
7  outcome on that issue alone. It has its other claims
8  unsecured, $5 billion, which could be asserted in
9  various ways against assets of the estate, including
10 funds that are held now by United Loyalty Services,
11 including its offset right, so that what we have here
12 is plainly within the range of litigated outcomes
13 just in terms of the dollar amount.
14             But when one is considering the
15 potential benefit to the estate here, the dollar
16 amount is not the only thing that's significant. It
17 is the certainty of a resolution allowing for an exit
18 from bankruptcy that has a value that's substantial
19 but not quantifiable. And the settlement has the
20 potential for reducing, if not eliminating, many
21 contested proceedings that would otherwise divert the
22 energy and resources of the debtor.
23             So on that question, is this something
24 where there is adequate consideration, the answer is
25 plainly, yes, this is something that on that level

Page 177

1  meets the test for court approval.
2              Now, the next question I had asked in
3  light of arguments that were made in the briefs was
4  whether this agreement would impair the obtaining of
5  exit financing. And, again, I think the colloquy has
6  established that the contrary is the case; that by
7  eliminating an overhang of uncertain liability, this
8  agreement makes exit financing more likely.
9              Now, to be sure, the debtors'
10 requirement to issue the securities, a substantial
11 amount in securities, will have some impact on exit
12 financing. But those securities were structured in
13 such a way as to have a minimum impact on exit
14 financing to require no cash outlays from the debtor
15 for a substantial period of time allowing a
16 reorganization to have a greater chance of being
17 successful.
18             Moreover, the agreement provides, as
19 clarified in the colloquy, that to the extent that
20 the precise nature of the securities does create some
21 obstacle to exit financing, that those securities
22 can't have their terms modified. So, again, that
23 issue I think is not an obstacle to approval of the
24 settlement.
25             The 45 percent of allowed unsecured

45 (Pages 174 to 177)

Page 178

1  claim that is proposed by this agreement to be
2  distributable by the debtor, or at the option of the
3  debtor, excuse me, is also not an obstacle because to
4  the extent that that provision might contradict other
5  requirements for confirmation of a plan, all parties
6  in interest will have the opportunity to object to
7  any proposed distribution of the 45 percent by the
8  debtor, at the direction of the debtor, prior to the
9  time that any such distribution would take place.
10        And to the extent that the court would
11  find that there would be any violation of the
12  Bankruptcy Code's provisions or any other provision
13  of law in what's proposed by the debtor, the
14  distribution would not be allowed. So that also has
15  been removed as an obstacle.
16        Now, finally, while we're still
17  talking about the general terms that have to be met
18  in order for the court to approve the proposed
19  settlement, I need to address the question of whether
20  the settlement imposes limits on rights of third
21  parties. This comes under the rubric of what was
22  argued as a sub rosa plan.
23        The rights of all interested parties
24  in a bankruptcy estate are affected by a plan of
25  reorganization. And courts have protected parties

Page 179

1  from having their rights affected prior to a plan of
2  reorganization by agreements that the debtor enters
3  into not affecting those parties. To some extent
4  this is what I had earlier found was a problem with
5  the originally proposed agreement between the debtors
6  and the pilots. It seemed to me that that originally
7  proposed agreement had the effect of unduly impacting
8  the rights of other parties.
9        Now, in several respects concerns were
10  raised, were raised today primarily by Ms. Levine,
11  about whether this particular proposal would unduly
12  impact the rights of third parties. And in each case
13  the colloquy that followed from those potential
14  problems being pointed out I believe has resolved the
15  potential issue.
16        Perhaps the only question that
17  remained is whether it was appropriate for the debtor
18  to agree with the PBGC not to propose the
19  establishment of a defined benefit plan for five
20  years after termination of the existing plans. And I
21  think what was uncovered in the course of the
22  colloquy is that that was a provision that was
23  essential to secure the benefit of not having PBGC's
24  assertion of a right to have restoration take place.
25  And, moreover, what we've clarified is that is

Page 180

1  something that has a fixed five-year, not ten-year
2  period, and would not prevent the negotiation of such
3  a plan being put into effect at the termination of
4  that five-year period.
5        So with all of those clarifications, I
6  think that the agreement does not unduly affect the
7  rights of third parties not participating in the
8  negotiation of the agreement.
9        That leaves the central question, and
10  the question that involved the vast bulk of the
11  argument, namely, does this agreement violate the
12  collective bargaining agreements, does this agreement
13  violate the Railway Labor Act or Section 1113 of the
14  Bankruptcy Code. Now, in addressing that question, I
15  think it's important to observe that both the
16  Bankruptcy Code and ERISA are very protective of
17  collective bargaining rights. Section 4041 of ERISA,
18  Section 4041(a)(3), prohibits the PBGC from
19  terminating a pension plan at the request of an
20  employer if termination would violate the terms of a
21  collective bargaining agreement.
22        Section 1113 of the Bankruptcy Code
23  does not allow a collective bargaining agreement to
24  be rejected unless the debtor bargains in good faith
25  to obtain modifications that are necessary to permit

Page 181

1  a reorganization, and that despite that good faith
2  negotiation, an agreement for such modification
3  cannot be reached.
4        So plainly a unilateral act by the
5  debtor to terminate a pension plan that's created by
6  a collective bargaining agreement is not possible
7  either under ERISA or under Section 1113 of the
8  Bankruptcy Code. And the obvious public policy that
9  underlies those provisions is the importance of
10  honoring collective bargaining agreements.
11        However, there is a countervailing
12  public policy, and that is in protecting the solvency
13  of the pension benefit guarantee system. Now, most
14  people I think in this room understand the general
15  operation of the pension benefit guarantee system set
16  up under ERISA. But just in case there is someone
17  who doesn't know that or isn't familiar with it, let
18  me just outline it in the very broadest terms.
19        Every sponsor of a defined benefit
20  pension plan, a plan that proposes to pay out in
21  defined terms certain benefits every month, the kind
22  of pension plan that someone can rely on that doesn't
23  depend on how well the investments do, that simply
24  guarantees a certain level of income, those defined
25  benefit pension plans were recognized by Congress

Page 182

1  decades ago to be vulnerable to the failure of the
2  company that sponsors them. If a company goes broke,
3  its promises to pay defined benefits can be
4  worthless, and the employees who were relying on
5  those pension plans can be left with no resources at
6  all.
7      To deal with that problem, Congress
8  passed ERISA. ERISA provides that any sponsor of a
9  defined benefit plan is required to pay an insurance
10  premium to the Pension Benefit Guaranty Corporation,
11  and the Pension Benefit Guaranty Corporation uses
12  those premiums to guarantee payment of pension
13  benefits not at the level defined by the plan, but at
14  a level defined by the statute in the event that a
15  company's plan fails.
16      Now, as Mr. Cohen was arguing earlier,
17  that puts a very grave responsibility on the PBGC.
18  It has to make sure that the money that it collects
19  in premiums from the sponsors of plans will be
20  sufficient to cover its statutory obligation to make
21  benefit payments to the recipients of plans that
22  fail. It has to protect its system to allow it to
23  respond to the needs of people who would otherwise
24  get no pension benefits when their company was unable
25  to pay them.

Page 183

1      That need requires the PBGC at times
2  to seek to terminate a pension plan. Why? Because
3  if the pension plan keeps paying out its benefits
4  while it's not receiving contributions from its
5  company sufficient to meet its obligations, the
6  potential liability of the pension benefit guarantee
7  system can grow greater and greater.
8      As the benefits -- as the assets of
9  the plan are exhausted and no new contributions or
10  inadequate contributions come in, the liability of
11  the PBGC becomes greater and greater. The claim on
12  its limited resources from collecting these insurance
13  premiums becomes greater and greater. And it is a
14  matter of very widespread understanding, something
15  that can be read in the paper virtually any day, that
16  the PBGC faces a very significant shortfall in the
17  funds that it has available to deal with the
18  potential of underfunded pension plans across the
19  country.
20      This role of the PBGC in needing to
21  protect the pension benefit guarantee system from
22  failing plans is reflected in a provision of ERISA
23  that allows the PBGC to itself initiate termination
24  of a plan, this is what's called involuntary
25  termination, even though that plan is covered by a

Page 184

1  collective bargaining agreement. And if PBGC
2  determines to seek involuntary termination of the
3  plan and the plan sponsor does not object, then that
4  plan can be terminated without any court proceeding.
5      The impact of this statutory construct
6  is to place the need of maintaining the solvency of
7  the pension benefit guarantee system ahead of the
8  need to enforce collective bargaining agreements.
9  That's a determination that Congress made. That's
10  not necessarily the interpretation that anyone in
11  this room would have made. The decision they would
12  have made is a policy matter, but that was Congress'
13  determination. Whether this is the right policy or
14  not is something that was determined by Congress.
15  The court's job is to enforce the law as Congress
16  wrote it.
17      Now, as to whether this is the correct
18  interpretation of the law, there really is very
19  little question. This precise issue of whether the
20  PBGC has the right to obtain an involuntary
21  termination of a plan with the consent of the plan
22  sponsor without a prior court ruling was addressed by
23  the Second Court of Appeals in the Jones & Laughlin
24  case that's been referred to several times in the
25  course of the argument today. The formal name of the

Page 185

1  case is In re Jones & Laughlin Hourly Pension Plan,
2  reported at 824 F.2d 197, a 1987 decision of the
3  Second Circuit.
4      That case presented precisely this
5  question. This was a proceeding that arose in the
6  first LTV Steel bankruptcy. The PBGC made a
7  determination after the plan sponsor stopped making
8  minimum funding contributions that there should be an
9  involuntary termination.
10      The union that was affected by that
11  decision objected and said that this could not be
12  done without a court hearing to determine the sorts
13  of things that are covered by Section 1113, one would
14  assume, and the necessity for the involuntary
15  termination. The court, looking at the language that
16  Congress had adopted in ERISA, concluded, and I
17  believe correctly for a number of good reasons, that
18  that was not required. A court hearing was not
19  required, that Congress had given the PBGC the power
20  to effect this termination without a prior court
21  opinion, prior court review, when management had
22  consented. The Jones & Laughlin case has been cited
23  numerous times. Its holding has never been
24  questioned. And I believe it's the correct
25  interpretation of the law that Congress had enacted.

47 (Pages 182 to 185)

Page 186

1      The result then is that the PBGC may
2   terminate a plan in order to protect the pension
3   benefit guarantee system with the consent of the plan
4   sponsor without a court hearing even though that
5   overrides the provisions of a collective bargaining
6   agreement.
7      Now, I was concerned that that could
8   be an unchecked power, that somehow the debtors or
9   the PBGC might be arguing that any time management
10  and the PBGC get together and decide that a pension
11  plan ought to be terminated that the employees are
12  left with no remedy, the unions have no voice, no
13  opportunity to get judicial review of that decision.
14  That's why we had the lengthy discussion that we did
15  have regarding Section 1103 of ERISA.
16      I came upon that section of ERISA by
17  reading the Jones & Laughlin decision of the Second
18  Circuit because the Second Circuit also did not want
19  to be in a position of denying due process.
20      The Second Circuit in that Jones &
21  Laughlin decision recognized that the right of
22  employees to receive the benefits that were defined
23  by their pension plans was an important property
24  right that should not be taken away without due
25  process. But in looking at the various elements that

Page 187

1   defined due process, the court specifically pointed
2   to Section 1303 of Title 29, 4003 of ERISA, for the
3   right that any aggrieved party has to bring the PBGC
4   into court to challenge the propriety of action that
5   the PBGC has taken under the statute. This is
6   critically important here.
7      Brought down to its essentials, many
8   of the parties objecting to the proposed settlement
9   between United and the PBGC are saying that the PBGC
10  is not going to be acting under its statutory power
11  to terminate a pension plan because the continued
12  existence of the plan would threaten the solvency of
13  the pension benefit guarantee system, that this plan
14  would be likely to create losses for the system if it were
15  allowed to continue, but that PBGC is agreeing with
16  the debtor to terminate a plan so that PBGC can
17  augment the solvency of the system by receiving funds
18  that it might otherwise not receive.
19      The information that's been presented
20  to this court would not support that interpretation.
21  But the important thing is that if the agency were to
22  act in an inappropriate way, if it were to take
23  action that's not authorized by the statute in
24  seeking involuntary termination of a pension plan,
25  the agency would be subject to a lawsuit under

Page 188

1   Section 1303 to have its decision reviewed by a
2   court. And if the agency were acting arbitrarily,
3   contrary to its statutory duties, that action could
4   be undone. That's critical here.
5      This settlement does not itself
6   terminate the plan, any plan. This settlement
7   provides that the PBGC will go through its
8   administrative procedures to come to a conclusion as
9   to whether the plans in question here ought to be
10  involuntarily terminated.
11      Now, as Mr. Sprayregen said at the
12  outset, it is the expectation of the debtors that
13  that decision will be in favor of involuntary
14  termination. It would be the expectation of the
15  debtors because the debtors have said for months that
16  they believe that these plans cannot be maintained
17  without generating losses. So PBGC may very well
18  come to the conclusion that the debtors expect. The
19  important thing is that if the unions believe that
20  that is an arbitrary decision not consistent with
21  PBGC's statutory authority, PBGC's action is
22  reviewable in court.
23      What that means for the terms of the
24  settlement that's before this court today is that
25  this settlement does not violate the law. The debtor

Page 189

1   is not unilaterally terminating a pension plan. PBGC
2   is agreeing under this agreement to exercise its
3   statutory obligation to determine whether a pension
4   plan ought to be involuntarily terminated. And PBGC,
5   in exercising that responsibility, will be subject to
6   judicial review, just as United would not be
7   violating Section 1113 had it not talked to the PBGC
8   about the possibility of an involuntary termination.
9   So it did not violate 1113 when it did talk to the
10  PBGC about an involuntary termination. United's
11  talking to the PBGC could not unilaterally terminate
12  a pension plan. Only the PBGC's decision could do
13  that.
14      And there is nothing in the Bankruptcy
15  Code that would prevent a debtor from consulting with
16  a regulatory agency about the proper exercise of its
17  responsibility. And, as I said before and I will say
18  one more time, the agency retains its statutory
19  obligation to exercise its discretion appropriately.
20      Now, does this limit the unions and
21  their employees to the opportunity to challenge any
22  decision that the PBGC might make? No. There are
23  other remedies besides. And in that connection, the
24  actions of the pilots union provides something of a
25  guideline for the sorts of things that can be done.

48 (Pages 186 to 189)

Page 190

1   A plan of reorganization still has to be negotiated.
2   Each of the unions on behalf of their members are
3   going to have claims against the debtors for wages
4   and benefits that had to be surrendered in
5   conjunction with prior agreements and may be
6   surrendered or lost in connection with activities to
7   take place in the future.
8             Each of those unions will have claims
9   that have to be treated in the plan. Each of those
10  unions will have opportunities to engage in further
11  collective bargaining in the future. The debtor has
12  no right to dictate the terms of its plan, no right
13  to dictate future collective bargaining agreements.
14  Those are matters to be determined. And the
15  equitable considerations that would otherwise come to
16  play in both a plan and in future collective
17  bargaining agreements certainly will include the loss
18  of pension benefits that may be accompanied by an
19  involuntary termination.
20            Now, obviously this is a complex
21  matter. But I think the important thing to keep in
22  mind is this: In a bankruptcy proceeding like the
23  one that is taking place here, and, indeed, in almost
24  any bankruptcy proceeding I've ever dealt with, no
25  one ever is able to come out with everything they

Page 191

1   would have had had there not been a bankruptcy. Had
2   this company not been involved in a situation where
3   it could not meet all of its obligations, we wouldn't
4   be in a situation like the one that we're in now.
5             Bankruptcy generally, and in this case
6   in particular, involves choosing the least bad among
7   a number of unfortunate choices. The least bad of
8   the unfortunate choices here has got to be the one
9   that keeps an airline functioning, that keeps people
10  employed, that pays creditors the most they can be
11  paid, and those creditors, again, include the
12  employees in a very major way, as an alternative to
13  what certainly is the worst choice, a shutdown of a
14  company that results in a loss of employment and a
15  loss of benefits and pay and payment of deserving
16  creditors across the board.
17            There is a great deal of work yet to
18  be done to negotiate a fair outcome for all of the
19  parties involved in this bankruptcy case and
20  particularly for the employees who have sustained
21  this enterprise throughout the bankruptcy proceeding.
22  My hope is that this agreement today can be an
23  ingredient that results in that outcome. But that
24  will depend on the choices that are made by any
25  number of parties.

Page 192

1             The decision that I have to make is
2   one that's dictated by the law. As I've just
3   outlined, the legal requirements for approval of this
4   agreement have been met. The agreement will be
5   approved. That leaves completely open what decisions
6   that the parties make not dictated by the law. And
7   my hope is that those decisions will be wise ones.
8             Now, having rendered that decision,
9   I'll enter an order consistent with it. That order
10  is going to have to incorporate all of the provisions
11  that were discussed in colloquy today.
12            And the last order of business will be
13  to discuss what takes place tomorrow in light of this
14  ruling.
15            MR. SPRAYREGEN: Thank you, Your Honor.
16  We'll probably need a little time to address the
17  order, and maybe we can bring it tomorrow prior to
18  the trial. Mr. Dimitrief is going to address the
19  pre-trial issues.
20            THE COURT: Okay.
21            MR. DIMITRIEF: Good afternoon, Your Honor.
22  Alex Dimitrief on behalf of the debtors. In light of
23  the court's ruling, and consistent with the comments
24  that the court just made, as for the trial for
25  tomorrow, we would ask leave to withdraw without

Page 193

1   prejudice our pending 1113(c) motion to reject the
2   AFA contract on the grounds it is no longer necessary
3   to proceed against the AFA. We also believe that the
4   scope of the trial on the pending motions to reject
5   the IAM and AMFA agreements is greatly narrowed so as
6   not to have to address pension issues any longer
7   pending proceeding with the settlement agreement with
8   the PBGC.
9             That, I believe, subject to
10  confirmation from counsel for the IAM and AMFA, not
11  only simplifies the trial, but also simplifies the
12  pre-trial conference because a great number of those
13  motions were primarily directed towards AFA-raised
14  issues. So, for example, Your Honor, the motion that
15  we had for leave to use the bridge report and
16  tentatively designate Mr. Schneling as a witness, we
17  would withdraw that issue at this point. And subject
18  to confirmation by counsel for IMA and AMFA that they
19  do not intend to use any of the evidence that the
20  balance of our motions were addressed to, I believe
21  those can be withdrawn as well. But that would be
22  our position, sir. And we think it does greatly
23  simplify things.
24            I'm prepared, if you would like, to
25  talk about what I would think a schedule would be at

49 (Pages 190 to 193)

Page 194

1  this time, depending on the court's preference.
2      THE COURT: I think it might make more
3  sense for you to consult with counsel for IAM and
4  AMFA and come back to me tomorrow morning because the
5  alternative is for basically a discussion of that
6  sort to take place on the record, and I think that's
7  likely to be less productive.
8      MR. DIMITRIEF: Very well, Your Honor.
9  What time would you like to see us?
10     THE COURT: You can't come -- well...
11     MR. DIMITRIEF: Right now I believe we're
12  scheduled to appear at 2:00.
13     THE COURT: You are. You could come in at
14  1:30. We can get a little bit of a head start that
15  way.
16     MR. DIMITRIEF: Thank you, Your Honor.
17     THE COURT: And I should tell all of the
18  parties that we're only going to have Friday morning.
19  Friday afternoon I've got other obligations that I'm
20  going to have to attend to.
21     MR. DIMITRIEF: Okay. Thank you, Your
22  Honor. I think we will try to meet with counsel for
23  the IAM and counsel for AMFA and try to address the
24  uncertainties or open issues that have been raised by
25  where we stand right now, and hopefully we'll all be

Page 195

1  on the same page tomorrow when we appear at 1:30.
2      THE COURT: Okay. I think that will be all
3  for -- oh, yes, yes. Ms. Williams was able to obtain
4  a larger courtroom for the proceeding tomorrow
5  afternoon. That will be courtroom 1903.
6      THE CLERK: It's the same size as this one.
7      THE COURT: I mean larger than my courtroom
8  on the 7th floor. It will be the same size as this
9  courtroom.
10     Now, we were not able to get an
11  overflow courtroom. So if there are IMA or AMFA
12  members who want to appear for the proceeding
13  tomorrow, you have to realize that there is some
14  chance that you might not be able to get into the
15  courtroom. We really have done everything we can to
16  try to get as many people able to be in a position to
17  hear the proceedings as possible. But tomorrow the
18  best we can do is to get one courtroom of this size.
19     And I think with that, we'll adjourn
20  for the day.
21     MR. DIMITRIEF: Thank you, Your Honor.
22     MR. SPRAYREGEN: Thank you, Your Ho
23     (Which were all the proceedings
        had in the above-entitled cause,
24      May 10, 2005.)
25

Page 196

1  I, GARY SCHNEIDER, CSR, RPR, DO HEREBY CERTIFY THAT
   THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
2  PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE. NOR.



PRINTED DUPLICATE
The original certified E-Transcript
file was electronically signed
using RealLegal technology.

Electronically signed by Jackleen DeFini (201-184-194-7430)    b0ffd064-65c8-4693-bfe6-5e64e9115794

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UAL CORPORATION, et al., | ) | Case No. 02-B-48191 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Eugene R. Wedoff |
| | ) | |
| | ) | |
| | ) | |

**ORDER APPROVING DEBTORS' EMERGENCY MOTION
TO APPROVE AGREEMENT WITH PBGC**

Upon the emergency motion (as amended hereby, the "Motion")[1] by the Debtors

to approve the Agreement with PBGC attached hereto as <u>Exhibit 1</u> (as amended by this Order,

the "Agreement") and incorporated herein; all interested parties having been afforded an

opportunity to be heard with respect to the Motion and all relief related thereto; it appearing that

the relief requested is in the best interests of the Debtors' estates, their creditors and other parties

in interest; it appearing that the relief requested is essential to the continued operation of the

Debtors' businesses; it appearing that this Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2); it appearing that venue is proper in this District pursuant to 28

U.S.C. §§ 1408 and 1409; adequate notice having been given; it appearing that no other notice

need be given; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED THAT:

---

[1]   All capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

1.    The Motion is granted in all respects.  All objections not otherwise resolved or withdrawn are hereby overruled, except to the extent set forth in the Court's statements on the record in open court on May 10, 2005.  The Court's statements on the record in open court on May 10, 2005 are incorporated herein by reference, including, without limitation:

(A)    Under Section 4042 of ERISA, 29 U.S.C. § 1342, PBGC may terminate a pension plan in order to protect the pension benefit guaranty system with the consent of the plan sponsor without a court hearing even though that overrides the provisions of a collective bargaining agreement;

(B)    Aggrieved parties have their rights under Section 4003(f) of ERISA, 29 U.S.C. § 1303(f), to bring actions against PBGC to challenge the propriety of its actions under ERISA (and PBGC reserves its rights in any such action); and

(C)    The Agreement, and United's entry into the Agreement, does not violate the law.

2.    Any findings by the Court herein and conclusions of law stated herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice-versa.

3.    The Agreement is hereby approved.

4.    The terms and conditions enumerated in Exhibit 2 to this Order are hereby incorporated into the Agreement as though set forth herein.  To the extent of any inconsistency between the originally filed Agreement and Motion, on the one hand, and this Order and Exhibit 2, on the other hand, the terms of the Order and Exhibit 2 shall control.

5.    United is authorized to execute and deliver the Agreement and take any and all actions reasonably necessary to consummate the Agreement in all respects, including those actions enumerated in Exhibit 2 to this Order.

2

6.      All parties are authorized to enter into such other documentation as may be reasonably necessary to effectuate the terms of the Agreement, as amended hereby, including the execution and delivery of termination and trusteeship agreements (each, a "Termination Agreement"), the form of which is attached hereto as Exhibit 3, and any and all waivers, releases, discharges, exculpations, or other agreements or documents. United shall provide the Committee with notice of any such supplemental documentation.

7.      Solely to the extent necessary to provide for, document, and effectuate any agreements and understandings between United, PBGC, and any other parties, entered into subsequent to the filing of the Motion and stated on the record before the Court or in the Reply in Support of Debtors' Emergency Motion to Approve Agreement with PBGC, and only as consistent therewith or as may be immaterial to United, PBGC, and/or any other parties in interest, the Agreement may be modified, amended, or supplemented in writing by the parties thereto without further order of the Court. United is authorized to execute all documents and instruments in respect of any further modification, amendment, or supplement.

8.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order and the Agreement.

9.      Any and all computations of or other matters related to time in connection with this Order shall be governed by Bankruptcy Rule 9006. Notwithstanding any provision contained in this Order or the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, (a) the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, (b) all of the provisions of this Order shall be self-executing, and (c) the automatic stay of orders authorizing the sale, use, or lease of property of the estate, to the extent applicable, shall not apply to the Order.

3

Dated: Chicago, Illinois
_____, 2005

**ENTERED**

MAY 1 1 2005

EUGENE R. WEDOFF
BANKRUPTCY JUDGE

_____
THE HONORABLE EUGENE R. WEDOFF
UNITED STATES BANKRUPTCY JUDGE

4

**Exhibit 1**

**Agreement**

IN RE UAL CORPORATION, ET AL. (Case No. 02-B-48191)

Settlement Agreement By and Among UAL Corporation and all Direct and Indirect
Subsidiaries and Pension Benefit Guaranty Corporation

This Settlement Agreement (this "Agreement") is made effective as of the Approval Date
(defined below) by and among UAL Corporation, all of its direct and indirect subsidiaries, and
all members of its "controlled group" as defined under the Employee Retirement Income
Security Act of 1974 (as amended, "ERISA"), and all of its successors and assigns (collectively,
"United"), and Pension Benefit Guaranty Corporation ("PBGC") (United and PBGC each shall
be referred to herein individually as a "Party" and collectively as the "Parties").

WHEREAS, on December 9, 2002, United filed voluntary petitions for relief (the
"Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy
Code") in the United States Bankruptcy Court for the Northern District of Illinois, Eastern
Division (the "Bankruptcy Court"), as Case Numbers 02-B-48191 et. seq. and continue to
operate their business as debtors-in-possession pursuant to Sections 1107 and 1108 of the
Bankruptcy Code;

WHEREAS, the Parties have reached a settlement and compromise (the "Agreement")
with respect to their various disputes and controversies in connection with their defined benefit
pension plans, and this Agreement sets forth the principal terms and conditions under which
United and PBGC will agree to a settlement and compromise of their various disputes in
connection with United's Pilot Plan, the Flight Attendant Plan, the Ground Plan, the
Management, Administrative and Public Contact Employee ("MA&PC") Plan, and the Variable
Plan (collectively, the "Pension Plans"), all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the above recitals and for other good and
valuable consideration, the receipt and adequacy of which are hereby mutually acknowledged,
and intending to be legally bound hereby, the Parties do hereby agree as follows.

1.    Termination of Agreement.  Prior to the Approval Date, the Parties may continue
to explore alternatives to the termination of the Pension Plans, and if the Parties agree, in each of
their respective sole and absolute discretion, to pursue any such alternative, this Agreement will
terminate.

2.    Consideration to PBGC.

a.    United's proposed plan of reorganization (the "POR") shall provide for the
distribution of the following property to PBGC (collectively, the "PBGC
Securities"):

(i)    $500 million 6% Senior Subordinated Notes described more fully
on Exhibit A (the "Senior Notes");

1

(ii)     $500 million 8% Contingent Senior Subordinated Notes described more fully on Exhibit B (the "Contingent Notes").

(iii)    $500 million 2% Convertible Preferred Stock, described more fully on Exhibit C (the "Preferred Stock").

b.     Indenture.   The documentation of the PBGC Securities shall include default and remedy provisions that are customarily found in public market securities and covenants that contain the most beneficial terms contained in any other securities of similar or junior ranking issued under the POR.

3.     Safety Valve.   If, in the Parties' judgment, the provisions of this Agreement relating to the issuance of any of the PBGC Securities, are materially impairing, hindering, or delaying United's ability to obtain exit financing, including any debt or equity based component thereof, the Parties may elect to modify the terms of the PBGC Securities to eliminate any features thereof which relate to, among other things, convertibility into common or preferred stock of reorganized United; provided, however, that the fair economic value of the modified PBGC Securities shall remain the same.

4.     Termination of Pension Plans.   Subject to Paragraph 1:

a.     Flight Attendant and MA&PC Plans.  As soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement (the "Approval Date"), PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant and MA&PC Plans.  If and when PBGC issues Notices of Determination that the Flight Attendant and MA&PC Plans should terminate, then PBGC and United shall execute termination and trusteeship agreements with respect to such Plans;

b.     Ground Plan.  As soon as practicable after the Approval Date, PBGC and United shall execute termination and trusteeship agreements with respect to the Ground Plan;

c.     Pilot Plan.  As soon as practicable after the Approval Date, PBGC and United shall execute termination and trusteeship agreements with respect to the Pilot Plan, with a termination date that is either mutually agreed by the Parties or judicially determined (but in neither event any later than the latest termination date for any of the other Pension Plans); provided, however, that:

(i)     nothing in this subparagraph shall be construed to limit the PBGC's rights to seek its proposed plan termination date of December 30, 2004;

(ii)    nothing in this subparagraph shall require United to act in a manner inconsistent with that certain Letter of Agreement by and between UAL Corp., United Air Lines, Inc., and the Air Line

2

Pilots in the service of United Air Lines, Inc., as represented by the Air Line Pilots Association, International, dated as of January 1, 2005 (the "ALPA LOA"); and

(iii)   PBGC reserves the right to appeal any such judicial determination until there is a final, non-appealable order.

d.   <u>Variable Plan.</u>   The Parties shall cooperate in United's merger of the Variable Plan into the MA&PC Plan effective as of a date that is prior to the termination date of the MA&PC Plan, to the extent permitted by law. If United decides to merge such Plans, and the Parties agree that such merger can proceed in a timely manner, then the amount by which the Variable Plan is overfunded as of the effective date of such merger, as mutually determined by the Parties on a PBGC termination basis (the "Overfunded Amount"), shall be used to reduce on a dollar for dollar basis the face amount of the Senior Notes.

e.   <u>Mutual Cooperation.</u>   If and when a Pension Plan is terminated involuntarily, United and the PBGC will cooperate with each other in connection with the involuntary termination process, including without limitation (and to the extent necessary):

(i)   Seeking Bankruptcy Court authority to the extent required to execute termination and trusteeship agreements with PBGC;

(ii)   Requesting that any order authorizing United's entry into a termination and trusteeship agreement also provide for the termination and discharge of any rights or obligations of the IFS (defined below) in connection with the Pension Plans, including any rights or obligations under the FSA; and

(iii)   Cooperation in any federal court action required to be brought in the event that the Bankruptcy Court does not provide United with such authority to execute such termination and trusteeship agreements.

5.   <u>Termination Date.</u>

a.   <u>Termination Dates.</u>   The termination date for the Pension Plans shall be as follows:

(i)   For the Flight Attendant and MA&PC Plans, five business days after the date of PBGC's Notice of Determination that the Plans should terminate;

(ii)   For the Ground Plan, March 11, 2005; and

(iii)   For the Pilot Plan, as determined pursuant to subparagraph 4(c).

3

    b.   <u>Statutory Trustee and Similar Obligations</u>. As of the date specified in the termination and trusteeship agreement with respect to each Pension Plan:

       (i)   PBGC shall become statutory trustee of each such Pension Plan; and

       (ii)  United shall no longer have any plan administrator, fiduciary, or similar powers, rights, duties, or obligations in connection with such Pension Plan.

    c.   <u>Recapture Rights</u>. PBGC retains whatever rights it has to recapture under ERISA § 4045 any amounts paid to Pension Plan participants (consistent with the terms of the Pension Plan) within the 3 year period prior to the relevant termination date.

6.   <u>Restoration Rights</u>.

    a.   Any defined contribution plan proposed to be provided by United to its employees following termination of the Pension Plans shall be subject to PBGC's consent, such consent not to be unreasonably withheld. To the extent the Parties dispute the reasonableness of PBGC's withholding of its consent, United (and not any other party) shall have the right to request the judicial determination of the reasonableness of such withheld consent in the Chicago federal court as requested by the PBGC (United not to challenge such selection). Such court shall have exclusive jurisdiction to make such a determination. The Parties further agree that such determination shall be final, and both Parties waive their right to appeal or seek reconsideration, modification, or vacatur of such determination by such court.

    b.   Subject to subparagraph 18(d), PBGC shall be deemed to have waived its rights to restore any of the Pension Plans in full or in part, and to cease any activities undertaken to terminate any of the Pension Plans in full or part, pursuant to 29 U.S.C. § 1347 or otherwise:

       (i)   As of the date that the PBGC consents to the proposed defined contribution plans set forth in subparagraph 6(a); and

       (ii)  If PBGC does not consent to the defined contribution plans set forth in subparagraph 6(a), then as of the date that the court determines that PBGC's consent was unreasonably withheld.

    c.   United shall not establish any new ERISA-qualified defined benefit plans for a period of ten (10) years after the Exit Date. United separately has informed PBGC that it will not establish any new non-ERISA-qualified defined benefit plans for the same period of time.

4

7.    Claims Against United.

    a.    Unfunded Liability Claim. Subject to Paragraph 13, United agrees to provide in the POR that PBGC shall have a single prepetition, general, unsecured unfunded liability claim (the "Unfunded Liability Claim") against the United Air Lines, Inc. bankruptcy estate (and not separate, joint and several claims against each United entity) arising from the termination of the Pension Plans, in an amount to be determined under PBGC regulations, taking into account, among other things, the effect of this Agreement (including without limitation the joint and several nature of the PBGC's claims, the value provided to PBGC under the Agreement, and PBGC's waiver of certain of its claims under the Agreement).

    b.    Minimum Funding Claims. PBGC shall be deemed to have settled and released any and all claims on its own behalf or on behalf of the Pension Plans against United arising from or related to any minimum funding obligations, including without limitation, any and all unpaid minimum funding contribution claims, claims for interest and penalties; provided, however, that with respect to its claims for breach of fiduciary duty:

        (i)    Such claims shall be deemed to have been settled and released automatically unless PBGC provides written notice to United, on or before three business days before the date on which a hearing to determine the adequacy of the disclosure statement on the POR is first scheduled to occur, that PBGC intends to reserve the right to pursue such claims, in which case United may in its sole and absolute discretion exercise the right to terminate the Agreement prior to such disclosure statement hearing.

        (ii)    In connection with PBGC's evaluation of whether to pursue such claims for breach of fiduciary duty within the time period set forth above, the Parties shall cooperate with each other to facilitate PBGC's due diligence with respect to such claims for breach of fiduciary duty.

        (iii)    In the event that United does not timely exercise its right to terminate the Agreement in accordance with subparagraph 7(b)(i) and PBGC pursues such claims for breach of fiduciary duty, PBGC shall only enforce such claims against, and limit any recovery on account of such claims to, applicable, actual, and available insurance proceeds.

    c.    Insurance Premiums. PBGC shall be deemed to have settled and released any claims for any PBGC insurance premiums (including without limitation claims for interest and penalties).

5

d.    Waiver of Other Claims.  PBGC shall be deemed to have settled and released any claims against United (other than Unfunded Liability Claims and fiduciary duty claims not released and settled pursuant to subparagraph 7(b)) on its own behalf or on behalf of the Pension Plans relating in any way to United's Pension Plans, as well as any claims against any other entity, based on "controlled group" liability or any other theory, relating in any way to United's Pension Plan obligations or liabilities.

8.    Release of Liens.  PBGC shall be deemed to have fully, finally, and forever released any purported liens against any United entity that exist (or could have been asserted) on or before the effective date of the POR (the "Exit Date") as of such Exit Date.

9.    Termination of Appointment of IFS.

a.    United shall seek to terminate that certain Fiduciary Services Agreement by and between United and Independent Fiduciary Services, Inc. ("IFS") (and accepted by the Department of Labor ("DOL")), dated as of September 3, 2004 (the "FSA") so that such termination is effective (taking into account, among other things any notice requirements) as of the termination date of the respective Pension Plan. PBGC shall support United's termination of the FSA.

b.    United shall seek to terminate that certain Agreement for Appointment of Independent Fiduciary, dated as of August 17, 2004, by and between United and the DOL (the "IFS Appointment Agreement"), so that such termination is effective (taking into account, among other things, any notice requirements) as of the termination date of the Pension Plans. PBGC shall support United's termination of the IFS Appointment Agreement.

10.    PBGC Appeal of ALPA Settlement. PBGC shall be deemed to have dismissed with prejudice its appeal of the order approving the ALPA LOA (the "ALPA Settlement Order").

11.    Setoff Rights. PBGC shall not assert any alleged setoff rights in United's bankruptcy case.

12.    Restructuring Activities and Plan of Reorganization.

a.    PBGC shall affirmatively support, in a manner not inconsistent with this Agreement or the Bankruptcy Code, including, without limitation, Section 1125 of the Bankruptcy Code, United's restructuring activities and positions in the Chapter 11 Cases and the POR in connection with the implementation of this Agreement and related initiatives. Nothing herein shall limit or impair PBGC in the exercise of its fiduciary duties in its capacity as a member of the Official Committee of Unsecured Creditors.

6

Nothing herein shall limit or impair PBGC's rights to object to the claims of other creditors.

b.  If the Bankruptcy Court confirms a POR that does not provide for the terms of the Agreement, or if a POR containing the terms of the Agreement does not become effective, then Paragraphs 7 (other than the settlement and release of fiduciary duty claims, if such settlement and release already has occurred pursuant to the terms of subparagraph 7(b)(i)), 8, 11, 13, and 14 shall be null and void.

13.  Release and/or Assignment of Claims.  At United's option, PBGC shall assign 45% of the distribution that it receives or is to receive on account of its claims in the Chapter 11 Cases as directed in writing by United.

14.  PBGC's Professional Fees and Expenses.  On the Exit Date, United shall reimburse PBGC for its outside professionals' fees and actual out of pocket expenses incurred in connection with the Chapter 11 Cases, but in no event more than $7 million.

15.  Conditions Precedent. The effectiveness of the Agreement shall be subject to Bankruptcy Court approval (which the Parties shall use commercially reasonable efforts to obtain); provided, however, that judicial approval of the Agreement shall otherwise have the same meaning and effect as the judicial approval of the 2003 amendments to United's collective bargaining agreements entered on April 30, 2003.

16.  Conditions Subsequent.  The effectiveness of the Agreement shall be subject to the occurrence of the following conditions subsequent prior to the date on which a hearing to confirm the POR is first scheduled to occur:

a.  Termination of all of the Pension Plans pursuant to Title IV of ERISA;

b.  PBGC's waiver of its restoration and cessation rights set forth in Paragraph 6.

c.  United having determined, in its sole and absolute discretion, and in good faith, that its liability on account of the following claims has been resolved to United's satisfaction (through release, waiver, discharge, exculpation, court order, agreement, or otherwise):

(i)  any and all claims arising from or related to any minimum funding obligations, including without limitation, any and all unpaid minimum funding contribution claims, claims for interest, penalties, and/or excise taxes, and fiduciary duty claims; and

(ii)  any and all claims (other than Unfunded Liability Claims) relating in any way to United's Pension Plans, as well as any claims against any other entity, based on "controlled group" liability or any other

7

theory, relating in any way to United's Pension Plan obligations or liabilities.

d.   United having determined, in its sole and absolute discretion, and in good faith, that the rights of the parties (including without limitation any alleged liability of United) under that certain Stipulation and Agreed Order Under Fed. R. Bankr. P. 9019 Approving the Settlement of Controversy Between the Debtors and the United States of America (the "Setoff Stipulation") has been resolved to its satisfaction.

e.   Termination of the FSA and the IFS Appointment Agreement in accordance with the Agreement (subject to United's right to waive such condition subsequent).

f.   The ALPA Settlement Order becoming an order no longer subject to appeal, reconsideration, or modification (subject to United's right to waive such condition subsequent).

17.   **Further Assurances.** From time to time, as and when requested by either Party hereto, the other Party hereto shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions (subject to any limitations set forth in this Agreement), as such other Party may reasonably deem necessary or desirable to consummate the transactions contemplated by this Agreement, all at the sole cost and expense of the requesting Party, including without limitation ensuring the occurrence of all conditions subsequent to the Agreement.

18.   **Disputes.**

a.   **No Litigation.** Except as otherwise provided herein, each Party hereto agrees that it shall not commence or proceed with any litigation against the other Party or take any action inconsistent with the terms of the Agreement.

b.   **Jurisdiction Over Disputes.** All disputes arising between the Parties under the Agreement, or any document entered pursuant hereto shall, prior to the issuance of a final decree from the Bankruptcy Court closing the Chapter 11 Cases, be resolved by the United States Bankruptcy Court for the Northern District of Illinois which has exclusive jurisdiction over such disputes; *provided, however,* that each Party reserves its rights with respect to which is the proper court to adjudicate an involuntary complaint to terminate a Pension Plan.

c.   **Termination Notice.** This Agreement may be terminated by either Party, on written notice, upon the occurrence of any material breach of the other Party's obligations under this Agreement, or of any failure of any condition under this Agreement, unless such breach or failure of condition is cured to the reasonable satisfaction of the other Party within ten (10)

8

days of such notice. In the event of such termination, this Agreement shall become null and void in its entirety, and the Parties shall thereafter be governed by the status quo ante without regard to this Agreement.

d.    Additional Remedies. In addition to other remedies otherwise available to PBGC under this Agreement, upon United's material breach of this Agreement, then PBGC, on written notice, may declare such breach under the Agreement, and unless such breach is cured to the reasonable satisfaction of PBGC within ten (10) days of such notice, then PBGC's waiver of rights in subparagraph 6(b) shall be null and void, and PBGC can again assert its rights under 29 U.S.C. § 1347.

19.    Miscellaneous.

a.    Authority.    Subject to Bankruptcy Court approval in United's Chapter 11 case, United represents that it has the authority to enter into this Agreement and to enter into the transactions contemplated thereby.

b.    Waiver.    Except with respect to the requirement for court approval or judicial determination, each Party may waive in writing the benefit of the other Party's compliance with any particular provision of this Agreement. No waiver by a Party with respect to any breach or default or of any right or remedy and no course of dealing or performance, will be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver is expressed in writing signed by the Party to be bound. Failure of a Party to exercise any right will not be deemed a waiver of such right or rights in the future.

c.    Non-Severability.    Each of the terms of this Agreement are a material and integral part hereof. Should any provision of this Agreement be held unenforceable or contrary to law, the entire Agreement shall be deemed null and void.

d.    Notices.    Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given upon the earlier of receipt or (i) three (3) business days after deposit in the United States mail, registered or certified mail, postage prepaid, return receipt requested, (ii) one (1) business day after deposit with Federal Express or similar overnight courier, or (iii) same day if delivered by hand, and addressed as provided in Exhibit D attached hereto or such other address as either party may, from time to time, specify in writing to the other.

e.    Governing Law.    Federal law shall govern this agreement, and to the extent applicable and not inconsistent therewith, the law of the State of Illinois shall apply.

9

K&E 10282843.11

f.    **Amendments.** The Parties may amend or modify this Agreement in a writing executed by both Parties.

g.    **Counterparts.** This Agreement may be executed in one or more counterparts, each of which together or separately shall constitute an original and when taken together, shall be considered one and the same binding agreement.

h.    **Business Day.** As used herein, the term "Business Day" means any calendar day other than a Saturday, Sunday, or any nationally recognized holiday or other day on which the Office of the Clerk of the Bankruptcy Court shall be closed.

i.    **Acceptance of Facsimile Signatures.** Delivery of an executed signature page of this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

\*    \*    \*    \*    \*    \*    \*

(signature pages to follow)

10

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

UNITED AIR LINES, INC.

By: Its Duly Authorized Agent

Name: _____

Title: _____

Dated: _____

PENSION BENEFIT GUARANTY CORPORATION

By: Its Duly Authorized Agent

Name: *Bradly Bell*

Title: *Executive Director*

Dated: *April 22, 2005*

11

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

UNITED AIR LINES, INC.

By: Its Duly Authorized Agent

Name: _____

Title: <u>Chief Financial Officer</u>

Dated: <u>April 22, 2005</u>

PENSION BENEFIT GUARANTY CORPORATION

By: Its Duly Authorized Agent

Name: _____

Title: _____

Dated: _____

11

## EXHIBIT A

Senior Subordinated Notes

| | |
|---|---|
| **Issuer:** | Reorganized UAL Corp. |
| **Guarantor:** | United Air Lines, Inc. |
| **Issue:** | 6% Senior Subordinated Notes (the "Senior Notes") to be issued no later than the Exit Date (the "Issuance Date") |
| **Initial Holder:** | Pension Benefit Guaranty Corporation |
| **Principal Amount:** | $500,000,000 in denominations of $1,000 (subject to potential reductions set forth in the Agreement) |
| **Term:** | 25 years from the Issuance Date |
| **Amortization:** | None prior to maturity; full principal to be repaid at the maturity date |
| **Interest Rate** | Interest shall be payable with in-kind notes or common stock on a semi-annual basis in arrears through 2011; thereafter, interest shall be paid in cash in arrears on a semi-annual basis. Notwithstanding the foregoing, the interest rate on the Senior Subordinated Convertible Notes (the "Pilot Notes") provided to the pilots under the ALPA LOA shall not be more than the interest rate on the Senior Notes. |
| **Security:** | None |
| **Ranking:** | Pari passu with all current and future UAL Corp. or United Air Lines, Inc. senior unsecured debt; senior to all current and future subordinated debt; senior to any notes contemplated to be issued to any labor groups under a POR (including without limitation the Pilot Notes). |
| **Transferability:** | The Notes shall not contain any transfer restrictions |
| **Call Rights:** | Callable at 100% of par at any time |
| **Mandatory Prepayments:** | Mandatory prepayment at par upon a "fundamental change"; no prepayment obligations for mergers in which the Issuer is the surviving entity |
| **Other Terms and Conditions:** | The documentation of the Notes shall include such other terms and conditions as are customarily found in public market securities |

K&E 10282843.11

## EXHIBIT B

Contingent Senior Subordinated Notes

| | |
|---|---|
| **Issuer:** | Reorganized UAL Corp. |
| **Guarantor:** | United Air Lines, Inc. |
| **Issue:** | 8% Contingent Senior Subordinated Notes (the "Contingent Notes") to be issued no later than 45 days following the end of any given fiscal year in which there is a Trigger Date (each, an "Issuance Date") |
| **Initial Holder:** | Pension Benefit Guaranty Corporation |
| **Principal Amount:** | Up to eight (8) tranches of $62,500,000 each, in denominations of $1,000 |
| **Term:** | Each tranche shall mature 15 years from its respective Trigger Date. |
| **Amortization:** | None prior to maturity; full principal to be repaid at the maturity date |
| **Interest Rate** | Interest shall accrue beginning on the Trigger Date and shall be paid in cash on a semi-annual basis in arrears following Issuance. |
| **Conditions to Issuance:** | Contingent Notes will be issued on the Issuance Date following any fiscal year, starting with the fiscal year ending December 31, 2009 and ending with the fiscal year ending December 31, 2017, in which there is a Trigger Date. |

"Trigger Date" is any Measuring Date where the following condition to Issuance is met: LTM EBITDAR exceeds $3.5 billion; provided, however, that (w) no more than two tranches of Contingent Notes may be issued upon any Issuance Date; (x) no more than eight tranches of Contingent Notes may be issued in total; (y) United shall not agree to provisions in the documentation of such securities existing at the time that explicitly prohibit the issuance of the Contingent Notes; and (z) if the issuance of additional Contingent Notes would cause a default under documentation of any securities existing at the time, then United shall issue Common Stock having a value of $62.5 million to PBGC in lieu of each tranche of Contingent Notes that otherwise would be issued.

A "Measuring Date" occurs on the following dates: June 30 and December 31.

| | |
|---|---|
| **Security:** | None |

13

K&E 10282843.11

| | |
|---|---|
| **Ranking:** | Pari passu with all current and future UAL Corp. or United Air Lines, Inc. senior unsecured debt; senior to all current and future subordinated debt; senior to any notes contemplated to be issued to any labor groups under a POR (including without limitation the Pilot Notes). |
| **Transferability:** | The Contingent Notes shall not contain any transfer restrictions |
| **Call Rights:** | Callable at 100% of par at any time |
| **Mandatory Prepayments:** | Once issued, mandatory prepayment at par upon a "fundamental change"; no prepayment obligations for mergers in which the Issuer is the surviving entity |
| **Other Terms and Conditions:** | Once issued, the documentation of the Contingent Notes shall include such other terms and conditions as are customarily found in public market securities |

14

## EXHIBIT C

**Convertible Preferred Stock**

| | |
|---|---|
| **Issuer:** | Reorganized UAL Corp. |
| **Guarantor:** | United Air Lines, Inc. |
| **Issue:** | Convertible Preferred Stock (the "Preferred Stock") to be issued no later than the Exit Date (the "Issuance Date") |
| **Initial Holder:** | Pension Benefit Guaranty Corporation |
| **Shares:** | 5,000,000 |
| **Liquidation Preference:** | $100 per share (the "Issue Price"), plus the sum of all accrued and unpaid dividends |
| **Term:** | 15 years from the Issuance Date |
| **Conversion:** | Convertible into common stock of Reorganized UAL Corp. at a conversion price ("Conversion Price") equal to 125% of the average of the closing prices of the Common Stock during the first 60 days following the Exit Date. |
| **Dividends** | 2% annual coupon shall be paid in-kind on a semi-annual basis in arrears |
| **Optional Conversion:** | The Holder may convert shares of Preferred Stock at any time after the 2nd anniversary of the Issuance Date |
| **Security** | None |
| **Ranking** | Pari passu with all current and future UAL Corp. or United Air Lines, Inc. preferred stock; subordinated to all current and future debt obligations; senior to all current and future classes of common stock |
| **Transferability:** | The preferred stock shall be non-transferable for a period of two years following the Issuance Date |
| **Optional Redemption:** | Redeemable at any time at the Issuer's option at 100% of Liquidation Preference, subject to a 45 day notice period during which time the Holder shall have the right to convert |
| **Mandatory Redemption:** | Mandatory redemption upon a "fundamental change"; no mandatory redemption obligations for mergers in which the Issuer is the surviving entity |
| **Anti-Dilution Protections:** | The Conversion Price will be subject to customary anti-dilution adjustments, including upon (i) stock or extraordinary dividends, (ii) reclassifications, subdivisions or combinations of the Common Stock, (iii) the issuance of rights or warrants to all holders of Common Stock convertible into or exercisable for Common Stock at less than the then-current market price, (iv) |

15

|                          | distribution of the capital stock of an Issuer subsidiary to holders of the Common Stock and (v) any other distributions of assets by the Issuer to holders of the Common Stock |
|--------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **Voting Rights:**       | None prior to conversion; upon conversion, the Common Stock shall have voting rights no less than any other class of common stock. |
| **Other Terms and Conditions:** | The documentation of the Preferred Stock shall include such other terms and conditions as are customarily found in public market securities |

16

<u>**EXHIBIT D**</u>

(Notice Addresses)

If to the Company:    United Air Lines, Inc.
1200 East Algonquin Road
Elk Grove Township, Illinois 60007
Attention:  Paul Lovejoy
Facsimile: 847-700-4099

with copies to:    Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
Attention:  James H.M. Sprayregen
Facsimile: 312-861-2200

If to PBGC    PENSION BENEFIT GUARANTY CORPORATION
Office of the Chief Counsel
1200 K Street, NW, Suite 340
Attention:  Jeffrey B. Cohen
Facsimile: 202-326-4112

with copies to:    Kelley Drye & Warren LLP
333 West Wacker Drive
Chicago, Illinois  60606
Attention:  Christopher T. Sheean
Facsimile:  312-857-7095

and

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attention:  Merrill B. Stone
Facsimile:  (212) 808-7897

17

K&E 10282843.11

**Exhibit 2**

**Additional Terms and Conditions**

## Additional Terms and Conditions

1.      PBGC's obligation to support United's restructuring activities in

Paragraph 12 of the Agreement is restated as follows: PBGC will support and seek approval of

the Agreement, and take every reasonable action necessary to obtain judicial approval of the

Agreement in United's bankruptcy case including the filing of motions, objections, and appeals;

this obligation is consistent with ALPA's obligation under Paragraph 14(c) of the January, 2005

Letter of Agreement between ALPA and United (the "ALPA LOA") approved by this Court.

2.      United will not waive any condition subsequent in Paragraph 16 of the

Agreement without consulting with the Committee and providing five (5) business days advance

notice of the waiver to the Rule 2002 service list parties.

3.      United's direction of PBGC's assignment of 45% of its unfunded benefit

liability claim shall be consistent with the best interests of general unsecured creditors, shall be

subject to at least ten (10) business days prior notice to the Committee, shall have been made

after consultation with the Committee, and shall be subject to Bankruptcy Court approval after

notice to the Rule 2002 service list parties and hearing under the best interest of creditors' test in

a *de novo* review; failing United's direction otherwise consistent with the foregoing, United shall

direct distribution to the unsecured creditor body.

4.      United shall also consult with the Committee as the documents reflecting

and evidencing the securities are negotiated with PBGC.

5.      Nothing contained in the Order shall be deemed to limit, interfere with or

waive the rights of the Aircraft Trustees or any holders for whom they act or any other parties in

interest or creditors to object to the size, allowance, or calculation (including without limitation

formulae or PBGC regulations as to the appropriate method of calculation) of the unfunded

benefit liability claims of the PBGC or to object to the terms of any plan of reorganization in this

i

case based upon the feasibility of the plan, the creditworthiness of the debtor, best interests test, unfair discrimination among creditors, inappropriate impact on other creditors or any other grounds available under applicable law, and all such rights are preserved.

   6. United's direction of PBGC's assignment of 45% of its unfunded benefit liability claim shall be consistent with applicable law including the provisions of the Bankruptcy Code and shall be subject to ten (10) business days prior notice to the Aircraft Trustees. United shall consult with the Aircraft Trustees as the documents reflecting and evidencing the securities are negotiated with PBGC.

   7. United and PBGC have confirmed on the record that the Agreement in no way affects United's obligation to ALPA under the ALPA LOA to provide the interest rate for the pilot notes as set forth in the ALPA LOA.

   8. United and PBGC have confirmed on the record that United is required to provide the pilots with the C Plan established under the ALPA LOA irrespective of the Agreement between United and PBGC. United also has acknowledged on the record that it will implement the Agreement with PBGC in a manner consistent with the ALPA LOA, including United's obligations to provide the pilot C Plan contribution under paragraph 5 of the ALPA LOA.

   9. PBGC and United have confirmed on the record that nothing in any of the foregoing in any way prevents PBGC and United from complying with the PBGC Agreement. Moreover, nothing affects PBGC's regulatory rights. United also reserves its rights with respect to the ranking issue described below. PBGC confirmed on the record that its position is under the language that "nothing affects PBGC's regulatory rights," PBGC is neither consenting to, or

ii

not consenting to, the pilot C plan at this time, and that each of the ALPA LOA and the PBGC

Agreement and the clarifications on the record speak for themselves.

10.     Contingent notes, to the extent issued to PBGC under the Agreement, will

be *pari passu* with the ALPA Notes, without prejudice to ALPA's position that the ALPA LOA

only permits indebtedness for new, borrowed money under a plan of reorganization to rank

senior to the pilot notes.

11.     With respect to each employee group, the Agreement's prohibition on

defined benefit pension plans is reduced from 10 years to 5 years, provided, however, that this

prohibition does not preclude negotiations of such plans becoming effective at the end of the 5

year period. The Internal Revenue Code § 415 excess plan arrangement under the ALPA LOA is

carved out from application of 5 year prohibition on defined benefit pension plans.

12.     Execution of the trusteeship agreement with respect to the Pilot Plan will

occur only after conclusion of the currently pending Pilot Plan involuntary termination litigation

resulting in plan termination.

13.     Nothing in the Agreement or any Termination Agreement shall affect the

termination provisions of either: (i) United's August 17, 2004 agreement with the Department of

Labor (the "DOL Agreement") or (ii) the September 3, 2004 Fiduciary Services Agreement (the

"FSA") with Independent Fiduciary Services, Inc. ("IFS").

14.     United will comply with the DOL Agreement and FSA before terminating

IFS.

15.     Judicial approval of the Agreement shall otherwise have the same meaning

and effect as the judicial approval of the 2003 amendments to United's CBA's entered on

April 30, 2003.

iii

16.    PBGC is party to the Agreement in its capacity as a government corporation formed under 29 U.S.C. § 1302, and no other governmental unit is a party to the Agreement.  As such, notwithstanding anything else to the contrary, no governmental unit other than PBGC shall be bound by the Agreement and the Agreement shall not impair any claim of any governmental unit other than PBGC.

**Exhibit 3**

**Termination Agreement**

FORM OF
AGREEMENT FOR APPOINTMENT OF
TRUSTEE AND TERMINATION OF PLAN

This is an agreement between the Pension Benefit Guaranty Corporation ("PBGC") and United Air Lines, Inc. ("United").

<u>RECITALS</u>

A.     PBGC is a United States government agency established by Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461 ("ERISA").

B.     United, the principal subsidiary of UAL Corporation, is a corporation organized under the laws of Delaware, with its principal place of business located in Elk Grove Village, Illinois.

C.     Effective _____, ____ the predecessor to United established the [name of retirement plan] to provide retirement benefits for certain of its employees. [That plan was amended and restated on _____, __, ____.] Effective as of the ____ Restatement Date, the Plan was amended, restated, renamed and continued as the United Airlines Ground Employees' Retirement Plan ("Plan").

D.     At all relevant times, United has been the contributing sponsor of the Plan within the meaning of 29 U.S.C. § 1301(a)(13).

E.     The Plan is an employee pension benefit plan to which 29 U.S.C. § 1321(a) applies and is not exempt under 29 U.S.C. § 1321(b). The Plan is therefore covered by Title IV of ERISA.

F.     United is and at all relevant times has been the Plan administrator within the meaning of 29 U.S.C. §§ 1002(16) and 1301(a)(1).

G.     PBGC has issued to the Plan administrator a Notice of Determination under 29 U.S.C. §§ 1342(a)(1) and (4) that the Plan must be terminated because the plan sponsor has not met the minimum funding standard required under section 412 of the Internal Revenue Code

and because the possible long-run loss of the corporation with respect to the Plan may reasonably be expected to increase unreasonably if the Plan is not terminated. Further, PBGC has determined that the Plan should be terminated in order to avoid any unreasonable increase in the liability of the fund. 29 U.S.C. § 1342(c).

       H.     On or before March 11, 2005, PBGC had caused notices to be placed in USA Today and major daily newspapers in each of the areas in which United operates a hub announcing that PBGC had determined the Plan should be terminated with a plan termination date of March 11, 2005. Therefore, on that date, participants and beneficiaries of the Plan had notice that the Plan would not continue.

      **NOW THEREFORE, the parties agree:**

    1.     The Plan is terminated under 29 U.S.C. § 1342(c).

    2.     The Plan termination date is March 11, 2005, under 29 U.S.C. § 1348.

    3.     PBGC is appointed trustee of the Plan under 29 U.S.C. § 1342(c).

    4.     United and any other person having possession or control of any records, assets or other property of the Plan shall convey and deliver to PBGC such records, assets or property.

    5.     PBGC will have, with respect to the Plan, all of the rights and powers of a trustee specified in ERISA and otherwise granted by law.

      The persons signing this agreement are authorized to do so. The agreement will take effect on the date the last person signs below.

                        United Air Lines, Inc.

Dated: _____          By: _____


                        PENSION BENEFIT GUARANTY CORPORATION

Dated: _____            By: _____

# EXHIBIT F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re )<br><br>UAL CORPORATION, et al. )<br><br>Debtors )<br>)<br>) | Chapter 11<br><br>Case No. 02-B-48191<br>(Jointly Administered)<br><br>Hon. Eugene R. Wedoff |

**NOTICE OF APPEAL OF ASSOCIATION OF FLIGHT ATTENDANTS-CWA,
AFL-CIO, FROM THE ORDER APPROVING DEBTORS'
EMERGENCY MOTION TO APPROVE AGREEMENT WITH PBGC**
[Docket No. 11229]

The Association of Flight Attendants-CWA, AFL-CIO ("AFA"), hereby appeals under 28

U.S.C. § 158(a) from the Order Approving Debtors' Emergency Motion to Approve Agreement with

PBGC, entered by Judge Eugene R. Wedoff on May 11, 2005. See attached Order.

The names of all parties to the order appealed from and the names, addresses, and telephone

numbers of their respective attorneys are as follows:

**APPELLANT:**

Association of Flight Attendants-CWA,
AFL-CIO

Robert S. Clayman
Carmen R. Parcelli
Mathew E. Babcock
Guerrieri, Edmond, Clayman & Bartos, P.C.
1625 Massachusetts Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 624-7400 (tel)
(202) 624-7420 (fax)

**APPELLEE:**

United Air Lines, Inc., et al.                    James H.M. Sprayregen, P.C.
                                                  Marc Kieselstein, P.C.
                                                  David R. Seligman
                                                  Marc J. Carmel
                                                  Jeffrey W. Gettleman
                                                  Kirkland & Ellis, LLP
                                                  200 East Randolph Drive
                                                  Chicago, IL 60601
                                                  (312) 861-2000 (tel)
                                                  (312) 861-2200 (fax)


                                                  Respectfully submitted,


                                                  Robert S. Clayman (admitted pro hac vice)
                                                  Carmen R. Parcelli (admitted pro hac vice)
                                                  Matthew E. Babcock (admitted pro hac vice)
                                                  GUERRIERI, EDMOND, CLAYMAN &
                                                  BARTOS, P.C.
                                                  1625 Massachusetts Avenue, N.W.
                                                  Suite 700
                                                  Washington, D.C. 20036-2243
                                                  Telephone: (202) 624-7400

                                                  Counsel for Association of Flight Attendants-
                                                  CWA, AFL-CIO


Dated: May 18, 2005

## CERTIFICATE OF SERVICE

I, Carmen R. Parcelli, hereby certify that on this 18th day of May, 2005, true copies of the foregoing **Notice of Appeal of Association of Flight Attendants-CWA, AFL-CIO, From the Order Approving Debtors' Emergency Order to Approve Agreement with PBGC** were served via overnight delivery on the attached Core Group Service List and via electronic mail or facsimile on the Updated 2002 Service List. Pursuant to Section C.3.i(1) of the Second Amended Notice, Case Management and Administrative Procedures in this proceeding, service lists have been filed with the Court. In accordance with Rules 9014 and 7004, a true copy of the foregoing Notice was served by first-class mail on Frederic Brace, an Officer of United.

Carmen R. Parcelli

# EXHIBIT
# G

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) |
| UAL CORPORATION, et al. | ) Chapter 11 |
| | ) |
| Debtors. | ) Case No. 02-B-48191 |
| | ) (Jointly Administered) |
| | ) |
| | ) Hon. Eugene R. Wedoff |
| | ) |
| | ) Hearing Date:   TBD |
| | ) |

### NOTICE OF MOTION (Docket No. 11338)

TO:   Parties Listed in Certificate of Service Filed with the Court.

PLEASE TAKE NOTICE that on a date to be determined, we shall appear before the Honorable Eugene R. Wedoff, or any judge sitting in his stead, at the United States Bankruptcy Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois, 60603, and then and there present the **Emergency Motion for a Stay Pending Appeal of the Association of Flight Attendants-CWA, AFL-CIO, from the Order Approving the Debtors' Emergency Motion to Approve Agreement with PBGC**, a copy of which is attached hereto and hereby served upon you.

Respectfully submitted,

Robert S. Clayman (admitted pro hac vice)
Carmen R. Parcelli (admitted pro hac vice)
Matthew E. Babcock (admitted pro hac vice)
GUERRIERI, EDMOND, CLAYMAN &
BARTOS, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036-2243
Telephone: (202) 624-7400

Counsel for Association of Flight Attendants-CWA,
AFL-CIO

Dated: May 20, 2005

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| UAL CORPORATION, et al. | ) |  |
|  | ) | Case No. 02-B-48191 |
| Debtors | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Hon. Eugene R. Wedoff |
|  | ) |  |
|  | ) | Hearing Date: TBD |

**EMERGENCY MOTION FOR A STAY PENDING APPEAL OF ASSOCIATION OF
FLIGHT ATTENDANTS-CWA, AFL-CIO, FROM THE ORDER APPROVING
DEBTORS' EMERGENCY MOTION TO APPROVE AGREEMENT WITH PBGC**
[Docket No. 11338]

Pursuant to Bankruptcy Rule 8005, the Association of Flight Attendants-CWA, AFL-CIO

("AFA"), hereby moves for a stay pending appeal of the Court's Order Approving Debtors'

Emergency Motion to Approve Agreement with PBGC, entered on May 11, 2005. The Court's May

11 Order approved a settlement agreement ("Agreement") whereby United Airlines is to pay the

Pension Benefit Guaranty Corporation ("PBGC") $1.5 billion in securities in exchange for the

government agency's termination of all of the Company's defined benefit plans, including the Flight

Attendant Plan, and the settlement of other litigation. AFA has appealed the Court's Order.

A stay of the Order pending appeal is warranted. There is a substantial likelihood that AFA

will succeed on the merits of its appeal based upon several independent grounds for reversing the

Court's Order.

- The Court failed to apply Seventh Circuit precedent holding that two
parties cannot enter a settlement agreement that extinguishes the
rights of a third party to that litigation.

- Contrary to both the undisputed facts and the law, the Court concluded that United was not unilaterally modifying the terms of AFA's collective bargaining agreement by entering the Agreement with PBGC.

- The Agreement subverts the Section 1113 process by effectively ending negotiations under that provision and depriving AFA of the judicial review of contract modifications afforded under the Code.

- The Court erred in permitting United to initiate an end-run around the contract bar of ERISA Section 4041.

- The provision of the Agreement barring establishment of a defined benefit plan for five years constitutes a patent violation of AFA's bargaining rights under the Railway Labor Act.

AFA also satisfies the other requirements for a stay. Absent a stay, Flight Attendants will suffer irreparable injury as they make life-altering decisions, which cannot be undone, based upon the termination of their pension benefits. In contrast, United will not suffer any significant harm from a stay. In addition, the intense public interest in the ultimate outcome of the pension issues raised by this case militates in favor of a stay. The public interest in promoting collective bargaining, as embodied in the Nation's labor laws, will also be served by a stay.

## PROCEDURAL AND FACTUAL BACKGROUND

On January 8, 2005, AFA and United reached a tentative agreement, providing the Company with $130 million in additional annual savings between 2005 and 2010 ("2005-2010 Agreement"). In a side letter to the 2005-2010 Agreement, AFA and United agreed to "continue to meet and confer regarding the Defined Benefit Plan." AFA Hearing Exh. 1, at Exh. 3.[1] That letter further provided

---

[1]    Through stipulation with Debtors, AFA introduced at the May 10, 2005 hearing on United's Agreement with PBGC exhibits identified in the List of Exhibits of the Association of Flight Attendants-CWA, AFL-CIO, for the Hearing on Motion to Approve PBGC Agreement, filed with the Court on May 10, 2005.

-2-

that, if the parties were unable to reach agreement on the pension issue by April 11, United would re-file its Section 1113(c) motion with respect to the pension issue. <u>See</u> AFA Hearing Exh. 2, at ¶ 5.

In late January, even before the 2005-2010 Agreement was ratified, AFA initiated discussions with PBGC, seeking to enlist the agency in its effort to find alternative funding for the Flight Attendant Plan and avoid termination. PBGC has consistently maintained that the Flight Attendant Plan was "affordable" and could be "retained in a successful reorganization." PBGC's Obj. Debtors' 1113(c) Mot. (filed Jan. 4, 2005) at 20. According to PBGC's expert, Michael Kramer, "[u]nder the Gershwin 5.0F projections, the Company has sufficient liquidity and free cash flow to support at least one of the Pension Plans currently in place, namely the F[light] A[ttendant] plan, even without application for any waivers." AFA Hearing Exh. 3, at ¶ 8. At a January 27, 2005 meeting with AFA, PBGC indicated that it was willing to explore a wide range of options to plan termination. <u>See</u> AFA Hearing Exh. 2, at ¶ 7.

At the same time, AFA attempted, largely in vain, to engage the Company in negotiations over alternatives to plan termination. As the Company itself recognized, the purpose of the three-month hiatus from litigation was to negotiate over "termination alternatives." AFA Hearing Exh. 1, at Exh. 9. Indeed, the Company told AFA that it "remain[ed] willing to consider any termination alternatives." <u>Id.</u> Despite its professed openness to alternatives, the Company demonstrated very little real willingness to engage in meaningful negotiations with the AFA about saving the Flight Attendant Plan. <u>See</u> AFA's Supp. Obj. (filed Apr. 29, 2005) at 11-14. PBGC, on the other hand, throughout this period, encouraged AFA's efforts to find alternative funding. During February and

-3-

March, AFA regularly consulted with PBGC, as the Union developed a proposal that identified sufficient alternative funding to save the Flight Attendant Plan. See id.

AFA outlined its proposal in a March 30 letter to Bradley Belt, the Executive Director of PBGC. See AFA Hearing Exh. 2, at ¶ 16 and Exh. 4. In his April 4 reply, Belt characterized AFA's proposal as "constructive" and reiterated the agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11." Id., at ¶ 17 and Exh. 6. Mr. Belt added that: "Based upon available information, we continue to believe that the interests of participants and the pension insurance program would best be served by the continuance of the AFA plan." Id. In closing, he encouraged further work between the agency and AFA to resolve the pension funding issue. See id.

On April 11, United re-filed its Section 1113 motion, seeking authority to reject the contractual bar to a distress termination contained in AFA's CBA. On the same date, the Company filed a motion for distress termination of the Flight Attendant Plan pursuant to ERISA Section 4041. Shortly thereafter on April 14, United issued the notice of its intent to terminate the Flight Attendant Plan, as required under ERISA Section 4041(c). That notice set a termination date of June 30, 2005 for the Plan.

Then, on April 22 in open court, United announced that it had reached an agreement with PBGC, which would result in the termination of all four defined benefit plans. The Company's press release stated that "the company and the [PBGC] have reached an agreement for the agency to terminate all of United's defined benefit pension plans." AFA Hearing Exh.10 (UAL Responds to PBGC Announcement of Agreement on Termination of United's Pension Plans). Likewise, in PBGC's April 22 press release, Executive Director Belt hailed the "'reaching [of] a settlement,'"

-4-

"[u]nder the terms [of which] . . . the PBGC would terminate and become trustee of the company's four pension plans." AFA Hearing Exh. 9 (PBGC Reaches Pension Settlement with United Airlines).

United filed an emergency motion to approve the settlement with PBGC on April 26. As stated in that motion, the immediate consequence of the Agreement was that it would do away with the "need" for further Section 1113 negotiations and the hearing under Section 1113 and ERISA Section 4041. See Debtors' Emergency Mot. Approve Agreem't PBGC (filed Apr. 26, 2005) ("Debtors' Mot.") at 14-15. The Company further asserted that "[i]f United did not enter into the Agreement, it would have to run the risks associated with litigating a sharply contested ERISA Section 4041 sponsor-initiated distress termination of all four Pension Plans, together with the Section 1113(c) trial." Id. at 18.

On April 29, United made a presentation to the Official Committee of Unsecured Creditors ("OCUC") regarding the settlement with PBGC. According to United, "[u]nder the terms of the settlement, the PBGC agreed to . . . [t]erminate and 'takeover' all of United's defined benefit pension plans." AFA Hearing Exh. 11, at Slide 2. The presentation also specified that "10-14 Days after May 10 hearing, PBGC issues notice of determination that AFA & MAPC plans should terminate." Id., at Slide 8. United also identified avoidance of the "[p]ension termination trial" and "[s]ignificantly narrow[ing] scope of 1113 trial" as "Key Takeaways" of the Agreement. Id., at Slide 9.

On May 2, the Court entered a stipulated order, whereby United preserved its right to move for a voluntary distress termination of its defined benefit plans on an emergency basis, should the

Court not approve the Agreement with PBGC. Through the Stipulated Order, PBGC likewise reserved all its rights to oppose such a motion.

During the May 5 deposition of PBGC expert Michael Kramer, he was asked what had changed between his December 28, 2004 declaration and the present to lead PBGC to conclude that the Flight Attendant Plan should be terminated. Mr. Kramer responded:

> I think what has changed in terms of the overall situation is there is a negotiated settlement that has been reached between the PBGC and the Company with respect to all the issues between the two, that the PBGC is comfortable and which it believes is acceptable to enter into.

AFA Hearing Exh. 4, at 117.

On May 11, the Court entered an order approving the Agreement between United and PBGC. Pursuant to the Agreement, United is to provide three tranches of securities with a total value of $1.5 billion, ($500 million of which is contingent on certain conditions subsequent), to PBGC in exchange for PBGC terminating the four pension plans and settling certain other claims. See Order Approving Debtors' Emergency Mot. Approve Agreem't PBGC (entered May 11, 2005) ("Approval Order"), at Exh. 1. By the terms of the Agreement, PBGC agrees that "[a]s soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement . . . PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant and MA&PC Plans." Id., Exh. 1 at ¶ 4(a). The Agreement also provides that United shall not establish any new ERISA-qualified defined benefit plans for a period of five years after its Exit Date from bankruptcy. Id., Exh. at § 6(c) and Exh. 2 at § 11.

AFA filed its notice of appeal on May 18, and intends to file a motion for expedited treatment of its appeal in the district court. On May 20, AFA filed a complaint against PBGC in the United States District Court for the District of Columbia, including a request for a preliminary

injunction against PBGC's termination of the Flight Attendant Plan in violation of ERISA.  This action is consistent with the Bankruptcy Court's Order, which provides that the litigants who opposed termination could still pursue claims against PBGC under Section 4003 of ERISA.

## ARGUMENT

In considering whether to grant a stay pending appeal under Bankruptcy Rule 8005, courts consider the following four factors:  (1) whether the appellant is likely to succeed on the merits of the appeal; (2) whether the appellant will suffer irreparable injury absent a stay; (3) whether a stay would substantially harm other parties to the litigation; and (4) whether the stay is in the public interest.  Matter of Forty-Eight Insulations, Inc., 115 F.3d 1294, 1300 (7th Cir. 1997).  Once a threshold showing on the first two factors is made, the Court then balances all four factors to determine whether a stay is supported.  Id.  Each factor need not be given equal weight, but rather should be used as a guide.  See Hilton v. Braunskill, 481 U.S. 770, 777 (1987) (the "stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules.").  Stays pending bankruptcy appeals often assume added importance because continued proceedings in reliance on a court order in some circumstances may moot an appeal, thus preventing any effective appellate review.  In re Edgewater Walk Apartments, Nos. 93C3612, 92B22023, 1993 WL 226427, at *2 (N.D. Ill. June 24, 1993).

## I.    THERE IS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON APPEAL.

In the context of a stay pending appeal, the movant must "demonstrate a substantial showing of likelihood of success."  Matter of Forty-Eight Insulations, 115 F.3d at 1301.  This means that movant "must raise 'serious questions going to the merits.'"  Id.  In this case, even this high standard is amply satisfied.

-7-

A.    **The Court Failed to Address the Argument That Two Parties Cannot Enter an Agreement to Extinguish the Legal Rights of Another Party in On-Going Litigation.**

As the record before the Court plainly showed, the Company intended through its Agreement with PBGC to settle on-going litigation over United's pension plans, both under Section 1113(c) and the distress termination provision of ERISA.  In fact, in a brief to this Court in favor of the Agreement, United stated unequivocally that the Agreement would settle litigation over the "contested ERISA Section 4041 sponsor-initiated distress termination of all four Pension Plans, together with the Section 1113(c) trial . . . over termination of the plans."  Debtors' Mot., at 18.  Debtors also acknowledged that the parties to the litigation were "PBGC, AFA, AMFA, IAM, and the retired pilots."  Id.  Moreover, in its reply memorandum, United touted the benefits to the estate of avoiding the pending pension litigation through the settlement agreement:

> A trial on 1113(c) and distress termination would be highly complex and occur against a backdrop of a tense, emotionally charged atmosphere.  Although United believes it would prevail, it would likely face the prospect of continuing appeals and, hence, uncertainty in its plan and exit process.  Thus, taking into consideration the expense and uncertainties of continuing to litigate, the benefits to United's estates, and the value of the PBGC Securities, the Agreement clearly is in the estates's best interests and should be approved.

Omnibus Reply Supp. Debtors' Mot. Approve Agreem't PBGC (filed May 9, 2005) ("Debtors' Reply"), at 30.  Thus, United extolled the benefits of settling on-going litigation involving AFA and others through agreement with only a single party to that litigation.

Seventh Circuit precedent provides, however, that "two parties cannot agree to extinguish the claim of a third party not in privity with either of them."  Fogel v. Zell, 221 F.3d 955, 964 (7th Cir. 2000).  As the Seventh Circuit recognizes, it is tempting for two parties to bargain away the legal rights of a third party:

-8-

> If A has a claim against B, it is easy to see why B would like to have a settlement that resolved not only its dispute with A but its dispute with C as well, and it is easy to see why A would be delighted to agree to such a provision since by making the settlement more valuable to B the provision would enable A to get a larger settlement . . .

Id. Notwithstanding the obvious advantages to parties A and B, a bankruptcy court cannot approve an agreement that compromises the legal rights of C, even under the liberal standard of Bankruptcy Code Section 363. Id. Indeed, a court-approved settlement agreement "is not to be used as a device by which A and B, the parties to the [agreement], can (just because a judge is willing to give the parties' deal a judicial imprimatur) take away the legal rights of C, a non-party." United States v. Bd. of Educ. of City of Chicago, 11 F.3d 668, 673 (7th Cir. 1993).

Debtors attempted to escape the clear mandate of binding precedent by contending that the rule stated in Fogel v. Zell is limited to the "unique facts" of the case. Debtors' Reply, at 25. During oral argument, however, the Court indicated disagreement with United's attempt to narrow the scope of Fogel v. Zell, stating: "The underlying proposition that two parties can't agree between themselves to eliminate the rights of a third party is one that I think has considerable validity . . ." Transcript of May 10, 2005 Hearing ("Tr."), at 161.

Nevertheless, in its ruling, the Court failed to explain how United could agree with one party to resolve litigation involving other parties consistent with the principle of Fogel v. Zell. This failure constitutes plain error in the face of binding Seventh Circuit precedent on this issue. Moreover, the deprivation of legal rights effected by the Court's approval of the settlement agreement could not have been more stark or immediate. In fact, within minutes of the Court's ruling, it was determined that the Section 1113(c) and ERISA Section 4041 trial on pension issues, scheduled to commence the very next day, would no longer proceed. Thus, the settlement agreement

between United and PBGC brought to a close the litigation in which United was required to demonstrate that termination of its pension plans was critical to its successful reorganization. In this way, AFA was deprived entirely of its legal rights in litigation to which it was a party.

**B.    The Court Erroneously Concluded That United Was Not Unilaterally Modifying AFA's Collective Bargaining Agreement Through Agreement With a Third Party.**

Both Bankruptcy Code Section 1113(f) and the Railway Labor Act ("RLA") forbid United from unilaterally altering the terms of its existing collective bargaining agreements ("CBAs") without exhausting required statutory procedures. Section 1113(f) provides that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." The words "no provision of this title" include Section 363, the Code provision through which United sought approval of its settlement agreement. The plain language of the Bankruptcy Code must be given effect. United Airlines, Inc. v. U.S. Bank N.A., ___ F.3d ___, No. 05-1871, 2005 WL 1083790, at *2 (7th Cir. May 6, 2005). Section 363 cannot trump Section 1113. Similarly, the RLA unambiguously precludes unilateral alteration of contract provisions prior to exhaustion of statutory procedures. 45 U.S.C. § 156 ("rates of pay, rules, or working conditions shall not be altered by the carrier"); see also 45 U.S.C. § 152, First ("[i]t shall be the duty of all carriers . . . to exert every reasonable effort to make and maintain agreements").

The Court ruled, however, that United "did not violate 1113 when it did talk to the PBGC about involuntary termination. United's talking to the PBGC could not unilaterally terminate a pension plan. Only the PBGC's decision could do that." Tr. at 189. This ruling is contrary both to the facts and the law.

The facts demonstrate that United did considerably more than simply talk to PBGC about terminating the Company's pension plans. In fact, United entered an Agreement that provides for payment of $1.5 billion in securities in exchange for termination of the plans. To assert that PBGC is simply acting on its own to terminate the Flight Attendants Plan and the MAPC Plan (as the agency did earlier in seeking to terminate the Pilots Plan and the Union Ground Plan) ignores the reality of the bargain struck between the parties. Indeed, if PBGC is simply acting on its own, there is no reason for United to give any consideration for PBGC's termination of the plans, and the language in the Agreement requiring termination is mere surplusage. As United's own statements in its briefs to the Court and presentations to the OCUC make plain, however, it is providing valuable consideration in exchange for plan termination. Debtors' Mot., at 14-15, 18; Debtors' Reply, at 30; AFA Hearing Exhs. 11 and 13. In so doing, United is acting in concert with another party in violation of both Section 1113(f) and the RLA.

There can be no doubt that United's entry into an Agreement requiring termination of the Flight Attendant Plan constitutes unilateral action in violation of Section 1113(f). In American Flint Glass Workers Union v. Anchor Resolution Corp., the Third Circuit held that a debtor's entry into an agreement with a third party impairing employee rights under a CBA constitutes a unilateral modification in violation of Section 1113(f). 197 F.3d 76 (3d Cir. 1999). In that case, debtor assumed its CBAs and then assigned them pursuant to a sale of substantially all its assets to a purchaser. As part of the asset purchase agreement, however, debtor did not provide for assignment of certain supplemental wage payments under the CBAs. The court of appeals held that such an assignment was not only invalid under Section 365(k) of the Bankruptcy Code, but also ran afoul of Section 1113(f). The court held that "when as here a debtor in possession . . . binds itself

-11-

contractually to obtain a change in the legal relations created by a CBA as a condition precedent to

closing a sale of substantially all of the debtor's assets, that constitutes an attempt to effect an

alteration of the CBA. That being so, [debtor] was required to comply with the procedures set out

in Code § 1113 -- and it did not."[2]  Id. at 81-82. The Third Circuit's holding is equally applicable

in this case, where Debtors have made a change to employee rights under their CBAs a condition

for consummation of a settlement agreement with a third party. Entry into such an agreement

constitutes unilateral action in violation of Section 1113(f).

It is also clear under the RLA that a carrier cannot enlist the assistance of third parties in

order to accomplish acts otherwise forbidden by its labor contracts. Indeed, judicial efforts "to give

practical meaning to the status quo requirement [of the RLA] would be circumvented if carriers

could use third parties to alter the collective bargaining agreement while the dispute was ongoing."

Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co., 210 F.3d 18, 28 (1st Cir. 2000). Thus,

courts have held that a carrier cannot contract with an independent company to carry out changes

that its unions protest. See, e.g., St. Louis S.W. Ry. v. Bhd. of R.R. Signalman, 665 F.2d 987, 995

(10th Cir. 1981). These general principles apply with equal force here. United may not through

contract with a third party circumvent its RLA obligation to maintain the status quo as embodied in

_____

[2]      In so ruling, the Third Circuit rejected lower court rulings that debtor did not
unilaterally modify the CBAs because the agreement merely contemplated the waiver of the union's
contractual rights as a condition for closing the sale. In re Anchor Resolution Corp., 231 B.R. 559,
565 (D. Del. 1999). Thus, according to the lower courts, any modification of the CBAs was only
the result of the unions' acquiescence to the modification in a subsequent agreement with the
purchaser. The court of appeals rejected this view of events. Instead, the court focused on the
reality of the situation created by debtor's entry into the asset purchase agreement, and found that
the agreement left the unions with a "Hobson's choice between two evils: save the members' jobs
minus the retroactive wages, or don't save the jobs at all." Am. Flint Glass Workers Union, 197 F.3d
at 82. Accordingly, under Section 1113(f), debtor remained responsible for initiating through
contract with a third party alteration of the unions' CBAs.

its labor agreements. Instead, such an attempt to skirt its bargaining obligations gives rise to a major

dispute under the RLA.

    **C.**    **The Agreement Subverts the Section 1113 Process, and For That Reason Cannot Stand.**

    In this case, United initiated the Section 1113 process, as it was required to do, in order to

obtain its proposed termination of the Flight Attendant Plan. But for United's Agreement with

PBGC, the Section 1113 process would have run its course. As a result of the Agreement, however,

United abandoned the process, having obtained the contract modification sought from AFA through

the Agreement with PBGC. This subversion of the Section 1113 process is unlawful, as it strips

AFA of the protections that Congress put in place when it enacted Section 1113. Section 1113 has

two essential purposes: (1) to ensure that a debtor negotiates in good faith with its unions over

proposed modifications to its CBAs; and (2) to provide unions with judicial review of proposed

contract modifications under the heightened Section 1113 standard. See 11 U.S.C. § 1113(b)-(d).

But for the Agreement with PBGC, the purposes of Section 1113 would have been fulfilled in this

case.

    With the Agreement, the Company jettisoned the Section 1113 negotiations altogether. In

making termination of the Flight Attendant Plan a fait accompli, the Agreement rendered further

negotiations to avoid termination a futile and pointless exercise. The Company's professed

willingness to continue negotiating with AFA was a transparent pretense. Having come to an

agreement with PBGC to terminate the Flight Attendant Plan, United had absolutely no incentive

to reach an agreement with AFA providing otherwise. Under such circumstances, there could be

no "honest purpose to arrive at an agreement as the result of the bargaining process," as Section

1113 requires. In re Walway Co., 69 B.R. 967, 973 (Bankr. E.D. Mich 1987); see also In re Blue

Diamond Coal Co., 131 B.R. 633, 646 (Bankr. E.D. Tenn 1991); In re Lady H Coal Co., 193 B.R.

233, 242 (Bankr. S.D. W. Va. 1996).

Not only did United's action halt the negotiation process with AFA, but it allowed PBGC to

come to the table and bargain in AFA's stead.  In fact, United engaged in negotiations with PBGC

over the very same pension terms contained in the Company's bargaining proposal to AFA, i.e.

termination of the Flight Attendant Plan.  United did so despite its statement to the Court in an

earlier stage of these proceedings that PBGC could not supplant the position of its unions in the

Section 1113 process.  In fact, in support of its agreement with the Pilots' union, the Company

asserted that PBGC, by holding out the threat of plan restoration, "would supplant the exclusive

bargaining position of each union, mandating that the PBGC ultimately approve every union

settlement, and undermine the entire Section 1113 process."  Debtors' Mot. Approve ALPA

Agreem't (filed Dec. 17, 2004), at 25.  In other words, United understands that the Section 1113

process requires it to treat with its unions over pensions, not PBGC, but nevertheless chose to do

otherwise.

The second principal purpose of Section 1113 -- judicial review under the heightened Section

1113 standard -- was also nullified by the Agreement.  In enacting Section 1113, Congress

purposefully rejected a business judgment standard in favor of the more stringent legal standard of

Section 1113.  See In re Century Brass Prods., Inc., 795 F.2d 265, 271-73 (2d Cir. 1986).  Through

its Agreement with PBGC, however, United was able to obtain under Section 363's business

judgment standard relief to which it should have been entitled only after meeting the substantially

higher standard of Section 1113.  As part of the heightened Section 1113 standard, a court must

scrutinize both United's conduct during negotiations and the necessity and fairness of the Company's

-14-

proposed contract modifications. As a result of the Agreement, United's conduct in negotiations with AFA over the Flight Attendant Plan received no judicial scrutiny. In addition, the necessity and fairness of termination of the Flight Attendant Plan was never tested. In a Section 1113 trial, United would have been required to show that it could not successfully reorganize unless the Flight Attendant Plan were terminated. Instead of making this required showing, United argued under Section 363 that "affordability [of its pension plans] is not a relevant inquiry for approval of the Agreement." Debtors' Reply, at 42.

In addition to the protection afforded by judicial review, a Section 1113 trial itself acts as an aid to reaching a consensual resolution. Often, it is only when a trial looms and parties are confronted directly with the risks inherent in any litigation that a consensual agreement is finally reached. In fact, the Section 1113 proceedings to date in this case have demonstrated that consensual agreements are most likely to be reached on the courthouse steps. Plainly, Congress intended the Section 1113 trial to spur the negotiation process in precisely this manner, as the Section specifically requires that the parties continue to negotiate up until the commencement of the trial. 11 U.S.C. § 1113(b)(2). But for United's Agreement with PBGC, AFA would have been afforded this benefit of the Section 1113 process as well. Instead, the union was deprived of the most fruitful period in negotiations, as United sought to free itself of the risks inherent in Section 1113 litigation through its Agreement with PBGC.

**D.     The Court Erred in Permitting United to Evade Through Agreement with PBGC the Contract Bar of ERISA Section 4041.**

As the Court stated in its ruling, "Section 4041 of ERISA . . . prohibits the PBGC from terminating a pension plan at the request of an employer if termination would violate the terms of a collective bargaining agreement." Tr. at 180. Yet, that is precisely what United has done here.

-15-

United has initiated termination of the Flight Attendant Plan. The terms of the Agreement leave no doubt on this point. The consideration exchanged between the parties, specifically the $1.5 billion in securities, requires PBGC to "initiate termination [of the Flight Attendant Plan] under [Section 4042,] 29 U.S.C. § 1342." Approval Order, Exh. 1 at 4(a). As discussed above, to contend that this is not the effect of the settlement, and that PBGC is merely doing what it could otherwise do under ERISA, is to reduce this central provision of the Agreement to mere surplusage. Simply put, but for the actions of United, PBGC would not have begun the termination process. The parties' invocation of Section 4042 as a basis for PBGC's action does not change that fact. As the PBGC admitted at oral argument, the Agreement and the consideration provided by United thereunder is the trigger for PBGC's initiation of the termination process under Section 4042. Tr. at 62. PBGC does not contend that, in the absence of the Agreement, it would nevertheless initiate the termination process with respect to the Flight Attendant Plan. Simply stated, in actuality the Agreement constitutes an employer-initiated termination under ERISA.

Because the plan termination at issue here is at the behest of an employer, ERISA's contract bar applies. As United itself has recognized, there are only two ways to remove the contract bar, "either [by] obtain[ing] the consent of the . . . union(s) . . . or [by] secur[ing] an order authorizing rejection of the CBA pursuant to Section 1113 of the Bankruptcy Code." Debtors' Mem. Supp. § 1113(c) Mot. (filed Dec. 14, 2004), at 40. United has done neither. It is undisputed that United has not obtained court authorization to remove the contract bar. Indeed, according to United one of the principal purposes of the Agreement was to avoid "the risks associated with litigating a sharply contested ERISA Section 4041 sponsor-initiated distress termination . . . together with the Section 1113(c) trial." Debtors' Mot. at 18. Nor has United obtained the consent of AFA to remove the

-16-

contract bar.  Again, as United recognizes, absent a court order, it "must . . . obtain the consent of

the . . . union" to remove the contract bar.  Debtors' Mem. Supp. § 1113(c) Mot. (filed Dec. 14,

2004), at 40.  Therefore, the Agreement violates ERISA's contract bar.

The Court relied on the Second Circuit's Jones & Laughlin case to reach a contrary

conclusion.  In re Jones & Laughlin Hourly Pension Plan, 824 F.2d 197 (2d Cir. 1987).  That

reliance was misplaced.  In Jones & Laughlin, "PBGC informed [the employer] of its intention to

terminate the plans."  Id. at 198.  Thereafter, the employer assented to PBGC's move to terminate

and the district court approved a consent order for termination.  Id.  The employer did not provide

PBGC with any consideration for the initiation of termination in Jones & Laughlin.  In other words,

the Jones & Laughlin case addresses issues arising from an ordinary PBGC-initiated termination,

in which the employer has no role prior to PBGC's decision to terminate.  The circumstances of this

case could not be more different.  In fact, the circumstances of this case are so different that the

termination effected here is properly characterized as an employer-initiated termination, to which

the ERISA contract bar applies unless and until lawfully removed.

### E. The Agreement Approved Violates the Railway Labor Act by Precluding Establishment of a Defined Benefit Plan Beyond the Amendable Date of the AFA Collective Bargaining Agreement.

The Agreement as approved prohibits United from establishing any new ERISA-qualified

defined benefit plans for a period of five years after the "Exit Date", which is defined as the effective

date of a bankruptcy plan of reorganization.  Approval Order, Exh. 1 at ¶¶ 6(c), 8 and Exh. 2 at ¶

11.  This five-year period will exceed the amendable date for the AFA-United CBA, when new

terms of employment for Flight Attendants can take effect.  Thus, United through its Agreement

with PBGC is attempting to strip AFA of its right to bargain for a defined benefit plan in the future.

An agreement between two parties to impair the bargaining rights of a third is patently unlawful under the RLA. United's willingness to enter such an agreement gives further testament to the Company's utter disregard for the protections afforded to AFA under labor law.

The amendable date for the current AFA-United CBA is January 7, 2010. The amendable date "is the date before which no changes [to the contract] can be made." EEOC v. United Air Lines, Inc., 755 F.2d 94, 99 (7th Cir. 1985). The CBA carefully defines the amendable date and the course of negotiations prior to that date, in order for contract modifications to go into effect as soon as possible following the amendable date.[3] United's Agreement with PBGC prohibits establishment of any new defined benefit for five years from the Company's exit date from bankruptcy. United currently predicts an exit date no earlier than the fall of 2005. Thus, under the terms of United's Agreement with PBGC, AFA will be prevented from bargaining for the commencement of a defined benefit plan during a period of at least nine months beyond the amendable date of its CBA.

Two Seventh Circuit decisions make plain that United's Agreement to deny bargaining rights to AFA violates the RLA. In ALPA v. UAL Corp., 874 F.2d 439 (7th Cir. 1989), United and the IAM entered into a collective bargaining agreement that limited the ability of ALPA to negotiate

---

[3]    The AFA-United CBA provides:

The 2005-2010 Flight Attendant Agreement shall continue in full force and effect through January 7, 2010, and shall thereafter renew itself yearly without change each January 7th unless written notice of intended change is served in accordance with Title 1, Section 6 of the Railway Labor Act by either party 270 days prior to January 7, 2010 or January 7th of any year thereafter. If such notice is served, negotiations will commence no more than 30 days after service. If a new tentative agreement is not reached by August 7, 2009 (or any August 7 thereafter, if applicable), the parties will jointly invoke the mediation services of the National Mediation Board under Section 5 of the Act.

-18-

a buyout of the airline. Specifically, the agreement dictated how shares in any proposed ESOP would be allocated among all employee groups in the event of a buyout. United had not bargained with any other employee groups about that agreement, and ALPA sued the Company to enjoin its implementation. The Seventh Circuit held that by negotiating an agreement with one union that "affect[ed] the terms of the pilots' employment without giving their union a chance to bargain collectively over the change," United had violated Section 2, First of the Act. 874 F.2d at 445.

Similarly, in Illinois Central Railroad Co. v. BLE, 443 F.2d 136 (7th Cir. 1971), one union sought to negotiate exclusively with the employer over matters that were also directly within the ambit of another organization representing employees of the railroad. The Court held that because the second union had a "bargainable interest" in the issues involved, the attempt to exclude that union from negotiations violated the RLA. The parties were ordered to give the second union "the right to participate in the negotiations" at issue. Id. at 144.

The Court's ruling on the five-year provision failed to address the RLA breach inherent in the provision. According to the Court, the provision "was essential to secure the benefit of not having PBGC's assertion of a right to have restoration [of the terminated plans] take place." Tr. at 179. Further, the Court found that because the moratorium on institution of a new plan was reduced from ten years, as specified in the original Agreement, to five years "the agreement does not unduly affect the rights of third parties not participating in the negotiation of the agreement." Id. at 180. Whether the provision was "essential" for United to secure a waiver of PBGC's restoration rights, however, is immaterial, because the Company has no legal authority to unilaterally modify AFA's CBA or to trade AFA's bargaining rights in order to obtain consideration from PBGC. Moreover, because the provision does impair AFA's bargaining rights, it is simply unlawful under the RLA as

-19-

set forth in binding Seventh Circuit precedent. Due to the unlawful five-year provision, as well as the numerous other legal defects in the Agreement, United's deal with PBGC cannot withstand appellate scrutiny and AFA will likely succeed in its appeal.

II.    **APPELLANT WILL SUFFER IRREPARABLE INJURY ABSENT A STAY, WHICH IS ALSO NEEDED TO PRESERVE THE STATUS QUO UNDER THE RLA.**

The termination of the Flight Attendant Plan as required under the terms of the Agreement will lead to irreparable injury. First, such injury will result because Flight Attendants will make decisions regarding whether to continue their employment with United on the basis of the benefits available to them upon termination and replacement of the Plan, as opposed to the benefits available under their current Plan. After reversal on appeal of the Court's decision, it will not be possible to reverse the effects of these decisions. Second, United's creation of a major dispute under the RLA provides grounds for a stay even without the customary showing of irreparable harm.

Absent a stay, Flight Attendants will make decisions regarding whether or not to resign based upon the plan termination effected by United's Agreement. Some Flight Attendants will find it in their best interests to leave United, considering the substantial diminution in their overall compensation represented by termination and replacement of their pension plan. See Attachment A hereto, Declaration of Gregory Davidowitch (dated May 18, 2005) ("Davidowitch Decl."), at ¶¶ 2-4. In fact, on average, Flight Attendants will see a 50% reduction in their pension benefits as a result of termination and replacement of their Plan. Id., at 2; see also Second Declaration of David Feinstein (filed Apr. 29, 2005), at ¶ 8. Having made the choice to resign, however, these Flight Attendants could not simply return to their former status upon reversal of the Court's decision on appeal. First, they will have forfeited their United seniority through voluntary resignation. Reversal of that decision and restoration of seniority status, even if permitted, would prejudice the interests

-20-

of other Flight Attendants who will have moved up in seniority rank in the interim to positions at domiciles different from those where they are currently based. Davidowitch Decl. ¶ 4. "It is clear that in a meritorious labor controversy the courts often grant preliminary injunctive relief to avoid the potential later problems of 'unscrambling eggs'." IAM v. Trans World Airlines, Inc., 601 F. Supp. 1363, 1372 (W.D. Mo. 1985); see also Local 553 v. Eastern Air Lines, Inc., 695 F.2d 668, 678 (2d Cir. 1982) (irreparable injury due to "ripple effect" of employer action throughout seniority system); Tech., Office, & Professional Workers Union v. Budd Co., 345 F. Supp. 42, 45 (E.D. Pa. 1972) (irreparable injury due to "domino effect" of employer action throughout seniority system).

Second, the decision to resign involves many significant life choices that cannot be reversed easily, if at all. Those leaving a position often choose to move from their current home. In fact, it is often necessary to relocate in order to pursue other work opportunities. Davidowitch Decl., at ¶ 4. Obviously, if a person sells their home, that is not a transaction which can be undone. Such "tremendous disruption in their personal lives and the personal lives of their families" is "the type of harm which is irreparable." Id. at 46. Thus, Flight Attendants will suffer irreparable injury because they will make life-altering decisions on the basis of the Court's Order, which cannot be undone upon reversal of the Order on appeal.

Although the irreparable injury here absent a stay is real and immediate, a stay is also necessary to preserve the status quo requirement of the RLA, which does not require a showing of irreparable harm. As demonstrated above, United's unilateral alteration of its CBAs through entering the Agreement triggers a major dispute under the RLA. In such circumstances a court may issue an injunction "without the customary showing of irreparable injury." Consol. Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 303 (1989); see also United Air Lines v. IAM, 243 F.3d 349,

-21-

362 (7th Cir. 2001) ("If either side unilaterally alters the status quo during the bargaining and mediation process, a court may issue an injunction to put a stop to that party's illegal self-help and to restore the status quo, and it may do so even without the traditional showing of irreparable injury to the other party."). This is so because the RLA itself requires maintenance of the status quo until the employer and union have exhausted the legal processes under the Act. 45 U.S.C. § 156. Thus, where as in this case, appellant has a substantial likelihood of establishing on appeal that a major dispute exists, a stay should issue in furtherance of the status quo requirement of the RLA.

## III.    A STAY WILL NOT RESULT IN ANY SUBSTANTIAL HARM TO UNITED.

In contrast to the irreparable harm to Flight Attendants absent a stay, United's interests would not be harmed in any significant way upon issuance of a stay. Since the fall of 2004, United has ceased making minimum funding payments to the Flight Attendant Plan, asserting that it was not obligated to do so under law during the course of these proceedings. Thus, there will be no immediate drain on the resources of the estate as a result of the stay, as United has already ceased making pension payments.

As for any argument that a stay would delay progress in these proceedings, the impact on United of restoring a terminated Flight Attendant Plan following reversal of the Court's order on appeal would cause far greater disruption to United's reorganization than a stay. In addition, United could mitigate any impact of delay resulting from a stay by joining with AFA to request expedited consideration of the appeal.

-22-

IV.    THE PUBLIC INTEREST IN THE SECURITY OF THE PRIVATE PENSION
       SYSTEM AND HEALTHY LABOR-MANAGEMENT RELATIONS WEIGHS
       HEAVILY IN FAVOR OF A STAY.

The resolution of AFA's appeal will have a substantial impact on the public interest. For this reason also, entry of a stay is warranted. A stay is in the public interest for two primary reasons. First, the issues regarding the security of private pension benefits raised by this case have tremendous public import.   Both the intense media coverage of the Court's decision and Congressional involvement in and reaction to the decision bear witness to the keen public interest in judicial review of the pension issues raised by this case. Second, a stay will further the public policy interests manifested in federal labor law.

The Court's approval of the Agreement between United and PBGC effectuates the largest pension plan default in United States history.   There are very real concerns that United's unprecedented move to cast off an estimated $9.5 billion in pension liabilities through the Agreement with PBGC will have ripple effects throughout the airline industry and beyond. As set forth in the Memorandum of Amici Curiae Members of Congress in Opposition to Approval of Debtors' Agreement with PBGC, "if one company enters bankruptcy and manages to shed all of its pension liabilities onto the PBGC, its competitors will be under intense pressure to follow suit, leading to further plan terminations and the further deterioration of the defined benefit pension system." Amici Curiae Mem. (filed May 9, 2005), at 5. To forestall such further deterioration, a bill was introduced in Congress to impose a six-month moratorium on pension plan transfers to PBGC in the wake of the Court's decision.  H.R. 2327, 109th Cong. (May 12, 2005).  The bill currently has thirty-eight co-sponsors in the United States House of Representatives.   The moratorium would allow Congress time to work on legislation to address the security of private

-23-

pension plans. <u>See</u> Press Release from Congressman George Miller, dated May 13, 2005, ("Moratorium Intended to Give Congress Time to Sort Out Pension Mess"). A stay of the Court's order pending appellate review would also serve the public interest in forestalling a run on the Nation's pension insurance system that would jeopardize the retirement security of vast numbers of working Americans.

A stay will further the public policy interests embodied in the Nation's labor laws as well. Congress' stated purpose in the RLA is to "provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions" in order to "avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C. § 151a. The specific public policy goals of the RLA reflect the broader federal labor policy enunciated in the Norris-LaGuardia Act. That Act provides:

> It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

29 U.S.C. § 151. A stay will further these policy goals by allowing resumption of the collective bargaining process that was prematurely halted when United struck its deal with PBGC. As federal labor policy recognizes, frustration of the collective bargaining process leads to labor-management tensions that pose a significant threat to the interests of the Nation as a whole.

Respectfully submitted,

Robert S. Clayman (admitted pro hac vice)
Carmen R. Parcelli (admitted pro hac vice)
Matthew E. Babcock (admitted pro hac vice)
GUERRIERI, EDMOND, CLAYMAN &
BARTOS, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036-2243
Telephone: (202) 624-7400
Counsel for Association of Flight Attendants-CWA,
AFL-CIO

Dated: May 20, 2005

-25-

# ATTACHMENT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) |
| UAL CORPORATION, et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Case No. 02-B-48191 |
| | ) (Jointly Administered) |
| | ) |
| | ) Hon. Eugene R. Wedoff |
| | ) |

## DECLARATION OF GREGORY DAVIDOWITCH

Gregory Davidowitch hereby declares, in accordance with 28 U.S.C. § 1746, as follows:

1.    Since July 1, 2002, I have served as the President of the Master Executive Council ("MEC") for the Association of Flight Attendants-Communications Workers of America, AFL-CIO ("AFA"), at United Airlines ("United" or the "Company").  The MEC is composed of the presidents of 17 Local Executive Councils ("LEC") at United. AFA establishes an LEC at each domicile where Flight Attendants are based.    I am the highest elected AFA official, representing exclusively United Flight Attendants.  The matters set forth herein are based upon my personal knowledge.

2.    As MEC President, I communicate regularly with Flight Attendants about the impact of United's reorganization on their jobs and lives.  Two concessionary agreements with United have resulted in a 19% wage cut for Flight Attendants, as well as a substantial increase in what Flight Attendants pay for healthcare. Based on my numerous communications with Flight Attendants, I know

that, of all the hardships imposed on them during this restructuring, Flight Attendants, as a group, are most concerned about losing their pension benefits. Through various media, including direct mail and the AFA-United MEC Web site, AFA has educated Flight Attendants about the impact of United's proposal to terminate the Flight Attendant Plan. Specifically, AFA has explained to Flight Attendants that, on average, replacement of the Flight Attendant Plan with the defined contribution plan proposed by the Company will result in a 50% decrease in retirement benefits. Needless to say, the reaction of Flight Attendants to this information has been uniformly negative. Since November 2004, I would estimate that approximately 100 Flight Attendants have told me that if United terminated the Flight Attendant Plan they would retire or resign from United.

3.   As a result of the Bankruptcy Court's approval of the Agreement terminating the Flight Attendant Plan, many Flight Attendants will make decisions, with irreversible consequences, regarding whether to continue their employment with United on the basis of the benefits available to them upon termination of the Flight Attendant Plan and replacement with a defined contribution plan. Many Flight Attendants, including the approximately 100 I have spoken to since November, will undoubtedly resign or retire from United if the Flight Attendant Plan is terminated based on the substantial diminution of their overall compensation.

4.   Many of the consequences of retiring or resigning cannot be reversed. First, Flight Attendants who voluntarily retire or

- 2 -

resign and then seek reinstatement will have forfeited their seniority, when and if United rehires them. Restoration of seniority status, even if permitted, would prejudice the interests of other Flight Attendants who will have moved up in seniority rank in the interim.   Further, retirement or resignation, especially when not anticipated, often involves significant lifestyle changes, including relocation, sometimes to pursue other work opportunities. This is particularly true of those retiring if their anticipated retirement income is insufficient to support continuation in their current residence.   Others may need to relocate to pursue other work opportunities.  Obviously, if a person sells their home, that is not a transaction which can be undone.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of May 2005.

Gregory E. Davidowitch

## CERTIFICATE OF SERVICE

I, Carmen R. Parcelli, hereby certify that on this 20th day of May, 2005, true copies of the foregoing **Emergency Motion for a Stay Pending Appeal of the Association of Flight Attendants-CWA, AFL-CIO, from the Order Approving the Debtors' Emergency Motion to Approve Agreement with PBGC**, were served via overnight delivery on the attached Core Group Service List and via electronic mail or facsimile on the Updated 2002 Service List. Pursuant to Section C.3.i(1) of the Second Amended Notice, Case Management and Administrative Procedures in this proceeding, service lists have been filed with the Court. In accordance with Rules 9014 and 7004, a true copy of the foregoing Motion was served by first-class mail on Frederic Brace, an Officer of United.

Carmen R. Parcelli

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| UAL CORPORATION, et al. | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 02-B-48191 |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | Hon. Eugene R. Wedoff |
| | ) | |
| | ) | Hearing Date:   May 26, 2005 |
| | ) | Hearing Time:   9:30 a.m. |
| | ) | |

## NOTICE OF HEARING (Docket No. 11338)

TO:    Parties Listed in Certificate of Service Filed with the Court.

PLEASE TAKE NOTICE that on May 26, 2005 at 9:30 a.m., we shall appear before the Honorable Eugene R. Wedoff, or any judge sitting in his stead, at the United States Bankruptcy Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois, 60603, and then and there present the **Emergency Motion for a Stay Pending Appeal of the Association of Flight Attendants-CWA, AFL-CIO, from the Order Approving the Debtors' Emergency Motion to Approve Agreement with PBGC**, a copy of which has been served upon you.

Respectfully submitted,

Robert S. Clayman (admitted pro hac vice)
Carmen R. Parcelli (admitted pro hac vice)
Matthew E. Babcock (admitted pro hac vice)
GUERRIERI, EDMOND, CLAYMAN &
BARTOS, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036-2243
Telephone: (202) 624-7400

Counsel for Association of Flight Attendants-CWA,
AFL-CIO

Dated: May 20, 2005

## CERTIFICATE OF SERVICE

I, Carmen R. Parcelli, hereby certify that on this 20th day of May, 2005, true copies of the foregoing **Notice of Hearing**, were served via overnight delivery on the attached Core Group Service List and via electronic mail or facsimile on the Updated 2002 Service List. Pursuant to Section C.3.i(1) of the Second Amended Notice, Case Management and Administrative Procedures in this proceeding, service lists have been filed with the Court. In accordance with Rules 9014 and 7004, a true copy of the foregoing Motion was served by first-class mail on Frederic Brace, an Officer of United.

Carmen R. Parcelli