IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————————— )
                                                    )
ASSOCIATION OF FLIGHT                  )
ATTENDANTS-CWA, AFL-CIO,            )
                                                    )
            Plaintiff,                         )
                                                    )
        v.                                       )   Civil Action No. 1:05CV01036
                                                    )
PENSION BENEFIT GUARANTY          )
CORPORATION,                             )
                                                    )
            Defendant.                       )
—————————————————————————— )

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION
OF ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO**

Plaintiff Association of Flight Attendants-CWA, AFL-CIO ("AFA"), hereby submits its reply memorandum in support of its motion for a preliminary injunction. In its initial memorandum, AFA showed that it had satisfied each of the four prongs of the test for a preliminary injunction. As demonstrated below, PBGC's opposition contains no factual support or legal analysis that diminishes the clear and compelling evidence and argument warranting this relief. Most importantly, PBGC has not challenged the gravamen of the motion -- that it is exercising its statutory authority to terminate the Flight Attendant pension plan at the behest of an employer. Nor can PBGC credibly dispute the effect of this decision, that it violates Sections 4041 and 4042 of ERISA and causes AFA and represented Flight Attendants to suffer irreparable harm.

<u>ARGUMENT</u>

I.   **AFA WILL SUCCEED ON THE MERITS OF ITS CLAIM THAT PBGC IS VIOLATING SECTIONS 4041 AND 4042 OF ERISA.**

    A.   **PBGC Does Not Contest The Principal Facts Demonstrating That Its Involuntary Termination Of The Flight Attendant Plan Violates ERISA.**

PBGC does not address or even acknowledge that the involuntary termination process that it is now undertaking was initiated by United. This undisputed fact can not be reconciled with the Agency's statutory authority. As the PBGC recognizes, the fundamental distinction between Sections 4041 and 4042 of ERISA is whether the employer or the Agency is the party initiating the termination. PBGC is unwilling, however, to concede that the actions it must take, as mandated by its settlement with United, violate both of these provisions.

PBGC also does not dispute the circumstances surrounding its decision to enter into the Agreement. Indeed, PBGC does not refer to any of the evidence proffered by AFA that shows that the Agency was adamantly opposed to the termination of the Flight Attendant Plan until it signed the Agreement on April 22. No mention is made of its January 4 opposition to United's motion for relief under Section 1113, the April 4 statement of its Executive Director supporting the continuation of the Plan, or its April 14 emergency motion to postpone consideration of United's motion for voluntary distress termination of its Plans. By omitting these facts and any description of the position it took prior to April 22, PBGC need not acknowledge that it completely reversed its support for the Plan when it entered into the Agreement. That about-face, however,

demonstrates that but for United's offer to settle the PBGC's claim in bankruptcy for $1.5 billion it would not have agreed to "initiate termination under 29 U.S.C. § 1342" of the Flight Attendant Plan.  Babcock Decl., submitted May 19, 2005, Exh. E at ¶ 4(a).

Also absent from PBGC's opposition is any recognition that United, as the only other party to the negotiations that resulted in the settlement, has assumed that an involuntary termination of the Flight Attendant Plan is required by the Agreement.  PBGC does not even attempt to explain United's belief that the Agreement provides the Company with the certainty and closure that only an involuntary termination offers.  Instead PBGC claims that the process it is undertaking pursuant to the Agreement is simply consistent with its regular practices.  It does not, however, refer to any other case in which an agreement with an employer was the sole reason the Agency initiated its involuntary termination procedures.  In sum, by proffering a very limited and highly selective presentation of the facts, PBGC hopes to escape the clear nexus between United's conduct and its own.

**B.    None Of PBGC's Arguments Alter The Legal Effect Of The Agreement -- That It Requires PBGC To Violate ERISA By Processing An Employer-Initiated Involuntary Termination.**

Just as PBGC cannot dispute the principal fact underlying AFA's motion -- that it is undertaking an involuntary termination at the behest of United -- it cannot refute the legal effects of that arrangement.  PBGC is violating the clear mandate of ERISA which prohibits it from proceeding with an employer-initiated

termination of a plan unless the contract bar is removed and the employer satisfies the requirements of a distress termination.

PBGC attempts to distinguish its actions here by claiming that the Agreement merely requires it to initiate the process to determine if the Flight Attendant Plan should be terminated. As stated by the Bankruptcy Court and adopted here by PBGC, the Agency agrees "under this agreement to exercise its statutory obligation to determine whether a pension plan ought to be involuntarily terminated." PBGC Opp., Novey Decl., Exh. D at 189. What is omitted from this statement is the fact that PBGC's exercise of its authority is not, as ERISA requires, the product of its independent judgment, but rather results solely from a commitment to an employer. An employer, however, cannot be the impetus for an involuntary termination; that responsibility falls solely within the province and discretion of PBGC.

PBGC contends that the decision in Allied Pilots v. PBGC, 334 F.3d 93 (D.C. Cir. 2003) supports its right to act pursuant to the agreement at issue here. Unlike this case, however, before settling with TWA, PBGC had determined that the underlying plan should be terminated. In that case it properly exercised its statutory authority under Section 4042 without regard to the position of or inducements offered by the employer.[1/]

---

[1/]    PBGC also relies upon the Allied Pilots opinion to claim that Section 1367 confers upon it the unfettered right to settle the liability resulting from a plan termination with the plan sponsor/employer. This provision of ERISA presupposes, however, that PBGC has already made the requisite determination that a plan should be involuntarily terminated. Indeed, Section 1367 refers to the "liability accruing as of the termination date..." which will
(continued...)

Here, there can be no doubt that PBGC has crossed the clearly marked boundary between Sections 4041 and 4042. This intrusion violates not only the statute itself but, as shown below, defeats Congress's purpose in establishing separate paths for PBGC and an employer to terminate a defined benefit plan.

In 1986, Congress enacted the Single-Employer Pension Plan Amendment Act ("SEPPAA"). Prior to its enactment, pension plan administrators could terminate a plan by simply notifying the PBGC at least 10 days before the proposed termination. The PBGC then had 90 days to determine if the plan had sufficient assets. If the PBGC were unable to determine that plan assets were sufficient to cover guaranteed benefits, it would proceed, pursuant to an agreement with the employer or court order, to have a trustee appointed to assume the obligation to pay the guaranteed benefits. PBGC could also proceed with an involuntary termination under Section 4042.

---

[1]/(...continued)
not be established unless and until PBGC approves the termination of the plan. In addition, the grant of authority to "make arrangements with any contributing sponsors and members of the controlled groups" is derived from Section 1362 which provides, in pertinent part, that a termination has been "instituted by the corporation under Section 1342 of this title."

The logic of the statutory scheme is clear -- first a termination must be instituted before settlement discussions ensue. That sequence occurred in Allied Pilots where PBGC had made the necessary determination and only then entered into an agreement with the plan sponsors. That Section 1367 affords the PBGC the right to make arrangements with employers who "may become liable under Section 1362" confirms this order of events. Although the liability may already be established under Section 1362, all the parties who may be responsible for that cost are not necessarily identified when the termination is instituted. Section 1367 simply permits PBGC to pursue a recovery against such parties.

SEPPAA was enacted because "the current termination insurance system in some instances encourages employers to terminate pension plans, evade their obligations to pay benefits, and shift unfunded pension liabilities onto the termination insurance system and the other premium-payers."  Omnibus Budget Reconciliation Act of 1985 (enacted April 7, 1986), Title XI, Section 11002(a)(4).  As explained in Senate Report 99-146 (Oct. 6, 1985), "The essential reform accomplished by this package is a narrowing of the 'funnel' into the Pension Benefit Guaranty Corporation (PBGC).  Under the terms of this bill, plan sponsors that demonstrate distress ... will still be permitted to transfer their plan liabilities to the PBGC.  Current law permits any plan sponsor to 'dump' their liabilities (insufficient assets to pay legally guaranteed benefits) on the system regardless of the financial condition of the employer."  1986 U.S.C.C.A.N. 42, 411.  SEPPAA added most of the current language in Section 4041, including the contract bar and the requirement of bankruptcy court approval for a distress termination.[2/]

By initiating an involuntary termination at the behest of an employer, PBGC is effectively restoring the process that existed before the SEPPAA amendments were enacted.  The only difference is that instead of United having the unilateral right to require PBGC

---

[2/]    The next year, in 1987, Congress again amended Section 4041 by creating the current standard for bankruptcy court approval of a distress termination: "unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the Chapter 11 reorganization process and approves the termination." See 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

to determine whether the Flight Attendant Plan should be terminated, it is paying PBGC for this "privilege".

It should also be noted that Congress intended SEPPAA to confirm "that ERISA provides the sole and exclusive means under which a qualified plan may be terminated." H.R. Rep. No. 241(II), reprinted in 1986 U.S.C.C.A.N. 699. This clarification was necessitated by a bankruptcy court decision that approved the rejection of a pension plan as an executory contract under Section 365 of the Bankruptcy Code without compliance with ERISA's termination requirements. In the instant case, PBGC believes it can terminate the Flight Attendant Plan without regard to the "sole and exclusive means" provided by Congress in ERISA.

Congress clearly intended that the paths for termination it demarcated for an employer and PBGC were to remain separate and distinct, with neither party having the right to tread upon the course of the other. Notwithstanding the amendments to Section 4041, PBGC would again allow an employer to initiate the transfer of its pension liabilities to the Agency. If the plain language of ERISA and the clear intent of Congress in amending Section 4041 are to be respected and upheld, PBGC must be enjoined from proceeding with an employer-initiated termination of the Flight Attendant Plan.

Equally important, the consequence of PBGC adopting an unauthorized means for terminating a pension plan is that neither the Agency nor debtors in future cases will see any reason to adhere to the rigors of Section 4041. Like United, other employers

will appreciate the exchange of consideration that could motivate PBGC to bypass the contract bar of this provision and to pursue an involuntary termination under Section 4042. No debtor would subject itself to the uncertainties and costs of Section 1113 bargaining and litigation and a Section 4041 hearing when it had the opportunity to avoid all of these "unpleasantries" by reaching an agreement directly with PBGC.

As it has done in this case, PBGC will assess its interests as a creditor of the bankrupt employer, will value its claims, weigh the likelihood of success in opposing a distress termination, and determine the price at which it is willing to sell to the company its exclusive franchise under Section 4042. Accordingly, if permitted to proceed down the path it has staked out here, PBGC will sound the death knell of Section 4041.

**C.    By Adhering To The Formalities Of Its Internal Review Process, PBGC Does Not Change The Fact That It Has Already Decided To Proceed With An Involuntary Termination.**

As shown in AFA's memorandum, PBGC violated ERISA by entering into the Agreement which provides for the involuntary termination of the Flight Attendant Plan before it had independently determined if, based upon the criteria of Section 4042, the Plan should be terminated. In response PBGC contends that it has not completed its study of the Flight Attendant Plan and has yet to make a decision as to whether it should be terminated. By merely instituting its review procedures, PBGC cannot alter the term of the Agreement that attaches a $1.5 billion reward to PBGC's termination of the Plan or any of the other facts that demonstrate

-8-

that the termination of the Flight Attendant Plan is pre-ordained.
Indeed, as the PBGC recognized in its press release announcing the
settlement, "Under the terms of the agreement, which must still be
approved by the bankruptcy court overseeing UAL's restructuring,
the PBGC would terminate and become trustee of the company's four
pension plans and the agency's claims against the company would be
settled." Declaration of Carmen R. Parcelli, filed this same date,
Exh. B at 1.  This unequivocal assurance could only be given if
PBGC assumed the plans would be involuntarily terminated.

     The ultimate decision regarding the fate of the Plan rests
with the Executive Director, Bradley Belt, the same individual who
signed the Agreement.  It is inconceivable that the chief officer
of the PBGC would endorse an agreement that promises the Agency so
much, only to put it all at risk by disapproving the involuntary
termination of the Plan.  Curiously, PBGC will not permit an
employee who has approved a staff recommendation regarding
termination to then vote as a member of the review panel on that
issue.  PBGC Opp., Bacon Decl. ¶ 1.  That awareness of inherent
conflicts apparently has not percolated to the higher echelons of
PBGC.  But recusal of PBGC's top officer would not, in any event,
alter the outcome of the Agency's determination.  Whether Mr. Belt
or a designee renders the ultimate decision, the influence and
effect of the Agreement's benefits remain fixed and compel the same
result.

     The bias this kind of remuneration engenders was addressed in
PBGC v. LTV Steel Corporation, 119 F.R.D. 339 (S.D.N.Y. 1988).

LTV, a company operating under Chapter 11, alleged that, "PBGC's pecuniary interest as a creditor of LTV led it to act in bad faith in restoring the Plans."   Id., at 343.   In allowing discovery against PBGC, the court found that:

> LTV's bad faith claim is based upon a narrow, albeit serious, charge that the PBGC exercised its statutory authority under ERISA for an improper purpose; namely, to increase its termination liability claim in the ongoing bankruptcy proceeding by approximately $800 million.

Id., at 344.   Here, no discovery is necessary.   PBGC has admitted that it is agreeing to exercise its statutory authority pursuant to an agreement that offers it $1.5 billion in securities and other consideration.   Thus, not only is the outcome of the Agreement -- an involuntary termination -- pre-ordained, but the process undertaken to achieve this result is indelibly stained with PBGC's bad faith.   By treating its statutory authority as barter, the Agency cannot exercise that power with the objectivity and good faith required by ERISA.

Furthermore, United, as made clear by AFA's initial memorandum, understands that the Agreement mandates a single outcome -- the involuntary termination of the Plan.   Inexplicably, PBGC has not addressed this fact, even though it is the only other signatory to the Agreement and the only other participant in the negotiations that resulted in the settlement.

While PBGC has remained silent about United's unequivocal statements that the Agreement guarantees an involuntary termination, the Agency has expressed more subtly the same view as United.   On May 2, 2005, PBGC and United entered into a court-

-10-

approved stipulation, holding in abeyance United's Motion for a Distress Termination of the Plans. In the Stipulation, the parties express their "hope" that a distress termination proceeding will be made "unnecessary" due to the court's approval of the Agreement. Babcock Decl., Exh. I at 2. Obviously, PBGC, like United, understood that the intended consequence of the Agreement was not a distress, but an involuntary, termination.

The Stipulation itself further demonstrates that PBGC assumes that an involuntary termination will result from the Agreement. PBGC contends that if it were not to approve an involuntary termination, the Agreement could still be effectuated by a successful distress termination proceeding. If the parties truly contemplated that as a possibility, they would not have forestalled the distress termination litigation that was well underway when they entered into the Agreement. The day after the Court approved the settlement, the Section 1113 and Section 4041 hearing was to begin and was scheduled to conclude on May 19, with the court committing that it would render a decision no later than May 31.

Nothing precluded the parties from pursuing both types of plan terminations at the same time. Indeed, until the court approved the Stipulation, United maintained its distress termination motion against the Ground Plan even though PBGC had already initiated and was litigating over an involuntary termination of that plan.

The only credible reason why PBGC and United avoided the distress termination proceeding, the outcome of which was mere weeks away, was that they believed that the Agreement assured them

the desired result even more quickly and definitively.  More quickly, because, as United stated, an involuntary termination would occur as early as May 20 and no later than May 24.  <u>See</u> Babcock Decl., Exh. M at Slide 8.  More definitively, since the determination to involuntarily terminate a pension plan rests with the PBGC alone, whereas a distress termination decision is subject to a court proceeding in which the debtor has the burden to prove that the termination of the pension plan is essential to its reorganization.

Finally, the fact that PBGC is committed to involuntarily terminate the Plan is further manifested by the effect of the Agreement upon PBGC's negotiations with other bankrupt companies.  If the PBGC wishes to establish its credibility in future negotiations over its claims and the disposition of pension plans, it must proceed with an involuntary termination of the Flight Attendant Plan.  If it does not "deliver" this result to United, debtors will be far less willing to negotiate with PBGC or to make their best offers.  They will perceive the primary benefits of a bargain with the Agency -- the guarantee of plan termination, the removal of the contract bar and the avoidance of litigation -- to be unattainable and illusory.  In turn, PBGC must consider that its credibility in future negotiations will be very much enhanced if the next employer believes that it can obtain these benefits by striking a deal with PBGC.  If an agreement still exposes an employer to the same risks and processes to which it would otherwise have been subjected, companies will have no reason to

-12-

settle with PBGC or to offer it the kind of remuneration provided for in the Agreement.

For all these reasons as well as those stated in its initial memorandum, it is abundantly clear that PBGC committed to involuntarily terminate the Flight Attendant Plan before it made the independent cause determination required by Section 4042.

## II.   PBGC'S ENTERING INTO THE SETTLEMENT PURSUANT TO 29 U.S.C. § 1367 IS A FINAL AGENCY ACTION BECAUSE IT MARKS A CONSUMMATION OF A PBGC DECISION-MAKING PROCESS AND DIRECT LEGAL CONSEQUENCES HAVE FLOWED FROM THAT DECISION.

In order for a district court to review a decision of an administrative agency, the decision must be considered a "final agency action." Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1037 (D.C. Cir. 2002). PBGC argues that there is nothing for the Court to review here because PBGC "has not taken final action to terminate the FA Plan." See PBGC Opp. at 17. But PBGC incorrectly frames the issue; it is not plan termination that AFA challenges in its Complaint. Rather, AFA challenges whether PBGC is exceeding its statutory authority under ERISA by carrying out the terms of the Agreement. See Compl., Violations of ERISA, ¶ 1. AFA also challenges PBGC's authority to agree to involuntarily terminate a plan without first having made an independent cause determination. Id. ¶ 2. As alleged in the Complaint, the settlement is an ultra vires agreement that violates ERISA.

The settlement is a final agency action. Agency action is final if: (1) it is a "consummation of the agency's decisionmaking process," and (2) "rights or obligations have been determined" by the action or "legal consequences will flow" from it. Bennett v.

-13-

<u>Spear</u>, 520 U.S. 154, 178 (1997). Both prongs are easily met by the settlement here: simply put, the settlement requires PBGC to take a definitive course of action that has had an immediate, deleterious effect on AFA and its members' legal rights.

**A.    The Settlement Is A Consummation Of A PBGC Decision-Making Process.**

Notably, "how an agency characterizes its actions does not determine whether they are final"; instead, "finality must be interpreted in a flexible and pragmatic way." <u>PDK Labs Inc. v. Ashcroft</u>, 338 F. Supp. 2d 1, 10 (D.D.C. 2004)(citation omitted). "To determine finality, courts must decide 'whether the agency's position is definitive'." <u>Her Majesty the Queen ex rel. Ontario v. EPA</u>, 912 F.2d 1525, 1531 (D.C. Cir. 1990). The consummation inquiry, therefore, seeks to distinguish a tentative agency position from the situation where "the agency views its deliberative process as sufficiently final to demand compliance with its announced position." <u>Ciba-Geigy Corp. v. EPA</u>, 801 F.2d 430, 436 (D.C. Cir. 1986).

The settlement agreement here, by definition, obviously demands compliance with PBGC's position regarding United's pension plans because it sets out PBGC's, United's and the unions' legal rights and obligations with respect to the plans. <u>See, e.g.</u>, Black's Law Dictionary 44 (6th ed. 1991)(defining "agreement", in part, as "the act of two or more persons, who unite in expressing a mutual and common purpose with a view of altering their rights and obligations"). According to PBGC's own papers, the "settlement agreement between PBGC and United resolves most of the issues

-14-

between them arising out of United's Chapter 11 bankruptcy case, including issues involving the FA Plan." PBGC Opp. at 1. Indeed, PBGC explicitly admits that the settlement is the consummation of the Agency's decision-making process with respect to the plans -- it asserts that this Court must grant it deference in its decision to enter into the settlement agreement because "[c]ourts must presume regularity on the part of agency officials in the decision-making process." Id. at 14 (emphasis added). PBGC's obligations as defined by the settlement legally bind it to take a specific course of action, and are therefore sufficiently definitive to be final.

Additionally, the fact that AFA challenges PBGC's interpretation of ERISA as a purely legal matter makes this case ripe for review. Contrary to PBGC's contentions, a decision on whether PBGC ultimately believes the Flight Attendant Plan meets the criteria for an involuntary termination will shed no light on the true subject of this suit: whether PBGC is exceeding its statutory authority under ERISA by carrying out the terms of the Agreement. See, e.g., Ciba-Geigy Corp., 801 F.2d at 438 ("we conclude, as this court has repeatedly held before, that 'an agency's interpretation of its governing statute, with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for judicial review'")(citations omitted); Nat'l Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689, 698 (D.C. Cir. 1971)("[t]he term 'agency action' embraces an agency's interpretation of [the] law").

**B.    The   Settlement   Has   Had   Immediate,   Direct   Legal Consequences For AFA.**

The second inquiry to whether "rights or obligations have been determined by [PBGC's] action", Fox Television Stations, 280 F.3d at 1037, is easily answered here.   There is no doubt that PBGC's decision to abide by the settlement had a "direct and immediate ... effect" on AFA,   FTC v. Standard Oil Co., 449 U.S. 232, 239 (1980): the settlement both immediately and indefinitely terminates AFA's rights under Section 1113 of the bankruptcy code and Section 4041 of ERISA and requires PBGC to initiate the involuntary termination process when there was no indication that it had otherwise intended to do so.

Both results are sufficient "legal consequences" to satisfy the second prong.  See, e.g., Ciba-Geigy Corp., 801 F.2d at 437-38 ("[h]aving definitively stated its position that Ciba-Geigy has no statutory right to a cancellation hearing, EPA has provided its final   word   on   the   matter,   'short   of   an   enforcement action'")(citation omitted); Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 112-13 (1948)(administrative actions reviewable when they "deny a right ... as a consummation of the administrative process")(citation omitted).[3/]

---

[3/]     PBGC's cases regarding final agency action all either support AFA's position or are easily distinguishable on their face. In Clifton Power Corp. v. FERC, 294 F.3d 108, 111 (D.C. Cir. 2002), the court held narrowly that a pending petition for reconsideration of a Federal Energy Regulatory Commission penalty rendered simultaneous judicial review of the penalty premature.  There is no similar petition pending here.  In Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001) and Common Sense Salmon Recovery v. Evans, 329 F. Supp. 2d 96, 103 (D.D.C. 2004) the issue was whether failure to act constituted final agency action.  Failure to act is not a
(continued...)

Finally, PBGC's quote from <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 148-49 (1967), that a court should not interfere until the "administrative decision has been formalized and its effects felt in a concrete way by the challenging parties" clearly supports judicial review in this case.    As demonstrated above, the settlement required PBGC to undertake the involuntary termination process, and, as a direct result, AFA's rights under Section 1113 of the bankruptcy code and Section 4041 of ERISA were indefinitely if not permanently extinguished.

## III.  AFA'S ACTION IS NOT AN IMPERMISSIBLE COLLATERAL ATTACK ON THE BANKRUPTCY COURT'S APPROVAL OF THE SETTLEMENT.

PBGC's unsupported allegation that AFA's action is an unsustainable collateral attack on the Bankruptcy Court's approval of the settlement agreement, <u>see</u> PBGC Opp. at 16, is wrong as a matter of law for two reasons.    <u>First</u>, PBGC asserted the identical defense in a similar situation in a prior case in front of this Court -- and was summarily rejected.    See <u>Air Line Pilots Ass'n Int'l v. PBGC</u>, 193 F. Supp. 2d 209, 219 (D.D.C. 2002)(" <u>Air Line Pilots</u>"), <u>aff'd</u> <u>Allied Pilots Ass'n v. PBGC</u>, 334 F.3d 93, 97 (D.C. Cir. 2003).    <u>Second</u>, the Bankruptcy Court specifically held that if PBGC's actions violate ERISA, judicial review is proper in this Court.

---

<u>3/</u>(...continued)
concern here.    And in <u>Citizens Alert Regarding the Env't v. EPA</u>, 259 F. Supp. 2d 9, 20-22 (D.D.C. 2003), this Court held that it did not have jurisdiction to enjoin a state pipeline project under NEPA because the project did not receive any federal money and was not a "major federal action."    That holding has no application to PBGC's decision to carry out the terms of the Agreement.

In <u>Air Line Pilots</u>, PBGC made a cause determination under Section 4042(a)(4) during the Trans World Airlines ("TWA") bankruptcy that its long-run liability was going to increase unreasonably if TWA's defined benefit pilots' plan was not terminated. 193 F. Supp. 2d at 219. PBGC thereafter entered into a settlement agreement with the plan administrator and the unions that provided for future involuntary termination on the occasion of certain "Significant Events." <u>Id.</u>, at 213. When a "Significant Event" occurred eight years later, the pilots' union brought suit, arguing that PBGC's termination procedures in carrying out the settlement violated ERISA. <u>Id.</u>

PBGC similarly argued in that case that "plaintiffs' claims amount to a collateral attack on the [settlement] and judicial relief from a 'bad deal'." <u>Id.</u>, at 215. Plaintiffs responded that PBGC had mischaracterized their claims, which, when properly viewed, instead "challeng[ed] the PBGC's action under Title IV of ERISA." <u>Id.</u>, at 216.

This Court agreed with plaintiffs. As a threshold matter, the Court dismissed PBGC's collateral attack defenses, holding that:

> After a thorough review of the claims presented, the court concurs with the plaintiffs' assessment of their claims. The question properly before the court is whether the PBGC, in abiding by the [settlement], has in any way violated the statutory-termination provisions of ERISA. In light of this observation, the court need not address any of the equitable defenses asserted by the parties, and therefore can proceed with an analysis of the [settlement] and its relation to the ERISA guidelines.

<u>Id.</u> So too here; AFA's Complaint alleges that PBGC, by abiding by the terms of the settlement, violated the termination provisions of

-18-

ERISA.  See Compl., Violations of ERISA, ¶¶ 1 & 2.  This Court
should once again proceed to an analysis of those allegations under
ERISA's guidelines.

Review by this Court is also entirely consistent with the
Bankruptcy Court's Order in this case.  Notably, at the hearing on
the Debtors' motion to approve the settlement, the Bankruptcy Court
recognized that:

> the important thing is that if [PBGC] were to act in an
> inappropriate way, if it were to take action that's not
> authorized by the statute in seeking involuntary
> termination of a pension plan, the [A]gency would be
> subject to a lawsuit under Section 1303 [29 U.S.C. §
> 1303] to have its decision reviewed by a court.

See Babcock Decl., Exh. G at 187:21-188:2.

## IV. FLIGHT ATTENDANTS WILL SUFFER IRREPARABLE INJURY DUE TO PBGC'S ACTIONS.

As set forth in AFA's opening brief, the Agreement requires
PBGC to terminate the Flight Attendant Plan.  This will lead to
injury, as Flight Attendants leave United due to the substantial
reduction in their compensation.  This injury is irreparable
because, even if they were allowed to return to their former
positions, seniority-based bidding on job assignments will make it
impossible to unscramble the egg.  Instead of squarely addressing
AFA's showing, PBGC argues again that its Agreement with United
does not require plan termination, and instead has merely suspended
the Section 1113 and ERISA distress termination process.  As AFA
has shown, PBGC's contention regarding the nature of the Agreement
is unworthy of credence.  Even if PBGC has merely suspended the
legal process underway prior to the Agreement, the Agency is still

causing irreparable harm to AFA's bargaining rights under Section 1113.

**A.    Plan Termination As Required By The Agreement Will Cause Certain Irreparable Injury To Flight Attendants.**

As AFA has demonstrated, PBGC's contention that the settlement agreement does not require plan termination is wholly disingenuous. Given that plan termination is the aim of the Agreement, and PBGC is now acting to terminate the plan pursuant to the Agreement, the injury of plan termination is sufficiently immediate to warrant injunctive relief.

It is also beyond doubt that termination will cause irreparable harm. Flight Attendants will leave upon plan termination; that is a fact, not mere speculation. Pension benefits are a paramount concern for Flight Attendants. In February 2003, AFA engaged an outside firm to conduct a survey of the membership in order to assess how the union should approach concessionary bargaining with United. Second Declaration of Gregory Davidowitch, filed this same date, ¶ 2. The survey showed that Flight Attendants were least willing to compromise their pension benefits in negotiations. Id. Informal conversations between AFA's leadership and membership since have confirmed the survey's finding. Davidowitch Decl., submitted May 19, 2005, ¶ 12.

As Flight Attendants understand well, the effect of plan termination on their benefits will be devastating. On average, current flight attendants will receive a 50% reduction in their benefits following plan termination. As the following chart shows,

even at a variety of assumed retirement ages, Flight Attendants'
pension losses are substantial.



Parcelli Decl., Exh. A at ¶ 8.  Nearly all Flight Attendants, from
new hires to those with long tenures, will suffer significant cuts:

|  | Age | Service | Salary | Monthly Benefit Under Current Plan | Monthly Benefit After Termination |
|---|---|---|---|---|---|
| Flight Attendant 1 | 49 | 26 years | 42,000 | $1,943.90 | $1,342.14 |
| Flight Attendant 2 | 43 | 16 years | 42,000 | $2,184.85 | $776.29 |
| Flight Attendant 3 | 31 | 8 years | 37,200 | $3,413.18 | $1,343.43 |
| Flight Attendant 4 | 25 | 0 years | 20,000 | $2,101.79 | $1,070.37 |

Id., Exh. A at ¶ 10.

     The pattern of Flight Attendant attrition throughout the
United bankruptcy confirms that substantial numbers of Flight

-21-

Attendants will choose to leave if their compensation is sharply reduced by plan termination. As the following chart shows, either in the run up to or the aftermath of each additional cut in compensation and benefits during the bankruptcy, Flight Attendants have left:



**FA Attrition Throughout United Bankruptcy**

2d Davidowitch Decl. ¶ 3. Particularly dramatic was the July 2003 increase in attrition in response to United's proposal to decrease retiree health benefits. The statistics also show an up-tick in attrition in the last three months as United has continued to insist that the Flight Attendant Plan must terminate. In addition to the attrition data, Gregory Davidowitch, the President of the AFA Master Executive Council at United, has heard from approximately 100 Flight Attendants that they would resign or

-22-

retire if the pension plan were terminated. Davidowitch Decl. ¶ 12.

The effects of these inevitable resignations and retirements could not be fully reversed following a favorable decision in this case or adequately addressed through legal remedies, due to the seniority system in place. Courts have found irreparable harm in the seniority context. See Local 553 v. Eastern Airlines, Inc., 695 F.2d 668, 678 (2d Cir. 1982); IAM v. Trans World Airlines, Inc., 601 F. Supp. 1363, 1372 (W.D. Mo. 1985) . Tellingly, PBGC does not discuss, much less attempt to refute, this line of authority specific to the issue of union bidding seniority. Instead, PBGC cites to a wholly inapposite case involving retired pilots, who sued in order to obtain pension benefits wrongly denied due to PBGC's miscalculation. Boivin v. US Airways, Inc., 297 F. Supp. 2d 110 (D.D.C. 2003). Obviously, the Boivin case involves no questions of reinstatement, much less the irreparable harm found in cases requiring reinstatement in the context of a seniority system.

The Boivin case is also distinguishable because there plaintiffs had available to them an administrative remedy, which specifically provided for monetary damages in the form of a lump-sum recovery of any amounts underpaid to them by PBGC. 297 F. Supp. 2d at 119. In contrast, the Section of ERISA under which this suit is raised provides for a cause of action "for appropriate equitable relief." 29 U.S.C. § 1303(f). Thus, PBGC's reliance on the Boivin case for its assertion that "flight attendants will have adequate legal remedies" is mistaken. PBGC Opp. at 19.

-23-

**B.    Even Accepting PBGC's Contention That The Agreement Does Not Require Plan Termination, The Agency's Suspension Of The Distress Termination Process Leads To Irreparable Injury To Flight Attendants' Bargaining Rights.**

In the face of the plain terms of the Agreement, the Agency argues that the Agreement does not require termination.  In support of this contention, PBGC asserts repeatedly that it has merely suspended the Section 1113 and ERISA distress termination process as a result of the Agreement, but that those processes could be resuscitated should PBGC find that the Plan should not be terminated.    PBGC Opp. at 10, 12, 20.    Even accepting these assertions as true, PBGC's alleged "suspension" of these legal processes results in irreparable harm to AFA's bargaining rights.

As fully set forth in AFA's opening memorandum, an ERISA distress termination cannot proceed unless and until the contract bar is removed.    In bankruptcy, the contract bar can be removed pursuant to Section 1113.  Section 1113, however, requires that the employer continue collective bargaining with its union over its proposed contract change until a judicial hearing is held regarding the change.  11 U.S.C. § 1113(b)(2).  Thus, PBGC's "suspension" of the process cuts off AFA's bargaining rights under Section 1113.

Courts recognize that the deprivation of union bargaining rights is a form of irreparable injury.  See <u>Arcamuzi v. Cont'l Air Lines, Inc.</u>, 819 F.2d 935, 938 (9th Cir. 1987); <u>United Steel Workers of Am. v. Cooper-Standard Auto. of Bowling-Green</u>, 175 L.R.R.M. (BNA) 3249, 3254-55 (N.D. Ill. 2004); <u>Allied Pilots Ass'n v. American Airlines, Inc.</u>, 713 F. Supp. 212, 218 (N.D. Tex. 1989). Impairment of employee bargaining rights also causes irreparable

harm to the union itself because the position of the bargaining representative is undermined, which may in turn lead to an erosion of support.  See Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 907 (3d Cir. 1981).

Impairment of a union's bargaining function cannot be remedied at a later time.  This is especially true in the bankruptcy context where the employer is restructuring its enterprise in an attempt to emerge from bankruptcy protection.  In this fluid environment, even a temporary suspension of AFA's bargaining rights will yield irreparable injury.  Indeed, during PBGC's "suspension" of the bargaining process, AFA might be able to reach a consensual resolution of its pension issues that may not be possible to obtain at a later date.  Thus, PBGC's contention that there is no irreparable injury due to the possibility that the Section 1113 and ERISA distress termination process might be resuscitated is false.

## CONCLUSION

For all the foregoing reasons, AFA respectfully submits that the Court should grant its motion for a preliminary injunction.

Respectfully submitted,

/s/ Robert S. Clayman
Robert S. Clayman, D.C. Bar No. 419631
Carmen R. Parcelli, D.C. Bar. No. 484459
Jonathan P. Rolfe, D.C. Bar No. 474296
Matthew E. Babcock, D.C. Bar No. 488107
GUERRIERI, EDMOND, CLAYMAN & BARTOS P.C.
1625 Massachusetts Avenue, N.W., Ste. 700
Washington, DC 20036
(202) 624-7400

Counsel for Association of Flight
Dated: May 31, 2005    Attendants-CWA, AFL-CIO

-25-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 31, 2005, I electronically filed Reply Memorandum of Points and Authorities in Support of Motion for a Preliminary Injunction of Association of Flight-Attendants-CWA, AFL-CIO, the Declaration of Carmen R. Parcelli with an attached Exhibit, and the Second Declaration of Gregory Davidowitch with the Clerk of the Court using the CM/ECF system.  I further certify that on May 31, 2005, a true and correct copy of the same was served by electronic mail on:

> Jeffrey B. Cohen
> Chief Counsel
> Pension Benefit Guaranty
>   Corporation
> 1200 K Street, N.W.
> Washington, D.C.  20005
> cohen.jeffrey@pbgc.gov
>
> Attorney for defendant PBGC


> /s/ Jonathan Rolfe
> Jonathan Rolfe