IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, <br><br> Plaintiff, <br><br> v. <br><br> PENSION BENEFIT GUARANTY CORPORATION, <br><br> Defendant. | Civil Action No. 1:05CV01036 |

**DECLARATION OF CARMEN R. PARCELLI IN SUPPORT OF AFA'S MOTION FOR A PRELIMINARY INJUNCTION**

Carmen R. Parcelli hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an associate in the law firm of Guerrieri, Edmond, Clayman & Bartos, P.C., which represents the Association of Flight Attendants-CWA, AFL-CIO ("AFA"), in this action.

2. Attached hereto as Exhibit A is a true and accurate copy of the Second Declaration of David Feinstein, filed with the United States Bankruptcy Court for the Northern District of Illinois April 29, 2005.

3. Attached hereto as Exhibit B is a true and accurate copy of a press release dated April 22, 2005 obtained from the PBGC web site.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 31, 2005

_____
Carmen R. Parcelli

# Exhibit A

```
            IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION
```

```
_____
                               )
In re                          )
                               )
UAL CORPORATION, et al.        )   Chapter 11
                               )
        Debtors                )   Case No. 02-B-48191
                               )   (Jointly Administered)
                               )
                               )   Hon. Eugene R. Wedoff
                               )
_____)
```

### SECOND DECLARATION OF DAVID FEINSTEIN

David Feinstein hereby declares, in accordance with 28 U.S.C. § 1746, as follows:

1. I am principal of the firm Feinstein Glaser Olney & Co., which provides technical actuarial and consulting support to clients. I have thirty-one years of experience as an actuary working on retirement benefit valuations. The ERISA plans on which I have worked include joint labor-management trusteed and single employer pension funds. At the present time I am the consulting actuary for fourteen multiemployer clients. I consult on defined benefit plans, defined contribution plans, and health and welfare plans for these clients. I am also the actuary for two public employer plans. I am a fellow in the Society of Actuaries and a member of the American Academy of Actuaries. I have been an enrolled actuary under ERISA since 1984.

2. I have been retained by the Association of Flight Attendants-CWA, AFL-CIO to advise on actuarial topics related to

the Flight Attendant Plan and to assist in the evaluation of the Supplemental Declaration of Timothy J. Marnell dated April 11, 2005, filed in the above-captioned proceeding.

3.  As part of the first Section 1113 process, AFA agreed to reductions in benefits under the Flight Attendant Plan. United's own actuaries show in their 2004 pension valuation report that the minimum funding requirement for 2004 decreased by $68 million as a result of the reduction in benefits. From 2003 to 2004 in large part as a result of the benefits reduction, the Plan's normal cost decreased from $49 million to $13 million.

4.  The Supplemental Declaration of Timothy J. Marnell presents an analysis of the impact on participants of termination of the Flight Attendant Plan and replacement of the Plan with a defined contribution plan. Specifically, Mr. Marnell presents a histogram showing the impact of termination and replacement on flight attendants retiring at 56, which is the current average retirement age for Plan participants (hereinafter "Marnell's Age 56 Histogram"). Marnell Supp. Decl. ¶ 37. Using the same participant data, employing essentially the same actuarial assumptions and methodology, I conducted my own analysis of the impact of plan termination and replacement on those retiring at assumed age 56, as well as ages 60, 62, and 65.

5.  In conducting my analysis, I used participant data collected by United Airlines for the company's January 1, 2005 pension valuation. United informed me that this same participant data was used to create Marnell's Age 56 Histogram.

6. I also relied upon the following actuarial assumptions in my analysis. United informed me that these same assumptions were relied upon to create Marnell's Age 56 Histogram.

    a. plan termination date of June 30, 2005;

    b. 4.00% rate of salary increases;

    c. 1983 Unisex Group Annuity Mortality Table;

    d. 4.00% contribution rate for the replacement defined contribution plan;

    e. 7.50% rate of return on contributions to the replacement defined contribution plan;

    f. 7.50% rate to convert either the defined benefit annuity to a single sum value or the defined contribution single sum to an annuity; and

    g. assumed that only PBGC Category 4 benefits would be available.

7. In my analysis, I employed the same methodology outlined in Mr. Marnell's Declaration with one variation. The results obtained through my analysis of the impact on participants retiring at age 56 are comparable to the results contained in Marnell's Age 56 Histogram. The following chart compares Mr. Marnell's results ("UAL") in the Age 56 Histogram to the results of my analysis ("AFA").



**Replacement Ratios at Age 56**

    8.   Using the same data, assumptions, and methodology described above, I also analyzed the impact of termination and replacement on current Flight Attendants retiring at ages 60, 62, and 65.  The results of my analysis are as follows:

- 4 -



9.  As these results show, 60% of those retiring at ages 56 will receive less than 50% of the value of their current benefits after termination and replacement; 63% of those retiring at age 60 will receive 50% less; 55% of those retiring at age 62 will receive 50% less; and 25% of those retiring at age 65 would receive 50% less.  In addition, more participants at assumed retirements ages 60, 62, and 65 will suffer an adverse impact from termination and replacement than will participants at the assumed retirement age of 56.

10. Based upon plan data provided to AFA from United's actuaries, I have calculated the current benefits due to variously situated Flight Attendants, and the benefits that would be payable after termination of the plan and replacement with a 4% defined

contribution plan. The calculations assume the historical average retirement age under the plan of 56. The results of my calculations are as follows:

|  | Age | Service | Salary | Monthly Benefit Under Current Plan | Monthly Benefit After Termination |
|---|---|---|---|---|---|
| Flight Attendant 1 | 49 | 26 years | 42,000 | $1,943.90 | $1,342.14 |
| Flight Attendant 2 | 43 | 16 years | 42,000 | $2,184.85 | $776.29 |
| Flight Attendant 3 | 31 | 8 years | 37,200 | $3,413.18 | $1,343.43 |
| Flight Attendant 4 | 25 | 0 years | 20,000 | $2,101.79 | $1,070.37 |

11.  Mr. Marnell's Supplemental Declaration also presents a histogram entitled "Impact on Flight Attendants at Assumed Retirement Age (65)." Marnell Supp. Decl. ¶ 39. In this histogram, Mr. Marnell compares the benefits that flight attendants would receive under their present Plan at the current average retirement age of 56 to the benefits that flight attendants would receive at the assumed retirement age of 65 after termination and replacement of the current Plan. Mr. Marnell's comparison, however, fails to take into account the present value of the benefits compared. Therefore, his histogram does not provide a comparison of actuarially equivalent values.

12.  When the present values of the benefits under the current Plan at age 56 and the benefits at assumed retirement age 65 after termination and replacement are compared, the results are vastly different than Mr. Marnell's dollar to dollar comparison.



**Age 65 to Age 56 Comparison**

13.  In fact, over 48% of flight attendants working until age 65 will receive less than 60% of the actuarially equivalent benefit that they would have received under their current Plan at age 56. Moreover, only 1% of flight attendants would fully recoup the value of the benefits lost as a result of termination and replacement through an additional nine years of service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April 2005.

*David Feinstein*
David Feinstein

# Exhibit B



Home > News > News Releases > 2005 >

**FOR IMMEDIATE RELEASE**
**April 22, 2005**
**PBGC Public Affairs, 202-326-4040**

### PBGC Reaches Pension Settlement with United Airlines

WASHINGTON—The Pension Benefit Guaranty Corporation (PBGC) announced today that it has reached a settlement with United Airlines over the termination of the company's pension plans.

"We believe that this agreement, under the circumstances, is in the best interests of the pension insurance program and its stakeholders," said PBGC Executive Director Bradley D. Belt. "The PBGC has an obligation to reduce its losses for the protection of workers and retirees, other companies that pay insurance premiums, and taxpayers. By reaching a settlement now, we further that goal."

Under the terms of the agreement, which must still be approved by the bankruptcy court overseeing UAL's restructuring, the PBGC would terminate and become trustee of the company's four pension plans and the agency's claims against the company would be settled. The PBGC and its financial advisers believe the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy.

Collectively, United's pension plans are underfunded by $9.8 billion on a termination basis, $6.6 billion of which is guaranteed, according to the PBGC. The four plans are: the UA Pilot Defined Benefit Plan, which covers 14,100 participants and has $2.8 billion in assets to pay $5.7 billion in promised benefits; the United Airlines Ground Employees Retirement Plan, which covers 36,100 participants and has $1.3 billion in assets to pay $4.0 billion in promised benefits; the UA Flight Attendant Defined Benefit Pension Plan, which covers 28,600 participants and has $1.4 billion in assets to pay $3.3 billion in promised benefits; and the Management, Administrative and Public Contact Defined Benefit Pension Plan, which covers 42,700 participants and has $1.5 billion in assets to pay $3.8 billion in promised benefits.

As of September 30, 2004, the PBGC's own balance sheet showed a $23.3 billion deficit, with $39 billion in assets to pay $62.3 billion in guaranteed pension benefits to more than 1 million workers and retirees. By law, the PBGC is required to keep premiums as low as possible and has no call on the U.S. Treasury beyond a $100 million line of credit.

"This again highlights the need for the comprehensive pension reform. Unless and until Congress fixes the rules that allow pension plans to become so underfunded, the insurance program and plan participants are at risk of suffering large financial losses," Belt said.

The PBGC is a federal corporation created under the Employee Retirement Income Security Act of 1974. It currently guarantees payment of basic pension benefits for about 44 million American workers and retirees participating in over 31,000 private-sector defined benefit pension plans.

- ### -

PBGC No. 05-36



Send comments about this Web site to *webmaster@pbgc.gov*
Last Edited: 04/22/05