## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.  05-1036 (ESH)** |
| | ) | |
| **PENSION BENEFIT GUARANTY CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Association of Flight Attendants -- CWA, AFL-CIO ("AFA") seeks a preliminary injunction against the Pension Benefit Guaranty Corporation ("PBGC") to prevent the latter from instituting proceedings to involuntarily terminate the United Airlines Flight Attendant Defined Benefit Pension Plan ("FA Plan"), arguing that a settlement agreement reached between PBGC and United Air Lines Corporation ("United") violates the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.* Based on the pleadings and the arguments of counsel presented at a hearing held on June 3, 2005, the Court denies the motion because plaintiff has failed to demonstrate that it is entitled to a preliminary injunction.

## BACKGROUND

Plaintiff represents all flight attendants at United.  Under the 2003 collective bargaining agreement ("CBA"), following one year of service, flight attendants become eligible to

participate in the FA Plan. (Davidowitch Decl., Ex. A at 228.) The FA Plan was established in 1941, and as of April 28, 2005, included 18,232 fully vested active employees, 5,199 retirees, and 4,971 separated vested participants who are entitled to benefits. (Bacon Decl., Ex. C (PBGC Form 600).) Many of these 28,402 current and former United employees stand to lose substantial pension benefits if the FA Plan is terminated and PBGC assumes responsibility for their pensions. (*See, e.g.*, Bacon Decl., Ex. B (United Notice of Intent to Terminate FA Plan).)

United has been operating as a debtor-in-possession since December 9, 2002, when it filed for voluntary reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, in the United States Bankruptcy Court for the Northern District of Illinois ("bankruptcy court"). Since July 2004, United has not made the minimum funding contributions to its pensions plans as required by Title IV of ERISA, 29 U.S.C. §§ 1301-1461, and by the Internal Revenue Code.[1] Further, on November 5, 2004, United moved to reject its CBAs with its unions (Novey Decl. at ¶ 4 and Ex. A at 7-8 (United Nov. 2004 Status Report)) as a first step toward seeking a "distress termination" of the airline's pension plans, including the FA Plan, pursuant to 29 U.S.C. § 1341.[2] (*Id.* at ¶ 4.) The Air Line Pilots Association ("ALPA") agreed with United

---

[1] In addition to the FA Plan, United also has three other pension plans covered by ERISA Title IV. These are the Ground Employees' Retirement Plan ("Ground Plan"), which covers 36,100 active and retired mechanics and ramp workers; the Pilot Defined Benefit Pension Plan ("Pilot Plan"), which covers 14,100 active and retired pilots at United; and the Management, Administrative and Public Contact Defined Benefit Pension Plan ("MAPC Plan"), covering 42,700 participants. In total, combined with the FA Plan, these United plans cover the pensions of 121,557 participants and have an unfunded liability of nearly $10 billion. (Babcock Decl., Ex. D at 2 n.4, 7; Parcelli Decl., Ex. B.)

[2] On January 8, 2005, United withdrew its motion with respect to the flight attendants' CBA as a result of the union's agreement to additional concessions. As part of their agreement, the parties agreed to "continue to meet and confer regarding the Defined Benefit Plan." However, as provided by that agreement, because the parties failed to resolve the pension

not to oppose the airline's termination of the Pilot Plan.  (Babcock Decl., Ex. D at 4 n.7.)

Subsequently, on December 29, 2004, PBGC[3] filed a complaint in the Northern District of Illinois to "involuntarily" terminate the Pilot Plan pursuant to 29 U.S.C. § 1342, and on March 10, 2005, PBGC filed a similar complaint concerning the Ground Plan in the Eastern District of Virginia.  However, the PBGC repeatedly asserted that United could retain at least one of its pension plans post-bankruptcy, and PBGC specifically pointed to the FA Plan as a plan that could be maintained under a variety of scenarios.  (*See, e.g.*, Babcock Decl., Ex. B at 20-27, Ex. C at ¶ 8; Davidowitch Decl., Ex. E.)

Consistent with this position, on April 14, 2005, PBGC filed an emergency motion in bankruptcy court to postpone consideration of United's then-pending motion for distress termination of its four pension plans, calling the airline's move "premature" in light of its failure to show that the FA Plan was not salvageable.  Under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV), a bankruptcy court cannot approve a debtor's motion to terminate a pension plan unless the court "determines that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process."  PBGC argued that because United's business plan on file with the court was stale and because the airline had not submitted a proposed plan for reorganization, United's emergence from bankruptcy was not imminent and it was therefore premature to

termination issue, United refiled its motion to reject the CBA pursuant to 11 U.S.C. § 1113(c) on April 11, 2005.  (*See* Davidowitch Decl., Ex. B (United / AFA 1/8/05 Letter of Agreement).)

[3] PBGC is the United States government agency that administers pension plan terminations under Title IV of ERISA, which provides the exclusive means for terminating such plans.  *See* 29 U.S.C. § 1302; *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446-447 (1999).

determine whether "*but for* the termination of the pension plan in issue, [United] will be forced to liquidate." (Babcock Decl., Ex. D at 5.)

Shortly thereafter, on April 22, PBGC and United reached a settlement ("the Agreement") providing that, if United's pension plans are terminated, the debtor's reorganization plan would provide for payment of up to $1.5 billion to PBGC.[4]  The Agreement also requires that, with respect to the FA Plan, "[a]s soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement, PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant . . . Plan[].  *If and when* PBGC issues [a] Notice of Determination[] [("NOD")] that the Flight Attendant . . . Plan[] should terminate, then PBGC and United shall execute termination and trusteeship agreements with respect to such Plan[]." (Babcock Decl., Ex. E at ¶ 4(a) (emphasis added).)  Furthermore, the settlement is expressly conditioned on the "condition subsequent" that all the United pension plans would be terminated pursuant to Title IV of ERISA, and the Agreement provides that it may be terminated by either party if this condition is not satisfied. (*Id.* at ¶¶ 16(a), 18(c).)  Should PBGC issue a NOD for the FA Plan, the plan's termination date would be five business days thereafter.  (*Id.* at ¶ 5(a)(i).)  PBGC in turn released substantial monetary claims against United and its assets.  (*See, e.g.*, *id.* at ¶ 7.)

On May 11, the bankruptcy court approved the Agreement, holding that "[t]his settlement does not itself terminate the plan, any plan.  This settlement provides that the PBGC will go through its administrative procedures to come to a conclusion as to whether the plans in question

---

[4] Payment would be provided in stock and notes that mature between 15 and 25 years after issuance.  Issuance of these notes and shares is far from guaranteed and is subject to various conditions, including United achieving certain financial goals between 2009 and 2017.  (*See* Babcock Decl., Ex. E (Agreement) at 12-16.)

here ought to be involuntarily terminated." (Novey Decl., Ex. D (5/11/05 Tr.) at 188.) The court

read the settlement as PBGC's "agreement to exercise its statutory obligation to determine

whether a pension plan ought to be involuntarily terminated" (*id.* at 189), noting that aggrieved

parties could sue PBGC under 29 U.S.C. § 1303(f) to challenge the propriety of the agency's

actions under ERISA. (*Id.* at 187.) On that same date, the bankruptcy court entered a written

order approving the Agreement.[5]

## ANALYSIS

AFA now moves for a preliminary injunction, making two legal arguments why PBGC's

entry into the Agreement was *ultra vires*. First, the union contends that, because the pension plan

termination envisioned by the settlement is in reality being initiated by United, the Agreement

unlawfully evades the strictures of 29 U.S.C. § 1341, which governs "voluntary" pension plan

terminations, *i.e.*, those initiated by an employer. (Pl.'s Mot. at 4.) Second, AFA argues that the

agency has exceeded its statutory authority under 29 U.S.C. § 1342, which governs PBGC-

---

[5] The order of the bankruptcy court provided that:

    (A) Under Section 4042 of ERISA, 29 U.S.C. § 1342, PBGC may
terminate a pension plan in order to protect the pension benefit guaranty system
with the consent of the plan sponsor without a court hearing even though that
overrides the provisions of a collective bargaining agreement;

    (B) Aggrieved parties have their rights under Section 4003(f) of ERISA,
29 U.S.C. § 1303(f), to bring actions against PBGC to challenge the propriety of
its actions under ERISA (and PBGC reserves its rights in any such action); and

    (C) The Agreement, and United's entry into the Agreement, does not
violate the law.

*In re UAL Corp.*, No. 02-48191, 2005 Bankr. LEXIS 816, at *4 (Bankr. N.D. Ill. May 11, 2005).

initiated involuntary terminations, by agreeing in advance to terminate a pension plan before it has made the findings required by statute to justify such a termination.

## I.    Statutory Framework

Section 1341 provides for employer-initiated terminations of pension plans in either standard or distress circumstances.[6]   In either case, a voluntary termination cannot proceed if to do so would violate an existing CBA.  29 U.S.C. § 1341(a)(3).  This "contract bar" provision was added in 1986 as part of a Congressional effort to address the preexisting "termination insurance system [which] in some instances encourages employers to terminate pension plans, evade their obligations to pay benefits, and shift unfunded pension liabilities onto the termination insurance system and the other premium-payers."  29 U.S.C. § 1001b(a)(4).  *See PBGC v. LTV Corp. (In re Chateaugay Corp.)*, 87 B.R. 779, 813 (S.D.N.Y. 1988), *rev'd on other grounds by* 496 U.S. 633 (1990) (discussing legislative history of 1986 ERISA amendments).  (*See also* Pl.'s Reply at 6.)  Nonetheless, the 1986 modifications sought to keep in place the delicate balance originally established in 1974, when ERISA was enacted.  "Though Congress was concerned chiefly with protecting the employees' expectations of pension benefits, it also realized that employers would not create, maintain, or expand pension plans if ERISA imposed too much cost.  Consequently, the entire statute is a finely tuned balance between protecting pension

_____

[6] Especially with respect to the legislative history surrounding the amendments to ERISA, the Court wishes to acknowledge the helpful brief filed by *amici curiae* Members of Congress George Miller and Jan Schakowsky, who make clear that the instant dispute is part of a much broader dilemma concerning this nation's private pension system.  (*See* Amici Curiae Br. at 1.)

benefits for employees while limiting the cost to employers." *A-T-O Inc. v. PBGC*, 634 F.2d 1013, 1021 (6th Cir. 1980).[7/]

A distress termination -- one involving a bankrupt plan sponsor -- may circumvent the contract bar only where the debtor has satisfied the requirements of § 1113 of the Bankruptcy Code. That provision governs CBA modification and expressly forbids a debtor-in-possession or trustee from "unilaterally terminat[ing] or alter[ing] any provisions of a collective bargaining agreement," 11 U.S.C. § 1113(f). A debtor may not change a CBA unless it engages, *inter alia*, in good faith negotiations with its unions designed to achieve necessary modifications that treat all affected parties "fairly and equitably." *Id.* § 1113(b)(1)(A). The bankruptcy court must so find before it can approve any unilateral CBA changes. *Id.* § 1113(c). *See Adventure Res., Inc. v. Holland*, 137 F.3d 786, 796 & n.13 (4th Cir. 1998). In other words, unless United reached a consensual agreement with its unions to remove the contract bar, or unless the bankruptcy court determined that the airline had complied with § 1113, the FA Plan could not be voluntarily terminated by United pursuant to § 1341 of ERISA.

Once a plan sponsor otherwise complies with the requirements of § 1341, PBGC must determine whether the plan is eligible for a distress termination. *See* 29 U.S.C. § 1341(c)(2)(B). Furthermore, a distress termination may not proceed unless the bankruptcy court finds that plan termination is essential for the debtor to be able to pay all its debts and to emerge from Chapter

---

[7/] For the sake of clarity, throughout this Memorandum Opinion the Court identifies the relevant ERISA provisions as they are codified in the United States Code. However, the parties and some other courts refer to the same sections by their ERISA section numbers. For example, ERISA § 4041 is codified at 29 U.S.C. § 1341, and ERISA § 4042 is codified at 29 U.S.C. § 1342.

11 bankruptcy.  29 U.S.C. § 1341(c)(2)(B)(ii)(IV).  In addition to statutory requirements, detailed

regulations govern distress termination proceedings.  *See* 29 C.F.R. § 4041.41 *et seq.*

A different set of rules governs PBGC-initiated terminations.  Such involuntary

terminations are predicated on the agency's independent cause determination that a pension plan

satisfies one or more of the four statutory criteria set forth in § 1342(a).  These criteria are:

> (1) the plan has not met the minimum funding standard required under section 412
> of the Internal Revenue Code of 1986 [26 U.S.C. § 412], or has been notified by
> the Secretary of the Treasury that a notice of deficiency under section 6212 of
> such Code [26 U.S.C. § 6212] has been mailed with respect to the tax imposed
> under section 4971(a) of such Code [26 U.S.C. § 4971(a)],
> (2) the plan will be unable to pay benefits when due,
> (3) the reportable event described in section 4043(c)(7) [29 U.S.C. § 1343(c)(7)]
> has occurred, or
> (4) the possible long-run loss of [PBGC] with respect to the plan may reasonably
> be expected to increase unreasonably if the plan is not terminated.[8/]

PBGC's internal administrative process for informal adjudications is governed by an agency

directive.  It establishes a Trusteeship Working Group ("TWG"), composed of PBGC financial,

actuarial, policy and legal staff, that reviews a written recommendation in favor of plan

termination generated by other PBGC staff.  (Bacon Decl., Ex. D at § 2(j).)  In the case of a

pension termination of the size proposed here, concurring signatures are required from a variety

of PBGC officials, including the General Counsel, the Chief Operating Officer, and the TWG

Chairperson.  (*Id.* § 3(d)(4).)  Ultimately, however, the final decision lies in the hands of the

Approving Official, in this case PBGC Executive Director Belt.  (*Id.* § 2(b)(4).)

---

[8/] As of September 30, 2004, PBGC was responsible for providing pension benefits to
over one million workers, and its balance sheet reflected a $23.3 billion deficit relative to the
$62.3 billion in benefits it has guaranteed to those workers.  (Parcelli Decl., Ex. B.)

8

This Court has jurisdiction pursuant to 29 U.S.C. § 1303(f), which provides the "exclusive means for bringing actions against [PBGC]" concerning termination decisions. *Id.* § 1303(f)(4); *see also id.*, § 1303(f)(2)(C). Only equitable relief is available. *Id.* § 1303(f)(1).

## II.    Preliminary Injunction Standard

For a court to grant a preliminary injunction, plaintiff must show: (1) a strong likelihood of success on the merits; (2) that without injunctive relief it will suffer irreparable harm; (3) that injunctive relief will not substantially harm other interested parties; and (4) that the public interest favors the injunction. *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987); *Fed'n Internationale De Football Ass'n v. Nike*, 285 F. Supp. 2d 64, 68 (D.D.C. 2003). These factors "interrelate on a sliding scale" and must be evaluated relative to one another, for "'if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). On the other hand, "if the plaintiff makes a particularly weak showing on one factor . . . the other factors may not be enough to compensate." *Dodd v. Fleming*, 223 F. Supp.2d 15, 20 (D.D.C. 2002) (citing *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995), *amended on other grounds*, 66 F.3d 1226 (D.C. Cir. 1995)). Indeed, "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." *Id.* at 20 (citing *CityFed*, 58 F.3d at 747). A preliminary injunction is an extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party. *Kahane v. Sec'y of State*, 700 F. Supp. 1162, 1165

(D.D.C. 1998). Based on the record before the Court, it is unable to find that plaintiff has satisfied this burden, and therefore, as explained herein, the motion will be denied.

**III.    Likelihood of Success on the Merits**

AFA argues that PBGC has acted *ultra vires* by entering into this Agreement whereby the FA Plan will be terminated in violation of ERISA. *See* 29 U.S.C. §§ 1341, 1342. Plaintiff's argument encounters several difficulties. First, the Agreement's plain language does not compel the plan's termination, for it does not preordain a given conclusion. (*See* Babcock Decl., Ex. E (Settlement Agreement) at ¶ 4(a) ("*If and when* PBGC issues [a] Notice of Determination[] that the Flight Attendant . . . Plan[] should terminate . . . .") (emphasis added); *see also id.* at ¶¶ 16(a), 18(c) (settlement voidable if pension plans not terminated).) Thus, while the end result of this process may well be predictable, the agency is not contractually bound to reach a certain decision, but rather has only agreed to initiate a § 1342 proceeding, which is an option provided to the agency by statute. *See* 29 U.S.C. § 1342(a), (c). Moreover, insofar as the agency's ultimate termination conclusion conforms to plaintiff's prediction, AFA's rights to challenge that termination will, as recognized by the bankruptcy court, be preserved under 29 U.S.C. § 1303(f). *See In re UAL Corp.*, 2005 Bankr. LEXIS 816, at *4. At this point, however, it is simply premature to discuss the FA Plan's termination as a *fait accompli*.[9]

The union further maintains that, in reaching a negotiated settlement with a plan sponsor, the agency acted *ultra vires* by allowing United to do what it could not do absent PBGC's

_____

[9] Any challenge to a termination determination could well raise many of the arguments which have been advanced at this juncture given the interconnectedness between any termination decision and the Agreement.

complicity:  terminate the FA Plan without being subject to a bankruptcy court finding of good faith efforts to renegotiate the flight attendants' CBA.  *See* 29 U.S.C. § 1341; 11 U.S.C. § 1113.  But AFA's argument relies on a rationale not supported by ERISA.  Rather, PBGC has substantial latitude to "make arrangements with contributing sponsors and members of their controlled groups who are or *may become* liable under section 1362 . . . ."  29 U.S.C. § 1367 (emphasis added).  Pursuant to § 1362, upon termination of the FA Plan, United would become liable, *inter alia*, for "the total amount of the unfunded benefit liabilities . . . ."  29 U.S.C. § 1362(b)(1)(A).  Thus, the plain language of § 1367 contemplates "arrangements" with plan sponsors whose plans have not yet been formally terminated under § 1342.  Accordingly, PBGC has the authority to reach settlements with firms in United's situation.

The conclusion is also in accord with *Allied Pilots Ass'n v. PBGC*, 334 F.3d 93 (D.C. Cir. 2003).  There, the Circuit found that PBGC has "general authority" to enter settlements under § 1367, including in a situation where the agency had made a cause determination supporting termination nearly a decade earlier but had not acted to terminate the pension plan because of a settlement agreement it had reached with the plan sponsor and others.  *Id.* at 98.  Although the Circuit Court did not specifically address the novel question presented here of whether the agency can reach a settlement agreement with a debtor prior to making an independent cause determination, *Allied Pilots* cannot be read, as suggested by plaintiff, to foreclose reliance on § 1367 to support such a settlement.  Indeed, the Circuit made clear that in PBGC-initiated terminations under § 1342, ERISA "imposes no procedural strictures on the PBGC other than requiring it to 'issu[e] a notice . . . to a plan administrator [that the PBGC] has determined that the plan should be terminated' before seeking either district court enforcement or voluntary

11

settlement." *Id.* at 97 (citing 29 U.S.C. § 1342(a), (c)). Therefore, plaintiff misreads § 1367 insofar as it contends that the statute precludes a settlement with a plan sponsor prior to a termination determination. (Pl.'s Reply at 4 n.1.) Rather, § 1367 clearly provides that a settlement may be reached with a plan sponsor who "may become liable," and there is no requirement that the timing of such a settlement must be between a § 1342 determination and the establishment of liability under § 1362.

Moreover, if anything, *Allied Pilots* supports the agency's authority to conclude that it is in its interest, as defined in light of PBGC's statutory purposes set forth in § 1302(a) of ERISA, to reach a settlement whereby it agrees to initiate a § 1342 proceeding in exchange for certain benefits as part of a § 1367 settlement. The agency's duties are:

> (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants;
> (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies; and
> (3) to maintain premiums established by [PBGC] under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter [*i.e.*, Title IV of ERISA].

29 U.S.C. § 1302(a). It has often been noted that these purposes can well raise an inherent conflict, for no priority is given to maximizing the benefits of particular pension plan participants. *See, e.g.*, *Brown v. PBGC*, 821 F. Supp. 26, 31 (D.D.C. 1993). Indeed, the Supreme Court has upheld the agency's decision to minimize PBGC liabilities, even at the expense of its other statutory purposes, based on a recognition that the resolution of conflicting goals is precisely the type of agency decisionmaking to which courts owe deference. *See PBGC v. LTV Corp.*, 496 U.S. at 651-52. *Accord Piech v. PBGC*, 744 F.2d 156, 161 (D.C. Cir. 1984) ("Although it may in many ways be desirable for plan participants to have a trustee who is

12

prepared to advocate their interests in opposition to the PBGC, Congress has evidently not envisioned such a role for the plan trustee.").

Given that PBGC has statutory authority, pursuant to 29 U.S.C. § 1367, to reach a settlement with a plan sponsor prior to determining whether termination is justified under § 1342(a)(1)-(4), the Court must now turn to the question of whether the Agreement on its face violates ERISA's requirement that a § 1342 termination must be agency, and not employer, initiated. While plaintiff acknowledges that a plan sponsor can advocate or lobby the PBGC to initiate a § 1342 termination proceeding, it argues that the agency cannot, without violating § 1342's requirement that PBGC initiate the termination, negotiate an agreement whereby one of the terms of a monetary settlement is the agency's promise to commence a termination proceeding. (6/3/05 Hearing Tr. at 48.)

The Court cannot agree that the distinction that the union attempts to create is sufficiently real as to conclude that the Agreement is *per se* violative of ERISA. First, it is clear that it is neither improper nor uncommon for PBGC to institute § 1342 proceedings after a company moves for a § 1341 termination. *See, e.g.*, *Pension Comm. For Farmstead Foods Pension Plan For Albert Lea Hourly Employees v. PBGC*, 991 F.2d 1415, 1418, 1421 (8th Cir. 1993). Second, the law treats agency decisions as presumptively regular "absent the most powerful preliminary showing to the contrary." *See, e.g.*, *Nat'l Nutritional Foods Ass'n v. FDA*, 491 F.2d 1141, 1146 (2d Cir. 1974). When considering these two principles in tandem, it follows first that the statute permits the use of a § 1342 proceeding even if the effect is to cut off the collective bargaining rights of the union under § 1341, and second, the Court is required to presume that the agency adopted this route, consistent with its statutory duties, as part of an arms-length negotiated

settlement.  In other words, assuming the Agreement resulted from a fair negotiation between the

parties and the agency entered into it based on its independent judgment (which on the record

before the Court it has no basis to dispute), it follows that the initiation of the § 1342 proceeding

agreed to under the settlement *cannot* be equated with a United-initiated proceeding within the

meaning of § 1341.  Rather, under the Agreement the agency is still making the decision to

initiate the proceeding, as required by § 1342, but it is doing this, as permitted by § 1367, as part

of an Agreement whereby it is presumably achieving certain benefits and furthering one or more

of PBGC's statutory purposes.  *See PBGC v. Republic Technologies Int'l*, 386 F.3d 659, 668 (6th

Cir. 2004) ("ERISA provides for involuntary termination proceedings precisely so that PBGC

can protect its own financial interests and 'avoid any unreasonable deterioration of the financial

condition of the plan or any unreasonable increase in the liability of the fund.'")

     For these reasons, the Court is not persuaded that plaintiff has made a strong showing of a

likelihood of success on the merits as to its claim that the agency acted *ultra vires* by agreeing to

initiate § 1342 proceedings as part of a settlement with United.

**IV.    Irreparable Harm**

     In order to secure preliminary injunctive relief, plaintiff must show that it will suffer

irreparable harm.  Plaintiff contends that if PBGC is not enjoined from initiating termination

proceedings, flight attendants may make "significant life choices that cannot easily be reversed,"

such as relocating to a new residence as a result of lower-than-expected pension income.  (Pl.'s

Mot. at 32.)  Further, some workers may resign from United and would thereupon irrevocably

lose their seniority, which would be difficult to reinstate if plaintiff ultimately prevails in this

litigation and those flight attendants seek to rejoin United.  (*Id.* at 31.)  Secondly, the union

claims that since the effect of the Agreement is to obviate any need for United to proceed under

§ 1341, plaintiff's collective bargaining rights have been seriously diminished.  (Pl.'s Reply at

24-25.)

        As for plaintiff's claim that its workers will suffer irreparable harm if PBGC is not

restrained from considering the termination of the FA Plan, the "life choices" (Pl.'s Mot. at 32)

and economic injuries at issue here have been found not to warrant preliminary injunctive relief.

*See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("economic loss does not, in and

of itself, constitute irreparable harm").  The anticipated "injuries documented on this record -- the

forced sale of a house, a boat or stock . . . -- do not rise to the level of 'irreparable' harm

necessary to warrant the extraordinary remedy of a preliminary injunction."  *Boivin v. U.S.*

*Airways, Inc.*, 297 F. Supp. 2d 110, 118-19 (D.D.C. 2003).

        But more importantly, it is far from clear whether an injunction would have any effect on

union members' decisions whether to quit their jobs at United.  First, even if the § 1342 process

contemplated by the Agreement is enjoined, the uncertainty regarding the FA Plan will continue

as long as the bankruptcy is ongoing and other avenues for termination of the Plan -- such as a

United-initiated § 1341 proceeding -- remain.  Second, flight attendants have already been

leaving (*see* Second Davidowitch Decl., ¶ 3 (chart showing average flight attendant attrition

throughout the last year of about 100 per month, with a recent increase from 109 in March 2005

(before the Agreement) to 188 in May)), and in light of this ongoing trend, it would be unduly

speculative to conclude that an injunction would curtail this attrition.  (*Compare id.* (showing

departure of 1690 flight attendants in July 2003, when United proposed decreasing retiree health

benefits).)  Third, if and when a termination decision is reached, the flight attendants' option, as it presently exists, to leave United will remain intact.  (*See* 6/3/05 Hearing Tr. at 53-54.)  And finally, the evidence of harm presented by plaintiff is that its members will leave United "if United terminated the Flight Attendant Plan."  (Davidowitch Decl., ¶ 12.)  Since at this time any decision as to termination has yet to be made, none of the above injuries is sufficiently imminent to warrant a preliminary injunction.  *See Barton v. Venneri*, No. 05-669, 2005 U.S. Dist. LEXIS 9765, at *6 (D.D.C. May 11, 2005) ("[T]he threatened injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, because injunctions are not intended 'to prevent injuries neither extant nor presently threatened, but only merely feared.'") (quoting *Comm. in Solidarity v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991)).[10/]

     With respect to AFA's loss of leverage at the bargaining table, plaintiff correctly argues that courts have recognized that substantial infringements of collective bargaining power constitute irreparable harm.  *See Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987); *United Steel Workers v. Cooper-Standard Automotive*, No. 04-358, 2004 U.S. Dist. LEXIS 24640, at *19-20 (N.D. Ind. Nov. 2, 2004); *Allied Pilots Ass'n v. American Airlines, Inc.*,

---

[10/] Plaintiff's contention that flight attendants may resign or retire as a result of a plan termination, thereby creating a ripple effect throughout the airline seniority system that could not effectively be reversed, likewise does not suffice.  In each of the cases cited by plaintiff identifying irreparable harm where a seniority system has been disrupted, the disruption was directly traceable to employment actions undertaken by the employer.  *See IAM v. Trans World Airlines, Inc.*, 601 F. Supp. 1363, 1372 (W.D. Mo. 1985) (furloughs); *Local 553 v. Eastern Air Lines, Inc.*, 695 F.2d 668, 678-80 (2d Cir. 1982) (airline assigned new non-union hires to preferred routes, disrupting seniority system); *Tech., Office, & Prof'l Workers Union v. Budd Co.*, 345 F. Supp. 42, 45-46 (E.D. Pa. 1972) (lay offs).  Unlike those cases, any disruption here would result from the employees' decision to leave the company because they face the prospect of reduced pension benefits.

713 F. Supp. 212, 218-219 (N.D. Texas 1989), *vacated*, 898 F.2d 462 (5th Cir. 1990); *see also Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 907 (3d Cir. 1981) (National Labor Relations Act § 10(j) temporary relief). While the D.C. Circuit appears not to have spoken on the issue, this Court will apply that principle here. The cases cited, however, are inapposite. In each of them, the party enjoined from taking actions that minimized a union's bargaining power was the worker's employer. Here, PBGC is not a party to the union's CBA and is not required by the Bankruptcy Code to negotiate in good faith with the union. Thus, in each of the cited cases, there was a direct link between the enjoined party and the arguably unlawful actions undercutting the union's bargaining power, whereas here AFA blames a third party outside the collective bargaining process for its reduced leverage. This link is too attenuated to constitute irreparable harm traceable to the actions sought to be enjoined. *See, e.g.*, *Stand Together Against Neighborhood Decay, Inc. v. Board of Estimate*, 690 F. Supp. 1192, 1200 (E.D.N.Y. 1988) ("Plaintiffs have not demonstrated any incremental irreparable harm that will inure to them absent an injunction, nor have they demonstrated that the Court's injunction could in any way eliminate the harm that already exists. The lack of a causal link between the act sought to be enjoined and the irreparable harm alleged means that plaintiffs have failed to . . . meet the . . . strict standard for obtaining preliminary injunctive relief.").

Furthermore, in none of the cases upon which plaintiff relies did the statute at issue provide a lawful alternative that would necessarily undercut the union's bargaining leverage. By contrast, under ERISA (as compared to the labor statutes at issue in the cases cited by plaintiff) PBGC-initiated involuntary terminations are explicitly exempted from compliance with the CBA provisions. *See* 29 U.S.C. § 1341(a)(3). Therefore, the union's right to bargain collectively is far

17

from inviolate under ERISA.  While the 1986 amendments to ERISA were intended to prevent

an employer-initiated termination in derogation of a union's collective bargaining rights (*see,*

*e.g.*, 29 U.S.C. § 1001b(a)(4)), Congress did not build in the same restrictions on PBGC's right

to involuntarily terminate a pension plan.  In the absence of such symmetry, the Court cannot

find that the use of § 1342 by the agency, as provided for in the Agreement, impermissibly harms

the union's collective bargaining rights, and therefore, plaintiff cannot rely on a claim of harm to

its bargaining leverage to sustain its claim for a preliminary injunction.  *See, e.g.*, *Harvey v.*

*Marlene Industries Corp.*, 477 F. Supp. 723, 726 (S.D.N.Y. 1979) (denying motion for injunctive

relief under National Labor Relations Act where purported injury derived from actions that were

not unlawful and no risk of irreparable injury could be shown).

    Moreover, it is speculative whether an injunction issued at this late stage would restore

the union's bargaining power.  Plaintiff, of course, must show that it will suffer irreparable harm

*absent the injunction.  O'Hara v. District No. 1-PCD*, 56 F.3d 1514, 1522 (D.C. Cir. 1995).

Here, there is no evidence to suggest that, even if the § 1342 proceeding were enjoined, the union

would regain the power it claims to have lost.  *See Eisenberg*, 651 F.2d at 907 (citing cases

where injunctive relief was inappropriate, because interim relief would probably be no more

effective than a final judgment later, and the injury already suffered could not readily be undone).

In fact, the only evidence in the record about negotiations around the time of the settlement

relates to AFA's discussions with *PBGC* about the FA Plan, not United; the union has presented

no such evidence concerning the negotiations with the airline.  (*See* Davidowitch Decl., ¶ 8

(declaring that AFA and United met on March 3 -- six weeks prior to the airline moving to

terminate the FA Plan -- but describing only negotiations with PBGC thereafter); ¶ 9 (AFA

meeting with PBGC on March 15);  ¶ 10 (AFA proposal sent to PBGC on March 30 seeking agency contributions to the FA Plan as necessary to shore up the pension plan); ¶ 11 (PBGC response on April 4 to AFA proposal).)  *See also Stand Together*, 690 F. Supp. at 1200 (injunction denied where plaintiff failed to demonstrate that such relief "could in any way eliminate the harm that already exists").

 For these reasons, the Court concludes that the union has failed to make the required showing of irreparable harm to justify the issuance of emergency relief.


**V.    Public Interest and Substantial Harm to Other Interested Parties**

 Plaintiff argues that an injunction is in the public interest, because enjoining PBGC from considering the termination of the FA and other United pension plans will diminish pressure for other airlines to shed their own pension plans.  (Pl.'s Br. at 33; *see also* Amici Curiae Br. at 1 (stating that public interest is served by "preserving the defined benefit plan system and stemming a wider crisis in the airline industry's and the country's retirement system").)  Plaintiff and *amici curiae* may be right about the potential ripple effects of the termination of United's pension plans.  But as the involvement of these Members of Congress demonstrates, there are "broader public policy goal[s]" (Amici Curiae Br. at 1) at issue here which may need to be resolved legislatively.  This Court's role, by contrast, is to apply the law as presently written.  *See Northwest Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 95 & n.34 (1981) ("once Congress addresses a subject . . . [t]hereafter, the task of the federal courts is to interpret and apply statutory law, not to create common law").

 Thus, to serve the public interest, the Court is constrained to give effect to ERISA as

presently enacted.  As discussed, Congress established a two track system for terminating

pension plans, one employer-initiated and substantially constrained by the Bankruptcy Code, and

the other PBGC-driven and subject to significant agency discretion.  It is the latter track that is

presently at issue, and the agency duties set forth in 29 U.S.C. § 1302(a) make clear that the

public interest is served by achieving a balance between the PBGC pension insurance program's

solvency and the expectations of the beneficiaries of underfunded plans.  On the basis of the

limited record currently before it, the Court therefore concludes that the public interest is served

by permitting PBGC to use its authority to consider whether to terminate the plan.  *See LTV

Corp.*, 496 U.S. at 651-52.

          Moreover, granting an injunction could substantially harm PBGC as an interested party,

potentially "hamstring[ing] the agency for months" and preventing it from carrying out its

statutory duties.  (Def.'s Opp'n at 20.)  Further, blocking PBGC's § 1342 review could also hold

up the airline's emergence from bankruptcy, harming other interested parties, including United,

its creditors, and its other employees.  (*Id.* at 21.)  The substantial uncertainty that would be

created by enjoining a federal agency from merely *considering* what action to take significantly

outweighs any benefit to plaintiff at this juncture, and therefore argues against granting the relief

plaintiff seeks.


                                    **CONCLUSION**

          The Court recognizes that United flight attendants have already given up much to do their

part to help their employer emerge from bankruptcy and remain viable, and that they face the

unfortunate and regrettable prospect of losing a significant portion of their pension benefits.  But

                                           20

the Court is constrained to conclude that plaintiff is not entitled to the extraordinary relief that it

seeks.

Accordingly, AFA's motion is DENIED.

                                                    _____s/_____
                                                    ELLEN SEGAL HUVELLE
                                                    United States District Judge

Date:  June 8, 2005