IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 1:05CV01036 |
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) ) |
| Defendant. | ) ) ) |

## SECOND DECLARATION OF CARMEN R. PARCELLI

Carmen R. Parcelli hereby declares, pursuant to 28 U.S.C. § 1746, as follows:

1.   I am an associate in the law firm of Guerrieri, Edmond, Clayman & Bartos, P.C., which represents the Association of Flight Attendants-CWA, AFL-CIO ("AFA"), in this action.

2.   I also represent the AFA in the United Airlines bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of Illinois.  As of May 18, 2005, United had not produced an updated business plan, and has still not produced an updated business plan as of this date.  Also as of May 18, 2005, United had not resolved issues regarding fleet planning, negotiations with its public debt group, and contracting with regional partners.  To various degrees, all of these issues remain open as of this date.

3.   Attached hereto as Exhibit A is a true and correct copy of PBGC's Response to the OCUC's First Set of Interrogatories in Connection with the Debtors' Emergency Motion to Approve the

Agreement with PBGC, dated May 3, 2005 and served in the United Airlines bankruptcy proceeding.

4.    Attached hereto as Exhibit B is a true and correct copy of Response of the Pension Benefit Guaranty Corporation to Debtors' Motion to Reject their Collective Bargaining Agreement and for Voluntary Distress Termination of their Defined Benefit Pension Plans, filed April 29, 2005 in the United Airlines bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 29, 2005                          Carmen R. Parcelli

-2-

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| UAL CORPORATION., et al., | ) | Case No. 02-48191 |
|  | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Honorable Eugene R. Wedoff |
|  | ) |  |
| Debtors | ) |  |
| _____ | ) |  |

**PBGC'S RESPONSE TO THE OCUC'S FIRST SET
OF INTERROGATORIES IN CONNECTION WITH THE
DEBTORS' EMERGENCY MOTION TO APPROVE
THE AGREEMENT WITH PBGC**

The Pension Benefit Guaranty Corporation ("PBGC") hereby responds to the Official

Committee of Unsecured Creditors' First Set of Interrogatories Directed to the PBGC in

Connection with the Debtors' Emergency Motion to Approve Agreement with PBGC.


1.      **INTERROGATORY:**

Identify and state the full name, address, telephone number, title and occupation or profession of each expert witness who you will call to testify at the hearing(s) relating to the Motion.  For each expert witness identified in answer to this Interrogatory, state:

(a)     The subject matter on which each such expert witness is expected to testify;

(b)     The expert witness's conclusion(s) or opinion(s) with respect to each and every subject on which the expert witness is expected to testify;

(c)     The basis or bases for each and every conclusion or opinion on which the expert witness is expected to testify; and

(d)     The expert witness's qualification, including but not limited to his or her educational background, practical experience in the area he or she is expected to testify in, any articles or papers he or she has written, any and all seminars or postgraduate training the expert witness has received, the expert witness's

experience, if any, as a teacher or lecturer, and his or her professional
appointments and association; and

(e)    The anticipated or actual fees for each expert witness.

**RESPONSE:**

None.

**2.    INTERROGATORY:**

Identify and state the full name, title and occupation or profession of each witness who
you will call to testify at the hearing(s) on the Motion, and for each state the subject matter on
which each witness is expected to testify.

**RESPONSE:**

None.

**3.    INTERROGATORY:**

Identify and state the full name, title, occupation or profession and role of each person
who participated in any portion of the negotiations or analysis relating to the PBGC Agreement.

**RESPONSE:**

Jeffrey B. Cohen, Chief Counsel, legal analysis
John Spencer, Acting Director, Division of Insurance Supervision and
        Compliance, financial analysis
Charles Finke, Associate Chief Counsel, legal analysis
John Menke, Assistant Chief Counsel, legal analysis
Shannon Novey, Attorney, legal analysis
Michael Kramer, Managing Director, Greenhill, financial analysis
Brad Robins, Managing Director, Greenhill, financial analysis
Adam Verost, Vice President, Greenhill, financial analysis

Frederic F. (Jake) Brace, United Air Lines Executive Vice President and
        Chief Financial Officer
Todd Snyder, Managing Director, Rothschild, Inc.
Ira Wolfson, Vice President, Rothschild, Inc.
Robert Damstra, Associate, Rothschild, Inc.

James H.M. Sprayregen, counsel to the Debtors
David R. Seligman, counsel to the Debtors

Date:  May 3, 2005                    Respectfully submitted,

 /s/   Christopher T. Sheean
CHRISTOPHER T. SHEEAN, ESQ.          JEFFREY B. COHEN
(ARDC #6210018)                      Chief Counsel
Kelley Drye & Warren LLP             CHARLES L. FINKE
333 West Wacker Drive                NANCY S. HEERMANS
Chicago, IL  60606                   Associate Chief Counsels
(312) 857-7087 (telephone)           JOHN A. MENKE
(312) 857-7095 (facsimile)           PAULA J. CONNELLY
csheean@kelleydrye.com               Assistant Chief Counsels
                                     ANDREA M. WONG
LOCAL COUNSEL                        SHANNON L. NOVEY
                                     JACQUELYN M. GRAY
                                     Attorneys
                                     PENSION BENEFIT GUARANTY CORP.
                                     Office of the Chief Counsel
                                     1200 K Street, N.W.
                                     Washington, DC  20005
                                     (202) 326-4020, ext. 3848 (telephone)
                                     (202) 326-4112 (facsimile)
                                     Novey.Shannon@pbgc.gov and efile@pbgc.gov

-3-

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and exact copy of PBGC's Response to the OCUC'S First Set

of Interrogatories in Connection with the Debtors' Emergency Motion to Approve the Agreement

with PBGC was served this 3rd day of May 2005 by e-mail upon:

> Pia Thompson, Esq.
> Sonnenschein Nath & Rosenthal LLP
> 8000 Sears Tower
> 233 South Wacker Drive
> Chicago, IL  60606
> pthompson@sonnenschein.com


> ___/s/  Paula Connelly_____
> Paula Connelly
> Assistant Chief Counsel
> Pension Benefit Guaranty Corp.
> 1200 K Street, N.W.
> Washington, DC  20005

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UAL CORPORATION, et al., | ) | Case No. 02-B-48191 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Eugene R. Wedoff |
| | ) | |
| | ) | Related Docket No: 10808 |
| | ) | Hearing Date: May 11, 2005 |
| | ) | Objection Deadline: April 29, 2005 |

**RESPONSE OF THE PENSION BENEFIT GUARANTY
CORPORATION TO DEBTORS' MOTION TO REJECT THEIR COLLECTIVE
BARGAINING AGREEMENT AND FOR VOLUNTARY DISTRESS TERMINATION
OF THEIR DEFINED BENEFIT PENSION PLANS**

The Pension Benefit Guaranty Corporation ("PBGC") responds to the Debtors' Motion to

Reject their Collective Bargaining Agreements and for Voluntary Termination of their Defined

Benefit Pension Plans in distress terminations under 29 U.S.C. § 1341(c) ("Motion").

Under the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"),

29 U.S.C. §§ 1301-1461 (2000 and Supp. II 2002), a bankruptcy court's role in the distress

termination process is limited to a factual determination under the reorganization in bankruptcy

test set forth in 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).  This test requires a bankruptcy court to

determine whether a debtor "will be unable to pay all of its debts pursuant to a plan of

reorganization and will be unable to continue in business outside the chapter 11 reorganization

process," unless the pension plan is terminated.[1]  ERISA directs PBGC to determine whether the

---

[1]  29 U.S.C. § 1341(c)(2)(B)(ii)(IV); *see also* 29 C.F.R. § 4041.41(c)(2)(iv).

contributing sponsor and each member of the sponsor's controlled group satisfy the other criteria for a distress termination of the pension plan.[2]

PBGC files this response to advise the Court of the agency's views regarding the interpretation and application of the distress termination provisions of ERISA.[3]  We address the legal requirements for a distress termination of United's defined benefit pension plans, although if the pension plans are terminated as contemplated in the PBGC/UAL agreement that is currently before the Court for approval, the Debtors' distress termination motion will be moot. PBGC urges the Court to carefully review the evidence offered by the Debtors ". . . so as to enable the Court to make the necessary determinations to meet ERISA's strict criteria for distress terminations."[4]  Once the Court makes the requisite factual findings, PBGC will determine whether the Debtors' applications for distress terminations of their pension plans meet the other requirements of ERISA.

### PBGC AND THE PENSION PLANS

PBGC is the wholly-owned United States government corporation that administers the defined benefit pension plan termination insurance program established by Title IV of ERISA ("Title IV").  When a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes statutory trustee of the plan and pays plan participants their pension benefits up to the limits established by Title IV.[5]

---

[2]  29 U.S.C. § 1341(c)(2)(B); 29 C.F. R. § 4041.41(a)(3).

[3]  29 U.S.C. § 1341(c); *see also* 29 C.F.R. § 4041.41(d).

[4]  *In re Wire Rope Corp.,* 287 B.R. 771, 773 (Bankr. W.D. Mo. 2002).

[5]  *See* 29 U.S.C. §§ 1321, 1322, and 1361.

2

On December 9, 2002, UAL Corporation and a number of its subsidiaries (collectively "Debtors"), including United Air Lines, Inc. ("United"), filed for bankruptcy protection under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

United sponsors and administers four underfunded defined benefit pension plans that are insured by PBGC (collectively, the "Pension Plans"):  the United Airlines Pilot Defined Benefit Pension Plan ("Pilot Plan"), the United Airlines Ground Employees Retirement Plan ("Ground Plan"); the United Airlines Flight Attendant Defined Benefit Pension Plan ("FA Plan"); and the United Airlines Management, Administrative and Public Contact Defined Benefit Pension Plan ("MAPC Plan").

The Debtors, including UAL and United, and five non-bankrupt subsidiaries of UAL, are members of United's controlled group.[6]  The plan sponsor and each member of its controlled group are jointly and severally liable for the unfunded benefit liabilities of any terminated Pension Plan ("Termination Liability"), and for any unpaid minimum funding contributions and unpaid premiums.[7]  PBGC  timely filed claims for the Termination Liability of the Pension Plans, contingent on plan termination, and for any unpaid minimum funding contributions and premiums for the Pension Plans.[8]

---

[6]  A group of trades or businesses under common control, referred to as a "controlled group," includes, for example, a parent and its 80-percent owned subsidiaries.  29 U.S.C. § 1301(a)(14); 29 C.F.R. 4001.3; 26 U.S.C. §§ 414(b),(c); Treas. Reg. § 1.414(b)-1, (c)-2.

[7]  *See* 29 U.S.C. § 1301(a)(18), 1307; 1362; 26 U.S.C. § 412(c)(11).

[8]  PBGC's proof of claim estimated the Termination Liability for the Pilot Plan at $2,481,100,000; for the Ground Plan, $1,922,000,000; for the FA Plan, $1,396,100,000; and the MAPC Plan, $1,730,000,000.  PBGC will amend those claims as necessary.  The current

Title IV of ERISA provides the exclusive means for termination of single-employer pension plans.[9]  A plan sponsor can terminate a pension plan in a standard termination under 29 U.S.C. § 1341(b) if the plan has sufficient assets to pay all benefits owed to the plan's participants.

If the plan does not have sufficient assets to cover all of its benefit liabilities, the plan sponsor can initiate a distress termination under 29 U.S.C. § 1341(c).  Under the distress termination provisions, a pension plan may terminate only if: (1) the plan administrator provides affected parties, including PBGC and plan participants, at least 60 days advance written notice of its intent to voluntarily terminate the pension plan, as required under 29 U.S.C. § 1341(a)(2); (2) the plan administrator provides PBGC with certain information required by 29 U.S.C. § 1341(c)(2)(A); and (3) the plan administrator proves that one of four statutory tests for distress is met.[10]

On April 14, 2005, United sent to affected participants notices of intent to terminate ("NOITs") the FA Plan and the MAPC Plan in distress terminations and establish June 30, 2005

_____

estimates are $2,937,700,000 for the Pilot Plan; $2,764,700,000 for the Ground Plan; $1,928,000,000 for the FA Plan; and $2,356,000,000 for the MAPC Plan.

[9]  29 U.S.C. § 1341(a); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999); *PBGC v. Mize Co.*, 987 F.2d 1059, 1061 (4th Cir. 1993); *Phillips v. Bebber*, 914 F.2d 31, 34 (4th Cir. 1990).

[10]  29 U.S.C. § 1341(c)(1)(A), (B).  PBGC reviews the notice of intent to terminate to determine whether it complies with ERISA's requirements.  PBGC must notify the plan administrator of its determination in this regard.  29 C.F.R. § 4041.44(a) and (b).  PBGC must also make a determination regarding the plan's sufficiency for guaranteed benefits or benefit liabilities.  29 U.S.C. § 1341(c)(3)(A); 29 C.F.R. § 4041.47.  If PBGC is unable to determine that the plan is sufficient for guaranteed benefits, PBGC shall commence an involuntary termination under 29 U.S.C. § 1342.

4

as the termination date for each. United has also filed its required Form 600 distress termination

filings for the MAPC and FA Plans on April 29, 2005. United has not, to PBGC's knowledge,

sent NOITs to the Pilot Plan and Ground Plan participants, nor has it yet provided PBGC with

the information required under § 1341(c)(2) for those two Pension Plans.

PBGC cannot proceed with a distress termination if such termination would violate the

terms and conditions of an existing collective bargaining agreement ("CBA"). 29 U.S.C. §

1341(a)(3). The collective bargaining agreements between United and three of its unions have

been amended by agreement with the unions. Currently, no terms of any CBA bar a distress

termination of the Pilot Plan. The International Association of Machinists and Aerospace

Workers, the Aircraft Mechanics Fraternal Association, and the Association of Flight Attendants

continue to have CBAs in place with terms affecting the Ground Plan, the MAPC Plan, and the

FA Plan. Accordingly, United has moved to reject those CBAs pursuant to 11 U.S.C. § 1113 in

conjunction with its distress termination motion.

Additionally, PBGC can initiate termination of a pension plan under 29 U.S.C. § 1342(a)

if it determines that certain criteria have been met. A PBGC-initiated termination can be

completed by an agreement between PBGC and the plan administrator, or, absent such

agreement, by filing an action in federal district court.

PBGC initiated involuntary terminations of the Pilot Plan on December 30, 2004 and the

Ground Plan on March 11, 2005. United has not entered into an agreement with PBGC

terminating those plans. Accordingly, PBGC filed an action in the U.S. District Court for the

Northern District of Illinois to terminate the Pilot Plan, which action was referred to this Court,

and in the U.S. District Court for the Eastern District of Virginia to terminate the Ground Plan.
Those termination actions are still pending.

United has filed the instant Motion to enable it to terminate all four Pension Plans in a
distress test by satisfying the "reorganization in bankruptcy" test, 29 U.S.C. § 1341(c)(2)(B)(ii).
United recently moved for approval of an agreement between it and PBGC under which PBGC
staff will initiate termination of the FA and MAPC plans, and United and PBGC will execute
termination agreements with respect to the Ground and Pilot Plans.  Because at this date PBGC
cannot know the outcome of the motion to approve the PBGC/United Agreement, or the result of
the PBGC-initiated terminations of the FA and MAPC Plans, this filing assumes that some
distress hearing may go forward.

THE REORGANIZATION IN BANKRUPTCY DISTRESS TEST

In a distress termination, the pension plan's contributing sponsor and each member of its
controlled group must satisfy at least one criterion of 29 U.S.C. § 1341(c)(2)(B).  United's
Motion asserts that the Debtors can satisfy the "reorganization in bankruptcy" test of 29 U.S.C.
§ 1341(c)(2)(B)(ii).  Under that criterion, the reorganization in bankruptcy test is met if, as of the
proposed termination date, the plan sponsor or controlled group member is a debtor in a chapter
11 bankruptcy proceeding, and the bankruptcy court finds that unless the pension plan is
terminated, the debtor will be unable to pay all of its debts under a plan of reorganization and
will be unable to continue in business outside of bankruptcy.[11]  The bankruptcy court must make

---

[11] 29 U.S.C. § 1341(c)(2)(B)(ii)(IV); *see In re Sewell Mfg. Co.*, 195 B.R. 180, 185
(Bankr. N.D. Ga. 1996); *Wire Rope*, 287 B.R. at 777.

6

the requisite findings required by this provision of ERISA as to each debtor controlled group member.[12]  PBGC will be bound by a final and non-appealable order of the bankruptcy court.[13]

This Court has found that in a distress termination, "the appropriate standard of review . . . pursuant to [29 U.S.C.] Section 1341(c)(2)(B)(ii), is *but for* the termination of the pension plan, the debtor will not be able to pay its debts when due and will not be able to continue in business."[14]  Thus, a bankruptcy court should make a factual finding, based on the evidence introduced by the debtor and other parties, that unless the pension plan is terminated, the debtor will be unable to pay all of its debts pursuant to a plan of reorganization and will be unable to continue in business outside the Chapter 11 reorganization process.[15]  In making this determination, a bankruptcy court should inquire whether a Debtor will be unable to pay its debts and continue in business under *any* plan of reorganization, as 29 U.S.C. § 1341(c)(2)(B)(ii)(IV) qualifies a debtor's ability to pay in terms of "a" plan of reorganization, and not "its" plan of reorganization.[16]

Under ERISA, a bankruptcy court's role in a distress termination is limited:

> Here, however, the Court does not find itself faced with the
> ultimate question of the Debtor's entitlement to the termination of

---

[12]  *Sewell Mfg.*, 195 B.R. at 183.

[13]  29 C.F.R. § 4041.41(d)(1)(iv).

[14]  *In re Resol Mfg. Co.*, 110 B.R. 858, 862 (Bankr. N.D. Ill. 1990) (emphasis added).

[15]  *In re Wire Rope Corp.*, 287 B.R. at 780-81; *Sewell*, 195 B.R. at 185.

[16]  *Sewell,* 195 B.R. at 184; *Wire Rope*, 287 B.R. at 777-78.  Thus, PBGC has suggested in another filing in this case that the distress hearing should not go forward until United and this Court has a better idea of what its plan of reorganization and ultimate business plan will look like.

its pension plan.  Instead, the Court simply must perform one narrow factual determination, the satisfaction of which will compose a single element in the Debtor's individual case for reorganizational "distress."  The ultimate sufficiency of that distress showing, as well as the adequacy of the Debtor's required disclosures and the qualifications of any "controlled group" parties, then will become a collective matter for the PBGC's consideration as it makes a final determination of the Debtor's right to a distressed [sic] termination.[17]

The legislative history of ERISA also provides guidance as to the appropriate role of a bankruptcy court in distress terminations.  Congress significantly changed the termination requirements for pension plans in 1986 and 1987.  Before these amendments, a plan sponsor could terminate a pension plan for any reason.  The distress termination provisions were first enacted by Congress as part of the Single-Employer Pension Plan Amendments Act of 1986 ("SEPPAA"), Pub. L. No. 99-272, 100 Stat. 237 (1986).  The legislative history shows that the "policy of the legislation is to limit the ability of plan sponsors to shift liability for guaranteed benefits onto other PBGC premium payers and to avoid responsibility for the payment of certain nonguaranteed benefits, to cases of severe business hardship."[18]  The House report further explained a primary purpose of the change was "to provide for the transfer of unfunded pension liabilities onto the single-employer pension plan termination insurance program only in cases of severe hardship so as to keep the premium costs of such system at a reasonable level."[19]

---

[17] *Sewell*, 195 B.R. at 185.  *See also*, *In re Diversified Indus., Inc.*, 166 B.R. 141, 144 (Bankr. E.D. Mo. 1993) (A bankruptcy court that lacks jurisdiction over a non-debtor cannot determine whether that non-debtor satisfies the reorganization test.)

[18] H.R. Rep. No. 300, 99th Cong., 1st Sess. 279 (1985), *reprinted in* 1986 U.S.C.C.A.N. 930.

[19] H.R. Rep. No. 300, 99th Cong., 1st Sess. 278 (1985), *reprinted in* 1986 U.S.C.C.A.N. 929.

The distress criteria were then further clarified by the Pension Protection Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330, when the current stringent reorganization test language was added.[20]

     The above standard must be met for each pension plan individually that United may seek to terminate, not for a group of plans in the aggregate.  The plain language of the statute requires an individualized standard.  The distress provision provides that "*A* single-employer *plan* may terminate under a distress termination"[21] only if, among other things, "the bankruptcy court determines that, unless *the plan* is terminated,"[22] the debtor cannot reorganize.  Moreover,

---

[20]  As explained by Rep. Schulze, a PPA conferee:

> The conference agreement narrowed the ability of a pension plan sponsor, under current law, to transfer his pension plan obligations to the PBGC by the mere filing of a bankruptcy petition under chapter 11.  Under the conference amendment a bankruptcy court judge will not allow a distress termination of a pension plan *unless he determines that the company is unable to pay its debts* pursuant to a plan of reorganization and continue in business outside of a [C]hapter 11.
>
> Furthermore, a pension plan termination would be allowed *only if it otherwise would force the sponsor into liquidation*; and where, for example, the court found that the sponsor had made sacrifices, such as in its pay package agreements.
> . . . .
>     . . . I trust the bankruptcy courts will apply this new provision in the way in which the conferees intended.

133 Cong. Rec. H11970 (Dec. 21, 1987) (emphasis added).

[21]  29 U.S.C. § 1341(c)(1) (emphasis added).

[22]  29 U.S.C. § 1341(c)(2)(B)(ii)(IV) (emphasis added).

limiting the application of the distress test to each plan individually furthers Congress' purpose of limiting the availability of a distress termination to cases of severe business hardship.

United argues, based on the district court decision in *Kaiser Aluminum*,[23] that this Court should consider the affordability of its pension plans as a group. That decision imported into the distress termination test the unrelated "fair and equitable" standard under 11 U.S.C. § 1113, governing the rejection of collective bargaining agreements in bankruptcy. But that court's reasoning was wrong, and PBGC intends to appeal that ruling. A motion for distress termination is not subject to the same standards applicable to a motion to reject a collective bargaining agreement. Different statutes, with different standards and different purposes, apply to these motions. The purpose of section 1113 is to ensure that the costs of reorganization are not unfairly allocated to the debtors' employees.[24] The purpose of the distress termination provision of ERISA is to avoid, where possible, the shifting of pension liabilities onto PBGC and its premium payers.[25] And Congress sought to achieve that goal by requiring a close examination of the ability of a plan sponsor to maintain each pension plan it seeks to terminate.

Congress could have incorporated a "fair and equitable" standard into § 1341, but it choose instead a more stringent standard. As the Supreme Court has made clear, "[b]ankruptcy does not alter the burden imposed by the substantive law," and [b]ankruptcy courts are not

---

[23] *PBGC v. Kaiser Aluminum Corp.*, No. 04-145-JJF, slip op. (D. Del. Mar. 30, 2005).

[24] *See, e.g.,* 130 Cong. Rec. S8898 (daily ed. June 29, 1984) (Sen. Packwood) (The "fair and equitable" requirement "guarantees that the focus for cost cutting must not be directed exclusively at unionized workers. Rather the burden of sacrifices in the reorganization process will be spread among all affected parties.").

[25] *See* p. 7, *supra.*

authorized in the name of equity to make wholesale substitution of underlying law . . ., but are limited to what the Bankruptcy Code itself provides."[26]  The Bankruptcy Code does not provide any exceptions to the careful restrictions on pension plan terminations for companies reorganizing in bankruptcy that Congress codified in Title IV of ERISA

In US Airways' first bankruptcy, the company sought a distress termination of its pilot plan only, while leaving other plans ongoing.  The pilots argued, *inter alia* that it was unfair for US Airways to do so.  But the Bankruptcy Court for the Eastern District of Virginia rejected the pilots' argument that fairness prohibits terminating some plans while maintaining others.[27] Instead, that court emphasized the effect of the plan to be terminated on the company's ability to reorganize, noting the cost of that plan versus the cost of the ones that were to remain ongoing. Even though the participants in any plan that is being terminated may "feel a particularly keen sense of having been shabbily treated," the alternative of terminating plans that do *not* meet the distress criteria is contrary to the plain language and the intent of the distress test.[28]

## CONSIDERATION OF THE DISTRESS MOTION

The Debtors state that for calendar years 2005 through 2010, its minimum funding contribution requirements for all four Pension Plans will total $4.4 billion, with contributions of $1.428 billion for the Pilot Plan, $624 million for the FA Plan, $1.1 billion for the MAPC Plan,

---

[26] *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15 (2000).

[27] *In re US Airways Group, Inc.*, 269 B.R. 734, 744 (Bankr. E.D. Va. 2003).

[28] 296 B.R. at 744; *see also id.* ("In simple dollar terms, terminating any of the other defined benefit plans would not solve the cash flow obstacles to the debtors' reorganization.").

and $1.303 billion for the Ground Plan.[29]  United contends that it needs $2 billion in exit

financing, which it believes it can attain based on its discussions with four financial institutions.[30]

It states, however, that exit financing is contingent upon its ability to meet the credit metrics in its

business plan, which in turn depends upon the Debtors' ability to terminate all four Pension

Plans.  United also claims that some of the specific metrics its proposed financiers would require

may increase if it were to retain one or more Pension Plans, even if it freezes benefit accruals for

the plans.  It specifically argues that freezing and replacing both the MAPC Plan and the FA Plan

would result in its missing its free cash flow and fixed charge coverage ratio.[31]  Finally, it cites

continued industry pressure on revenues and recent increases in fuel prices as limiting its ability

to create any cushion in the business plan.

        If this Court is faced with determining whether the FA Plan and/or the MA&PC Plan

should be terminated, this Court should require the Debtors to offer appropriate proof that, but

for the termination of *each* Pension Plan, they will be unable to obtain the necessary exit

financing to reorganize and emerge from bankruptcy.[32]  Simply demonstrating that the plan of

reorganization that would result from implementing *this* business plan contemplates termination

---

        [29]  Supplemental Memorandum in Support of Debtors' Motion ("Supplemental
Memorandum") at 14, 24.

        [30]  Supplemental Memorandum at 70-71.

        [31]  Supplemental Memorandum at 77.

        [32]  The Court need not make any finding with regard to the Pilot Plan and the Ground
Plan, because United and PBGC have agreed that those plans will terminate through PBGC's
initiated termination.

of the Pension Plans is not sufficient.[33]  Both the *Wire Rope* and *Sewell* courts, when analyzing similar assertions by debtors, heard testimony regarding the debtors' efforts to obtain financing and their lenders' conditions precedent for providing financing.[34]  Similarly, this Court should analyze the Debtors' evidence on the credit metrics required for United to qualify for financing and examine whether retaining any one Pension Plan causes United to fall meaningfully short of those metrics.  If this Court is then satisfied that the Debtors cannot attain the cost savings necessary to qualify for any financing unless each and every Pension Plan is terminated – *i.e.*, that *but for* the termination of the Pension Plan, the Debtor will not be able to pay its debts when due and will not be able to continue in business – it can make the findings required by ERISA.

---

[33]  *Wire Rope*, 287 B.R. at 777.

[34]  *Wire Rope,* 287 B.R. at 778-81; *Sewell*, 195 B.R. at 185-86.

13

# CONCLUSION

Should consideration of distress termination motions for any of the Pension Plans proceed in this Court, Debtors must make the factual and legal showings required by ERISA for *each* Pension Plan in order for this Court to make the necessary determinations that the strict criteria for distress terminations of the Pension Plans are met.

Dated: April 29, 2005                              Respectfully submitted,


LOCAL COUNSEL:                          JEFFREY B. COHEN
                                        Chief Counsel
Christopher T. Sheean                   CHARLES L. FINKE
Christopher T. Sheean, Esq.             Associate Chief Counsel
(ARDC# 6210018)                         JOHN A. MENKE
Kelley Drye & Warren LLP                KAREN L. MORRIS
333 West Wacker Drive                   Assistant Chief Counsel
Chicago, Illinois 60606                 STEPHANIE THOMAS
(312) 857-7087 (telephone)              ANDREA M. WONG
(312) 857-7095 (facsimile)              SHANNON L. NOVEY
csheean@kelleydrye.com                  Attorneys
                                        PENSION BENEFIT GUARANTY CORPORATION
                                        Office of Chief Counsel
                                        1200 K Street, NW, Suite 340
                                        Washington, D.C. 20005-4026
                                        (202) 326-4020, ext. 3457 (telephone)
                                        (202) 326-4112 (facsimile)
                                        Novey.Shannon@pbgc.gov and efile@pbgc.gov

14