# ATTACHMENT 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) |
| UAL CORPORATION, et al. | )    Chapter 11 |
| | ) |
| Debtors. | )    Case No. 02-B-48191 |
| | )    (Jointly Administered) |
| | ) |
| | )    Hon. Eugene R. Wedoff |
| | ) |
| | )    Pre-trial Hearing Date:    May 9, 2005 |
| | )    Pre-trial Hearing Time:    1:30 p.m. |
| | ) |
| | )    Hearing Date:    May 10, 2005 |
| | )    Hearing Time:    10:30 a.m. |
| | ) |

## OBJECTION OF ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, TO DEBTORS' EMERGENCY MOTION TO APPROVE AGREEMENT WITH PBGC
### [Docket No. 11024]

The Association of Flight Attendants-CWA, AFL-CIO ("AFA"), hereby submits its Objection to Debtors' Emergency Motion to Approve Agreement with the Pension Benefit Guaranty Corporation ("PBGC"). United seeks Bankruptcy Court approval of an agreement (the "Agreement") which provides, in pertinent part, that United will pay PBGC $1.0 billion in securities in exchange for PBGC involuntarily terminating the defined benefit plan covering Flight Attendants (the "Flight Attendant Plan" or "Plan").

## INTRODUCTION

United's motion should be denied on four different and independent grounds. First, the Agreement excludes AFA from settlement of litigation to which it is a party. As the Seventh Circuit has held, such an Agreement violates Bankruptcy Code Section 363, 11 U.S.C. § 363. Indeed, it is a fundamental legal principle that two parties may not impair the legal rights of a third party in the manner contemplated by the Agreement that United asks the Court to bless.

Second, the Agreement unilaterally cancels a provision of the Flight Attendants' collective bargaining agreement in violation of Section 1113(f), 11 U.S.C. § 1113(f), and the Railway Labor Act ("RLA"), 45 U.S.C. § 151, et seq. Those legal provisions plainly prohibit

United from unilaterally altering the terms of its agreement with AFA, unless and until statutory procedures are exhausted.    In this way, United's action resembles its recent attempt to unilaterally alter an agreement with the Air Line Pilots Association by claiming that certain provisions of that agreement were "mere surplusage."    In that instance, the Court rejected United's attempt to alter unilaterally its contractual obligations, and for the same reasons Debtors' current effort with respect to AFA' s agreement should be rejected as well.    United's action also echoes its recent attempt to use Section 1113(e) to nullify AFA's contractual right to notice termination of its most recent Section 1113 agreement in the event that United failed to live up to its commits thereunder.  The Court rejected that effort too.

Third, the Agreement voids United's obligations and AFA's rights under Section 1113. Through Section 1113, Congress requires a debtor to negotiate in good faith with its unions over contract modifications, and should negotiations fail, provides unions with judicial review of the negotiations and the necessity and fairness of the proposed contract modifications.  United's motion seeks to bring the Section 1113 process to a premature end.  This Court previously rejected United's attempt to "tilt the playing field" in Section 1113 negotiations regarding pensions through agreement with only one of its unions.  United's current attempt to abandon the Section 1113 playing field entirely constitutes an even more egregious violation of the Bankruptcy Code processes and AFA's rights thereunder.  Under no circumstances would such a violation be permissible.  But here, when United seeks a pension plan termination that will result in an average 50% reduction in the retirement income of current Flight Attendants, the Company's attempt to circumvent the multiple layers of legal protection afforded to pension benefits is unconscionable.

Lastly, the Agreement violates ERISA by basing a so-called "involuntary" termination upon criteria not set forth in or permitted under the statute.  Simply stated, ERISA does not allow PBGC to trade its regulatory authority for monetary compensation as a bankruptcy creditor.  In fact, United itself has raised the same objection in another stage of these proceedings, asserting

that PBGC cannot permit its pecuniary interests to dictate the exercise of its regulatory powers. The Company was right then -- it and PBGC are wrong now.

## FACTUAL BACKGROUND

On January 8, 2005, AFA and United reached a tentative agreement, providing the Company with $130 million in additional annual savings between 2005 and 2010 ("2005-2010 Agreement"). In a side letter to the 2005-2010 Agreement, AFA and United agreed to "continue to meet and confer regarding the Defined Benefit Plan." Davidowitch Decl. (dated Apr. 15, 2005), Exh. 3. That letter further provided that, if the parties were unable to reach agreement on the pension issue by April 11, United would re-file its Section 1113(c) motion with respect to the pension issue. See Davidowitch Decl. (dated Apr. 29, 2005) ¶ 5.

On January 31, Flight Attendants ratified the 2005-2010 Agreement by a margin of 56% to 44%. Over 70% of eligible Flight Attendants participated in the ratification vote, the highest turnout for any vote conducted by the Union in the course of United's bankruptcy. The same day, immediately after the ratification vote was announced, the Court approved the 2005-2010 Agreement. See id.

In late January, even before the 2005-2010 Agreement was ratified, AFA initiated discussions with PBGC, seeking to enlist the agency in its effort to find alternative funding for the Flight Attendant Plan and avoid termination. PBGC has consistently maintained that the Flight Attendant Plan was "affordable" and could be "retained in a successful reorganization." PBGC's Obj. Debtors' 1113(c) Mot. (filed Jan. 4, 2005) at 20. According to PBGC's expert, Michael Kramer, "[u]nder the Gershwin 5.0F projections, the Company has sufficient liquidity and free cash flow to support at least one of the Pension Plans currently in place, namely the F[light] A[ttendant] plan, even without application for any waivers." Kramer Decl. & Expert Report (dated Dec. 28, 2004) ¶ 8. At a January 27, 2005 meeting with AFA, PBGC indicated that it was willing to explore a wide range of options to plan termination. See Davidowitch Decl. (dated Apr. 29, 2005) ¶ 7.

- 3 -

At the same time, AFA attempted, largely in vain, to engage the Company in negotiations over alternatives to plan termination. As the Company itself recognized, the purpose of the three-month hiatus from litigation was to negotiate over "termination alternatives." Davidowitch Decl. (dated Apr. 15, 2005), Exh. 9. Indeed, the Company told AFA that it "remain[ed] willing to consider any termination alternatives." Id. Despite its professed openness to consider termination alternatives, the Company demonstrated very little real willingness to engage in meaningful negotiations with the AFA about saving the Flight Attendant Plan. See AFA's Supp. Obj. (filed Apr. 29, 2005) at 11-14.

PBGC, on the other hand, throughout this period, encouraged AFA's efforts to find alternative funding. During February and March, AFA regularly consulted with PBGC, as the Union developed a proposal that identified sufficient alternative funding to save the Flight Attendant Plan. See id.

AFA outlined its proposal in a March 30 letter to Bradley Belt, the Executive Director of PBGC. See Davidowitch Decl. (dated Apr. 29, 2005) ¶ 16, Exh. 4. In his April 4 reply, Belt characterized AFA's proposal as "constructive" and reiterated the agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11." Id. ¶ 17, Exh. 6. Mr. Belt added that: "Based upon available information, we continue to believe that the interests of participants and the pension insurance program would best be served by the continuance of the AFA plan." Id. In closing, he encouraged further work between the agency and AFA to resolve the pension funding issue. See id.

On April 11, United re-filed its Section 1113 motion, seeking authority to reject the collective bargaining agreements' contractual bar to a distress termination.

On April 14, PBGC filed an emergency motion to postpone consideration of United's motion for distress terminations of its defined benefit plans, calling United's motion "premature" and arguing that the Company had failed to show that the plans were not salvageable. PBGC's Mem. Supp. Emergency Mot. (filed Apr. 14, 2005) at 1-7. PBGC explained that, until United

"provide[s] an updated business plan . . . and file[s] its plan of reorganization . . . PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy." Id. at 5-6. On April 15, PBGC served written discovery on United, requesting "[a]ll documents relating to the affordability of the Flight Attendant Plan." PBGC's 2d Req. Docs. No. 13.

Then, on April 22, United announced that it had reached an agreement with PBGC, which would result in the termination of all four defined benefit plans. Pursuant to the Agreement, United is to provide three tranches of securities with a total value of $1.5 billion, ($500 million of which is contingent on certain conditions subsequent), to PBGC in exchange for PBGC terminating the four pension plans and settling certain other claims. See Debtors' Emergency Mot. Approve Agreem't PBGC (filed Apr. 26, 2005) ("Debtors' Mot."), Exh. A. By the terms of the Agreement, PBGC agrees that "[a]s soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement . . . PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant and MA&PC Plans." Id. at 2. The Agreement also provides that "United shall not establish any new ERISA-qualified defined benefit plans for a period of ten (10) years after the Exit Date." Id. at 4.

The immediate consequence of the Agreement being approved by the Court is that it would do away with the "need" for further Section 1113 negotiations and the hearing under Section 1113 and ERISA Section 4041. See Debtors' Mot. at 14-15. As the Company says in its Motion, "[i]f United did not enter into the Agreement, it would have to run the risks associated with litigating a sharply contested ERISA Section 4041 sponsor-initiated distress termination of all four Pension Plans, together with the Section 1113(c) trial." Id. at 18.

Further, the public statements of the Company and PBGC heralding the Agreement leave no doubt that both parties entered into the Agreement fully intending and expecting that, pending Court approval, the Agreement would result in termination. In PBGC's April 22 press release, Executive Director Belt hailed the "'reaching [of] a settlement,'" "[u]nder the terms [of which]

- 5 -

. . .," according to the press release, "the PBGC would terminate and become trustee of the company's four pension plans." Exh. 1 (PBGC Reaches Pension Settlement with United Airlines). Likewise, the Company announced on April 22 that "the company and the [PBGC] have reached an agreement for the agency to terminate all of United's defined benefit pension plans." Exh. 2 (UAL Responds to PBGC Announcement of Agreement on Termination of United's Pension Plans).

**ARGUMENT**

**I.    THE BANKRUPTCY CODE BARS THE AGREEMENT BECAUSE AFA IS NOT A PARTY TO THE SETTLEMENT.**

The Debtors bring their motion under Section 363(b), claiming that, pursuant to Federal Rule of Bankruptcy Procedure 9019, the use of the estate assets to achieve a settlement resolving the dispute over the Flight Attendant Plan, is justified. According to the Debtors, "various courts have endorsed the use of Bankruptcy Rule 9019 to resolve disputes." Debtors' Mot. at 13

The key issue, however, is what dispute this agreement is settling and who are the parties to that dispute. United provides the answer: The litigation is over the "contested ERISA Section 4041 sponsor-initiated distress termination of all four Pension Plans, together with the Section 1113(c) trial . . . over termination of the Plans", and the parties to the litigation are "PBGC, AFA, AMFA, IAM, and the retired pilots." Debtors' Mot. at 18. Although AFA is a recognized party to the litigation United describes, it is not a party to the agreement that ends that litigation. In a case involving approval of a litigation settlement under Section 363, the Seventh Circuit made clear that "two parties cannot agree to extinguish the claim of a third party not in privity with either of them." Fogel v. Zell, 221 F.3d 955, 964 (7th Cir. 2000).

What is forbidden by Fogel is exactly what is happening here. AFA is not a party to the Agreement, nor is it in privity with either the Company or PBGC. Nonetheless, the Agreement is depriving AFA of its rights as a litigant to contest plan termination in the Section 1113 and ERISA Section 4041 proceedings. Although Flight Attendants' rights are extinguished by the Agreement, AFA was completely excluded from the process of reaching the settlement, indeed,

- 6 -

was never informed a settlement was being negotiated, and was in no way a party to the "compromise."

The Company disingenuously urges the Court, in determining whether the Agreement is in the best interests of the estate, to weigh the costs of potential litigation against the benefits to the estate of the settlement. See Debtors' Mot. at 14. This simply ignores the fact that the litigant in this case, AFA, has not agreed to the terms of the settlement. Indeed, the case relied on by the Debtors is readily distinguishable on those grounds. In In re Miller, 148 B.R. 510 (Bankr. N.D. Ill. 1992), all of the potential litigants were parties to the approved settlement.

Further, where, as here, the settlement excludes a party whose rights are extinguished by the agreement, whether litigation is avoided is irrelevant as a matter of law. In Fogel, the court noted that "[J]udges naturally prefer to settle complex litigation . . . especially when it is litigation in a bankruptcy proceeding -- the expenses of administering the bankruptcy often consume most or even all of the bankrupts assets." 221 F.2d at 960. However, the preference for settlement notwithstanding, the Fogel court rejected the settlement because it excluded a party whose rights were extinguished by the agreement.[1]

## II.    THE AGREEMENT VIOLATES SECTION 1113.

United not only fails to satisfy the most basic requirement of Section 363 and Bankruptcy Rule 9019, but its reliance upon these provisions is precluded by Section 1113. By entering into the Agreement, United intends to cancel the provision of AFA's collective bargaining agreement that establishes the Flight Attendant Pension Plan, an action that can only be taken once a debtor has complied with the requirements of Section 1113. United knows this all too well, as it has on two different occasions invoked the processes set forth in this provision in order to modify the labor agreements of six different unions. It also understands that Congress enacted Section 1113

---

[1]    The Debtors cite Fogel v. Zell for the proposition that compromises are favored to reduce administrative costs, but neglect to point out that in that case the Seventh Circuit reversed the lower court's decision, finding that the district court had abused its discretion in approving a settlement that extinguished the rights of a party that was not party to the settlement. See Debtors' Mot. at 13.

in order to establish a standard of review for collective bargaining agreements that would supplant the standard applied to all other executory contracts under Section 365. See Debtors' Mem. Supp. Mot. Reject CBAs Pursuant to Section 1113(c) (filed Mar. 17, 2003) at 58-59; Debtors' 1113(c) Mem. (filed Dec. 14, 2004) at 79-84. Clearly, United cannot plead ignorance of the law, and so its decision to proceed with this Motion can only be seen as a deliberate attempt to evade both the purpose and requirements of Section 1113.

Fundamentally, Section 1113 prohibits a debtor from unilaterally changing a collective bargaining agreement and imposes upon the debtor both procedural and substantive obligations that must be satisfied before it can modify a labor agreement. By entering into the Agreement, United seeks to evade this prohibition and to void these obligations.

**1.      By Entering into the PBGC Agreement United Has Violated Section 1113(f).**

The Agreement contravenes Section 1113(f), which expressly forbids a debtor-in-possession from unilaterally modifying a collective bargaining agreement without complying with Section 1113's substantive and procedural requirements. See id. See Adventure Res., Inc. v. Holland, 137 F.3d 786, 796 (4th Cir. 1998) (Section 1113 "plainly imposes a legal duty on the debtor to honor the terms of a collective bargaining agreement, at least until that agreement is properly rejected"); In re Alabama Symphony Ass'n, 211 B.R. 65, 70-71 (N.D. Ala. 1996) ("If a debtor is free to breach the CBA without impairing its ability to reject the contract later, then § 1113 provides no incentive to abide by the terms of the CBA in the interim."); see also In re Elec. Contracting Servs. Co., 305 B.R. 22, 29-30 (Bankr. D. Colo. 2003).

Indeed, in its 1113(c) memorandum, the Company acknowledged that, absent the consent of the union, "a debtor seeking to terminate a plan required by a CBA must . . . secure an order authorizing the rejection of the CBA pursuant to Section 1113 of the Bankruptcy Code." Debtors' 1113(c) Mem. at 40. It is not disputed that the Agreement will have the effect of canceling the provision of the AFA contract that establishes the Flight Attendant Plan. Yet, in presenting the Agreement to the Court in a Section 363 motion, the Company is failing to do

precisely what it has acknowledged it must: "secure an order authorizing the rejection of the CBA pursuant to Section 1113." Id.

**2.    By Entering into the PBGC Agreement, United Has Completely Abnegated Its Section 1113 Obligations.**

Section 1113 has two essential purposes: (1) to ensure that a debtor negotiates in good faith with its unions over proposed modifications to its collective bargaining agreements; and (2) to provide unions with judicial review of those negotiations and the necessity and fairness of the proposed modifications before the debtor is authorized to reject a collective bargaining agreement.[2/]    See 11 U.S.C. § 1113(b)-(d).    In its 1113(c) memorandum, the Company recognizes that Section 1113 is the exclusive means under the Bankruptcy Code to modify a collective bargaining agreement, as well as the centrality to the Section 1113 scheme of the court's review of the purported necessity of proposed modification, noting that "Section 1113 protects [the debtor's] . . . unions . . . against changes to CBAs except those that a bankruptcy court independently confirms are 'necessary' for a reorganization to succeed." Debtors' 1113(c) Mem. at 150.

With regard to the first purpose of Section 1113 -- good faith negotiations -- United is compelled in this case to engage in such bargaining not only by the law, but by Court order and contract as well. A side letter to the 2005-2010 Agreement expressly provides that "United and AFA-CWA will continue to meet and confer regarding the Defined Benefit Plan." Davidowitch Decl. (dated Apr. 15, 2005), Exh. 3. On January 31, the Court entered an order approving the 2005-2010 Agreement, including the requirement that the Company continue to negotiate with AFA to find an alternative to termination.

With this Agreement, however, the Company jettisons the Section 1113 negotiations altogether. In making termination of the Flight Attendant Plan a fait accompli, the Agreement renders further negotiations to avoid termination a futile and pointless exercise.

_____

[2/]    The Court said essentially this at the June 2004 hearing on the Debtors' Section 1114 motion. See 6/2/04 Hrg. Tr. at 13-14.

- 9 -

The Company's professed willingness to continue negotiating with AFA is a transparent pretense. Having come to an agreement with PBGC to terminate the Flight Attendant Plan, United has absolutely no incentive to reach an agreement with AFA providing otherwise. Under such circumstances, even if United continues to sit down at the bargaining table, there can be no "honest purpose to arrive at an agreement as the result of the bargaining process," as Section 1113 requires. In re Walway Co., 69 B.R. 967, 973 (Bankr. E.D. Mich 1987); see also In re Blue Diamond Coal Co., 131 B.R. 633, 646 (Bankr. E.D. Tenn 1991); In re Lady H Coal Co., 193 B.R. 233, 242 (Bankr. S.D. W. Va. 1996).

The second principal purpose of Section 1113 - judicial review of United's compliance with its Section 1113 obligations -- is also nullified by the Agreement. Under Section 1113, the court must scrutinize United's conduct during negotiations to determine if it has satisfied each of the requirements set forth in this provision. Here, as agreed to by United and ordered by the Court, judicial review would entail a seven-day hearing. Now, according to the Company, there is to be no hearing and no adjudication of its compliance with Section 1113. United will merely have to pass the business judgment test, a standard that Congress replaced when it enacted Section 1113 to provide greater protection to collective bargaining agreements than to other executory contracts. See In re Century Brass Prods., Inc., 795 F.2d 265, 271-73 (2d Cir. 1986).

## III.    BECAUSE THE AGREEMENT CONSTITUTES UNLAWFUL SELF-HELP UNDER THE RAILWAY LABOR ACT FLIGHT ATTENDANTS ARE ENTITLED TO STRIKE IF THEIR DEFINED BENEFIT PLAN IS TERMINATED.

Like Section 1113(f), the RLA prohibits unilateral modification of a collective bargaining agreement.[3/] See 45 U.S.C. § 152, Seventh. Under the RLA, a contract's amendable

---

[3/]    The RLA distinguishes between "minor" and "major" disputes. A minor dispute arises "'out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" Consol. Ry. Corp. v. Railway Labor Executives Ass'n, 491 U.S. 299, 303 (1989) (quoting 45 U.S.C. § 153 First (I)); see also Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246 (1994) ("minor disputes . . . are those that are grounded in the [collective-bargaining agreement]"). Minor disputes are subject to arbitration before the board of adjustment, which is authorized to make a "final and binding" decision on the matter. See 45 U.S.C. §§ 153 First (I) and (continued...)

date establishes when negotiations begin between the union and the carrier over modifications to the collective bargaining agreement. An employer must bargain in good faith over proposed contractual changes under the procedures set forth in the RLA. See 45 U.S.C. § 156.

Under the RLA, an employer that unilaterally modifies a collective bargaining agreement has created a "major dispute" over which employees may strike. Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378-80 (1969); Pan Am. World Airways v. IBT, 894 F.2d 36 (2d Cir. 1990). "If the [carrier] is free [to] . . . resort to self-help, the union cannot be expected to hold back its own economic weapons." Detroit & Toledo Shore Line v. UTU, 396 U.S. 142, 155 (1969).

Here, as discussed above, the Agreement unilaterally modifies the Flight Attendants' collective bargaining agreement by terminating those provisions establishing the Flight Attendant Plan. Not only does the Agreement terminate Flight Attendants' contractual rights in the present, it also denies them those rights for ten years, barring the establishment of a defined benefit plan until 2015. See Debtors' Mot., Exh. A at 4. Clearly, United intends to unilaterally modify the Flight Attendants' agreement before it has even begun, much less completed, the bargaining process required by the RLA. By this conduct, United would create a major dispute which would trigger AFA's concomitant right to initiate a strike against the airline.

_____

3/(...continued)

(m); Consol. Rail, 491 U.S. at 303-304. By contrast, a major dispute, which is what United has created here, arises "during the process of negotiation and formation of an RLA collective-bargaining agreement." Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, 861 F.2d 1546, 1554 (11th Cir. 1988); see also Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 723 (1945). To resolve major disputes, the RLA mandates that parties undergo a "virtually interminable" process of bargaining and mediation. Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 118 (1991); see also Consol. Rail, 491 U.S. at 302. Major disputes are "subject to mediation by the [National Mediation Board,] voluntary arbitration, conciliation attempts by the President." Air Line Pilots Ass'n, Int'l v. Texas Int'l Airlines, Inc., 567 F. Supp. 66, 71 (S.D. Tex 1983). Until they have exhausted the required procedures, the parties must maintain the status quo. Consol. Rail, 491 U.S. 302-03. Only at the conclusion of "this protracted process[, where no] agreement has been reached, [may] the parties . . . resort to the use of economic force." Id. at 303. The Company may unilaterally modify the collective bargaining agreement, and the union may respond with its own economic weapons including a strike.

**IV.    PBGC HAS EXCEEDED ITS STATUTORY AUTHORITY IN AGREEING TO AN INVOLUNTARY TERMINATION OF THE FLIGHT ATTENDANT PLAN.**

Pursuant to 29 U.S.C. § 1342(a), PBGC may institute proceedings to terminate a defined benefit plan only after making one of the following independent determinations:

> (1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under Section 4971(a) of Title 26;
>
> (2) the plan will be unable to pay benefits when due;
>
> (3) the reportable event described in section 1343(c)(7) of this title has occurred; or
>
> (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably in the plan is not terminated.

29 U.S.C. § 1342(a)(1)-(4). Only after having made one of these determinations can PBGC proceed with termination either by obtaining the agreement of the plan administrator to terminate the plan or by obtaining a court decree adjudicating that the plan must be terminated. See 29 U.S.C. § 1342(c).

As the Company itself has recognized, PBGC must base its determination to involuntarily terminate a defined benefit plan on one of the four factors enumerated in Section 1342(a). See Debtors' Mot. at 9. Indeed, in Allied Pilots Ass'n v. Pension Benefit Guar. Corp, a case upon which the Company relies for its contention that the Agreement comports with ERISA, the court of appeals approved of the finding in Air Line Pilots Ass'n v. Pension Benefit Guar. Corp. (also relied upon by the Company) that "the PBGC may not terminate plans based on factors other than the ERISA criteria." 334 F.3d 93, 97 (D.C. Cir. 2003). In fact, United itself has recognized that the criteria PBGC may rely upon are strictly limited to those stated in Section 1342. In the pre-trial statement relating to the litigation over the Pilots' pension plan, United stated categorically that basing a decision to involuntarily terminate a pension plan upon PBGC's own "pecuniary interest as a creditor" is not "proper grounds for termination under 29 U.S.C. § 1342." Pretrial Statement in PBGC v. UAL (filed Mar. 19, 2005) at 5-6.

- 12 -

One only has to consider PBGC's position before the $1.0 billion inducement from United and after to grasp that the agency plainly based its decision to terminate the Flight Attendant Plan on its own pecuniary interest. Until PBGC and United announced the Agreement to terminate the defined benefit pension plans, PBGC had consistently stated that termination of the Flight Attendant Plan was not necessary for United to reorganize successfully.

In its January 4, 2005 opposition to United's Section 1113(c) motion, PBGC stated that the Flight Attendant Plan was "affordable" and could be "retained in a successful reorganization." PBGC's Obj. Debtors' 1113(c) Mot. at 20.

In an April 4 letter, Bradley Belt, the Executive Director of PBGC, characterized AFA's proposal, which identified sufficient alternative funding to save the Flight Attendant Plan, as "constructive" and reiterated the agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11." Davidowitch Decl. (dated Apr. 29, 2005), Exh. 6.

On April 14, PBGC filed an emergency motion to postpone consideration of the Company's motion for distress terminations of its defined benefit plans, calling United's motion "premature" and arguing that United had failed to show that the plans could not be salvaged. PBGC's Mem. Supp. Emergency Mot. at 1-7. PBGC explained that, until United "provide[s] an updated business plan . . . and file[s] its plan of reorganization . . . PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy." Id. at 5-6 (emphasis added). As recently as April 15, PBGC served discovery on the Company, requesting "[a]ll documents relating to the affordability of the Flight Attendant Plan." PBGC 2d Req. Docs. No. 13.

Then, on April 22, United announced that it had reached its Agreement with PBGC, whereby the Company paid PBGC securities valued at $1.0 billion in exchange for PBGC terminating United's four defined benefit plans.

- 13 -

The only intervening event between April 14, when PBGC stated that any termination of United's defined benefit plans would be premature and April 22, when PBGC agreed to terminate the plans, and, therefore, the only conceivable explanation for PBGC's about face was the Company's $1.0 billion inducement. PBGC has completely abdicated its public trust, exalting its own pecuniary interest as a creditor over the public's interest in preserving defined benefit plans whenever possible.

Again, the Company has recognized that it is improper under ERISA Section 4042 for PBGC to base its decision to terminate on its pecuniary interest as a creditor. See Pretrial Statement in PBGC v. UAL (filed Mar. 19, 2005) at 5-6. PBGC has also recognized that its role as regulator should not be conflated with its role as creditor. In opposing referral of its action to terminate the Pilots' Plan to this Court, PBGC stated that "referral to the bankruptcy court ignores the fact that this action involves PBGC as regulator and United as plan administrator, not in their debtor-creditor relationship." PBGC's Mot. Reconsid. (filed Feb. 11, 2005) at 7.

Apparently, however, PBGC is no longer concerned with maintaining any kind of boundary between its creditor role and its regulator role. Nowhere are the merger of those identities and the decision to subordinate the public interest to PBGC's pecuniary interest as a creditor more apparent than in PBGC's April 22 press release, announcing the Agreement with United. There, PBGC acknowledges that it is taking the regulatory action of termination based on a determination that "the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy." Exh. 1.

The fact that PBGC's determination to terminate the Flight Attendant Plan is a condition subsequent of the Agreement leaves no doubt that this termination is in fact voluntary. Two willing parties entered into "arm's length" negotiations and they freely decided to reach an agreement with each other. See Agreement at 2. By the terms of the Agreement, PBGC's notice of determination and initiation of termination is contingent on the $1.0 billion payout from United. Thus, the Company's claim that this involuntary termination was "PBGC-initiated" is

- 14 -

ludicrous. How could this involuntary termination be PBGC-initiated, if PBGC is waiting to get paid by United before it initiates termination proceedings?

Indeed, PBGC has plainly failed to comply with the involuntary termination process mandated by ERISA, which requires that the "PBGC initiate[] the termination process by 'issuing a notice . . . to a plan administrator [of PBGC's] determin[ation] that the plan should be terminated.'" Allied Pilots Ass'n v. Pension Benefit Guar. Corp., 334 F.3d at 95 (quoting 29 U.S.C. § 1342(c)). After the notice of determination has issued, PBGC may negotiate with the plan administrator, either obtaining an agreement to terminate the plan or some other settlement that avoids adjudication. Otherwise, PBGC applies for a decree adjudicating the plan terminated. Here, PBGC has done the reverse of what ERISA mandates. It negotiated the Agreement to terminate the defined benefit plans with United first and promises to issue a notice of determination that the Flight Attendant and MA&PC Plans should be terminated as a condition of that Agreement.

The Company's reliance on the authority cited in its Motion for the proposition that the "PBGC has the statutory power to terminate pension plans whenever [the] PBGC believes the ERISA criteria are met (including, among other scenarios, as part of a settlement agreement with the plan sponsor)," Debtors' Mot. at 20, is entirely misplaced. In all three cases cited by the Debtor for this proposition, PBGC first issued a notice of determination that the plan should be terminated. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 641 (1990); Allied Pilots Ass'n v. Pension Benefit Guar. Corp., 334 F.3d 96; Air Line Pilots Ass'n, Int'l v. Pension Benefit Guar. Corp., 193 F.Supp. 2d 209, 212-13 (D.D.C. 2002). At that point, in Allied Pilots Ass'n and Air Line Pilots Ass'n, PBGC gave the administrator the option of agreeing or opposing the termination. Indeed, in both cases, the plan administrator, upon being notified by PBGC of its determination to involuntarily terminate the employees' pension plans, began negotiations with the unions and PBGC, which ultimately culminated in an agreement that resulted in the

- 15 -

plans surviving for another eight years. See Allied Pilots Ass'n, 334 F.3d at 96; Air Line Pilots Ass'n, 193 F.Supp.2d at 213.

The Company's claim that Section 1113 has no bearing upon an involuntary termination may be true when it is actually initiated by PBGC. That is not the case here. As shown above, PBGC and United made a deal to swap involuntary terminations for $1.0 billion in securities. As a co-sponsor of the agreement and its consequences, United cannot now try to place all the "credit" on PBGC's shoulders. By making this trade, United has sought to avoid the responsibilities it alone has under Section 1113 and ERISA Section 4041.

## CONCLUSION

For all the foregoing reasons, the Debtors' Emergency Motion to Approve Agreement with PBGC should be denied.

Respectfully submitted,

Robert S. Clayman (admitted pro hac vice)
Carmen R. Parcelli (admitted pro hac vice)
Matthew E. Babcock (admitted pro hac vice)
GUERRIERI, EDMOND, CLAYMAN &
BARTOS, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036-2243
Telephone: (202) 624-7400

Counsel for Association of Flight
Attendants-CWA, AFL-CIO

Dated: May 6, 2005.

- 16 -

# EXHIBIT 1





I want info about
- PBGC        go



Pension Search
- View Options    go

Trusteed Plan Info
- Complete List    go



Search the Site

Advanced Search    go

PBGC en Español

Plan Administration

Participant Services

Home > News > News Releases > 2005 >

**FOR IMMEDIATE RELEASE**
**April 22, 2005**
**PBGC Public Affairs, 202-326-4040**

## PBGC Reaches Pension Settlement with United Airlines

WASHINGTON—The Pension Benefit Guaranty Corporation (PBGC) announced today that it has reached a settlement with United Airlines over the termination of the company's pension plans.

"We believe that this agreement, under the circumstances, is in the best interests of the pension insurance program and its stakeholders," said PBGC Executive Director Bradley D. Belt. "The PBGC has an obligation to reduce its losses for the protection of workers and retirees, other companies that pay insurance premiums, and taxpayers. By reaching a settlement now, we further that goal."

Under the terms of the agreement, which must still be approved by the bankruptcy court overseeing UAL's restructuring, the PBGC would terminate and become trustee of the company's four pension plans and the agency's claims against the company would be settled. The PBGC and its financial advisers believe the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy.

Collectively, United's pension plans are underfunded by $9.8 billion on a termination basis, $6.6 billion of which is guaranteed, according to the PBGC. The four plans are: the UA Pilot Defined Benefit Plan, which covers 14,100 participants and has $2.8 billion in assets to pay $5.7 billion in promised benefits; the United Airlines Ground Employees Retirement Plan, which covers 36,100 participants and has $1.3 billion in assets to pay $4.0 billion in promised benefits; the UA Flight Attendant Defined Benefit Pension Plan, which covers 28,600 participants and has $1.4 billion in assets to pay $3.3 billion in promised benefits; and the Management, Administrative and Public Contact Defined Benefit Pension Plan, which covers 42,700 participants and has $1.5 billion in assets to pay $3.8 billion in promised benefits.

As of September 30, 2004, the PBGC's own balance sheet showed a $23.3 billion deficit, with $39 billion in assets to pay $62.3 billion in guaranteed pension benefits to more than 1 million workers and retirees. By law, the PBGC is required to keep premiums as low as possible and has no call on the U.S. Treasury beyond a $100 million line of credit.

"This again highlights the need for the comprehensive pension reform. Unless and until Congress fixes the rules that allow pension plans to become so underfunded, the insurance program and plan participants are at risk of suffering large financial losses," Belt said.

The PBGC is a federal corporation created under the Employee Retirement Income Security Act of 1974. It currently guarantees payment of basic pension benefits for about 44 million American workers and retirees participating in over 31,000 private-sector defined benefit pension plans.

- ### -

PBGC No. 05-36

▦ Site Map   ▦ FAQs   ▦ Disclaimer   ▦ Privacy Statement   ▦ Glossary   ▦ What's New   ▦ Customer Service Pledge

Send comments about this Web site to *webmaster@pbgc.gov*
Last Edited: 04/22/05

# EXHIBIT 2



Home > About United > Company information > Press room > Press releases
> Press release detail

# UAL Responds to PBGC Announcement of Agreement on Termination of United's Pension Plans

Quick links:

Shop for flights

Special deals

Vacation packages

Mileage summary

Customer support

**Ted** flyted.com

April 22, 2005

**Chicago, April 22, 2005** – UAL Corporation, the parent company of United Airlines, issued the following statement in response to today's announcement by the Pension Benefit Guaranty Corporation (PBGC) that the company and the agency have reached an agreement for the agency to terminate all of United's defined benefit pension plans:

"This agreement with the PBGC – if approved by the U.S. Bankruptcy Court – resolves one of the major issues standing between United and its successful exit from bankruptcy. It will allow the company to move forward as a sustainable, competitive enterprise for the long term – ultimately United's most important goal.

"While the company's first choice was to resolve pension issues consensually with all of its unions, unfortunately no viable solutions were offered or found over the past many months. In the event that United and its unions are able to find a viable alternative to termination and replacement of their defined benefit pension plans prior to this agreement taking effect, the agreement would allow United to pursue that alternative.

"If approved, the agreement will streamline the trial that is scheduled to begin on May 11, allowing the trial to focus solely on issues related to 1113(c). In addition, this agreement will keep United on track to exit bankruptcy.

"United's employees have been doing extraordinary work throughout the restructuring, and today's step will allow the company to move ahead efficiently though this next, most challenging part of the process and toward a far more competitive future.

"United plans to submit this agreement to the Bankruptcy Court as quickly as possible for approval prior to the May 11 trial date."

**About United**

United Airlines (OTCBB: UALAQ.OB) is the world's second largest airline and operates more than 3,400 flights a day on United, United Express and Ted to more than 200 U.S. domestic and international destinations from its hubs in Los Angeles, San Francisco, Denver, Chicago and Washington, D.C. With key

global air rights in the Asia-Pacific region, Europe and Latin
America, United is the largest international carrier based in the
United States.* United is also a founding member of Star
Alliance, which provides connections for our customers to nearly
800 destinations in 139 countries worldwide.  United's 60,000
employees reside in every U.S. state and in many countries
around the world. News releases and other information about
United can be found at the company's Web site at united.com.

* Measured by revenue passenger miles as reported to the U.S. Department
of Transportation for 12 months ending September 2004, the most recent
comparison data available.

### #

Privacy | Terms and conditions | Compatible browsers © 2005 United Air Lines, Inc.     STAR ALLIANCE

## CERTIFICATE OF SERVICE

I, Carmen R. Parcelli, hereby certify that, on this 6th day of May 2005, true copies of the foregoing **Objection of Association of Flight Attendants-CWA, AFL-CIO, to Debtors' Emergency Motion to Approve Agreement with PBGC** were served via overnight delivery on the attached Core Group Service List and via electronic mail or facsimile on the Updated 2002 Service List. Pursuant to Section C.3.i(1) of the Second Amended Notice, Case Management and Administrative Procedures in this proceeding, service lists have been filed with the Court. In accordance with Rules 9014 and 7004, a true copy of the foregoing Objection was served by first-class mail on Frederic Brace, an Officer of United.

Carmen R. Parcelli