# ATTACHMENT  4

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
 4    In re:                    )
                                ) No. 02 B 48191
 5    UAL CORPORATION, et al.,  )
                                ) Chicago, Illinois
 6                              ) May 10, 2005
                      Debtors.  ) 10:30 a.m.
 7
 8         TRANSCRIPT OF PROCEEDINGS BEFORE THE
               HONORABLE EUGENE R. WEDOFF
 9
10    APPEARANCES:
11    MR. JAMES SPRAYREGEN
      MR. TODD GALE
12    MR. ALEX DIMITRIEF
      on behalf of the debtors;
13
      MR. FRANK CITERA
14    on behalf of the city of Chicago;
15    MR. JEFFREY COHEN
      on behalf of the PBGC;
16
      MR. FRUMAN JACOBSON
17    on behalf of the creditors committee;
18    MR. BRUCE SIMON,
      on behalf of the Air Line Pilots Association;
19
      MR. ROBERT CLAYMAN
20    on behalf of the Association of Flight Attendants;
21    MR. LEE SEHAM
      on behalf of the Aircraft Mechanics Fraternal
22    Association;
23    MR. JACK CARRIGLIO
      MR. FRANK CUMMINGS
24    on behalf of the Retired Pilots;
25    MR. PAT HERRINGTON
      on behalf of IFS;
```



Page 2

1   MR. BILL SMITH
    on behalf of the Bank of New York;

2

    MS. SHARON LEVINE
3   on behalf of the International Association of
    Machinists and Aerospace Workers.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   would not fit in this courtroom to be able to hear
2   today's proceedings.
3           It's also very important, obviously,
4   that the attorneys who are representing all of the
5   parties, including the employees, be able to move
6   through the courtroom and consult with one another.
7   So to the extent that anyone had to leave this
8   courtroom to make room for those attorneys, I'm sorry
9   that that was required. But I think you can
10  understand why it was necessary. And, again, I'm
11  happy, as I understand it, that everyone who wishes
12  to hear these proceedings will be able to hear them.
13          We're going to take up arguments on
14  the debtors' motion to enter into a settlement with
15  the Pension Benefit Guaranty Corporation in just a
16  second. But as Mr. Sprayregen said, there is a
17  matter that involves the city of Chicago and the
18  enforcement of certain payment obligations regarding
19  bonds issued by the city that needs to be addressed
20  first.
21          MR. GALE: Good morning, Your Honor. Todd
22  Gale for the debtors.
23          MR. CITERA: Good morning, Your Honor.
24  Frank Citera here on behalf of the city of Chicago.
25          THE COURT: My question is really going to

Page 3

1           THE CLERK: UAL Corporation, 02 B 48191.
2           MR. SPRAYREGEN: Good morning, Judge
3   Wedoff. James Sprayregen from Kirkland & Ellis on
4   behalf of the debtors. Your Honor, you had --
5   someone had contacted our office about the Chicago
6   municipal bond omnibus. I don't know if you wanted
7   to -- no omnibus, but some questions on that. Did
8   you want to handle that at a different time?
9           THE COURT: No. That should take very
10  little time, and we can take care of that at the
11  beginning of today's hearing. But before we do,
12  there are a couple of things I wanted to say. The
13  first is that I can easily understand the great
14  interest that employees of United have in today's
15  proceeding. And I want to let you know that I wanted
16  to make it possible for everyone to hear what was
17  going on in today's proceedings. We made
18  arrangements to get the largest courtroom available,
19  that is this courtroom. The single largest courtroom
20  in the building was not available because it's used
21  for immigration and naturalization matters, and that
22  was previously reserved for that purpose. I am very
23  grateful to the staff of the district court for
24  making facilities available to let as many people who
25  present in this courtroom and to allow the people who

Page 5

1   Mr. Citera. In reviewing the briefs that the parties
2   had submitted on United's pending motion for judgment
3   on the pleadings, it became very apparent that a
4   major argument made by the city was that judgment on
5   the pleadings was inappropriate because the city
6   wanted to introduce evidence on the relationship
7   between the airport use agreement and the special
8   facilities agreement. Now, if the city still wants
9   to present evidence on that point, I would like to
10  know what the evidence is that you want to present
11  and schedule a hearing to let you present it.
12          MR. CITERA: Well, Your Honor, I think that
13  more appropriately what -- as we've pointed out in
14  our motion, and I believe correctly pointed out in
15  our motion, 12(c) is an inappropriate vehicle to deal
16  with this particular issue, particularly based on the
17  pleadings as presented to the court, and including,
18  and most specifically, the complaint of United, which
19  is barren of essentially any facts.
20          While it's true that the city has
21  pointed out in its motion that it would like to
22  introduce evidence, I mean, that evidence has to be
23  framed, in our view, more appropriately by whatever
24  issues United raises. I mean, if United wishes to
25  file a Rule 56 motion and comply with the obligations

Electronically signed by Jackleen DeFini (201-184-194-7430)

b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 78

1 creditors committee.
2     THE COURT: Thank you.
3     According to the schedule that
4 Mr. Sprayregen outlined at the outset of our
5 proceedings today, it would be the IAM that would go
6 next.
7     MR. CLAYMAN: Your honor, by agreement, I
8 think the AFA is going to --
9     THE COURT: That's fine, Mr. Clayman.
10     MR. CLAYMAN: Robert Clayman for the
11 Association of Flight Attendants.
12     Your Honor, also by agreement, United
13 has agreed to extend my time another five minutes to
14 25 minutes if need be. I will try to stick to the 20
15 minutes, but I think I may need a little more time.
16     THE COURT: That's fine.
17     MR. CLAYMAN: Your Honor, I appreciate that
18 Mr. Sprayregen took the time to explain how we got
19 here. I would suggest, however, that the Association
20 of Flight Attendants perspective on how we got here
21 is somewhat, if not drastically, different than the
22 company's.
23     This Section 1113 process, which is,
24 in fact, scheduled to begin the hearing tomorrow, was
25 well under way as provided by law, by judicial

Page 79

1 decree, the scheduling order, and by our contract,
2 which required United to meet and confer with us
3 about the pension termination issue --
4     The question that really needs to be
5 asked is what happened. Well, I think
6 Mr. Sprayregen, in so many words, said it, which is
7 that United simply grew tired of the 1113 process.
8 That I think one only need to refer to a draft press
9 release of April 30th to understand exactly what
10 happened with regard to United.
11     And what it says there, and it's
12 quoting Mr. Brace in his deposition, he agreed that
13 this was still an accurate statement, it says: Our
14 first choice was always to resolve pension issues
15 consensually with all of the unions.
16     Unfortunately, despite exploring
17 numerous alternatives over the past many months, no
18 viable, alternative solutions were offered for a
19 fact.
20     So United, on its own, and without any
21 allegiance to the law, decided that there was a
22 second choice, and it decided to go down a path that
23 is not plotted by the Bankruptcy Code or any other
24 statute.
25     And what it went on to say in this

Page 80

1 indicates quite clearly exactly what United did. It
2 states that United was, however, able to reach an
3 agreement with the PBGC on these difficult matters.
4 Now, the law does not provide for that, and I'll get
5 into that later in my argument.
6     The second question that has to be
7 asked is, what happened to the PBGC? The PBGC was
8 intent upon saving at least one of United's pension
9 plans. It was stated repeatedly in its pleadings
10 with the Court and as recently as a month ago in
11 Bradley Beltz' letters to the Association of Flight
12 Attendants. Mr. Beltz is a signatory to this
13 agreement now. But in his letter to the flight
14 attendants, he stated that he continued to believe
15 that the interest of the participants and the pension
16 insurance program would best be served by the
17 continuance of the AFA plan.
18     What happened to this belief, to this
19 commitment to salvage at least one of United's
20 defined benefit plans? One need only look to the
21 deposition of PBGC's financial advisor and expert.
22 Mr. Michael Kramer of Greenhill provided an expert
23 report in December of last year in support of the
24 PBGC's position against termination, and in that
25 report, he stated that if the AFA plan were not

Page 81

1 terminated, United could still satisfy the credit
2 metrics it believed necessary to obtain exit
3 financing.
4     The question is posed to Mr. Kramer in
5 his deposition on May 5th. He's asked what changed
6 between December of '04, when you signed your
7 affidavit, your declaration, and now that leaves the
8 PBGC to conclude that the AFA pension plan should be
9 terminated? His response? I think what has changed
10 in terms of the overall situation is there's a
11 negotiated settlement that has been reached between
12 the PBGC and the company with respect to all the
13 issues between the two, that the PBGC is comfortable,
14 and which it believes is acceptable to enter into.
15     Now, the upshot of all this, of
16 course, is that an agreement was reached, and at that
17 moment, for all intents and purposes, United stopped
18 the Section 1113 process and the PBGC reversed its
19 position that it had been taking throughout this
20 case, and the two parties entered into an agreement.
21     And this is no different than any
22 other agreement. As with any other agreement, its
23 purpose is to secure certain benefits that a party
24 may not otherwise receive while minimizing certain
25 costs it risks suffering. That's exactly what United

Page 82

1   did when it entered into this agreement.
2          Now, there's been some mention made of
3   what the impact of this agreement is, and I think
4   that the best source of what, in fact, is intended by
5   this agreement and the intended consequence of this
6   agreement will be is presented by United to the
7   creditors committee in a presentation that was given
8   on April 29th .
9          There, they have, as one of its many
10  slides, or several slides, in a Power Point
11  presentation, a slide that states, "overview of
12  settlement agreement." And it says, under the terms
13  of the settlement, the PBGC agreed to terminate and
14  take over all of United's defined benefit pension
15  plans and waive restoration rights. That is what
16  they agreed to. That is the benefit of United's
17  bargain.
18         Now, as with any agreement, United had
19  to waive the cost and benefit of this agreement, and
20  it did. Slide five of that same presentation is
21  titled, "cost/benefit analysis." And under the
22  benefits, under the benefits, there is listed the
23  following: Closure and certainty regarding pension
24  obligations. Again, there should be no doubt what
25  this bargain is about or what its intended

Page 83

1   consequences are.
2          Now, finally, if there should be any
3   remaining doubt as to what United assumed would
4   happen here, one need only turn to slide eight of the
5   same presentation in which -- the caption of which is
6   "termination finance." And it says that within 10 to
7   14 days after May 10th's hearing, PBGC issues
8   notice of determination that AFA and MAPC plans
9   should terminate. Ten to 14 days, Your Honor.
10  There's no mystery here as to what's going to happen.
11         If Mr. Beltz is a signatory to this
12  agreement, this is a fait accompli, and the deal is
13  done, and our plan will be terminated if this
14  agreement is approved. There should be no doubt
15  about that. And at a minimum, at a minimum, this
16  agreement starts that process, and but for this
17  agreement, that process would not have been
18  undertaken by the PBGC. That is an irrefutable fact.
19         A billion and a half dollars buys you
20  something, and in this case, it bought the PBGC'S
21  agreement to initiate a process.
22         Now, what is the primary, though,
23  unstated benefit that United achieves by this
24  agreement? It enables it to do what the law
25  prohibits.

Page 84

1          This agreement cannot be reconciled
2   with the plain language of Section 1113(f), with the
3   mandatory processes of Section 1113, or the Railway
4   Labor Act, or the fundamental principle that two
5   parties cannot extinguish the rights of the third
6   party who's not consenting to that agreement.
7          One has to struggle to understand how
8   United attempts to reconcile those legal requirements
9   with its conduct, and it engages with -- I would say
10  what it engages in can be described as slight of hand
11  advocacy.
12         What I mean by that is that they, in
13  essence, say now you see a fact, now you don't; now
14  you see a legal obligation, and now you don't. And
15  it's entirely dependent, Your Honor -- as to what is
16  appearing or disappearing is entirely dependent upon
17  the audience to whom it is appealing, what argument
18  it is responding to.
19         So, for example, with the aircraft
20  lessors, there, it touts the very significant
21  benefits that it will receive by entering into this
22  agreement. And it states on page 30 of its brief,
23  these benefits will render 1113(c) and 4441 distress
24  termination trial unnecessary. A trial on 1113(c)
25  and distress termination would be highly complex and

Page 85

1   occur against the backdrop of an intense, emotionally
2   charged atmosphere. Although United believes it
3   would prevail, it would likely face the prospect of
4   continuing appeals and, hence, uncertainty in its
5   plans and exit process. And as I quoted earlier,
6   what they get from this is certainty and closure.
7   That's what they tout when they're trying to appeal
8   to the aircraft lessors.
9          But when it must address the impact of
10  the agreement upon employees, all of a sudden, the
11  agreement and its intended consequences disappear,
12  and all that is left standing is the PBGC. All one
13  needs to do is look at page 19 of their brief, and it
14  says 1113(f) and the the Railway Labor Act are not
15  implicated, whereas here, United is not acting
16  unilaterally to terminate its pension plans, rather,
17  it is PBGC that would be initiating and United that
18  would be consenting to the 4042 termination process
19  which can proceed, notwithstanding any allegedly
20  contrary provision in a CBA.
21         That, Your Honor, is a feat, a magical
22  feat that the law does not permit. There is a
23  continuum of conduct here, Your Honor, that they
24  cannot simply eliminate. This process began with
25  their agreement, and it will end with termination.

Page 86

1   And the terminations process is inextricably linked
2   to this agreement.
3           So I cannot understand, other than
4   through a slight of hand, that they can now, all of a
5   sudden, claim that there's no impact on 1113(f).
6           So where are we? What has to be done
7   is that there are, from this agreement clear,
8   intended consequences, and they have to be applied to
9   the law.
10          In the first law, the easiest of many
11  easy tasks here, is to apply the consequences to
12  Section 1113(f).
13          Now, it's interesting that
14  Mr. Sprayregen or no one else thought it appropriate
15  to read any portion of Section 1113, but 1113(f) is a
16  single sentence, and all that it says is that no
17  provision of this title shall be construed to permit
18  a trustee to unilaterally terminate or alter any
19  provision of a CBA prior to compliance with the
20  provision of this section. It's absolute. There
21  are, though, exceptions. It says no provision.
22          And where are they today? They're
23  here before you, Your Honor, invoking Section 363.
24  Not 1113. 363. They want you to use 363 to trump
25  1113(f). That is a provision of this title, and that

Page 88

1   management. This statute doesn't contemplate that
2   they can go out and find a third party to basically
3   eviscerate the statute.
4           The fact is, it will be United that
5   terminates our contract ultimately because it has
6   begun the process. And but for this agreement, that
7   process would not have been undertaken. It is the
8   intended -- clearly the intended consequence of this
9   agreement. And the fact that they found a willing
10  participant to undermine and basically ignore the
11  dictates of 1113, they should not be rewarded for
12  that conduct. The law doesn't permit it. Now, there
13  should be no doubt, again, that consequence of
14  invoking 363 is to basically supplant the entire
15  purpose of 1113(f). That is what will happen.
16          Now, again, what the company tries to
17  do is to conceal the agreement -- to conceal the
18  effect of the agreement from consideration. It says
19  if the PBGC determines that it is appropriate to
20  terminate a pension plan in accordance with ERISA,
21  4042, United CBA obligations cannot override ERISA.
22          Thus, because the agreement merely
23  contemplates, merely contemplates that PBGC and
24  United take actions, ERISA explicitly permits that if
25  ERISA -- explicitly permits -- the agreement

Page 87

1   is something that 113(f)does not permit. You cannot
2   use another title -- provision of this title to be
3   construed to permit a trustee to unilaterally
4   terminate a provision.
5           THE COURT: But the pretty obvious question
6   is, is what United is seeking to do now a unilateral
7   termination, or is this not a termination by the
8   PBGC.
9           MR. CLAYMAN: Your Honor, it's a difference
10  without a distinction or a distinction without a
11  difference. Let's be real about this, Your Honor.
12  The fact of the matter is, they entered into an
13  agreement for one purpose only, one primary purpose:
14  To achieve the termination of pension plans that it
15  was concerned about it could not accomplish through
16  the mandated process of 1113. There is no doubt that
17  this is the beginning of a process that will not have
18  begun but for this agreement. That's the end of the
19  inquiry.
20          The fact that they found a third party
21  to interfere with those rights is inconsequential.
22  The fact is that when you talk about permitting a
23  trustee to unilaterally terminate, what they're
24  talking about, what they're talking about is the
25  interplay, the relationship between labor and

Page 89

1   necessarily does not violate United CBA. That is one
2   of the most tortured interpretations of the law that
3   I've ever read.
4           Why? Because on page three of their
5   brief, they say exactly the opposite, that the PBGC
6   is required to initiate termination. That's what
7   this is about. There is no doubt that PBGC is
8   required to initiate termination. And there should
9   be little doubt that the expectation that the
10  intended consequence of all that is termination of
11  our plan.
12          Now, United continues along this road
13  when it tries to escape the requirements of the 1113
14  negotiations, as well as the Railway Labor Act. Both
15  those statutes provide for a method, a method for a
16  debtor to modify a collective bargaining agreement,
17  and United has violated both.
18          Now, let me refer, again, to their
19  brief. And this is quite amazing, but what they say
20  is that United acknowledges that the effect of this
21  agreement is that we'll render both the 1113 and
22  pension termination trial unnecessary. But then it
23  says that that is no more than the natural
24  consequence, the natural consequence of the
25  interaction between ERISA, its PBGC initiated

23 (Pages 86 to 89)

Page 170

1  not part of the consideration received by PBGC.
2       THE COURT: He doesn't have to stipulate to
3  that. Again, the substantive question that you
4  raised, the one that concerned me, was whether the
5  agreement eliminated AMFA's right to litigate the
6  appropriateness of the termination date. I think
7  it's been established that your right to litigate
8  that question has not been eliminated, that you have
9  the right under Section 1303 to challenge PBGC's
10 termination date.
11      To the extent that that's an open
12 question, I think Mr. Cohen's comments from the
13 podium today would help any court to resolve it.
14      MR. SEHAM: One last sentence, if I might.
15 It remains our position that United plays in the role
16 on our statutory right to challenge under 1348 in
17 exchange for consideration received from the PBGC,
18 and the PBGC received a $130 million benefit.
19      MR. COHEN: Well, Your Honor, really --
20      THE COURT: That doesn't need to be argued
21 anymore, because to the extent that remains a
22 litigated matter, you haven't received anything. If
23 the right to litigate the matter had been taken away,
24 think that point would have a great deal more for us.
25      MR. COHEN: This is not the forum for that.

Page 171

1  I would like to just address the five-year
2  prohibition from the PBGC's perspective, and it's
3  noteworthy that everybody was talking about -- well,
4  except Mr. Cummings, that perhaps we paid too
5  much. We are, even with the face value, even if you
6  look at the face value of the securities we're
7  getting -- we're still going to being taking the
8  largest loss in the agency's over 30-year history
9  from the United plans put together. It's about
10 $5 billion if you take the face value. It's the
11 amount of guaranteed benefits that PBGC will be
12 eating.
13      And it's appropriate, and I realize
14 that other constituencies are taking haircuts, too,
15 but in that vein, the five-year prohibition from
16 PBGC's perspective is that when companies haven't
17 funded their pension plans and have left us with this
18 kind of liability, that there shouldn't be an
19 immediate second hit. And so, you know, there's no
20 magic to the five years, but it has been done before
21 where there's a prohibition on the establishment of
22 the new defined benefit plan.
23      THE COURT: I guess the point here is that
24 you're doing something fairly extraordinary in
25 limiting your ability to restore the defined benefit

Page 172

1  pension plans. And one of the elements for not
2  requiring restoration, for continuing to pay out the
3  insured pension benefits that is the agency's
4  responsibility, is that they're not what you would
5  perceive to be an add-on plan. And another defined
6  benefit plan supplementing the insurance payments
7  that you're making would be perceived by the agency
8  as likely to be such an add-on plan.
9       MR. CLAYMAN: Wrap around, yes, Your Honor.
10 You're absolutely right. It could start to look like
11 the kind of abuse that we saw in the LTV case, for
12 instance, but it's also -- which I think is the point
13 you're making, but also from our perspective, United
14 obviously likes the certainty that they wouldn't have
15 what they call the volatility associated with having
16 defined benefit plans, but from our regulatory
17 viewpoint, it's that we shouldn't be subject to an
18 immediate second hit after we've already taken a
19 large loss from the same plan sponsor.
20      So that's the government's view on
21 that.
22      Thank you, Your Honor.
23      THE COURT: Thank you. I believe that
24 concludes the argument; is that correct?
25      MR. SPRAYREGEN: Yes, Your Honor.

Page 173

1       THE COURT: What I would like to do is take
2  a brief recess. I want to go down and meet with the
3  people briefly that I was supposed to meet with at
4  4:00 o'clock, and I'll get back up here as soon as I
5  can.
6       (Brief recess.)
7       (Change of court reporters.)
8       THE COURT: In our pre-trial conference
9  yesterday, I identified four questions that I thought
10 needed to be addressed in passing on the question of
11 whether the proposed agreement between the debtors
12 and the PBGC should be approved. Those questions
13 basically broke down into two categories. One
14 category is whether this agreement satisfied the
15 obligations of any proposed settlement under the
16 Bankruptcy Code. That is to say, did it comply with
17 the law, did it provide adequate consideration to the
18 debtor, was it a benefit to the debtors' estate.
19 Those are questions that we would look at in any
20 bankruptcy settlement.
21      The other question was whether this
22 settlement was consistent with collective bargaining
23 agreements and the rights of the union members under
24 Section 1113 of the Bankruptcy Code and the RLA. The
25 general settlement requirements, as I think was

Electronically signed by Jackleen DeFini (201-184-194-7430)

b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 174

1 reflected in the colloquy that took place today, have
2 been satisfied by the agreement. We can go through
3 the specific questions that I raised yesterday and
4 that have been addressed in the argument today. But,
5 again, I don't think there is a great deal of doubt
6 about those points.
7         Is there adequate consideration for
8 the rights that United is giving up? Now, what
9 United is giving up is $1.5 billion face amount in
10 securities and the nonobjection by United to a claim
11 to be calculated by the PBGC under its usual
12 procedures. That's the primary consideration that
13 United is offering.
14         In exchange, the PBGC is giving up
15 claims that it would have to minimum funding
16 contributions that accrued since the time this case
17 was filed; it's giving up its right to seek payment
18 from each of the debtors jointly and severally; it's
19 giving up its right to assert a setoff against sums
20 owing from the United States Government; it is giving
21 United a procedure that can assure that there will
22 not be restoration of pension plans by PBGC after the
23 effective date of a plan of reorganization; and it is
24 surrendering distribution rights of 45 percent of
25 whatever claim is ultimately allowed on account of

Page 175

1 underfunded pension contributions.
2         The discussions that have taken place
3 in court today have reflected the belief of the
4 creditors committee and the nonassertion by any other
5 party to the contrary that these tradeoffs are on
6 balance beneficial to the estate, that is to say that
7 what the estate is getting in terms of a surrender of
8 claims in terms of certainty for its future outweigh
9 or at least sufficiently balance what the company is
10 giving up.
11         As it turns out, the bankruptcy court
12 is directed in making this kind of determination to
13 use a very deferential standard. The court, as the
14 Seventh Circuit's stated in In re American Reserve
15 Corporation, is supposed to compare the settlement
16 terms with the probable cost and benefits of
17 litigation, and only to deny approval of the
18 settlement if the settlement is below the range of
19 likely litigation outcomes. The Seventh Circuit's
20 decision In re American Reserve Corporation, 841 F.2d
21 159, 161, 1987. And that's a decision that I also
22 discussed in a decision that I wrote in 1999, In re
23 Telesphere Communications, Inc., 229 B.R. 173, 181.
24 So, again, given the tenor of all of the discussions
25 today, it's quite clear that what the debtor is

Page 176

1 giving up is well within that range of potential
2 litigation outcomes.
3         The minimum funding contribution
4 liability that the debtors face right now
5 approximates a billion dollars if the position of the
6 PBGC were to ultimately prevail in a litigated
7 outcome on that issue alone. It has its other claims
8 unsecured, $5 billion, which could be asserted in
9 various ways against assets of the estate, including
10 funds that are held now by United Loyalty Services,
11 including its offset right, so that what we have here
12 is plainly within the range of litigated outcomes
13 just in terms of the dollar amount.
14         But when one is considering the
15 potential benefit to the estate here, the dollar
16 amount is not the only thing that's significant. It
17 is the certainty of a resolution allowing for an exit
18 from bankruptcy that has a value that's substantial
19 but not quantifiable. And the settlement has the
20 potential for reducing, if not eliminating, many
21 contested proceedings that would otherwise divert the
22 energy and resources of the debtor.
23         So on that question, is this something
24 where there is adequate consideration, the answer is
25 plainly, yes, this is something that on that level

Page 177

1 meets the test for court approval.
2         Now, the next question I had asked in
3 light of arguments that were made in the briefs was
4 whether this agreement would impair the obtaining of
5 exit financing. And, again, I think the colloquy has
6 established that the contrary is the case; that by
7 eliminating an overhang of uncertain liability, this
8 agreement makes exit financing more likely.
9         Now, to be sure, the debtors'
10 requirement to issue the securities, a substantial
11 amount in securities, will have some impact on exit
12 financing. But those securities were structured in
13 such a way as to have a minimum impact on exit
14 financing to require no cash outlays from the debtor
15 for a substantial period of time allowing for a
16 reorganization to have a greater chance of being
17 successful.
18         Moreover, the agreement provides, as
19 clarified in the colloquy, that to the extent that
20 the precise nature of the securities does create some
21 obstacle to exit financing, that those securities
22 can't have their terms modified. So, again, that
23 issue I think is not an obstacle to approval of the
24 settlement.
25         The 45 percent of allowed unsecured

45 (Pages 174 to 177)

Page 178

1  claim that is proposed by this agreement to be
2  distributable by the debtor, or at the option of the
3  debtor, excuse me, is also not an obstacle because to
4  the extent that that provision might contradict other
5  requirements for confirmation of a plan, all parties
6  in interest will have the opportunity to object to
7  any proposed distribution of the 45 percent by the
8  debtor, at the direction of the debtor, prior to the
9  time that any such distribution would take place.
10      And to the extent that the court would
11 find that there would be any violation of the
12 Bankruptcy Code's provisions or any other provision
13 of law in what's proposed by the debtor, the
14 distribution would not be allowed. So that also has
15 been removed as an obstacle.
16      Now, finally, while we're still
17 talking about the general terms that have to be met
18 in order for the court to approve the proposed
19 settlement, I need to address the question of whether
20 the settlement imposes limits on rights of third
21 parties. This comes under the rubric of what was
22 argued as a sub rosa plan.
23      The rights of all interested parties
24 in a bankruptcy estate are affected by a plan of
25 reorganization. And courts have protected parties

Page 179

1  from having their rights affected prior to a plan of
2  reorganization by agreements that the debtor enters
3  into not affecting those parties. To some extent
4  this is what I had earlier found was a problem with
5  the originally proposed agreement between the debtors
6  and the pilots. It seemed to me that that originally
7  proposed agreement had the effect of unduly impacting
8  the rights of other parties.
9       Now, in several respects concerns were
10 raised, were raised today primarily by Ms. Levine,
11 about whether this particular proposal would unduly
12 impact the rights of third parties. And in each case
13 the colloquy that followed from those potential
14 problems being pointed out I believe has resolved the
15 potential issue.
16      Perhaps the only question that
17 remained is whether it was appropriate for the debtor
18 to agree with the PBGC not to propose the
19 establishment of a defined benefit plan for five
20 years after termination of the existing plans. And I
21 think what was uncovered in the course of the
22 colloquy is that that was a provision that was
23 essential to secure the benefit of not having PBGC's
24 assertion of a right to have restoration take place.
25 And, moreover, what we've clarified is that is

Page 180

1  something that has a fixed five-year, not ten-year
2  period, and would not prevent the negotiation of such
3  a plan being put into effect at the termination of
4  that five-year period.
5       So with all of those clarifications, I
6  think that the agreement does not unduly affect the
7  rights of third parties not participating in the
8  negotiation of the agreement.
9       That leaves the central question, and
10 the question that involved the vast bulk of the
11 argument, namely, does this agreement violate the
12 collective bargaining agreements, does this agreement
13 violate the Railway Labor Act or Section 1113 of the
14 Bankruptcy Code. Now, in addressing that question, I
15 think it's important to observe that both the
16 Bankruptcy Code and ERISA are very protective of
17 collective bargaining rights. Section 4041 of ERISA,
18 Section 4041(a)(3), prohibits the PBGC from
19 terminating a pension plan at the request of an
20 employer if termination would violate the terms of a
21 collective bargaining agreement.
22      Section 1113 of the Bankruptcy Code
23 does not allow a collective bargaining agreement to
24 be rejected unless the debtor bargains in good faith
25 to obtain modifications that are necessary to permit

Page 181

1  a reorganization, and that despite that good faith
2  negotiation, an agreement for such modification
3  cannot be reached.
4       So plainly a unilateral act by the
5  debtor to terminate a pension plan that's created by
6  a collective bargaining agreement is not possible
7  either under ERISA or under Section 1113 of the
8  Bankruptcy Code. And the obvious public policy that
9  underlies those provisions is the importance of
10 honoring collective bargaining agreements.
11      However, there is a countervailing
12 public policy, and that is in protecting the solvency
13 of the pension benefit guarantee system. Now, most
14 people I think in this room understand the general
15 operation of the pension benefit guarantee system set
16 up under ERISA. But just in case there is someone
17 who doesn't know that or isn't familiar with it, let
18 me just outline it in the very broadest terms.
19      Every sponsor of a defined benefit
20 pension plan, a plan that proposes to pay out in
21 defined terms certain benefits every month, the kind
22 of pension plan that someone can rely on that doesn't
23 depend on how well the investments do, that simply
24 guarantees a certain level of income, those defined
25 benefit pension plans were recognized by Congress

Page 182

1  decades ago to be vulnerable to the failure of the
2  company that sponsors them. If a company goes broke,
3  its promises to pay defined benefits can be
4  worthless, and the employees who were relying on
5  those pension plans can be left with no resources at
6  all.
7      To deal with that problem, Congress
8  passed ERISA. ERISA provides that any sponsor of a
9  defined benefit plan is required to pay an insurance
10  premium to the Pension Benefit Guaranty Corporation,
11  and the Pension Benefit Guaranty Corporation uses
12  those premiums to guarantee payment of pension
13  benefits not at the level defined by the plan, but at
14  a level defined by the statute in the event that a
15  company's plan fails.
16      Now, as Mr. Cohen was arguing earlier,
17  that puts a very grave responsibility on the PBGC.
18  It has to make sure that the money that it collects
19  in premiums from the sponsors of plans will be
20  sufficient to cover its statutory obligation to make
21  benefit payments to the recipients of plans that
22  fail. It has to protect its system to allow it to
23  respond to the needs of people who would otherwise
24  get no pension benefits when their company was unable
25  to pay them.

Page 183

1      That need requires the PBGC at times
2  to seek to terminate a pension plan. Why? Because
3  if the pension plan keeps paying out its benefits
4  while it's not receiving contributions from its
5  company sufficient to meet its obligations, the
6  potential liability of the pension benefit guarantee
7  system can grow greater and greater.
8      As the benefits -- as the assets of
9  the plan are exhausted and no new contributions or
10  inadequate contributions come in, the liability of
11  the PBGC becomes greater and greater. The claim on
12  its limited resources from collecting these insurance
13  premiums becomes greater and greater. And it is a
14  matter of very widespread understanding, something
15  that can be read in the paper virtually any day, that
16  the PBGC faces a very significant shortfall in the
17  funds that it has available to deal with the
18  potential of underfunded pension plans across the
19  country.
20      This role of the PBGC in needing to
21  protect the pension benefit guarantee system from
22  failing plans is reflected in a provision of ERISA
23  that allows the PBGC to itself initiate termination
24  of a plan, this is what's called involuntary
25  termination, even though that plan is covered by a

Page 184

1  collective bargaining agreement. And if PBGC
2  determines to seek involuntary termination of the
3  plan and the plan sponsor does not object, then that
4  plan can be terminated without any court proceeding.
5      The impact of this statutory construct
6  is to place the need of maintaining the solvency of
7  the pension benefit guarantee system ahead of the
8  need to enforce collective bargaining agreements.
9  That's a determination that Congress made. That's
10  not necessarily the interpretation that anyone in
11  this room would have made. The decision they would
12  have made is a policy matter, but that was Congress'
13  determination. Whether this is the right policy or
14  not is something that was determined by Congress.
15  The court's job is to enforce the law as Congress
16  wrote it.
17      Now, as to whether this is the correct
18  interpretation of the law, there really is very
19  little question. This precise issue of whether the
20  PBGC has the right to obtain an involuntary
21  termination of a plan with the consent of the plan
22  sponsor without a prior court ruling was addressed by
23  the Second Court of Appeals in the Jones & Laughlin
24  case that's been referred to several times in the
25  course of the argument today. The formal name of the

Page 185

1  case is In re Jones & Laughlin Hourly Pension Plan,
2  reported at 824 F.2d 197, a 1987 decision of the
3  Second Circuit.
4      That case presented precisely this
5  question. This was a proceeding that arose in the
6  first LTV Steel bankruptcy. The PBGC made a
7  determination after the plan sponsor stopped making
8  minimum funding contributions that there should be an
9  involuntary termination.
10      The union that was affected by that
11  decision objected and said that this could not be
12  done without a court hearing to determine the sorts
13  of things that are covered by Section 1113, one would
14  assume, and the necessity for the involuntary
15  termination. The court, looking at the language that
16  Congress had adopted in ERISA, concluded, and I
17  believe correctly for a number of good reasons, that
18  that was not required. A court hearing was not
19  required, that Congress had given the PBGC the power
20  to effect this termination without a prior court
21  opinion, prior court review, when management had
22  consented. The Jones & Laughlin case has been cited
23  numerous times. Its holding has never been
24  questioned. And I believe it's the correct
25  interpretation of the law that Congress had enacted.

Electronically signed by Jackleen DeFini (201-184-194-7430)       b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 186

1    The result then is that the PBGC may
2  terminate a plan in order to protect the pension
3  benefit guarantee system with the consent of the plan
4  sponsor without a court hearing even though that
5  overrides the provisions of a collective bargaining
6  agreement.
7    Now, I was concerned that that could
8  be an unchecked power, that somehow the debtors or
9  the PBGC might be arguing that any time management
10  and the PBGC get together and decide that a pension
11  plan ought to be terminated that the employees are
12  left with no remedy, the unions have no voice, no
13  opportunity to get judicial review of that decision.
14  That's why we had the lengthy discussion that we did
15  have regarding Section 1103 of ERISA.
16    I came upon that section of ERISA by
17  reading the Jones & Laughlin decision of the Second
18  Circuit because the Second Circuit also did not want
19  to be in a position of denying due process.
20    The Second Circuit in that Jones &
21  Laughlin decision recognized that the right of
22  employees to receive the benefits that were defined
23  by their pension plans was an important property
24  right that should not be taken away without due
25  process. But in looking at the various elements that

Page 187

1  defined due process, the court specifically pointed
2  to Section 1303 of Title 29, 4003 of ERISA, for the
3  right that any aggrieved party has to bring the PBGC
4  into court to challenge the propriety of action that
5  the PBGC has taken under the statute. This is
6  critically important here.
7    Brought down to its essentials, many
8  of the parties objecting to the proposed settlement
9  between United and the PBGC are saying that the PBGC
10  is not going to be acting under its statutory power
11  to terminate a pension plan because the continued
12  existence of the plan would threaten the solvency of
13  the pension benefit guarantee system, that this plan
14  would be likely to create losses for PBGC if it were
15  allowed to continue, but that PBGC is agreeing with
16  the debtor to terminate a plan so that PBGC can
17  augment the solvency of the system by receiving funds
18  that it might otherwise not receive.
19    The information that's been presented
20  to this court would not support that interpretation.
21  But the important thing is that if the agency were to
22  act in an inappropriate way, if it were to take
23  action that's not authorized by the statute in
24  seeking involuntary termination of a pension plan,
25  the agency would be subject to a lawsuit under

Page 188

1  Section 1303 to have its decision reviewed by a
2  court. And if the agency were acting arbitrarily,
3  contrary to its statutory duties, that action could
4  be undone. That's critical here.
5    This settlement does not itself
6  terminate the plan, any plan. This settlement
7  provides that the PBGC will go through its
8  administrative procedures to come to a conclusion as
9  to whether the plans in question here ought to be
10  involuntarily terminated.
11    Now, as Mr. Sprayregen said at the
12  outset, it is the expectation of the debtors that
13  that decision will be in favor of involuntary
14  termination. It would be the expectation of the
15  debtors because the debtors have said for months that
16  they believe that these plans cannot be maintained
17  without generating losses. So PBGC may very well
18  come to the conclusion that the debtors expect. The
19  important thing is that if the unions believe that
20  that is an arbitrary decision not consistent with
21  PBGC's statutory authority, PBGC's action is
22  reviewable in court.
23    What that means for the terms of the
24  settlement that's before this court today is that
25  this settlement does not violate the law. The debtor

Page 189

1  is not unilaterally terminating a pension plan. PBGC
2  is agreeing under this agreement to exercise its
3  statutory obligation to determine whether a pension
4  plan ought to be involuntarily terminated. And PBGC,
5  in exercising that responsibility, will be subject to
6  judicial review, just as United would not be
7  violating Section 1113 had it not talked to the PBGC
8  about the possibility of an involuntary termination.
9  So it did not violate 1113 when it did talk to the
10  PBGC about an involuntary termination. United's
11  talking to the PBGC could not unilaterally terminate
12  a pension plan. Only the PBGC's decision could do
13  that.
14    And there is nothing in the Bankruptcy
15  Code that would prevent a debtor from consulting with
16  a regulatory agency about the proper exercise of its
17  responsibility. And, as I said before and I will say
18  one more time, the agency retains its statutory
19  obligation to exercise its discretion appropriately.
20    Now, does this limit the unions and
21  their employees to the opportunity to challenge any
22  decision that the PBGC might make? No. There are
23  other remedies besides. And in that connection, the
24  actions of the pilots union provides something of a
25  guideline for the sorts of things that can be done.

48 (Pages 186 to 189)

Page 190

1   A plan of reorganization still has to be negotiated.
2   Each of the unions on behalf of their members are
3   going to have claims against the debtors for wages
4   and benefits that had to be surrendered in
5   conjunction with prior agreements and may be
6   surrendered or lost in connection with activities to
7   take place in the future.
8           Each of those unions will have claims
9   that have to be treated in the plan. Each of those
10  unions will have opportunities to engage in further
11  collective bargaining in the future. The debtor has
12  no right to dictate the terms of its plan, no right
13  to dictate future collective bargaining agreements.
14  Those are matters to be determined. And the
15  equitable considerations that would otherwise come to
16  play in both a plan and in future collective
17  bargaining agreements certainly will include the loss
18  of pension benefits that may be accompanied by an
19  involuntary termination.
20          Now, obviously this is a complex
21  matter. But I think the important thing to keep in
22  mind is this: In a bankruptcy proceeding like the
23  one that is taking place here, and, indeed, in almost
24  any bankruptcy proceeding I've ever dealt with, no
25  one ever is able to come out with everything they

Page 191

1   would have had had there not been a bankruptcy. Had
2   this company not been involved in a situation where
3   it could not meet all of its obligations, we wouldn't
4   be in a situation like the one that we're in now.
5           Bankruptcy generally, and in this case
6   in particular, involves choosing the least bad among
7   a number of unfortunate choices. The least bad of
8   the unfortunate choices here has got to be the one
9   that keeps an airline functioning, that keeps people
10  employed, that pays creditors the most they can be
11  paid, and those creditors, again, include the
12  employees in a very major way, as an alternative to
13  what certainly is the worst choice, a shutdown of a
14  company that results in a loss of employment and a
15  loss of benefits and pay and payment of deserving
16  creditors across the board.
17          There is a great deal of work yet to
18  be done to negotiate a fair outcome for all of the
19  parties involved in this bankruptcy case and
20  particularly for the employees who have sustained
21  this enterprise throughout the bankruptcy proceeding.
22  My hope is that this agreement today can be an
23  ingredient that results in that outcome. But that
24  will depend on the choices that are made by any
25  number of parties.

Page 192

1           The decision that I have to make is
2   one that's dictated by the law. As I've just
3   outlined, the legal requirements for approval of this
4   agreement have been met. The agreement will be
5   approved. That leaves completely open what decisions
6   that the parties make not dictated by the law. And
7   my hope is that those decisions will be wise ones.
8           Now, having rendered that decision,
9   I'll enter an order consistent with it. That order
10  is going to have to incorporate all of the provisions
11  that were discussed in colloquy today.
12          And the last order of business will be
13  to discuss what takes place tomorrow in light of this
14  ruling.
15          MR. SPRAYREGEN: Thank you, Your Honor.
16  We'll probably need a little time to address the
17  order, and maybe we can bring it tomorrow prior to
18  the trial. Mr. Dimitrief is going to address the
19  pre-trial issues.
20          THE COURT: Okay.
21          MR. DIMITRIEF: Good afternoon, Your Honor.
22  Alex Dimitrief on behalf of the debtors. In light of
23  the court's ruling, and consistent with the comments
24  that the court just made, as for the trial for
25  tomorrow, we would ask leave to withdraw without

Page 193

1   prejudice our pending 1113(c) motion to reject the
2   AFA contract on the grounds it is no longer necessary
3   to proceed against the AFA. We also believe that the
4   scope of the trial on the pending motions to reject
5   the IAM and AMFA agreements is greatly narrowed so as
6   not to have to address pension issues any longer
7   pending proceeding with the settlement agreement with
8   the PBGC.
9           That, I believe, subject to
10  confirmation from counsel for the IAM and AMFA, not
11  only simplifies the trial, but also simplifies the
12  pre-trial conference because a great number of those
13  motions were primarily directed towards AFA-raised
14  issues. So, for example, Your Honor, the motion that
15  we had for leave to use the bridge report and
16  tentatively designate Mr. Schneling as a witness, we
17  would withdraw that issue at this point. And subject
18  to confirmation by counsel for IMA and AMFA that they
19  do not intend to use any of the evidence that the
20  balance of our motions were addressed to, I believe
21  those can be withdrawn as well. But that would be
22  our position, sir. And we think it does greatly
23  simplify things.
24          I'm prepared, if you would like, to
25  talk about what I would think a schedule would be at

Electronically signed by Jackleen DeFini (201-184-194-7430)                              b0ffd064-65c8-4693-bfe6-5e64e9115794

Page 194

1   this time, depending on the court's preference.
2       THE COURT: I think it might make more
3   sense for you to consult with counsel for IAM and
4   AMFA and come back to me tomorrow morning because the
5   alternative is for basically a discussion of that
6   sort to take place on the record, and I think that's
7   likely to be less productive.
8       MR. DIMITRIEF: Very well, Your Honor.
9   What time would you like to see us?
10      THE COURT: You can't come -- well...
11      MR. DIMITRIEF: Right now I believe we're
12  scheduled to appear at 2:00.
13      THE COURT: You are. You could come in at
14  1:30. We can get a little bit of a head start that
15  way.
16      MR. DIMITRIEF: Thank you, Your Honor.
17      THE COURT: And I should tell all of the
18  parties that we're only going to have Friday morning.
19  Friday afternoon I've got other obligations that I'm
20  going to have to attend to.
21      MR. DIMITRIEF: Okay. Thank you, Your
22  Honor. I think we will try to meet with counsel for
23  the IAM and counsel for AMFA and try to address the
24  uncertainties or open issues that have been raised by
25  where we stand right now, and hopefully we'll all be

Page 195

1   on the same page tomorrow when we appear at 1:30.
2       THE COURT: Okay. I think that will be all
3   for -- oh, yes, yes. Ms. Williams was able to obtain
4   a larger courtroom for the proceeding tomorrow
5   afternoon. That will be courtroom 1903.
6       THE CLERK: It's the same size as this one.
7       THE COURT: I mean larger than my courtroom
8   on the 7th floor. It will be the same size as this
9   courtroom.
10      Now, we were not able to get an
11  overflow courtroom. So if there are IMA or AMFA
12  members who want to appear for the proceeding
13  tomorrow, you have to realize that there is some
14  chance that you might not be able to get into the
15  courtroom. We really have done everything we can to
16  try to get as many people able to be in a position to
17  hear the proceedings as possible. But tomorrow the
18  best we can do is to get one courtroom of this size.
19      And I think with that, we'll adjourn
20  for the day.
21      MR. DIMITRIEF: Thank you, Your Honor.
22      MR. SPRAYREGEN: Thank you, Your Ho
23      (Which were all the proceedings
            had in the above-entitled cause,
24          May 10, 2005.)
25

Page 196

1   I, GARY SCHNEIDER, CSR, RPR, DO HEREBY CERTIFY THAT
    THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
2   PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE. NOR.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



PRINTED DUPLICATE
The original certified E-Transcript
file was electronically signed
using RealLegal technology.

Electronically signed by Jackleen DeFini (201-184-194-7430)

b0ffd064-65c8-4693-bfe6-5e64e9115794