# ATTACHMENT 6

```
                        06_02_2004 United 1114 Hearing.txt
 0001
   1            IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
   2                      EASTERN DIVISION
   3
   4   In re:                    )
                                 ) No. 02 B 48191
   5   UAL CORPORATION, ET AL.,  )
                                 ) Chicago, Illinois
   6                             ) June 2, 2004
                        Debtors. ) 9:00 a.m.
   7
   8        TRANSCRIPT OF PROCEEDINGS BEFORE THE
                 HONORABLE EUGENE R. WEDOFF
   9
  10   APPEARANCES:
  11   MR. ALEX DIMITRIEF
       MR. ANDREW KASSOF
  12   MS. MARIAN DURKIN
       MS. JENNIFER COYNE
  13   MS. TERESA SHEA
       on behalf of the debtors;
  14
       MS. CATHERINE STEEGE
  15   MR. CHARLES SKLARSKY
       MR. BARRY LEVENSTEIN
  16   on behalf of the SAM committee;
  17   MR. JACK CARRIGLIO
       MR. FRANK CUMMINGS
  18   MR. ERIC NEWMAN
       on behalf of the Retired Pilot Section 1114
  19   Committee;
  20   MS. SHARON LEVINE
       on behalf of The International Association of
  21   Machinists and Aerospace Workers;
  22   MR. ROBERT CLAYMAN
       on behalf of the Association of Flight Attendants -
  23   CWA;
  24   MR. WESLEY KENNEDY
       on behalf for the Professional Airline Flight Control
  25   Association;
 0002
   1   MR. DAVID JACOBSON
       on behalf of the creditors committee;
   2
       MR. SCOTT PETERSON
   3   on behalf of the Aircraft Mechanics Fraternal
       Association;
   4
       MR. IRVING KING
   5   on behalf of the Transport Workers Union.
   6
   7
   8
   9
  10
  11
  12
  13
  14
  15
  16
  17
                                Page 1
```

06_02_2004 United 1114 Hearing.txt

17 taken with us, for example, is the debtor I think has
18 to negotiate it. And as we lay out in our brief,
19 they started this process by saying, "Because we have
20 to negotiate, here is a sheet of paper that shows
21 what we're asking you for today, but here is what
22 we're willing to agree to after we negotiate." So
23 they created this artificial $5 million cushion.
24          THE COURT: Well, I'll tell you what. If
25 someone said to me, "I am willing to sell you a
0020
1 particular item from between 3 to $5," I would have
2 no difficulty in concluding that what they're really
3 offering is $3.
4          MS. STEEGE: That's correct, your Honor.
5          THE COURT: And so if they made a proposal
6 to you in which they said, "Here is a high number,
7 but we're willing to accept the low number," I would
8 interpret that as a proposal for the low number.
9          MS. STEEGE: And that's how we interpreted
10 it, your Honor. And when we went back to them and
11 sought to negotiate with them about that, if your
12 Honor looks at each of the offers that they made us
13 that they didn't limit and withdraw so therefore they
14 don't count under 1114, and there was only one of
15 those, they continued to stay at the 55 million.
16 They say that, "We need $55 million of plan design
17 changes. Plan design changes are nonnegotiable. And
18 we need then premium changes in contribution. And
19 the structuring in which we need those is
20 nonnegotiable." And they never moved off of that.
21          All of a sudden on May 18th they come
22 back and they say after we -- we go back and we
23 figure out what that means over the life of the plan
24 and we attempt to address our economic issues by
25 putting forth a proposal to them. They come back and
0021
1 they say, "This number that we've told you we've
2 needed now has suddenly changed," and it's higher.
3 And we say, "Well, why is that?" We don't understand
4 how the number changed. And we would like to know
5 what the negotiations were with AMFA. Because they
6 did move off of the 55 million with respect to them,
7 and suddenly now what they're asking for from the
8 rest of the retirees is higher. One of the questions
9 that we have is what exactly was that conversation,
10 and are we now being asked to pick up what they
11 didn't negotiate and obtain from the AMFA represented
12 retirees. And is that at the end of the day fair and
13 equitable to be essentially trying to pit all of your
14 retirees over on this side against one other group --
15          THE COURT: Okay. So --
16          MS. STEEGE: -- of retirees --
17          THE COURT: -- what you're --
18          MS. STEEGE: -- on this side.
19          THE COURT: -- saying is you need to get
20 information that would allow you to determine whether
21 they're taking a more aggressive position with
22 respect to the people you represent because of the
23 agreement that was reached with AMFA.
24          MS. STEEGE: Correct.
25          THE COURT: Okay. And what information do
0022
1 you suppose there might be that would indicate that

Page 9

```
                         06_02_2004 United 1114 Hearing.txt
 2    that's subject to being discovered?
 3              MS. STEEGE:  Well, for one thing the --
 4    what parties conversed about with AMFA when they
 5    negotiated. They have not allowed us to ask
 6    questions about that under a confidentiality.  All
 7    they've allowed us to know is what they've made
 8    available in the --
 9              THE COURT:  Okay.  Well --
10              MS. STEEGE:  -- public record,
11    that there --
12              THE COURT:  -- let me -- let me hear --
13              MS. STEEGE:  -- was this agreement.
14              THE COURT:  -- from the debtors'
15    representatives on that particular point.
16              MR. KASSOF:  Good morning, your Honor.
17    Initially I just want to address the fact of the
18    debtor is not moving and then the fact of the
19    debtors -- the argument that --
20              THE COURT:  I don't want --
21              MR. KASSOF:  -- the debtors took --
22              THE COURT:  -- to get into that.  I want --
23              MR. KASSOF:  Okay.
24              THE COURT:  -- to get into the question --
25              MR. KASSOF:  The AMFA?
0023
 1              THE COURT:  -- of whether there is
 2    information that you ought to be giving to the unions
 3    so that we -- or the authorized representatives so
 4    that we can avoid questions regarding the
 5    appropriateness of the bargaining process.
 6              MR. KASSOF:  There is not, your Honor.  We
 7    laid out in detail in our papers the tenor and the
 8    nature of the negotiations.  We, in fact, in
 9    depositions have allowed our witnesses to answer with
10    respect to the --
11              THE COURT:  Okay.  So you're --
12              MR. KASSOF:  -- AMFA agreement.
13              THE COURT:  -- saying you've given them all
14    the information they've asked for.
15              MR. KASSOF:  With one exception, your
16    Honor, which I want to address.  With respect to
17    AMFA, they have been allowed to inquire about, as we
18    put forth in our brief, the nature of the bargaining,
19    when you met, when you negotiated, what the tenor of
20    those negotiations were.  The aspect of the AMFA
21    negotiations that we have not allowed answers to was
22    pursuant to a confidentiality agreement that AMFA and
23    United entered into which was comparable, your Honor,
24    to precise confidentiality agreements that were
25    entered into by some of these same groups in the 1113
0024
 1    proceedings.  What those agreements said was "we are
 2    on our way to yet --" and it's on the face of the
 3    agreement and they have the confidentiality
 4    agreements, and they can compare those to the ones --
 5              THE COURT:  Okay.  Well, here is the
 6    problem I have:  Any confidentiality agreement is
 7    subject to a court order that directs the disclosure
 8    of the information.  So what you put in the
 9    confidentiality agreement, frankly, is not very
10    important to me.  What's important to me is whether
11    we're talking about discoverable information that
12    would assist in the resolution of this 1114 problem.
                                Page 10
```

06_02_2004 United 1114 Hearing.txt

```
13  So, again, what you have in the confidentiality
14  agreement is not of concern.  What is of concern to
15  me is whether they're seeking legitimate information
16  and whether you ought to produce it.
17          MR. KASSOF:  Well, two issues, your Honor.
18  One is in terms of whether it's relevant information.
19  We don't see how United's negotiations and back and
20  forth, give and take with AMFA in an effort to reach
21  consensual agreement with that particular group has
22  any relevance at all with respect to all of the other
23  groups.  United has provided and will continue to
24  provide any information that's relevant with respect
25  to those groups and those negotiations.  But the give
0025
 1  and take of the process with AMFA, what AMFA deemed
 2  to be relevant and needed with respect to the
 3  retirees that they represented and what United was
 4  willing to do in terms of movements to address the
 5  issues that AMFA raised with respect to their
 6  retirees has no relevance to United's negotiations
 7  with all of the other groups, and they --
 8          THE COURT:  Okay.
 9          Ms. Steege, why is it important to
10  know the give and take in the negotiations as opposed
11  to the final result?
12          MS. STEEGE:  Well, your Honor, they take
13  the position that suddenly the request from us goes
14  up at about the time that this agreement gets
15  finalized.
16          THE COURT:  Yeah.
17          MS. STEEGE:  And we don't know, for
18  example, what was said about why they were doing
19  that.  They have clauses in there about things that
20  change depending on what happens with us.  And
21  essentially the debtor has taken one group and pitted
22  it kind of against the other.
23          THE COURT:  I understand that.  But isn't
24  that something that you argue based on the agreement
25  that they reached with that group?  If, for example,
0026
 1  they had said to AMFA, "In order to get an agreement
 2  with you, we'll agree that your retiree benefits
 3  won't be cut at all and that's our agreement."  Well,
 4  your argument would be crystal clear, "This is not
 5  fair.  You're asking our employees, our retirees, to
 6  accept a far greater burden than you agreed to impose
 7  on this other group.  So we don't have something
 8  that's fair and equitable.  The proposal you're
 9  making can't possibly be approved by the court under
10  1114."  If that's the kind of argument you want to
11  make, knowing how that agreement with the one group,
12  AMFA in this case, was arrived at is not particularly
13  important.  What's important is the agreement itself
14  and whether it does give more favorable treatment to
15  AMFA than is being imposed or sought to be imposed on
16  other retirees.
17          MS. STEEGE:  But, your Honor, we don't know
18  if there is other aspects of this that don't make its
19  way into the retiree agreement, number one, which we
20  can find out by finding out what parties talked about
21  and why they negotiated what they did.  We don't
22  know -- for example, the debtor says in its brief and
23  seems to suggest to the court that, again, because
```

Page 11

```
                                   06_02_2004 United 1114 Hearing.txt
24   AMFA agreed to this, therefore these other groups
25   can't possibly have good cause not to agree to this
0027
 1   other and higher proposal. I don't think it's a very
 2   good argument. But to the extent that they are
 3   seeking to hold this group out as the ideal retiree
 4   group that we should all follow as being an example
 5   of what someone should do and what the, you know,
 6   documents are that they had and everything else, we
 7   have a right to know what their information exchange
 8   was. I mean -- and we don't know that because one of
 9   the things that at least I didn't see in all of the
10   information exchanged is the debtor took the position
11   with all of the parties in our groups that anybody
12   who asks for information, everybody gets it. AMFA
13   always seemed out of all of that process. We only
14   ever saw them at one information meeting. And now
15   they're being -- said, "Well, AMFA stipulates they
16   got what they needed to make their deal --"
17           THE COURT: Okay. Let me just --
18           MS. STEEGE: "-- and you should be held to
19   that."
20           THE COURT: -- say I don't think that AMFA
21   stands as a guidepost for the issues that I have to
22   address with respect to the groups of retirees who
23   did not reach agreement with the debtors. And that
24   being the case, the only question is going to be
25   whether the reductions that the debtors seek to
0028
 1   impose on the other groups is fair in light of the
 2   agreement that they did reach with AMFA. And for
 3   that purpose, knowing what the terms of the AMFA
 4   agreement are is the only thing I think that's
 5   relevant. How they came about it would not be
 6   relevant consideration. So I do not believe that
 7   there is any impropriety in the debtors holding that
 8   information confidential. I don't think that it's
 9   likely to lead to discoverable information,
10   discoverable material in the context of this 1114
11   hearing. But in saying that, I want to emphasize my
12   agreement with you that the debtors cannot say,
13   "Because AMFA agreed to this, it's obviously
14   reasonable and everyone else ought to agree to it."
15   All that can be done is to look at the entire package
16   that AMFA agreed to and consider the fairness of
17   what's being sought from the other retirees in light
18   of that.
19           MS. STEEGE: Thank you, your Honor.
20           MR. KASSOF: Your Honor, the only point I
21   want to clarify --
22           THE COURT: So, again, since I don't
23   believe that that's something that needs to be
24   disclosed, is there any other material that hasn't
25   been given to the authorized representatives that
0029
 1   would lead you to believe that there has been
 2   inappropriate conduct by the debtors in the context
 3   of the bargaining?
 4           MS. STEEGE: Your Honor, let me just confer
 5   with the other parties.
 6           Your Honor, thank you for the time.
 7   Two points: The one thing that we would respectfully
 8   suggest with respect to conversations with AMFA is if
                                Page 12
```

06_02_2004 United 1114 Hearing.txt

```
 9  in connection with talking with AMFA in their
10  capacity as authorized representative for the
11  retirees they also had conversations with AMFA as the
12  representative of active employees about the
13  collective bargaining agreements that they have there
14  that impacts, I think, what it was that was done here
15  and, again, leads again to this fairness issue. So
16  that would be one additional point of information
17  that we would like to be able to inquire on that.
18          THE COURT: I didn't follow that,
19  Ms. Steege.
20          MS. STEEGE: To the extent that in
21  connection with meeting with AMFA, which is also the
22  representative of the active mechanics, to the extent
23  that in talking with them in connection with the 1114
24  process they also had conversations with them with
25  respect to treatment of active employees --
0030
 1          THE COURT: Don't they have a collective
 2  bargaining agreement in place with respect to the
 3  active employees?
 4          MS. STEEGE: They do. But they can always
 5  talk about that agreement and they can always talk
 6  about the treatment of the active employees and how
 7  that agreement is --
 8          THE COURT: Okay. If there is --
 9          MS. STEEGE: -- administered.
10          THE COURT: -- some side agreement, if
11  that's what you're suggesting --
12          MS. STEEGE: Yes, that's what I'm saying,
13  your Honor.
14          THE COURT: -- yes, I think it would be
15  entirely appropriate for you to get disclosure of any
16  side agreement that was entered into in conjunction
17  with the 1114 agreement.
18          MS. STEEGE: And by not being able to ask
19  questions about what occurred, we haven't been able
20  to ask questions with respect to that.
21          MR. KASSOF: That point, that latter point
22  I absolutely disagree with, your Honor. What we've
23  said, and we've actually taken the position and will
24  continue to take the position, the head of United's
25  benefits program, who is one of the key negotiators,
0031
 1  was asked a question: Is this agreement the entire
 2  agreement between United and AMFA, or is there other
 3  side agreements out there that you had with AMFA or
 4  not? The answer was point blank no. This is the
 5  agreement with AMFA. There is no other side deals,
 6  and that's it. If they want to ask questions about
 7  that to every single witness and get the same answer,
 8  they can do that.
 9          THE COURT: As I say, Ms. Steege, I believe
10  that would be a relevant question that would be
11  entirely appropriate to have answered. But if it has
12  been asked and answered, then I don't think there is
13  anything more to be gone into.
14          MS. STEEGE: Well --
15          THE COURT: You can certainly ask the same
16  question of the representatives from AMFA who entered
17  into the 1114 agreement with the debtors and see if
18  they say anything differently. But if both sides say
19  there is no agreement, I think it would be very hard
```

Page 13

06_02_2004 United 1114 Hearing.txt

```
20  for either side to say later that there was such an
21  agreement and try to enforce it.
22              MS. STEEGE:  I did not take that
23  deposition, your Honor, Mr. Carriglio did.  He can
24  address what was said.  But as I asked him in
25  a sidebar --
0032
 1              MR. CARRIGLIO:  Just real briefly, Judge.
 2  The witness gave me a conclusion when I tried to get
 3  into the conversations that -- so that everyone could
 4  draw from the facts whether there was any discussion
 5  about anything extra being given to AMFA that -- we
 6  were shut off of that because of the confidentiality
 7  agreement.  So, sure, I got a conclusion from a
 8  witness without any facts in the same way if we had a
 9  witness in here who just came in willing to testify
10  to a conclusion and not give you the foundation and
11  the facts.  I don't think that's acceptable, but
12  that's what happened.
13              THE COURT:  Okay.  Again, without opening
14  up the entire course of negotiations, I don't know
15  what else can be done.  With both sides, as appears
16  to be the case, acknowledging that there is no other
17  agreement, as I said, neither side would be able to
18  enforce such an agreement against the other.  They're
19  both going to be estopped.  United is not going to be
20  able to go to AMFA and say later on, "You agreed to
21  such and such a change in the collective bargaining
22  agreement."  More importantly, AMFA is not going to
23  be able to go to United and say, "You've agreed to
24  give us concessions" when they've acknowledged that
25  there was no such agreement.  So I would be inclined
0033
 1  to think that at this point you've gotten -- see,
 2  what the brief said and what gave me pause was -- let
 3  me see if I can get the exact language here.
 4  "United's refusal to disclose the existence or the
 5  terms of an agreement that it reached with AMFA."
 6  That may have historically been true.  But you do
 7  have, as I understand it now, the complete terms of
 8  the agreement that was reached with AMFA, right?
 9              MR. CARRIGLIO:  We have the agreement, your
10  Honor.  And the agreement that we were given very
11  recently recites in it that the negotiations were
12  done in good faith.  That conclusion is in the
13  agreement.  When we tried to get into that to see --
14              THE COURT:  Okay.  Again, what I think is
15  important is that you've got all of the terms of the
16  agreement that was reached.  If they have given you
17  what they say is the full agreement and they've
18  acknowledged, each side, that there is no side
19  agreement that contains additional or different
20  terms, I think you've gotten everything that's
21  relevant for purposes of our hearing.
22              MR. CARRIGLIO:  Very well, Judge.
23              MS. LEVINE:  Your Honor, I think we need to
24  approach this from a slightly different vantage
25  point.  I think what the court has heard from the
0034
 1  authorized representatives earlier is in terms of the
 2  negotiation process we have had some dialogue with
 3  regard to the valuation of the company's proposal and
 4  our proposal, and we're moving in a direction that's
```

Page 14

```
                                    06_02_2004 United 1114 Hearing.txt
 5     positive with regard to those kinds of discussions
 6     and we can continue.  The disconnect seems to be over
 7     the issue of permanency --
 8              THE COURT:  Yes, that I --
 9              MS. LEVINE:  -- at the end of the plan.
10     The AMFA agreement --
11              THE COURT:  Okay.
12              MS. LEVINE:  -- is important with regard to
13     that issue --
14              THE COURT:  All right.
15              MS. LEVINE:  -- because the company, using
16     it as a tool for pattern bargaining, has indicated
17     that the AMFA agreement has some attributes, which we
18     don't understand as to why and how they would be
19     acceptable, and information with regard to the
20     costing and the financial underpinnings of what
21     analysis was done.  The same way we're drilling down
22     and costing out our proposal versus the company's
23     proposal and agreeing in some places where we can
24     agree to disagree and get closer, we don't know what
25     the company did with AMFA with regard to costing and
0035
 1     valuing different components of that proposal and
 2     also what sorts of considerations, factual
 3     considerations went into the decision-making process
 4     that ultimately resulted in an agreement that deals
 5     with permanency --
 6              THE COURT:  Okay.  But my point is --
 7              MS. LEVINE:  -- in a way that's different.
 8              THE COURT:  My point is that you have
 9     whatever provisions were actually agreed to.
10              MS. LEVINE:  But the court --
11              THE COURT:  You've got -- you've got your
12     own experts who can analyze the impact of whatever
13     terms were agreed to.  You don't need to have the
14     negotiating sessions replayed to determine the impact
15     of what agreement was actually reached.
16              MS. LEVINE:  No.  But the company's view of
17     what their savings are from each element of that
18     agreement would be different than what our initial
19     view of what the savings are going to be, which is
20     exactly what's going on with our proposals now.  In
21     other words, you know, much of what's going on is
22     costing and analyzing the assumptions and then going
23     back and doing the homework over the new agreements
24     that we're reaching with regard to different and new
25     assumptions.  We don't have the benefit of that
0036
 1     analysis with regard to the AMFA proposal and the
 2     AMFA agreement.  And we don't --
 3              THE COURT:  All right.
 4              MS. LEVINE:  And, you know, to --
 5              THE COURT:  So you're suggesting that
 6     United may have an internal analysis of the savings
 7     that would be generated by the AMFA agreement that
 8     would be helpful to you.
 9              MS. LEVINE:  Yes.  And AMFA as well.  Our
10     assumption is that as part of that bargaining
11     process, valuation was necessarily discussed and
12     analyzed.  And whether or not it's reduced to
13     writing, we would assume that it would at a minimum
14     have been talked about over the bargaining table and
15     those types of --
                                    Page 15
```

```
                                06_02_2004 United 1114 Hearing.txt
16              THE COURT:  All right.  Let me get what the
17    response is to that suggestion.
18              MR. KASSOF:  Two points, your Honor.
19    Number one, in terms of our evaluation of the AMFA
20    agreement, they haven't.  We've given that to them.
21    Their experts can look at it.  If they want to value
22    it differently, they can argue that.  But the
23    other --
24              THE COURT:  To the extent that you have an
25    internal analysis of the value of the reductions
0037
 1    involved in the AMFA agreement, you've supplied them.
 2              MR. KASSOF:  Yes, sir.
 3              But to address the second point as
 4    well, the argument that is being raised here by
 5    Ms. Steege, and now implicitly Ms. Levine, that
 6    somehow as a result of the AMFA agreement the debtors
 7    have increased their proposal to the other authorized
 8    representatives that remain is simply not true.
 9              THE COURT:  Well, you know, that's a
10    conclusion that I can reach on my own by looking at
11    what changes and bargaining posture took place over
12    the course of this.  But, again, I want to try to
13    avoid that particular area of inquiry under 1114.
14    The question of whether all of the relevant
15    information has been given, whether there has been
16    sufficient time for the authorized representatives to
17    consider that information, and whether there has been
18    a good faith negotiation by United are issues that,
19    if they're still outstanding now, I would like to
20    have addressed so that in the time between now and
21    the hearing, to the extent it's possible, there can
22    be ongoing good faith negotiations.
23              So, again, let me ask the authorized
24    representatives, do you acknowledge that you've
25    gotten an internal analysis from the debtors as to
0038
 1    the value of the AMFA agreement?
 2              MS. STEEGE:  Your Honor, to be honest with
 3    you, what I was going to say was perhaps Mr. Kassof
 4    could identify us to a Bates stamped document that we
 5    could look to.
 6              THE COURT:  Yeah.
 7              MS. STEEGE:  It is true that they were
 8    going to produce documents on Friday.  Through some
 9    mix-up, they didn't arrive at our office until late
10    yesterday afternoon after I was already out at
11    United's headquarters.
12              THE COURT:  Okay.
13              MS. STEEGE:  And I haven't talked to
14    the people --
15              THE COURT:  Let me do this --
16              MS. STEEGE:  -- who looked at those to find
17    out if that's true or not.
18              THE COURT:  We are the beneficiaries of the
19    trial that was supposed to start at 9:30 not going
20    forward today.  So I'll be happy to give you a break
21    to discuss what information has actually been
22    provided.
23              Now, as far as what AMFA is providing
24    you, AMFA at this point is not a party to the 1114
25    proceedings.  You're talking about what amounts to
0039
                                  Page 16
```