# ATTACHMENT  7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                        )Chapter 11
UAL CORPORATION, et al.,      )Case No. 02-B-48191
            Debtors.          )Jointly Administered
----------------------------)

Thursday, May 5, 2005
9:42 a.m.

Deposition of MICHAEL A. KRAMER,

held at the offices of Sonnenschein, Nath

& Rosenthal, LLP, 1221 Avenue of the

Americas, New York, New York 10020,

pursuant to Notice, before Otis Davis, a

Notary Public of the State of New York.



**David Feldman**
W o r l d w i d e

**Page 2**

```
 1
 2   A P P E A R A N C E S :
 3      KIRKLAND & ELLIS, LLP
 4      Counsel for Debtors
 5         200 East Randolph Drive
 6         Chicago, Illinois 60601
 7      BY:  ANDREW A. KASSOF, ESQ.
 8
 9   SONNENSCHEIN, NATH & ROSENTHAL, LLP
10   Counsel for The Committee of Unsecured
11   Creditors
12         8000 Sears Tower
13         233 South Wacker Drive
14         Chicago, Illinois 60606
15      BY:  MARK A. FLESSNER, ESQ.
16      AND:  PIA N. THOMPSON, ESQ.
17      AND:  LESLIE A. KLEIN, ESQ.
18
19   LOWENSTEIN SANDLER, P.C.
20   Counsel for IAM
21         65 Livingston Avenue
22         Roseland, New Jersey 07068
23      BY:  M. KAITLIN CARROLL, ESQ.
24
25
```

**Page 3**

```
 1
 2   A P P E A R A N C E S : (Cont'd)
 3      PENSION BENEFIT GUARANTY CORPORATION
 4      OFFICE OF THE GENERAL COUNSEL
 5      Counsel for PBGC
 6         1200 K Street, N.W., Suite 340
 7         Washington, D.C. 20005
 8      BY:  CHARLES L. FINKE, ESQ.
 9      AND:  JEFFREY B. COHEN, ESQ.
10
11   COHEN, WEISS AND SIMON, LLP
12   Counsel for Airline Pilots Association
13         330 West 42nd Street
14         New York, New York 10036
15      BY:  PETER HERMAN, ESQ.
16
17   GUERRIERI, EDMOND, CLAYMAN & BARTOS, P.C.
18   Counsel for Association of Flight Attendants
19         1625 Massachusetts Avenue, N.W., Suite 700
20         Washington, D.C. 20036
21      BY:  MATTHEW E. BABCOCK, ESQ.
22
23
24   ALSO PRESENT:
25         ROBERT E. DAMSTRA, Rothschild
```

**Page 4**

```
 1
 2
 3
 4
 5         IT IS HEREBY STIPULATED AND AGREED,
 6   by and among counsel for the respective
 7   parties hereto, that the filing, sealing
 8   and certification of the within deposition
 9   shall be and the same are hereby waived.
10         IT IS FURTHER STIPULATED AND AGREED
11   that all objections, except as to the form
12   of the question, shall be reserved to the
13   time of the trial.
14         IT IS FURTHER STIPULATED AND AGREED
15   that the within deposition may be signed
16   before any Notary Public with the same
17   force and effect as if signed and sworn to
18   before the Court.
19
20
21
22
23
24
25
```

**Page 5**

```
 1
 2   M I C H A E L   A.   K R A M E R, called
 3      as a witness, having been duly sworn by a
 4      Notary Public, was examined and testified
 5      as follows:
 6   EXAMINATION BY
 7   MR. FLESSNER:
 8      Q.  You are Michael Kramer?
 9      A.  Yes.
10      Q.  How are you employed?
11      A.  I am a managing director at Greenhill
12   & Company.
13      Q.  How long have you been there?
14      A.  Since 2001, January 2001.
15      Q.  Mr. Kramer, in your declaration, you
16   had indicated you had been deposed before; is
17   that correct?
18      A.  Yes.
19      Q.  So you understand the give-and-take
20   of depositions, don't interrupt me, I won't
21   interrupt you.  If you don't understand my
22   question, ask me to rephrase it.  I'll be glad
23   to do so.  Okay?  Do you understand that?
24      A.  Yes.
25      Q.  You have to speak to the court
```

2  (Pages 2 to 5)



122

M. Kramer

1
2  opinion of whether G-5 needs to be updated,
3  correct?
4      A.  Correct.
5      Q.  Based on all the information that you
6  have received from the company in the last four
7  or five months, does that indicate to you that
8  the G-5 is outdated?
9      A.  No.
10      Q.  So based on the information you have
11  received from the company, the financial
12  information you have received from the company
13  since December of '04, it's your opinion that
14  G-5 is current and up to date?
15      A.  I don't have an opinion either way.
16  I haven't looked at it closely enough and with
17  the mind-set of should this or shouldn't it be
18  updated.
19      Q.  Do you know anyone who has an opinion
20  on that?
21      A.  I do not.
22      MR. FLESSNER:  Mr. Babcock.
23  EXAMINATION BY
24  MR. BABCOCK:
25      Q.  Mr. Kramer, my name is Matthew

123

M. Kramer

1
2  Babcock.  I represent the Association of Flight
3  Attendants, Communication Workers of America,
4  American Federation of Labor, Congress of
5  Industrial Organizations, also known as AFA.  I
6  have a few questions to ask you today, and I
7  apologize in advance.  I think some of this
8  ground we've already plowed, but be that as it
9  may.
10      Is it your expert opinion, or was
11  it your expert opinion in early January of
12  2005, that the flight attendant plan was
13  salvageable?
14      A.  It was my opinion, based upon the
15  report that we put forth, that if the test to
16  keep a plan or not keep a plan was the credit
17  ratios that the company put forth as garnered
18  from the proposed exit lenders, with certain
19  modifications that keeping that plan would meet
20  those -- would and could meet those credit
21  ratios.
22      Q.  Is it impossible to answer the
23  question, just sort of the direct question
24  directly?  I mean is it necessary to qualify
25  your answer in the way you have qualified

124

M. Kramer

1
2  it?
3      A.  Yes.
4      Q.  And why is that?
5      A.  Because that's my opinion.
6      Q.  So if I was to simply ask you your
7  opinion, is it salvageable, you can't say yes or
8  no?
9      A.  Correct.
10      Q.  And if I were to ask essentially the
11  same question but phrase it this way, would it
12  be possible for United to reorganize
13  successfully and maintain the flight attendant
14  plan in early January of 2005, what would your
15  answer be?
16      A.  If the test was as outlined in my
17  affidavit and that was the only issue
18  outstanding, I think leaving that plan in place
19  would have satisfied those requirements.
20      Q.  Are there other tests that could be
21  applied to determine whether the plan is
22  salvageable?
23      A.  I think there probably is, yes.
24      Q.  The test that you were applying,
25  United's test, is that sort of the -- did that

125

M. Kramer

1
2  make sense to you as a test to determine whether
3  the plan was salvageable?
4      A.  I think it was clearly one approach
5  to look at it.  I think the big issue that we
6  had with it at that point in time was that it
7  lumped all the different -- all of the pension
8  plans together, and it said you either had to
9  terminate them all or none of them.  And what my
10  report or declaration did was sort of take it
11  down to say maybe you don't have to.  Maybe
12  you can apply the test on a more incremental
13  basis.
14      MR. FLESSNER:  Can we take a break?
15  The Court is going to call in.
16      MS. WOLF:  Hi, this is Barbara Wolf
17  from Judge Wedoff's chambers.  Are you able
18  to hear me?  Is everybody able to hear me?
19      MR. FLESSNER:  Yes.  We're in a
20  conference room, and actually, the court
21  reporter is still here, and he'll go ahead
22  and record it, but we are able to hear you.
23      MS. WOLF:  Okay.  I am going to
24  hopefully be able to transfer to Judge
25  Wedoff right now.

32  (Pages 122 to 125)

**126**

1          M. Kramer
2    Judge Wedoff, you've got the
3 deposition on the line.
4    THE COURT: (Via Telephone) Okay.
5 You can hang up.
6    MS. WOLF: Okay.
7    THE COURT: Hello.
8    MR. FLESSNER: Hi, Judge Wedoff.
9 This is Mark Flessner from Sonnenschein,
10 Nath & Rosenthal. We are here taking a
11 deposition. I am going to have everybody
12 identify themselves, because there is a
13 cast of thousands in here.
14    We are taking the deposition of
15 Michael Kramer from Greenhill, who is an
16 advisor to the PBGC, and some questions
17 have come up which we would like to -- I
18 would like to have you address. But first,
19 I think it would be better to have
20 everybody identify themselves. We also
21 have a court reporter here in the
22 deposition, who is recording the
23 conversations.
24    THE COURT: All right.
25    MR. KASSOF: Good afternoon, your

**127**

1          M. Kramer
2 Honor. Andrew Kassof on behalf of the
3 debtors.
4    MS. CARROLL: Good afternoon, your
5 Honor. Kaitlin Carroll on behalf of IAM.
6    MR. HERMAN: Peter Herman, from the
7 firm of Cohen, Weiss And Simon for the
8 Airline Pilots Association.
9    MR. FINKE: Charles Finke for the
10 Pension Benefit Guaranty Corporation.
11    MR. COHEN: Jeffrey Cohen for PBGC.
12    MR. KRAMER: Michael Kramer from
13 Greenhill on behalf of PBGC.
14    MR. BABCOCK: Matthew Babcock, your
15 Honor, for the AFA.
16    MS. THOMPSON: Pia Thompson from
17 Sonnenschein, Nath & Rosenthal on behalf of
18 the committee.
19    MR. KLEIN: Les Klein from
20 Sonnenschein on behalf of the committee.
21    MR. FLESSNER: Your Honor, the issue
22 is as follows: There has been, I think,
23 discussion in the Court. In other words,
24 the Court gave us a ruling with respect to
25 negotiations of the labor contracts, which

**128**

1          M. Kramer
2 are subject to specific regulatory laws
3 about whether or not it could be inquired
4 as to the negotiations of those contracts.
5    Today, and yesterday in fact, we've
6 asked witnesses questions regarding the
7 motivations behind the agreement, the
8 settlement agreement, the PBGC settlement
9 agreement. And specifically, what I
10 talked to Mr. Kramer about today was there
11 is this -- I don't know how familiar you
12 are -- but there's this 45 percent "slush
13 fund" that the PBGC has given to debtors,
14 and we find it problematic that they are
15 going to treat creditors disproportionately
16 and not disclose who that money is going
17 to.
18    We've asked Mr. Kramer to tell us
19 who -- excuse me, I'm just looking at my
20 notes here. I was doing two things before
21 you called -- who insisted on the
22 provision, what was the purpose of the
23 provision, why it was insisted upon, the
24 goals it's meant to achieve, and it has
25 been instructed -- he has been instructed

**129**

1          M. Kramer
2 by counsel not to answer those issues,
3 claiming -- Mr. Kassof and Mr. Finke both
4 claim that you have ruled that all these
5 issues, issues surrounding anything which
6 they identify as negotiations, are not
7 subject to disclosure.
8    It's the committee's position that
9 these are -- first of all, we think that
10 that is not a precise ruling under Rule
11 408, because 408 would allow such inquiry.
12 But be that as it may, it is the
13 committee's position that this would go to
14 an improper -- but demonstrating improper
15 motivations of the debtor, and it shows
16 that what the debtor is doing here is
17 abusing the Bankruptcy Code.
18    So my point is that we want to
19 inquire -- even if we disagree with the
20 ruling with respect to negotiations, this
21 is not specifically with respect to
22 negotiations because it has to do with the
23 agreement. What is the motive behind the
24 agreement? Why this was agreed to? What
25 it attempts to address, and what goals it

33 (Pages 126 to 129)

130

1    M. Kramer
2    achieves. We've been prevented from
3    inquiring into that.
4        MR. KASSOF: Your Honor, Andrew
5    Kassof on behalf of the debtors. If I can
6    just respond?
7        I just first want to -- I am not
8    going to belabor the "slush fund" comment
9    or some of the other comments. I think
10   those are better left for other purposes.
11   Just to state on the record, we disagree
12   with that characterization.
13       Getting to the merits of the point,
14   as your Honor knows, in two separate
15   contexts previously, one in the 1114
16   context, you ruled that the negotiations
17   that led to the final agreement and that
18   was in the context of the AMPA agreement,
19   as you called it, were not discoverable,
20   and that they were irrelevant for the
21   purposes of something that could possibly
22   lead to the discovery of admissible
23   evidence.
24       We had a very similar issue arise in
25   the last round of 1113 with the Retired

131

1    M. Kramer
2    Pilots. Your Honor denied a motion by the
3    Retired Pilots to get into the
4    back-and-forth negotiations between United
5    and the Airline Pilots Association
6    agreement on the same grounds.
7        Where we are here today and where we
8    were yesterday is we have objected
9    specifically to the back-and-forth
10   negotiations, what was discussed, what was
11   the exchange, and the give-and-take as it
12   relates to how the agreement was arrived
13   at.
14       What Mr. Flessner described in part
15   as to what we have instructed is just not
16   true, and the portion of the transcript
17   that has been relied upon for purposes of
18   this hearing proves that.
19       One comment Mr. Flessner said is we
20   have instructed not to answer questions as
21   to what the purpose of a particular
22   provision was, or what the goal was, what
23   the objective was.
24       Mr. Flessner asked the witness,
25   Mr. Kramer, specifically what the purpose

132

1    M. Kramer
2    was of this 45 percent provision in his
3    estimation, and the answer was: "I think
4    the purpose of the reduction or the
5    assignment was to actually create a
6    scenario where there was something, and he
7    was not -- by the way, he was not
8    instructed not to answer -- was to create a
9    scenario where there was something else for
10   other -- something for other people, "other
11   people" meaning other creditors, to benefit
12   from in this agreement.
13       "So either it could be used as a
14   reduction of the overall claim pool, or it
15   could be used as what I'll call sort of
16   anti-dilution to the claim pool if it was
17   given out to someone else."
18       He is permitted to answer that
19   question. We've only instructed not to
20   answer or objected not to answer on the
21   back-and-forth give-and-take of the
22   negotiations on the basis of your prior
23   rulings, not with respect to the purpose of
24   overall provisions, the goals of the
25   provisions, the objectives of the

133

1    M. Kramer
2    provisions. We have objected to the
3    question of who in who asked for something
4    or why something was asked for, and that
5    sort of thing based on your prior rulings.
6        MR. FLESSNER: Your Honor, Mr. Kassof
7    doesn't completely disclose the record,
8    because that question on page 5 was
9    answered, subject to the objection made by
10   Mr. Finke. Just prior to that:
11   "Objection. I instruct him not to answer
12   if it's going to involve back-and-forth
13   negotiations."
14       So the entire context of these
15   answers to who, what, where, why, the
16   purpose, the goal, everything that is meant
17   to be achieved by this provision has been
18   answered in a very limited and restricted
19   fashion, subject to that it doesn't have
20   anything to do with discussions during the
21   negotiation. And that simply is
22   inconsistent with our needs to find out who
23   did this, why they did it, and what the
24   purpose of the provision is.
25       THE COURT: I think the objection is

134

M. Kramer

1  appropriate. The roads that you are
2  seeking to travel require almost any
3  challenged agreement that a debtor reached
4  in the context of a bankruptcy to be
5  completely disclosed in terms of its
6  negotiation in the course of discovery of a
7  question of the challenge to that
8  agreement. I think that would have an
9  enormously chilling effect on agreements
10  being reached in bankruptcy.
11      I don't think that whatever can be
12  gleaned from that kind of questioning would
13  be commensurate to the burden and the
14  negative impact on bankruptcy
15  administration.
16      I, frankly, don't think that a great
17  deal of useful information would be
18  obtained by engaging in that questioning.
19  I will sustain the objection.
20      MR. FLESSNER: Okay, your Honor.
21      MR. KASSOF: Thank you.
22      THE COURT: Thank you.
23  BY MR. BABCOCK:
24      Q.  Mr. Kramer, before we broke, I

*(line numbers 1–25)*

135

M. Kramer

1  believe your testimony was that, I believe that
2  was your word, the only problem we had with -- I
3  forget what the end of the sentence was, but you
4  described as a problem the fact that the company
5  was not analyzing the impact of keeping or
6  terminating the pensions on a plan-by-plan
7  basis, but was insisting on running the analysis
8  only in terms of all of the plans; is that
9  correct?
10      MR. KASSOF: Objection, misstates the
11  testimony.
12      MR. BABCOCK: Can we read it back?
13      (Record read.)
14      THE COURT REPORTER: "QUESTION: The
15  test that you were applying, United's test,
16  is that sort of the -- did that make sense
17  to you as a test to determine whether the
18  plan was salvageable?
19      "ANSWER: I think it was clearly one
20  approach to look at it. I think the big
21  issue that we had with it at that point in
22  time was that it lumped all the
23  different -- all of the pension plans
24  together and it said you either had to

*(line numbers 1–25)*

136

M. Kramer

1  terminate them all or none of them. And
2  what my report or declaration did was take
3  it down to say maybe you don't have to,
4  maybe you can apply the test on a more
5  incremental basis."
6      Q.  I'm sorry, "issue." Why was that an
7  issue?
8      A.  I think we identified that as an
9  issue because my understanding was you do not
10  have to terminate all of the pension plans or
11  none. You have to look at each of the pension
12  plans individually, and the company's analysis
13  that we saw did not do that. It, again, lumped
14  them all together.
15      Q.  Do you have an opinion as to whether
16  it is more or less appropriate to analyze the
17  plans individually versus analyzing them lumped
18  together?
19      A.  I think that's more of a legal issue.
20  I would rely on lawyers to tell me what the
21  right standard to that would be. So, no.
22      Q.  In early January of 2005, was it your
23  opinion or belief that the company, United, was
24  exploring all alternatives to pension

*(line numbers 1–25)*

137

M. Kramer

1  termination?
2      MR. KASSOF: Objection, foundation.
3      A.  Was it my opinion that they were
4  exploring all options?
5      Q.  In your opinion.
6      MR. KASSOF: Same objection.
7      A.  I don't know that I have a formal
8  opinion on that. They clearly stated that they
9  were looking at that.
10      Q.  But in your opinion, did you believe
11  that they had exhausted all alternatives, and
12  specifically to terminating the flight attendant
13  plan?
14      MR. KASSOF: Same foundation
15  objection.
16      A.  I don't know that I had an opinion
17  one way or the other on that.
18      Q.  Moving to early April of 2005, was it
19  your opinion in early April of 2005, that the
20  flight attendant plan was salvageable?
21      MR. KASSOF: Object to the form.
22      A.  I didn't have an opinion.
23      Q.  You didn't have an opinion in
24  April --

*(line numbers 1–25)*

35  (Pages 134 to 137)