IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS – CWA, AFL-CIO, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.:  1:05CV01036 (ESH) |
| v. | ) ) | |
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) ) | |
| Defendant. | ) ) ) | |

# PBGC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Date: October 3, 2005

JEFFREY B. COHEN
Chief Counsel
CHARLES L. FINKE
NANCY HEERMANS
Associate Chief Counsels
JOHN A. MENKE
PAULA CONNELLY
Assistant Chief Counsels
SHANNON L. NOVEY
ANDREA M. WONG
DEVA KYLE
Attorneys
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, NW, Suite 340
Washington, D.C.  20005-4026
(202) 326-4020, ext. 3848 (telephone)
(202) 326-4112 (facsimile)
Wong.Andrea@pbgc.gov & efile@pbgc.gov

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.     PBGC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       B.     Plan Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

  I.     THE COURT SHOULD UPHOLD PBGC'S DETERMINATION TO TERMINATE
        THE FA PLAN UNDER 29 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       A.     PBGC'S TERMINATION DECISION MUST BE REVIEWED ON THE
            ADMINISTRATIVE RECORD, AND SHOULD BE RESOLVED ON
            SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       B.     PBGC RATIONALLY DETERMINED THAT THE FA PLAN SHOULD BE
            TERMINATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.     PBGC Rationally Determined That The Plan Will be Unable to Pay
                 Benefits when Due Because of Underfunding . . . . . . . . . . . . . . . . . . . . . . 16

            2.     PBGC Rationally Determined that There Is an Unreasonable Increase in
                 the Risk of Its Long-Run Loss Absent Termination . . . . . . . . . . . . . . . . 17

  II.    PBGC DID NOT VIOLATE 29 U.S.C. § 1341 BY TERMINATING THE FA PLAN
        UNDER 29 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.    BECAUSE THE SETTLEMENT AGREEMENT DID NOT TERMINATE THE FA
        PLAN, PBGC DID NOT VIOLATE 29 U.S.C. § 1342(a) BY ENTERING INTO THE
        AGREEMENT WITHOUT FIRST DETERMINING THAT THE PLAN MUST BE
        TERMINATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## CASES CITED

*Ass'n of Flight Attendants ("AFA") v. PBGC,*
  Case No. 1:05cv01036 (D.D.C. August 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ass'n of Flight Attendants ("AFA") v. PBGC,*
  372 F. Supp. 2d 91 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ass'n of Flight Attendants ("AFA") v. United Air Lines Inc.,*
  Case No. 05 C 3172 (N.D. Ill. July 21, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Ass'n of Flight Attendants ("AFA") v. United Air Lines Inc.,*
  Case No. 05-3200 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Air Line Pilots Ass'n ("ALPA") v. PBGC,*
  193 F. Supp. 2d 209 (D.D.C. 2002)
  *aff'd sub. nom. Allied Pilots Ass'n v. PBGC ("APA"),*
    334 F.3d 93 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Allied Pilots Ass'n ("APA") v. PBGC,*
  334 F.3d 93 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

*Balboa Ins. Co. v. United States,*
  775 F.2d 1158 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bloch v. Powell,*
  227 F. Supp. 2d 25 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Castillo v. Army & Air Force Exch. Serv.,*
  849 F.2d 199 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,*
  802 F. Supp. 1325 (D. Md. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Coal Employment Project v. Dole,*
  889 F.2d 1127 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Authorities upon which we chiefly rely are marked with an asterisk.*

*Conservation Council for Hawaii v. Babbitt*,
  2 F. Supp.2d 1280 (D. Hawaii 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Corridor H Alternatives, Inc. v. Slater*,
  982 F. Supp. 24, 28 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Elk Run Coal Co. v. Babbitt*,
  919 F. Supp. 225 (S.D.W. Va. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*\*Girling Health Care v. Shalala*,
  85 F.3d 211 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hammond v. Norton*,
  370 F. Supp. 2d 226 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Heckler v. Chaney*,
  470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432, 446 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kaiser Aluminum Corp., In re*,
  2005 WL 735551 (D. Del. March 30, 2005)
  *appeal pending*, No. 05-2695 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kauble v. PBGC*,
  1994 WL 722966 (S.D. Ind. 1994),
  *aff'd mem.*, 94 F.3d 647 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*\*Motor Vehicle Mfr. Assn. v. State Farm Mut. Auto. Ins.* Co.,
  463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*OSG Bulk Ships v. United States*,
  132 F.3d 808 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*PBGC v. FEL Corp.*,
  798 F. Supp. 239 (D.N.J. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*PBGC v. Haberbush*,
  2000 WL 33362003 (C.D. Cal. Nov. 3, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*PBGC v. Heppenstall Co.*,
  633 F.2d 293 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*PBGC v. J.D. Industries*,
　　887 F. Supp. 151 (W.D. Mich. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*PBGC v. LTV Corp.*,
　　496 U.S. 633 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

*PBGC v. Mize Co., Inc.*,
　　987 F.2d 1059 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*\*PBGC v. Republic Techs. Int'l, LLC*,
　　386 F.3d 659 (6th Cir. 2004),
　　*cert. denied*, 2005 WL 517002 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*\*PBGC v. The Pension Comm. of Pan Am. World Airways, Inc.*,
　　777 F. Supp. 1179 (S.D.N.Y. 1991),
　　*aff'd mem.*, 970 F.2d 896 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16, 19

*PBGC v. United Air Lines, et al.*,
　　No. 02-B-48191(Bankr. Ct. N.D. Ill. Mem. Dec. September 21, 2005) . . . . . . . . . . . . . 15

*PBGC v. Wilson N. Jones*,
　　374 F.3d 362 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pension Comm. for Farmstead Foods Pension Plan
　　for Albert Lea Hourly Employees v. PBGC*,
　　991 F.2d 1415 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Piggly Wiggly Southern, Inc. v. PBGC*,
　　19 Employee Ben. Cas. 1163 (N.D. Ind. April 4, 1995) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Serono Labs., Inc., v. Shalala*,
　　158 F.3d 1313 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Southern Utah Wilderness Alliance v. Norton*,
　　326 F. Supp.2d 102 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Int'l Harvester Co.*,
　　387 F. Supp. 1338 (D.D.C. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## UNITED STATES CODE CITED

Title 5
     Section 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Title 11
     Section 1113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Title 26
     Section 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18
     Section 412(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     Section 412(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Title 29
     Section 1002(16)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1082 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Sections  1301-1461 (2000 & Supp. II 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     Section 1301(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1301(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1301(a)(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1301(a)(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     Section 1301(a)(14)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     Section 1301(a)(18) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     Section 1301(a)(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1301(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     Section 1302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     Section 1302(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3
     Section 1302(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     Section 1322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1322(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1322(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1322(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1322(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     Section 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 12, 20, 21
     Section 1341(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     Section 1341(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21
     Section 1341(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     Section 1341(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10, 21
     Section 1341(c)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     Section 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21
     Section 1342(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 14, 17
     Section 1342(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     Section 1342(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 17

Section 1342(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16
Section 1342(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13
Section 1347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Section 1348(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 1362(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1362(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## **OTHER AUTHORITIES CITED**

26 C.F.R.
    Section 1.414(b)-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 1.414(c)-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 1.414(c)-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 C.F.R.
    Section 4022.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 4022.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 4022.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 4022.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 4041.7(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

S. Rep. No. 93-383 (1973),
    *reprinted in* 1974 U.S.C.C.A.N. 4889 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10A C. Wright, A. Miller & M. Kane,
    *Federal Practice & Procedure*: *Civil 2d* § 2733 (1983) . . . . . . . . . . . . . . . . . . . . . 15

2004 PBGC Ann. Rep.,
    http://www.pbgc.gov/docs/ 2004_annual_report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Statement of Steven A. Kandarian, Executive Director, PBGC,
    Before the House Comm. on Ways and Means,
    Subcomm. on Oversight at 3 (June 20, 2002),
    http://www.pbgc.gov/media/news-archive/ExecutiveTestimony/tm14601.html . . . . . . . . 3

PBGC press release, "Seventy Percent of PBGC's Losses Incurred in 2000-2004,"
    http://www.pbgc.gov/media/news-archive/2005/pr05-40.html (May 27, 2005) . . . . . . . . 3

PBGC press release, Maximum monthly guarantee tables,
http://www.pbgc.gov/workers-retirees/find-your-pension-plan/content/page789.html . . . . . . . . . 6

United Press Release,
   http://www.united.com/press/detail/0,6862, 52157-1,00.html  . . . . . . . . . . . . . . . . . . . . . 6

PBGC Directive TR-00-2, issued May 8, 2001  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## INTRODUCTION

Pursuant to its specific statutory authority, the Pension Benefit Guaranty Corporation ("PBGC") determined on June 23, 2005, that the United Airlines Flight Attendant Defined Benefit Pension Plan ("FA Plan" or "Plan") should be terminated.  On that date, PBGC issued a Notice of Determination and sent it to United Air Lines, Inc. ("United") and the Association of Flight Attendants-CWA, AFL-CIO ("AFA" or "Flight Attendants").  United and PBGC entered into a Trusteeship Agreement the next day, which provided that the Plan would be terminated (and PBGC appointed trustee) as of June 30, 2005.  As the federal agency responsible for insuring the nation's defined benefit pension plans, PBGC has stepped in to become trustee of the FA Plan and pay participants their guaranteed benefits, which are underfunded by approximately $1.7 billion.

PBGC terminated the FA Plan in order to prevent additional costs from being transferred to the agency's insurance fund by any delay in the Plan's termination date.  By contesting this termination, the Flight Attendants seek to shift financial responsibility onto PBGC and its premium-payers for additional unfunded benefits.  PBGC was fully justified, and far from arbitrary and capricious, when it determined that the facts and circumstances of this case presented an unreasonable risk of loss.  Accordingly, the Court should enter an order granting summary judgment in favor of PBGC, and find that PBGC did not act arbitrarily and capriciously in terminating the FA Plan.

1

<u>**STATUTORY BACKGROUND**</u>

**A.    PBGC**

PBGC is a federal agency and wholly-owned United States government corporation.

29 U.S.C. § 1302(a).  PBGC administers the termination insurance program under Title IV of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461 (2000

& Supp. II 2002), which protects participants in private sector defined benefit pension plans.[1]

PBGC guarantees the pension benefits of more than 44 million participants in

approximately 31,200 pension plans, and is the trustee of nearly 3,500 failed pension plans.  The

insurance program administered by PBGC acts as a backstop for American workers, providing

retirement income for more than 1 million workers who would receive no benefits but for

PBGC's protection.  In 2004, PBGC assumed responsibility for the benefits of nearly 150,000

additional pension plan participants.[2]

PBGC is self-financed, and obtains its revenues exclusively from four sources:

(I) premiums paid by employers sponsoring ongoing plans; (ii) investment income; (iii) the assets

in terminated plans; and (iv) recoveries, if any, from employers whose underfunded plans have

terminated.[3]  It has three stated statutory purposes: 1) to encourage the continuation and

maintenance of voluntary private pension plans; 2) to provide for the timely and uninterrupted

---

[1] *See generally PBGC v. LTV Corp.*, 496 U.S. 633, 636-39 (1990).

[2] 2004 PBGC Ann. Rep., inside front cover, pp. 4, 13; *available at* http://www.pbgc.gov/docs/
2004_annual_report.pdf.

[3] *Id.* at inside front cover.

payment of pension benefits; and 3) to maintain premiums at the lowest level consistent with carrying out its obligations under Title IV.[4]

For its first 21 years, PBGC operated at a deficit.  Beginning in 1996, PBGC gradually built a surplus due to factors such as the strong economy, a robust return on investments, and no pension plan terminations with major underfunding between 1996 and 2000.[5]  In recent years, however, PBGC's exposure to losses in large underfunded plans in certain industries, including the airline industry, has accelerated, and PBGC's financial condition has rapidly declined.[6]  In 2004, PBGC posted its largest loss and the largest year-end shortfall in the agency's 30-year history.  PBGC recorded financial losses totaling $14.7 billion for fiscal year 2004, more than doubling the program's deficit to $23.3 billion by year end.[7]

### B.    Plan Termination

Title IV of ERISA is the exclusive means of terminating a defined benefit pension plan.[8]  Plan termination can be initiated by the sponsoring employer or by PBGC.  An employer may terminate a plan in a standard termination under 29 U.S.C. § 1341(b) if the plan has sufficient assets to cover all future benefit payments through the purchase of private sector annuities, or in

---

[4]  29 U.S.C. § 1302(a).

[5]  *See* Statement of Steven A. Kandarian, Executive Director, PBGC, Before the House Comm. on Ways and Means, Subcomm. on Oversight at 3 (June 20, 2002), http://www.pbgc.gov/media/ news-archive/ExecutiveTestimony/tm14601.html.

[6]  *See* PBGC press release, "Seventy Percent of PBGC's Losses Incurred in 2000-2004," *at* http://www.pbgc.gov/media/news-archive/2005/pr05-40.html (May 27, 2005).

[7]  2004 Ann. Rep. at 5.

[8]  29 U.S.C. § 1341(a)(1); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999)*; PBGC v. Mize Co., Inc.*, 987 F.2d 1059, 1063 (4th Cir. 1993).

a distress termination under 29 U.S.C. § 1341(c) if the plan is underfunded and the employer meets certain statutory financial distress tests. Typically, in a bankruptcy proceeding, a plan sponsor and each member of its "controlled group"[9] must show that it will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside bankruptcy.[10]

In addition, PBGC has discretion to initiate the termination of an underfunded plan if it determines that one of four criteria set forth in 29 U.S.C. § 1342(a) has been met, including: the plan will be unable to pay benefits when due, 29 U.S.C. § 1342(a)(2); and the possible long-run loss to the PBGC insurance program with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated, 29 U.S.C. § 1342(a)(4).

Pursuant to an internal directive, PBGC follows an established administrative process to determine whether an underfunded pension plan should be involuntarily terminated and to select a proposed date of termination.[11] The Trusteeship Working Group ("TWG") — an interdisciplinary body comprised of representatives from PBGC's financial, actuarial, policy and legal offices — reviews a written recommendation by PBGC staff that one or more of the criteria under 29 U.S.C. § 1342(a) have been met, and that the pension plan should be

---

[9] *See* 29 U.S.C. §§ 1362(a), (b); 1301(a)(18). A "controlled group" includes a parent-subsidiary or brother-sister group of trades or businesses connected through ownership of at least 80% controlling interest by a common entity. *See* 29 U.S.C. §§ 1301(a)(14), (b); 26 U.S.C. §§ 414(b), (c); 26 C.F.R. §§ 1.414(b)-1, 1.414(c)-1, 1.414(c)-2.

[10] 29 U.S.C. § 1341(c)(2)(B)(ii). As discussed at page 20 infra, a distress termination cannot proceed "if the termination would violate the terms and conditions of an existing collective bargaining agreement." 29 U.S.C. § 1341(a)(3).

[11] *See* PBGC Directive TR-00-2, issued May 8, 2001, Attachment A.

4

terminated.  The TWG considers the recommendation from staff, and then makes its own recommendation, which, along with supporting documents, is passed on to the "approving official."[12]

In cases involving claims of more than $100 million, the approving official is the Executive Director, the head of the agency.  The Executive Director reviews the TWG recommendations and supporting documents, and determines whether the plan should be terminated and PBGC appointed its trustee.  The Executive Director also determines the appropriate plan termination date that should be proposed to the plan administrator.  The Executive Director's decision is documented in a Notice of Determination ("NOD") and a Termination and Trusteeship Decision Record ("TDR").[13]

PBGC notifies the plan administrator of its determinations by sending the administrator a copy of the NOD in accord with 29 U.S.C. § 1342(c).  PBGC typically effectuates the termination, trusteeship and establishment of a plan termination date of an underfunded plan by agreement with the plan administrator as authorized by section 1342(c).  If PBGC and the plan administrator cannot agree, section 1342(c) authorizes the agency to apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated, and PBGC

---

[12]  *See id.* at § 2(j); § 3(d)(3). The TWG reviews actuarial, financial and other information developed by the agency staff regarding the funding status of the pension plan and the financial condition of the employer and the employer's "controlled group," as that term is used in 29 U.S.C. § 1301(a)(14)(A).  *Id.* at § 3(a)-(e).  Depending on criteria primarily relating to the number of participants and the amount of underfunding in a plan, either the TWG Chairperson or the full TWG will review the relevant information and make a recommendation to the approving official.  *Id.* at §§ 2(b), (j), and 3(b). The definition of an approving official is also primarily dependent on the size of the case.  *Id.* at § 2(b).

[13]  *Id.* at §§ 2 (b), (f), (h), 3(d)(5).

be appointed its trustee.  ERISA also directs that the court establish the plan termination date if

PBGC and the plan administrator cannot agree on a date.[14]  The establishment of a plan

termination date is crucial because it fixes PBGC's liability for guaranteed benefits and serves as

the date upon which participants' right to accrue additional benefits ceases.  It also serves as the

date upon which the liability of the employer and its controlled group for the plan's unfunded

benefit liabilities is measured.[15]

    In creating the pension insurance program, Congress limited the benefits that PBGC

could pay.  Title IV insurance was "not intended as a full replacement of a pension plan, but

rather as covering the basic retirement benefits provided under it."[16]  Accordingly, when a

pension plan terminates with insufficient funds to cover all of its benefit liabilities, ERISA limits

the PBGC guarantee to the payment of "nonforfeitable" benefits as of the date of plan

termination.[17]  A nonforfeitable benefit is a benefit for which a participant has satisfied all of the

conditions for entitlement under the plan and ERISA, as of the date of plan termination.[18]

ERISA also limits the size of the guaranteed benefit PBGC can pay to any participant; the

amount of that limit, which changes every year on January 1, is based on the year in which the

---

[14]  29 U.S.C. § 1348(a)(4).

[15]  *See, e.g.*, 29 U.S.C. §§ 1301(a)(19), 1322, 1362; *PBGC v. Heppenstall Co.*, 633 F.2d 293, 296 (3d Cir. 1980).

[16]  S. Rep. No. 93-383, at 81 (1973), *reprinted in* 1974 U.S.C.C.A.N 4889.

[17]  29 U.S.C. § 1322(a); 29 C.F.R. § 4022.3(a).

[18]  29 U.S.C. § 1301(a)(8).

6

pension plan's termination date falls.[19]  Finally, Congress mandated that benefit increases in

existence for less than five years before a plan's termination date are generally phased in at a rate

of 20% per year.[20]

## FACTUAL BACKGROUND

United was the plan administrator and contributing sponsor of the FA Plan within the

meaning of 29 U.S.C. §§ 1002(16)(A), 1301(a)(1), and 1301(a)(13).  (AR 1689).[21]  The Plan has

approximately 28,600 participants.  (AR 128, AR-S 4230).

On December 9, 2002, United filed a voluntary petition under Chapter 11 of the

Bankruptcy Code.  (AR 37).  After the Air Transportation Stabilization Board made its final

decision to deny United's application for a federal loan guarantee in June 2004, United

repeatedly stated that it must terminate all of its pension plans in order to successfully emerge

from bankruptcy.  (AR 69, 628, 984-985, 1356-1357).  On July 23, 2004, United announced it

did not expect to make any more statutorily-required minimum funding contributions to its

pension plans.[22]

---

[19]  29 U.S.C. § 1322(b)(3); 29 C.F.R. §§ 4022.22, 4022.23.  The maximum benefit for plans with termination dates in 2005 is $3,801.14 per month and $45,613.68 per year for retirement at age 65, *available at*
http://www.pbgc.gov/workers-retirees/find-your-pension-plan/content/page789.html.

[20]  29 U.S.C. §§ 1322(b)(1), (7); 29 C.F.R. § 4022.24.

[21]  "AR" refers to the administrative record of PBGC's determination to terminate the FA Plan, filed with the Court on July 22, 2005.  "AR-S" refers to sealed portions of the administrative record filed with the Court on the same date.

[22]  *See* United Press Release, *at* http://www.united.com/press/detail/0,6862, 52157-1,00.html.  Until a plan is terminated, the sponsoring employer must fund the plan in accordance with the minimum funding requirements set forth in 29 U.S.C. § 1082 and 26 U.S.C. § 412.  The plan actuary calculates the minimum funding contributions based on reasonable actuarial assumptions

On December 14, 2004, United filed a motion under Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, to reject its collective bargaining agreement with the Flight Attendants.[23]  (AR 968-1137).  One of the provisions in the collective bargaining agreement United sought to eliminate through this motion was any requirement that United maintain a defined benefit pension plan.  (AR 1055-1056).  PBGC participated in that litigation in order to protect its interests in assuring that it would not be prejudiced by a conflation of the standards for termination of a pension plan under ERISA and for the rejection of a collective bargaining agreement.  PBGC filed an expert report in December of 2004, which concluded that at that time United could afford the FA Plan.  (AR 822-842).  This report was premised on the business plan under which United had been operating and the forecasted fuel curve at that point in time.  (AR 827-828, 840).

United was able to reach agreements with its unions which resolved the most immediate of its pressing financial concerns in the first quarter of 2005.  (AR 01370-1371).  The issue of termination of the FA Plan was postponed until April 11, 2005.  (AR 01371).  United stated that, in the interim, it would negotiate with its unions over termination, replacement, or other solutions to its pension plans issue.  (AR 01371).  On April 11, 2005, United re-filed its 1113 motion and filed a motion to terminate its underfunded pension plans in a "distress" termination pursuant to 29 U.S.C. § 1341.  (AR 619-718).  PBGC moved to postpone the hearing on the distress application, asserting that it was premature because a bankruptcy court should not analyze a

---

regarding predictable factors such as mortality, retirement age and investment returns.

[23] The description of this motion and the subsequent discussion is limited to the AFA, as it is the union bringing suit.  However, United's motion was filed with respect to all of its unions.

distress termination application without studying the plan sponsor's proposed plan of reorganization, which United had not yet filed. (AR 606-618).

On April 26, 2005, United filed an emergency motion to approve a settlement agreement between United and PBGC ("Agreement") regarding myriad issues including among other things: PBGC's claims in United's bankruptcy proceeding, liens PBGC had placed on non-debtor subsidiaries, rights to set off, the time and manner of approving replacement plans in the event of the termination of United's pension plans, and a process by which the United pension plans might be terminated. On May 11, 2005, the bankruptcy court approved the Agreement over the objection of the unions and several other creditors, (AR 88-118), finding that the Agreement was not in violation of law. (AR 88-91).[24] AFA appealed to the District Court for the Northern District of Illinois, which upheld the decision, and subsequently to the Seventh Circuit Court of Appeals.[25]

On June 16, 2005, PBGC staff forwarded a memorandum and supporting materials to the agency's TWG, recommending termination of the FA Plan as soon as practicable. (AR 25-33). On June 21, 2005, the TWG met to consider the staff recommendations. The TWG voted to concur in the staff recommendation that PBGC terminate and become trustee of the FA Plan, with a termination date as soon as practicable. (AR 15-16). On June 22, 2005, this

---

[24] At the time of the Agreement's approval, United withdrew its pending motions on both 29 U.S.C. § 1341 and 11 U.S.C. § 1113.

[25] The district court held that the Agreement did not violate any statutory provision or any portion of the collective bargaining agreement, nor did it require PBGC to terminate the Plan, although PBGC has the statutory authority to terminate the Plan "if it sees fit despite AFA's objections." *Ass'n of Flight Attendants ("AFA") v. United Air Lines, Inc.*, No. 05-C 3172, Memorandum Opinion (N.D. Ill. July 21, 2005) at 3. The Seventh Circuit appeal was argued on September 13, 2005. *AFA v. United Air Lines Inc.*, 05-3200 (7th Cir. 2005).

recommendation, with supporting materials, was transmitted to PBGC's Executive Director for review and deliberation.  (AR 5).

Information before the Executive Director showed that the unfunded benefit liabilities of the Plan were about $2 billion, of which about $1.7 billion were guaranteed.  (AR 2, 29, 128).[26] PBGC believed the Plan was virtually certain to terminate prior to United's emergence from Chapter 11 bankruptcy protection.  In the summer of 2004, United stated that it would not make any further minimum funding contributions to its Plans while in bankruptcy because such payments "would diminish the company's liquidity and reduce flexibility, thus impairing the company's ability to attract exit financing."  (AR 1445).  By the time staff recommended termination of the Plan, United had missed over $111 million of funding contributions for the FA Plan alone.[27]  (AR 31).  In addition, United had revised its position that its pension plans *may* have to be terminated, and had instituted the process to terminate its remaining plans, including the FA Plan.  (AR 31-31, 80-81).[28]  PBGC concluded that United would likely meet the standard for a distress termination of its plans under section 1341(c).  (AR 31-32, 129-134).

PBGC also determined that, if the Plan continued until September 2005, the agency would have to absorb nearly $10 million of additional liability.  (AR 32).   That potential liability

---

[26]  PBGC's unfunded benefit liability calculations for the Plan were based on information provided by the Plan's actuary.  (AR 128, AR-S 3586).

[27]  Although the TWG did not rely on missed contributions in recommending termination, the company's failure to make quarterly funding payments, while not constituting grounds for termination, was relevant to the agency's judgment regarding the probability of plan termination in the foreseeable future.

[28]  PBGC ultimately instituted proceedings to terminate all of United's pension plans involuntarily.

would come from three sources. First, a grow-in due to an early retirement subsidy would add approximately $1.4 million in guaranteed benefit per month the Plan remained ongoing. (AR 32; AR-S 3590). Next, active participants were continuing to accrue $1.9 million in guaranteed benefits each month the Plan remained ongoing. (AR 32; AR-S 3591). Finally, plan assets would continue to be depleted by an estimated $10,000 per month through United's payment of benefits that are not guaranteed by PBGC. (AR 32; AR-S 3591).

On June 23, 2005, PBGC's Executive Director issued a Notice of Determination that the Plan should terminate effective June 30, 2005, and PBGC should become its statutory trustee:

> [T]he Pension Benefit Guaranty Corporation ("PBGC") has determined, under section 4042(a)(2) and (4) of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. § 1342(a)(2) and (4), that the United Airlines Flight Attendant Defined Benefit Pension Plan ("Plan") must be terminated because the Plan will be unable to pay benefits when due because of underfunding, and the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the Plan is not terminated. PBGC further determined, under ERISA § 4042(c), 29 U.S.C. § 1342(c), that the Plan must be terminated in order to avoid any unreasonable deterioration of the financial condition of the Plan and any unreasonable increase in the liability of the fund. Accordingly, PBGC intends to proceed under ERISA § 4042, 29 U.S.C. § 1342, to have the Plan terminated and PBGC appointed as statutory trustee, and under ERISA § 4048, 29 U.S.C. § 1348, to have June 30, 2005, established as the Plan's termination date.

 (AR at 1).

## SUMMARY OF ARGUMENT

In this case, the Court is reviewing discretionary agency action taken by PBGC at a time when the agency was, and still is, facing its most daunting fiscal challenge ever. With a deficit of over $23 billion in fiscal year 2005, PBGC was compelled to protect its financial interest and the related interests of its stakeholders, as is contemplated under the statute. The AFA seeks to limit

this statutory authority granted to the PBGC with respect to terminating or soon-to-be-terminating pension plans.  The AFA also seeks to impose limits on PBGC-initiated terminations, like the contract bar of 29 U.S.C. § 1341, that simply are not in the statute.  Finally the AFA seeks to overturn PBGC's determination that the FA Plan should be terminated because the Plan will be unable to pay benefits when due and to avoid an unreasonable increase in the risk of long-run loss to PBGC.  But those determinations must be upheld unless the agency's administrative record indicates that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Title IV of ERISA simply does not afford the AFA the relief it seeks.  Both this Court and the District Court for the Northern District of Illinois, have recognized that AFA's problem is with the statute as written, and a court is not the appropriate branch of government to re-write a statute.[29]  Furthermore, the extensive administrative record in this case amply supports PBGC's determination.  Accordingly, the agency's decision should be upheld.

## ARGUMENT

I.    **THE COURT SHOULD UPHOLD PBGC'S DETERMINATION TO TERMINATE THE FA PLAN UNDER 29 U.S.C. § 1342.**

   A.    **PBGC'S TERMINATION DECISION MUST BE REVIEWED ON THE ADMINISTRATIVE RECORD, AND SHOULD BE RESOLVED ON SUMMARY JUDGMENT.**

This Court is reviewing PBGC's determination that the FA Plan should be terminated.  Congress explicitly delegated to PBGC in 29 U.S.C. § 1342(a) the responsibility to apply its

---

[29]  *AFA v. PBGC*, 1:05 cv01036 (D.D.C. August 10, 2005) transcript at 28-29 (Attachment B); *AFA v. United Air Lines, Inc.*, 1:05-cv-03172 mem. op. at 4 (N.D. Ill July 21, 2005 ) (Attachment C).

expertise and "determine" whether one or more statutory grounds for termination exist with respect to a pension plan. If PBGC determines that grounds exist and the plan should be terminated, it can either enter an agreement with the plan administrator to terminate the plan, or institute proceedings to obtain a judicial decree terminating the plan.[30] But, by statute, the agency must make the determination in the first place. Courts have explicitly so held:

> Such [*de novo*] review is unwarranted. There is nothing in the applicable ERISA provisions to show that the sections of the Administrative Procedure Act . . . should not apply to this [termination] decision by PBGC. To find a contrary intent in the statute would be to depart from the usually applicable judicial deference to the expertise of an administrative agency, particularly when the agency has made an adjudicative decision within its sphere of responsibility. Courts scrutinizing such decisions do not substitute their own judgments for those of administrative agencies.[31]

Where an agency is "given primary responsibility for the implementation of particular statutes, . . . the standard of review of the agency's action is arbitrary and capricious."[32] As the Supreme Court has noted, "a court is not to substitute its judgment for that of the agency."[33] This is particularly true where, as here, the agency is exercising its discretion.[34] PBGC generally

---

[30] 29 U.S.C. § 1342(c).

[31] *PBGC v. The Pension Comm. of Pan Am. World Airways, Inc.*, 777 F. Supp. 1179, 1181-82 (S.D.N.Y. 1991), *aff'd mem.*, 970 F.2d 896 (2d Cir. 1992); *see also PBGC v. Haberbush*, 2000 WL 33362003, *5 (C.D. Cal. Nov. 3, 2000) (rejecting employer's claim that review under APA does not apply to PBGC's termination decision under § 1342); *PBGC v. FEL Corp.*, 798 F. Supp. 239, 241 (D.N.J. 1992) (same).

[32] *Elk Run Coal Co. v. Babbitt*, 919 F. Supp. 225, 229 (S.D.W. Va. 1996); *see generally PBGC v. LTV Corp.,* 496 U.S. at 645-47.

[33] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002).

[34] *See Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1164 (Fed. Cir. 1985) ("where the Government is entitled to exercise its discretion, the [challenger] has an unusually heavy burden

"may" take action to terminate a plan under section 1342(a) when statutory grounds exist, but it is not required to do so.[35] Given the "traditional judicial distaste for *de novo* factfinding concerning matters properly delegated by Congress to the expertise of a regulatory agency," this Court's role must be to review PBGC's determination under the "arbitrary and capricious" standard.[36]

PBGC's interpretation of its authorizing statute is entitled to deference. "Courts are bound to uphold an agency interpretation as long as it is reasonable— regardless whether there may be other reasonable, or even more reasonable, views."[37] "The Court must defer to the agency's interpretation of a statute that it implements so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language."[38] Under this standard, PBGC's interpretation of what constitutes an unreasonable risk of long run loss to the agency's insurance fund should be given deference.

---

of proof in showing that the determination made . . . was arbitrary and capricious.") (internal quotations and citation omitted).

[35]  The only situation when PBGC "must" take action to terminate a pension plan is when the plan does not have available assets to pay benefits that are immediately due.  29 U.S.C. § 1342(a).

[36]  *United States v. Int'l Harvester Co.*, 387 F. Supp. 1338, 1341 (D.D.C. 1974).

[37]  *Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998).

[38]  *Hammond v. Norton*, 370 F. Supp. 2d 226, 239 (D.D.C. 2005), quoting *OSG Bulk Ships v. United States*, 132 F.3d 808, 814 (D.C. Cir. 1998) and *Coal Employment Project v. Dole*, 889 F.2d 1127, 1131 (D.C. Cir. 1989) (internal quotes omitted).

Finally, summary judgment is a particularly appropriate vehicle for resolving this administrative record case, as it presents only a question of law: whether the administrative record supports the agency's determination or shows that it was arbitrary and capricious:

> The summary judgment procedure is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency. The explanation for this lies in the relationship between the summary judgment standard of no genuine issue as to any material fact and the nature of judicial review of administrative decisions. . . . [T]he administrative agency is the fact finder. Judicial review has the function of determining whether the administrative action is consistent with law – that and no more.[39]

Indeed, the issue in this case "is not whether there are contested *fact questions* in the underlying administrative record, but rather the *legal question* whether the agency action was arbitrary and capricious or not supported by substantial evidence."[40] Courts have granted summary judgment to PBGC in numerous administrative record cases.[41]

---

[39] *Girling Health Care v. Shalala*, 85 F.3d 211, 215 (5th Cir. 1996), *quoting* 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure*: *Civil 2d* § 2733 (1983) (internal quotations and footnotes omitted); s*ee also Southern Utah Wilderness Alliance v.* Norton, 326 F. Supp.2d 102, 107 (D.D.C. 2004); *Conservation Council for Hawaii v. Babbitt*, 2 F. Supp.2d 1280, 1282 (D. Hawaii 1998); *Corridor H Alternatives, Inc. v. Slater*, 982 F. Supp. 24, 28 (D.D.C. 1997); *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1332 (D. Md. 1991).

[40] *Castillo v. Army & Air Force Exchange Service*, 849 F.2d 199, 203 (5th Cir. 1988) (emphasis added).

[41] *See, e.g., PBGC v. Wilson N. Jones*, 374 F.3d 362 (5th Cir. 2004); *Air Line Pilots Ass'n* ("*ALPA*") *v. PBGC*, 193 F. Supp. 2d 209 (D.D.C. 2002)*, aff'd sub. nom. Allied Pilots Ass'n* ("*APA*") *v. PBGC*, 334 F.3d 93 (D.C. Cir. 2003); *Piggly Wiggly Southern Inc. v. PBGC*, 19 Employee Ben. Cas. 1163 (N.D. Ind. April 4, 1995); *Kauble v. PBGC*, 1994 WL 722966 (S.D. Ind. 1994), *aff'd mem.*, 94 F.3d 647 (7th Cir. 1996); *PBGC v. J.D. Ind.*, 887 F. Supp. 151, 155 (W.D. Mich. 1994); *but see*, *PBGC v. United Air Lines, Inc.*, *et al.*, No. 02-B-48191 (Bankr. Ct. N.D. Ill. Mem. Dec. September 21, 2005).

**B.    PBGC RATIONALLY DETERMINED THAT THE FA PLAN SHOULD BE TERMINATED.**

To set aside PBGC's determination that the FA Plan should be terminated as arbitrary and capricious, this Court must find that the agency failed to consider relevant factors, or that there is no rational connection between the record and the agency's conclusion. "[T]he court must consider whether the PBGC based its determination [to terminate a plan under section 1342] on a consideration of the relevant factors and whether there has been a clear error of judgment."[42]  In other words, the Court must enforce the agency's decision unless it finds "that no reasonable person could have reached the decision to terminate the plans on the evidence contained in the administrative record."[43]

The administrative record here fully supports PBGC's determination under sections 1342(a)(2) and (4) that the Plan will be unable to pay benefits when due and that PBGC's possible long-run loss with respect to the FA Plan may reasonably be expected to increase unreasonably if the Plan is not terminated.  In reaching this conclusion, PBGC examined the underfunding of the Plan and the effect of its escalating underfunding on the Title IV insurance fund should the Plan not terminate then.

**1.    PBGC Rationally Determined That The Plan Will be Unable to Pay Benefits when Due Because of Underfunding.**

At the time of the termination recommendation, the Plan was underfunded for all benefits by over $2 billion, with a funded ratio of 39.8%.  (AR 128).  The Plan was underfunded for

---

[42]  *ALPA v. PBGC*, 193 F. Supp. 2d at 220 (D.D.C. 2002); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

[43]  *Pan Am,* 777 F. Supp. at 1182.

guaranteed benefits by $1.76 billion, with a funded ratio of 43.3%. (AR 128). In light of these numbers, and the fact that United had not made required minimum funding contributions over the previous year, nor did it have plans to make any funding contributions in the future, PBGC was rational in determining that the Plan would be unable to pay benefits when due.

PBGC's interpretation of the statutory provision "unable to pay benefits when due" should be entitled to deference. The statute has two termination provisions regarding the inability of a pension plan fund to pay benefits: a mandatory termination provision when "the plan does not have assets available to pay benefits which are currently due," and a discretionary termination provision, when "the plan will be unable to pay benefits when due."[44] Congress could not have meant the same standard to apply to both provisions, but left it to PBGC to determine how soon a pension plan must deplete its funds to meet the discretionary standard. In making this determination it is rational for PBGC to rely on how well the plan is funded, particularly where, as here, the sponsor made clear that it did not intend to make any further contributions. (AR 1445).

### 2. PBGC Rationally Determined that There Is an Unreasonable Increase in the Risk of Its Long-Run Loss Absent Termination.

Once United expressed its clear intent to terminate the FA Plan prior to exit from bankruptcy, and PBGC concluded that it would likely succeed, the agency had the right (if not the obligation) to limit its liability. United had repeatedly stated in court filings that it would need to terminate its defined benefit pension plans to emerge from bankruptcy. Although United withdrew its distress termination motions once the Agreement was approved by the bankruptcy

---

[44] 29 U.S.C. §§ 1342(a) and (a)(2).

court, PBGC rationally concluded that the Plan would likely terminate prior to United's exit from bankruptcy. (AR 31-32). The statutory standard for distress termination of a pension plan requires a plan by plan analysis and review of the debtor's proposed plan of reorganization. However, due to a recent court decision,[45] the litigation risk to PBGC associated with contesting a distress termination in bankruptcy on these grounds has increased.

Furthermore, PBGC's outside financial experts wrote a detailed report analyzing the ability of United to afford the FA Plan based on the then-current fuel prices (which had increased). (AR 129). PBGC therefore reasonably concluded that it was likely that the FA Plan would terminate in the not-too-distant future, and that the date on which the Plan would terminate would be near the exit date (which at that time was projected to be sometime in September).

Moreover, United continuously stated it would no longer make contributions to the FA Plan. In all likelihood United would therefore miss its September 15, 2005, required annual payment. Thus PBGC would have grounds under 29 U.S.C. § 1342(a)(1) to terminate the FA Plan because it had not met the minimum funding standard required under section 412 of the Internal Revenue Code. In light of these facts, PBGC reasonably calculated its possible loss with an expected future termination date in September, 2005. No rational person could conclude that the agency acted arbitrarily in determining that it was reasonably possible that the FA Plan would terminate sometime in September.

---

[45] *In re Kaiser Aluminum* Corp., 2005 WL 735551 (D. Del. March 30, 2005), *appeal pending, No. 05-2695 (3d Cir)*.

PBGC acted reasonably in taking steps to avoid the insurance program's absorbing what would be more than an additional $9.9 million from the Plan's termination in September. The District Court for the Southern District of New York found in 1991 that "wherever the line may be drawn to separate substantiality from insignificance, $700,000 per month is substantial."[46] In that case, the total underfunding of the plans was over $800 million.[47] Here, the total underfunding of the FA Plans is approximately $2 billion, with a monthly increase of $3.3 million. Clearly, PBGC's risk of incurring an increase in the insurance fund's liability of up to $9.9 million under the present circumstances is at least as unreasonable as what the court found in *Pan Am*.

Similarly, the Sixth Circuit recently confirmed PBGC's legitimate interest in terminating a pension plan to avoid an increase in its liability, noting "the inappropriateness of the district court's assumption that a government entity can afford to withstand an additional $95 million in liabilities."[48] That court noted that "ERISA provides for involuntary termination proceedings precisely so that PBGC can protect its own financial interests and 'avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.'"[49]

---

[46] *In re Pan Am. World Airways*, 777 F. Supp. at 1183.

[47] *Id*.

[48] *PBGC v. Republic Techs. Int'l, LLC,* 386 F.3d 659, 667 (6th Cir. 2004), *cert. denied*, 2005 WL 517002 (2005).

[49] *Id.* at 668.

Accordingly, the agency's determination that the FA Plan should terminate to prevent an unreasonable increase in its loss is fully supported by the administrative record. The Court should uphold that determination.

## II.    PBGC DID NOT VIOLATE 29 U.S.C. § 1341 BY TERMINATING THE FA PLAN UNDER 29 U.S.C. § 1342.

In its complaint, AFA alleges that PBGC violated 29 U.S.C. § 1341 by terminating the FA Plan under 29 U.S.C. § 1342. AFA attempts to shoehorn a PBGC-initiated termination into the structure of a distress termination, which neither the statute nor the facts support. PBGC initiated a termination of the FA Plan pursuant to 29 U.S.C. § 1342. The analysis provided by PBGC in its administrative record of the termination decision shows that PBGC made findings under 29 U.S.C. § 1342 that the Plan must be terminated. (AR 25-33). PBGC's ultimate findings were that the Plan would be unable to pay benefits when due, and that PBGC would suffer a long run loss if the plan were to remain ongoing. These are findings under section 1342, not section 1341.

Regulations promulgated under section 1341 explicitly state that notwithstanding any pending section 1341 termination proceeding initiated by the plan sponsor, PBGC retains the right to terminate a plan under section 1342.[50] This regulation speaks to the exact factual situation present here. Further, the statute expressly states that although a termination pursuant to section 1341 cannot proceed if the termination would violate an existing collective bargaining agreement, the same limitation does not apply to a termination instituted by PBGC under section

---

[50] 29 C.F.R. § 4041.7(f). *See also, Pension Comm. for Farmstead Foods Pension Plan for Albert Lea Hourly Employees v. PBGC*, 991 F.2d 1415, 1418, 1421 (8th Cir. 1993).

1342.[51]  As this Court already recognized in this case, "the initiation of the § 1342 proceeding

agreed to under the settlement *cannot* be equated with a United-initiated proceeding within the

meaning of § 1341."[52]  The contract bar therefore does not apply to the termination under review.

AFA's argument confuses the nomenclature of defined benefit plan terminations for the

actual statutory structure.  A termination under section 1342 is often referred to as an

"involuntary" or PBGC-initiated termination, while a termination under section 1341 is referred

to as a distress, sponsor-initiated, or voluntary termination.  These descriptive names are just that,

and cannot change the statute.  When a plan sponsor applies to a bankruptcy court to terminate its

underfunded plans, it must do so under 29 U.S.C. § 1341(c).  When PBGC seeks to terminate a

plan, it must do so under 29 U.S.C. § 1342.  The statute cannot be read any other way.

### III. BECAUSE THE SETTLEMENT AGREEMENT DID NOT TERMINATE THE FA PLAN, PBGC DID NOT VIOLATE 29 U.S.C. § 1342(a) BY ENTERING INTO THE AGREEMENT WITHOUT FIRST DETERMINING THAT THE PLAN MUST BE TERMINATED.

As this Court has already found, PBGC's entry into the Agreement with United did not

effectively terminate the plan.[53]  If it had, PBGC and United would have signed a trusteeship

agreement at that time appointing PBGC trustee and establishing a termination date.

Termination has very real consequences to participants.

---

[51]  *Compare* 29 U.S.C. § 1341(a)(3) *with* 29 U.S.C. § 1342.

[52]  *AFA v. PBGC*, 372 F. Supp. 2d at 100.

[53]  *Id.* at 98. ("[T]he Agreement's plain language does not compel the plan's termination, for it does not preordain a given conclusion. . . .  Thus, while the end result of this process may well be predictable, the agency is not contractually bound to reach a certain decision, but rather has only agreed to initiate a § 1342 proceeding. . . .").

The facts simply refute AFA's argument that the Agreement terminated the FA Plan. It was not until over two months after the Agreement was reached between United and PBGC that the FA Plan was terminated. PBGC went through its internal process to determine whether the Plan should be terminated. A deliberative, interdisciplinary body, the Trusteeship Working Group, reviewed the recommendation of the staff before the ultimate decision-maker saw the termination recommendation. (AR 9-21). This body, consisting of people who previously had not been a part of the decision to enter into the settlement agreement, gave their approval of the termination recommendation. (AR 23). Finally, the decision-maker, in this instance the Executive Director, made the termination decision. Not until the decision was made, and a Plan termination date established, was the Plan terminated.

Agreeing with a plan sponsor to initiate the decision-making process regarding a pension plan does not in any way violate the law. In fact, PBGC has the authority pursuant to 29 U.S.C. § 1367 to enter into agreements with plan sponsors who are or may become liable to the agency. The D.C. Circuit recently rejected arguments from a union under a similar factual circumstance and held that such a settlement agreement was within PBGC's authority under 29 U.S.C. § 1367.[54]

Furthermore, the agency is specifically authorized to "enter into contracts, to execute instruments, to incur liabilities, and to do any and all other acts and things as may be necessary or incidental to the conduct of its business and the exercise of all other rights and powers granted to the [PBGC] by [ERISA]." 29 U.S.C. § 1302(b). In the United Settlement, PBGC has merely entered into an agreement as contemplated by section 1302 to exercise its power under

---

[54] *APA v. PBGC*, 334 F.3d 93 (D.C. Cir. 2003).

22

section 1342. PBGC did not terminate the Plan upon entering into the agreement with United. PBGC merely did as the statute permits: the agency entered into an agreement with a plan sponsor who may have become liable to the PBGC. The AFA does not argue that PBGC was prohibited from deciding to initiate its internal process – because this is a decision the agency makes on a routine basis. If PBGC has discretion to initiate its process, it certainly is not inappropriate for it to agree to initiate that same process.

23

## CONCLUSION

For the reasons set forth above, the Court should enter an order granting summary judgment in favor of PBGC, upholding its determination that the Plan should be terminated.[55]

Date: October 3, 2005                 Respectfully submitted,

   /s/ Andrea M. Wong
JEFFREY B. COHEN
Chief Counsel
CHARLES L. FINKE
NANCY HEERMANS
Associate Chief Counsels
JOHN A. MENKE
PAULA CONNELLY
Assistant Chief Counsels
SHANNON L. NOVEY
ANDREA M. WONG
DEVA KYLE
Attorneys
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, NW, Suite 340
Washington, D.C.  20005-4026
(202) 326-4020, ext. 3848 (telephone)
(202) 326-4112 (facsimile)
Wong.Andrea@pbgc.gov & efile@pbgc.gov

---

[55] Even if the Court finds the action taken by PBGC was arbitrary and capricious, it is not appropriate for the Court to order restoration of the plan as requested by AFA.  Restoration is an act wholly committed to PBGC's discretion under 29 U.S.C. § 1347.  PBGC's decision not to enforce this provision is not reviewable and cannot be mandated.  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

24