IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                  )
ASSOCIATION OF FLIGHT             )
ATTENDANTS-CWA, AFL-CIO,          )
                                  )
         Plaintiff,               )
                                  )
    v.                            )        Civil Action No. 1:05CV01036
                                  )
PENSION BENEFIT GUARANTY          )
CORPORATION,                      )
                                  )
         Defendant.               )
_____   )
```

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Plaintiff Association of Flight Attendants-CWA, AFL-CIO ("AFA"), hereby submits its statement of material facts not in genuine dispute in support of AFA's motion for summary judgment.

1.      On December 9, 2002, United filed for Chapter 11 protection in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.  AR 37.[1/]  The Company continued to operate and manage United's assets as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  AR 26.

2.      On or about December 13, 2002, the Official Committee of Unsecured Creditors ("OCUC") was formed in the United Bankruptcy.  Clayman Decl. ¶ 2.  From the start, the Pension Benefit Guaranty Corporation ("PBGC" or "Agency") was a member of the OCUC.  Id.; see also AR 26.  AFA has also been an OCUC member from the outset.  Clayman Decl. ¶ 2.  United and its

---

[1/]      Citations to the Administrative Record prepared by PBGC are in the form "AR" or "AR-S" for sealed portions of the record.

outside advisors continuously update members of the OCUC on the progress of the bankruptcy reorganization, including confidential information not made available to the public.  Id.  Advisors to the OCUC also perform their own analysis of United's reorganization efforts.  Id.

3.      In the United bankruptcy PBGC was "assisted by Greenhill & Co., LLC ("Greenhill"), a well known investment banking firm.  Greenhill has provided DISC with financial expertise and analysis on United's forecasts, capital structure, etc., and prepared financial models to determine whether United can afford one or more of its pension plans."  AR 14.

4.      PBGC entered into an engagement letter with Greenhill signed September 30, 2004. AR 824.  "Greenhill is compensated for services rendered based on a monthly fee and a completion fee."  Id.  During his deposition on May 5, 2005, Greenhill partner Michael Kramer testified that the monthly fee is between $150,000 and $160,000.  Kramer Dep. at 7-9 (attached as Ex. 1 to Clayman Decl.).  Mr. Kramer also testified that the completion fee was $3 million.  Kramer Dep. at 8.  He further testified:

> Q:      What are the conditions in which you will get the completion fee?  Is it just that the project be completed, or are there other conditions?
>
> A:      It's fairly broad. There is a -- the retainer agreement has a whole page on what completion is.  But in essence, it's the deal being done or a plan being confirmed.
>
> Q:      Are there any specific conditions as to how the deal is resolved?
>
> A:      No.
>
> Q:      Just that it be resolved?
>
> A:      Yes.

Id.

5.      In the course of its bankruptcy proceeding, United created a financial forecasting model known as "Gershwin."  Clayman Decl. ¶ 3.  Gershwin is United's business plan.  Id.  United has frequently revised Gershwin, and each major revision is denominated by a number.  In October 2004, United presented a revised business plan to the OCUC, known as Gershwin 5.F.  In August 2005, United presented a revised business plan to the OCUC, known as Gershwin 6.0.  Id.

6.      When United entered bankruptcy it maintained five defined benefit plans: the UAL Corporation Flight Attendant Defined Benefit Plan ("Flight Attendant Plan"); the United Airlines Pilot Defined Benefit Pension Plan ("Pilots Plan"); United Airlines Ground Employees Retirement Plan ("Union Ground Plan"); United Airlines Management, Administrative and Public Contact Defined Benefit Pension Plan ("MAPC Plan"); and the Employees Variable Benefit Retirement Income Plan ("Variable Plan").  AR 26; Pilots Plan AR 14 (attached as Ex. 2 to Clayman Decl.). The Variable Plan was far smaller than the other defined benefit plans with assets of $35.5 million as of July 31, 2004 and a funded ratio of 166%, meaning that the plan was overfunded.  Pilots Plan AR 17.  In the settlement agreement, the parties agreed to cooperate in seeking the merger of the Variable Plan into the MAPC Plan prior to the termination of the MAPC Plan.  AR 95.  They further agreed that any amount of overfunding of the Variable Plan as of that date would reduce the amount of PBGC's senior notes under the settlement agreement on a dollar to dollar basis.  Id.

7.      As of April 2005, there were 28,402 participants in the Flight Attendant Plan: 15,254 active employees; 7,949 deferred employees; and 5,199 retirees.  AR 796.  The Flight Attendant Plan covered 23% of all participants in United's four defined benefit plans.  Id.

8.      According to PBGC, the Flight Attendant Plan was "the least financially burdensome of United's pension plans."  AR 129.  In the bankruptcy proceeding in April 2005, United

-3-

represented that the present value of all projected benefits under its defined benefit plans was $10.7 billion, with the value of projected benefits under the Flight Attendant Plan valued at $1.9 billion. AR 725.  Thus, the Flight Attendant Plan accounted for only 18% of projected benefits, although the plan covered 23% of all participants in United's plans.

9.    In April 2005, United also valued its minimum funding requirements for all of its defined benefit plans for the next six years at $4.4 billion, with $624 million attributable to the Flight Attendant Plan.  AR 726.  Thus, the Flight Attendant Plan, which covered 23% of all plan participants, accounted for only 14% of United's total minimum funding requirements for 2005-2010.

10.    The fact that the Flight Attendant Plan represented a relatively small portion of United's pension funding obligations was attributable in part to significant reductions in benefits under the Plan, agreed to by AFA in the first round of concessionary bargaining with United during bankruptcy. 2d Feinstein Decl. ¶ 3 (attached as Ex. 3 to Clayman Decl.).  According to United's own actuaries, those benefit reductions decreased United's minimum funding requirements by $68 million for 2004.  Id.  From 2003 to 2004, in large part as a result of this change, the Plan's "normal cost" decreased from $49 million to $13 million.  Id.  Pursuant to IRS Regulations the normal cost "for any year is the amount actuarially determined which would be required as a contribution by the employer in such year to maintain the plan if the plan had been in effect from the beginning of service of each then included employee and if such costs for prior years had been paid and all assumptions as to interest, mortality, time of payment, etc., had been fulfilled."  26 C.F.R. § 1.404(a)-6(a)(2).

11.    On July 23, 2004, United announced an amendment to its Debtor-In-Possession ("DIP") financing. AR 60-61. The amendment required that United not "make any payments inconsistent with its current financial projections, effectively prohibiting further pension contributions before exit." AR 61. United sought court approval for its amended financing agreement. PBGC Obj. DIP Amendment (attached as Ex. 4 to Clayman Decl.). PBGC argued that approval should not be granted because failure to continue making minimum funding payments to existing pension plans would be unlawful. Id. The bankruptcy court approved the amended financing agreement finding that "the proposed financing does not prohibit contributions to the debtors' pension plans." Hearing Tr. (Aug. 20, 2004), at 84 (attached as Ex. 5 to Clayman Decl.).

12.    United failed to make quarterly payments to its pension plans that were due on July 15, 2004 and October 15, 2004. PBGC Resp. IFS Mot. at 4 (attached as Ex. 6 to Clayman Decl.).

13.    Shortly after United decided to stop making minimum funding contributions, the Company revealed for the first time that all the fiduciaries for its pension plans had simultaneously resigned. Id. at 5. As PBGC has stated:

> Due to the arranged absence of any other fiduciaries, the company took over the fiduciary responsibilities and decided to stop making funding contributions. To address the obvious conflict of interest within the company, United and the Secretary of Labor entered into an agreement on August 17, 2004, requiring United to appoint an Independent Fiduciary to take all appropriate action with respect to contributions owed to the Pension Plans.

Id. United appointed Independent Fiduciary Services ("IFS") on September 17, 2004. IFS Mem. at 20 (attached as Ex. 7 to Clayman Decl.).

14.    On November 30, 2004, IFS filed a motion in the bankruptcy proceeding seeking administrative expense treatment for the minimum funding payments to each of United's pension plans. Id. PBGC filed a thirty-one page brief in support of the IFS's motion, asserting that ERISA

obligated United to make its full minimum funding payments.  PBGC Resp. IFS Mot.  On March 18, 2005, the bankruptcy court ruled on IFS's motion.  Mem. Op. & Order (N.D. Ill. June 29, 2005) at 1 (attached as Ex. 8 to Clayman Decl.).  The court held that "to the extent that the operation of UAL's business in bankruptcy had added to the amount it was required to contribute," that amount was entitled to administrative expense priority, however, pension obligations arising from services performed before the bankruptcy were general unsecured claims.  Id. at 2.  IFS moved for leave to appeal the bankruptcy court ruling.  Id. at 1.  On June 29, 2005, the District Court for the Northern District of Illinois granted the motion for an interlocutory appeal.  Id. at 5.

15.     On November 25, 2004, the Debtors moved the Bankruptcy Court for authority to reject their collective bargaining agreements, pursuant to Section 1113(c) of the Bankruptcy Code, 11 U.S.C. § 1113(c).  UAL 1113 Mot. (attached as Ex. 9 to Clayman Decl.).  In addition to further wage and work rule concessions, United sought authority "to eliminate any provisions in [its] CBAs that would prohibit a distress termination of the Company's pension plans."  AR 1055.  Section 34(1) of AFA's collective bargaining agreement with United expressly bars "[t]he Company" from "reduc[ing]" "benefits provided in the Retirement Plans . . . without the prior agreement of the Union."  Davidowitch Decl., filed May 20, 2005, Ex. A.

16.     On December 16, the Air Line Pilots Association ("ALPA") reached a settlement with United over the Section 1113 modifications to its collective bargaining agreement.  Pilots Plan AR 62-86.  As part of that settlement, ALPA agreed to waive the contract bar in its collective bargaining agreement, not to oppose United's distress termination of the Pilot Plan, and to establish that the termination date of the Pilot Plan would not be earlier than April 2005.  Id. at 63-64.

17.    On December 28, 2004, Michael Kramer, a partner with Greenhill, signed a declaration and expert report.  AR 822-42.  PBGC submitted the Kramer declaration to the bankruptcy court in opposition to United's motion to reject the portions of its CBAs that would prohibit distress termination of its pension plans.  PBGC 1113 Obj. (attached as Ex. 10 to Clayman Decl.).  In his expert report, Kramer analyzed whether United could achieve the credit metrics reflected in Gershwin 5.F and still retain one or more of its pension plans.  AR 825-28.  The Company claimed that it was necessary to attain the identified credit metrics in order to obtain exit financing.  AR 900; AR 911-15.  Kramer concluded that "[u]nder the Gershwin 5.0F projections, the Company has sufficient liquidity and free cash flow to support at least one of the Pension Plans currently in place, namely the F[light] A[ttendant] plan, even without application for any waivers."  AR 825.  Kramer also stated "I must note that I am not convinced that United cannot obtain exit financing unless its business plan shows it surpassing" targets for credit metrics identified by the Company.  AR 827.

> However, applying United's credit metrics to alternative pension scenarios developed using United's numbers serves a useful comparative purpose.  It demonstrates that, even on United's own terms, it has failed to carry its requisite burden to demonstrate that it must terminate all the Pension Plans to successfully reorganize and avoid liquidation.

AR 827-28.

18.    One of the terms underlying United's Gershwin 5.F business plan was an assumption regarding the future price of fuel.  AR 828.  The fuel assumption in Gershwin 5.F was based on the NYMEX crude oil futures curve as of October 14, 2004 when the price of oil stood at approximately $44.00 per barrel.  AR 130.  Kramer concluded that one or more plans were affordable given this fuel price.  AR 825.  He also performed his analysis based on the forward curve as of December 27,

2004 when oil stood at approximately $41.00 per barrel, and found that United's plans were even more affordable under that scenario. AR 838; AR 130. Kramer also analyzed a downside fuel scenario, assuming fuel prices of $60 per barrel in 2004, $55 per barrel in 2005, $50 per barrel in 2006, and the Gershwin forecast prices thereafter. AR 839, 915. Based on those fuel price assumptions, Kramer concluded that "United maintains significant cash balances when retaining as many as two of the Pension Plans under the downside case." AR 839.

19.    On December 29, PBGC issued a Notice of Determination that the Pilot Plan should be terminated involuntarily and PBGC should be appointed as the plan's statutory trustee, pursuant to ERISA Section 4042. Pilots Plan AR 1. PBGC initiated the ERISA Section 4042 process to terminate the Pilots Plan in response to the agreement between United and ALPA. Id. (Pilots Plan AR 22). PBGC determined that the Pilots Plan should terminate as of December 30, 2004 in order to avoid a long-run loss to the Agency due to benefit liability increases in the period prior to April 2005, when United and ALPA agreed the plan should terminate. Id. (Pilots Plan AR 10, 22-23). On December 30, PBGC filed a complaint, seeking a court order terminating the Pilots Plan, appointing PBGC as the statutory trustee of the plan, and establishing the plan's termination date as December 30. PBGC Pilots Plan Compl. (attached as Ex. 11 to Clayman Decl.).

20.    On January 4, 2005, PBGC filed an Objection to the Debtors' Section 1113 Motion. PBGC 1113 Obj. (attached as Ex. 10 to Clayman Decl.). The Agency disputed as a factual and legal matter United's contention that it had to terminate all of its plans in order to reorganize successfully. Id. Factually, PBGC asserted that "it [was] clear that United can reorganize in Chapter 11 and maintain one or more of its Pension Plans." Id. at 11 (emphasis in original). PBGC stated that its "financial and actuarial testimony shows one or more of the Pension Plans to be affordable in a

-8-

variety of scenarios." Id. at 20.  Specifically, PBGC found that the alternative to plan termination that "most easily satisfied" the credit metrics identified by United "was retaining only the Flight Attendants Plan, with minimum funding waivers." Id. at 21.

21.    As a legal matter, PBGC argued that under ERISA Section 4041 the termination analysis had to be conducted on a plan-by-plan basis. Id. at 18.  In so arguing, PBGC highlighted the language of Section 4041, which "provides that 'A single-employer plan may terminate under a distress termination' only if among other things, 'the bankruptcy court determines that, unless the plan is terminated,' the debtor cannot reorganize." Id. (emphasis in original).

22.    On January 8, 2005, AFA and United reached a tentative agreement regarding wage and other concessions.  Davidowitch Decl. ¶ 4.  In a side letter to that agreement, AFA and United agreed to "continue to meet and confer regarding the Defined Benefit Plan." Id.

23.    At this point, AFA initiated discussions with PBGC, seeking to enlist the Agency in its effort to find alternative funding for the Flight Attendant Plan and avoid termination. Id. ¶ 6.  At a January 27, 2005 meeting with AFA, PBGC indicated that it was ready and willing to explore a wide range of options to the distress termination proposed by United. Id.

24.    On January 25, 2005, a hearing was held in the Pilots Plan termination action on United's motion to refer the case to the bankruptcy court.  PBGC Mot. Reconsideration, Ex. 1 (attached as Ex. 12 to Clayman Decl.).  At that hearing, PBGC stated: "PBGC has filed this termination action in its role as federal guarantor, not in its role as creditor." Id. at 7.  The Agency also recognized that the policy considerations that should underlie a termination decision are different from and potentially inconsistent with the goals of bankruptcy reorganization. Id. at 5-6, 10. On February 11, 2005 in the same action, PBGC filed a motion for reconsideration of the court's

referral of that case to the bankruptcy court.  The Agency stated that the termination proceeding "involves PBGC as a regulator and United as plan administrator, not in their debtor-creditor relationship."  PBGC Mot. Reconsideration at 7.

      25.                       **[REDACTED]**

      Todd Snyder, a financial analyst at United's restructuring advisor Rothschild, Inc., participated in the negotiations between PBGC and United.  PBGC Interrog. Ans. at 2 (attached as Ex. 13 to Clayman Decl.); Snyder Dep. at 122   (attached as Ex. 14 to Clayman Decl.).   At deposition, Mr. Snyder testified that Executive Director Bradley Belt was "treated as the ultimate principal" during the settlement negotiations between PBGC and United.  Snyder Dep. at 127-28.

      26.    When asked during discovery in the bankruptcy proceeding to "[i]dentify and state the full name, title, occupation or professional role of each person who participated in any portion of the negotiations or analysis relating to the PBGC Agreement," PBGC identified the following persons:

> Jeffrey B. Cohen, Chief Counsel, legal analysis
> John Spencer, Acting Director, Division of Insurance Supervision and Compliance,
>     financial analysis
> Charles Finke, Associate Chief Counsel, legal analysis
> John Menke, Assistance Chief Counsel, legal analysis
> Shannon Novey, Attorney, legal analysis
> Michael Kramer, Managing Director, Greenhill, financial analysis
> Brad Robins, Managing Director, Greenhill, financial analysis
> Adam Verost, Vice President, Greenhill, financial analysis

PBGC Interrog. Ans. at 2.

      27.

                        **[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

34.     On March 10, 2005, PBGC issued a Notice of Determination under ERISA Section 4042 that the Ground Plan should be terminated as of March 11, and thereafter initiated court proceedings to terminate.  Union Ground AR 1 (attached as Ex. 16 to Clayman Decl.).  As of December 23, 2004, PBGC had determined the "Union Ground Plan cannot be kept under any scenario."  Pilots Plan AR 20.  PBGC determined that the plan should terminate prior to March 14, 2005, when benefits for participants in the plan were set to increase.  Union Ground Plan AR 6-7.

35.     On March 11, the day after issuing its Notice of Determination, PBGC filed a complaint in the Eastern District of Virginia seeking a court order terminating the Ground Plan.  PBGC Union Ground Plan Compl. (attached as Ex. 17 to Clayman Decl.).  On April 4, 2005, the Aircraft Mechanics Fraternal Association ("AMFA") moved to intervene in the termination

proceedings. Union Ground Plan Docket at 3 (attached as Ex. 18 to Clayman Decl.). On May 24, 2005, PBGC and United filed a joint motion to dismiss PBGC's complaint, in light the parties' settlement agreement. Joint Mot. Dismiss (attached as Ex. 19 to Clayman Decl.). In response, AMFA filed a counterclaim complaint, challenging the termination date for the Union Ground Plan selected by PBGC. AMFA Mot. for Leave (attached as Ex. 20 to Clayman Decl.). As a result, on June 10, 2005, PBGC, United and AMFA agreed that AMFA had a right to challenge PBGC's termination date and PBGC and United withdrew their joint motion to dismiss. Mem. Supp. Jt. Mot. Withdraw (attached as Ex. 21 to Clayman Decl.). The litigation over the termination date of the Union Ground Plan remains on-going. Union Ground Plan Docket.

36.     On March 30, 2005, AFA sent a letter to Bradley Belt describing the Union's proposal to keep the Flight Attendant Plan intact. Davidowitch Decl. ¶ 10. Earlier the same day, AFA had sent to PBGC a formal term sheet for its proposal. Id. A key component of AFA's proposal was a contribution by United of notes to the Flight Attendant Plan in order to maintain it. Id.

37.     On April 4, Belt replied to AFA's March 30 letter. Davidowitch Decl. ¶ 11. He characterized AFA's proposal as "constructive" and reiterated the Agency's position "that the AFA plan can and should be maintained by the company upon emergence from Chapter 11." Id. Mr. Belt added that: "Based upon available information, we continue to believe that the interests of the participants and the pension insurance program would best be served by the continuance of the AFA Plan." Id. In closing, he encouraged further work between the Agency and AFA to resolve the pension funding issue. Id.

38.     On April 5, 2005, AFA presented its proposal to retain the Flight Attendant Plan to United. Davidowitch 2d Decl. ¶ 18 (attached as Ex. 22 to Clayman Decl.). PBGC was present at

that meeting.  Id.  On April 8, 2005, United offered AFA a counter-proposal to maintain the Flight

Attendant Plan.  Id. ¶¶ 19-20.  United's proposal incorporated some of AFA's funding alternatives,

but United refused to supply any notes to support continuation of the Flight Attendant Plan.  Id.

39.    On April 11, 2005, United re-filed its Section 1113 motion, seeking authority to reject

its collective bargaining agreements' contractual bar to a distress termination.  AR 619.  Also, United

moved for a judicial determination that it had satisfied the requirements for a distress termination

under Section 4041(c).  Id.  A trial on United's motions was scheduled to commence on May 11.

AR 612.

40.    On April 14, PBGC filed an emergency motion to postpone consideration of United's

motion for distress terminations of its defined benefit plans, calling United's motion "premature" and

arguing that the Company had failed to show that the plans were not salvageable.  AR 606-18.

PBGC asserted that "PBGC currently believes that United can afford to maintain at least one or more

of its Pension Plans."  AR 614.  In urging a postponement, PBGC also explained that:

> The parties agreed to the schedule for this distress termination proceeding in
> December, 2004.  At that time, the parties contemplated that United would have
> provided an updated business plan according to its schedule and filed its plan of
> reorganization prior to seeking the distress termination of their Plans.  Those
> circumstances have changed.  The timing for the distress hearing must also change.
> Otherwise it will be impossible for this Court to follow the law and determine
> whether United can afford to maintain any of the Pension Plans after it emerges from
> bankruptcy on the basis of a plan of reorganization and the financial outlook of
> United.

AR 613.  The Agency further asserted:

> For instance, vital decisions regarding fleet planning, negotiations with the public
> debt group, and contracting with United's regional partners remain to be resolved.
> Until the Debtors can provide final answers to these critical issues and their impact
> on United's financial projections, PBGC cannot even determine its position on
> whether United can afford to maintain the Pension Plans coming out of bankruptcy,

and it will be impossible for this Court to decide what the restructured United can or cannot afford.

AR 613-14.  PBGC stressed: "The importance of this issue -- and the magnitude of approximately $9 billion of liability that United seeks to shift onto PBGC and the affect on the pensions of some 121,557 participants -- requires that this case be decided on a fully-developed record."  AR 615.  In PBGC's proposed order, the court would have postponed the distress termination hearing "until after United has completed its final business plan, after it has filed a proposal plan of reorganization; and no earlier than two (2) months before it plans to merge [sic] from bankruptcy."  AR 617-18.

41.    Also on April 14, United issued notices of intent to terminate the Flight Attendant Plan and the MAPC Plan, pursuant to Section 4041(c), notifying plan participants that June 30, 2005 was the termination date for both plans.  AR 74; PBGC Resp. 1113 Mot. at 4-5 (attached as Ex. 23 to Clayman Decl.).

42.    On April 22, 2005, PBGC and United entered into a settlement agreement.  AR 93-110.  PBGC's Executive Director, Bradley Belt was the ultimate decision-maker for the Agency on the settlement agreement.  AR 103.  Under the agreement, United is to provide PBGC with three tranches of securities with a total value of $1.5 billion, ($500 million of which is contingent on certain conditions subsequent). AR 93-94.  In exchange, PBGC agreed that "[a]s soon as practicable after the date that the Bankruptcy Court enters an order approving the Agreement . . . PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant and MA&PC Plans."  AR 94.  Under the agreement, PBGC also gave up its Non-UBL Claims.  AR 97-98.  The parties further agreed that United would allow PBGC's unfunded benefit liability claim in an amount determined according to the Agency, with 45% of the claims to be assigned by United.  AR 97, 99.  United also agreed to pay PBGC's outside professional fees up to $7 million.  AR 99.  The agreement would not

become effective until each of United's four pension plans were terminated. AR 99. Under the terms of the settlement agreement, the termination date of the Pilots Plan remained unresolved. AR 94-95.

43.     The settlement agreement as signed by the parties provided that PBGC "shall affirmatively support, in a manner not inconsistent with this Agreement or the Bankruptcy Code, including without limitation, Section 1125 of the Bankruptcy Code, United's restructuring activities and positions in the Chapter 11 Cases and the POR in connection with the implementation of this Agreement and related initiatives." AR 98. This language was ultimately removed from the final agreement approved by the bankruptcy court. AR 112.

44.     On April 22, PBGC issued a press release regarding the settlement agreement. PBGC Press Release (attached as Ex. 24 to Clayman Decl.). In the press release, Executive Director Belt hailed the "reaching [of] a settlement," "[u]nder the terms [of which] . . . the PBGC would terminate and become trustee of the company's four pension plans." Id. at 1. Director Belt stated that "PBGC and its financial advisors believe the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy." Id. Overall, he asserted: "We believe that this agreement, under the circumstances, is in the best interests of the pension insurance program and its stakeholders." Id.

45.     On April 26, 2005, United filed in the bankruptcy court a motion for emergency approval of the settlement agreement with PBGC. UAL Mot. Approve Settlement (attached as Ex. 25 to Clayman Decl.).

46.     PBGC filed an opposition to United's motion for distress termination of its pension plans on April 29, 2005. PBGC Resp. 1113 Mot. In the opposition, PBGC urged the bankruptcy

court to "require the Debtors to offer appropriate proof that, but for termination of <u>each</u> Pension Plan, they will be unable to obtain the necessary exit financing to reorganize and emerge from bankruptcy." <u>Id.</u> at 12 (emphasis in original). PBGC also reiterated its legal position that the distress termination standard "must be met for each pension plan individually" because ERISA Section 4041 "provides that '<u>A</u> single-employer <u>plan</u> may terminate under a distress termination" only if, among other things, 'the bankruptcy court determines that, unless <u>the plan</u> is terminated,' the debtor cannot reorganize." <u>Id.</u> at 9.

47.    On May 5, 2005, the deposition of PBGC expert Michael Kramer was taken in the bankruptcy proceeding. During the deposition, Mr. Kramer testified as follows:

> Q:    What changed between December of '04 when you signed your affidavit, your declaration, and now that leads the PBGC to conclude that the AFA pension plan should be terminated?
>
> [Objection to form]
>
> A:    I think what has changed in terms of the overall situation is there is a negotiated settlement that has been reached between the PBGC and the company with respect to all the issues between the two, that the PBGC is comfortable and which it believes is acceptable to enter into.

Kramer Dep. at 116-18. Kramer also testified that he had not done any new analysis since his December 28, 2004 expert report of United's ability to afford its pension plans. <u>Id.</u> at 26-27. Mr. Kramer also testified:

> Q:    What analysis would you need to do decide today whether your opinion has changed since the declaration?
>
> A:    I think what we would like to do is understand more from the company what they believe their projected operating results would be going forward based upon, for example, fuel prices, and what modifications they would make to their business to offset some of those costs.

Id. at 28-29.  Mr. Kramer also testified that he did not know whether or not United needed to modify the fuel assumptions contained in Gershwin 5.F.  Id. at 35.

48.    On May 10, 2005, the bankruptcy court approved the settlement agreement between PBGC and United from the bench, and an order issued the next day.  AR 88-91.

49.    On May 12, 2005, Greenhill produced a document entitled "FA Plan Recovery Analysis."  AR 135-50.  The document purported to compare PBGC's recovery with respect to the Flight Attendant Plan under the settlement agreement to the anticipated recovery in the absence of the agreement.  AR 137.  The analysis was "based on the assumption that the FA Plan is terminated" either under the agreement or in the absence of the agreement.  Id.  The analysis quantified not only PBGC's recovery with respect to the Flight Attendant Plan, but also its recovery with respect to the Pilots Plan, the Union Ground Plan, and the MAPC Plan.  AR 143, 145-50.  The analysis also quantified the agency's recovery on its Non-UBL Claims.  Id.

50.    On May 18, 2005, Greenhill produced a memorandum regarding the affordability of the Flight Attendant Plan.  AR 129-34.  Greenhill's May 18 analysis was based upon Gershwin 5.F with only two modifications: (1) Greenhill assumed a higher fuel forecast based upon the May 16, 2005 forward curve, when fuel stood at approximately $50.00 per barrel (AR 130); and (2) Greenhill accounted for the impact of $755 million in securities that United anticipated it would distribute to its labor groups (AR 131-32).  In conclusion, the memorandum stated:

> As of the date of this memorandum, Greenhill believes that the Company is unlikely to be able to support the funding obligations of the Flight Attendants' Plan ("FA Plan") due to unfavorable developments in the airline industry.  Since the time of Michael Kramer's expert report ("Kramer Declaration"), filed December 28, 2004, fuel prices and competitive pressures have increased significantly, causing Greenhill to revise its opinion regarding the affordability of this plan.

AR 129.  On the basis of Greenhill's affordability analysis, PBGC's Office of Corporation Counsel ("OCC") concluded that PBGC would not likely be successful in litigation opposing the distress terminations of any of United's pension plans.  AR 30.

51.     At the June 3, 2005 preliminary injunction hearing in this case, the Court questioned PBGC regarding whether a stay of the Agency's termination process could lead to mounting plan liabilities that the Agency would ultimately shoulder if the Flight Attendant Plan terminated. Hearing Tr. at 9-10 (attached as Ex. 26 to Clayman Decl.).  PBGC counsel responded that, if the agency process were stayed, United would "undoubtedly resuscitate the distress termination process," resulting in plan termination on June 30, 2005 if the Company's motion were successful. Id. at 9-12.

52.     On June 16, 2005, PBGC's Division of Insurance Supervision and Compliance ("DISC") sent its recommendation for termination of the Flight Attendant Plan to PBGC's Trusteeship Working Group ("TWG").  AR 25-33.  DISC proposed a termination date of June 30, 2005.  Id.  John Spencer, as Director of DISC, signed the recommendation memorandum.  AR 25. The TWG met to consider termination of the Plan on June 21, 2005, and voted in favor of termination.  AR 9-24.  On June 22, 2005, PBGC Chief Counsel Jeffrey Cohen forwarded TWG's termination recommendation to Executive Director Bradley Belt for a final decision.  AR 5-8.  On June 23, 2005, Mr. Belt issued his Notice of Determination that the Plan should terminate as of June 30, 2005.  AR 1.

53.     On the same date, PBGC also issued a notice of determination that the MAPC Plan should terminate.  Union Ground Plan AR 1 (attached as Ex. 27 to Clayman Decl.).

54.    When PBGC issued its determination to terminate the Flight Attendant Plan, unfunded benefit liabilities equaled $2,038,600.  AR 2.  However, the unfunded benefits guaranteed by PBGC under the plan only equaled $1,762,900.  Id.

55.    PBGC advanced three rationales under Section 4042 for its decision to terminate the Flight Attendant Plan.  AR 5-9.  The Agency's first rationale for termination was long-run loss under Section 4042(a)(4) due to monthly increases in accrued benefits under the Plan.  AR 7.  PBGC calculated the benefit increases at $3.3 million each month.  AR 7, 18-19, 32.  DISC concluded that because "it is highly likely the FA Plan will terminate even in the absence of PBGC initiating termination," the Agency faced a risk of long-term loss from the Plan's normal benefit increases. AR 31-32.                              **[REDACTED]**


56.    The second rationale, also advanced under the long-run loss provision of Section 4042(a)(4), involved the settlement agreement with United.  AR 7.  As explained in the June 16 DISC recommendation, the "agreement is conditioned on PBGC ultimately assuming responsibility for all four of United's underfunded plans."  AR 28.  According to DISC, the Agency faced an increased risk of long-run loss because "without immediate termination, the PBGC/UAL Agreement may be jeopardized" and "PBGC believes that its recovery will be greater under the agreement than without it."  AR 32.  DISC cited Greenhill's May 12 analysis of recovery under the settlement agreement for its assertion that the Agency's recovery under the settlement agreement was greater than otherwise.  Id.

57.    DISC also asserted:

As United has stated repeatedly in court filings and press releases, certainty over the status of the pension plans is needed for United to successfully gain exit financing

upon exit from bankruptcy (see, for example, Attachments 4, 13). Delaying the termination of the FA Plan will only keep United in a tenuous position, making it difficult for it to gain the confidence of lenders to obtain exit financing, and to continue to maintain exclusivity for filing a POR. If an entity other than United proposes a POR, PBGC's benefits under the Agreement most likely will not materialize. Without immediate termination, the likelihood of United successfully proposing a POR is reduced, and this puts the agreement, and therefore PBGC's recoveries under it, at greater risk. As has been indicated through recent press reports, other entities have shown an interest and capability to propose and alternative POR. (Attachment 14) Although, it is difficult to quantify this increased risk to a mathematical certainty, the increased risk to PBGC and its potential recovery is substantial and unreasonable.

AR 32-33.

58.    During the June 21 TWG meeting, DISC represented that:

If PBGC did not terminate the plan, PBGC could lose the benefit of the settlement agreement. Though hard to quantify precisely, DISC noted that the agreement had been closely and carefully negotiated with United and that Greenhill and DISC both believed that settlement of United's pension issues was in PBGC interests.

AR 19.

59.    In the final recommendation to Director Belt, Chief Counsel Jeffrey Cohen summarized the Agency's reasoning this way:

A significant increase to PBGC's long-run loss is present if Plan termination is delayed because such a delay places PBGC's Agreement at risk. The Agreement depends on PBGC taking over all four of United's underfunded Plans, including the FA Plan. Delay in termination of the FA Plan puts the Agreement at risk, and Greenhill has concluded that PBGC's recovery is substantially greater with the Agreement than without the Agreement - an estimated 137% better recovery (equaling approximately $123,000,000). Additionally, delayed termination of the FA Plan might obstruct United's ability to obtain exit financing and to maintain exclusivity for filing a plan of reorganization ("POR"). PBGC likely would lose its recovery pursuant to the Agreement if a POR by an entity other than United is confirmed.

AR 7.

60.     The third rationale for termination advanced by the Agency was that United would be unable to pay benefits when due under the Flight Attendant Plan, and therefore met the statutory criterion under Section 4042(a)(2).  AR 7.  PBGC relied upon Greenhill's May 18 memorandum to assert that United could no longer afford to maintain the Plan.  AR 6, 15, 30.  PBGC further explained that the "FA Plan is seriously underfunded, with assets equal to only 42% of benefit liabilities.  United has refused to make further employer contributions to it.  Accordingly, the Plan will be unable to pay benefits when due."  AR 7.

61.     During the TWG meeting on June 21, 2005, members of the TWG raised concerns about a possible domino effect from termination of the Flight Attendant Plan.  AR 21.  DISC responded to this concern saying "that the better reading of section 4042(c) was to limit it to the particular plan under consideration."  AR 21.

62.     PBGC calculated that the unfunded liabilities of the Flight Attendant Plan were $1.5 billion as of July 31, 2004.  Pilots Plan AR 17.  PBGC calculated that the unfunded liabilities of the Flight Attendant Plan were $1.8 billion as of January 31, 2005.  Union Ground Plan AR 16.

63.

**[REDACTED]**

64.     In its Memorandum of Law in Support of its Motion for Summary Judgment in the litigation over the termination date of the Pilots Plan, PBGC wrote: "based on the virtually unanimous body of case law PBGC's proposed termination date should prevail."  PBGC Pilots Plan Br. at 2 (attached as Ex. 28 to Clayman Decl.).

65.

**[REDACTED]**

66.     As of April 14, 2005, PBGC knew that United anticipated completion of a revised business plan by July 31, 2005, and intended to file a plan of reorganization by September 1, 2005. AR 611.  As of May 18, 2005, United had not resolved issues regarding its fleet planning, negotiations with the public debt group, or contracting with United's regional partners.  UAL Aug. 2005 Status Report at 2-3, 9 (attached as Ex. 29 to Clayman Decl.).

67.     On August 25, 2005, United stated in a bankruptcy court filing that it had sought "up to $2.5 billion in exit financing," and "received commitments for up to $3 billion in all-debt financing."  UAL Aug. 2005 Status Report at 2.

68.     United's current business plan assumes an oil price of $50.00 per barrel through 2010. "UAL Says It Plans A February Exit From Bankruptcy" (attached as Ex. 30 to Clayman Decl.).  The Company has stated that: "If long term oil prices are significantly higher than are contemplated today, they will drive industry fare increases or structural changes such as capacity reductions.  Id.

69.     In its May 12, 2005 analysis of the settlement agreement, Greenhill treats $388 million as an off-set to PBGC's recovery in a "Contested Outcome".  AR 135-50.  The $388 million approximates the additional liabilities that the Agency would incur if it lost litigation over the termination dates of the Pilots Plan and the Union Ground Plan.  AR 140.

70.     In its May 12, 2005 analysis Greenhill points to two scenarios in which it claims that the recovery to the PBGC is better with the settlement agreement (the "Consensual Outcome") than in its absence (the "Contested Outcome").  AR 135-50.  First, it assumes in the "best case scenario"

that PBGC realizes a recovery of 100% on the Non-UBL Claims and 7% on the UBL claims.  AR 32, 147.  Accepting Greenhill's premise that the $388 million should only apply to the Contested Outcome, PBGC would recover $8 million more with the Settlement Agreement than without it. AR 147.  If, however, the $388 million liability is applied to both outcomes, as logic requires, PBGC's recovery under the Consensual Outcome is $40 million less than in the Contested Outcome. Clayman Decl. Ex. 31 at Figure 2.

71.    In the second scenario, which PBGC labels as a "more realistic scenario", Greenhill claims that the Settlement Agreement generates a $123 million advantage over the Contested Outcome.  AR 32, 149.  But again, this conclusion is significantly skewed by Greenhill's decision to count the $388 million liability only against the recovery in the no settlement situation.  If this amount is treated the same for both outcomes, the benefit of the agreement is reduced by $84 million to $39 million.  Clayman Decl. Ex. 31 at Figure 6.

72.    When these analyses are expanded to reflect a 50% and 100% probability of PBGC success in the date-termination litigation, the results in the "best case scenarios" is reversed with the Contested Outcome generating a better return than the consensual one.  Clayman Decl. Ex. 31 at Figures 3 and 4. Similarly in the "more realistic scenarios" the claimed benefit of the Consensual Outcome is significantly diminished when using either an assumed success probability of 50% or 100%.  Clayman Decl. Ex. 31 at Figures 7 and 8.

Respectfully submitted,

/s/ Robert S. Clayman
Robert S. Clayman, D.C. Bar No. 419631
Carmen R. Parcelli, D.C. Bar. No. 484459
Guerrieri, Edmond, Clayman & Bartos, P.C.
1625 Massachusetts Avenue, N.W., Ste. 700
Washington, DC 20036-2243
(202) 624-7400

Counsel for Association of Flight
Dated: October 24, 2005            Attendants-CWA, AFL-CIO

## <u>NOTICE OF FILING UNDER SEAL</u>

Plaintiff filed under seal an unredacted version of its Statement of Material Facts Not in Genuine Dispute with the Court this 24th day of October, 2005.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 24, 2005, I electronically filed Plaintiff's Statement

of Material Facts Not in Genuine Dispute using the CM/ECF system.  I further certify that on

October 24, 2005, a true and correct copy of the same was served by electronic mail on:


Jeffrey B. Cohen
Chief Counsel
Pension Benefit Guaranty
 Corporation
1200 K Street, N.W.
Washington, D.C.  20005
cohen.jeffrey@pbgc.gov

Attorney for defendant PBGC



/s/ Robert S. Clayman
Robert S. Clayman