IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
ASSOCIATION OF FLIGHT                )
ATTENDANTS-CWA, AFL-CIO,             )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        Civil Action No. 1:05CV01036
                                     )
PENSION BENEFIT GUARANTY             )
CORPORATION,                         )
                                     )
        Defendant.                   )
_____ )

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**[REDACTED VERSION]**

Robert S. Clayman, D.C. Bar No. 419631
Carmen R. Parcelli, D.C. Bar. No. 484459
Guerrieri, Edmond, Clayman & Bartos, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036-2243
(202) 624-7400

Dated:  October 24, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION............................................................................................. 1

STATEMENT OF FACTS................................................................................. 3

    I.    United's Initial Efforts to Terminate Its Pension Plans, and the
        PBGC's Insistence That United Need Not Terminate the Flight
        Attendant Plan.................................................................................. 3

    II.

**[REDACTED]**

                   .................................................................. 8

    III.    PBGC and United Enter Into the Settlement Agreement, and
          PBGC Initiates Termination of the Flight Attendant Plan Pursuant
          to the Agreement.............................................................................. 14

    IV.    PBGC's Rationales for Termination of the Flight Attendant Plan.... 19

ARGUMENT.................................................................................................... 21

    I.    ERISA Does Not Allow PBGC to Use Its Statutory Authority to
        Terminate a Pension Plan as a Bargaining Chip to Settle Its
        Bankruptcy Claims........................................................................... 23

        A.

**[REDACTED]**

                   .......................................................... 25

        B.    Using termination of the Flight Attendant Plan as barter is
            contrary to ERISA and the Agency's own construction of
            the statute.............................................................................. 25

            1.    Statutory Purpose........................................................ 25

            2.    Melding PBGC's Role as a Regulator and a
                Creditor....................................................................... 27

**TABLE OF CONTENTS (cont'd)**

3.    The Requirement of a Plan-by-Plan Termination
Decision.................................................................... 28

C.    By virtue of the settlement agreement, the Agency
rendered itself incapable of conducting the independent
cause analysis required under Section 4042........................ 29

II.    The Reasons Given by PBGC for Terminating the
Flight Attendant Plan are Fundamentally Unsound and
Demonstrate That the Agency was Reaching for a Predetermined
Result, Instead of Conducting the Independent Cause
Determination Required by ERISA.................................................. 33

A.    The Agency's consideration of the settlement agreement
in deciding to terminate the Flight Attendant Plan was
contrary to ERISA................................................. 33

B.    Even assuming that the Agency could consider the
settlement, PBGC's analysis of the settlement was
arbitrary and capricious........................................ 36

C.    PBGC acted arbitrarily and capriciously in relying upon an
affordability analysis performed without information
identified as crucial by the Agency and without
consideration of important aspects of affordability issue..... 39

D.    The Agency's findings based upon the flawed affordability
analysis are equally unsound.................................... 42

E.    The Agency's finding of a long-run loss due to benefit
increases of $3.3 million per month is inexplicably
inconsistent with the Agency's prior position as
represented to this Court....................................... 44

CONCLUSION.................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**

Aetna Life Ins. Co. v. Lavoie,
    475 U.S. 813 (1986)........................................................................ 31

Antoniu v. SEC,
    877 F.2d 721 (8th Cir. 1989)......................................................... 29-30

Cinderella Career & Finishing Schs., Inc. v. FTC,
    425 F.2d 583 (D.C. Cir. 1970)....................................................... 29, 31

County of Los Angeles v. Shalala,
    192 F.3d 1005 (D.C. Cir. 1999)..................................................... 21

Fla. Mun. Power Agency v. FERC,
    411 F.3d 287 (D.C. Cir. 2005)....................................................... 22, 45

FTC v. Cement Inst.,
    333 U.S. 683 (1948)........................................................................ 31

Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,
    426 U.S. 482 (1976)........................................................................ 21

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.,
    463 U.S. 29 (1983).......................................................................... 21, 22, 35, 39,
    42

PBGC v. Kaiser Aluminum Corp.,
    No. Bankr. 02-10429JFK, Civ.A. 04-145-JJF, 2005 WL 735551
    (D. Del. Mar. 30, 2005)................................................................. 29

PBGC v. LTV Steel Corp.,
    119 F.R.D. 339 (S.D.N.Y. 1988)................................................... 27

PBGC v. LTV Corp.,
    496 U.S. 633 (1990)....................................................................... 21, 27

PBGC v. Wilson N. Jones Mem'l Hosp.,
    374 F.3d 362 (5th Cir. 2004)......................................................... 21

## TABLE OF AUTHORITIES (cont'd)

**Federal Cases (cont'd)**

Ramaprakash v. Fed. Aviation Admin.,
    346 F.3d 1121 (D.C. Cir. 2003)..................................................................... 22, 33

Rettig v. PBGC,
    744 F.2d 133 (D.C. Cir. 1984)..................................................................... 21, 26

Southern Co. Servs., Inc. v. FERC,
    416 F.3d 39 (D.C. Cir. 2005)..................................................................... 22

Wisc. Valley Improvement Co. v. FERC,
    236 F.3d 738 (D.C. Cir. 2001)..................................................................... 22


**Federal Rules and Statutes**

5 U.S.C. §§ 551-59.................................................................................... 21

5 U.S.C. §§ 701-06.................................................................................... 21

5 U.S.C. § 706 (2)(A)................................................................................ 1, 21, 35

29 U.S.C. § 1302(a)................................................................................... 1, 23, 25-26

29 U.S.C. § 1341...................................................................................... 29

29 U.S.C. § 1342...................................................................................... *passim*

Plaintiff Association of Flight Attendants-CWA, AFL-CIO ("AFA"), hereby opposes the motion for summary judgment filed by Defendant Pension Benefit Guaranty Corporation ("PBGC" or "Agency").  Plaintiff AFA also submits its memorandum in support of its cross-motion for summary judgment.  AFA seeks to set aside the PBGC's decision to terminate the pension plan covering Flight Attendants of United Airlines ("Flight Attendant Plan" or "Plan").  PBGC's decision to terminate the Plan should be overturned as it does not comport with the standards of the Administrative Procedure Act, which prohibits agencies from acting arbitrarily, capriciously, or otherwise not in accordance with law.  5 U.S.C. § 706 (2)(A).

## INTRODUCTION

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**                                    When PBGC initiated the

Section 4042 process to determine the fate of the Plan, it conducted an analysis that was contrived

to reach a certain result.  Consequently, the Agency's assessment is replete with inconsistencies,

illogic, and bias, and violates ERISA.  As just two of the many examples set forth below of such

conduct, PBGC performed the requisite analysis of the Plan's affordability without the data the

Agency, only a month earlier, had deemed essential to such an undertaking.  In addition, PBGC's

decision to terminate the Flight Attendant Plan rests on the settlement agreement itself -- a reason

that falls outside the strict parameters of ERISA Section 4042.

Thus, at each stage of these proceedings --                **[REDACTED]**

, to reaching the resulting agreement, to conducting the termination

analysis, to formally deciding to terminate the Plan -- PBGC's actions were unlawful, as well as

arbitrary and capricious.  Accordingly, its decision to terminate the Flight Attendant Plan should be

set aside.

## STATEMENT OF FACTS

I.    **United's Initial Efforts to Terminate Its Pension Plans, and the PBGC's Insistence That United Need Not Terminate the Flight Attendant Plan.**

On December 9, 2002, United filed for Chapter 11 protection in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.  SOMF ¶ 1 (AR 37).[1/] Within days of the bankruptcy filing, United's Official Committee of Unsecured Creditors ("OCUC") was formed.  SOMF ¶ 2 (Clayman Decl. ¶ 2).  From the start, PBGC and AFA were members of the OCUC, and as such received constant updates from United and its advisors on the progress of reorganization, including confidential information.  Id.  In September 2004, PBGC also retained Greenhill & Co., LLC ("Greenhill"), a well known investment banking firm, to provide the Agency with expert analysis of United's forecasts, capital structure, and the Company's ability to afford its pension obligations.  SOMF ¶ 3 (AR 14, 824).

In the course of the bankruptcy proceeding, United created a financial forecasting model known as "Gershwin."  SOMF ¶ 5 (Clayman Decl. ¶ 3).  Gershwin functions as United's business plan.  Id.  Throughout the bankruptcy, United has frequently revised Gershwin.  Id.  In October 2004, United presented a revised business plan to the OCUC, known as Gershwin 5.F.  Id.

When United entered bankruptcy it maintained four primary defined benefit plans: the Flight Attendant Plan, the Pilots Plan, the Union Ground Plan, and the MAPC Plan.[2/]  SOMF ¶ 6 (AR 26).

---

[1/]    References to AFA's Statement of Material Facts Not in Genuine Dispute are in the form "SOMF ¶ __" with the material relied upon in the SOMF indicated in parenthesis.  Citations to the administrative record submitted by PBGC is this case are in the form "AR __" or "AR-S __" for sealed portions of the record.

[2/]    United also had a fifth and far smaller defined benefit pension plan, known as the Variable Plan, that was overfunded.  SOMF ¶ 6 (Pilots Plan AR 17).

As of April 2005, there were 28,402 participants in the Flight Attendant Plan: 15,254 active employees; 7,949 deferred employees; and 5,199 retirees. SOMF ¶ 7 (AR 723). The Flight Attendant Plan covered 23% of all participants in United's four defined benefit plans, nevertheless, the Plan accounted for only 18% of projected benefits and only 14% of United's total pension funding requirements for 2005-2010. SOMF ¶¶ 8-9 (AR 725-26).[3/] Thus, as stated by PBGC, the Flight Attendant Plan was "the least financially burdensome of United's pension plans." SOMF ¶ 8 (AR 129).

On July 23, 2004, United announced an amendment to its Debtor-In-Possession ("DIP") financing that effectively prohibited further pension contributions before the Company exited bankruptcy. SOMF ¶ 11 (AR 60-61). PBGC resisted United's efforts to stop making minimum funding payments to its on-going pension plans, asserting that such conduct was unlawful under ERISA. SOMF ¶ 11. Subsequently, the Independent Fiduciary ("IFS") appointed to ensure United's compliance with ERISA (under an agreement between the Company and the Department of Labor) initiated litigation to force United to meet its plan funding obligations. SOMF ¶ 14 (IFS Mem.). PBGC joined in the litigation. SOMF ¶ 14.

On November 25, 2004, United moved the bankruptcy court for authority to reject its collective bargaining agreements, pursuant to Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113(c). SOMF ¶ 15 (UAL 1113 Mot.). In addition to further wage and work rule concessions,

---

[3/]    The fact that the Flight Attendant Plan represented a relatively small portion of United's pension funding obligations was attributable in part to significant reductions in benefits under the Plan, agreed to by AFA in the first round of concessionary bargaining with United during bankruptcy. SOMF ¶ 10 (2d Feinstein Decl. ¶ 3). AFA's pension concession decreased United's minimum funding requirements by $68 million for 2004 alone. Id.

United sought authority "to eliminate any provisions in [its] CBAs that would prohibit a distress termination of the Company's pension plans." SOMF ¶ 15 (AR 1055).

Roughly three weeks after United's motion, the Air Line Pilots Association ("ALPA") reached a settlement with United, agreeing not to oppose distress termination of the Pilot Plan under ERISA Section 4041, provided the termination date of the Pilot Plan would be no earlier than April 2005. SOMF ¶ 16 (Pilots Plan AR 63-64). In response, PBGC initiated the ERISA Section 4042 process to terminate the Pilots Plan. SOMF ¶ 16 (Pilots Plan AR 22). PBGC determined that the Pilots Plan should terminate as of December 30, 2004 in order to avoid a long-run loss to the Agency due to benefit liability increases in the period prior to April 2005, when United and ALPA agreed the plan should terminate. SOMF ¶ 16 (Pilots Plan AR 10, 22-23).

PBGC also opposed United's motion to alter its CBA requirements regarding pensions. First, the Agency filed a declaration and expert report from Michael Kramer, a partner with Greenhill, dated December 28, 2004. SOMF ¶ 17 (AR 822-42). In his expert report, Kramer analyzed whether United could achieve the credit metrics reflected in Gershwin 5.F, the current business plan, and still retain one or more of its pension plans. SOMF ¶ 17 (AR 825-28). The Company claimed that it was necessary to attain the identified credit metrics in order to obtain exit financing. SOMF ¶ 17 (AR 827; AR 911-15). Kramer concluded that "[u]nder the Gershwin 5.0F projections, the Company has sufficient liquidity and free cash flow to support at least one of the Pension Plans currently in place, namely the F[light] A[ttendant] plan, even without application for any waivers." SOMF ¶ 17 (AR 825). Kramer also stated "I must note that I am not convinced that United cannot obtain exit financing unless its business plan shows it surpassing" the target credit metrics identified by the Company. SOMF ¶ 17 (AR 827).

> However, applying United's credit metrics to alternative pension scenarios developed using United's numbers serves a useful comparative purpose. It demonstrates that, even on United's own terms, it has failed to carry its requisite burden to demonstrate that it <u>must</u> terminate all the Pension Plans to successfully reorganize and avoid liquidation.

SOMF ¶ 17 (AR 827-28).

One of the terms underlying United's Gershwin 5.F business plan was an assumption regarding the future price of fuel. SOMF ¶ 18 (AR 828). The fuel assumption in Gershwin 5.F was based on the NYMEX crude oil futures curve as of October 14, 2004, when the price of oil stood at approximately $44.00 per barrel. SOMF ¶ 18 (AR 130). Kramer concluded that one or more plans were affordable given this fuel price. SOMF ¶ 18 (AR 825). He also performed his analysis based on the forward curve as of December 27, 2004, when oil stood at approximately $41.00 per barrel, and found that United's plans were even more affordable under that scenario. SOMF ¶ 18 (AR 838; AR 130). Significantly, Kramer also analyzed a downside fuel scenario, assuming fuel prices of $60 per barrel in 2004, $55 per barrel in 2005, $50 per barrel in 2006, and the Gershwin forecast prices thereafter. SOMF ¶ 18 (AR 839, 915). Based on those fuel price assumptions, Kramer still concluded that "United maintains significant cash balances when retaining as many as two of the Pension Plans under the downside case." SOMF ¶ 18 (AR 839).

PBGC followed the Kramer declaration with an objection to United's motion on January 4, 2005. SOMF ¶ 20 (PBGC 1113 Obj.). The Agency disputed as a factual and legal matter United's contention that it had to terminate all of its plans in order to reorganize successfully. <u>Id.</u> Factually, PBGC asserted that "it [was] clear that United can reorganize in Chapter 11 and maintain <u>one or more</u> of its Pension Plans." SOMF ¶ 20 (PBGC 1113 Obj. at 11)(emphasis in original). PBGC stated that its "financial and actuarial expert testimony shows one or more of the Pension Plans to

be affordable in a variety of scenarios." SOMF ¶ 20 (PBGC 1113 Obj. at 20). Specifically, PBGC found that the alternative to plan termination that "most easily satisfied" the credit metrics identified by United "was retaining only the Flight Attendants Plan, with minimum funding waivers." SOMF ¶ 20 (PBGC 1113 Obj. at 21).

As a legal matter, PBGC argued that under ERISA Section 4041 the termination analysis had to be conducted on a plan-by-plan basis. SOMF ¶ 21 (PBGC 1113 Obj. at 18). In so arguing, PBGC highlighted the language of Section 4041, which "provides that '<u>A</u> single-employer <u>plan</u> may terminate under a distress termination' only if among other things, 'the bankruptcy court determines that, unless <u>the plan</u> is terminated,' the debtor cannot reorganize." <u>Id.</u> (emphasis in original).

On January 8, 2005, AFA and United reached a tentative agreement regarding the wage and work rule concessions sought by the Company in its Section 1113 motion. SOMF ¶ 22 (Davidowitch Decl. ¶ 4). In a side letter to that agreement, AFA and United agreed to "continue to meet and confer regarding the Defined Benefit Plan." <u>Id.</u> At this point, AFA initiated discussions with PBGC, seeking to enlist the Agency in its effort to find alternative funding for the Flight Attendant Plan and avoid termination. SOMF ¶ 23 (Davidowitch Decl. ¶ 6). At a January 27, 2005 meeting with AFA, PBGC indicated that it was willing to explore a wide range of options to the distress termination proposed by United. <u>Id.</u>

**[REDACTED]**

During the negotiations, Executive Director Bradley Belt was "treated as the ultimate principal." SOMF ¶ 25 (Snyder Dep. at 128). Participating in negotiations on behalf of PBGC were: Jeffrey B. Cohen, Chief Counsel (legal analysis); John Spencer, Acting Director, Division of Insurance Supervision and Compliance (financial analysis); Charles Finke, Associate Chief Counsel (legal analysis); John Menke, Assistance Chief Counsel (legal analysis); Shannon Novey, Attorney (legal analysis); Michael Kramer, Managing Director, Greenhill (financial analysis); Brad Robins, Managing Director, Greenhill (financial analysis); and Adam Verost, Vice President, Greenhill (financial analysis). SOMF ¶ 26 (PBGC Interrog. Ans. at 2). PBGC had previously entered into an engagement letter with Greenhill signed September 30, 2004. SOMF ¶ 4 (AR 824). The engagement letter provided a monthly retainer fee of approximately $150,000 to $160,000 per month, as well as a completion fee of $3 million. SOMF ¶ 4 (AR 897; Kramer Dep. at 7-9). The completion fee was to be paid for "the deal being done or a plan being confirmed." SOMF ¶ 4 (Kramer Dep. at 8).

**[REDACTED]**

-8-

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

, on March 30, 2005, AFA

sent a letter to Bradley Belt describing the Union's proposal to keep the Flight Attendant Plan intact.

SOMF ¶ 36 (Davidowitch Decl. ¶ 10).  Earlier the same day, AFA had sent to PBGC a formal term

sheet for its proposal.  Id.  A key component of AFA's proposal was a contribution by United of

notes to the Flight Attendant Plan in order to maintain it.  Id.

On April 4, Belt replied to AFA's March 30 letter.  SOMF ¶ 37 (Davidowitch Decl. ¶ 11).

He characterized AFA's proposal as "constructive" and reiterated the Agency's position "that the

AFA plan can and should be maintained by the company upon emergence from Chapter 11."  Id.

Mr. Belt added that: "Based upon available information, we continue to believe that the interests of

the participants and the pension insurance program would best be served by the continuance of the

AFA Plan."  Id.  In closing, he encouraged further work between the Agency and AFA to resolve

the pension funding issue.  Id.  On April 5, 2005, AFA presented its proposal to retain the Flight

Attendant Plan to United.  SOMF ¶ 38 (Davidowitch 2d Decl. ¶ 18).  PBGC was present at that

meeting.  Id.  On April 8, 2005, United offered AFA a counter-proposal to maintain the Flight

Attendant Plan.  SOMF ¶ 38 (Davidowitch 2d Decl. ¶¶ 19-20).  United's proposal incorporated some

of AFA's funding alternatives, but United refused to supply any notes to support continuation of the

Flight Attendant Plan.  Id.

On April 11, 2005, United re-filed its Section 1113 motion, seeking authority to reject its

collective bargaining agreements' contractual bar to a distress termination.  SOMF ¶ 39 (AR 619).

United also moved for a judicial determination that it had satisfied the requirements for a distress

-12-

termination under Section 4041(c).  Id.  A trial on United's motions was scheduled to commence on

May 11.  SOMF ¶ 39 (AR 612).

On April 14, PBGC filed an emergency motion to postpone consideration of United's motion

for distress termination of its pension plans.  PBGC asserted that United's motion was "premature."

SOMF ¶ 40 (AR 606-18).  The Agency also reiterated that "PBGC currently believes that United

can afford to maintain at least one or more of its Pension Plans."  SOMF ¶ 40 (AR 614).  In urging

a postponement, PBGC explained that absent an updated business plan from United, it would be

"impossible" for PBGC to determine whether United could afford to maintain its plans.  PBGC noted

that:

> The parties agreed to the schedule for this distress termination proceeding in
> December, 2004.  At that time, the parties contemplated that United would have
> provided an updated business plan according to its schedule and filed its plan of
> reorganization prior to seeking the distress termination of their Plans.  Those
> circumstances have changed.  The timing for the distress hearing must also change.
> Otherwise it will be impossible for this Court to follow the law and determine
> whether United can afford to maintain any of the Pension Plans after it emerges from
> bankruptcy on the basis of a plan of reorganization and the financial outlook of
> United.

SOMF ¶ 40 (AR 613).  The Agency further asserted:

> For instance, vital decisions regarding fleet planning, negotiations with the public
> debt group, and contracting with United's regional partners remain to be resolved.
> Until the Debtors can provide final answers to these critical issues and their impact
> on United's financial projections, PBGC cannot even determine its position on
> whether United can afford to maintain the Pension Plans coming out of bankruptcy,
> and it will be impossible for this Court to decide what the restructured United can or
> cannot afford.

SOMF ¶ 40 (AR 613-14).  PBGC stressed: "The importance of this issue -- and the magnitude of

approximately $9 billion of liability that United seeks to shift onto PBGC and the affect on the

pensions of some 121,557 participants -- requires that this case be decided on a fully-developed

-13-

record." SOMF ¶ 40 (AR 615). In PBGC's proposed order, the court would have postponed the

distress termination hearing "until after United has completed its final business plan, after it has filed

a proposal plan of reorganization; and no earlier than two (2) months before it plans to merge [sic]

from bankruptcy." SOMF ¶ 40 (AR 617-18).

Also on April 14, United issued notices of intent to terminate the Flight Attendant Plan and

the MAPC Plan, pursuant to Section 4041(c), notifying plan participants that June 30, 2005 was the

termination date for both plans. SOMF ¶ 41 (AR 74; PBGC Resp. 1113 Mot. at 4-5).

**III.    PBGC and United Enter Into the Settlement Agreement, and PBGC Initiates
Termination of the Flight Attendant Plan Pursuant to the Agreement.**

On April 22, 2005, PBGC and United entered into a settlement agreement, and made their

settlement negotiations known for the first time in open court. SOMF ¶ 42 (AR 93-110). PBGC's

Executive Director, Bradley Belt was the ultimate decision-maker for the Agency on the settlement

agreement. SOMF ¶ 42 (AR 103). Under the agreement, United is to provide PBGC with three

tranches of securities with a total value of $1.5 billion, ($500 million of which is contingent on

certain conditions subsequent). SOMF ¶ 42 (AR 93-94). In exchange, PBGC agreed that "[a]s soon

as practicable after the date that the Bankruptcy Court enters an order approving the Agreement .

. . PBGC staff will initiate termination under 29 U.S.C. § 1342 of the Flight Attendant and MA&PC

Plans." SOMF ¶ 42 (AR 94). Under the agreement, PBGC also gave up its Non-UBL Claims.

SOMF ¶ 42 (AR 97-98). The parties further agreed that United would allow PBGC's unfunded

benefit liability claim in an amount determined according to the Agency, with 45% of the claims to

be assigned by United. SOMF ¶ 42 (AR 97, 99). The agreement would not become effective until

each of United's four pension plans were terminated. SOMF ¶ 42 (AR 99).

In PBGC's April 22 press release, Executive Director Belt hailed the "reaching [of] a settlement," "[u]nder the terms [of which] . . . the PBGC would terminate and become trustee of the company's four pension plans." SOMF ¶ 44 (PBGC Press Release at 1). Director Belt stated that "PBGC and its financial advisors believe the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy." Id.

Within days, United filed in the bankruptcy court an emergency motion for approval of the settlement agreement with PBGC. SOMF ¶ 45 (UAL Mot. Approve Settlement). In the event the bankruptcy court denied the motion, PBGC filed an opposition to United's motion for distress termination of its pension plans on April 29, 2005. In the opposition, PBGC urged the bankruptcy court to "require the Debtors to offer appropriate proof that, but for termination of each Pension Plan, they will be unable to obtain the necessary exit financing to reorganize and emerge from bankruptcy." SOMF ¶ 46 (PBGC Resp. 1113 Mot. at 12) (emphasis in original). PBGC also reiterated its legal position that the distress termination standard "must be met for each pension plan individually" because ERISA Section 4041 "provides that 'A single-employer plan may terminate under a distress termination" only if, among other things, 'the bankruptcy court determines that, unless the plan is terminated,' the debtor cannot reorganize." Id. at 9.

On May 5, 2005, the deposition of PBGC expert Michael Kramer was taken in the bankruptcy proceeding. During the deposition, Mr. Kramer testified:

> Q:    What changed between December of '04 when you signed your
>        affidavit, your declaration, and now that leads the PBGC to conclude
>        that the AFA pension plan should be terminated?
>
> [Objection to form]

> A:    I think what has changed in terms of the overall situation is there is a negotiated settlement that has been reached between the PBGC and the company with respect to all the issues between the two, that the PBGC is comfortable and which it believes is acceptable to enter into.

SOMF ¶ 47 (Kramer Dep. at 116-18).  Kramer also testified that he had not done any new analysis since his December 28, 2004 expert report on United's ability to afford its pension plans.  SOMF ¶ 47 (Kramer Dep. at 26-27).  In addition, he testified:

> Q:    What analysis would you need to do to decide today whether your opinion has changed since the declaration?

> A:    I think what we would like to do is understand more from the company what they believe their projected operating results would be going forward based upon, for example, fuel prices, and what modifications they would make to their business to offset some of those costs.

SOMF ¶ 47 (Kramer Dep. at 28-29).  Mr. Kramer also stated that he did not know whether or not United needed to modify the fuel assumptions contained in Gershwin 5.F.  SOMF ¶ 47 (Kramer Dep. at 35).

On May 10, 2005, the bankruptcy court approved the settlement agreement between PBGC and United from the bench, and an order issued the next day.  SOMF ¶ 48 (AR 88-91).  AFA appealed that order and the appeal is currently pending before the United States Court of Appeals for the Seventh Circuit.

Two days after bankruptcy court approval of the settlement agreement, on May 12, 2005, Greenhill produced a document entitled "FA Plan Recovery Analysis."  SOMF ¶ 49 (AR 135-50).  The document purported to compare PBGC's recovery with respect to Flight Attendant Plan under the settlement agreement to the anticipated recovery in the absence of the agreement.  SOMF ¶ 49

-16-

(AR 137). The analysis was "based on the assumption that the FA Plan is terminated" either under the agreement or in the absence of the agreement. Id. The analysis quantified not only PBGC's recovery with respect to the Flight Attendant Plan, but also its recovery with respect to the Pilots Plan, the Union Ground Plan, and the MAPC Plan. SOMF ¶ 49 (AR 143, 145-50). The analysis also quantified the agency's recovery on its Non-UBL Claims. Id.

Greenhill followed up its May 12 analysis, which assumed termination of the Flight Attendant Plan with or without the settlement agreement, with a memorandum on May 18 regarding the affordability of the Flight Attendant Plan. SOMF ¶ 50 (AR 129-34). As of May 18, 2005, United had not issued a revised business plan, although PBGC knew that the Company anticipated completion of a revised business plan by July 31, 2005 and intended to file a plan of reorganization by September 1, 2005. SOMF ¶ 66 (AR 611). Therefore, Greenhill's May 18 analysis was based upon Gershwin 5.F with only two modifications: (1) Greenhill assumed a higher fuel forecast based upon the May 16, 2005 forward curve, when fuel stood at approximately $50.00 per barrel; and (2) Greenhill accounted for the impact of $755 million in securities that United anticipated it would distribute to its labor groups. SOMF ¶ 50 (AR 130-32). In conclusion, the memorandum stated:

> As of the date of this memorandum, Greenhill believes that the Company is unlikely to be able to support the funding obligations of the Flight Attendants' Plan ("FA Plan") due to unfavorable developments in the airline industry. Since the time of Michael Kramer's expert report ("Kramer Declaration"), filed on December 28, 2004, fuel prices and competitive pressures have increased significantly, causing Greenhill to revise its opinion regarding the affordability of this plan.

SOMF ¶ 50 (AR 129). On the basis of Greenhill's affordability analysis, PBGC's Office of Corporation Counsel ("OCC"), then headed by Jeffrey Cohen, concluded that PBGC would not

likely be successful in litigation opposing the distress terminations of any of United's pension plans. SOMF ¶ 50 (AR 30).

On May 20, 2005, AFA commenced this action, seeking a preliminary injunction against PBGC's initiation of termination of the Flight Attendant Plan pursuant to the terms of the settlement agreement. At the June 3 hearing on AFA's motion for preliminary injunction, the Court questioned PBGC regarding whether a stay of the Agency's termination process could lead to mounting plan liabilities that the Agency would ultimately shoulder if the Flight Attendant Plan terminated. SOMF ¶ 51 (Hearing Tr. at 9-12). PBGC counsel responded that, if the agency process were stayed, United would "undoubtedly resuscitate the distress termination process," resulting in plan termination on June 30, 2005 if the Company's motion were successful. Id.

On June 16, 2005, PBGC's Division of Insurance Supervision and Compliance ("DISC") sent its recommendation for termination of the Flight Attendant Plan to PBGC's Trusteeship Working Group ("TWG"). SOMF ¶ 52 (AR 25-33). DISC proposed a termination date of June 30, 2005. Id. John Spencer, as Director of DISC, signed the recommendation memorandum. SOMF ¶ 52 (AR 25). The TWG met to consider termination of the Plan on June 21, 2005, and voted in favor of termination. SOMF ¶ 52 (AR 9-24). The next day, PBGC Chief Counsel Jeffrey Cohen forwarded TWG's termination recommendation to Executive Director Bradley Belt for a final decision. SOMF ¶ 52 (AR 5-8). The very next day, Mr. Belt issued his Notice of Determination that the Plan should terminate as of June 30, 2005. SOMF ¶ 52 (AR 1). On the same date, PBGC also issued a notice of determination that the MAPC Plan should terminate. SOMF ¶ 53 (Union Ground Plan AR 1).

**IV.    PBGC's Rationales for Termination of the Flight Attendant Plan.**

Section 4042(a) of ERISA provides that PBGC "may institute proceedings . . . to terminate a plan" only where it determines:

(1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under Section 4971(a) of Title 26;

(2) the plan will be unable to pay benefits when due;

(3) the reportable event described in section 1343(c)(7) of this title has occurred; or

(4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342(a)(1)-(4). PBGC advanced three rationales under Section 4042 for its decision to terminate the Flight Attendant Plan. SOMF ¶ 55 (AR 5-9). The Agency's first rationale for termination was long-run loss under Section 4042(a)(4) due to monthly increases in accrued benefits under the Plan. SOMF ¶ 55 (AR 7). PBGC calculated the benefit increases at $3.3 million each month. SOMF ¶ 55 (AR 7, 18-19, 32). DISC concluded that because "it is highly likely the FA Plan will terminate even in the absence of PBGC initiating termination," the Agency faced a risk of long-term loss from the Plan's normal benefit increases. SOMF ¶ 55 (AR 31-32).

**[REDACTED]**

The second rationale, also advanced under the long-run loss provision of Section 4042(a)(4), involved the agreement. SOMF ¶ 56 (AR 7). As explained in the June 16 DISC recommendation, the "agreement is conditioned on PBGC ultimately assuming responsibility for all four of United's

-19-

underfunded plans." SOMF ¶ 56 (AR 28). According to DISC, the Agency faced an increased risk of long-run loss because "without immediate termination, the PBGC/UAL Agreement may be jeopardized" and "PBGC believes that its recovery will be greater under the agreement than without it." SOMF ¶ 56 (AR 32). DISC cited Greenhill's May 12 analysis of the settlement agreement for its assertion that the Agency's recovery under the settlement agreement was greater than otherwise. Id. During the June 21 TWG meeting, DISC represented that:

> If PBGC did not terminate the plan, PBGC could lose the benefit of the settlement agreement. Though hard to quantify precisely, DISC noted that the agreement had been closely and carefully negotiated with United and that Greenhill and DISC both believed that settlement of United's pension issues was in PBGC's interests.

SOMF ¶ 58 (AR 19). In the final recommendation to Director Belt, Chief Counsel Jeffrey Cohen summarized the Agency's reasoning this way: "A significant increase to PBGC's long-run loss is present if Plan termination is delayed because such a delay places PBGC's Agreement at risk. The Agreement depends on PBGC taking over all four of United's underfunded Plans, including the FA Plan." SOMF ¶ 59 (AR 7).

The third rationale for termination advanced by the Agency was that United would be unable to pay benefits when due under the Flight Attendant Plan, and therefore met the statutory criterion under Section 4042(a)(2). SOMF ¶ 60 (AR 7). PBGC relied upon Greenhill's May 18 memorandum to assert that United could no longer afford to maintain the Plan. SOMF ¶ 60 (AR 6, 15, 30). PBGC further explained that the "FA Plan is seriously underfunded, with assets equal to only 42% of benefit liabilities. United has refused to make further employer contributions to it. Accordingly, the Plan will be unable to pay benefits when due." SOMF ¶ 60 (AR 7). United had announced that

it would cease making contributions to its pension plans during bankruptcy on July 23, 2004.  SOMF

¶ 11 (AR 60-61).                    **[REDACTED]**


## ARGUMENT

Under the Administrative Procedure Act, courts will set aside agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."[4]  5 U.S.C. § 706(2)(A).

To survive review under this standard, an agency must "examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection between the facts found and

the choice made.'"  Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.,

463 U.S. 29, 43 (1983).  "'Where the agency has failed to provide a reasoned explanation, or where

the record belies the agency's conclusion, [the court] must undo its action.'"  County of Los Angeles

v. Shalala, 192 F.3d 1005, 1021 (D.C. Cir. 1999).

Agency actions are not the product of reasoned analysis where decision-making is tainted

by prejudgment based on extrinsic considerations and conflict of interest.  To the contrary, decision-

makers must be "'capable of judging a particular controversy fairly on the basis of its own

circumstances.'"  Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 493

(1976).  Moreover, agency action is:

---

[4]        Neither the District of Columbia Circuit or this Court has ruled on the standard of
review to be applied to PBGC's termination decisions under ERISA Section 4042.  The
Administrative Procedure Act, however, provides a default standard for review of agency decision-
making.  5 U.S.C. §§ 551-59, 701-06.  The Supreme Court and federal appellate courts have applied
the APA standard of review to other types of PBGC decision-making.  See PBGC v. LTV Corp., 496
U.S. 633, 645 (1990) (decision to restore pension plan); Rettig v. PBGC, 744 F.2d 133, 140 (D.C.
Cir. 1984) (PBGC rulemaking); PBGC v. Wilson N. Jones Mem'l Hosp., 374 F.3d 362, 366 (5th Cir.
2004) (PBGC interest rate calculation).

. . . arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

"In particular, an agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reasons for doing so." Wisc. Valley Improvement Co. v. FERC, 236 F.3d 738, 748 (D.C. Cir. 2001). "Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" Ramaprakash v. Fed. Aviation Admin., 346 F.3d 1121, 1124 (D.C. Cir. 2003) (Roberts, J.). As the District of Columbia Circuit has observed, "'the core concern underlying the prohibition of arbitrary or capricious agency action' is that agency 'ad hocery' is impermissible." Id. at 1130.

"[A]gency action 'must be upheld, if at all, on the basis articulated by the agency itself.'" Southern Co. Servs., Inc. v. FERC, 416 F.3d 39, 47 (D.C. Cir. 2005). "[P]ost hoc rationalizations by agency counsel will not suffice." Fla. Mun. Power Agency v. FERC, 411 F.3d 287, 291 (D.C. Cir. 2005). A reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

**I.      ERISA Does Not Allow PBGC to Use Its Statutory Authority to Terminate a Pension Plan as a Bargaining Chip to Settle Its Bankruptcy Claims.**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**B.    Using termination of the Flight Attendant Plan as barter is contrary to ERISA and the Agency's own construction of the statute.**

**[REDACTED]**

This course of action is simply not in accordance with the plain language of ERISA and the Agency's prior construction of the statute.  First, PBGC merged the Agency's role as a regulator with its role as a bankruptcy creditor -- two roles that the Agency itself maintains must be kept separate.  Next, through the agreement, PBGC tied the fate of the Flight Attendant Plan to that of United's other plans, contrary to the requirement of plan-by-plan termination decisions.  Lastly, the Agency violated the statutory purposes of ERISA through the agreement.

**1.    Statutory Purpose**

The Agency's initiation of plan termination pursuant to the agreement and in order to obtain its various benefits is also inconsistent with PBGC's statutory purpose.  ERISA tasks PBGC with carrying out the following purposes:

-25-

(1)  to encourage continuation and maintenance of voluntary  private pension plans for the benefit of their participants,

(2)  to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and

(3)  to maintain premiums established by the corporation under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.

29 U.S.C. § 1302(a).

The District of Columbia Circuit has explained how these different statutory purposes fit together.  In Rettig v. PBGC, 744 F.2d 133 (D.C. Cir. 1984), the court struck down regulations adopted by PBGC that would have denied benefits to some plan participants.  In so doing, the court rejected the Agency's reliance on the need to keep down its costs (and thus premiums), finding that the Agency had failed to properly "accommodate the conflicting policies underlying ERISA."  Id. at 135.  The court held that ERISA "was passed with the overwhelming purpose of protecting the legitimate expectations harbored by millions of employees of a measure of retirement security at the end of many years of dedicated service.  The other statutory purposes -- encouraging the growth of private pension plans and keeping down the costs of termination insurance for those plans -- are important but necessarily secondary."  Id. at 155.

In bargaining to terminate the Flight Attendant Plan, the Agency sacrificed Flight Attendants' "legitimate expectations" of receiving the pension benefits for which they had bargained.  Instead of pressing for United to maintain the Plan, the Agency bargained with the Company over consideration for a terminated plan, even as the Agency maintained that the Company could afford the Plan.  Rettig makes clear that the Agency cannot benefit itself at the expense of plan participants.

Yet, that is precisely what the Agency did in the settlement agreement. In this way, PBGC violated ERISA as well.

### 2.    Melding PBGC's Role as a Regulator and a Creditor

Under ERISA, PBGC acts as a regulator, taking certain actions with respect to private pension plans as defined by statute. In some instances, PBGC also finds itself in the role of a bankruptcy creditor. The Agency has held that it must keep separate its roles as regulator and creditor.[5] Thus, in the termination proceeding related to the Pilots Plan, the Agency made clear that it must act as a regulator with respect to plan terminations, not as a bankruptcy creditor. The Agency stated that the termination proceeding "involves PBGC as a regulator and United as plan administrator, not in their debtor-creditor relationship." SOMF ¶ 24 (PBGC Mot. Reconsideration at 7); Id., Ex. 1 at 7 ("PBGC has filed this termination action in its role as federal guarantor, not in its role as creditor."). The Agency also recognized that the policy considerations that should underlie a termination decision are different from, and potentially inconsistent with, the goals of bankruptcy reorganization. Id. at 5-6, 10.

Through the agreement, however, PBGC impermissibly mixed its regulator and creditor roles, in contravention of its own construction of ERISA. Here, the Agency used its termination power to extract a payment of its bankruptcy claims in an amount greater than the Agency otherwise believed it would obtain. The agreement also aligned the Agency's interests with those of United

---

[5]    Similarly, in PBGC v. LTV Steel Corp., 119 F.R.D. 339 (S.D.N.Y. 1988), the district court found that allegations that PBGC exercised its regulatory authority to restore a pension plan on the basis of interests as a bankruptcy creditor stated a claim of Agency bad faith and impropriety sufficient to warrant discovery beyond the administrative record. PBGC steadfastly maintained that its creditor concerns had not shaped its actions as a regulator. PBGC v. LTV, 496 U.S. 633, 658 n.1 (1990) (Stevens, J., dissenting).

in the reorganization process. Indeed, the agreement, as signed by the parties, explicitly provided

that PBGC "shall affirmatively support . . . United's restructuring activities and positions in the

Chapter 11 Cases and the POR [(i.e., plan of reorganization)] in connection with the implementation

of this Agreement and related initiatives."[6/]  SOMF ¶ 43 (AR 98).  In fact, the Agency ultimately

determined that it must terminate the Flight Attendant Plan quickly in order to avoid delaying

United's plan of reorganization.  SOMF ¶¶ 57, 59 (AR 7, 32-33).  Thus, the Agency abandoned the

proper distinction between regulator and creditor.  In so doing, the Agency acted arbitrarily and

capriciously in violation of its own construction of ERISA.

### 3.    The Requirement of a Plan-by-Plan Termination Decision

The settlement agreement also violates the basic principle of plan-by-plan termination

decisions under ERISA.  ERISA Section 4042 makes clear that the termination decision is to be

limited to the individual plan under consideration.  The statute states:

> The corporation may institute proceedings under this section to terminate <u>a plan</u>
> whenever it determines that --
>
> (1) <u>the plan</u> has not met the minimum funding standard required under section 412
> of Title 26, or has been notified by the Secretary of the Treasury that a notice of
> deficiency under section 6212 of Title 26 has been mailed with respect to the tax
> imposed under Section 4971(a) of Title 26;
>
> (2) <u>the plan</u> will be unable to pay benefits when due;
>
> (3) the reportable event described in section 1343(c)(7) of this title has occurred; or
>
> (4) the possible long-run loss of the corporation with respect to <u>the plan</u> may
> reasonably be expected to increase unreasonably if the plan is not terminated.

---

[6/]        In response to the objection of the OCUC that a creditor could not grant such an
advance commitment to support a plan of reorganization and other restructuring activities, United
and PBGC were forced to removed this language from the final court-approved agreement.  SOMF
¶ 43 (AR  112).

29 U.S.C. § 1342(a).  On the basis of similar language in ERISA Section 4041, PBGC has

consistently and vigorously maintained that plan termination decisions under that Section must be

made on an individual plan basis.[7/]  See, e.g., SOMF ¶¶ 21, 46; see also PBGC v. Kaiser Aluminum

Corp., No. Bankr. 02-10429JFK, Civ.A. 04-145-JJF, 2005 WL 735551 (D. Del. Mar. 30, 2005).

Through the settlement agreement, however, PBGC explicitly tied termination of the Flight

Attendant Plan to termination of United's other plans, as well as the disposition of its bankruptcy

claims.  That is contrary to ERISA.

> ### C.    By virtue of the settlement agreement, the Agency rendered itself incapable of conducting the independent cause analysis required under Section 4042.

PBGC admits that it would be contrary to ERISA for the agency to predetermine plan

termination without first completing the Section 4042 process.  Hearing Tr. (Aug. 10, 2005), at 9.[8/]

Indeed, basic fairness requires that Agency decision-making is the product of an independent

assessment of the facts, free from conflict of interest and prejudgment.  Cinderella Career &

Finishing Schs., Inc. v. FTC, 425 F.2d 583, 589 (D.C. Cir. 1970); Antoniu v. SEC, 877 F.2d 721,

---

[7/]    As the administrative record shows, when members of TWG raised concerns about a possible domino effect from termination of the Flight Attendant Plan, DISC told them "that the better reading of section 4042(c) was to limit it to the particular plan under consideration."  SOMF ¶ 61 (AR 21).

[8/]    THE COURT:  . . . if you had agreed to terminate before you went through the analysis, i.e. administrative review process, made a determination of one, two, three, or four of 1342A, would you agree with the plaintiff that that would be outside your powers?

MR. FINKE:  I think it would be, yes.

Hearing Tr. (Aug. 10, 2005), at 9.

724-25 (8th Cir. 1989). Entry into the settlement agreement made it impossible for PBGC decision-makers to exercise the independent judgement required of them.

First, as the record makes plain, the key participants in the settlement process -- Belt, Spencer, Cohen, and the Greenhill analysts

**[REDACTED]**

The decision-makers and analysts were committed to plan termination in other ways as well. As John Spencer's department stated in recommending termination, the agreement was "closely and carefully negotiated with United." SOMF ¶ 58 (AR 19). In fact, the negotiators spent **[REDACTED]** working on the deal. Having made such an investment of time and energy, the negotiators naturally would desire to see the deal fully consummated. Moreover, key participants in the negotiations should not also have been responsible for assessing the success of those negotiations.

The key decision-makers had also made up their minds that the settlement was in the best interests of the Agency. In announcing the settlement agreement, Bradley Belt stated that the settlement was "in the best interests of the pension insurance program and its stakeholders." SOMF

-30-

¶ 44 (PBGC Press Release at 1).[9/] John Spencer's Department and Greenhill also "believed that settlement of United's pension issues was in PBGC interests." SOMF ¶ 58 (AR 19). Having come to this conclusion, these decision-makers could not make the required independent and individual assessment of whether the Flight Attendant Plan should terminate under Section 4042.

PBGC's financial advisors at Greenhill also labored under a conflict of interest due to the $3 million completion fee contained in their retainer agreement with PBGC. The completion fee was to be paid for "the deal being done or a plan being confirmed." SOMF ¶ 4 (Kramer Dep. at 8). Thus, Greenhill had a financial incentive to insure that plan termination occur in order to effectuate the terms of the settlement agreement. In addition, as PBGC made plain, consummation of the settlement agreement would also facilitate United's ability to propose a plan of reorganization and exit bankruptcy. SOMF ¶ 57 (AR 32-33). In this sense as well, Greenhill had a financial motive to facilitate United's efforts to get a plan of reorganization confirmed and hasten receipt of the $3 million completion fee. As the administrative record shows, PBGC relied heavily on analysis performed by Greenhill in deciding to terminate the Flight Attendant Plan. Government decision-making tainted by "direct, personal, substantial, pecuniary interest" violates the most basic principles of fairness. Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 822 (1986); FTC v. Cement Inst., 333 U.S. 683, 702 (1948).

PBGC easily could have removed the taint of prejudgment and conflicts of interest through recusal of the settlement negotiators and decision-makers from the termination process. The

---

[9/]    Such public statements also "may have the effect of entrenching [an agency decision-maker] in a position which he has publically stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record." Cinderella Career & Finishing Schs., Inc., 425 F.2d at 590.

administrative record, however, does not indicate that recusal was ever proposed or considered.

Instead, those who negotiated the settlement were the same people who provided the analysis to

support plan termination, recommended termination on the basis of that analysis, and made the final

decision to terminate.[10]  As set forth fully below, the termination decision reached by these

interested parties is so riddled with inconsistency and patent error as to be obviously contrived and

result-oriented.  In the words of Greenhill analyst Michael Kramer:

> Q:    What changed between December of '04 when you signed your
>        affidavit, your declaration, and now that leads the PBGC to conclude
>        that the AFA pension plan should be terminated?
>
> [Objection to form]
>
> A:    I think what has changed in terms of the overall situation is there is
>        a negotiated settlement that has been reached between the PBGC and
>        the company with respect to all the issues between the two, that the
>        PBGC is comfortable and which it believes is acceptable to enter
>        into.

SOMF ¶ 47 (Kramer Dep. at 16-18).  Thus, the settlement agreement tainted the Agency's

termination process and deprived plan participants of the independent cause determination that

ERISA Section 4042 requires.

---

[10]        In arguing that the Settlement Agreement did not dictate the PBGC's decision to
terminate the Flight Attendant Plan, the Agency touts the fact that the TWG in this case consisted
"of people who previously had not been part of the decision to enter into the settlement agreement."
PBGC Summ. J. Mem. at 22.  In the next sentence, PBGC identifies the Executive Director as the
"decision-maker" regarding termination, but does not acknowledge that Mr. Belt played the same
role regarding the settlement agreement.  Obviously, if independence is required at the penultimate
stage of decision-making, then at least an equal, if not heightened, degree of impartiality is required
at the point of final approval.

II.    **The Reasons Given by PBGC for Terminating the Flight Attendant Plan are Fundamentally Unsound and Demonstrate That the Agency was Reaching for a Predetermined Result, Instead of Conducting the Independent Cause Determination Required by ERISA.**

Under the highly unusual circumstances of this case, the financial condition of the Flight Attendant Plan and its sponsor was not the only consideration that the Agency assessed in determining whether the Plan should terminate.  Instead, PBGC also considered a factor of its own making -- the settlement agreement.  As the Agency acknowledged, it could not be certain of enjoying the benefits of its bargain as a creditor if it did not conclude that the Flight Attendant Plan should be terminated.  As a result, each step PBGC took toward termination was dictated, or at a minimum tainted, by the settlement agreement.  The fruits of that taint were analyses fundamentally inconsistent with prior positions of the Agency, both in terms of the information necessary to make a termination decision and in terms of prior analysis of the need for, likelihood of, and timing of a Plan termination by United.  Such Agency "ad hocery" is arbitrary and capricious.  <u>Ramaprakash</u>, 346 F.3d at 1124.

A.    **The Agency's consideration of the settlement agreement in deciding to terminate the Flight Attendant Plan was contrary to ERISA.**

PBGC's consideration of the settlement agreement in deciding to terminate the plan was patently improper, because the agreement stands outside the statutory factors of ERISA Section 4042.  In its brief in support of summary judgment, PBGC does not even acknowledge, much less attempt to defend, the Agency's consideration of the settlement agreement as a ground for terminating the Flight Attendant Plan.  Instead, the Agency is entirely silent about this rationale, despite its prominence in the administrative record.  PBGC Summ. J. Mem. at 9-11, 16-20.  The

-33-

Agency's current silence on this issue is a tacit concession that the settlement agreement was an impermissible consideration under ERISA Section 4042.

The Agency's current silence contrasts with its prior heavy reliance on the settlement as an explicit ground for termination. As the Court recognized previously, "there can be no dispute when you look at the administrative record before the Court, that the settlement agreement was an integral part of the decision to terminate. The agreement in fact is cast as one of the principle arguments for compelling that result." Hearing Tr. (Aug. 10, 2005), at 34. In fact, throughout the termination process, the Agency acknowledged that it would only realize the benefits of the settlement agreement if all United's plans terminated. SOMF ¶¶ 56, 59 (AR 7, 28). DISC represented to TWG that:

> If PBGC did not terminate the [Flight Attendant Plan], PBGC could lose the benefit of the settlement agreement. Though hard to quantify precisely, DISC noted that the agreement had been closely and carefully negotiated with United and that Greenhill and DISC both believed that settlement of United's pension issues was in PBGC interests.

SOMF ¶ 58 (AR 19). The final agency recommendation to Director Belt unequivocally asserted:

> A significant increase to PBGC's long-run loss is present if Plan termination is delayed because such a delay places PBGC's Agreement at risk. The Agreement depends on PBGC taking over all four of United's underfunded Plans, including the FA Plan.

SOMF ¶ 59 (AR 7). In addition, the Agency reasoned that it should terminate the plan quickly in order to assist United in gaining exit financing, which in turn would enable the Company to maintain the exclusive right to file a bankruptcy plan of reorganization. SOMF ¶ 57 (AR 32-33). If United did not maintain exclusivity, the Agency worried that some other entity might propose a plan of

-34-

reorganization that would not include the recovery promised to PBGC under the settlement agreement.

The Agency's concern for its enhanced recovery under the settlement agreement (particularly as it relates to other plans and bankruptcy claims) and its focus on tactical bankruptcy considerations have no place in the Section 4042 analysis. Congress has explicitly defined for the Agency the factors to be considered in making its termination decision. 29 U.S.C. § 1342(a). The Agency is not at liberty to consider other factors in its termination decision. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider"). The settlement of claims and interests unrelated to the plan at issue are not among the factors that Congress directed the Agency to weigh. To the contrary, as discussed fully above, Section 4042 requires a determination based upon the individual plan. This is demonstrated both by the plain language of Section 4042 and the Agency's own construction of ERISA. Therefore, the Agency's consideration of recovery under the settlement related to other plans and unrelated claims and litigation is not a proper Section 4042 analysis.

In addition, according to the Agency, its roles as a regulator under ERISA and as a bankruptcy creditor are distinct and not to be intertwined. In its consideration of the bankruptcy benefits of the settlement, the distinction between the Agency's regulatory role in plan terminations and its creditor status broke down entirely. In these ways, PBGC's reliance on the settlement agreement to terminate the Plan violated ERISA as a matter of law. Agency action "not in accordance with law" cannot stand. 5 U.S.C. § 706(2)(A).

-35-

**B.    Even assuming that the Agency could consider the settlement, PBGC's analysis of the settlement was arbitrary and capricious.**

Even if it were somehow permissible for PBGC to consider the settlement agreement, the Agency needed to evaluate the settlement correctly and in a manner consistent with its analysis of the settlement during negotiations with United.  On May 12, Greenhill produced an analysis of the settlement agreement, which attempted to quantify the benefits of the agreement with respect to each of the claims resolved thereunder. Greenhill's May 12 analysis was inconsistent with Greenhill's own prior analysis of the settlement in two key respects:                        **[REDACTED]**

        **[REDACTED]**                    ; and (2) Greenhill treated a potential offset of $388 million in an inconsistent manner.  These inconsistencies indicate a result-oriented analysis intended to inflate the value of the settlement to the Agency.

The May 12 analysis assumed that termination of the Flight Attendant Plan was the only possible scenario,

**[REDACTED]**

**[REDACTED]**

In addition, as of May 12, when Greenhill presented its analysis of PBGC's recovery under the settlement agreement, PBGC's Counsel had not yet concluded that "PBGC would not likely be successful in litigation opposing the distress termination." SOMF ¶ 50 (AR 30). In fact, PBGC's Counsel reached its conclusion on the basis of Greenhill's later affordability analysis, which was not completed until May 18, 2005, nearly a week after the May 12 analysis. SOMF ¶ 50 (AR 30, 129). Thus, Greenhill inexplicably assumed that a distress termination was likely even though OCC had yet to reach that conclusion.

The May 12 settlement analysis is also skewed by Greenhill's inconsistent and erroneous handling of $388 million in potential PBGC liabilities. The $388 million approximates the additional liabilities that the Agency would incur if it lost litigation over the termination dates of the Pilots Plan and the Union Ground Plan. SOMF ¶ 69 (AR 140). The settlement agreement with United did not resolve the issue of the termination dates for these two plans.[11] Thus, <u>with or without</u> the agreement, PBGC faced a potential loss of $388 million.

**[REDACTED]**

Nevertheless, Greenhill's analysis only accounts for the $388 million loss under a "no settlement" scenario, as if the settlement agreement had resolved the

---

[11]    Under the terms of the settlement agreement, the termination date of the Pilots Plan remained unresolved. SOMF ¶ 42 (AR 94-95). With respect to the Union Ground Plan, as of June 10, 2005, PBGC and United had agreed that the Aircraft Mechanics Fraternal Association ("AMFA") could pursue a challenge to the termination date. SOMF ¶ 35. That litigation is on-going. <u>Id.</u>

termination-date litigation even though it did not. Plainly, Greenhill should have treated the $388 million as an offset in both its "no settlement" and "settlement" scenarios.

Greenhill's treatment of the $388 million was also inconsistent in another regard. All other litigation outcomes in the May 12 analysis are evaluated under a range of possible litigation outcomes, i.e., 100% PBGC litigation success, 50% success, and 0% success. In contrast, Greenhill did not assume a range of possible litigation outcomes with respect to the $388 million, and acted as if the only possible outcomes were PBGC losses in both termination-date cases. This failure to consider the possibility of PBGC success in this litigation is all the more egregious, given the Agency's own assessment that "based on the virtually unanimous body of case law on this issue, PBGC's proposed date of termination should prevail." SOMF ¶ 64 (PBGC Pilots Plan Br. at 2); see also                                   **[REDACTED]**


Greenhill's inconsistent handling of the $388 million in delayed termination liability is no small or inconsequential matter. In fact, if the $388 million had been correctly reflected the difference between the "no settlement" and "settlement" scenarios is greatly reduced. Under Greenhill's "best case scenario," PBGC would recover $40 million less under the settlement than without, with respect to the Flight Attendant Plan. SOMF ¶ 70. Under Greenhill's "more realistic scenario," the net benefit of the settlement with respect to the Plan decreases by $84 million to $39 million. SOMF ¶ 71. PBGC acted arbitrarily and capriciously in relying on Greenhill's inconsistent and clearly erroneous settlement analysis.

C.     **PBGC acted arbitrarily and capriciously in relying upon an affordability analysis performed without information identified as crucial by the Agency and without consideration of important aspects of affordability issue.**

As part of the termination process, Greenhill issued a memorandum dated May 18, assessing the affordability of United's pension plans. The May 18 analysis provided the key underpinning for PBGC's termination decision.  The analysis, however, was so fundamentally flawed -- under the Agency's own standards -- that PBGC's reliance on it was arbitrary and capricious.  In fact, the flaws in the analysis are so basic and pervasive that the Agency's reliance can only be explained as the product of a result-oriented approach to plan termination, as opposed to an independent assessment of the relevant facts.

The first and most fundamental flaw in the May 18 analysis is that it was performed without information that the Agency itself previously identified as crucial to an affordability analysis of United's pension plans.  To survive review under the APA, an agency must "examine the relevant data." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  Here, the Agency defined the relevant data needed to undertake its affordability analysis.  Nevertheless, the Agency proceeded without that data, and without any explanation of its sudden departure from its prior position.

On April 14, 2005 (a month prior to the Greenhill's May 18 affordability analysis), PBGC defined the relevant data needed to determine the affordability of United's pension plans in a bankruptcy court filing.  PBGC stated to the court that the Agency could not make a determination as to whether the Company could afford its pension plans on the basis of the then-current business plan, Gershwin 5.F, and without a bankruptcy plan of reorganization.  SOMF ¶ 40 (AR 613).  The Agency further asserted:

> For instance, vital decisions regarding fleet planning, negotiations with the public debt group, and contracting with United's regional partners remain to be resolved. <u>Until the Debtors can provide final answers to these critical issues and their impact on United's financial projections, PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy, and it will be impossible for this Court to decide what the restructured United can or cannot afford.</u>

SOMF ¶ 40 (AR 613-14) (emphasis added).  According to PBGC, only with such information would "a fully-developed record" exist.  SOMF ¶ 40 (AR 615).

Similarly, on May 5, 2005, Michael Kramer of Greenhill defined the data that he would need to perform an updated analysis of the affordability of United's pension plans.  During a deposition, Mr. Kramer testified:

> Q:    What analysis would you need to do decide today whether your opinion has changed since the declaration?

> A:    I think what we would like to do is understand more from the company what they believe their projected operating results would be going forward based upon, for example, fuel prices, and what modifications they would make to their business to offset some of those costs.

SOMF ¶ 47 (Kramer Dep. at 28-29).  Thus, both PBGC and Mr. Kramer were very clear and explicit regarding the information needed to determine whether or not United could afford its plans.

As of May 18, however, United had not produced a revised business plan, had not filed a plan of reorganization, and had not completed work on such issues as fleet planning, negotiations with the public debt group, and contracting with regional partners.  SOMF ¶ 66 (UAL Aug. 2005 Status Report at 2-3, 9).  As PBGC was aware, however, all of that information would soon be available.  PBGC knew that United anticipated completion of a revised business plan by July 31, 2005.  SOMF ¶ 66 (AR 612).  Nevertheless, Greenhill performed its May 18 affordability analysis without any of the information previously identified by the Agency and Mr. Kramer as crucial.

Although PBGC's April 14 court filing was part of the administrative record, the Agency made no attempt in its termination decision to explain how it could rely on an affordability analysis made without the information identified on April 14. Nor did Greenhill explain how it could revise Mr. Kramer's prior assessment without the information identified by him as necessary for such a reassessment.

Had PBGC waited for United to produce the information crucial to an affordability analysis, the results of Greenhill's analysis would have been markedly different. For example, Gershwin 5.F assumed that United would obtain $2 billion in exit financing. United later revealed that it has sought $2.5 billion in exit financing and has commitments for up to $3 billion. SOMF ¶ 67 (UAL Aug. 2005 Status Report at 2). In addition, Gershwin 6.0 assumed fuel costs of $50.00 per barrel, and offsets sufficient to absorb those costs and insure profitable operations. SOMF ¶ 68 ("UAL Says It Plans A February Exit From Bankruptcy"). Plainly, such information would have radically altered Greenhill's May 18 affordability analysis, which lacked all of this information previously identified as essential.

Not only did Greenhill perform its analysis without the information identified as critical, but the May 18 analysis also failed to consider pertinent information then known to the Agency. As a result of the settlement agreement, PBGC knew that United could afford to pay out $1.5 billion in notes. Yet, the May 18 affordability analysis never considered whether the assets represented by the $1.5 billion in notes were sufficient to maintain the Plan. In fact, AFA's proposal to maintain the Plan called for such notes (although United had refused to give them), and AFA had already argued in the distress termination proceeding that the availability of $1.5 billion in notes showed that United could afford the Plan. Nevertheless, in making the termination decision, PBGC never

considered whether the $1.5 billion in notes could have prevented plan termination, ultimately to the benefit of both the Agency and Plan participants. In "fail[ing] to consider an important aspect of the problem," the Agency acted arbitrarily and capriciously. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

Lastly, with respect to the key topic of fuel prices, Greenhill's May 18 analysis was also fundamentally at odds with the conclusions reached in Michael Kramer's December 28, 2004 declaration. In the earlier declaration, Kramer considered a downside fuel scenario and still concluded that United could afford one or more of its plans. SOMF ¶ 18 (AR 839, 915). In contrast, the May 18 analysis assumed fuel prices lower than the earlier downside analysis, and yet reached the opposite conclusion that United could not afford any of its plans. The May 18 memorandum does not explain why Greenhill changed its view of the impact of downside fuel projections on United's ability to afford its plans. Such inexplicable inconsistency is the hallmark of arbitrary and capricious agency action. The failure to perform a consistent analysis is also very significant given the centrality of fuel prices to Greenhill's revised affordability analysis.

> ### D. The Agency's findings based upon the flawed affordability analysis are equally unsound.

On the basis of the May 18 affordability analysis, PBGC made two findings under Section 4042. First, PBGC determined that the Flight Attendant Plan would be unable to pay benefits when due under Section 4042(a)(2). Second, the Agency determined that it would suffer a long-run loss with respect to the Plan under Section 4042(a)(4) due to monthly benefit accruals of $3.3 million. Both findings partake of the flawed affordability analysis and for that reason cannot withstand scrutiny.

In terminating the Flight Attendant Plan, PBGC determined that the Plan would be unable to pay benefits when due because the Plan was 42% underfunded and United had refused to make further contributions to the Plan.  SOMF ¶ 60 (AR 7).  PBGC, however, was aware of these facts for nearly a year prior to the termination decision and had consistently maintained that the Flight Attendant Plan was nonetheless sustainable.  The Agency changed course only after the settlement and Greenhill's revised affordability analysis.

### [REDACTED]

On July 23, 2004, United announced in a press release that it would no longer make funding payments to its plans during bankruptcy.  SOMF ¶ 11 (AR 60-61).  Thus, as of July 23, 2004, PBGC knew both that the Flight Attendant Plan had an underfunding ratio of 45% and that United did not intend to make further contributions to the Plan during bankruptcy.  Nevertheless, beginning in December 2004, PBGC took the position that United could and should maintain the Plan, despite its underfunded ratio and United's refusal to make further payments.  Only after entering the settlement agreement and receiving the revised affordability analysis did PBGC move to terminate the Plan, citing its underfunded status and United's refusal to make payments.

Similarly, PBGC was long aware that pension liabilities under the Flight Attendant Plan continued to accrue steadily, as always occurs unless a plan is frozen.  In fact, the Agency calculated that the unfunded liabilities of the plan were $1.5 billion as of July 31, 2004, and had grown to $1.8 billion as of January 31, 2005.  SOMF ¶ 62 (Pilots Plan AR 17; Union Ground Plan AR 16).

Nevertheless, the Agency continued to insist that the Plan not terminate up

-43-

until the time it entered the settlement and conducted its May 18 affordability analysis. Thus, the revised affordability analysis undertaken after the settlement agreement apparently caused the Agency to change its view of facts previously known. Because the affordability analysis was flawed, however, the Agency's determinations based on that analysis are equally deficient.

       **E.**    **The Agency's finding of a long-run loss due to benefit increases of $3.3 million per month is inexplicably inconsistent with the Agency's prior position as represented to this Court.**

PBGC's determination that the Agency would face a long-run loss due to additional liabilities of $3.3 million per month is also deeply flawed for another reason. This determination simply ignored the Agency's prior determination that, absent a Section 4042 termination by PBGC, United would seek to terminate the Plan retroactive to June 30, 2005. There were only two possible outcomes with respect to the Plan, as acknowledged by the Agency: (1) PBGC could terminate; or (2) if PBGC did not terminate, United would resuscitate its distress termination motion seeking termination retroactive to June 30, 2005. If the latter occurred and United's motion succeeded, the Plan would be terminated as of June 30, 2005. If United's motion did not succeed, then the Plan would not terminate at all. Thus, even if PBGC declined to terminate, any Plan termination would be effective June 30, 2005. Thus, the Agency faced no risk of a long-run loss due to monthly increases in Plan liabilities after June 30.

In fact, at the June 3 hearing in this case, the Court questioned PBGC regarding the possibility that the Agency would incur a run-up of losses if the Court were to prevent PBGC from proceeding with its termination process. In response, PBGC Counsel informed the Court that the Agency would not be subjected to a run-up of liabilities because inaction by PBGC would simply prompt United to "resuscitate" its distress termination. SOMF ¶ 51 (Hearing Tr. at 9-12). As

-44-

counsel explained, the United distress termination would be retroactive to June 30, 2005.[12] Id.

Despite PBGC's stated position, the Agency decision-makers somehow failed to appreciate that if

United were to terminate the Flight Attendant Plan it would do so as of June 30, and thus there

would be no run-up in liabilities for the Agency.[13]

<u>CONCLUSION</u>

For the all the foregoing reasons, AFA respectfully requests that the Court grant its motion

for summary judgment and set aside PBGC's plan termination decision.

Respectfully submitted,

/s/ Robert S. Clayman
Robert S. Clayman, D.C. Bar No. 419631
Carmen R. Parcelli, D.C. Bar. No. 484459
Guerrieri, Edmond, Clayman & Bartos, P.C.
1625 Massachusetts Avenue, N.W., Ste. 700
Washington, DC 20036-2243
(202) 624-7400

Counsel for Association of Flight
Dated: October 24, 2005          Attendants-CWA, AFL-CIO

---

[12]     THE COURT:  Assuming [United] went through the 1341 . . . proceeding, it would
be basically retroactive back to 6/30/05?

MR. FINKE:   Correct.

SOMF ¶ 51 (Hearing Tr. at 11).

[13]     In its summary judgment memorandum, PBGC asserts for the first time that the
Agency "reasonably concluded that it was likely that the FA Plan would terminate in the not-too-
distant future, and that the date on which the Plan would terminate would be near the exit date
(which at that time was projected to be sometime in September)."  PBGC Summ. J. Mem. at 18.
PBGC, however, cites no portion of the administrative record in which the Agency concluded that
United would not terminate the Plan until a September exit date, and AFA is unable to identify any
such conclusion.  Post hoc rationalizations cannot be used to support Agency action.  <u>Fla. Mun.
Power Agency</u>, 411 F.3d at 291.

**<u>NOTICE OF FILING UNDER SEAL</u>**

Plaintiff filed under seal an unredacted version of its Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment with the Court this 24th day of October, 2005.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 24, 2005, I electronically filed Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment using the CM/ECF system.  I further certify that on October 24, 2005, a true and correct copy of the same was served by electronic mail on:

Jeffrey B. Cohen
Chief Counsel
Pension Benefit Guaranty
  Corporation
1200 K Street, N.W.
Washington, D.C.  20005
cohen.jeffrey@pbgc.gov

Attorney for defendant PBGC

/s/ Robert S. Clayman
Robert S. Clayman