IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS – CWA, AFL-CIO, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 1:05CV01036 (ESH) |
| v. | ) ) ) | |
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) ) | |
| Defendant. | ) ) ) | |

**PENSION BENEFIT GUARANTY CORPORATION'S OPPOSITION
TO THE ASSOCIATION OF FLIGHT ATTENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Date: November 4, 2005

JEFFREY B. COHEN, DC Bar #347880
Chief Counsel
CHARLES L. FINKE
NANCY HEERMANS, DC Bar #291757
Associate Chief Counsels
JOHN A. MENKE, DC Bar #370540
PAULA CONNELLY, DC Bar #389055
Assistant Chief Counsels
SHANNON L. NOVEY, DC Bar #476277
ANDREA M. WONG, DC Bar #449128
DEVA KYLE
Attorneys
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, NW, Suite 340
Washington, D.C. 20005-4026
(202) 326-4020, ext. 3848 (telephone)
(202) 326-4112 (facsimile)
Wong.Andrea@pbgc.gov & efile@pbgc.gov

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PBGC'S DECISION TO TERMINATE THE FA PLAN WAS NOT ARBITRARY
      AND CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    THE SETTLEMENT AGREEMENT DID NOT "TAINT" PBGC'S
            TERMINATION DECISION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    IN ITS ROLE AS A REGULATOR, PBGC SOMETIMES
            MUST TERMINATE A PENSION PLAN TO AVOID AN INCREASE
            IN THE AGENCY'S RISK OF LONG-RUN LOSS. . . . . . . . . . . . . . . . . . . . . . 5

      C.    PBGC'S ANALYSIS WAS REASONABLE AND IS SUPPORTED
            BY THE ADMINISTRATIVE RECORD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

TABLE OF AUTHORITIES

**Cases Cited**

*AFA v. PBGC*,
       372 F. Supp. 2d 91 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*ALPA v. PBGC*,
       193 F. Supp. 2d 209 (D.D.C. 2002),
       *aff'd*, 334 F.3d 93 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
       463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*\*PBGC v. Republic Technologies, Inc.*,
       386 F.3d 659 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*PBGC v. UAL and ALPA*,
       No. 05A-00481 (Bankr. N.D. Ill. Oct. 26, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Rettig v. PBGC*,
       744 F.2d 133 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*\*In re UAL Corp.*,
       2005 WL 2848938 (7th Cir. Nov. 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 8

**United States Codes Cited**

Title 11
       Section 1113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Title 29
       Section 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
       Section 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7
       Section 1342(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
       Section 1342(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
       Section 1342(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7
       Section 1342(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*\*Authorities upon which we chiefly rely are marked with an asterisk.*

**INTRODUCTION**

This suit challenges the determination of the Pension Benefit Guaranty Corporation ("PBGC") that the Flight Attendants' Pension Plan ("FA Plan") should terminate, and not the provisions of the settlement agreement between PBGC and United Airlines, Inc.("Settlement Agreement"), which the Association of Flight Attendants ("AFA") already has litigated without success before the Seventh Circuit.  AFA nonetheless attempts to challenge the Settlement Agreement here in the guise of asserting that it "tainted" PBGC's termination decision.  It did not.  The only question before this Court is whether PBGC's termination decision was arbitrary and capricious.  It was not.  Accordingly, the Court should grant PBGC's motion for summary judgment and deny AFA's cross-motion for summary judgment.

**ARGUMENT**

**PBGC'S DECISION TO TERMINATE THE FA PLAN
WAS NOT ARBITRARY AND CAPRICIOUS**

AFA makes three general arguments supporting its claim that PBGC's termination of the FA Plan was improper.  First, it asserts that the Settlement Agreement so corrupted the termination process that the FA Plan could not be terminated.  Second, it argues that PBGC's statutory mission of encouraging the maintenance of defined benefit pension plans trumps the involuntary termination provision in 29 U.S.C. § 1342.  Finally, AFA argues that even if PBGC was allowed to consider terminating the FA Plan, the agency did not show that it would suffer a long-run loss if the FA Plan was not terminated.  As shown below, each of these arguments is wrong.

### A.    THE SETTLEMENT AGREEMENT DID NOT "TAINT"
###        PBGC'S TERMINATION DECISION.

The negotiations underlying the Settlement Agreement between PBGC and United

Airlines Inc. and its controlled group ("United") are not relevant to PBGC's decision to terminate

the FA Plan.  Accordingly, PBGC does not address the lengthy discussion of the parties'

negotiating positions and proposals that occupies the first 20 pages of AFA's brief, though the

agency disputes much of it.  To the extent the Settlement Agreement is relevant at all, its terms in

their final form – the only version that can be reviewed – are entirely appropriate and consistent

with the law, and they in no way tainted PBGC's subsequent termination decision.[1]

AFA argues that PBGC's entry into the Settlement Agreement "made it impossible" for

agency officials to exercise independent judgment regarding the involuntary termination of the

FA Plan.[2]  AFA argues that PBGC officials were willing to (or believed that they could)

"terminate an affordable plan," based on the fact that United's advisors told PBGC in February

2005 that the FA Plan was "mathematically supportable."[3]  As documented in the Administrative

Record of the termination decision, however, PBGC's advisors, Greenhill & Co., concluded in

---

[1] As the Seventh Circuit held this week in affirming the bankruptcy court's approval of the Settlement Agreement, "the path taken by United and PBGC" in the Settlement Agreement was "entirely appropriate," and the Agreement "did not require PBGC to terminate the plan." Instead, "PBGC was to consider 'if' a § 1342 termination was appropriate.  The termination was not preordained." *In re UAL Corp.*, 2005 WL 2848938 (7th Cir. Nov. 1, 2005) at **2, 4.

[2] AFA brief at 29.

[3] AFA brief at 30.

May 2005 that the FA Plan was likely *not* affordable.[4]  Once the FA Plan appeared destined to

terminate, PBGC had the right, if not the statutory obligation, to limit its liability.

AFA nevertheless cites PBGC officials' statements that the *Settlement Agreement* was in

the best interests of the agency to suggest that they could not thereafter make an independent

determination of whether involuntary termination was warranted.[5]  But as this Court has already

recognized, and as the Seventh Circuit reaffirmed, the Settlement Agreement did not compel the

Plan's termination, but rather, required PBGC to initiate its process to determine whether there

was cause for termination.[6]  If PBGC had not found that grounds existed to involuntarily

terminate the FA Plan, United could have revived its motions under sections 1113 and 1341 to

reject its collective bargaining agreement and terminate its pension plans.[7]  This would have been

entirely consistent with the Settlement Agreement.

AFA additionally argues that "the settlement agreement violates the basic principle of

plan-by-plan termination decisions under ERISA."[8]  Again, this suit is *not* a challenge to the

Settlement Agreement.  AFA has now had its day in three courts on that challenge.  In any event,

---

[4]  AR-129.  Even if PBGC had believed the FA Plan was affordable, inability to afford is a statutory requirement in the distress termination of a plan under section 1341, but not in an involuntary termination under either section 1342(a)(2) or (a)(4).  Therefore, PBGC could have proceeded under section 1342 even if it had not had the updated analysis from Greenhill.

[5]  AFA brief at 30-31.

[6]  *AFA v. PBGC*, 372 F. Supp. 2d 91, 98 (D.D.C. 2005); *accord In re UAL Corp.*, 2005 WL 2848938 at *2.

[7]  For the same reason, the prospect of a completion fee for PBGC's financial analysts contingent on "the deal being done or a plan [of reorganization] being confirmed" did not taint the analysis they provided the agency.  AFA brief at 31.

[8]  AFA brief at 28.

the Administrative Record of the termination decision belies AFA's suggestion that the FA Plan

was not considered independently.  PBGC staff analyzed the FA Plan on its own merits before

the agency's Trusteeship Working Group.[9]  That group – comprised of interdisciplinary

professionals who were not involved in the Settlement Agreement – considered the FA Plan and

made a termination recommendation to the Executive Director,[10] who made a decision that

specifically applied only to the FA Plan.[11]  AFA's baseless suggestion otherwise must be

rejected.

Finally, in its single-minded focus on the FA Plan, AFA asserts that termination of that

plan was "the core bargaining chip" in the Settlement Agreement.[12]  This is simply false.  First,

as both this Court and the Seventh Circuit have held, "the Agreement's plain language [did] not

compel the [FA] plan's termination."[13]  It only required PBGC to initiate its internal processes to

determine whether there was cause for termination.  AFA's concomitant assertion that PBGC

"violated ERISA" by not insisting that United keep the FA Plan[14] is specious as well.  ERISA

does not require that PBGC ignore its financial health and the interests of the other various

stakeholders of the pension insurance system; indeed PBGC acts properly when it weighs all

these interests in its decision making process.

---

[9]  AR-25 to AR-165.

[10]  AR-2 to AR-4, AR-9 to AR-24.

[11]  AR-1.

[12]  AFA brief at 24.

[13]  372 F. Supp. 2d at 98; *accord In re UAL Corp.*, 2005 WL 2848938 at *2.

[14]  AFA brief at 26.

Second, the Settlement Agreement resolved a myriad of complex and vigorously-contested issues between PBGC and United.  PBGC provided an assortment of valuable consideration to United completely unrelated to termination of the FA Plan.  Among other provisions, PBGC compromised its recovery on its $10 billion joint and several claims for pension underfunding; its administrative claims for missed minimum funding contributions; its right to government set-off against United's tax refunds; its liens against non-debtor entities; and its claims relating to insurance premiums.  Additionally, it agreed to a mechanism to review United's proposed replacement plans and waive its restoration rights; it agreed to dismiss its appeal of an agreement between United and the Air Line Pilots Association; and it agreed to a mechanism to resolve fiduciary breach claims.

In sum, provisions regarding the termination of United's pension plans were but one facet of this comprehensive settlement.  And the provision requiring PBGC to initiate its termination process with respect to the FA Plan did not compromise or taint PBGC's ultimate termination decision in any way.

## B.  IN ITS ROLE AS A REGULATOR, PBGC SOMETIMES MUST TERMINATE A PENSION PLAN TO AVOID AN INCREASE IN THE AGENCY'S RISK OF LONG-RUN LOSS.

AFA argues that PBGC has an "overarching statutory objective . . . to preserve the benefits of plan participants."[15]  AFA's vision of the federal pension termination insurance program does not comport with reality.  If PBGC's sole mandate was to preserve the ongoing benefits of plan participants, the agency would be forbidden from ever terminating a plan, since

---

[15]  AFA brief at 23.

termination results in cessation of benefit accruals and reduction in certain benefits. This is not the law.

Instead, in its role as a regulator, PBGC is statutorily authorized to seek termination of pension plans when certain criteria are present, including to avoid an unreasonable increase in the insurance fund's risk of long-run loss due to a pension plan's continuation.[16] Of course, termination of a plan on such grounds typically results in greater recovery for PBGC than the agency would receive if the plan remained ongoing for a longer period of time. But this is what Congress envisioned, and pursuing such a termination does not transform PBGC from the role of regulator to the role of creditor or somehow taint its termination decision. As the Sixth Circuit recently recognized in *PBGC v. Republic Technologies, Inc.*:

> ERISA provides for involuntary termination proceedings precisely so that PBGC can protect its own financial interests and "avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the [PBGC insurance] fund." 29 U.S.C. § 1342(c).[17]

Accordingly, PBGC did not, as AFA contends, "impermissibly mi[x] its regulator and creditor roles,"[18] but rather, carried out the complex statutory duties that Congress assigned to it.

Finally, AFA's reliance on the D.C. Circuit's *Rettig* decision to challenge PBGC's termination decision as violative of the agency's statutory purposes is entirely misplaced.[19] *Rettig* was a suit brought more than twenty years ago by a class of plan beneficiaries who were denied *all* benefits through the application of an early PBGC regulation. The case did not

---

[16] 29 U.S.C. § 1342(a)(4).

[17] 386 F.3d 659, 668 (6th Cir. 2004).

[18] AFA brief at 27.

[19] AFA brief at 26, *citing Rettig v. PBGC*, 744 F.2d 133 (D.C. Cir. 1984).

involve an analysis of PBGC's risk of long-run loss absent plan termination, or indeed any issue

involving plan termination.  In analyzing the benefit issue, the Court emphasized ERISA's

purpose of protecting "a *measure* of retirement security"[20] via PBGC's payment of guaranteed

benefits.  But in the instant case, PBGC without question is paying guaranteed benefits under the

Plan – the "measure of retirement security" that the *Rettig* Court described.  Accordingly, this

decision is entirely inapposite.

**C.      PBGC'S ANALYSIS WAS REASONABLE AND IS
         SUPPORTED BY THE ADMINISTRATIVE RECORD.**

Although AFA asserts many and varied challenges to PBGC's analysis under sections

1342(a)(2) and (a)(4), it does not and cannot demonstrate a failure by the agency to "examine the

relevant data and articulate a satisfactory explanation for its action, including a 'rational

connection between the facts found and the choice made.'"[21]  PBGC's termination decision, far

from being arbitrary and capricious, was thoroughly reasonable and is fully supported by the

Administrative Record.

AFA begins by challenging PBGC's consideration of the Settlement Agreement at all in

reaching its decision to terminate the FA Plan, asserting that the Settlement Agreement "stands

outside the statutory factors of ERISA section 4042."[22]  But section 4042(a)(4) specifically

authorizes PBGC to terminate a plan when "the possible long-run loss of [the agency] with

---

[20]   744 F.2d at 155 (emphasis added).

[21]   *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *accord ALPA v. PBGC*, 193 F. Supp. 2d 209, 220 (D.D.C. 2002), *aff'd*, 334 F.3d 93 (D.C. Cir. 2003)  (in reviewing PBGC's decision to terminate a plan under 29 U.S.C. § 1342, "the court must consider whether the PBGC based its determination on a consideration of the relevant factors and whether there has been a clear error of judgment").

[22]   AFA brief at 33.

respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated."[23]

At the time PBGC considered terminating the FA Plan, the Settlement Agreement indisputably was part of the financial landscape affecting the company, the agency, and the agency's liabilities with respect to the FA Plan. Greenhill analyzed PBGC's potential recovery both with and without the Settlement Agreement, and advised PBGC that under any reasonable scenario, PBGC would likely recover considerably less with respect to the FA Plan absent the Settlement Agreement.[24] PBGC was entirely reasonable in considering this issue.

Indeed, if PBGC had *not* assessed the impact of the Settlement Agreement, it might well have "entirely failed to consider an important aspect of the problem," which is one hallmark of arbitrary and capricious agency action.[25] By June 2005, AFA already had initiated this lawsuit and unsuccessfully sought a preliminary injunction, asserting that the Settlement Agreement impermissibly tainted any termination decision PBGC might make. If PBGC staff had not discussed the impact of the Settlement Agreement in the Administrative Record, AFA undoubtedly would have attacked that as a failure to consider relevant information.

AFA next challenges PBGC's substantive analysis of the Settlement Agreement. AFA questions the assumption in Greenhill's May 12, 2005 recovery analysis that the FA Plan would terminate, when it did not make this assumption in its analyses on March 18 and March 22.[26]

---

[23] 29 U.S.C. § 1342(a)(4). *See also In re UAL Corp.*, 2005 WL 2848938 at *2 ("Congress authorized PBGC to terminate a failing plan so that PBGC could nip a plan's increasing losses and thereby reduce PBGC's exposure to mounting liabilities.").

[24] AR-135 to AR-150.

[25] *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

[26] AFA brief at 36, citing AR-S- 4520-54 (March 18) and AR-S-4556 (March 22).

This is easily understood:  PBGC's earlier position had been that the Plan was affordable and should not terminate, but by May 2005, the agency believed that it would be very difficult to establish that the FA Plan was affordable, and therefore that it was destined to terminate.[27]

AFA also challenges Greenhill's approach in estimating PBGC's recoveries under the Settlement Agreement, because it assumed that PBGC would prevail on the termination dates it sought for two other United Plans under the "consensual" scenario, but that PBGC would not prevail under the "contested" scenario.  However, as the Administrative Record recites, this component of long run loss is "difficult to measure," and the agency did not rely on a specific number to justify its case under section 1342(a)(4).[28]

It is always difficult to assess the effect of one variable on the outcome of litigation.  But at the time of the Settlement Agreement, United was vigorously opposing termination of the Pilot and Ground plans in ongoing litigation.  Because of the Settlement Agreement, United signed a trusteeship agreement with PBGC terminating the Ground Plan and appointing PBGC statutory trustee, and ceased its involvement in litigation on that case.  Similarly, United took an essentially passive role in the Pilot Plan litigation.  While both suits continued between PBGC and the employee groups, PBGC believed its chances of prevailing in these cases improved significantly.  PBGC notes that the court in the Pilot termination recently ruled in favor of PBGC and its effort to avoid tens of millions of dollars in increased costs for that plan.[29]

---

[27]  The fact that PBGC did not document this belief in writing until May 18 (*see* AFA brief at 36), hardly invalidates the recovery analysis.

[28]  AR-32 to 33.

[29] *PBGC v. UAL and ALPA*, No. 05A-00481 (Bankr. N.D. Ill. Oct. 26, 2005) (Attachment 1 hereto).  Even if AFA's critique of the Greenhill analysis were to be accepted in whole, AFA concludes: "Under Greenhill's 'more realistic scenario,' the net benefit of the settlement with

AFA additionally challenges Greenhill's May 18 affordability analysis because it was
completed without the benefit of a business plan or proposed plan of reorganization, when PBGC
earlier stated that those documents were needed to evaluate the company's distress termination
application. Although for a number of reasons PBGC's position in April 2005 was that a distress
application should not proceed in the bankruptcy court at that time, the agency was not thereby
constrained to sit idly by and absorb increasing losses as it appeared ever-clearer that the FA Plan
was likely to terminate. Accordingly, in May 2005, PBGC asked Greenhill to prepare an
affordability analysis with the data that was available to it, and that analysis, together with the
other factors set forth in the record, prompted PBGC to go forward with the termination.[30]

AFA next argues that Greenhill used lower fuel prices in its May 2005 analysis than in its
December 2004 analysis, yet still came to the opposite conclusion – that the FA Plan was
unaffordable.[31] On this point, AFA is just factually wrong. The fuel prices in the May 2005
analysis actually were higher than those in the December 2004 analysis with the exception of one

---

respect to the Plan decreases by $84 million to $39 million." AFA Brief at 38. PBGC submits
that under any reasonable interpretation, $39 million is an unreasonable increase in the loss to the
PBGC fund, and the section 1342(a)(4) criteria are still met. *See, e.g., PBGC v. UAL and ALPA,*
*supra* (Attachment 1 hereto) at p. 8 (finding that an increase of $44 million constituted an
unreasonable increase sufficient to warrant termination under section 1342(a)(4)).

[30] AFA asserts that "PBGC never considered whether the $1.5 billion in notes [payable to
PBGC under the Settlement Agreement] could have prevented plan termination," even though
AFA concedes that "United had refused to give [such notes]" for purposes of maintaining the
Plan. AFA brief at 41. No conceivable construction of the arbitrary and capricious standard
requires PBGC or this Court to speculate about whether completely different actions, if taken by
United, could have led to a different outcome.

[31] AFA brief at 41-42.

year, 2005.[32]  In the critical years of 2006 and beyond, the May analysis shows fuel prices much

higher than even the worst case scenario in the December analysis.

Additionally, AFA challenges PBGC's finding that if it did not obtain plan termination as

of June 30, 2005, the agency could reasonably face approximately $10 million in additional

liabilities – $3.3 million per month from June through September (when additional termination

grounds would arise under 29 U.S.C. § 1342(a)(4) due to United's well-documented position that

it would not make a required contribution to the FA Plan).[33]  AFA argues that if PBGC had not

brought its termination action, United would have revived its distress termination motion with a

June 30 termination date; thus there was no reason to measure the agency's loss through

September.[34]  First, even if United did revive its distress termination motion, it might not have

prevailed on June 30, 2005 as the termination date.  The only way for PBGC to ensure the

June 30 date was to initiate involuntary termination.

In any event, PBGC could not know what United would have done if the agency did not

bring or prevail in the involuntary termination as of June, but the agency certainly would not

have had to await the actions of a third party to stem its mounting losses.  AFA provides no

---

[32]  *Compare* AR-130 *to* AR-838.

[33]  AFA brief at 43-44.  AFA asserts that PBGC did not articulate the rationale underlying this $10 million increase in the Administrative Record.  AFA is wrong.  PBGC staff specifically informed the agency's Trusteeship Working Group that "if PBGC does not issue a [Notice of Determination terminating the Plan] until United has missed its 2005 catch-up payment, PBGC will be required to use a plan termination date of September 23, 2005, increasing the liability to the fund by nearly $10 million." AR-32.  United did in fact miss its September 2005 catch-up payment, which would provide an additional ground for termination under 29 U.S.C. § 1342(a)(1) in the event that the Court were to find PBGC's analysis insufficient and remand the case to PBGC.

[34]  AFA brief at 44.

reason why PBGC would not have brought a termination action in September 2005 if United did not revive or prevail on its distress application, and there is none. Thus, it was eminently reasonable for PBGC to measure its potential liability under this scenario in assessing its risk of long-run loss.

Finally, AFA challenges PBGC's conclusion under section 1342(a)(2) that the FA Plan would be unable to pay benefits when due by arguing that these grounds had likely existed for months prior to PBGC's decision to terminate. Even if AFA is correct, this Court is assessing whether PBGC's decision that termination grounds existed on June 30 is arbitrary or capricious. Whether grounds also existed earlier is irrelevant; under section 1342(a), PBGC has discretion over when – and indeed whether – to initiate a termination action. For all the reasons stated in PBGC's initial memorandum, PBGC's determination is supported by the record, and is not arbitrary or capricious.

**CONCLUSION**

AFA's many critiques of PBGC's determination fail to identify a single ground on which

it may be invalidated as arbitrary and capricious.  Because PBGC's decision is fully supported by

the record, it should be upheld.  The Court should grant PBGC's motion for summary judgment

and deny AFA's cross-motion for summary judgment.


Date:  November 4, 2005                    Respectfully submitted,


  /s/ Andrea M. Wong
JEFFREY B. COHEN, DC Bar #347880
Chief Counsel
CHARLES L. FINKE
NANCY HEERMANS, DC Bar #291757
Associate Chief Counsels
JOHN A. MENKE, DC Bar #370540
PAULA CONNELLY, DC Bar #389055
Assistant Chief Counsels
SHANNON L. NOVEY, DC Bar #476277
ANDREA M. WONG, DC Bar #449128
DEVA KYLE
Attorneys
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, NW, Suite 340
Washington, D.C.  20005-4026
(202) 326-4020, ext. 3848 (telephone)
(202) 326-4112 (facsimile)
Wong.Andrea@pbgc.gov & efile@pbgc.gov