IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, | ) ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil Action No. 1:05CV01036 |
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) ) ) |  |
| Defendant. | ) ) |  |

**PLAINTIFF'S REPLY IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

**[REDACTED VERSION]**

Robert S. Clayman, D.C. Bar No. 419631
Carmen R. Parcelli, D.C. Bar. No. 484459
Guerrieri, Edmond, Clayman & Bartos, P.C.
1625 Massachusetts Ave., N.W.
Suite 700
Washington, D.C. 20036-2243
(202) 624-7400

Dated: November 18, 2005

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................... ii

INTRODUCTION................................................................................................ 1

ARGUMENT....................................................................................................... 2

    I.       PBGC Argues That the Administrative Record Is Limited to the Termination Decision, Even Though this Court Has Already Determined That the Administrative Record in this Case Includes the Negotiations That Led to the Settlement Agreement.................. 2

    II.      By Ignoring an Entire Portion of the Administrative Record, PBGC Does Not Even Acknowledge, Much less Grapple with the Effects the Settlement Negotiations Had on Its Decision to Terminate the Flight Attendant Plan................................................ 4

    III.     PBGC Fails to Explain the Inconsistencies, Illogic, and Bias That Permeate the Agency's Termination Decision Due to its Result-Oriented Approach to Terminating the Plan..................................... 7

          A.      PBGC fails to establish that the settlement agreement was a proper basis for termination under ERISA Section 4042, and its attempt to explain the flaws in Greenhill's May 12 analysis of the settlement is unavailing................................ 7

          B.      PBGC cannot explain the inconsistency and illogic of Greenhill's affordability analysis.......................................... 10

          C.      PBGC does not address its inconsistent positions regarding the risk of increased losses due to the accrual of benefits under the Plan............................................................ 13

CONCLUSION................................................................................................... 16

## TABLE OF AUTHORITIES

**Federal Cases**

Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,
    426 U.S. 493 (1976)...................................................................................... 10

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto Ins. Co.,
    463 U.S. 29 (1983)................................................................................. 7, 9, 13

Wisc. Valley Improvement Co. v. FERC,
    236 F.3d 738 (D.C. Cir. 2001)..................................................................... 11, 13-14


**Federal Statutes**

29 U.S.C. § 1341.............................................................................................. 4

29 U.S.C. § 1342.............................................................................................. 1, 3, 4, 7-8, 14

The Association of Flight Attendants-CWA, AFL-CIO ("AFA") hereby submits its reply brief in support of its motion for summary judgment to set aside the decision of the Pension Benefit Guaranty Corporation ("PBGC") to terminate the pension plan for Flight Attendants of United Airlines.

## **INTRODUCTION**

As the administrative record plainly shows, in negotiations with United, PBGC wielded its power to terminate the Flight Attendant Plan as a tool to extract a greater recovery as a bankruptcy creditor. In so doing, the Agency violated its own construction of ERISA and tainted the Section 4042 plan termination process. In its opposition, PBGC declines to even address those portions of the administrative record relating to the settlement negotiations. PBGC Opp. at 2. Instead, the Agency argues that the negotiations are simply irrelevant. According to PBGC, its actions must be judged solely in terms of the language contained in the final settlement agreement. Id. Based on the faulty premise that the conduct of Agency decision-makers in negotiations can somehow be divorced from their ultimate decision to terminate the Plan, PBGC contends that the settlement agreement did not taint the termination process. Id. at 2-3. PBGC's position constitutes an untenable attempt to side-step the core issue in this case, and shows that the Agency is incapable of reconciling its conduct with the dictates of ERISA.

As AFA demonstrated in its opening brief, the offspring of PBGC's tainted termination process is a termination decision rife with inconsistencies and illogic. For the most part, PBGC does not even attempt to confront the crucial failings in its termination analysis. When PBGC does attempt explanation, however, it inevitably resorts to post hoc rationalizations that ultimately are as

-1-

unsatisfactory as the Agency's original rationales. In the end, PBGC's termination decision can only be understood as the contrived and result-oriented product of a tainted termination process.

## ARGUMENT

I. **PBGC Argues That the Administrative Record Is Limited to the Termination Decision, Even Though this Court Has Already Determined That the Administrative Record in this Case Includes the Negotiations That Led to the Settlement Agreement.**

PBGC's assertion that the settlement negotiations are irrelevant to its ultimate termination decision ignores the Court's prior ruling requiring production of the administrative record pertaining to the settlement agreement. In resisting production of those materials, PBGC argued that the negotiations were irrelevant. The Court rejected that argument stating:

> But its like you are cutting a loaf of bread. The decision is in the middle somewhere, the agreement, but there were, I assume, certain analyses that went into that settlement. If you cut that off and say that's not part of the administrative record, then you have just taken away the legs of the termination, because that's the foundation of the legs of the termination is the settlement. And the settlement is built on something else, the record relating to the settlement. It looks to me like it's a foundation that is built upward, landing up in the ultimate administrative record that I have before me.

Hearing Tr., dated Aug. 10, 2005, at 10. PBGC offers no reason why the Court's prior finding that the administrative record of the settlement formed the foundation for the ultimate termination decision should not apply as well in this stage of the proceeding.

Indeed, in finding that the settlement negotiations were part of the administrative record, the Court expressed concern that in making the ultimate termination decision, the PBGC may have relied upon impermissible settlement considerations.

> Let's just say hypothetically, . . . [i]f there were some, that this negotiation was not arm's length, was not agreement to initiate termination or that it was not justifiable, the agreement. Let's just say it did not comport with your statutory objectives or whatever criteria or regulations you have.

> Hypothetically, wouldn't that carry over to the termination decision which is intimately involved in the agreement to settle? If you were to assume for a moment that there was something wrong with the settlement, if the agency can only terminate for one or two reasons. And you entered into the settlement agreement for a third reason. And then the termination relies on the settlement agreement to terminate, you've tainted the termination.

Hearing Tr., dated Aug. 10, 2005, at 9-10.

Notwithstanding the Court's clearly articulated view, PBGC persists in maintaining that its conduct in negotiations is irrelevant to its ultimate termination decision. The Agency offers no explanation as to why this Court should deem irrelevant the administrative record relating to the settlement agreement. Plainly, as the Court previously found, the actions of the Agency decision-makers and analysts during the settlement negotiations are relevant because the same persons played the key roles in the ultimate termination decision. During the negotiations stage, these persons came to know facts relevant to the Plan, reached conclusions regarding the value to be attached to Plan termination, and formed opinions regarding the desirability of the settlement predicated upon successful termination of the Plan. It is inconceivable that their prior knowledge, conclusions, and opinions did not affect their consideration of Plan termination under the formal Section 4042 process. In fact, it is clear from the administrative record that the desirability of the settlement directly affected the ultimate termination decision. AFA SOMF ¶¶ 56, 58, 59 (AR 7, 19, 32). Also relevant is the extent to which the facts known and opinions formed in the negotiations stage are inconsistent with the facts and opinions asserted by these same individuals only a short time later in the Section 4042 process.

**II.    By Ignoring an Entire Portion of the Administrative Record, PBGC Does Not Even Acknowledge, Much less Grapple with the Effects the Settlement Negotiations Had on Its Decision to Terminate the Flight Attendant Plan.**

PBGC attempts to evade consideration of the impact of the settlement on its termination decision by pretending that the decision to terminate the Flight Attendant Plan was immaculately conceived apart from the settlement process. In proceeding from this false premise, the Agency fails to confront adequately the essential issue of taint. PBGC's evasion only serves to show that it cannot dispute AFA's assertions regarding its conduct in negotiating the settlement and the effect of the settlement in leading the Agency to terminate a Plan that it otherwise had no intention of terminating.

First, PBGC fails to confront squarely the evidence that key Agency decision-makers and analysts lacked the independence necessary to fairly and impartially assess termination of the Flight Attendant Plan. PBGC emphasizes that the Agency technically remained free under the final settlement terms to refuse to terminate the Plan, but ignores how the settlement warped the motivations of the key Agency decision-makers, including the financial motivation of the Greenhill analysts to hasten receipt of their $3 million completion fee. PBGC claims that Agency decision-makers and analysts could not have been influenced by these considerations because the Agency would receive the benefits of the settlement even if United were forced to terminate under ERISA Section 4041. This claim, however, is belied by the administrative record, where the Agency asserts that it can only insure realization of the benefits of the settlement by initiating its own termination under Section 4042. AFA SOMF ¶¶ 57, 59 (AR 7, 32-33).

The Agency also asserts that members of the Trusteeship Working Group ("TWG") were not directly involved in the settlement, implying that their review somehow sanitized the taint of the

-4-

settlement. This argument too must fail. First, Executive Director Belt remained the ultimate decision-maker, and the Agency cannot and does not deny his direct involvement in the settlement. Second, the persons directly involved in the settlement made the termination recommendation to TWG, selecting and shaping the facts and analysis presented to TWG. A key consideration that those involved in the settlement presented to TWG was their view of the benefits and desirability of the settlement which they had crafted. They told TWG that the settlement, already publically endorsed by Executive Director Belt, was in the best interests of PBGC. Thus, TWG's analysis too was tainted by the settlement, even if those individuals were not directly involved in its creation.

Second, in now choosing to ignore the administrative record of the settlement negotiations, PBGC does not directly address the true nature of the deal it struck with United and the implications of that bargain.

**[REDACTED]**

Thus, even if the language of the agreement did not technically bind the Agency to terminate the Plan, PBGC fully appreciated what it had to do in order to secure for itself the benefits of the settlement, and proceeded to terminate the Plan to obtain that result. The Agency's repeated reliance on the findings of this Court and the Seventh Circuit regarding the final terms of the settlement therefore is misplaced, especially in light of the fact that those findings were not informed by the complete administrative record now before this Court.

Third, the Agency seeks to run from the administrative record of the settlement because the evidence conclusively establishes that the settlement tainted the termination decision with illegitimate and unlawful considerations. As is clear, the Agency's creditor interests overwhelmed its role as a regulator. PBGC does not deny that under ERISA these roles must be kept separate. Instead, the Agency attempts to set up a straw-man argument, claiming that AFA would somehow deny the Agency the ability to ever terminate a plan. PBGC Opp. at 5-7. To the contrary, AFA simply insists that the Agency must follow its own interpretation of ERISA, and not permit its creditor interests to dictate its termination decisions, as was done in this case. The Agency remains free to protect itself from long-run loss through plan termination, but that capability is entirely different from using plan termination as a bargaining chip to secure a greater bankruptcy recovery on claims and litigation unrelated to the plan at issue.

The Agency also fails to reconcile its settlement conduct with the plan-by-plan termination analysis required under ERISA. PBGC has consistently taken the position that ERISA requires a plan-by-plan analysis, and does not deny that position here. Instead, the Agency argues that it did consider the Flight Attendant Plan "independently" and "on its own merits." PBGC Opp. at 4. The administrative record, however, belies this claim. The record makes clear that the Agency considered the fact that the settlement agreement required termination of all United's defined benefit plans. AFA SOMF ¶¶ 56, 58, 59 (AR 7, 19, 28). The Agency also quantified its recovery under the settlement with respect to the other terminated plans. AFA SOMF ¶ 49 (AR 143, 145-50). In seeking to realize these gains, PBGC inextricably bound termination of the Flight Attendant Plan to termination of United's other plans in violation of ERISA.

Finally, PBGC contends that "[t]o the extent the Settlement Agreement is relevant at all," any consideration of the settlement agreement must be limited to the settlement terms in their final form. The Agency further argues that because the final terms of the settlement are "entirely appropriate and consistent with the law" the agreement cannot be viewed as tainting the termination decision. PBGC Opp. at 2.

**[REDACTED]**

This is what the administrative record shows. PBGC offers no evidence to the contrary.

**III. PBGC Fails to Explain the Inconsistencies, Illogic, and Bias That Permeate the Agency's Termination Decision Due to its Result-Oriented Approach to Terminating the Plan.**

  **A. PBGC fails to establish that the settlement agreement was a proper basis for termination under ERISA Section 4042, and its attempt to explain the flaws in Greenhill's May 12 analysis of the settlement is unavailing.**

In ERISA, Congress explicitly set forth statutory factors for plan termination. 29 U.S.C. § 1342(a)(1)-(4). PBGC's consideration of the settlement stands outside those factors, and therefore is impermissible as a matter of law. Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 43 (1983) (agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider"). In its opening brief, PBGC did not even acknowledge that the settlement agreement served as a key rationale for Plan termination, much less assert that it is a permissible consideration under ERISA. Now, in response

to AFA's brief, PBGC claims that the settlement was a proper consideration because ERISA permits the Agency to consider the "possible long-run loss of [the Agency] with respect to the plan." 29 U.S.C. § 1342(a)(4). What PBGC fails to explain is how the settlement can be considered a possible long-run loss to the Agency. Moreover, if forgoing the benefits of a settlement entered into by the Agency constitutes a form of "loss," then entry into the settlement agreement itself preordains the plan termination analysis. PBGC, however, has steadfastly maintained that the settlement agreement did not preordain its decision.

Even if it were permissible to view the settlement as a creating a potential loss for the Agency, PBGC needed to evaluate the settlement correctly and consistent with its analyses produced during settlement negotiations. Greenhill's May 12 analysis of the settlement was neither correct nor consistent.

**[REDACTED]**

Greenhill does not explain its change in assumptions in the administrative record. In its opposition brief, PBGC offers the explanation that "by May 2005, the agency believed that it would be very difficult to establish that the FA Plan was affordable, and therefore that it was destined to terminate." PBGC Opp. at 9. There is nothing in the administrative record, however, indicating that the Agency had reached such a conclusion by May. To the contrary, as of April 14, PBGC still believed the Plan was affordable based on the information then available, and needed updated information to make a final affordability determination. AFA SOMF ¶ 40 (AR 613-14). As of May 5, Greenhill had not performed any analysis of affordability to update Michael Kramer's December 2004 expert report concluding that the Plan was affordable. AFA SOMF ¶ 47 (Kramer Dep. at 26-27). In addition, the administrative record indicates that PBGC's Counsel only made a determination

that the Plan would likely terminate after reviewing Greenhill's May 18 analysis. AFA SOMF ¶ 50 (AR 30). Thus, if PBGC had concluded by May that the Plan was not affordable, it reached that conclusion without the benefit of any expert analysis, and on some basis not revealed in either the administrative record or even PBGC's opposition brief. Such a conclusion would be arbitrary and capricious. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency must "articulate a satisfactory explanation for its action").

The second major flaw in Greenhill's May 12 settlement analysis is the treatment of $388 million in potential PBGC liabilities if the Pilots Plan and the Union Ground Plan terminated at a date later than that selected by PBGC. In the May 12 analysis, Greenhill assumed that PBGC would prevail on the date issue with the settlement agreement, but lose on the date issue without the settlement, even though the settlement did not actually resolve the litigation over the dates. PBGC does not dispute that the settlement agreement left open the date issue for further litigation. Nor does the Agency explain why Greenhill's May 12 analysis did not evaluate the $388 million in terms of a range of possible litigation outcomes (i.e. 100% success, 50%, and 0%), as it did every other piece of litigation assessed in the May 12 document.

**[REDACTED]**

As AFA showed in its opening brief, Greenhill's illogical approach inflated the Agency's projected settlement recovery by as much as $40 million.

Instead of confronting these issues, the Agency merely asserts that PBGC's possible settlement recoveries were "difficult to measure." PBGC Opp. at 9. Even assuming that Greenhill's analysis reflects difficult judgment calls, it was all the more important that an impartial entity make

-9-

those calls. Here, however, the Greenhill analysts were called upon to assess the success of the settlement agreement that they helped to craft, and which would hasten receipt of the $3 million completion fee. PBGC acted arbitrarily and capriciously in relying on an analysis conducted under such circumstances. Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 493 (1976) (agency must be "capable of judging a particular controversy fairly on the basis of its own circumstances").

### B.    PBGC cannot explain the inconsistency and illogic of Greenhill's affordability analysis.

Perhaps the starkest example of PBGC's inconsistency and illogic is the affordability analysis performed by Greenhill and heavily relied upon by the Agency. On April 14, 2005, PBGC filed a motion to postpone consideration of United's distress termination motion until the Company produced a revised business plan and a plan of reorganization. According to the Agency, until this information was provided, "PBGC cannot even determine its position on whether United can afford to maintain the Pension Plans coming out of bankruptcy." AFA SOMF ¶ 40 (AR 614) (emphasis added). Accordingly, PBGC proposed postponing consideration of United's distress termination motion until "no earlier than two months before [the Company] intends to confirm its plan of reorganization," which PBGC understood would occur "no earlier than September 2005, and probably later." AR 609-10. Then, on May 5, 2005, Greenhill analyst Michael Kramer testified that he had not done any analysis of the affordability of United's pension since his expert report issued on December 28, 2004. AFA SOMF ¶ 47 (Kramer Dep. at 26-27). He further testified that in order to conduct such an analysis he would need more information from United regarding their projected operating results and modifications the Company would make to offset fuel prices. Id. (Kramer Dep.

at 28-29). Nevertheless, without the benefit of the information described by PBGC as necessary for "a fully-developed record" or the information identified by Kramer, Greenhill proceeded to perform an affordability analysis dated May 18, 2005.

In relying upon an affordability analysis conducted without information previously identified as vital, the Agency acted arbitrarily and capriciously. "[A]n agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so." Wisc. Valley Improvement Co. v. FERC, 236 F.3d 738, 748 (D.C. Cir. 2001). Here, the Agency and Greenhill took an unequivocal position that certain information was necessary to assess affordability, and have failed to offer any satisfactory explanation for their abandonment of that position only weeks later.

The administrative record itself is silent regarding the issue of conducting an affordability analysis without the information identified as key to a "fully-developed record."[1] In its opposition brief, however, PGBC states:

> Although for a number of reasons PBGC's position in April 2005 was that a distress application should not proceed in the bankruptcy court at that time, the agency was not thereby constrained to sit idly by and absorb increasing losses as it appeared ever-clearer that the FA Plan was likely to terminate. Accordingly, in May 2005, PBGC asked Greenhill to prepare an affordability analysis with the data that was available to it . . . .

PBGC Opp. at 10. PBGC's post hoc explanation does not withstand scrutiny. As discussed above (see supra at 8), PBGC offers no evidence, and the administrative record contains none, that it

---

[1] In responding to AFA's Statement of Material Facts Not in Genuine Dispute, PBGC disputes the materiality of the statements contained in the Agency's April 14 Emergency Motion to postpone United's distress termination motion. The entire April 14 pleading, however, is included in the administrative record. AR 606-18. PBGC should not be permitted to assert that portions of the administrative record are immaterial.

"appeared ever-clearer to PBGC that the Flight Attendant Plan was likely to terminate" before Greenhill's May 18 affordability analysis. Indeed, it makes no sense for PBGC to claim that it was "ever-clearer" that the Flight Attendant Plan was likely to terminate, when it lacked the very information identified by it as necessary to make such a judgment.

Equally flawed is PBGC's assertion that it could not sit "idly by" and allow potential losses to increase, and therefore needed to act without the information previously identified as crucial. This assertion simply and inexplicably contradicts the position taken by the Agency on April 14. PBGC's April 14 court filing plainly recognized that upon review of the fully-developed record PBGC might ultimately conclude that all of United's pension plans would terminate. AR 610, 614. At that time, PBGC anticipated that it would not be able to reach an ultimate conclusion until September 2005. AR 609-10.

### [REDACTED]

PBGC was aware of all of these facts, and yet the Agency's position on April 14 was that it needed to await further information in order to reach a fully-informed conclusion as to whether or not the Flight Attendant Plan should terminate, even though that position exposed the Agency to potential additional loss.

So what caused the Agency's position to change from a willingness to wait to a sudden rush to make an affordability assessment previously characterized as "impossible" without an updated business plan? The administrative record provides the answer -- the Agency changed course because of the settlement agreement. As John Spencer and his group in PBGC's DISC division explained to TWG:

> Delaying the termination of the FA Plan will only keep United in a tenuous position, making it difficult for it to gain the confidence of lenders to obtain exit financing, and to continue to maintain exclusivity for filing a POR [("plan of reorganization")]. If an entity other than United proposes a POR, PBGC's benefits under the Agreement most likely will not materialize.

AR 32-33. Thus, as a result of the settlement agreement, PBGC was no longer interested in scrutinizing a revised business plan and reorganization plan to determine whether United could afford the Flight Attendant Plan. Instead, the Agency was simply interested in facilitating confirmation of a reorganization plan that included the claim recoveries promised under the settlement agreement.

Greenhill's affordability analysis is also grossly deficient because it failed to consider a key piece of information known to the Agency -- that United had the means to produce $1.5 billion in notes. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency cannot "entirely fail[] to consider an important aspect of the problem"). In its opposition, PBGC maintains that it was not required "to speculate" about whether United would be willing to give notes to save the Plan. PBGC Opp. at 10 n.30. But United's willingness is irrelevant. Plan affordability under ERISA is not a matter of what the plan sponsor wants to pay, but rather what it has the means to pay. The salient fact was that United had assets that could be used to support the Plan. PBGC cannot ignore such a fact simply because an employer no longer wishes to honor its pension obligations.

### C. PBGC does not address its inconsistent positions regarding the risk of increased losses due to the accrual of benefits under the Plan.

PBGC does not even attempt to provide a rational explanation for its change in position on the risk of losses due to benefit accruals under the Flight Attendant Plan. Inexplicable inconsistency is the hallmark of arbitrary and capricious agency action. Wisc. Valley Improvement Co., 236 F.3d

at 748. Such inconsistency also strongly suggests that agency action was guided not by the relevant facts, but rather by illegitimate considerations.

On June 3, 2005, this Court questioned the Agency about the risk of increased losses if PBGC did not terminate the Plan quickly. The Agency responded unequivocally that it was not faced with such risk of loss because, if PBGC did not move swiftly to terminate the Plan, United would simply resuscitate its distress termination motion.

> If the termination process here, Your Honor, that PBGC has initiated, were to go too slowly for United, United would <u>undoubtedly</u> resuscitate the distress termination process that it has already started in the bankruptcy court. . . . <u>I think it is clear</u> that if PBGC's processing of the termination is delayed for whatever reason, either its own internal reasons or because it's stayed by this Court or any other reason, that that's what United would feel it was prudent to do.

AFA SOMF ¶ 51 (Hearing Tr. at 9-10) (emphasis added). PBGC was equally adamant that a termination obtained in this way would be retroactive to June 30, 2005. Id. (Hearing Tr. at 11). Thus, according to PBGC, it mattered very little that the Agency had agreed to initiate the Section 4042 process as part of the settlement, because if PBGC declined to terminate, United would undoubtedly seek to do so on its own.

Despite its position before this Court, in the administrative record of the termination decision, PBGC asserted that it had to terminate the Plan quickly in order to protect itself from losses due to additional benefit accruals. AFA SOMF ¶ 55 (AR 7). The Agency worked from the assumption that the Plan would not terminate absent its own intervention.

PBGC offers no sound explanation for its sudden change in position with regard to the accrual of Plan liabilities. In particular, the Agency fails to even address the inconsistency between its June 3 statement to this Court and its asserted rationale for Plan termination. On June 3, PBGC

expressed confidence that, if it did not terminate, then United would seek to terminate the Plan effective June 30. In its opposition brief, however, the Agency now asserts that it could not know whether United would revive its distress termination motion, and, even if the Company did, whether it would prevail on the motion at all, or prevail but with a termination date beyond June 30, 2005. PBGC Opp. at 11-12. As a threshold matter, the Agency's explanation is purely post hoc and does not reflect any discussion contained in the administrative record. The PBGC's current explanation also flatly contradicts the Agency's statements to this Court on June 3.

In addition, PBGC's current explanation lacks foundation in fact or logic. As PBGC itself has emphasized, United consistently maintained in its public statements in the Winter and Spring of 2005 that it needed to terminate all its pension plans in order to successfully reorganize.[2] PBGC Mem. Supp. Summ. J., at 7. PBGC cannot plausibly assert that United would simply abandon its distress termination motion. Even if United did abandon its motion, that would benefit PBGC because the Flight Attendant Plan would then continue and PBGC would not assume any responsibility for Plan benefits. Lastly, as PBGC itself explained to the Court during the June 3 hearing, United had given notice of termination effective June 30, 2005, which served to cut off the expectations of plan participants as of that date. AFA SOMF ¶ 51 (Hearing Tr. at 10-11). Having done so, there is no sound reason as a legal matter why a later termination date would be adopted.

---

[2] **[REDACTED]**

## **CONCLUSION**

For all the foregoing reasons, AFA respectfully requests that the Court grant its motion for summary judgment and set aside PBGC's plan termination decision.

Respectfully submitted,

/s/ Robert S. Clayman
Robert S. Clayman, D.C. Bar No. 419631
Carmen R. Parcelli, D.C. Bar. No. 484459
GUERRIERI, EDMOND, CLAYMAN
 & BARTOS, P.C.
1625 Massachusetts Avenue, N.W., Ste. 700
Washington, DC 20036-2243
(202) 624-7400
rclayman@geclaw.com

Dated: November 18, 2005

Counsel for Association of Flight
Attendants-CWA, AFL-CIO

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 18, 2005, I electronically filed Plaintiff's Reply in Support of Cross-Motion for Summary Judgment using the CM/ECF system. I further certify that on November 18, 2005, a true and correct copy of the same was served by electronic mail on:

>Jeffrey B. Cohen
>Chief Counsel
>Pension Benefit Guaranty
> Corporation
>1200 K Street, N.W.
>Washington, D.C.  20005
>cohen.jeffrey@pbgc.gov
>
>Attorney for defendant PBGC

/s/ Robert S. Clayman
Robert S. Clayman