# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————

ASSOCIATION OF FLIGHT       )
ATTENDANTS-CWA, AFL-CIO,    )
                           )
          Plaintiff,        )
                           )
     v.                     )        Civil Action No.  05-1036 (ESH)
                           )
PENSION BENEFIT GUARANTY    )
CORPORATION,                )
                           )
          Defendant.        )
———————————————————)

## MEMORANDUM OPINION

This Court is again confronted by difficult and novel issues that have arisen between the

Pension Benefit Guaranty Corporation ("PBGC" or "agency") and the Flight Attendants-CWA,

AFL-CIO ("AFA") over the flight attendant's defined benefit pension plan ("the FA Plan") as a

result of United Air Lines' Chapter 11 bankruptcy in the Northern District of Illinois.  The first

round of this dispute was resolved by the Court's opinion in *Ass'n of Flight Attendants v. PBGC*,

372 F. Supp. 2d 91 (D.D.C. 2005) ("*AFA I*").  There, the Court refused plaintiff's request to

preliminarily enjoin PBGC from instituting involuntary termination proceedings under § 1342 of

ERISA[1] pursuant to an April 22, 2005 Settlement Agreement ("Agreement") between United and

PBGC.  Plaintiff also challenged the Agreement in the bankruptcy proceedings, arguing that

United had violated its collective bargaining responsibility by entering into the Agreement.  This

argument was rejected by the bankruptcy court, and on November 25, 2005, the Seventh Circuit

———————————————————

[1] The Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.

affirmed.  *In re UAL Corp.*, 428 F.3d 677 (7th Cir. 2005).[2]  While the union's efforts to stop PBGC from considering whether it should terminate the FA Plan have been rebuffed by the courts, both the Seventh Circuit and this Court recognized that the union's right to challenge a termination decision by PBGC has been preserved under § 1303(f), which provides the "exclusive means for bringing actions against [PBGC]" concerning termination decisions.  29 U.S.C. § 1303(f)(4).  *See also In re UAL Corp.*, 428 F.3d at 684; *AFA I*, 372 F. Supp. 2d at 98.

By Notice of Determination ("NOD") issued on June 23, 2005, PBGC has now decided to terminate the FA Plan effective June 30, 2005, and plaintiff has invoked its rights under § 1303(f) by attacking the termination decision under ERISA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  In particular, plaintiff argues that: (1) PBGC violated ERISA by relying on the Agreement as a basis for its termination decision; and (2) PBGC's other rationales for termination should be rejected under the APA as arbitrary and capricious and the product of biased decisionmaking resulting from the agency's desire to realize the Agreement's benefits.  As explained more fully below, the Court agrees that PBGC's reliance on the Agreement to justify the termination is contrary to § 1342, but nonetheless, upholds the agency's decision under the APA given the existence of other valid bases for termination.

## BACKGROUND

Much of the relevant factual background and the governing legal framework has been set forth previously in *AFA I*, 372 F. Supp. 2d at 93-97, as well as by the Seventh Circuit.  *In re UAL*

---

[2] The bankruptcy court approved the Agreement on May 11, 2005, *see AFA I*, 372 F. Supp. 2d at 95 & n.5, and this decision was affirmed by the district court on July 21, 2005. *Ass'n of Flight Attendants v. United Airlines, Inc.*, 333 B.R. 346 (N.D. Ill. 2005).

*Corp*., 428 F.3d at 680-82.  Therefore, only a brief summary is needed before turning to the events that post-dated the April 22, 2005 Agreement.

## I.      Pre-Settlement Events

The FA Plan is one of four underfunded United benefit plans, and despite staggering unfunded liabilities for these four plans, the FA Plan has stood out as "the least financial burdensome of [the] . . . plans."[3/]  (Administrative Record ["AR"] 129.)  At the time it was terminated, the FA Plan covered 28,402 participants or 23% of all participants in United's four plans and had an unfunded liability of roughly $2 billion, including $1.7 billion in guaranteed benefits.  (Pl.'s Statement of Material Facts Not In Dispute ["Pl.'s Facts"] ¶ 7.)  When combined with the other three plans, there were 121,557 participants and an unfunded liability totaling nearly $10 billion.  (PBGC's Statement of Undisputed Material Facts ["Def.'s Facts"] ¶ 18.)  As of April 2005, United valued its minimum funding requirements for all its defined benefit plans for the next six years at $4.4 billion, with $624 million attributable to the FA Plan.  (AR 726.)

---

[3/] The other three underfunded plans were the Ground Employees' Retirement Plan (Ground Plan), which covered 36,100 active and retired mechanics and ramp workers; the Pilot Defined Benefit Pension Plan (Pilot Plan), which covered 14,100 active and retired pilots; and the Management, Administrative and Public Contact Defined Benefit Pension Plan (MAPC Plan), which had 42,700 participants.  None of these plans will survive United's bankruptcy.  On December 29, 2004, the PBGC issued a NOD of its intent to terminate the Pilot Plan involuntarily under § 1342 and sought and obtained a court order establishing a plan termination date of December 30, 2004.  *See In re UAL Corp.*, No. 02-B-48191, 2005 WL 2840266 (Bkrtcy N.D. Ill. Oct. 26, 2005).  Similarly, the PBGC issued a NOD with respect to the Ground Plan on March 10, 2005, establishing a termination date of March 14, 2005.  (Pl.'s Facts ¶ 34.)  The termination of the Ground Plan was upheld by court order in November 2005.  *See PBGC v. United Air Lines, Inc.*, No. 05-0269, 2005 WL 3088455 (E.D. Va. Nov. 10, 2005).  On June 23, 2005, PBGC issued a NOD to terminate the MAPC plan as of June 30, 2005 (Pl.'s Facts ¶ 52), which, consistent with the terms of the Agreement between PBGC and United, will be merged with the Variable Plan effective prior to the MAPC Plan termination date.  (AR 95.)

Thus, the FA Plan accounted for only 14% of United's total minimum funding requirements for 2005-2010.  (Pl.'s Facts ¶ 9.)

In 2004 and until mid-2005, PBGC unsuccessfully resisted United's efforts in bankruptcy court to terminate its pension responsibilities.  First, in the summer of 2004, PBGC opposed United's request to cease making minimum funding payments to its plans; nevertheless, pursuant to an order of the bankruptcy court, United has not, since July 2004, made any minimum funding contributions to its pension plans, as required by Title IV of ERISA, 29 U.S.C. §§ 1301-1461 (2000 & Supp. II 2002), and by the Internal Revenue Code.  (Pl.'s Facts ¶¶ 11-12.) Further, on November 25, 2004, United moved under 11 U.S.C. § 1113(c) to reject any provisions within its collective bargaining agreements ("CBA") that would prohibit it from seeking a "distress termination" of its union pension plans, including the FA Plan, as the first step toward seeking a "distress termination" in bankruptcy court under § 1341 of ERISA.[4] Following this filing, PBGC issued its NOD to terminate the Pilot Plan and then the Ground Plan under § 1342.  *See supra* note 3.  The agency also filed an objection to United's § 1113 motion,

_____

[4]  Despite its § 1113 motion, United continued to negotiate with its unions to resolve pension, wage and other issues.  On December 16, 2004, the Air Line Pilots Association ("ALPA") reached a settlement with United in which ALPA agreed to waive the CBA provision barring termination of the Pilot Plan and not to oppose United's distress termination of the Pilot Plan.  (Pl.'s Facts ¶ 16.)  The settlement also established that the termination date of the Pilot Plan would not be earlier than April 2005, enabling plan participants to continue to accrue benefits until that time.  (*Id*.)  In order to limit its future liability, PBGC acted to terminate the Pilot Plan pursuant to 29 U.S.C. § 1342, effective December 30, 2004.  *See supra* note 3.  Further negotiations with the AFA were only partially successful.  On January 8, 2005, United withdrew its § 1113 motion with respect to the flight attendants' CBA as a result of the union's agreement to additional concessions.  In a side letter to that agreement, the parties agreed to "continue to meet and confer regarding the Defined Benefit Plan."  (Pl.'s Facts ¶ 22.)  The parties failed to resolve the pension termination issue, however, and on April 11, 2005, United re-filed its motion to reject the CBA pursuant to 11 U.S.C. § 1113(c).  (*Id*.)

however, asserting, based on an analysis done by Michael Kramer, a Managing Director at

Greenhill & Co., LLC ("Greenhill"), which had been retained by PBGC to help analyze United's

financial forecasts, that "it is clear that United can reorganize in Chapter 11 and maintain one or

more of its Pensions Plans" and suggesting that the alternative to plan termination "that most

easily satisfied" the credit metrics identified by United was "retaining only the Flight Attendants

Plan, with minimum funding waivers [from the IRS]."  (Pl.'s Facts ¶ 20.)[5]

Throughout the spring, PBGC continued to publicly support AFA's efforts to preserve its

plan,[6] including opposing United's renewed § 1113 motion, filed on April 11, 2005, to reject its

CBA with the flight attendants and to obtain a judicial determination that it had satisfied § 1341's

requirements for a distress termination.  In its memorandum in support of its motion, United

---

[5] In late December 2004, Michael Kramer executed a declaration and expert report (the Kramer Declaration) analyzing the affordability of United's pension plans under the business plan United had in place at the time, known as Gershwin 5.F.  (Pl.'s Facts ¶¶ 3, 5, 17).  The Kramer Declaration concluded that "[u]nder the Gershwin 5.0F projections, the Company has sufficient liquidity and free cash flow to support at least one of the Pension Plans currently in place, namely the FA plan, even without application for any [IRS] waivers.  Furthermore, if one considers United's ability to freeze the Pension Plans and obtain near-term waivers of upcoming payments, additional plans are also supportable."  (AR 825.)  The Kramer Declaration assessed the affordability of United's pension plans under several different fuel price projections. Gershwin 5.F assumed a fuel price of $44.00 per barrel -- the price of oil on October 14, 2004. Kramer found the FA Plan affordable at $44.00 per barrel, as well as at the lower price of $41.00 per barrel in place on December 27, 2004.  (Pl.'s Facts ¶ 18.)  Moreover, the Kramer Declaration considered a "downside scenario" in which the price of fuel was projected to be $55 per barrel in 2005, declining to $50 per barrel in 2006, and using Gershwin 5.F projections thereafter.  (*Id.*; *see also* AR 838.)  Even under this scenario, Greenhill concluded that "United maintains significant cash balances when retaining as many as two of the Pension Plans under the downside case." (AR 839.)

[6] For instance, PBGC Executive Director Bradley Belt responded to an AFA proposal for retaining the FA Plan by stating that the agency "continue[s] to believe that the interests of the participants and the pension insurance program would best be served by the continuance" of the plan.  (Pl.'s Facts ¶ 37.)

provided an updated financial analysis that cited higher than expected fuel prices, increased competitive pressures from low cost carriers and from fares instituted by competitors (*i.e.*, Delta's SimpliFares), and demands by exit financiers to further justify a distress termination of its plans.  (AR 619-780.)  United also notified its plan participants of its intent to terminate the FA Plan as of June 30, 2005, and a trial was set by the bankruptcy court for May 11.  (Pl.'s Facts ¶ 39.)  PBGC opposed this motion, calling the airline's motion "premature" in light of its failure to show that the FA Plan was not salvageable.[7]  (AR 609.)  PBGC argued that an affordability analysis of the plans could not be done without "an updated business plan" and a plan of reorganization and that further data was needed "regarding fleet planning, negotiations with the public debt group and contracting with United's regional partners" before PBGC could "even determine its [own] position on whether United can afford to maintain the Pension Plans."  (AR 613-14.)  While the agency acknowledged that "United's financial picture may get grimmer, in which case PBGC could very well conclude that it would not oppose the distress motion," it asked the bankruptcy court to postpone the trial until after United filed its updated business plan and proposed plan of reorganization, which were expected in July.  (AR 609, 614-15.)

Despite these public statements and filings and unbeknownst to the union, PBGC and United had begun settlement discussions as early as February 2005.[8]  These negotiations

---

[7] Under § 1341, a bankruptcy court cannot approve a debtor's motion to terminate a pension plan unless the court "determines that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the Chapter 11 reorganization process."  29 U.S.C. § 1341(c)(2)(B)(ii)(iv).

[8] By Order of this Court issued on August 10, 2005, PBGC was required to supplement the administrative record to include the materials pertaining to the Agreement.  These materials have been filed under seal and appear in the record as AR-S-04483-04652.

continued for three months, and on April 22, an agreement was reached.  The terms of the

Agreement are detailed in *AFA I*, 372 F. Supp. 2d at 95, and by the Seventh Circuit, *In re UAL*

*Corp.*, 428 F.3d at 681.  As noted, the Agreement was approved by the bankruptcy court on May

11, 2005, and this decision was subsequently affirmed by the district court for the Northern

District of Illinois and the Seventh Circuit.  *See supra* note 2.

## II.     Post-Settlement Events

Pursuant to the Agreement, PBGC initiated § 1342 proceedings by first requesting that

Greenhill update its affordability analysis of the FA Plan.  In response, on May 18, 2005,

Greenhill issued a memorandum to PBGC revising its December 2004 analysis and  concluding

that "the Company is unlikely to be able to support the funding obligations of the [FA Plan] due

to unfavorable developments in the airline industry."  (AR 129.)  Greenhill cited four

developments since December 2004 that caused it to revise its analysis: (1) substantial increases

in current and projected fuel costs; (2) worsening competitive conditions in the industry;

(3) United's issuance of $755 million in debt to labor groups; and (4) United's failure to apply

for an IRS waiver of its 2004 plan year pension funding requirement.  (AR 129.)  As a result of

these developments, Greenhill found it "unlikely" that United would be able to afford the FA

Plan after exiting bankruptcy or to obtain sufficient exit financing to reorganize without

terminating the Plan.  (AR 134.)

PBGC's Division of Insurance Supervision and Compliance ("DISC") completed its

analysis of the FA Plan on June 16, 2005, and concluded that PBGC had grounds for involuntary

termination under § 1342(a)(2) and (4) of ERISA; *i.e.*, that United would be "unable to pay

benefits when due," and that "the possible long-run loss of the corporation with respect to the

plan may reasonably be expected to increase unreasonably if the plan is not terminated." (AR

25.) DISC estimated losses to PBGC of $3.3 million each month after June 30, 2005 that the FA

Plan remained in existence. (AR 32.) PBGC's Trusteeship Working Group ("TWG") endorsed

DISC's conclusion, and on June 22, 2005, recommended by a vote of 10-2 that Executive

Director Belt approve the termination of the FA Plan. (AR 5, 23.) On June 23, 2005, Executive

Director Belt issued a NOD that the FA Plan would be terminated effective June 30, 2005,

pursuant to 29 U.S.C. § 1342(a)(2) and (4). (AR 1.)[9]

On June 30, 2005, AFA amended its complaint in this Court to challenge the agency's

June 23 NOD under 29 U.S.C. § 1303(f), claiming that the decision to terminate the FA Plan was

contrary to ERISA and the APA. Thereafter, cross-motions for summary judgment were filed,

and arguments were presented by counsel at a hearing held on January 5, 2006. In addressing the

issues raised by these motions, the Court will first describe the statutory framework which

governs PBGC and the terminations of pension plans and then the governing standards under the

APA, and finally, it will address the validity of the agency's decision to terminate under ERISA

and the APA.

---

[9] PBGC's internal administrative process for informal adjudications is governed by an agency directive. It establishes a TWG, composed of PBGC financial, actuarial, policy and legal staff, that reviews a written recommendation in favor of plan termination generated by other PBGC staff. *AFA I*, 372 F. Supp. 2d at 97. In the case of a pension termination of the size proposed here, concurring signatures are required from a variety of PBGC officials, including the General Counsel, the Chief Operating Officer, and the TWG Chairperson. *Id.* Ultimately, however, the final decision lies in the hands of the Approving Official, in this case PBGC Executive Director Belt. *Id.*

## ANALYSIS

### I.    Statutory Framework

Under Title IV of ERISA, PBGC administers the pension termination insurance program. 29 U.S.C. § 1302; *see also Nachman Corp. v. PBGC*, 44 U.S. 359, 361 (1980).  In that capacity, it pays the guaranteed benefits of terminated pension plans to former participants, up to certain statutory maximums.  *See* 29 U.S.C. § 1322(b)(3); 29 C.F.R. §§ 4022.22, 4022.23.  PBGC is financed through four sources of revenue: premiums paid by plan sponsors; investment income; the assets of terminated plans; and recoveries from the sponsors of terminated plans.  (Def.'s Mot. at 2.)  "Though Congress was concerned chiefly with protecting the employees' expectations of pension benefits, it also realized that employers would not create, maintain, or expand pension plans if ERISA imposed too much cost.  Consequently, the entire statute is a finely tuned balance between protecting pension benefits for employees while limiting the cost to employers."  *A-T-O Inc. v. PBGC*, 634 F.2d 1013, 1021 (6th Cir. 1980).  Because PBGC is self-financed, in part through employer premiums, limiting the cost to employers necessarily means, at least in part, limiting PBGC's own liabilities.[10/]  *See Rettig v. PBGC*, 744 F.2d 133, 154 (D.C. Cir. 1984).

Indeed, by statute the agency's mission is defined in terms of potentially conflicting duties:

> (1)      to encourage the continuation and maintenance of voluntary
>          private pension plans for the benefit of their participants,

---

[10/] As of September 30, 2004, PBGC was responsible for providing pension benefits to over one million workers, and its balance sheet reflected a $23.3 billion deficit relative to the $62.3 billion in benefits it has guaranteed to those workers.  (Def.'s Mot. at 3.)

> (2)     to provide for the timely and uninterrupted payment of
>          pension benefits to participants . . . , and
>
> (3)     to maintain premiums established by PBGC under 1306 of
>          this title at the lowest level consistent with carrying out its
>          obligations under this subchapter [*i.e.*, Title IV of ERISA].

29 U.S.C. § 1302(a).  Given these statutory purposes, it is clear, contrary to plaintiff's argument

that the statute prohibits the agency from "benefit[ing] itself at the expense of plan participants"

(Pl.'s Opp. at 26), that the agency must try to resolve the inherent tension created by the statute

by "accommodat[ing] the conflicting policies underlying ERISA." *Rettig*, 744 F.2d at 135.

While ERISA was passed to protect the participants' expectations, at some point the agency's

need to minimize its own liabilities may predominate over other statutory purposes.  And as

recognized by the Supreme Court, the resolution of conflicting goals is precisely the type of

agency decisionmaking to which courts owe deference.  *See PBGC v. LTV Corp.*, 496 U.S. 633,

651-52 (1990); *accord Piech v. PBGC*, 744 F.2d 156, 161 (D.C. Cir. 1984) ("Although it may in

many ways be desirable for plan participants to have a trustee who is prepared to advocate their

interests in opposition to the PBGC, Congress has evidently not envisioned such a role for the

plan trustee.").[11]

     It is for this reason that Congress gave PBGC an alternative to waiting for a plan to be

terminated through a contested and often lengthy and costly § 1341 proceeding in bankruptcy

_____

     [11] Given the statutory requirement that the agency must balance these conflicting goals
and accommodate the needs of both the plan participants and the financial well-being of the
pension insurance system, there is no basis in either the statute or the case law for plaintiff to
argue that PBGC, entering into the Agreement, "impermissibly mixed its regulator and creditor
roles, in contravention of its own construction of ERISA."  (Pl.'s Opp. at 27.)  While admittedly
the agency's primary goal is to protect the plan participants (*see* Pl.'s Opp. at 26 (citing *Rettig*,
744 F.2d at 155)), ERISA expressly permits PBGC to terminate a plan when its own financial
health is likely to be impacted unreasonably.  29 U.S.C. § 1342(a)(4).

court.[12/]  Under this alternative proceeding -- a § 1342 involuntary termination proceeding -- the

agency is authorized by statute to terminate a failing plan regardless of the CBA so that PBGC

can, without negotiating with the union, "nip a plan's increasing losses and thereby reduce

PBGC's exposure to mounting liabilities."  *In re UAL Corp.*, 428 F.3d at 681 (citing 29 U.S.C.

§ 1342(a)(4)).  *See also PBGC v. Republic Techs. Int'l*, 386 F.3d 659, 668 (6th Cir. 2004)

("ERISA provides for involuntary termination proceedings precisely so that PBGC can protect its

own financial interests and 'avoid any unreasonable deterioration of the financial condition of the

plan or any unreasonable increase in the liability of the fund.'" (quoting 29 U.S.C. § 1342(c))).[13/]

## II.    Standard of Review

As will become clearer, the agency's attempt to walk this statutory tightrope is put

squarely at issue here, since plaintiff claims that PBGC abused its discretion by proceeding too

quickly to terminate under § 1342 without the very data it had previously identified as being

necessary to assess the plan's affordability and by bargaining away the flight attendants' pension

benefits in order to obtain the financial benefits of the Agreement.  In deciding this case, the

---

[12/] As explained by defense counsel, a § 1341 distress termination can be more costly and complex; it can delay the reorganization and thereby create uncertainty regarding exit financing; and because the required actuarial work is paid from plan assets, it can reduce the assets that will eventually be transferred to PBGC upon termination of the plan.  (1/5/06 Tr. at 8, 14-15.)

[13/] As described by agency counsel:

> [O]nce the determination is made that . . . this plan was going to terminate, that we weren't going to be able to stop it from terminating, at that point we are in essentially recovery mode. We're looking to minimize our loss.

(1/5/06 Tr. at 22.)

parties agree that the agency's action is reviewable under the APA's arbitrary and capricious standard. (Def.'s Mot. at 12; Pl.'s Opp. at 21-22.) Under that test, a court will affirm an agency's action as long as it is not "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2)(A); *see also LTV Corp.*, 496 U.S. at 636; *Allied Pilots Ass'n v. PBGC*, 334 F.3d 93, 98 (D.C. Cir. 2004); *Rettig*, 744 F.2d at 140. A "court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Therefore, when an agency action depends on a "high level of technical expertise," the Court must "defer to 'the informed discretion of the responsible federal agencies.'" *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). While PBGC is entitled to "substantial deference," it must still articulate a "factual basis" that permits the Court to "conclude that the PBGC has reached its decision on the basis of a reasonable accommodation of the policies underlying ERISA." *Rettig*, 744 F.2d at 156. Put differently, "it must provide some basis in the record . . . to conclude that the agency 'considered the matter in a detailed and reasoned fashion.'" *Id*. (quoting *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 865 (1984)).

## III.    PBGC's Termination Decision

### A.      The Settlement Agreement: Section 1342(a)(4)

Although PBGC's initial motion for summary judgment is noticeably silent with respect to the Agreement as a grounds for its decision to terminate, it has conceded in its reply brief and during oral argument that it considered the potential loss of the benefits of the Agreement as a

basis for invoking § 1342(a)(4).[14]  (*See* Def.'s Reply at 7-8; 1/5/06 Tr. at 22.)  In particular,

PBGC argues that "the Settlement Agreement indisputably was part of the financial landscape

affecting the company, the agency, and the agency's liabilities with respect to the FA Plan"

(Def.'s Reply at 8), and therefore appropriately constitutes an aspect of "the possible long-run

loss of [the agency] with respect to the plan."  29 U.S.C. § 1342(a)(4).

PBGC's argument that it is permitted to consider the potential benefits of an agreement

crafted under § 1367 as a basis for termination under § 1342(a)(4) is troubling.  When reviewing

PBGC's interpretation of ERISA, courts typically apply the *Chevron* doctrine.  *See, e.g., LTV

Corp.*, 496 U.S. at 647.   Under *Chevron*, a court must first determine "whether Congress has

directly spoken to the precise question at issue."  467 U.S. at 842.  If so, both the agency and the

court must give effect to Congress' intent.  *Id*.  If not, the court must further consider "whether

the agency's answer is based on a permissible construction of the statute."  *Id*. at 843.  Section

1342(a)(4) grants PBGC the authority to terminate a pension plan when "the possible long-run

loss [to PBGC] *with respect to the plan* may reasonably be expected to increase unreasonably if

the plan is not terminated."  29 U.S.C. § 1342(a)(4) (emphasis added).  Since it is not clear on the

_____

[14] Its belated concession is necessary in view of the record, which makes clear that PBGC
considered the potential loss of the benefits from the Agreement as a basis for invoking
§ 1342(a)(4).  (*See* AR 7-8, 11, 31-33.)  For instance, PBGC staff relied heavily on Greenhill's
May 12, 2005 report entitled "FA Plan Recovery Analysis" (AR 135-150), in concluding that the
Agreement was a net benefit to the agency over its likely recovery in a bankruptcy proceeding.
In its June 16, 2005 recommendation to the TWG, DISC staff noted that "[w]ithout immediate
termination, the likelihood of United successfully proposing a POR [Plan of Reorganization] is
reduced, and this puts the agreement, and therefore PBGC's recoveries under it, at greater risk."
(AR 33.)  The risk of losing the benefits of the Agreement was also discussed at a June 21, 2005
meeting of the TWG, which adopted DISC's position in its recommendations to Executive
Director Belt.  The TWG cited as a basis for termination under § 1342(a)(4) the "significant
increase to PBGC's long-run loss . . . if Plan termination is delayed because such a delay places
PBGC's Agreement at risk."  (AR 7.)

face of the statute whether "long-run loss . . . with respect to the plan" includes benefits to the agency from a § 1367 agreement unrelated to the plan, the Court must proceed to step two of *Chevron* and consider whether the agency's interpretation is reasonable. *See*, *e.g.*, *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C. Cir. 2005) ("[T]he agency's statutory interpretation is entitled to deference as long as it is reasonable.").

The case law interpreting § 1342(a)(4) is sparse. Courts that have considered PBGC's authority under the provision have uniformly agreed that when the agency determines that it faces a "possible long-run loss . . . with respect to the plan," *id.*, it is "expressly authorized to terminate" the plan. *Republic Techs. Int'l*, 386 F.3d at 667; *see also Allied Pilots Ass'n*, 334 F.3d at 98; *PBGC v. Heppenstall Co.*, 633 F.2d 293, 296-97 (3d Cir. 1980). This analysis adds little to our inquiry, for it merely repeats the statute. Moreover, legislative history sheds little light on the problem. *In re UAL Corp.*, 332 B.R. 858, 862-63 & n.2 (N.D. Ill. 2005). *See generally* Legislative History of the Employee Retirement Income Security Act of 1974, Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 94th Cong., 2nd Sess. (1976).

Thus, the Court must attempt to discern from the language of the statute and the policies underpinning its enactment whether the potential loss of benefits from a negotiated settlement agreement constitutes a permissible form of "long-run loss" within the meaning of § 1342(a)(4). Section 1342(a)(4) provides that the "possible long-run loss" must be "with respect to the plan," suggesting that consideration of benefits and losses external to the plan to be terminated would be inconsistent with the statutory scheme. PBGC does not dispute that the Agreement, taken as a whole, is external to the FA Plan. PBGC describes the Agreement as resolving "myriad issues," including "PBGC's claims in United's bankruptcy proceeding, liens PBGC had placed on non-

-14-

debtor subsidiaries, rights to set off, the time and manner of approving replacement plans . . . and

a process by which the United pension plans might be terminated." (Def.'s Mot. at 9.)  Further,

at oral argument, defense counsel admitted that aspects of the Agreement are "unrelated" to the

FA Plan. (1/5/06 Tr. at 37-39.)  Instead, the agency instructed Greenhill to attempt to quantify the

benefits of the Agreement attributable to the FA Plan.  (*Id*. at 38.)  (*See* FA Plan Recovery

Analysis (May 12, 2005) AR 135-50.)  The agency misses the point, however, because even if

PBGC were capable of apportioning the value of a comprehensive settlement, which PBGC's

counsel called "incredibly difficult" (1/5/06 Tr. at 37), the statute does not appear to contemplate

that "long-run loss . . . with respect to the plan" can encompass factors distinct from the financial

health of the plan itself.  Indeed, if § 1342(a)(4) were read to permit PBGC to consider the loss of

benefits from a settlement agreement as "long-run loss," the agency could use its own $23 billion

deficit (*see supra* note 10) and a favorable settlement to justify termination of a plan that might

not otherwise meet the termination requirements of § 1342.  In effect, grounds for termination

would become virtually limitless, rendering the four factors set forth in § 1342(a)(1)-(4)

meaningless.

This conclusion is buttressed by the statutory policies that animate ERISA.  In addition to

its affirmative duty to make payments to the beneficiaries of terminated pension plans, 29 U.S.C.

§ 1302(a)(2), PBGC is charged by statute "to encourage the continuation and maintenance of

voluntary private pension plans for the benefit of their participants," 29 U.S.C. § 1302(a)(1), and

"to maintain premiums [paid by plan sponsors] at the lowest level consistent with carrying out its

obligations under this subchapter." 29 U.S.C. § 1302(a)(3).  While these goals are largely

consistent, in some circumstances they necessarily conflict with one another.  That is, where

delaying termination might result in increased liability for PBGC, the agency has an incentive to terminate immediately rather than "to encourage the continuation" of the plan.  *See  A-T-O Inc.*, 634 F.2d at 1021.  As the D.C. Circuit has recognized, however, "keeping down the costs of termination insurance" is "necessarily secondary" to "protecting the legitimate expectations" of plan participants.  *Rettig*, 744 F.2d at 155.  To permit PBGC to consider financial benefits external to the plan itself would elevate PBGC's interest in protecting its own bottom line above its obligation to encourage the continuation of existing plans.  Therefore, the Court concludes that PBGC's reliance on the Agreement in deciding to terminate the FA Plan is not a "permissible construction" of § 1342(a)(4), *Chevron*, 467 U.S. at 842-43, because it does not "represent[] a reasonable accommodation of conflicting policies . . . committed to the agency's care by the statute." *United States v. Shimer*, 367 U.S. 374, 383 (1961).[15]

---

[15] Having found that the value of the Agreement cannot be relied on to terminate the plan under § 1342(a)(4), plaintiff's arguments (*see* Pl.'s Opp. at 35-38) attacking Greenhill's May 12 analysis are largely irrelevant, since whether the net benefits under the Agreement are $123 million or $39 million cannot be used to assess the validity of the termination decision. Moreover, contrary to plaintiff's arguments (*see* Pl.'s Opp. at 22-28), the bargaining chips the agency used in trying to improve its position in the settlement negotiations do not doom the termination decision.  First, as all courts that have addressed the issue have recognized, the "[A]greement . . . did not terminate the plan.  It simply provided for PBGC to initiate a review to determine whether PBGC should terminate the plan under § 1342." *In re UAL Corp.*, 428 F.3d at 683.  Also, Congress has not prohibited plan sponsors and PBGC from "pursuing § 1367 negotiations . . . that leads to PBGC considering if it should terminate a plan under § 1342." *Id*. Second, PBGC stood to reap the benefits of the Agreement whether the plan terminated under either § 1342 or § 1341, which militates against any finding that PBGC misused its § 1342 authority in negotiations.  Similarly, plaintiff's argument that the Agreement violated the need for a plan-by-plan termination decision (*see* Pl.'s Opp. at 28) misses the mark, for while the termination decision may need to be justified by an analysis of a specific plan (which is in fact what Greenhill did in its May 18 analysis), there is no statutory basis for engrafting that requirement onto negotiations under § 1367.

B. ____Escalating Liability: Section 1342(a)(4)

The agency's second rationale for termination under § 1342(a)(4) -- escalating liability in the amount of $3.3 million per month -- rests on stronger footing.  Under this rationale, the agency concluded:

> A significant increase in guaranteed benefits will occur due to the grow-in of an early retirement subsidy, further accruals of guaranteed benefits in 2005, and payment of non-guaranteed benefits in 2005 to current retirees -- all of which occur in the absence of United making any funding contributions to the FA Plan.  Accordingly, PBGC will incur losses at a rate of $3,310,000 a month if the FA Plan does not terminate immediately.

(AR 7.)  Since the agency had concluded that termination of the FA Plan was "highly likely" to occur (AR 7), it found that § 1342(a)(4) had been satisfied because "the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the Plan is not terminated." 29 U.S.C. § 1342(a)(4).

As is clear from the language of this test under § 1342(a)(4), the agency has substantial discretion to decide when to "nip a plan's increasing losses and thereby reduce PBGC's exposure to mounting liabilities."  *In re UAL Corp.*, 428 F.3d at 681.  Indeed, "courts have never required PBGC to produce evidence indicating the impact of additional liabilities on its insurance fund." *Republic Techs. Int'l*, 386 F.3d at 667.  Rather, one court, applying an abuse of discretion standard to PBGC's determination, has found that a "substantial increase in potential liability, with no certain prospect that such potential liability can be recouped, should be regarded under this statute as unreasonable."  *In re Pan Am. World Airways, Inc.*, 777 F. Supp. 1179, 1183 (S.D.N.Y. 1991).  That court found an increase in such liability to the agency of only $700,000 per month constitutes a "substantial increase."  *Id.*

-17-

AFA does not dispute PBGC's financial predictions regarding the per month cost of the FA Plan.  Nonetheless, it argues that PBGC acted arbitrarily and capriciously by reversing positions in this litigation regarding its risk of incurring such losses.  (Pl.'s Reply at 13-16.)  It is well-established that "an agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so."  *Wisc. Valley Improvement Co. v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001).  At the June 3, 2005 preliminary injunction hearing before this Court, counsel for PBGC stated that if an involuntary § 1342 termination failed, "United would undoubtedly resuscitate the distress termination process." (6/3/05 Tr. at 9.)  The Court then asked whether, "[a]ssuming they went through the 1341 . . . proceedings, it would be basically retroactive back to 6/30/05?"  (*Id*. at 11.)  Counsel for PBGC responded, "Correct."  (*Id*.)  If so, according to AFA, PBGC faced no increased risk of long-run loss from a delay in termination because plan participants would have no expectation interest in benefits accruing after June 30.  (Pl.'s Reply at 14.)  In response, PBGC argues that "even if United did revive its distress termination motion, it might not have prevailed on June 30, 2005 as the termination date.  The only way for PBGC to ensure the June 30 date was to initiate involuntary termination."  (Def.'s Reply at 11.)  At oral argument, counsel for PBGC explicated the "litigation risk" involved in relying on  a § 1341 proceeding instead of an involuntary termination under § 1342:

> participants could challenge the date and . . . say . . . once United had withdrawn its distress motion, that our expectation of that date went away . . . . [T]he jurisprudence of plan termination date litigation is not straightforward, and there is a litigation risk that, if the distress termination process was reached starting now, that we wouldn't get the 6/30 day.  We would argue for it most likely, but we may or may not get it.

(1/5/06 Tr. at 16-17.)  By initiating involuntary termination in June, "there is no question about the termination date . . . .  So, in acting in that way, we are preserving the $3.31 million per month."  (*Id*. at 25-26.)

In addition to the unpredictabilities relating to the termination date, there are additional reasons for the agency to avoid a contested § 1341 proceeding in favor of an involuntary termination under § 1342.  Contested proceedings under § 1341 are inevitably more costly.  Not only does the agency bear the expense of litigation, but the extensive actuarial analysis required to resolve a § 1341 motion is paid for out of plan assets, thereby depleting the recovery available to the agency.  (1/5/06 Tr. at 14-15.)  Furthermore, a contested proceeding delays the reorganization and creates uncertainty with respect to the debtor's financial prospects upon reorganization, impeding the debtor's attempt to obtain the exit financing.  (*Id*. at 6, 8, 14-15; AR 17, 30, 32-33.)

ERISA does not require the agency to presume the outcome of a contested litigation.  Rather, it authorizes PBGC to terminate a pension plan based on a "*possible* long-run loss."  29 U.S.C. § 1342(a)(4) (emphasis added).  As such, the agency need not have perfect information regarding either the exact amount of increased liability or the probability that the agency will have to assume this liability.  In this case, PBGC staff assessed the risk and costs to the agency of delaying termination.  Armed with those figures, the agency chose, as it was entitled to do, to invoke its power to involuntarily terminate under § 1342 instead of waiting for the resolution of a § 1341 termination.  Such determinations regarding the amount of loss the agency is willing to risk are precisely the sort of discretionary decisions about which a "court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  The Court

therefore concludes that PBGC's decision to terminate based on § 1342(a)(4) is reasonable under the APA.

### C.    Chronic and Severe Underfunding: Section 1342(a)(2)

PBGC also relied in its NOD on § 1342(a)(2), which permits the agency to terminate if it determines that "the plan will be unable to pay benefits when due."  29 U.S.C. § 1342(a)(2).  The FA Plan was severely underfunded, to the tune of $2 billion in unfunded benefit liabilities, including $1.7 billion in guaranteed benefits.  (Def.'s Facts ¶ 18.)  United's debtor-in-possession ("DIP") agreement did not permit the payment of minimum funding contributions, meaning that the FA Plan's funded ratio would continue to deteriorate until United's exit from bankruptcy.  (AR 128.)  United had not made any pension contributions since July 2004 and was not expected to make any more.  (AR 1445-46.)  As a result, the FA Plan was funded for only 43.3% of its guaranteed benefits at the time PBGC issued its NOD.  (AR 128.)

The FA Plan's chronic and severe underfunding was known to PBGC long before it decided to terminate.  "Given the concerns and responsibilities facing PBGC plus United's deteriorating financial situation, PBGC carefully monitored the health of United's pension plans during the bankruptcy."  *In re UAL Corp.*, 428 F.3d at 681.  The state of United's pension plans was "literally a daily conversation" within PBGC.  (1/5/06 Tr. at 28.)  No one contests that the FA Plan was severely underfunded.  Nevertheless, in light of the agency's repeated assertions that the FA Plan could and should survive United's bankruptcy (Pl.'s Facts ¶¶ 20, 27), AFA challenges the timing of the agency's decision to initiate termination.  In AFA's view, PBGC's motivation to terminate when it did was irrational because it was done to secure the benefits of

the Agreement.[16]  (1/5/06 Tr. at 45, 48, 58.)  According to plaintiff, "the settlement agreement was the trigger for the affordability analysis" that led to the termination (*id*. at 58), whereas PBGC contends that its termination decision was the product of a host of changed circumstances. (Def.'s Reply at 9-12.)  In essence, the question posed is this: given the agency's knowledge of the dramatic underfunding of the FA Plan throughout the United bankruptcy proceeding, were there sufficient changed circumstances to provide a rational basis for the agency to shift its position from defending the plan's affordability to terminating it?  The answer is clearly yes.

The tide began shifting against retention of the FA Plan at least by March 2005, if not before.  Greenhill's "worst case scenario" analysis in December 2004 assumed a fuel price of $55 per barrel in 2005 and declining thereafter.  (Pl.'s Facts ¶ 18; *see also* Kramer Decl. ¶ 28, AR 838-39.)  The price of crude oil passed $50 per barrel on March 5, 2005.  On March 17, the price of crude closed at an all time high of $57.60.[17]  (AR 632.)  In addition, March brought confirmation that United would not seek an IRS funding waiver for mandatory pension payments for the 2004 plan year, and United's cash flow would therefore be reduced upon exiting bankruptcy if the FA Plan were still in place.  Further complicating matters for the agency, in an unrelated bankruptcy proceeding in Delaware, the district court reviewed a company's distress termination motion and, on March 30, 2005, held that a bankruptcy court can consider the

---

[16] AFA also asserts that PBGC's reversal of position with regard to the affordability of the FA Plan is not satisfactorily explained in the record (Pl.'s Reply at 11), itself a ground for finding the agency's action to be arbitrary and capricious.  *See Wisc. Valley Improvement*, 236 F.3d at 748.  As the discussion of the changed circumstances leading to PBGC's termination decision shows, the record clearly explains why PBGC abandoned its prior position.  *See infra* at 21-24.

[17] At the time that United refiled its § 1113 motion on April 11, fuel prices were more than 20% higher than its previous Gershwin 5.F projections.  (AR 631-35.)

cumulative affordability of all the company's pension plans, rather than conduct a plan-by-plan

analysis, in order to assure equitable treatment of employees and retirees.  *PBGC v. Kaiser*

*Aluminum Corp.*, 2005 WL 73551, *2-3 (D. Del. Mar. 30, 2005).  This decision, which had been

strenuously opposed by PBGC, threatened PBGC's entire strategy for salvaging the FA Plan,

which was premised on the assumption that one plan could be retained even if the others were

not.  (*See* Kramer Decl. at 4, AR 825.)  If the bankruptcy court in Illinois followed *Kaiser*

*Aluminum*, PBGC was convinced that the FA Plan would terminate, as two of United's other

plans had already been terminated.  (AR 32, 703; 1/5/06 Tr. at 30.)  Thus, entering April, the FA

Plan's prospects for survival had become dim.

Matters did not improve in April.  Oil prices reached $58.28 on April 4.  (AR 632.)

Moreover, oil futures projected a sustained price spike for several years, contrary to prior

predictions of price reductions in 20006 and 2007.  (*Compare* AR 130 *with* AR 631.)  Thus, not

only was Greenhill's downside scenario too optimistic for the short term, it was dramatically so

for the long term.  (*Compare* AR 130 *with* AR 838-39.)  On April 11, United filed its

Supplemental Memorandum in support of its motion for distress termination with the bankruptcy

court.  (AR 617-780.)  United's Memorandum detailed the impact of rising fuel costs and

increased competitive pressures -- factors that would drive Greenhill's revised analysis in May.

(AR 129-34.)  United's filing demonstrated the flaws in Greenhill's prior December 2004

analysis and the likelihood that the company would succeed in its distress termination motion.

(AR 704 n.228, 706.)  In addition, United had issued roughly $755 million in debt securities to

its union members, further reducing its ability to afford the FA Plan.  (AR 131-32.)  Moreover,

the agency was well aware of United's representations that its ability to obtain exit financing

would be dependent on the termination of its pension plans.[18/]   (AR 706.)  And, although the

agency continued to maintain its litigation posture of opposing United's motion on the grounds it

was "premature," it recognized the new financial realities, stating: "United's financial picture

may get grimmer, in which case PBGC could very well conclude that it would not oppose the

distress motion."  (AR 609, 614.)  Finally, the agency recognized that it would have a further

ground for termination under § 1342(a)(1) on September 15, 2005, if United failed to make a

mandatory minimum funding payment, which was inevitable given United's DIP financing

restrictions.  (AR 13-14.)

Thus, as of June 2005, the agency was confronted with what it perceived as a high

probability of termination as of September 15 under § 1342(a)(1)[19/] or a § 1341 distress

termination at some future date that could be retroactive to June 30.  Based on these prospects, it

reasonably concluded that it was in the agency's interest to initiate an involuntary termination as

soon as possible in order to assure itself of the June 30 date.  (AR 27-28.)  *See In re UAL Corp.*,

428 F.3d at 681; *Republic Techs. Int'l*, 386 F.3d at 667-68.

Despite these documented changed circumstances, AFA characterizes Greenhill's May

18, 2005 analysis of the affordability of the FA Plan as "driven by the Settlement Agreement to

reach a certain result."  (1/5/06 Tr. at 48.)  Such an argument, however, ignores the new financial

realities surrounding the FA Plan, and United's prospects for prevailing at a § 1341 proceeding.

---

[18/] At some point, Greenhill and agency officials independently verified these predictions
by participating in meetings with the likely lenders.  (AR 30; 1/5/06 Tr. at 32.)

[19/] As is clear from the record, the agency considered the possibility of a § 1342(a)(1)
termination, but it decided to go forward quickly under §§ 1342(a)(2) and (4) because it was in
"PBGC's interest to terminate the Plan sooner rather than later" given the monthly losses to the
agency.  (AR 20.)

Greenhill acknowledged the deleterious impact of increased fuel costs on United's cash flow and liquidity.  (AR 133-34.)  It discussed the negative effects of increased competition from low-cost carriers and pricing pressures from other major carriers.  (AR 131.)  It noted how the $755 million of debt securities issued to United's labor groups would increase debt and interest expenses when United exited bankruptcy, further reducing the company's ability to afford the FA Plan.  (AR 131-32.)  Moreover, as PBGC's decision-making process continued into June, the price of oil had continued to rise to nearly $60 per barrel.  (AR 15.)  *See* NYMEX Light Crude Oil Monthly Price Chart, *available at* http://futures.tradingcharts.com/chart/CO/M.

In light of the dramatic shift in the legal and financial landscape, AFA's assertion that the Agreement was the impetus for PBGC's termination decision simply takes too narrow a view. PBGC's assessment under § 1342(a)(2) was a reasonable conclusion based on the information available to the agency at the time it made its decision, and thus, it cannot be considered as arbitrary and capricious under the APA.

AFA nonetheless argues that even if PBGC had grounds for terminating, it was irrational to act precipitously without the data that it had identified on April 11 as being necessary for performing an accurate affordability analysis.  (Pl.'s Opp. at 39; 1/5/06 Tr. at 46.)  AFA's argument is predicated on the assumption that termination under § 1342 requires the agency to complete an updated § 1341 affordability analysis.  (*See* 1/5/06 Tr. at 66-68.)  Plaintiff's premise, however, is faulty.

First, under § 1342, the test is not affordability, but rather whether the plan will be "unable to pay benefits when due."  29 U.S.C. § 1342(a)(2).  The latter standard encompasses a range of factors that permit the exercise of discretion by the agency, whereas the concept of

-24-

affordability within a § 1341 bankruptcy proceeding is far more demanding.  29 U.S.C.

§ 1341(a)(2)(B)(ii)(IV) (a plan is unaffordable and may be terminated in a reorganization

proceeding only if the plan sponsor "will be unable to continue in business outside the Chapter

11 reorganization process").  Thus, while a § 1342(a)(2) termination decision that failed to

consider the financial health of the plan and its sponsor would likely be arbitrary and capricious,

the agency's failure to wait for an updated business plan and plan of reorganization before doing

its affordability analysis does not violate ERISA.

Second, an agency is not required to delay action while awaiting ever more current

information.  For, to "characterize the actions of [PBGC] as 'arbitrary or capricious' in light of

the facts then available to it . . . is to deprive those words of any meaning," *Vt. Yankee Nuclear*

*Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 554 (1978), and "to require

otherwise would render agency decisionmaking intractable, always awaiting updated information

only to find the new information outdated by the time a decision is made."  *Marsh*, 490 U.S. at

373.  As noted, PBGC faced litigation risks related to the plan termination date and the agency's

potential liability if it failed to act immediately.  The agency used the most current information

available to it to update United's existing business plan.[20]  AFA's assertion that United's updated

---

[20] AFA contends that PBGC failed to consider information available to it at the time
Greenhill conducted its affordability analysis, specifically, whether United's ability to allocate to
PBGC $1.5 billion in stock and notes demonstrated its ability to sustain the FA Plan.  (Pl.'s Opp.
at 41.)  The whole purpose behind issuing notes upon termination of the plans, however, was to
minimize United's current liabilities until a future point in time when United hoped to be better
positioned to afford them.  (1/5/06 Tr. at 10.)  Retaining the FA Plan rather than issuing notes to
PBGC would do nothing to diminish United's immediate financial obligations upon exiting
bankruptcy.  (*Id*. at 10-11.)  Moreover, the value of the notes and stock is dependent on the
success of United's reorganization and its future financial success.  Thus, the Court is unable to
accept the argument that their present value should be treated as an indicator of United's ability
to maintain the FA Plan when the bankruptcy proceedings are over.

business plan, Gershwin 6, would have demonstrated the affordability of the FA Plan (Pl.'s Opp. at 38-42), regardless of its dubious validity in hindsight, was pure speculation at the time PBGC was making its decision.   Therefore, it was reasonable for the agency to use the best available information at the time.

Finally, to insist that the agency delay plan termination in the hopes of improved financial projections flies in the face of the statutory purpose of minimizing PBGC's overall liability. If PBGC were required to delay its decision until a final business plan or plan of reorganization is filed, despite the existence of valid bases for termination under § 1342, the agency would lose needed flexibility by being forced to postpone its decisionmaking until the § 1341 proceeding is close at hand.   This is exactly the scenario that the statute meant to prevent by providing an alternative to a § 1341 proceeding so that the agency could halt the accrual of benefits, and thereby "safeguard [the] insurance system for the benefit of future employees."   *Republic Techs. Int'l*, 386 F.3d at 668.

### D.   Did the Settlement Agreement Taint the Termination Process?

Having determined that two of the agency's three stated rationales for terminating the FA Plan are valid under ERISA and the APA, the Court must now consider whether the agency's ultimate decision was nonetheless tainted by its reliance on the loss of the settlement benefits as a grounds for termination under §1342(a)(4).   "When an administrative decision is based on inadequate or improper grounds, a reviewing court may not presume that the [agency] would have made the decision on other, valid grounds."   *Am. Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272, 1278 (D.C. Cir. 1981).   This rule "prevents a court from improperly substituting its judgment and evaluation for that of the responsible agency."   *Salt River Project Agric.*

-26-

*Improvement and Power Dist.v. United States*, 762 F.2d 1053, 1060 n.8 (D.C. Cir. 1985).

"When an agency relies on a number of findings," however,

> one or more of which are erroneous, we must reverse and remand
> only when there is a significant chance that but for the errors the
> agency might have reached a different result.  When it is clear that
> based on the valid findings the agency would have reached the
> same ultimate result, we do not improperly invade the
> administrative province by affirming.

*Id*.  "Only when the [agency] states but a single incorrect ground . . . will the removal of that

ground require a remand for further consideration."  *Commc'n Workers of Am., Local 5008 v.

NLRB*, 784 F.2d 847, 851-52 (7th Cir. 1986).  Where, as here, the agency provided multiple

grounds for its decision, the agency must be affirmed "so long as any one of the grounds is valid,

unless it is demonstrated that the agency would not have acted on that basis if the alternative

grounds were unavailable."  *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003).

AFA argues that the record shows that the agency has failed the *Salt River* test, since the

Agreement "informs the entire course of conduct through the time of their decision . . . . [Y]ou

can't separate that out from what happened here."  (1/5/06 Tr. at 64.)   In particular, AFA posits

that the Agreement "infected the entire decision," *Dietrich v. Tarleton*, 473 F.2d 177, 179 (D.C.

Cir. 1972), by creating a conflict of interest on the part of agency decisionmakers that deprived

them of objectivity with respect to termination. (Pl.'s Opp. at 29-32; 1/5/06 Tr. at 48-49, 57-59,

61-64.)

In support of this argument, AFA points to Executive Director Bradley Belt's public

statement at the time the Agreement was announced in which he said:  "We believe that this

agreement, under the circumstances, is in the best interests of the pension insurance program and

its stakeholders." (Pl.'s Facts ¶ 44.) Belt also stated that "PBGC and its financial advisors believe the settlement is superior to the recovery the agency would have received as an unsecured creditor in bankruptcy." (*Id*.) According to AFA, Belt's statements demonstrate prejudgment that should disqualify him from later involvement in the termination decision. (Pl.'s Opp. at 30.) Similarly, AFA asserts that individuals who both negotiated the Agreement and were later involved in the termination decision (*i.e.*, Belt, John Spencer, Jeff Cohen and the Greenhill advisors) were unable to "exercise the independent judgment required of them."[21] (*Id*. at 29.)

AFA relies on *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970), in which the Chairman of the Federal Trade Commission gave a speech in which he commented unfavorably regarding a party whose appeal was currently pending before him. *Id*. at 589. The D.C. Circuit held that the Chairman should have recused himself, finding that his comments could "have the effect of entrenching [him] in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record." *Id*. at 590. Yet, the decisions of administrative officials are granted a "presumption of regularity." *Citizens to Pres. Overton*

---

[21] The AFA further argues that Greenhill's May 12 and 18 analyses were tainted by the $3 million "completion fee" it stood to gain when United successfully exited bankruptcy. (*Id*. at 31.) This claim merits little discussion. The Supreme Court has ruled that when a judge decides a case in which he or she has a "direct, personal, substantial, pecuniary interest," a violation of due process has occurred. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). AFA would have the Court extend this precedent to Greenhill, a non-governmental consultant retained to provide financial advice. The Court need not reach that issue, however, because Greenhill's $3 million completion fee in no way constitutes a "direct, personal, substantial, pecuniary interest." Greenhill stands to receive the completion fee at the time United exits bankruptcy, regardless of the outcome of the § 1342 proceeding. That Greenhill might receive the completion fee slightly sooner if a distress termination proceeding is avoided is not a substantial enough interest to create the bias described in *Tumey*.

*Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also PLMRS Narrowband v. FCC*, 182 F.3d 995, 1002 (D.C. Cir. 1999) ("An administrative official is presumed to be objective and mere proof that he or she has taken a public position . . . cannot overcome that presumption.") (internal quotation marks and alterations omitted).  Thus, an agency official should be disqualified "only when there has been a clear and convincing showing that the [individual] has an unalterably closed mind on matters critical to the disposition of the proceeding."  *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979).

This high standard cannot be met here.  Executive Director Belt's public comments spoke only to his support for the Agreement, not to the related but independent issue of whether the termination criteria set forth in § 1342(a)(1)-(4) were satisfied.  As the record makes clear, the agency stood to reap the benefits from the Agreement whether the FA Plan was terminated under § 1342 or § 1341.  Had the evidence demonstrated that the FA Plan did not meet the statutory requirements for an involuntary termination, the agency could have still received the benefits from the Agreement if United succeeded at a § 1341 proceeding.  Belt's comments do not demonstrate an "unalterably closed mind" on this issue.  More importantly, it was worth far more to the agency for the FA Plan to survive than for the Agreement to be performed.  (1/5/06 Tr. at 13.)  The Agreement provided PBGC with $1 billion in notes, of which $500 million is contingent on United meeting certain financial targets, and $500 million in stock, the value of which is entirely dependent on United's success in reorganization (AR 105-109), against the $1.7 billion in liability assumed by PBGC upon termination.  The overwhelming incentive for the

agency to ensure the survival of the FA Plan if at all possible undermines any perceived bias on the part of Executive Director Belt.

Nor does the record contain evidence sufficient to overcome the presumption of regularity with respect to the members of the negotiating team.  Greenhill, as the financial advisor, merely ran an updated financial analysis in May 2005 reflecting current fuel prices and other relevant economic indicators.  Even AFA concedes that the alleged "bias" of Greenhill stems primarily from the timing of its revised affordability analysis (which was the agency's, not Greenhill's, decision) and not necessarily from the results reached.  (*See* 1/5/06 Tr. at 58-59.)  Though John Spencer, as Director of DISC, was involved in the recommendation to the TWG that PBGC terminate the FA Plan, there is nothing in the record to indicate that "he was unwilling to consider arguments . . . contrary to termination."  *PLMRS Narrowband*, 182 F.3d at 1002. Moreover, the voting members of the TWG who approved DISC's conclusions and recommended termination to Executive Director Belt were not involved in the settlement negotiations.  Thus, the agency took "sufficient steps to insulate the final result[]" from any potential biases stemming from members of the negotiating team.  *Davis v. Mineta*, 302 F.3d 1104, 1113 (10th Cir. 2002).

A claim of bias might be more compelling were it not for the overwhelming evidence of changed circumstances justifying PBGC's decision.  The FA Plan was only 45% funded with respect to guaranteed benefits, and only 42% funded overall.  (AR 31.)  The agency was well aware that the financial condition of the FA Plan was likely to deteriorate further because United had announced its intention not to make any further contributions.  (AR 31.)  Without any reference to the Agreement, these facts constitute a valid basis for involuntary termination under

§ 1342(a)(2).  Moreover, faced with declining economic prognostications and an unfavorable legal environment following the decision in *Kaiser Aluminum*, the agency could reasonably conclude that its chances of stopping a distress termination were virtually nil.  PBGC was aware that for each month the FA Plan remained active, the cost to the agency should the Plan eventually terminate was $3.3 million per month.  (AR 32.)  Therefore, even ignoring the impact of the Agreement, the agency had multiple grounds for termination under § 1342(a), and this Court cannot conclude that it is clear that PBGC  "would not have acted," *BDPCS*, 351 F.3d at 1183, to terminate the FA Plan were it not for the Agreement.

The Court's conclusion is consistent with the case law.  For instance, in *Mail Order Ass'n of Am. v. United States Postal Serv.*, 2 F.3d 408 (D.C. Cir. 1993), the D.C. Circuit upheld a decision by the Postal Ratemaking Commission (PRC) despite the fact that one rationale for PRC's decision was subsequently undermined by a report that PRC filed with Congress.  *Id*. at 433-34.  The Court stated that when "an agency relies on multiple grounds for its decision, some of which are invalid," an agency action may be sustained as long as "one is valid and the agency would clearly have acted on that ground even if the other were unavailable," *id*. at 657 (internal quotation marks omitted), before finding that "the record . . . strongly suggests that the [PRC] would have" made the same decision "even without regard to" the questionable basis.  *Mail Order Ass'n*, 2 F.3d at 434 (quoting *Syracuse Peace Council v. FCC*, 867 F.2d 654, 657 (D.C. Cir. 1989)).  Similarly, in *Salt River*, the Court upheld a decision by the Interstate Commerce Commission ("ICC") despite the fact that its ruling was "based in part on erroneous findings . . . because it is clear that the ICC would" reach the same conclusion "based on [other] findings." *Salt River*, 762 F.2d at 1060 n.8.

Even the one case where an agency action was remanded because it was not clear that the agency would have reached the same conclusion in the absence of the invalid basis for its decision provides little help to plaintiff.  In *Am. Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272 (D.C. Cir. 1981), the Department of Transportation ("DOT") promulgated regulations related to handicapped accessibility on public transportation.  *Id*. at 1273-76.  The DOT's regulations were designed to conform to Department of Health, Education and Welfare ("HEW") regulations that mandated "mainstreaming" of handicapped individuals pursuant to § 504 of the Rehabilitation Act.  29 U.S.C. § 794 (Supp. III 1979).  DOT's notice of proposed rulemaking stated that the agency "felt bound by the HEW guidelines to adopt only such options as would constitute 'mainstreaming.'" *Am. Pub. Transit Ass'n*, 655 F.2d at 1275 (quoting 43 Fed. Reg. 25,017 (1976)).  In addition, prior to "publication of the final rules, DOT submitted its draft rules to HEW for approval." *Id*.  In the time between DOT's notice of proposed rulemaking and the issuance of its final rule, however, the Supreme Court rejected HEW's interpretation of § 504.  In *Se. Cmty Coll. v. Davis*, 442 U.S. 397 (1979), the Supreme Court found that while § 504 prohibited discrimination, *id*. at 410, it did not "impose an affirmative action obligation on all recipients of federal funds." *Id*. at 410-11.  Despite other statutory provisions on which the DOT Secretary could have relied to promulgate the regulations, the D.C. Circuit found that "events surrounding the adoption of the . . . regulations strongly suggest that he did not do so, and it would be improper for this court to 'rummage' through the record to resolve a question . . . that should be made by the Secretary in the first instance." *Am. Pub. Transit Ass'n*, 655 F.2d at 1280. Therefore, the Court remanded the matter to DOT.

*American Public Transit* is not analogous to this case.  This is not a case where the agency was "compelled to adopt a policy it prefers to avoid."  *Commc'n Workers of Am., Local 5008*, 784 F.2d 851.  No intervening case law has cast doubt on the grounds for the agency's decision.  Nor must the Court "rummage" through the record for evidence that the agency relied on factors other than the Agreement in making its decision to terminate.  On the contrary, it is clear that each of the three rationales was treated as separate and distinct, and there is no suggestion that the benefits of the Agreement overshadowed the decisionmakers' other valid statutory grounds.  *Id.*

## CONCLUSION

Based on the foregoing analysis, the Court finds that PBGC complied with the dictates of the APA and ERISA in terminating the FA Plan.  Accordingly, defendant's Motion for Summary Judgment is GRANTED and plaintiff's Cross-Motion for Summary Judgment is DENIED.


_____
            s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: January 13, 2006